IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES, | Civil Action No.:  20-cv-8668-VM |
| Plaintiffs, | |
| v. | |
| JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT .................................................................................II

II.     STATEMENT OF FACTS .................................................................................. 2

     A.     Defendants Create and Disseminate Deceptive Robocalls Preying on Historical Fears of Racism through the Use of Insidious Stereotypes.................. 2

     B.     Defendants' Attempts to Intimidate Voters Have Already Been Successful ........ 5

     C.     Plaintiff NCBCP Diverted its Limited Resources to Remediate the Injuries Caused by Defendants' Robocalls to NCBCP's Beneficiaries ............................ 7

     D.     Defendants are Criminally Charged in Michigan for the Underlying Conduct at Issue Here ............................................................................ 8

     E.     A TRO is Necessary Because Defendants have a Long History of Relentlessly Engaging in Fraud and Disinformation Campaigns and have Publicly Trumpeted their Mission to Disrupt the November Election ................. 8

III.     LEGAL STANDARD .................................................................................... 11

IV.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................. 12

     A.     Plaintiffs Are Likely To Show That Defendants Have Violated Section 11(b) of The Voting Rights Act of 1965, 52 U.S.C. § 10307(b) ........................ 12

     B.     Plaintiffs Are Likely to Show That Defendants Have Violated The Ku Klux Klan Act, 42 U.S.C. § 1985(3)................................................................... 15

V.      PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF ............................................................................... 19

VI.     THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN PLAINTIFFS' FAVOR ...................................................................................................... 23

VII.    CONCLUSION ............................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burson v. Freeman,*
  504 U.S. 191 (1992)...........................................................................................1, 24

*Cacchillo v. Insmed, Inc.,*
  638 F.3d 401 (2d Cir. 2011)..............................................................................11, 23

*Coleman v. Board of Educ. of City of Mount Vernon,*
  990 F. Supp. 221 (S.D.N.Y. 1997) ...........................................................................20

*Daschle v. Thune,*
  No. 04-CV-4177, Dkt. No. 6 (D.S.D. Nov. 2, 2004) ......................................13, 14

*Fish v. Kobach,*
  840 F.3d 710 (10th Cir. 2016) ................................................................................21

*Fisk v. Letterman,*
  424 F. Supp. 2d 670 (S.D.N.Y. 2006)......................................................................16

*Forsberg v. Pefanis,*
  634 Fed. App'x 676 (11th Cir. 2015) ......................................................................20

*Freeman & Bass, P.A. v. State of N.J. Comm'n of Investigation,*
  359 F. Supp. 1053 (D.N.J. 1973) .............................................................................19

*Great American Fed. S. L. Assn. v. Novotny,*
  442 U.S. 366 (1979).................................................................................................19

*Griffin v. Breckenridge,*
  403 U.S. 88 (1971)...................................................................................................16

*Kemler v. Poston,*
  108 F. Supp. 2d 529 (E.D. Va. 2000) ......................................................................24

*The Ku Klux Cases*, 110 U.S. 651 (1884).....................................................................16

*Kush v. Rutledge,*
  460 U.S. 719 (1983).................................................................................................16

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub.
  Interest Legal Found.,*
  No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ..............*passim*

*League of Women Voters of North Carolina v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ......................................................................21

*Mahmood v. Nielsen*,
  312 F. Supp. 3d 417 (S.D.N.Y. 2018) .........................................................11

*Mizell v. N. Broward Hosp. Dist.*,
  427 F.2d 468 (5th Cir. 1970) ......................................................................19

*Paynes v. Lee*,
  377 F.2d 61 (5th Cir. 1967) ..........................................................16, 17, 20

*Puerto Rican Legal Def. and Educ. Fund, Inc. v. City of New York*,
  769 F. Supp. 74 (E.D.N.Y. 1991) ...............................................................20

*Reynolds v. Sims*,
  377 U.S. 533 (1964).......................................................................................1

*Reynolds v. Sims*,
  377 U.S. 544 (1964).....................................................................................20

*Smith v. Meese*,
  821 F.2d 1484 (11th Cir. 1987) ..................................................................21

*Spencer v. Blackwell*,
  347 F.Supp.2d 528 (S.D. Ohio 2004) ............................................................1

*People of New York ex rel. Spitzer v. Cty. of Delaware*,
  82 F. Supp. 2d 12 (N.D.N.Y. 2000) ............................................................24

*United States v. Bruce*,
  353 F.2d 474 (5th Cir. 1965) ......................................................................18

*United States v. Clark*,
  249 F. Supp. 720 (S.D. Ala. 1965)..............................................................18

*United States v. Nguyen*,
  673 F.3d 1259 (9th Cir. 2012) .........................................................14, 15, 18

*Wesberry v. Sanders*,
  376 U.S. 1 (1964).........................................................................................25

*Williams v. Rhodes*,
  393 U.S. 23 (1968).......................................................................................24

*Williams v. Salerno*,
  792 F.2d 323 (2d Cir. 1986).................................................................20, 21

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ........................................................................................24

**Statutes**

18 U.S.C. § 912 ...............................................................................................23

42 U.S.C. § 1971(b) .........................................................................................13

42 U.S.C. § 1973i(b) ........................................................................................12

42 U.S.C. § 1985 .............................................................................................20

42 U.S.C. § 1985(3) ................................................................................ *passim*

52 U.S.C. § 10101(b) .......................................................................................13

52 U.S.C. § 10307(b) ...........................................................................1, 12, 14

Civil Rights Act of 1871 ..................................................................................15

Civil Rights Act of 1957 ..................................................................................13

Civil Rights Act § 131(b) .................................................................................13

Ku Klux Klan Act of 1871 ..............................................................11, 14, 15, 16

Title VII ...........................................................................................................19

Voting Rights Act of 1965 § 11(b) ..........................................................*passim*

**Constitutional Provisions**

Fifteenth Amendment .......................................................................................16

**Other Authorities**

Cady & Tom Glazer, Voters Strike Back: Litigating Against Modern Voter
Intimidation, 39 N.Y.U. Rev. of Law & Social Change 173 (2015) ........................13

H.R. Rep. No. 89-439 (1965) ...........................................................................13

*In re Nex Capital Mgmt, LLC and Jacob Wohl*,
NFA Case No. 16-BCC-011 (Mar. 2, 2017), *available at*
https://www.nfa.futures.org/basicnet/regulatory-actions-detail-
doc.aspx?docid=4428&rnd=e340ca2f-284d-4205-9a78-d9a6cda0106c ...............23

The Support or Advocacy Clause of § 1985(3), 133 Harv. L. Rev. 1382 (Feb. 10,
2020) ...............................................................................................................16

## I.       PRELIMINARY STATEMENT

Plaintiffs urgently request that the Court enter a temporary restraining order ("TRO") and a preliminary injunction to prevent Defendants from continuing to make robocalls and engaging in any other types of communications directed at multiple recipients that seek to discourage voters from participating in the November 3, 2020 election (the "November Election").

