IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES,<br><br>            Plaintiffs,<br><br>      v.<br><br>JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10,<br><br>            Defendants. | Civil Action No.: 20-cv-8668 |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION……………………………………………………………………5

PRELIMINARY STATEMENT……………………………………………………...6

ARGUMENT…………………………………………………………………….....9

PLAINTIFFS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER…....9

I.    NCBCP Has Not Established That It Has Standing Either As An Organization Itself, Or On Behalf Of Individual Plaintiffs…………………..9

II.    There Exists No Redressability As To Individual Plaintiffs……………………..12

III.    NCBC Has Failed To Establish That It Or Its Members Will Suffer Irreparable Harm…………………………………………….....13

IV.    Plaintiffs Have Not Established Substantial Likelihood Of Success On The Merits…………………………………...……16

V.    The Disruptive Relieve Sought by Plaintiff is not Favored by the Equities…………………………………………………………………….…...21

CONCLUSION…………………………………………………………...…......24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aamer v. Obama,*
  742 F.3d 1023 (D.C. Cir. 2014) ......................................................................... 9

*Abdul Wali v. Coughlin,*
  754 F.2d 1015 (2d Cir. 1985) ............................................................................. 8

*Abrams v. United States,*
  250 U. S. 616 (1919) ........................................................................................ 19

*Aguilar v. Immigration & Customs Enf't Div. of the U.S. Dep't of Homeland Sec.,*
  811 F. Supp. 2d 803 (S.D.N.Y. 2011) ............................................................. 14

*Andino v. Fischer,*
  555 F.Supp. 2d 418 (S.D.N.Y. 2008) ................................................................ 7

*Applications, Inc. v. Energy Conservation Corp. of Am.,*
  436 F. Supp. 354 (N.D. Ga. 1977) .................................................................. 15

*Asseo v. Pan Am. Grain Co.,*
  805 F.2d 23 (1st Cir.1986) ............................................................................... 21

*Ass'n of Flight Attendants–CWA v. Dep't of Transp.,*
  564 F.3d 462 (D.C. Cir. 2009) ......................................................................... 10

*Bell & Howell: Mamiya Co. v. Masel Supply Co.,*
  719 F.2d 42 (2d Cir. 1983) ................................................................................ 8

*Benisek,*
  138 S.Ct. ........................................................................................................... 24

*Brandenburg v. Ohio,*
  395 U. S. 444 (1969) ........................................................................................ 20

*Calhoun v. Lillenas Publg.,*
  298 F.3d 1228 (11th Cir. 2002) ....................................................................... 15

*Capitol Square Review and Advisory Bd. v. Pinette,*
  515 U. S. ........................................................................................................... 19

*Church v. City of Huntsville,*
  30 F.3d 1332 ..................................................................................................... 14

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
  598 F.3d 30 (2d Cir. 2010) ............................................................................... 21

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398, 133 S. Ct. 1138 (2013) ............................................................. 10

*Cohen v. California,*
  403 U. S. 15 (1971) .......................................................................................... 20

*Echo Design Group, Inc. v. Zino Davidoff S.A.,*
  283 F.Supp.2d 963 (S.D.N.Y.2003) .................................................................. 7

*EMA Fin., LLC v. Vystar Corp.,* 1:19-cv-01545 (ALC),
  2020 WL 1233608 (S.D.N.Y. Mar. 13, 2020) ................................................ 14

*Freedom Holdings, Inc. v. Spitzer,*
  408 F.3d 112 (2d Cir. 2005) ....................................................................... 12, 13

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ......................................................................................... 10

*Hirschfeld v. Bd. of Elections*,
  984 F.2d 35 (2nd Cir. 1993) ................................................................ 16
*JBR, Inc. v. Keurig Green Mtn., Inc.*,
  618 F. App'x 31 (2d Cir. 2015) ............................................................. 7
*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
  51 F.3d 982 (11th Cir. 1995)................................................................ 21
*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................. 9
*Madsen v. Women's Health Center, Inc.*,
  512 U. S. 753 (1994) ........................................................................... 20
*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................. 8
*Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199 v.*
  *Blackwell*,
  467 F.3d 999 ................................................................................. 10, 11
*O'Lone v. Estate of Shabazz*,
  482 U.S. 342 (1987) ............................................................................. 8
*Pella Windows & Doors v. Buscarnera*, 07CV82(SLT)(JMA),
  2007 WL 2089298 (E.D.N.Y. July 18, 2007) ...................................... 7
*R. A. V. v. City of St. Paul*,
  505 U. S. ............................................................................................ 20
*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999)................................................................ 13
*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)................................................................... 8
*Schenck v. Pro-Choice Network of Western N. Y.*,
  519 U. S. 357 (1997) ........................................................................... 20
*Scott v. Roberts*,
  612 F.3d 1279 (11th Cir. 2010)...................................................... 23, 24
See,
  52 F.3d 64 (4th Cir.1995).................................................................... 18
*Shapiro v. Cadman Towers, Inc.*,
  51 F.3d 328 (2d Cir. 1995)................................................................... 8
*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000)........................................................... 14
*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*,
  190 F.Supp.2d 577 (S.D.N.Y.2002) ..................................................... 7
*Texas v. Johnson*,
  491 U. S. 397 (1989) ........................................................................... 20
*Tinker v. Des Moines Independent Community School Dist.*,
  393 U. S. 503 (1969) ........................................................................... 20
*United States v. Jones*,
  907 F.2d 456 (4th Cir.1990)................................................................ 17
United States v. O'Brien,
  391 U. S. 367 (1968) ........................................................................... 20
*United States v. Richardson*,

