KAQKNATM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NATIONAL COALITION ON BLACK
CIVIC PARTICIPATION, et al.,

              Plaintiffs,

       v.                   20 CV 8668 (VM)
                           Telephone Conference
JACOB WOHL, et al.,

              Defendants.

------------------------------x
                         New York, N.Y.
                         October 26, 2020
                         9:00 a.m.

Before:

               HON. VICTOR MARRERO,

                         District Judge

                  APPEARANCES

ORRICK HERRINGTON & SUTCLIFFE LLP
     Attorneys for Plaintiffs
BY:  RACHELLE MARIE NAVARRO

LAWYERS' COMMITTEE FOR CIVIL RIGHTS
     Attorneys for Plaintiffs
BY:  JOHN LIBBY

JACOB WOHL, Pro Se Defendant

JACK BURKMAN, Pro Se Defendant

KAQKNATM

1          (The Court and all parties appearing telephonically)

2          THE COURT:  Good morning.  This is Judge Victor

3     Marrero.

4          This is a proceeding in the matter of National

5     Coalition on Black Civic Participation and others against Wohl

6     and others.  It's Docket No. 20 CV 8668.

7          Do we have a reporter on the line?

8          (Pause)

9          THE COURT:  The Court scheduled this proceeding on the

10    filing by plaintiffs of this action seeking a temporary

11    restraining order and permanent injunction prohibiting the

12    defendants from engaging in telephone communications designed

13    to intimidate voters from participating in the presidential

14    election scheduled next week.

15         Would counsel please enter your appearances for the

16    record.

17         MS. NAVARRO:  Good morning, your Honor.  This is

18    Rachelle Navarro, of Orrick Herrington & Sutcliffe.  And also

19    on the phone for the plaintiff, you have Mr. John Libby, of the

20    Lawyers' Committee for Civil Rights.

21         MR. LIBBY:  Good morning, your Honor.  John Libby

22    here.

23         THE COURT:  Good morning.  Thank you.

24         MR. BURKMAN:  Your Honor, this is Jack Burkman.

25    Unfortunately, we have not yet been able to secure counsel.  We

KAQKNATM

1   did yesterday, and counsel will be available tomorrow.  We only

2   had two days, so I am just here speaking for myself pro se this

3   morning.  We were served with this lawsuit last week, and we

4   tried to get counsel as fast as we could.  Thank you.

5           MR. WOHL:  This is Jacob Wohl here.  I would basically

6   second everything that Jack just brought up.

7           THE COURT:  Mr. Burkman and Mr. Wohl, can you indicate

8   what efforts you made to seek counsel and any particular

9   prospect that counsel would be available?

10          MR. BURKMAN:  Yes, your Honor.  We have secured

11  counsel by the name of David Schwartz.  I believe we were

12  served with this lawsuit Thursday.  I can't remember exactly.

13  We rushed as fast as we could to get a lawyer, and we have

14  secured him as of yesterday, and he will be available on the

15  case literally within 24 hours or so.  We moved as fast as we

16  could.

17          THE COURT:  All right.  I thank you.

18          Can you give me some particulars about who Mr. David

19  Schwartz is?

20          MR. BURKMAN:  He is a litigator, he is a civil

21  litigator in New York City, I think a fairly well-known civil

22  litigator in New York City, and we have retained him.

23          THE COURT:  All right.  Thank you.

24          In light of that, we're going to proceed since we have

25  a record in the hearing.  The transcript will be available to

KAQKNATM

1    the defendants and Mr. Schwartz, so let us proceed in the
2    meantime.

3         I will give the plaintiffs a minute initially to make
4    their case, and I will give the defendants each an equal amount
5    of time to present their case pro se, and I will give them an
6    opportunity to supplement whatever they indicate now by
7    submission by Mr. Schwartz not later than close of business
8    tomorrow.

9         All right, Ms. Navarro.

10        MS. NAVARRO:  Thank you, your Honor.  And just as a
11   matter to clarify the record, defendants, Mr. Burkman and
12   Mr. Wohl, were served on Wednesday of last week, not Thursday.

13        Your Honor, first, we want to thank you on behalf of
14   the plaintiffs, many of which are on the phone.  We want to
15   thank you for holding a prompt hearing on this issue.  We are
16   here today asking this court for your help.  We're here asking
17   you to protect what the Supreme Court has called the most
18   precious right, the right to vote, free of intimidation and
19   free of interference.