"[T]he right to exercise the franchise [of voting] in a free and unimpaired manner is preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  The right to vote is so central and important to our democracy that interference with that right, including intimidation, is prohibited by the U.S. Constitution, as well as multiple federal and state statutes. *See, e.g.*, 52 U.S.C. § 10307(b); 42 U.S.C. § 1985(3).  This is because "[v]oter intimidation severely burdens the right to vote." *Spencer v. Blackwell*, 347 F.Supp.2d 528, 535 (S.D. Ohio 2004) (citing *Burson v. Freeman*, 504 U.S. 191, 206 (1992)).

By their own admissions, Defendants are engaged in an assault on the right to vote in the November Election through lies and disinformation, resulting in intimidation of legally registered voters.  Defendants and their co-conspirators have launched a nationwide robocall scheme that involves calling tens of thousands of voters and leaving intimidating voicemail messages containing blatant lies about the consequences that will befall them if they vote by mail in the November Election—that the police will use the voter's identifying information to execute outstanding arrest warrants, that credit card companies will use the information to collect outstanding credit card debt, and that the Centers for Disease Control will use the information to pursue forced vaccines.  While their targets appear to be voters in the Black community, voters of all demographics are affected.  Defendants' deceitful calls instilled fear that would naturally lead voters—who are already afraid to vote in person because of the COVID-19 pandemic—to not vote by mail.  These voters may not vote at all.

1

Plaintiffs include just a handful of these registered voters, out of tens of thousands across the country, who received Defendants' calls and were intimidated by them.  Indeed, Defendants Wohl and Burkman currently face felony charges for this conduct in the State of Michigan—further demonstrating the legitimacy of Plaintiffs' claims and concerns.  As part of those criminal proceedings, Wohl and Burkman are prohibited from conducting robocalls or other mass communications until after the November Election.  Plaintiffs seek to extend that relief beyond the State of Michigan's jurisdiction to enforce bail conditions to ensure that Defendants—career fraudsters who have a demonstrated disregard for the law and have expressed their unwavering commitment to election disruption—are sufficiently deterred to not intimidate voters *anywhere*.  An injunction by this Court is necessary.

## II.     STATEMENT OF FACTS

As detailed below, Defendants have conspired with each other to create and disseminate deceptive robocalls preying on historical fears in the Black community through the use of insidious stereotypes to intimidate the recipients out of voting.

### A.     Defendants Create and Disseminate Deceptive Robocalls Preying on Historical Fears of Racism through the Use of Insidious Stereotypes

Defendants are responsible for a large scale, deceptive robocall campaign aimed at suppressing votes, particularly among Black voters.  *See gen.*, Compl.  In late August, Defendants made thousands of robocalls to voters in multiple states, including Illinois, Ohio, Michigan, New York, and Pennsylvania.  *Id.* ¶ 26.  The robocall left the following message:

> Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay home safe and beware of vote by mail.

*Id.* ¶ 29.

The robocall originated from Defendants.  *Id.* ¶ 27; *see* Declaration of Nancy Hart (the "Hart Decl."), ¶ 5.[1]  "Project 1599," which the robocaller identifies as the source of the calls, is a political operation founded by Burkman and Wohl.  Compl. ¶ 32.  It is not a "civil rights organization" as the robocall claims.  *Id.*

Through the robocalls, Defendants have engaged in threatening and intimidating conduct. *Id.* ¶¶ 23, 26.  The calls make false statements that qualify as intimidation, specifically: (1) stating that vote by mail information will be used by police to track down warrants, which could deter some voters from voting if they or their family members fear police attention; (2) stating that vote by mail information will be used by debt collectors, which could deter some voters from voting if they have debt; and (3) stating that the CDC will use vote by mail information to conduct mandatory vaccination efforts.  *Id.* ¶ 28.  The adverse—albeit false—consequences the robocaller warns about have the potential to make a person fearful of voting by mail and, indeed, have already had the effect of intimidating some voters.  *Id.* ¶ 30; *see also* Declaration of Gene Steinberg (the "Steinberg Decl."), ¶¶ 11-14.  Stating that voting by mail information will be used by police intimidates voters if they or their family members fear attention from law enforcement. Due to a long history of injustice and systemic racism, including the risk of unwarranted violence, many Black voters have legitimate fears of any interaction with law enforcement. Compl. ¶ 33.  Similarly, stating that voting by mail information will be used by debt collectors is

---

[1] The ongoing criminal case in Michigan further affirms that Defendants are the source of the robocall.  In support of its charges, the prosecutor has stated that the State's evidence includes an eyewitness from MessageCommunications, the company which Burkman and Wohl used to disseminate the robocalls, as well as emails originating from Wohl that contained the recording of the robocall in question.  *See* Recording of Jacob Wohl and Jack Burkman's Probable Cause Conference (Oct. 15, 2020), *available at* https://www.youtube.com/watch?v=dyMHDzXEpZ8, beginning at 38:22.

likely also to intimidate voters with debts.  Due to a long history of discriminatory redlining and predatory lending practices, Black populations are disproportionately indebted and have fewer resources to seek recourse from abusive and invasive debt collection practices.  *Id.* ¶ 34.  The claim relating to mandatory vaccines is especially pernicious and harmful, given the history of racist medical experimentation and practices in the U.S., such as the forced sterilization of black women and the Tuskegee syphilis experiment.  *Id.* ¶ 35.  Making these robocalls even more repulsive is the fact that the so-called "warnings" draws on offensive stereotypes.  *See* Hart Decl., ¶ 8.

Similarly, it is likely no coincidence that Defendants' message was delivered by someone who identifies herself as "Tamika Taylor."  That name has been associated by some media outlets (incorrectly) with Breonna Taylor's mother.  Breonna Taylor was a Black woman killed by police in Louisville, Kentucky, earlier this year.  Her story is a key part of the movement for Black lives and racial justice.  Compl. ¶ 31.  The call creates the false impression that it originated from Ms. Taylor's mother, a true civil rights advocate, thus providing it with an aura of legitimacy, particularly to Black voters.  Additionally, the name of Defendants' operation, "Project 1599," may have a similar deceptive effect as some may confuse it with "The 1619 Project"—an initiative developed by the New York Times which documents the history of slavery and racism.  *Id.* ¶ 32.  In fact, Plaintiff Mary Winter was initially deceived and confused the robocaller with the 1619 Project.  *See* Declaration of Mary Winter (the "Winter Decl."), ¶ 6.

Defendants have already placed approximately 85,000 robocalls to potential voters.  Compl. ¶ 39.  They are targeting areas with large populations of Black voters—i.e., those voters with whom Defendants' false statements are likely to resonate the most.  *Id.* ¶ 37.  For example, the Michigan Department of Attorney General reported that Defendants placed nearly 12,000

robocalls to residents in the Detroit area, which is predominantly Black.  *Id.*  Similarly, Attorneys General offices in New York, Pennsylvania, Ohio, and Illinois have similarly reported that Defendants' robocalls reached residents in their states who live in urban areas with significant minority populations, such as New York City.[2]  *Id.* ¶ 38.