    418 U.S. 166 (1974) ................................................................................................ 9
*United States v. Selfa,*
    918 F.2d 749 (9th Cir.1990) ................................................................................ 17
*US v. McNeal,*
    818 F. 3d 141 ............................................................................................... 17, 19
*Virginia v. Black,*
    538 US 343 .................................................................................................. 18, 19
*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................................................................ 9
*Watts v. United States,*
    394 U. S. 705 (1969) ............................................................................................ 20
*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ................................................................................................ 9
*Whitney v. California,*
    274 U. S. 357 (1927) ............................................................................................ 20
*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................... 8, 9, 23, 24
*Wreal, LLC v. Amazon.com,*
    840 F.3d 1244 (11th Cir. 2016) .......................................................................... 15

Statutes

Section 1985 of Title 42 of the U.S. Code ................................................................ 6
Va. Code Ann. § 18.2-423 (1996) ............................................................................ 18

Rules

Rule 65 of the Federal Rules of Civil Procedure ................................................. 6, 8

Other Authorities

*Discriminatory Intent and the Taming of Brown,*
    56 U. CHI. L. REV. 935 (1989) ........................................................................... 17
*Regions Bank v. Kaplan,*
    2017 U.S. Dist. LEXIS 127803, *9 (M.D. Fla. Aug. 11, 2017)*Regions Bank v. Kaplan,* 2017
    U.S. Dist. LEXIS 127803, *9 (M.D. Fla. Aug. 11, 2017) ................................... 15
The Making of Federal Enforcement Laws, 1870–1872,
    70 CHI.-KENT L. REV. 1013 (1995) ................................................................... 16
*U.S. Bank Nat'l Ass'n v. Turquoise Props. Gulf,*
    2010 U.S. Dist. LEXIS 60882, 13-14 (S.D. Ala. June 18, 2010)*U.S. Bank Nat'l Ass'n v.*
    *Turquoise Props. Gulf,* 2010 U.S. Dist. LEXIS 60882, 13-14 (S.D. Ala. June 18, 2010) ..... 15
*What Is Discriminatory Intent?,*
    103 CORNELL L. REV. 1211 (2018) .................................................................. 17

## <u>INTRODUCTION</u>

Contrary to counsel's letter dated October 26th, 2020 sent to Plaintiff's after being alerted that morning that Defendants were retaining counsel that very day the conveniently newly discovered transcription error referenced therein "Stay safe and beware vote by mail" is quite material. Originally all were led to believe that the statement was "Stay **home** safe and beware of vote by mail"

One is left wondering how the Defendant's change from *pro se* status helped divulge this discrepancy but the idea that this "**Stay home safe** and beware of vote by mail" is the same as "**Stay safe** and beware of vote by mail" is beyond disingenuous in a case predicated upon an assumption of motives of voter suppression. This is ludicrous. Expressing one's wariness about the trustworthiness of one mode of voting over another is not voter suppression. In fact, it could be construed as an attempt to get folks to vote in-person to ensure voting integrity. That Plaintiffs have conceded that similar statements have been made in the news media makes clear that such cannot be prohibited speech.

One statement, in sum and substance, could be viewed as, "My opinion is don't trust in vote by mail and stay home." The other is, "My opinion is not to vote by mail - vote in person." In any case all Plaintiffs decided to exercise their own decision and are voting, which is evidenced in their sworn affidavits. Moreover, even as plead, the Plaintiffs lack standing, or otherwise, do not meet the legal standard for the grant of the draconian emergency relief requested herein.

## PRELIMINARY STATEMENT

The Court should deny plaintiffs NATIONAL COALITION ON BLACK CIVIC PARTICIPATION's (hereinafter "NCBCP" or "Organization"), and MARY WINTER, GENE STEINBERG, NANCY HART SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES (collectively, referred hereinafter, "Individual Plaintiffs")(or "NCBCP and "Individual Plaintiffs", collectively, the "Plaintiffs") extraordinary request for a Temporary Restraining Order and Preliminary Injunction, prohibiting the Defendants from, *inter alia*, engaging in certain communications violative of Section 11(b) of the Voting Rights Act, or certain actions violative of Section 1985 of Title 42 of the U.S. Code. Furthermore, the Court should deny Plaintiffs' request for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from, *inter alia*, engaging in, or causing anyone else to engage in, robocalls or similar forms of communication, without prior written consent, through at least November 3, 2020 (the "November Election"). Furthermore, the Court should deny Plaintiffs' request for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants to keep records of each such communication discussed previously mentioned, until the conclusion of this litigation.