20        In this case, the defendants disseminated a robocall
21   to over 85,000 people.  This robocall contained three blatant
22   lies designed to dissuade people from using mail-in voting.
23   These three lies are that the police will use the voters'
24   identifying information to execute outstanding police warrants,
25   that credit cards will use the information to collect on

KAQKNATM

1   outstanding debts, and that the CDC will use the information to

2   pursue forced vaccinations.

3          Defendants have targeted these robocalls to areas with

4   high populations of black residents.  And it's important, your

5   Honor, that the lies that are included in the robocalls feed on

6   very real fears that exist in the black community.  The

7   robocall is intended to intimidate voters, and, indeed, it has

8   intimidated voters, and it's also caused organizations, like

9   Plaintiff National Coalition, to divert resources in order to

10  respond.

11         Your Honor, we did our best to lay out our arguments

12  in the papers, and I don't want to rehash them for you, but we

13  do think there are three very important points that must be

14  emphasized.

15         The first, your Honor, is that the defendants'

16  behavior here is the most offensive kind.  Not only does the

17  robocall contain blatant lies about mail-in voting that stir up

18  racist tropes, but the defendants are sending this robocall at

19  a moment when the country is navigating the worst and most

20  deadly pandemic it has seen in over a hundred years.

21         So what does that mean tactically?  It means that if

22  voters are intimidated out of voting by mail because of this

23  robocall, they either have to vote in person, potentially

24  exposing themselves to COVID-19, or not vote at all.

25         Second, the intimidating effect of these robocalls is

KAQKNATM

1    not just conjecture.  The effect is very real.  And in

2    considering this motion, I ask the Court to remember our

3    plaintiffs.  Let's take plaintiffs, Mary Winter and James

4    Steinberg, for example.  As Ms. Winter and Mr. Steinberg laid

5    out in their declaration, they live in a county where COVID-19

6    cases have been on the rise.  And, as such, in an effort to

7    protect themselves and their loved ones, they have always said

8    that they were going to vote by mail.  But then they received

9    this call, this hateful call.  And even though both Ms. Winter

10   and Mr. Steinberg, they know this robocall is a hateful lie,

11   they still found this robocall to be so intimidating, that it

12   has completely undermined their confidence in mail-in voting,

13   and now they will be voting in person.

14          This is the effect that the robocalls have had on

15   people who know it's a lie, so we can just imagine the effect

16   the robocall will have on all these other recipients of the

17   robocalls who don't realize that.

18          Real harm has also been caused to organizations like

19   Plaintiff National Coalition on Black Civic Participation.

20   This organization, an organization whose resources are already

21   stretched and who are serving underrepresented communities,

22   they were forced to divert these resources from the regular

23   mission to respond and counter these deceptive robocalls.  This

24   injury is not conjecture, it is real.

25          Third, and lastly, your Honor, it is almost certain

KAQKNATM

that if defendants are not enjoined, they will continue to
engage in voter intimidation.  Defendants have a long history
of perpetrating fraudulent schemes, and these fraudulent
schemes are designed to disrupt elections.  We laid out in our
papers the long history the defendants have.

You've read the examples, your Honor.  Over the last
couple of years, they have encouraged or paid multiple
individuals to falsely allege sexual assault against various
different public figures.  Just a few months ago, they went on
Craigslist and hired actors to play FBI agents to stage a raid
on Mr. Burkman's house, and then alleged that the government
was retaliating against them.

The defendants are fraudsters, your Honor.  Frankly,
they have made being a fraudster their full-time job these last
couple of years.  And this behavior, this behavior of
perpetrating fraudulent schemes, is consistent with their
stated goal.  Defendants have publicly admitted that they are
engaged in an all-out assault to disrupt the election.  Last
year, when they sought funding for organization, they said they
planned to make stuff up in order to suppress the votes.  And
as we get closer to the election, your Honor, the more relevant
and potentially more effective this strategy of disrupting the
election becomes.  It must be stopped.

So, for these reasons and the reasons laid out in our
brief, we would ask the Court to enjoin the defendants from

KAQKNATM

1    further violations of the law and also enjoin them from sending

2    out any other robocalls or other mass communications until

3    after the election.

4             Thank you, your Honor.

5             THE COURT:  All right.  Thank you, Ms. Navarro.  A

6    couple of questions.