### B.   Defendants' Attempts to Intimidate Voters Have Already Been Successful

Defendants' robocall campaign has already had the intended effect of intimidating potential voters.  Mary Winter and Gene Steinberg are residents of Rockland County, New York, where they are both registered to vote.  Winter Decl. ¶ 3; Steinberg Decl. ¶ 3.  Because of the COVID-19 outbreak, they do not think it is safe for them to vote in person.  Winter Decl. ¶ 9; Steinberg Decl. ¶ 8.  They voted in the primary election by mail-in ballot and intended to vote in the November 3, 2020 general election by mail-in ballot.  *Id.*  Although both Ms. Winter and Mr. Steinberg had doubts about the integrity of voting through the mail-in ballot process due to reports they had seen in the media (including whether someone would tamper with their mail-in ballot or violate its secrecy), they were still planning to vote by mail-in ballot.  Winter Decl. ¶¶ 10-11; Steinberg Decl. ¶¶ 9-10.

But Defendants' robocall heightened their concerns about voting by mail.  As Ms. Winters describes it, "[i]f someone is willing to go to the lengths of creating a false robocall to lie and scare people from voting by mail, . . . what else might they be willing to do to block my mail-in ballot[?]"  Winter Decl. ¶ 13.  Mr. Steinberg has the same concerns that Ms. Winter did, but the robocall was particularly "traumatic" for him due to his personal history.  Mr. Steinberg

---

[2] Darrel Rowland, Ohio may pursue men already charged in Michigan over voter intimidation in minority areas, THE COLUMBUS DISPATCH (October 13, 2020), *available at* https://www.dispatch.com/story/news/politics/elections/2020/10/13/ohio-may-pursue-charges-voter-intimidation-minority-areas-against-conservative-trump-supporters/3643566001/.

has a nonviolent criminal conviction from more than 18 years ago.  Given his history with law enforcement, Mr. Steinberg was particularly fearful after hearing the robocall's threat that law enforcement would use mail-in ballots to track voters.  Steinberg Decl. ¶ 13.  In fact, this threat has so "profoundly scared [him]," Mr. Steinberg now has "great anxiety" and is reliving earlier traumas as a result.  *Id.*  Both Ms. Winter and Mr. Steinberg have been intimidated by the robocall to the point where they are no longer voting by mail and instead have decided to vote in person, despite the increased risks of contracting COVID-19.  Winter Decl. ¶¶ 15-16; Steinberg Decl. ¶¶ 14-15.

The intimidating effect of Defendants' robocalls has been felt by the other Plaintiffs as well.  Nancy Hart, a journalist particularly attuned to issues of voter suppression due to her work's focus on the Black community in the Pittsburgh area, was "irate" upon receiving the call because she understood it to be exactly what Defendants intended: a deceptive scheme to scare voters, and particularly Black voters, from exercising their fundamental right.  Hart Decl. ¶ 7.  Ms. Hart was also angry that the robocalls specifically targeted Black voters by preying upon real fears that exist within the Black community about the police, predatory debt collectors, and government-mandated medical programs.  *Id.* ¶¶ 7-8.  Ms. Hart's concerns about the robocall have only grown deeper since receiving the robocall because she has observed others on social media repeating the false information disseminated by the robocall.  *Id.* ¶ 12.

Similar to Ms. Hart, Plaintiffs Sarah Wolff, Kate Kennedy, Karen Slaven, Eda Daniel, and Andrea Sferes each received the call and immediately recognized the nefarious intention behind it: voter suppression.  *See* Declaration of Sarah Wolff, ¶¶ 6-8; Declaration of Kate Kennedy, ¶¶ 7-8; Declaration of Karen Slaven, ¶ 7; Declaration of Eda Daniel, ¶¶ 5-7; Declaration of Andrea Sferes, ¶ 7.

**C.**     **Plaintiff NCBCP Diverted its Limited Resources to Remediate the Injuries Caused by Defendants' Robocalls to NCBCP's Beneficiaries**

Defendants' lawlessness has caused already-stretched organizations to expend their limited resources countering the intimidating effect of the robocalls rather than fulfilling other much needed services to their communities.  Plaintiff National Coalition on Black Civil Participation ("NCBCP") is a prime example.  NCBCP expends significant resources and effort, especially through its program Black Women's Roundtable ("BWR"), both promoting Black participation in the Census and promoting voting and other civic participation by the Black community, including on-the-ground organizing in Detroit.  Compl. ¶ 40; Declaration of Tameka Ramsey (the "Ramsey Decl."), ¶¶ 4-6.

When Defendants began making their robocalls on August 26, 2020, BWR Metro Detroit learned that members of their community were receiving the calls, and they were concerned that the robocalls would intimidate Black voters and lead to the suppression of their votes.  *See* Ramsey Decl., ¶ 7.  BWR Metro Detroit was also concerned that the robocalls would cause more voters to lose trust in mail in voting and instead vote in person, placing a community already hard-hit by COVID-19 at even greater risk.  *Id.* ¶ 8.  BWR Metro Detroit immediately diverted staff and resources that were allocated toward encouraging Census participation to respond to the threat of Defendants' voter intimidation.  *Id.* ¶ 9.  Its co-chair stopped her usual work—helping people fill out their Census forms—so that she could respond to the disinformation.  *Id.* ¶ 10.  As a result, BWR Metro Detroit's efforts to promote Census participation were impaired and fewer people completed the Census.  *Id.*  As the Census has concluded, this harm is irreparable. Compl. ¶ 43.  The diversion of resources harms not only the mission of the NCBCP, but also its constituents in Detroit who risk being undercounted in the Census and consequently losing their fair share of funding and representation associated with the Census count.  *Id.*  NCBCP

anticipates that if Defendants continue to disseminate voter intimidation robocalls, they will need to divert additional resources to protect the communities they serve.  Ramsey Decl. ¶ 11.

### D.  Defendants are Criminally Charged in Michigan for the Underlying Conduct at Issue Here

On October 1, 2020, the Michigan Attorney General announced the filing of felony charges against Burkman and Wohl for the robocalls at issue in this case.[3]  Each was charged with one count of intimidating voters, one count of conspiracy to commit an election law violation, one count of using a computer to commit the crime of intimidating voters, and using a computer to commit the crime of conspiracy.  As a condition of bail, the Michigan court, weighing the need to protect the public from Defendants, prohibited Defendants from "initiat[ing], or caus[ing] anyone else to initiate, any robocalls or other communications directed at multiple recipients until November 4."[4]

### E.  A TRO is Necessary Because Defendants have a Long History of Relentlessly Engaging in Fraud and Disinformation Campaigns and have Publicly Trumpeted their Mission to Disrupt the November Election

The intimidation of voters through fraudulent means is nothing new to Wohl and Burkman.  For years, they have made a full-time job of being venal grifters, whose currency is the suppression of Americans' votes.  The list of Wohl and Burkman's lawless plots is long, and involves the wholesale fabrication of lurid accusations—usually cooked up and paid for by Wohl and Burkman—in order to achieve their admitted goal of disrupting the democratic process:[5]

---

[3] Ohio authorities are also considering pressing charges against Wohl and Burkman for the robocalls made to residents in Ohio.  It is reported that "[a] total of 8,050 robocalls were made and 3,449 answered on Ohioans' phones" from the Defendants.  *See supra*, note 2.