As a threshold matter, the Court lacks jurisdiction to issue a temporary restraining order and lacks jurisdiction to issue a preliminary injunction because NCBCP failed to establish its standing and, as to the Individual Plaintiffs, there exists no injury in fact and no redressability. NCBCP alleged no facts that the organization has suffered any injury warranting either a preliminary injunction, or a temporary restraining order nor has NCBCP identified a single member of the NCBCP who is suffering such injury warranting either a preliminary injunction or

a temporary restraining order. In any event, NCBCP's members could not possibly be injured in so far as the NCBCP alleges it already spends significant resources and effort promoting voting and other civic participation by the Black community. *See* Plaintiffs' Memorandum of Law In Support of Temporary Restraining Order and Preliminary Injunction page. Even assuming, arguendo, that NCBCP could prove that it will suffer injuries as a result of the actions of the Defendants, this falls well short of an imminent and concrete injury that is traceable to the Defendants and redressable by this Court.

Next, even assuming the Court has jurisdiction, NCBCP has not established its entitlement to emergency injunctive relief. NCBCP has not shown that it will suffer any harm – much less irreparable harm – in the absence of a temporary restraining order. Nor has NCBCP established a substantial likelihood of success on the merits. Finally, the public interest weights against the court issuing Plaintiffs such emergency injunctive relief.

Plaintiffs have requested that this Court take extreme measures and issue a temporary restraining order ("TRO") and a preliminary injunction, which, if granted, will prevent Defendants from exercising their freedom of Assembly and Free Speech, guaranteed to them under the First Amendment of the United Stated Constitution. A preliminary injunction is a drastic remedy which should be sparingly used. *JBR, Inc. v. Keurig Green Mtn., Inc.*, 618 F. App'x 31, 33 (2d Cir. 2015); *Pella Windows & Doors v. Buscarnera*, 07CV82(SLT)(JMA), 2007 WL 2089298, at *1 (E.D.N.Y. July 18, 2007).

The standard for a temporary restraining order in the Second Circuit is the same for a preliminary injunction. *See e.g., Andino v. Fischer*, 555 F.Supp. 2d 418, 419 (S.D.N.Y. 2008); *Echo Design Group, Inc. v. Zino Davidoff S.A.*, 283 F.Supp.2d 963, 966 (S.D.N.Y.2003); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F.Supp.2d 577, 580

(S.D.N.Y.2002) ("The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical."). "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). In order to establish entitlement to such drastic relief, plaintiffs must clearly show each of the following elements: (1) a likelihood of ultimate success on the merits; (2) irreparable injury in the absence of the injunction; (3) a balancing of the equities in its favor; and (4) that the public interest is not disserved by the relief granted. *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). Moreover, such relief is never granted as of right, and the decision to grant such extraordinary relief remains in the Court's sound discretion. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Respectfully, the Court should not use that discretion here; as the Plaintiffs have not shown irreparable harm, or likely success on the merits, and both the balance of hardships and the public interest against issuing a restraining order. While Plaintiffs need not show success is "an absolute certainty," at a minimum, the "probability" of success is required. *See Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). Second, that they are "likely to suffer irreparable harm in the absence of preliminary relief." Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction. *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983). "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995). Third, Plaintiffs must prove that "the balance of equities tips in [its] favor," and fourth, that a temporary

8

restraining order "is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). None of these factors support Plaintiffs' request; indeed, they directly undercut it.

**ARGUMENT**

**PLAINTIFFS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER**

I.    **NCBCP Has Not Established That It Has Standing Either As An Organization Itself, Or On Behalf Of Individual Plaintiffs.**

NCBCP's request for a temporary restraining order must be denied because it has failed to establish standing to seek such relief. *See Aamer v. Obama*, 742 F.3d 1023, 1028 (D.C. Cir. 2014). The doctrine of standing is an essential aspect of the Article III case-or-controversy requirement and demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). At its "irreducible constitutional minimum," the doctrine requires a plaintiff to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

To establish injury-in-fact, a plaintiff must show that the defendant's action affects him or her in a "personal and individual way," see *d*. at 560 n.1, rather than in some generalized way common to the general public, *see United States v. Richardson*, 418 U.S. 166, 176 (1974). Moreover, a plaintiff must show more than a "possible future injury"; he or she must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citations omitted). The Supreme Court has emphasized that "threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury

9

are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S. Ct. 1138, 1147 (2013) (citations omitted).

NCBCP claims standing in its own right and on behalf of a relatively small number of individual Plaintiffs, who allegedly have received robocalls from the Defendants; it is not even alleged by Plaintiff NCBCP in their filings, that Individual Plaintiffs are members of the NCBCP.

To bring suit on its own behalf, an organization must itself meet the requirements for standing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). To establish representational standing, an organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Flight Attendants–CWA v. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (citations omitted).