7             Do plaintiffs have a complete list and contact numbers

8    of the individuals who were targeted to receive the defendants'

9    robocalls?

10            MS. NAVARRO:  Just for clarity, do we have a complete

11   list of the 85,000 recipients?

12            THE COURT:  Yes.

13            MS. NAVARRO:  We do not, your Honor.  We do

14   understand, and as laid out in our papers, the Michigan A.G.'s,

15   Attorney General's, Office does have an active criminal

16   investigation.  The robocalls were sent through a company

17   called Message Communications.  Discovery is ongoing in that

18   case, and I imagine that the Michigan Attorney General's Office

19   probably does have that list from Message Communications.

20            THE COURT:  Thank you.

21            With reference to the proceeding in Michigan, do

22   plaintiffs have any indication whether the defendants engaged

23   in any form of robocalls or other communication to plaintiffs

24   or other individuals like plaintiffs following the order by the

25   Michigan court in that case?

SOUTHERN DISTRICT REPORTERS, P.C.

KAQKNATM

1          MS. NAVARRO:  This is Rachelle Navarro again.

2          Your Honor, I understand for you to be asking whether

3     we have reason to believe that defendants have perhaps violated

4     their bail conditions.  One of the bail conditions of the

5     Michigan court was that defendants not engage in sending out

6     any other mass communications.

7          We have no direct evidence, your Honor.  I will note

8     that I believe at the last proceeding, on October 15th, the

9     Court did raise concerns that they had received indications

10    that Defendant Wohl, Mr. Wohl, has potentially violated the

11    order, but they're still running down that evidence.

12         If I may, your Honor, also, we recognize that there is

13    this Michigan bail condition in place, but we do not believe

14    that the conditions imposed by the court as part of the bail

15    package in Michigan are sufficient to protect the voters, and

16    we believe this for a couple of reasons.

17         First, your Honor, there's no guarantee that the bail

18    condition ordering Mr. Burkman or Mr. Wohl not to engage in

19    further mass communications will stay in place.  Bail

20    conditions do change, and plaintiffs and other voters have no

21    control over this.  And the Michigan court also has

22    jurisdictional limits on enforcement, right?  The Court has no

23    way to address substantive voter intimidation that occurred

24    outside of Michigan other than the relief available to it for

25    violations of bail.  And the Michigan order does not reach the

KAQKNATM

1    entity defendants -- does not reach the entity defendants

2    either.   This TRO seeks to bind entity defendants and others

3    who may be working with Mr. Burkman and Mr. Wohl.

4            Also, your Honor, we only know of robocalls.  We only

5    know of actions by Mr. Wohl and Mr. Burkman if they are

6    reported to us.  All we know -- we do know - and Mr. Wohl and

7    Mr. Burkman have stated - that it is their goal to suppress the

8    vote, that it is their goal to disrupt the election.  We know

9    that.  We just don't know what other schemes they have embarked

10   on to do so because we only know what is reported to us.

11           The last thing I'll say, your Honor, on this point --

12   and I think this is important -- there are only nine days left

13   to the election.  There is no reason to believe that defendants

14   won't continue to engage in their efforts to intimidate voters,

15   and for the reasons I just said, I think there's every reason

16   to believe that defendants will continue.  They have a long

17   history of perpetrating fraud and have publicly repeatedly

18   stated their intentions to interfere with the election.

19           And I think plaintiffs here and, frankly, voters

20   everywhere, have a right to vote free of intimidation that is

21   caused by the defendants' fraudulent schemes.

22           THE COURT:  All right.  Thank you very much.

23           Let me then turn to the defendants and allow you an

24   opportunity to say anything you may wish to say on your behalf

25   in response to the plaintiffs' allegations.

KAQKNATM

1          Mr. Burkman?

2          MR. BURKMAN:  Thank you, your Honor.

3          Well, I would just say, first of all, we have no plans

4     to do any -- will not be doing any robocalls and, frankly, no

5     electioneering between now and Election Day.  That much, I can

6     say for sure.

7          Secondly, we strongly believe that the bail order of

8     the Michigan judge is unconstitutional and that it violates the

9     First Amendment.

10          Thirdly, I would say, just even a cursory look at the

11     case law, I don't believe any federal judge has ever given an

12     order like the one that Ms. Navarro is requesting today in the

13     Southern District or anywhere in the United States.  I think it

14     would be completely entirely without precedent.