[4] Recording of Jacob Wohl and Jack Burkman's arraignment in Michigan, *available at* https://www.youtube.com/watch?v=X8KUAWLGbZA&feature=emb_err_woyt, beginning at 13:12.

[5] Bridget Read, All of Jacob Wohl's Spectacularly Failed Smear Attempts, THE CUT (May 7, 2020), *available at* https://www.thecut.com/2020/05/who-is-jacob-wohl-failed-smears.html.

- In October 2018, Wohl and Burkman concocted an elaborate, but transparent, plot to smear Special Counsel Robert Mueller (who was then investigating President Donald Trump campaign's connections to Russia) with allegations of rape.[6]

- In February 2019, Wohl, conspiring with Burkman, traveled to Minneapolis to invent an allegation that Minnesota Congressman Ilhan Omar had married her brother. Wohl subsequently faked a death threat against himself (supposedly from an Omar supporter) and filed a complaint with Minneapolis police.[7] It was later revealed that Wohl had sent himself the death threat via a fake profile.

- In April 2019, Wohl and Burkman published claims that then-Democratic presidential candidate Pete Buttigieg sexually assaulted a Michigan college student.[8] The young man recanted the allegations within days and claimed that Wohl had contacted him via Instagram to pitch the fake plot.

- In October 2019, Wohl and Burkman presented a 24-year-old young man who claimed that then-Democratic presidential candidate Elizabeth Warren paid for him to fly to Massachusetts and they engaged in consensual BDSM sex.[9] The ruse was easily proven a fraud when the young man's social media accounts contradicted his statements.

- In March 2020, Wohl circulated information relating to a fake COVID-19 lab test, claiming that Democratic presidential candidate Joseph Biden had tested positive for the virus and that he would die within 30 days.[10]

- In April 2020, Wohl and Burkman convinced a woman to lie to reporters, claiming that she had been sexually assaulted by White House Coronavirus Task

---

[6] Andrew Prokop, The incredibly shoddy plot to smear Robert Mueller, explained, VOX (October 30, 2018), *available at* https://www.vox.com/2018/10/30/18044110/robert-mueller-jacob-wohl-jack-burkman-surefire; Christal Hayes and Gus Garcia-Roberts, This is How Jacob Wohl Created a Sexual Harassment Accusation Against Robert Mueller, USA TODAY (Feb. 26, 2019), *available at* https://www.usatoday.com/story/news/politics/2019/02/26/robert-mueller-hoax-how-jacob-wohl-created-sexual-harassment-plot/2993799002/.

[7] See *supra*, note 5.

[8] Lachlan Markay, Kevin Poulsen, and Noah Shachtman, Far-Right Smear Merchants Try to Slime Pete Buttigieg with Bogus Sex Assault Claim, THE DAILY BEAST (April 29, 2019), *available at* https://www.thedailybeast.com/far-right-smear-merchants-jacob-wohl-and-jack-burkman-try-to-slime-pete-buttigieg-with-bogus-sex-assault-claim.

[9] James Walker, Jacob Wohl Mocked After Claiming Elizabeth Warren Sex Scandal, Says 2020 Candidate Had Affair with 24-Year-Old Marine, NEWSWEEK (October 3, 2019), *available at* https://www.newsweek.com/jacob-wohl-mocked-after-claiming-elizabeth-warren-sex-scandal-says-2020-candidate-had-affair-1462895.

[10] See *supra*, note 5.

Force member Dr. Anthony Fauci in 2014.[11]  The woman admitted to reporters only days later that Wohl and Burkman had paid her to lie.

- In September 2020, Wohl and Burkman orchestrated a plot to stage a fake "FBI" raid on Burkman's home in Arlington, Virginia.[12]  This plot included hiring "actors" through Craigslist for a supposed television pilot.[13]  Burkman then created a false social media account to publicly announce the raid.[14]

Burkman and Wohl's actions are consistent with their stated goals of election interference.  In February 2019, Wohl told USA Today that he is "already plotting ways to discredit Democrats in the November Election with lies and other disinformation, using his large following on social media to cause disarray similar to what Russians did during the 2016 election."[15]  Around the same time, Wohl sought investors on a scheme to use fraudulent news stories "aim[ed] to ultimately suppress turnout" and employ a "voter suppression effort."[16]  To accomplish these goals, Wohl indicated his plan was to "make s**t up."[17]

---

[11] Nancy Rommelmann, She Said Anthony Fauci Sexually Assaulted Her. Now She Says Jacob Wohl and Jack Burkman Paid Her to Lie, REASON (May 7, 2020), *available at* https://reason.com/2020/05/07/she-said-anthony-fauci-sexually-assaulted-her-now-she-says-jacob-wohl-and-jack-burkman-paid-her-to-lie/.

[12] Lachlan Markay, Will Sommer, and Adam Rawnsley, Jacob Wohl Staged Fake FBI Raid on Business Partner, Actor Hired for Production Says, THE DAILY BEAST (Sept. 15, 2020), *available at* https://www.thedailybeast.com/jacob-wohl-staged-fake-fbi-raid-on-business-partner-actor-hired-for-production-says.

[13] *Id,*

[14] *Id.*

[15] Christal Hayes and Gus Garcia-Roberts, This is How Jacob Wohl Created a Sexual Harassment Accusation Against Robert Mueller, USA TODAY (Feb. 26, 2019), *available at* https://www.usatoday.com/story/news/politics/2019/02/26/robert-mueller-hoax-how-jacob-wohl-created-sexual-harassment-plot/2993799002/.

[16] Manuel Roig-Franzia and Beth Reinhard, Meet the GOP Operatives Who Aim To Smear the 2020 Democrats – But Keep Bungling It, WASHINGTON POST (June 4, 2019), *available at* https://www.washingtonpost.com/lifestyle/style/meet-the-gop-operatives-who-aim-to-smear-the-2020-democrats--but-keep-bungling-it/2019/06/04/5b70f000-7691-11e9-bd25-c989555e7766_story.html.

[17] *Id.*

### III.    LEGAL STANDARD

The same legal standard governs both the issuance of preliminary injunctions and temporary restraining orders.  *Mahmood v. Nielsen*, 312 F. Supp. 3d 417, 421 (S.D.N.Y. 2018). Movants must show irreparable harm and either likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and that the balance of hardships decidedly tips towards them.  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011).

Irreparable harm to Plaintiffs (and other voters) will occur in the absence of immediate relief because Defendants' efforts at harassment and intimidation interferes with the right to vote in the November Election.  These voters will be forced into the choice of risking their health by voting in person or not voting at all.  Plaintiff NCBCP (and other organizations) will also be irreparably harmed (as well as the communities it serves) because it will be forced to divert resources from underserved communities to counteract Defendants' fraud.