NCBCP cannot demonstrate standing either for itself or as a representative of the Individual Plaintiffs who allegedly have received these robocalls. In fact, NCBCP does not even, in their court filings, refer to the Individual Plaintiffs as *representatives* of the NCBC, but instead, NCBCP refers to the Individual Plaintiffs as "NCBCP's Beneficiaries." *See* First Heading on Page 7 of Plaintiffs' Memorandum of Law In Support of Temporary Restraining Order And Preliminary Injunction.  Use of the word "Beneficiaries" to describe those who allegedly were affected by the Defendants actions, is telling, because  this is not enough to convey standing and is likely attempting to gloss over this threshold issue. However, this is insufficient for NCBCP to assert standing on behalf of the Individual Plaintiffs. See *Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199 v. Blackwell*, 467

F.3d 999, 1010 & n. 4 (6th Cir. 2006). In <u>Northeast Ohio Coalition</u>, an association providing services to homeless persons sought a temporary restraining order, enjoining identification for absentee voting. However, the Complaint did not identify any member injured but instead attempted to assert standing on the premise that the homeless persons the association attempted to demonstrate standing on behalf of, were served by the organization; or in other words, *beneficiaries* of the organization.  The court disagreed and added that "standing on behalf of the group served by the organization" would be "a form of representational standing never recognized by any court." *Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1010 & n. 4 (6th Cir. 2006). Similarly, here, NCBCP asserts that when Defendants allegedly began making their robocalls on August 26, 2020, causing, BWR Metro, to divert staff and resources to respond to the Defendants' actions. As a result, NCBCP asserts that, this diversion of resources harmed the mission of the NCBCP, but also the "constituents in Detroit" who risked "losing their fair share of funding and representation associated with the Census count." [see page 12 of Plaintiffs' complaint]. Not only is this argument specious, at best, NCBCP never claims that these "constituents in Detroit" were members of its organization.  At best, NCBCP argues that these constituents in Detroit" were groups served by the NCBCP, which is a form of representational standing never recognized by any court. *Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1010 & n. 4 (6th Cir. 2006).

In effect, NCBCP is alleging that the robocall attributed to the Defendants, which is in and of itself a political opinion or statement or query and therefore otherwise protected free speech, caused them monetary damages. However, by definition damages that can be addressed

by a monetary award cannot be deemed irreparable harm and therefore injunctive relief is not available. *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir. 2005)

In sum, because NCBC lacks standing, either on its own, or on behalf of the Individual Plaintiffs, the Court lacks jurisdiction to issue either a temporary restraining order or a preliminary injunction.

## II.  **There Exists No Redressability As To Individual Plaintiffs**

Plaintiffs allege that Defendants created and disseminated "deceptive robocalls preying upon historical fears of racism through the use of stereo types." *See* Plaintiff' Memorandum of Law In Support Of Temporary Restraining Order And Preliminary Injunction. In fact, even were everything asserted taken as true, which goes to an ultimate determination all of the foregoing, this would amount to permissible statements of opinion. Plaintiffs recite (and actually concede they misquote) the text of a purported robocall which, if taken as true and verbatim, is merely a query or a statement of opinion, and if it actually relies on stereotypes, as alleged, would certainly not be effective. As it is, Plaintiffs describe Mary Winter and Gene Steinberg as not being dissuaded from voting, having decided to vote in person due to media reports calling into question mail in ballot integrity. Note, that the robocall called upon folks to "stay safe and beware of vote by mail." These Plaintiffs were able to exercise their prudential judgment, despite anxieties about voting in person and have voted or intend to vote in person. No doubt they may experience anxiety while going to the supermarket but the idea it would be illegal or prohibited to repeat to others concerns about mail in vote integrity when the highest elected officials in the country and the news media have repeatedly expressed such concerns and indeed news reports have featured stories about lost or stolen mail in ballots and earlier instances of paper ballot tampering and indictments is an odd proposition.

12

Plaintiff Hart is described as immediately discounting the call and in her view saw it a scheme to depress turnout and so it had no impact on her. It is said that Plaintiff Wolff, Kennedy Slaven, Daniel and Sfrese all "immediately recognized" "nefarious intent." *See* Plaintiff' Memorandum of Law In Support Of Temporary Restraining Order And Preliminary Injunction. It follows then that they were not in any way harmed by a statement that they saw as a political statement encouraging them not to vote insofar as they were not in any way undeterred and have or are voting anyway.

In addition, NY Plaintiffs Winters and Steinberg "voted in the primary by mail in ballot" Presidential Primaries were had in June of 2020 fully two months before the alleged call in August of 2020. (6/23/20 Last day to postmark ballot; must be received by the board of elections no later than 6/30/20. §8-412 (1))[1]

As a result, because there exists no injury in fact and no redressability as to the Individual Plaintiffs, the Court should not exercise its discretion in issuing an emergency injunctive relief nor issue a temporary restraining order.