15          Fourth, I would say, of course, we deny the

16     plaintiffs' claims.  We believe they're baseless and without

17     any foundation.  The plaintiff really hangs her claims on a

18     statute called the Ku Klux Klan Act, which is a statute from

19     150 years ago, which has never been used for this purpose or

20     any purpose even close to it.

21          Fifth, we would suggest that none of the plaintiffs

22     have any standing in this case.

23          So just to go down this long list, I mean, I don't

24     want to use the word absurd, and I don't want to succumb to

25     hyperbole, but I really think this is about as far-fetched as

KAQKNATM

1   anything could possibly be.  And I would ask -- if you would, I

2   would ask if Mr. Wohl has anything to add.

3            THE COURT:  Let me --

4            MR. WOHL:  Yes.

5            THE COURT:  Before Mr. Wohl speaks, Mr. Burkman, I

6   will ask just a couple of questions, and I will ask the same

7   questions to Mr. Wohl.

8            MR. BURKMAN:  Sure.

9            THE COURT:  You deny and claim that the plaintiffs'

10  allegations have no basis.  Did you or anyone that you are

11  affiliated with prepare the robocalls and cause them to be

12  sent?

13           MR. BURKMAN:  Well, I would suggest -- the call in

14  question, your Honor, what I would suggest to you, first of

15  all, we believe it's true on its face.

16           Secondly, we believe --

17           THE COURT:  Mr. Burkman, my question was not whether

18  they're true or false right now.  My question was whether you,

19  acting alone or with anyone else, prepared that message and

20  caused it to be sent?

21           MR. BURKMAN:  Oh, yes, your Honor, yes.  That is our

22  call, yes, yes.

23           THE COURT:  You don't deny that you caused this call

24  to be made and that you --

25           MR. BURKMAN:  No.

KAQKNATM

1          THE COURT:  -- don't deny the content of it?

2          MR. BURKMAN:  No, your Honor, we do not.

3          THE COURT:  Thank you.

4          Second question:  Do you have in your possession or

5     through an agent, like the entity that Ms. Navarro referred to

6     before, that has the contacts, the individuals to whom your

7     call was directed?

8          MR. BURKMAN:  In my -- I do not have in my possession.

9     I do not know what that entity in California has in its

10    possession.  Obviously, there are sensitivities.  One of the

11    things we'll probably be asking for in this case is a stay

12    pending the resolution of the criminal case in Michigan.  So I

13    don't know what they would have in California.

14         THE COURT:  Well, when you prepared the robocall and

15    presumably had it transmitted to the entity in California, did

16    you have instructions to them as to what they should do with

17    the content of the robocall?

18         MR. BURKMAN:  Yes, as to the content, yes, we did,

19    yes.

20         THE COURT:  You told them what to do with it?

21         MR. BURKMAN:  Well, in terms of what to do with it,

22    you mean what the content of the call would be?

23         THE COURT:  No.  What they should do with the content

24    of the call that you directed them to do something with.  Did

25    you ask them to forward that robocall to anyone, to plaintiffs

KAQKNATM

1    in particular?

2              MR. BURKMAN:  To the plaintiffs?  Well, a robocall

3    call is sent out, it's sent out to various zip codes in various

4    places.  So it's a random -- any robocall is kind of a random

5    distribution to various people in various places.

6              THE COURT:  That is my question.  Did you give

7    instructions to that entity to send the --

8              MR. BURKMAN:  Well, yes, of a kind, yes, in the way

9    that any robocall would have instructions, yes, correct.  Yes.

10             THE COURT:  All right.

11             And did you indicate to them any guidelines as to

12   where the call should be directed in particular, any

13   particular --

14             MR. BURKMAN:  Your Honor, honestly, I would have to

15   consult -- it's been a while.  I would have to consult notes

16   and such.  To answer that fully, I'd have to consult.

17             THE COURT:  All right.

18             MR. BURKMAN:  I don't have all of that at the ready.

19             THE COURT:  Thank you.

20             Let me, then, ask Mr. Wohl if he wishes to make any

21   statement?

22             MR. WOHL:  Yes, your Honor.

23             I would second everything that Mr. Burkman just

24   pointed out.  I would also say, and I would stress the point,

25   that there are no robocalls underway.  There have not been any

KAQKNATM

1   robocalls underway since the beginning of any sort of legal

2   proceedings in Michigan, and that what we believe that this is,

3   is not an effort to stop robocalls -- no one, least of all the

4   plaintiffs, and no one else has alleged that any robocalls have

5   taken place since the proceedings began in Michigan.  So what

6   this represents is an effort not to stop robocalls, but to

7   stifle our constitutionally protected political speech.