Plaintiffs are likely to succeed on the merits of their claims under Section 11(b) of the Voting Rights Act of 1965 and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3).[18]  Notably, a court in Michigan has already weighed the merits of enjoining Defendants from making further robocalls and deemed it necessary as part of Defendants' bail conditions to protect the public.[19] An injunction by this Court is necessary to clarify that Defendants' behavior will also not be tolerated outside the jurisdiction of Michigan.  Notably in this regard, the Michigan court has

---

[18] If the Court has any doubt about the merits of Plaintiffs' claims—it should not—injunctive relief is still appropriate because the balance of hardships tips in favor of temporary relief barring Defendants from continuing their intimidation, harassment, and voter suppression efforts.  An injunction barring such unlawful and flagrantly anti-democratic conduct is in the public interest of protecting free and fair elections in which every registered voter can exercise his or her right to vote without fear or intimidation. *See* Section VI, *infra*.

[19] See *supra*, note 4.

raised concerns that Wohl is already violating the conditions of his bail.[20]  Defendants'

lawlessness knows no bounds, and they must be estopped from interfering with the most sacred

of rights: the right to vote.

## IV.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.   Plaintiffs Are Likely To Show That Defendants Have Violated Section 11(b) of The Voting Rights Act of 1965, 52 U.S.C. § 10307(b)

Plaintiffs are likely to prevail on their claim that Defendants have violated Section 11(b)

of the Voting Rights Act ("Section 11(b)").  Section 11(b) states in relevant part: "No person,

whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to

intimidate, threaten, or coerce any person for voting or attempting to vote. . . ."  52 U.S.C.

§ 10307(b) (formerly 42 U.S.C. § 1973i(b)).

Voter intimidation tactics violate Section 11(b)'s prohibition when they are undertaken

by a private person.  The plain language of the statute regulates the conduct of individuals

"whether acting under color of law *or otherwise*. . . ."  52 U.S.C. § 10307(b) (emphasis added).

"[T]he language 'or otherwise' indicates Congressional intent to reach both government and

private conduct under § 11(b)."  *League of United Latin Am. Citizens - Richmond Region*

*Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3 (E.D.

Va. Aug. 13, 2018) ("*LULAC*").

Section 11(b) contains no intent requirement, as to racial motivation or otherwise.  *See id.*

at *4; *see Daschle v. Thune*, No. 04-CV-4177, Dkt. No. 6, at *2  (D.S.D. Nov. 2, 2004)

("[w]hether the intimidation was intended or simply a result of excessive zeal is not the issue, as

the result was the intimidation of prospective Native American voters[.]") (attached as Exhibit

---

[20] Recording of Jacob Wohl and Jack Burkman's Probable Cause Conference (Oct. 16, 2020), *available at* https://www.youtube.com/watch?v=dyMHDzXEpZ8, beginning at 38:22.

A).  Indeed, Congress deliberately omitted any intent requirement and prohibited voter intimidation regardless of an actor's motives.[21]  *See* H.R. Rep. No. 89-439, at 30 (1965) (House report on § 11(b) stating that "[t]he prohibited acts of intimidation need not be racially motivated; … no subjective purpose or intent need be shown"); Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965) (Attorney General Nicholas Katzenbach, a drafter of § 11(b), testifying before the Senate Judiciary Committee that, "Under [the VRA] no subjective 'purpose' need be shown … in order to prove intimidation under the proposed bill.  Rather, defendants would be deemed to intend the natural consequences of their acts."); *see also* Cady & Tom Glazer, Voters Strike Back: Litigating Against Modern Voter Intimidation, 39 N.Y.U. Rev. of Law & Social Change 173, 204-206 (2015) ("The most logical reading of section 11(b), in light of its legislative history and its textual changes from section 131(b), is that it reaches any objectively intimidating conduct without regard to the defendant's intent.").

By its own terms, the operative language of Section 11(b) is broad, not limited to any particular act, and not restricted to overt acts of violence or physical threats.  52 U.S.C. § 10307(b).  As the *LULAC* court observed, "[i]ntimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct."  2018 WL 3848404, at *4 (internal quotation marks and citation omitted).  Thus, Section 11(b) is violated by, among other things, any actual or attempted action to instill fear in connection with one's exercise of his or her right to vote.

---

[21] Prior to the 1965 enactment of the Voting Rights Act, Congress passed the Civil Rights Act of 1957. Section 131(b) of the Civil Rights Act, 52 U.S.C. § 10101(b) (formerly 42 U.S.C. § 1971(b)), prohibited intimidation, threats, and coercion but had the additional requirement that those acts have been undertaken "for the purpose of interfering with the right of such other person to vote or to vote as he may choose."  Congress omitted that language in Section 11(b).

For example, in *Daschle*, the district court granted a temporary restraining order under Section 11(b) (and the Ku Klux Klan Act) against defendants who followed Native Americans at polling sites, wrote down their license plate numbers, and engaged in loud conversations about Native Americans being prosecuted for voting illegally. No. 04-CV-4177, Dkt. No. 6. Similarly here, the robocalls, which falsely state that personal information of those who vote by mail will be used by the police to make arrests, credit card companies to collect outstanding debts, and the CDC in connection with forced vaccines, clearly fall within the prohibitions of Section 11(b), as they instill fear that exercising one's right to vote by mail would lead to adverse consequences, and manipulate voters—through lies— not to exercise their right. In some cases, Defendants' conduct has intimidated voters. But even when voters have not been intimidated, Defendants' *attempts* to intimidate voters by inducing fear violate Section 11(b). *See* 52 U.S.C. § 10307(b) ("No person . . . shall . . . *attempt* to intimidate, threaten, or coerce any person for voting or attempting to vote. . . .") (emphasis added).

Defendants' actions are remarkably similar to those condemned in *United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012). In *Nguyen*, letters were mailed during a congressional campaign to immigrant, Hispanic voters warning that if they voted in the upcoming election, their personal information would be collected by the government and shared with organizations who were "against immigration," and that unlawful voting could lead to incarceration and deportation. *Id.* at 1261. Recognizing that "intimidation" encompasses not only "forcefully coercive" conduct, but also "manipulation and suggestion," the Ninth Circuit held that the mailing could have "constituted a tactic of intimidation" under a California state statute that is virtually identical to Section 11(b). *Id.* at 1265. The false statements in the robocalls at issue, like the mailing in *Nguyen*, intimidate and deceive voters through the use of suggestive threats.

14

Similarly, in *LULAC*, the court found that plaintiffs stated a viable intimidation claim under § 11(b) (and the Ku Klux Klan Act), where defendants allegedly published and publicized reports that falsely accused Virginia voters of committing felony voting fraud by registering to vote and/or voting.  2018 WL 3848404, at *1.  The Court rejected the defendants' argument that the publication of the reports could not amount to intimidation under Section 11(b), finding that "[p]laintiffs have alleged, plausibly, that the [] reports put them in fear of harassment and interference with their right to vote" and, on that basis, stated a cognizable Section 11(b) claim. *Id.* at *4.  The court's reasoning in *LULAC* applies with equal force here.

In sum, Plaintiffs are highly likely to succeed on their claim that Defendants violated Section 11(b).