## III.   NCBC Has Failed To Establish That It Or Its Members Will Suffer Irreparable Harm

As the "single most important prerequisite" in the preliminary injunction analysis, irreparable harm must be established "before the other requirements for the issuance of an injunction will be considered." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). The litigant must demonstrate that the injury alleged is "actual and imminent," not merely possible, and cannot be remedied in money damages. *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir. 2005). Plaintiffs cannot satisfy this stringent burden.

---

[1] https://www.elections.ny.gov/NYSBOE/law/2020PoliticalCalendar0608.pdf

First, let's look at the definition of "irreparable harm". Plaintiff NCBC is alleging that it suffered what amounts to monetary loss due to the actions of the Defendants. *See* Complaint. "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *EMA Fin., LLC v. Vystar Corp.*, 1:19-cv-01545 (ALC), 2020 WL 1233608, at *4 (S.D.N.Y. Mar. 13, 2020) (quoting *Aguilar v. Immigration & Customs Enf't Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 828 (S.D.N.Y. 2011)). Here, because a monetary award *could* be an adequate compensation for the expenses expended by the Plaintiff, Plaintiff  NCBCP has not, despite what it alleges, suffered irreparable harm, and therefore, an injunction is not warranted under law.

**<u>MERITLESS:</u>**

Furthermore, even if Plaintiff established a likelihood of success on the merits (which it has not), its failure to demonstrate "a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "A showing of irreparable injury is the *sine qua non* of injunctive relief." *Id*. "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.*; *see also Church v. City of Huntsville*, 30 F.3d 1332, 1337 (injunctive relief is warranted only when a party "alleges, and ultimately proves, a real and immediate – as opposed to a merely conjectural or hypothetical – threat of future injury").

**<u>NO IRREPARABLE HARM</u>**

Here, Plaintiff NCBC has not even alleged – let alone established – that there is any threat of irreparable harm to itself as an organization or to the Individual Plaintiffs. Rather, Plaintiff NCBC seems to assert the *potential* for harm exists for individuals *outside of this lawsuit*. Such allegations, even if true, cannot form the for the issuance of a preliminary injunction. *See, e.g., Sci.*

*Applications, Inc. v. Energy Conservation Corp. of Am.*, 436 F. Supp. 354, 357 (N.D. Ga. 1977) ("[B]urden is on the plaintiffs to demonstrate: . . . an immediate and real threat of irreparable injury to plaintiffs [and] that the imminent harm to plaintiffs is greater than the harm to defendant if an injunction is imposed. . . .") (emphasis added).

## DELAYS MEAN NO EMERGENCY

Furthermore, the Court should consider the timing of Plaintiffs' plea for this extraordinary emergency relief and conclude that there does not exist any irreparable harm. "[C]ourts have frequently considered delay in initiating an action where . . . preliminary injunctive relief has been requested" and held that "delay is suggestive of a lack of irreparable harm." *Calhoun v. Lillenas Publg.*, 298 F.3d 1228, 1235 (11th Cir. 2002). In addition "a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) (affirming district court's finding of absence of irreparable harm where preliminary injunction motion "relied exclusively on evidence that was available to [the plaintiff]" five months prior to the time the motion was filed).

Here, the alleged statement complained of was made in August 2020 and was allegedly intended to affect a November election. Why wait three months? "A delay in seeking a preliminary injunction of even only a few months – though not necessarily fatal – militates against a finding of irreparable harm." *Id. See also Regions Bank v. Kaplan*, 2017 U.S. Dist. LEXIS 127803, *9 (M.D. Fla. Aug. 11, 2017) (plaintiff's five-month delay in filing action and seeking injunction after learning about allegedly fraudulent transfers "belie[d] [the plaintiff's' claim of an imminent and irreparable injury"); *U.S. Bank Nat'l Ass'n v. Turquoise Props. Gulf*, 2010 U.S. Dist. LEXIS 60882, 13-14 (S.D. Ala. June 18, 2010) (moving party's failure to act with reasonable diligence to

15

protect its own interests after being on notice of the challenged conduct undercuts the movant's plea that it will suffer irreparable injury unless the court issues a mandatory injunction); *Hirschfeld v. Bd. of Elections*, 984 F.2d 35, 39 (2nd Cir. 1993) (holding that a party's delay in seeking an injunctive relief "severely undermines [its] argument that absent a stay irreparable harm w[ill] result"). Plaintiffs' delay in seeking the extraordinary injunctive relief requested is sufficient to deny the injunction, and at a minimum, this delay in seeking such relief, severely undercuts Plaintiffs' claim of irreparable harm and any need for emergency immediate relief.

As such, because Plaintiffs fail to establish irreparable harm – the single most important prerequisite for a court to issue preliminary injunction - there is no basis for the Court to invoke its emergency powers at this early stage in the litigation, and the Court does not even need to get into any further emergency injunction analysis.