8           And as to Ms. Navarro's mention of the bail conditions

9   in Michigan and the like, that was examined by the court.

10  There was another hearing since the one that she referenced,

11  and everything is all in good standing as it relates to bail

12  conditions in Michigan.

13          So that's what I would conclude with, your Honor.

14          THE COURT:  All right.  Thank you.

15          Mr. Wohl, you indicated that you echo all of what

16  Mr. Burkman said.  Does that include acknowledgment that you

17  participated in the preparation of the content of the message

18  and its communication to plaintiffs through the entity in

19  California?

20          MR. WOHL:  Yes, your Honor, as to Mr. Burkman's

21  specific representation, yes, yes.

22          THE COURT:  All right.  Thank you.

23          Now, let me ask both Mr. Burkman and Mr. Wohl whether

24  they have specific facts or evidence that the voter information

25  that voters submit if they mail in ballots is, in fact, being

KAQKNATM

1    made available either to law enforcement agents, to credit card

2    companies, or to the CDC for the purpose of forced vaccination.

3    On what specific evidence or facts do you base your statement

4    that those representations are not false?

5              MR. WOHL:  This is Mr. Wohl here, if I could begin.

6              No one has ever made the claim, until now, presumably,

7    that voter records, particularly in the State of Michigan, are

8    not part of the public record.  Of course, they're part of the

9    public record.  And, in fact, in the State of Michigan, not

10   just law enforcement, not just credit card companies, but, in

11   fact, any person can walk into the clerk's office, and without

12   even filling out a Freedom of Information Act request and, in

13   fact, a much simpler, much more abbreviated request, they can

14   obtain the information belonging to voters.

15             In the Michigan case in particular, law enforcement

16   proved this was true, as we've recently learned in discovery,

17   because Michigan law enforcement requested the voter records of

18   individuals.  It did not require a subpoena, it did not require

19   a warrant because, of course, that is public information.  So

20   there is no question as to whether or not voter records are

21   public information that can be accessed by law enforcement.

22             Further, I would say that there is an entire industry

23   of database providers, of service providers to law enforcement

24   agencies and debt collectors that specifically specialize in

25   scraping public databases, whether it be for library cards, for

KAQKNATM

1   voter records, or any other form of public data.  So that has

2   never been anything that has been held in contention.  All that

3   Ms. Navarro would have to do is consult the Michigan statute or

4   consult statutes in other states to see that that is, in fact,

5   the case.

6          Now, as to law enforcement, I address that point by

7   pointing to the specific example in Michigan where the voter

8   records were pulled, and, clearly, that is something that could

9   happen more broadly should law enforcement decide they want to

10  do it.

11         But the most important thing to understand is that

12  those records will be scraped by database providers, and so if

13  your latest address was not in one of those databases, and you

14  register to vote, it will be at some point.

15         And as to the difference between voting by mail versus

16  voting in person, if you were to vote in person, many folks

17  that are in at-risk situations -- whether they have debt,

18  whether they have criminal warrants that are not felony

19  warrants and they're able to vote -- they will use oftentimes,

20  we learned, less specific addresses.  Perhaps they'll use their

21  apartment building and not the unit number when they fill out

22  to register to vote.  And, of course, there's no problem with

23  this because if you vote in person, you vote in person, but if

24  you're voting by mail, you have to use your specific address

25  right down to the unit number, otherwise you won't receive your

KAQKNATM

1    ballot in the mail, and you won't vote.

2            So that addresses that point.  Again, credit card

3    collectors use every piece of data at their disposal, including

4    data scraped from voter records.

5            And then as to the last point, the CDC, what I would

6    say is that there are now dozens of hours of congressional

7    testimony by public health officials at the federal level, at

8    the statehouse level before state legislatures, talking about

9    what they feel is the importance of mandatory vaccines,

10   particularly for COVID-19 as they become available, in order to

11   beat back the pandemic.