### B.    Plaintiffs Are Likely to Show That Defendants Have Violated The Ku Klux Klan Act, 42 U.S.C. § 1985(3)

Passed as part of the Civil Rights Act of 1871, the Ku Klux Klan Act creates a cause of action against those who "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" to a candidate for national office. *See* 42 U.S.C. § 1985(3).  Plaintiffs must show: (1) a conspiracy of two or more, (2) to prevent by force, intimidation, or threat, (3) any citizen from giving his or her "support or advocacy" to a candidate—in this instance, by voting—for federal office, and (4) an act in furtherance of that conspiracy.  *See LULAC*, 2018 WL 3848404, at *1, 5–6; *see Kush* v. *Rutledge*, 460 U.S. 719, 724 (1983) (noting that Section 1985(3) "proscribe[s] conspiracies that interfere with" among other things "the right to support candidates in federal elections").

The "support or advocacy" clause protects civil rights in two separate ways.  *First*, it reflects Congress' "power to protect and enforce" the constitutional right to vote.  *See The Ku Klux Cases*, 110 U.S. 651, 665 (1884) (recognizing that the Fifteenth Amendment "confer[s] . . .

the right to vote"). *Second*, it creates an independent cause of action to protect voters, which is both separate and complementary to its ability to vindicate the constitutional right to vote. *See LULAC*, 2018 WL 3848404 at *1, 5–6; *see also Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) ("[T]he sometimes called Ku Klux Act, a Federal right was created to recover damages for interfering with Federal voting rights."). *See generally* The Support or Advocacy Clause of § 1985(3), 133 Harv. L. Rev. 1382 (Feb. 10, 2020).[22]

A violation of Section 1985(3) does not require state action. *Griffin* v. *Breckenridge*, 403 U.S. 88, 96 (1971) ("On their face, the words of [§ 1985(3)] fully encompass the conduct of private persons."). Nor is there an intent requirement. *Kush*, 460 U.S. at 726.

Plaintiffs satisfy all elements of a Section 1985(3) claim. *First*, there is substantial evidence that the defendants conspired together. A conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose. *See Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004). In each robocall, co-conspirator "Tamika Taylor" explicitly says the call is coming from Jack Burkman and Jacob Wohl. The call discusses Project 1599, and the originating phone number is associated with Burkman, as well his lobbying firm, J.M Burkman & Associates, LLC. The pending criminal charges in Michigan against Burkman and Wohl include conspiracy (indicating that law enforcement has sufficient evidence to bring those charges and expects to prove them beyond a reasonable doubt, a higher standard than Plaintiffs here are required to show). Burkman's and Wohl's own public statements support the existence of a conspiracy; during a May 8, 2019 press conference held in front of the Project 1599 headquarters, Defendant

---

[22] The "support or advocacy" clause is distinct from the first two clauses of Section 1985(3)—which are rooted in equal protection theories. The support or advocacy clause has a separate legal history and claims thereunder require different elements than claims under the equal protection clauses.

Burkman stated "Jacob and I are committed to finding the truth; we want you to think of this home . . . as the center for Election 2020"[23] and promised actions to come.[24]  Later during that press conference, Wohl said "of course we want to hurt Democrats"[25] and Burkman then noted that he is personally funding their efforts.[26]

    *Second*, the aim of the conspiracy was clearly intimidation.  The message used veiled threats that police will "track down" robocall recipients, credit card companies will "collect outstanding debts" and the CDC will "track [you] for mandatory vaccines."  These messages made Plaintiffs fearful, caused and dissuaded them from voting by mail, at a time when they are already justifiably fearful of voting in person.  *See*, *e.g.*, Winter Decl. ¶¶ 9-13; Steinberg Decl. ¶¶ 6-12.  Playing on such fears to frustrate voting is unlawful.  *See Paynes*, 377 F.2d at 64 (construing the right to vote broadly as "[t]he right to be free from threatened harm and the right to be protected from violence for an attempted exercise of a voting right are no less protected than the right to cast a ballot on the day of the election").[27]

    It is well settled that voter "intimidation" encompasses a wide range of conduct that would reasonably place an individual in fear and does not require overt displays of physical force or violence.  *LULAC*, 2018 WL 3848404 at *4 ("Intimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct." (internal quotation marks and citation

---

[23] New2Share, Jacob Wohl, Jack Burkman Press Conference on Pete Buttigieg, YOUTUBE (May 8, 2019), available at https://www.youtube.com/watch?v=RK_g0me2CKE, at 16:30.

[24] *Id*, at 28:30.

[25]*Id.*, at 31:30.

[26] *Id.*, at 32:15.

[27] Further, as noted, Section 1985(3)'s "support or advocacy" clause creates an independent cause of action beyond just vindicating the right to vote.  The robocalls will undermine basic trust in the electoral process in general, thereby suppressing the vote and the recipients' inclination to more broadly support or advocate for certain federal candidates.

omitted)); *see also Nguyen*, 673 F.3d at 1259 (describing "intimidation" as not only "forcefully

coercive" conduct, but also "manipulation and suggestion").  The types of such conduct are

legion and can include barring Black citizens from certain property, evictions, or abuses of the

court system.  *See, e.g.*, *United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965) (finding voter

intimidation arose when white landowners ordered Black defendant, an insurance collector active

in encouraging voter registrations, to stay off their propriety, preventing him from reaching

business clients); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (reasoning that

the "inevitable effect" of "baseless arrests, unjustified prosecutions, unwarranted and illegal

injunctions" is deterring individuals from voting).

     *Third*, Plaintiffs, and tens of thousands of other robocall recipients like them, are citizens

who are lawfully entitled to vote.  *See*, *e.g.*, Hart Decl. ¶ 2.  Plaintiffs intended to express their

"support or advocacy" through voting by mail for their preferred candidates.  The robocalls

sought to dissuade Plaintiffs from doing so.

     *Fourth*, at least "one or more [Defendants] engaged" in the conspiracy have "do[ne] or

cause[d] to be done, [an] act in furtherance of the object of such conspiracy."  42 U.S.C. §

1985(3).  Each individual robocall is an act, and the robocalls identify Defendants as their

source.  The robocalls further the purpose of the conspiracy, which is to dissuade some portion of

recipients from voting by mail and, due to the risk of death from voting in person, from voting at

all.  The robocalls thereby prevent Plaintiffs and tens of thousands of others from expressing

their support or advocacy for their preferred candidates.

     Plaintiffs, and doubtless some portion of the tens of thousands of other robocall

recipients, have been injured by Defendants.  Plaintiffs Winter and Steinberg both heard

Defendants' robocall and were intimidated by it.  Winter Decl. ¶ 12; Steinberg Decl. ¶ 11.  As a

result of the robocall, they have decided not to vote by mail-in ballot.  Instead, they are planning to vote in person, despite their fears that voting in person will expose them to COVID-19.  *Id.* ¶¶ 10-12.  The robocall was particularly injurious for Mr. Steinberg, a man with an 18-year-old conviction.  The robocall has stirred great anxiety and painful past traumas.  *Id.* ¶ 13.  Ms. Hart, Ms. Kennedy, Ms. Slaven and Ms. Daniel were also deeply offended and infuriated by the robocalls because the robocalls attacked the institution of voting and attempted to undermine confidence in the voting process.  *See*, *e.g.*, Hart Decl. ¶ 9.