**IV.**   **Plaintiffs Have Not Established Substantial Likelihood Of Success On The Merits**

The Ku Klux Klan Act ("The Act") was passed at the behest of President Ulysses S. Grant following the Civil War.[2] The Act also imposed civil liability and criminal penalties for a range of private conspiracies. These included conspiracies to overthrow the government; wage war against the United States; "depriv[e] any person or any class of persons of the equal protection of the laws"; or use "force, intimidation, or threat to prevent any citizen of the United States lawfully entitled to vote from giving his support or advocacy" to a federal candidate. This last "Support or Advocacy Clause" underlies Plaintiff's § 1985(3) claim. Clarifying the meaning of § 1985(3) is especially important given courts' increasing reluctance to make findings of

---

[2] Xi Wang, The Making of Federal Enforcement Laws, 1870–1872, 70 CHI.-KENT L. REV. 1013, 1049 (1995).

discriminatory intent.[3] Because there is a vast split in the circuit, Plaintiffs cannot establish

substantial likelihood of the success on the merits in the cause of action.

    The Plaintiffs in short allege that Defendants caused communications that (a) intimidate,

or attempt to intimidate voters in violation of 11(b) of the Voters Act and an anti-KKK Act. The

underlying statutes cited to were intended to curtail violence, menacing and intimidation of the

kind employed by a violent secret society that used violence and menacing to curtail the rights of

Republicans and Blacks in the reconstruction era south. The anti-KKK Act was not intended to

curtail free speech let alone free speech that is either true or merely an expression of opinion.

The Voting Rights Act Section 11(b), which is solely enforceable by the Attorney General of the

United States and not individual Plaintiffs states in pertinent part, "No person, whether acting

under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate,

threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce,

or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or

attempt to vote" Plaintiffs clearly recognizing there was not threat or coercion of any kind have

plead intimidation. Yet nothing in the robocall  would meet the legal definition of intimidation.

        In *US v. McNeal*, 818 F. 3d 141 - Court of Appeals (2016) the Fourth Circuit had

to wrestle with how to define intimidation in the context of a criminal statute hold that, "[t]he

logic of those decisions is straightforward. A taking "by force and violence" entails the use of

physical force. Likewise, a taking "by intimidation" involves the threat to use such force. *See*

*United States v. Jones*, 907 F.2d 456, 460 (4th Cir.1990). ("Intimidation means the threat of

force."); *United States v. Selfa*, 918 F.2d 749, 751 (9th Cir.1990); (explaining that the

---

[3] *See* Aziz Z. Huq, *What Is Discriminatory Intent?*, 103 CORNELL L. REV. 1211, 1215 (2018) (explaining that the
federal judiciary has not "developed a consistent approach to the evidentiary tools through which discriminatory
intent is substantiated"); David A. Strauss, Discriminatory Intent and the Taming of Brown, 56 U. CHI. L. REV. 935,
953 (1989) (arguing that "the discriminatory intent standard leads to speculative or meaningless questions").

intimidation element of § 2113(a) meets "the [Guidelines] section 4B1.2(1) requirement of a `threatened use of physical force'")…In *United States v. Presley*, in 1995, we recognized the equivalence between "intimidation" and the "threatened use of physical force," holding that a Virginia robbery offense satisfied the ACCA force clause. See 52 F.3d 64, 69 (4th Cir.1995)…Reasoning that "[v]iolence is the use of force," and "[i]ntimidation is the threat of the use of force," we concluded that "robbery in Virginia has as an element the use or threatened use of force." Id…In this case …[there is no] … no sound basis for concluding that the "intimidation" element of Virginia robbery is any narrower or broader than the "intimidation" element of federal bank robbery… Put succinctly, the reasoning of *Jones*, *Selfa*, and *Presley* is persuasive."

In *Virginia v. Black*, 538 US 343 – 2003 the United States Supreme Court provided us with a definition of "Intimidation" as well as the kinds of speech that are constitutionally proscribable. By no stretch of the imagination is the robocall statement comparable in any way.

The Supreme court held that:

> "In this case we consider whether the Commonwealth of Virginia's statute banning cross burning with "an intent to intimidate a person or group of persons" violates the First Amendment. Va. Code Ann. § 18.2-423 (1996). We conclude that while a State, consistent with the First Amendment, may ban cross burning carried out with the intent to intimidate, the provision in the Virginia statute treating any cross burning as prima facie evidence of intent to intimidate renders the statute unconstitutional in its current form."

This is telling in and of itself because of the noxious conduct of cross burning is not at all times prohibited. The statement attributed to Defendants which contains no discernible threat and is merely a statement of opinion is simply not comparable.

In any case this Klan Rally related case the lower state court "instructed the jury that the Commonwealth must prove that "the defendant intended "the defendant had the intent of

intimidating any person or group of persons."…The court did not instruct the jury on the meaning of the word "intimidate,"

Virginia v Black is such a treasure trove it makes clear that the statement attributable to Defendants in the instant case is a permissible statement and the KKK Act was never intended to curtail such.