12           Mandatory vaccines were cited by Ms. Navarro as

13   something that is, for whatever reason she believes, especially

14   unpopular in the black community, but our research indicates

15   that mandatory vaccines are not just unpopular in the black

16   community, they're unpopular across all different kinds of

17   communities, all different races, all different religions,

18   creeds, colors, nationalities.  The anti-vaccine movement is a

19   diverse movement, and, clearly, this call was not targeted to

20   black individuals -- there's no way to do that, to my

21   knowledge -- it is a call that is a public service

22   announcement, and every claim made in the call is dispositively

23   true.

24           THE COURT:  All right.  Thank you.

25           Mr. Burkman, anything else you may wish to add to what

KAQKNATM

1    Mr. Wohl just said?

2              MR. BURKMAN:  I would just add, your Honor, I have

3    been in Washington a long time, and I would say that entities

4    like FBI, and DOJ, and DHS, they all have an enormous

5    history -- and not just these entities, but the contractor

6    community by which they're supported - the Lockheeds, the

7    General Dynamics, and Northrup, and all of that -- they all

8    have an enormous history of gathering data from anything they

9    possibly can, not just voting data, but immigration data, you

10   name it.  And in terms of I believe that message said the CDC

11   is pushing for certain kinds of data -- I don't have it in

12   front of me -- the CDC is always pushing for any kind of data

13   it can get its hands on.  So I've seen all of that for decades.

14             THE COURT:  All right.  Thank you.

15             Ms. Navarro, let me turn back to you.  Do you have

16   anything to add by way of reply?

17             MS. NAVARRO:  Yes, your Honor.  Thank you.

18             First, I'd like to take on Mr. Burkman's and

19   Mr. Wohl's last, if you can call them, statements regarding the

20   veracity of the robocall, and then my colleague, Mr. Libby,

21   will address First Amendment concerns.

22             Your Honor, I started this conversation by talking

23   about why the robocalls were so effective.  What's shocking to

24   me is defendants are now using this legal proceeding, this

25   phone call, to continue to perpetrate hateful lies.  Your

KAQKNATM

Honor, let's be clear.  The robocalls were directed at mail-in voting.  Mail-in voting is part of voter registration.  That information, the information of your name and your address, that exists in the voter registry database.  It doesn't exist also as part of mail-in voting.  The information already exists.

So the distinction that defendants are trying to draw between a voter registration and information that's part of your mail-in ballot is completely disingenuous and, again, is intended to play on the fears that exist in a time when this country is dealing with the worst pandemic it has dealt with in a hundred years.  This behavior is unacceptable, and I find it unacceptable that defendants are using your Honor's courtroom to continue to perpetrate these lies.

Second, there is a difference between whether information is publicly available and how it will be used.  All I heard defendants say was that information regarding voter registration is publicly available.  That has nothing to do with how it will be used by the CDC, by law enforcement, by credit card companies.  There is zero evidence to support that.  And let's be clear, let's go back to what the robocall said.  This is an effort by defendants to discourage mail-in voting, and thereby discourage voting.  The robocall says, stay home, stay safe, and beware of vote by mail.  Stay home, they want you to stay home.  This is an all-out assault on voting.

KAQKNATM

1          I'll now give the floor to my colleague, Mr. Libby.

2          MR. LIBBY:  Yes.  Good morning, your Honor.  John

3     Libby.

4          With regard so defendants' statements concerning the

5     First Amendment and the scope of the TRO that we're seeking,

6     this is actually a very narrowly tailored proposed TRO that

7     we're asking the Court to enter.

8          The first paragraph simply admonishes the defendants

9     not to violate the law.  Criminal speech is not protected by

10    the First Amendment.

11         The second paragraph is a very narrowly tailored time,

12    place, and manner restriction, which, by the way, they've

13    already admitted that they're not going to do, they've said

14    that they're not going to engage in robocalls between now and

15    the election.  But we're asking the Court to enter the order

16    that we're seeking ordering the defendants not to make any

17    robocalls between now and Election Day or to cause others to

18    make robocalls between now and Election Day.  And we're eight

19    days away, very limited time, place, and manner restrictions

20    protecting the integrity of the election, and such a

21    restriction and such an order, which they've admitted they

22    would abide by anyway, does not run afoul of the First

23    Amendment.

24         The other point I'd make, your Honor, is with regard

25    to Mr. Burkman's statement regarding the KKK Act.  The KKK Act

KAQKNATM

1    has been used repeatedly in voter intimidation cases – and we

2    cited the cases in our briefs — to prevent conspiracies

3    designed to intimidate voters, again to protect the integrity

4    of the vote and the integrity of the election.  So it's not

5    simply an old 150-year-old law, it's active, it's used

6    repeatedly in cases of this type, and it's certainly

7    appropriate to be used here.