Section 1985(3) makes available all relief that Plaintiffs seek, including injunctive relief, *see Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 473 (5th Cir. 1970) (injunctive relief available); *Freeman & Bass, P.A. v. N.J. Comm'n of Investigation*, 359 F. Supp. 1053, 1059 (D.N.J. 1973) (same), and compensatory and punitive damages.  *See* 42 U.S.C. § 1985(3); *Great Am. Fed. S. L. Assn. v. Novotny*, 442 U.S. 366, 376-77 (1979) (rejecting Title VII as predicate for Section 1985(3) claim citing in part the availability of compensatory and punitive damages); *Forsberg v. Pefanis*, 634 Fed. App'x 676, 680 (11th Cir. 2015) (holding that § 1985 permits punitive damages, even in the absence of compensatory damages); *see also Paynes*, 377 F.2d at 64-65 (permitting plaintiff to seek damages against defendants who had allegedly attempted to intimidate the plaintiff from registering to vote).

In sum, Plaintiffs are highly likely to succeed on their claim that Defendants violated Section 1985(3).

## V.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

A plaintiff suffers "irreparable harm" where, as here, the harm is based upon plaintiff's fundamental right to vote.  *See Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote

were impinged upon."); *Coleman v. Bd. of Educ. of City of Mount Vernon*, 990 F. Supp. 221, 226 (S.D.N.Y. 1997) ("The deprivation . . . of voting rights constitutes irreparable harm."); *Puerto Rican Legal Def. and Educ. Fund, Inc. v. City of New York*, 769 F. Supp. 74, 79 (E.D.N.Y. 1991) ("[I]t is well-settled that the claimed deprivation of a constitutional right such as the right to a meaningful vote or to the full and effective participation in the political process is in and of itself irreparable harm.") (citing *Reynolds v. Sims*, 377 U.S. 544, 562 (1964)).  Given the current climate, in which a significantly increased number of citizens are expected to vote by mail because of the COVID-19 pandemic, Defendants' acts, if not enjoined, will have a particularly widespread and egregious impact, by making those who are already choosing to vote by mail because they fear the health risks of voting in person, to also fear voting by mail.  That harm is immediate and irreparable.

The November Election will be held before a final ruling on the merits in this action.  In the absence of interim injunctive relief, Defendants will continue to carry out their plans to intimidate voters and place undue burdens on their ability to vote.  They have plainly and repeated stated that this is their intent.  As a result, Plaintiffs have already been harmed by being subjected to such attempted intimidation and coercion, and are likely to continue to be harmed by continued robocalling from Defendants, and potentially others acting in concert with them, leading up to the November Election.[28]  "If individuals fail to vote because of intimidation …, whether or not specifically targeted at the individuals, the individuals have been injured, especially in light of the importance of the vote in our political system."  *Smith v. Meese*, 821

---

[28] Defendants do not have to use the same robocall message in their future robocalls to injure Plaintiffs and there is no reason to assume they will.  As demonstrated by their past acts, such as their robocalls in 2019 attacking Joe Biden and their numerous other smear campaigns, they can, and will, change their messages to be as deceptive and harmful as possible.  Thus, Plaintiffs will not necessarily be able to identify Defendants' future voter intimidation robocalls.

F.2d 1484, 1494 (11th Cir. 1987) (regarding state officials' targeted threats to prosecute voter issues in minority areas).

The harm to Plaintiffs cannot be rectified by monetary relief after the fact. Those who suffer discrimination "would certainly suffer irreparable harm if their right to vote were impinged upon." *Williams*, 792 F.2d at 326; *see also Fish v. Kobach*, 840 F.3d 710, 752, (10th Cir. 2016) ("Because there can be no 'do-over' or redress of a denial of the right to vote after an election, denial of that right weighs heavily in determining whether plaintiffs would be irreparably harmed absent an injunction."). Thus, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 247 (4th Cir. 2014) (collecting Second, Third, and Sixth Circuit cases and noting that "once the election occurs, . . . [t]he injury to [] voters is real and completely irreparable if nothing is done to enjoin [the discriminatory voting process]").

That the state court in Michigan prohibited Defendants from initiating robocalls or other communications directed at multiple recipients supports the need for broader injunctive relief. But the Michigan court's jurisdiction is limited: its order is made only in connection with bail conditions. The Michigan court has no substantive authority to pursue violations of that condition. As such, this Court cannot rely on that order to protect the Plaintiffs and other voters outside of Michigan from the Defendants' endless fraudulent schemes in the future. Nor is there any reason to assume that Defendants will voluntarily stop such activity outside Michigan, given their track record detailed above. Indeed, the Michigan court has already raised concerns that

Defendant Wohl appears to have violated his bail conditions by sending out a mass communication.[29]

Defendants also have an established, undeterred history of running afoul of the law. Wohl has also been previously investigated for securities fraud by several authorities, including the National Futures Association, the Arizona Corporation Commission, and the Riverside County District Attorney's Office.[30]  Wohl's criminal case for securities fraud in Riverside County is ongoing, and Wohl has failed to pay the restitution required by the Arizona Corporation Commission for securities laws violations after it concluded that Wohl defrauded investors.[31]  The National Futures Association has also banned Wohl for life.[32]  In addition, when Defendants hired actors on Craigslist last month to stage an FBI raid on Burkman's home that he alleged was retaliation by government officials, they ran dangerously close to running afoul of federal law prohibiting aiding and abetting the false impersonation of federal agents.[33]  *See* 18 U.S.C. § 912.

---

[29] Recording of Jacob Wohl and Jack Burkman's Probable Cause Conference (Oct. 16, 2020), *available at* https://www.youtube.com/watch?v=dyMHDzXEpZ8 at 47:38.

[30] Christina Zao, Who is Jacob Wohl? Far-Right Conspiracy Theorist, Internet Troll Wanted on Felony Arrest Warrant, NEWSWEEK (Sept. 4, 2019), *available at* https://www.newsweek.com/who-jacob-wohl-far-right-conspiracy-theorist-internet-troll-wanted-felony-arrest-warrant-1457729; Brandy Zadrozny, Jacob Wohl, 20, far-right conspiracy theorist, gets a moment in spotlight with Mueller plot, NBC NEWS (Nov. 1, 2018), *available at* https://www.nbcnews.com/news/amp/ncna929726.

[31] Zadrozny, *supra* note 30; *see also* Will Sommer, Jacob Wohl Charged with Felony in California, DAILY BEAST (Sept. 4, 2019), *available at* https://www.thedailybeast.com/jacob-wohl-wanted-on-felony-arrest-warrant.

[32] *In re Nex Capital Mgmt, LLC and Jacob Wohl*, NFA Case No. 16-BCC-011 (Mar. 2, 2017), *available at* https://www.nfa.futures.org/basicnet/regulatory-actions-detail-doc.aspx?docid=4428&rnd=e340ca2f-284d-4205-9a78-d9a6cda0106c.