"Often, the Klan used cross burnings as a tool of intimidation and a threat of impending violence. For example, in 1939 and 1940, the Klan burned crosses in front of synagogues and churches…After one cross burning at a synagogue, a Klan member noted that if the cross burning did not "shut the Jews up, we'll cut a few throats and see what happens."… In Miami in 1941, the Klan burned four crosses in front of a proposed housing project, declaring, "We are here to keep niggers out of your town.... When the law fails you, call on us." *Id*., at 176 (internal quotation marks omitted). And in Alabama in 1942, in "a whirlwind climax to weeks of flogging and terror," the Klan burned crosses in front of a union hall and in front of a union leader's home on the eve of a labor election. *Id*., at 180. These cross burnings embodied threats to people whom the Klan deemed antithetical to its goals. And these threats had special force given the long history of Klan violence…after a cross burning in Suffolk, Virginia, during the late 1940's, the Virginia Governor stated that he would "not allow any of our people of any race to be subjected to terrorism or intimidation in any form by the Klan or any other organization."… acts of violence included bombings, beatings, shootings, stabbings, and mutilations…To this day, regardless of whether the message is a political one or whether the message is also meant to intimidate, the burning of a cross is a "symbol of hate." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U. S., at 771 (THOMAS, J., concurring). And while cross burning sometimes carries no intimidating message, at other times the intimidating message is the only message conveyed. For example, when a cross burning is directed at a particular person not affiliated with the Klan, the burning cross often serves as a message of intimidation, designed to inspire in the victim a fear of bodily harm. Moreover, the history of violence associated with the Klan shows that the possibility of injury or death is not just hypothetical. The person who burns a cross directed at a particular person often is making a serious threat, meant to coerce the victim to comply with the Klan's wishes unless the victim is willing to risk the wrath of the Klan. Indeed, as the cases of respondents Elliott and O'Mara indicate, individuals without Klan affiliation who wish to threaten or menace another person sometimes use cross burning because of this association between a burning cross and violence. In sum, while a burning cross does not inevitably convey a message of intimidation, often the cross burner intends that the recipients of the message fear for their lives. And when a cross burning is used to intimidate, few if any messages are more powerful

The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law ... abridging the freedom of speech." The hallmark of the protection of free speech is to allow "free trade in ideas" — even ideas that the overwhelming majority of people might find distasteful or discomforting. *Abrams v.*

*United States*, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting); *see also Texas v. Johnson*, 491 U. S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Thus, the First Amendment "ordinarily" denies a State "the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence." *Whitney v. California*, 274 U. S. 357, 374 (1927) (Brandeis, J., concurring). The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. See, *e. g., R. A. V. v. City of St. Paul*, 505 U. S., at 382; *Texas v. Johnson, supra*, at 405-406; United States v. O'Brien, 391 U. S. 367, 376-377 (1968); *Tinker v. Des Moines Independent Community School Dist.*, 393 U. S. 503, 505 (1969)… We have consequently held that fighting words — "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction" — are generally proscribable under the *First Amendment. Cohen v. California*, 403 U. S. 15, 20 (1971); *see also Chaplinsky v. New Hampshire, supra*, at 572. Furthermore, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U. S. 444, 447 (1969) *(per curiam)*. And the First Amendment also permits a State to ban a "true threat." *Watts v. United States*, 394 U. S. 705, 708 (1969) (per curiam) (internal quotation marks omitted); accord, *R. A. V. v. City of St. Paul, supra*, at 388 ("[T]hreats of violence are outside the First Amendment"); *Madsen v. Women's Health Center, Inc.*, 512 U. S. 753, 774 (1994); *Schenck v. Pro-Choice Network of Western N. Y.*, 519 U. S. 357, 373 (1997). "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *See Watts v. United States, supra*, at 708 ("political hyberbole" is not a true threat); *R. A. V. v. City of St. Paul*, 505 U. S., at 388. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid*. **Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."** (emphasis added)

The aforementioned body of law informs us that unless this court is open to making new law that sharply curtails free speech, albeit perhaps obnoxious free speech, the prospects for Plaintiffs prevailing are slim to none.

Plaintiffs' entire case rises and falls on speculation from out of court declarants, activists, and reporters. The information frequently contains hearsay within hearsay within hearsay. "While

courts in this Circuit frequently apply a permissive standard to determine whether evidence can be admitted in a preliminary injunction setting, that standard is not limitless*." See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir.1986)). Indeed, evidence should be excluded if it is hearsay and inappropriate "given the character and objectives of the injunctive proceeding." *Id*.

As aforementioned, by its letter, Plaintiff has admitted that the facts as plead in its complaint are inaccurate and cannot be relied on. *See* October 26, 2020 Correspondence to Court. Plaintiffs are, in effect, asking the Court to assume things not in evidence and to add insult to injury asks this court to act based on the unsworn, out-of-court statements of counsel and the opinion of counsel that a potential for harm existed. Even at this early stage, such unsubstantiated assertions are insufficient to warrant the drastic and extraordinary relief of granting a preliminary injunction.