8              I'll submit, your Honor.

9              THE COURT:  All right.  Thank you.

10             Let me ask a follow-up question to that, Mr. Libby.

11             By plaintiffs' estimate, the robocall message was sent

12   to 85,000 or more voters.  The plaintiffs, the individual

13   plaintiffs in this litigation, presumably, are a very small

14   fraction of the people who received the call.  Is that correct?

15             MR. LIBBY:  That's correct, your Honor.  That's our

16   current information.

17             THE COURT:  So, out of the 85,000, is it conceivable

18   that a substantial number of those still may have been

19   influenced or might be influenced by the robocall into not

20   voting or not voting by mail?

21             MR. LIBBY:  Well, your Honor, that would be

22   speculation on my part, but we certainly have what we believe

23   is a representative set of plaintiffs who have clearly

24   indicated in their declarations that they felt intimidated by

25   this call.  As Ms. Navarro indicated in her opening remarks, at

KAQKNATM

1    least two of those plaintiffs have had their voting plans

2    changed, and they're going to take their health and their lives

3    into risk, and they're going to go vote in person because of

4    this hateful robocall by these defendants.

5            THE COURT:  So, again, at least in theory, a fair

6    number of people who received this call, absent any other

7    contrary message, could be influenced into not voting or not

8    voting by mail, again in theory?

9            MR. LIBBY:  I think that would be a reasonable

10   inference, your Honor.  But we don't have any concrete

11   information at this point absent further discovery in this case

12   or in the Michigan case.

13           THE COURT:  All right.  I thank you.

14           If there is nothing else, I'm going to close the

15   hearing and --

16           MR. WOHL:  Just one last thing, your Honor.  Mr. Wohl

17   here, just for the record, if you would allow?

18           THE COURT:  Yes.

19           MR. WOHL:  Just a quick note:  I would be remiss not

20   to point out that when Ms. Navarro last spoke, she said the

21   call said to stay home.  She is mistaken.  The call did not say

22   the words "stay home" in it; it did not say "stay home" in any

23   way, shape, or form.  So I just wanted to get that on the

24   record.

25           THE COURT:  Well, isn't that a matter that could be

KAQKNATM

1   factually verified?  Is there a --

2               MR. WOHL:  There's a transcript of the call, your

3   Honor.  There is a tape, and the tape -- and nobody has ever

4   alleged the tape says stay home.  That's not in the transcript

5   published by anyone.  I think it's probably an innocent

6   mistake, but I wanted to get that on the record.

7               THE COURT:  All right.

8               MR. WOHL:  It does say "stay safe"; it does not say

9   stay home.

10              THE COURT:  Let's come back to Ms. Navarro.

11              Where did the plaintiffs' version of the call come

12  from?  And does it contain the language that you indicate that

13  says stay home?

14              MS. NAVARRO:  Your Honor, the transcript of the call,

15  we have laid it out for your Honor on page 2 of the memorandum

16  of law, there's a transcript there, and it's also page 29 of

17  the complaint.  And the very last line is:  "Don't be finessed

18  into giving your private information to the man.  Stay home,

19  safe, and beware of vote by mail."

20              THE COURT:  All right.  Thank you.

21              Again, this is a question of fact dispute that should

22  be easily verifiable by looking into the transcript.

23              Coming back, I'm going to close the hearing at this

24  point.  Mr. Burkman and Mr. Wohl, I will give you, through

25  Mr. Schwartz, an opportunity to supplement what you've said,

KAQKNATM

```
1    present any other legal defense.  I will ask that Mr. Schwartz
2    submit a notice of appearance today, and that he have until
3    tomorrow, not later than 3:00 p.m., to submit any further
4    material that he may wish to submit on your behalf.
5              MR. WOHL:  Thank you, your Honor.
6              THE COURT:  All right.  Thank you very much.  Have a
7    good day.
8              MR. BURKMAN:  Thank you, your Honor.
9              MS. NAVARRO:  Thank you, your Honor.
10                                * * *
11
12
13
14             I hereby certify that the foregoing is a true and
15   accurate transcript, to the best of my skill and ability, from
16   my stenographic notes.
17
18
19
20   _____
21             Official Court Reporter
22             U.S. District Court
23
24
25
```