[33] Lachlan Markay, Will Sommer, and Adam Rawnsley, Jacob Wohl Staged Fake FBI Raid on Business Partner, Actor Hired for Production Says, THE DAILY BEAST (Sept. 15, 2020), *available at* https://www.thedailybeast.com/jacob-wohl-staged-fake-fbi-raid-on-business-partner-actor-hired-for-production-says.

Enough is enough.  Defendants must be deterred immediately to prevent irreparable harm to voters, including Plaintiffs.  Being denied the right to vote via intimidation is an irreparable harm; the voter permanently loses that opportunity to vote.  Similarly, a voter suffers an irreparable, and potentially fatal, harm when they feel compelled to expose themselves to heightened COVID-19 risk in order to vote in person because they do not trust vote by mail due to intimidation and deception.

Plaintiffs' showing of irreparable harm, in conjunction with their clear showing of a likelihood of success on their underlying claims (*see* Section IV, *supra*), is sufficient for this Court to issue the requested injunctive relief.  *See Cacchillo*, 638 F.3d at 405-06.

## VI. THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN PLAINTIFFS' FAVOR

To the extent applicable, the balance of hardships tips decidedly in favor of Plaintiffs.  Plaintiffs will suffer severe hardship if the requested relief is not granted; Plaintiffs would be prevented from exercising their fundamental right to vote, free from initiation and other unlawful interference.  Plaintiffs have an overwhelmingly strong interest in protecting the right to vote.  *People of New York ex rel. Spitzer v. Delaware*, 82 F. Supp. 2d 12, 16 (N.D.N.Y. 2000) ("Unquestionably, the right to vote in an election is hallmark of our democracy.").  For well over a century, the Supreme Court has viewed the right to vote as a "fundamental political right, because [it is] preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson* v. *Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion; Blackmun, J), and indeed the "right …, regardless of political persuasion, to cast [] votes effectively" is voters' "most precious" right.  *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).  Thus, courts have similarly recognized that "[t]he right to vote is among the most important benefits of citizenship."  *See, e.g.*, *Kemler v.*

*Poston*, 108 F. Supp. 2d 529, 542 (E.D. Va. 2000).  That overwhelmingly strong interest in protecting the unimpaired right to vote, free of intimidation, is vindicated by the injunctive relief requested here.

In contrast to Plaintiffs' overwhelming, legitimate interests in the relief sought, Defendants obviously have no legitimate interest in intimidating voters.  Unlike the serious harms to fundamental rights facing the Plaintiffs, the cost to Defendants is slight.  They are already under court order not to make additional robocalls as part of their bail conditions. Extending that protection nationwide is not too burdensome.  Moreover, the relief requested here is time-limited to only a few weeks.  Plaintiffs do not seek preliminary injunctive relief extending beyond the conclusion of the November Election.

The public interest clearly would be advanced by the injunction sought here.  Defendants should not be permitted to engage in conduct that impedes and threatens the exercise of the most basic right in American democracy.  "[O]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964).

## VII.    CONCLUSION

This Court should grant Plaintiffs' application for injunctive relief.


Dated: New York, New York                Respectfully submitted,
      October 20, 2020

                                           ORRICK, HERRINGTON & SUTCLIFFE LLP

                                           By:_____ /s/ Rachelle Navarro_____

                                           Amy Walsh
                                           Rene Kathawala
                                           Rachelle Navarro
                                           Julie Gorchkova
                                           Spencer Bruck

Aaron Gold
Michael Maruca *(not admitted in SDNY)*
ORRICK HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
(212) 506-5000
rkathawala@orrick.com
awalsh@orrick.com
rnavarro@orrick.com
jgorchkova@orrick.com
sbruck@orrick.com
aaron.gold@orrick.com
mmaruca@orrick.com

Jon Greenbaum*
Ezra Rosenberg*
John Libby
David Brody*
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
jlibby@lawyerscommittee.org
dbrody@lawyerscommittee.org

*Application Pro Hac Vice Forthcoming

# EXHIBIT A

FILED

NOV 0 2 2004

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| THOMAS A  DASCHLE, | \* | CIV 04-4177 |
|  | \* |  |
| Plaintiff, | \* |  |
|  | \* |  |
| vs. | \* | TEMPORARY |
|  | \* | RESTRAINING ORDER |
| JOHN THUNE; | \* |  |
| SOUTH DAKOTA REPUBLICAN | \* |  |
| PARTY; and JOHN DOES 1-200, | \* |  |
|  | \* |  |
| Defendants. | \* |  |
|  | \* |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Under the principles of *Bush v. Gore*, 531 U.S. 98 (2000), the Court finds that the Plaintiff Thomas A. Daschle has standing to bring the present action. The action shows that Plaintiff Daschle is suing on his behalf as well as on behalf of persons who are unable to protect their own rights, that being Native Americans, to vote in this South Dakota General Election. See also *Oti Kaga, Inc. v. South Dakota Housing Authority*, 342 F.3d 871, 881-82 (8th Cir. 2003), and cases cited therein.

Oral testimony, photographs, and arguments were presented by the Plaintiff and the Defendants concerning today's events in a hearing from 8:00 P.M. until 11:30 P.M. this evening. Due to the fact that the General Election voting commences at 7:00 A.M. tomorrow morning, the Court cannot prepare a more detailed opinion.

After receiving evidence on behalf of Plaintiff and Defendants in the form of oral testimony as well as photographs, the Court applies the four factor tests from *Dataphase Systems, Inc. v. C L Systems, Inc.*, 540 F.2d 109 (8th Cir. 1981), and concludes that there clearly is the threat of irreparable harm to the Movant in that if Native Americans are improperly dissuaded from voting, those voters normally simply disappear and there is no identifying most of them and even if

identified, they can't vote later. The harm that will be inflicted upon the Movant is far greater than any injury granting the temporary restraining order will cause Defendants. The Movant and the Native American voters whose rights are asserted by the Movant will suffer the irreparable harm described above while Defendants are only being required to follow the law. The Court does find that the Movant is more likely to succeed on the merits of the equal protection claim and the claims under 42 U.S.C. § 1973i(b) and 42 U.S.C. § 1985(3), as the Court finds that there was intimidation particularly targeted at Native American voters in Charles Mix County by persons who were acting on behalf of John Thune. The Eighth Circuit has ruled that injunctive relief is available under § 1985(3). *See Brewer v. Hoxie School District*, 238 F.2d 91 (8th Cir. 1956). Whether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters in Charles Mix County. This is a small Native American population within which word travels quickly. Finally, the public interest is served by having no minority denied an opportunity to vote. Accordingly,

IT IS ORDERED that a Temporary Restraining Order is entered against Joel C. Mandelman and all other Defendant John Does acting on behalf of John Thune in Charles Mix County prohibiting them from following Native Americans from the polling places and directing that they not copy the license plates of Native Americans driving to the polling places, or being driven to the polling places, and further directing that the license plates of Native Americans driving away from the polling places also not be recorded.

Dated this ___ day of November, 2004.

BY THE COURT:

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
DEPUTY