## V.   **The Disruptive Relieve Sought by Plaintiff is not Favored by the Equities.**

Even if the Court determines that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation," Plaintiffs cannot prove that the balance of hardships tips decidedly in their favor. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The balance of hardships tips decidedly towards Defendant because the Plaintiffs are asking this Court to ignore well-established 1st Amendment protections for expressions of opinion and political speech.

In this case, Plaintiffs seeks an order, in effect, silencing Defendants from making *any* political statements between now and Election Day. Given that a State AG has filed a criminal indictment there idea that Plaintiffs' criminal defense counsel would let them exercise free speech of any kind over the next 7 days does not render opposition to this motion meaningless and given that such implicates the prospects of a likelihood of prevailing on the merits when a contrary result

is in fact called for. Plaintiffs frame their claims in histrionic terms of voter suppression and racism without any substantiation and when in fact all affiants already have a remedy: the normal processing of voting, either in person or by mail. *See* Complaint. In fact, many have already voted and all have indicated they will not be deterred from voting.

The alleged offending statement, if it even can be called that, attributed to the Defendants can be universally deplored and still be a perfectly legal expression protected under the first amendment. The underlying statutes cited to by the Plaintiffs in their Complaint were intended to curtail violence, menacing and intimidation of the kind employed by a violent secret society that used violence and menacing to curtail the rights of Republicans and Blacks in the reconstruction era South. The Ku Klux Klan statute was not intended to curtail free speech let alone free speech that is either true or merely an expression of opinion. As such, the Complaint is unlikely to succeed and imposing a constraint on otherwise legal free speech inequitable. It is also likely to be entirely moot. The Plaintiffs are complaining of the contents in robocalls allegedly made on August 26th 2020. Plaintiffs have not alleged a single succeeding call. There are roughly 7 days until election day. Additionally as plaintiffs note AG's offices have already inserted themselves into the mix. It is therefore evident that the Defendants cannot be expected to be associated with issuing any robocalls. Despite same, Defendants must oppose this motion for all the sundry reasons asserted about and because Plaintiff's motion requires a sort of prejudgment on the merits

Plaintiffs waited many months to file its complaint and evidently inserted the newsworthy Ku Klux Klan act immediately before the election rather than perhaps in September. This Court should deny Plaintiff's 11th hour attempt to make press. The balance of equities does not favor Plaintiffs because of the curtailing of first amendment rights as opposed to trusting in voters' capacity to make intelligent decisions, evidently as every individual Plaintiff herein attests he or

she is capable of doing. A court weighing the equities of a proposed injunction must "balance the competing claims of injury" and consider the "public consequences" of an injunction. *Winter*, 555 U.S. at 24. A court should consider the harm the applicant is likely to suffer with the harm the opponent will suffer if an injunction is imposed. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010).

There is therefore no one who has been harmed by the alleged robocalls attributed to the Defendants, and there exists no need to enjoin anything or anyone. Plaintiffs have not produced a single voter in the situation it imagines exists who has not voted who is not committed to voting and the fact that the election outcome will not change, the equities do not favor an injunction. As such, the proposed injunction does not serve the public interest and Plaintiffs have not shown that the proposed injunction is in the public interest. The proposed injunction is also not in the public interest because Plaintiffs do not exercise reasonable diligence in placing these matters before the Court. Indicative of this is its letter noting there are inaccuracy in the complaint after Defendant secured counsel. *See* October 26, 2020 Correspondence to Court.  Plaintiffs have not shown that any new information was needed before bringing this lawsuit after 3 months. Plaintiffs filed this action just before the election and then sat and waited until days before the election exposing its true intent – <u>a news splash</u>. This Court should deny Plaintiff's 11th hour attempt to make press. The balance of equities does not favor Plaintiffs because of the curtailing of First Amendment rights as opposed to trusting in voters' capacity to make intelligent decisions, evidently as every Individual Plaintiffs herein attests he or she is capable of doing. *See* Affidavits of Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, And Andrea Sferes.

A court weighing the equities of a proposed injunction must "balance the competing claims of injury" and consider the "public consequences" of an injunction. *Winter*, 555 U.S. at 24. A court should consider the harm the applicant is likely to suffer with the harm the opponent will suffer if an injunction is imposed. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). Finally, as discussed above, Plaintiffs have not exercised reasonable diligence and its request for a temporary restraining order should be denied. *Benisek*, 138 S.Ct. at 1944.

As a result of the foregoing, the extraordinary relief sought by Plaintiffs is not favored by the equities, and the Court should deny the herein requested relief in its entirety.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's emergency motion for a temporary restraining order and deny NCBCP's motion for a preliminary injunction, and grant Defendants such other and further relief in either law or in equity as the court deems just and proper.

Dated: October 27, 2020                                    Respectfully submitted,

                                                        **GERSTMAN SCHWARTZ LLP**

                                    By:     */s/ David M. Schwartz*
                                             David M. Schwartz, Esq.
                                             1399 Franklin Avenue, Suite 200
                                             Garden City, New York 11530
                                             Tel. No.: (516) 880 – 8170
                                             DSchwartz@GerstmanSchwartz.com