

December 2, 2020

**BY EMAIL**
The Honorable Victor Marrero (chambersnysdmarrero@nysd.uscourts.gov)
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

  Re: *National Coalition on Black Civil Participation et al. v. Wohl et al.*, United States
   District Court, Southern District of New York, Case No. 1:20-cv-08668

Dear Judge Marrero:

  From your Honor's Order rendered today, it is clear that you have declined our request for an additional seven days to file a proper and complete motion to dismiss. We were appreciative that opposing counsel consented to same. Respectfully, our pre-motion letter for leave to file a motion to dismiss absolutely did not incapsulate each and every basis upon which a motion to dismiss can and should be granted. Such was not possible given the three-page limit attaching to pre-motion letter's pursuant to your Your Honor's rules.

  With the greatest of respect, we were busily assembling our arguments and relying upon Your Honor's Memo Endorsement dated November 10, 2020, which would have allowed us until tomorrow at midnight to file a motion to dismiss. That said, in order to preserve and not prejudice our clients' substantive rights, we enclosed a semblance of our arguments herewith and reiterate our request for more time, and we quite respectfully beseech you to deem this as part of our pre-motion letter which you have deemed our Motion to Dismiss as, respectfully, the scant procedural record is insufficient to the task and without same our clients' rights will be greatly prejudiced. To the extent that Your Honor is disinclined to revisit your decision to allow us more time, in the interest of justice, we implore you allow this letter to serve to augment same and deem it a part thereto and review such in tandem with our previous letter.

  Thank you in advance for considering the foregoing.

I.  **Defendants' Robocall Statement Does Not Violate 52 U.S.C. § 10307(b) or 42 U.S.C. § 1985(3).**

  a.  **The Statement was not intimidating, threating or coercive in either intent or effect.**

  The complete text and history of both 52 U.S.C. § 10307(b)) and 42 U.S.C. § 1985(3) demonstrate that intimidation, threats, force, and/or coercion are prerequisites to their applicability. Indeed, 52 U.S.C. § 10307(b), entitled, "Intimidation, threats, or coercion", states in pertinent part that, "[n]o person…shall **intimidate, threaten, or coerce**, or attempt to intimidate, threaten, or

coerce any person for voting or attempting to vote, or…any person for urging or aiding any person to vote or attempt to vote…" *Id*. (emphasis added). Similarly, 42 U.S.C. § 1985(3), entitled, "Depriving persons of rights or privileges", states in pertinent part that, "…if two or more persons conspire to prevent by **force, intimidation, or threat**, any citizen who is lawfully entitled to vote, from giving support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President of Vice-President…"

While there is an admitted dearth of case law analyzing these statutes, the United States Supreme Court's definition of a "true threat" is one "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id*. at 347; *see also Watts v. United States*, 394 U.S. 705 (1969) (mere rhetoric and political hyperbole do not constitute a true threat).

### b. Even assuming, *arguendo*, that threats and/or intimidation do not have to be explicitly violent under Section 11(b), the Statement contains neither.

Even assuming, *arguendo*, that "threats" and "intimidation" need not be explicitly violent under Section 11(b), the Statement at issue here is easily distinguishable from instances where other district and circuit courts have found a violation of same. The instances in which the courts have found potential "intimidation" involved statements that directly targeting specific individuals/ethnicities and/or outwardly proclaimed that the act of voting would have definitive and potentially adverse outcomes.

For example, in *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.,* 2018 WL 3848404, at *1 (E.D. Va. 2018), the defendants obtained voter registration lists and used the lists to publish two separate written reports accusing immigrant voters generally and targeting specific voters by name of committing a variety of felonious acts related to voter registration and voting. The individually named plaintiffs sued alleging, *inter alia*, intimidation and fear of harassment pertaining to their participation in the electoral process. *Id*. The organizational plaintiff League of United Latin American Citizens ("LULAC") argued that as a result of the two reports, entitled *Alien Invasion I* and *Alien Invasion II*, respectively, "members and the Latino community [it] represents have been and continue to be intimidated and threatened by Defendants asserting that registering to vote and/or voting constitutes an unlawful 'alien invasion' that should be prosecuted." *Id*. (internal quotations omitted). The court rejected the defendants' argument that their conduct did not meet the definition of intimidation under the meaning of Section 11(b) because the "Defendants have linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium…Plaintiffs have alleged, plausibly, that the *Alien Invasions* reports put them in fear of harassment and interference with their right to vote." *Id*. at *4.

Similarly, in *United States v. Nguyen*, 673 F.3d 1259, 1261 (9 Cir. 2012), the criminal defendant was convicted of obstruction of justice after failing to disclose his full knowledge regarding his mailing of a Spanish-language letter to "foreign-born registered voters with Hispanic

surnames who were registered Democrats or 'decline to states.' *Id*. The letter stated, among other things, that "there is no incentive for voting in this country" and informed recipients that, if they voted in the upcoming election in November their personal information ***would be*** collected by a newly implemented government computer system…and that organizations that were against immigration might request information from this system. The letter also encouraged citizens to participate in the democratic process of voting, but warned those who are in this country illegally or [are] legal resident[s] that voting in a federal election is a crime that could result in incarceration and deportation. *Id*. (internal quotations omitted) (emphasis added).

Here, unlike *League of United Latin Am. Citizens* and *Nguyen*, the New York robocall Statement allegedly disseminated by Defendants was dispersed in English, does not name or target any individual or protected class, does not attempt to dissuade anyone from voting, and is facially neutral. Indeed, each of the Statement's three sentences following the introductory sentence (*i.e.*, Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl) use the terms "vote by mail" or "mail-in voting." Here, the Statement relates only to one particular *method of voting*, *i.e.*, mail-in voting, and provides no adverse opinion about in-person voting. *Compare Nguyen*, 673 F.3d at 1261 ("there is no incentive for voting in this country").

### c. Plaintiffs' insinuation that the Statement constitutes a threat of physical harm is untenable.

Plaintiffs' argue, in pertinent part, that,

> Even if actionable threats require expression of physical harm (which they do not), the robocalls at issue *did include* threats of such harm. Given the present widespread uncertainty concerning COVID-19, and historic distrust in the Black community of nonconsensual government vaccination programs, ECF No. 1 ¶ 35, threats of mandatory vaccinations is "reasonably perceived as a threat of bodily harm" to voters who vote by mail, ECF No. 38 at 50. Also, the threat of arrest in relation to old warrants could "fairly be perceived as threatening arrest or legal action against those with criminal records," which could involve a bodily seizure. *Id.*

This argument is specious and untenable for multiple reasons. First, notwithstanding Plaintiffs' conclusory allegation about the Black community's purportedly "historic distrust" of mandatory vaccinations, the Statement does not target the Black community. Second, Plaintiffs completely mischaracterize the content of the Statement, as the Statement does not contain any language threatening the recipient with mandatory vaccinations; rather, the Statement merely states that, "[t]he CDC is even pushing to use records for *mail-in voting* to track people for mandatory vaccines." Similarly, the Statement contains no language threatening the recipient with arrest; rather, the Statement merely states that, "*if you vote by mail*, your personal information will be part of a public database that will be used by police departments to *track down old warrants*." Plaintiffs' interpretation is sophistical and unfair.

As it happens the New York Bar Association is now calling for mandatory vaccination.[1] And as previously noted the Statement itself however controversial is one of political opinion and the specific arguments marshalled in favor of Defendants policy preferences protected free speech.

## II.    Statements of Mail-In Voting Are Not Actionable Under The First Amendment.

Under the First Amendment, the merits of political controversy must be resolved through the process of free and open debate, not through costly litigation. That principle applies directly here, where mail-in voting is at the center of a heated political debate. Plaintiffs cannot use the courts to impose sanctions on Defendants for publishing vigorous criticism of mail-in voting or for speech that can reasonably be interpreted as such.

"[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers,* 461 U. S. 138, 145 (1983). "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964). "That is because 'speech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Snyder v. Phelps,* 131 S. Ct. 1207, 1215 (2011) (quoting *Garrison,* 379 U. S. at 74-75). "At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 50 (1988). As far as the Constitution is concerned in this area, "there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974).

In its recent decision in *United States v. Alvarez,* 132 S. Ct. 2537, 2547 (2012), the Supreme Court made clear that truth on matters of public controversy cannot be dictated by the government, including by the courts. As Justice Kennedy explained for the plurality, quoting George Orwell's *1984,* "[o]ur constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Id.* at 2547. Justice Breyer agreed, stating that in "the political arena" especially, imposing legal punishment for supposedly "false" speech "is particularly dangerous." *Id.* at 2556 (Breyer, J., concurring). Even the dissenting Justices acknowledged that "there are broad areas" - including, notably, "matters of public concern" such as "philosophy, religion, history, the social sciences, the arts, and the like" - "in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech." *Id.* at 2564 (Alito, J., dissenting). The First Amendment thus prohibits judicial determination of "truth" in the realm of public controversy, in recognition of the serious dangers to deliberative democracy that would result from turning the federal courts into a truth squad on public affairs. *See Alvarez,* 132 S. Ct. at 2547-48 (plurality); *id.* at 2552, 2556 (Breyer, J., concurring); *id.* at 2564 (Alito, J., dissenting).

---

[1] NYLJ 11/7/2020 The New York State Bar Association on Saturday passed a resolution urging the state to consider making it mandatory for all New Yorkers to undergo COVID-19 vaccination when a vaccine becomes available, even if people object to it for "religious, philosophical or personal reasons."Nov 7, 2020

"The constitutional guarantee of freedom of expression [which] serves many purposes, but its most important role is protection of robust and uninhibited debate on important political and social issues. If citizens cannot speak freely and without fear about the most important issues of the day, real self-government is not possible." *Review, Inc. v. Mann*, 140 S. Ct. 344, 346 (2019) (Alito, J., dissenting); *see also Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) (("[S]peech concerning public affairs is more than self-expression; it is the essence of selfgovernment"). "To ensure that our democracy is preserved and is permitted to flourish, this Court must closely scrutinize any restrictions on the statements that can be made on important public policy issues. Otherwise, such restrictions can easily be used to silence the expression of unpopular views." *Review, Inc.*, 140 S. Ct. at 347 (Alito, J., dissenting).

## A. Political controversy must be resolved through free and open debate, not through litigation.

The First Amendment recognizes that the surest path to truth in the realm of political controversy is through the free and open exchange of ideas, not through litigation. Expressions of political opinion are protected by the First Amendment and include both statements that are classic opinions (*e.g.*, "this food tastes lousy") and factual-sounding statements where it is clear that the speaker is "plainly express[ing] a subjective view, an interpretation, a theory, conjecture or surmise, rather than…claim[ing] to be in possession of objectively verifiable…facts." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (citations omitted). Indeed, "even if a statement is objectively verifiable, it nevertheless qualifies as an opinion" where its content and context make "clear…that a reasonable reader or listener would recognize its…subjective character – and discount it accordingly." *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 508 (W.D. Va. 2019) (internal quotations omitted). This ensures that public discourse will not suffer from the absence of "imaginative expression" or "rhetorical hyperbole" that has "traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).

In keeping with these principles, criticism of mail-in voting must be answered by intellectual rebuttal, not through the filing of lawsuits. Indeed, if statements about the validity of mail-in voting could be subject to lawsuits, then the process of free debate would wither and die. Critics would be deterred from speaking out due to the threat of punishment for participating in the very process of truth-seeking that the First Amendment is designed to protect.

## B. The First Amendment protects rhetorical hyperbole on matters of public controversy.

Speakers who engage in protected expression on matters of public controversy often use vigorous language and rhetorical hyperbole to make their point. They do not hew to strict literalisms but regularly use words "in a loose, figurative sense" to express "strong disagreement," *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 284 (1973), and attack their intellectual opponents through "rhetorical hyperbole" or "vigorous epithets." *Greenbelt Coop. Publ'g,* 398 U.S. at 14. Such vigorous expression is an inherent feature of our "profound national commitment to the principle that debate on public issues

should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *N.Y. Times Co. v. Sullivan,* 376 U. S. 254, 270 (1964).

"If the First Amendment's guarantees of freedom of speech and of the press are to ensure that these rights are meaningful not simply on paper, but also in the practical context of their exercise, then a newspaper Op-Ed column discussing a subject of public interest must surely be accorded a high level of protection, lest the expression of critical opinions be chilled." *Guilford Transp.,* 760 A.2d at 582. If courts did not provide strong protection for caustic criticism in public debate, the threat of litigation would cast a "pall of fear and timidity... upon those who would give voice to public criticism," thus creating "an atmosphere in which the First Amendment freedoms cannot survive." *N.Y. Times Co.,* 376 U.S. at 278.

The realm of public debate is full of caustic rhetorical hyperbole. For example, Pulitzer Prize-winning columnist Charles Krauthammer penned a column in the *Washington Post* asserting that "intelligent design may be interesting as theology, but as science it is a fraud."[2] A writer for The *Atlantic* similarly asserted that it was "fraudulent" for actress Jenny McCarthy to claim that autism is linked to infant vaccination.[3] New York Times columnist Thomas Friedman asserted that "the climate-denier community, funded by big oil, has published all sorts of bogus science for years."[4] Also in the New York Times, another writer railed against the National Rifle Association for deploying "bogus" statistics on "defensive gun use."[5] Columnist Paul Krugman blasted House Republicans for passing "what was surely the most fraudulent budget in American history," adding, "[a]nd when I say fraudulent, I mean just that."[6] He also accused a fellow economist of "using a comparison that is completely fraudulent - and I say fraudulent, not wrong, because he is indeed enough of a policy wonk here to know that he is pulling a fast one."[7]

Similarly, in the context of mail-in voting, the National Conference of State Legislatures outlines advantages and disadvantages of mail-in voting including financial consideration, an increase in voter "errors" or "residual votes" including overvotes and undervotes, tradition and, notably,

> [d]isparate effect on some populations. Mail delivery is not uniform across the nation. Native Americans on reservations in particular may have difficulty with all-mail elections. Many do not have street addresses, and their P.O. boxes may be shared. Low-income citizens

---

[2] Charles Krauthammer, "Phony Theory, False Conflict," *The Washington Post* (Nov. 18, 2005), http://www.washingtonpost.com/wp-dyn/content/article/2005/11/17/AR2005111701304.html
[3] David M. Perry, "Destabilizing the Jenny McCarthy Public-Health Industrial Complex," *The Atlantic* (July 11, 2013), http://www.theatlantic.com/health/archive/2013/07/destabilizing-the-jenny-mccarthy-public-health-industrial-complex/277695/.
[4] Thomas L. Friedman, "Going Cheney on Climate," New York Times (Dec. 8, 2009), http://ww.nytimes.com/2009/12/09/opinion/09friedman.html.
[5] Juliet Lapidos, "Defensive Gun Use," *New York Times* (Apr. 15, 2013), http://takingnote.blogs.nytimes.com/2013/04/15/dcfensive-gun-use.
[6] Paul Krugman, "Pink Slime Economics," *The New York Times* (Apr. 1, 2012), http://www.nytimes.com/2012/04/02/opinion/krugman-pink-slime-economics.html
[7] Paul Krugman, "We Are Not Having a Serious Discussion, Obamacare Edition," *The New York Times* (June 1, 2013), http://krugman.blogs.nytimes.com/2013/06/01/we-are-not-having-a-serious-discussion-obamacare-edition/

move more frequently and keeping addresses current can pose problems. Literacy can be an issue for some voters, as well, since election materials are often written at a college level. (Literacy can be a problem for voters at traditional polling place locations, too.). Opportunities for coercion. If a voter is marking a ballot at home, and not in the presence of election officials, there may be more opportunity for coercion by family members or others. Slower result reporting.[8]

The decidedly progressive and quite readable Derek Thompson at The Atlantic on September 30th 2020 wrote "*How Voting by Mail Could Cost Biden the Election - While in-person voting looks safer than expected, mail-in voting looks more dangerous—not because of fraud, but because of human error and partisan politics*."[9] Other topical examples include the fact that 21% of New York's mail-in ballots (approximately 84,000) during June's primary election were rejected[10], and that the New York State Bar Association recently passed a mandatory COVID-19 vaccination resolution[11].

In the heat of public debate, such rhetorical hyperbole is fully protected under the First Amendment. Indeed, if authors and publishers could be sued every time they used figurative language about "fraudulent" methodology, "bogus" science, or misleading statistics on matters of public controversy, the scope of free speech in our national discourse would be dramatically curtailed. "[A]uthors of every sort would be forced to provide only dry, colorless descriptions of facts, bereft of analysis or insight. There would be little difference between the editorial page and the front page, between commentary and reporting, and the robust debate among people with different viewpoints that is a vital part of our democracy would surely be hampered." *Guilford,* 760 A.2d at 599 (quoting *Partington v. Bugliosi,* 56 F.3d 1147, 1154 (9th Cir. 1995)).

The Supreme Court has made clear that the First Amendment provides broad leeway for rhetorical hyperbole on matters of public controversy. That Defendants expressed their opinions through a robocall instead of an op-ed piece, billboard, television commercial, or soapbox on the street is not relevant. Defendants are well within their First Amendment rights to champion these opinions regardless of whether they are ultimately proven true and irrespective of the medium. *See Citizens United v FEC,* 558 U.S. 310, 326-327 (2010) (finding that courts "**must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker**…First Amendment standards must give the benefit of any doubt to protecting rather than stifling speech." (citations omitted) (emphasis added).

## III.   Plaintiffs Have Not Suffered Any Compensable Injury.

With regard to the Individual Plaintiffs, it must be recognized that not one even alleges he or she was dissuaded from voting. One or two attested that it reinforced their concerns about the

---

[8] https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx
[9] https://www.theatlantic.com/ideas/archive/2020/09/the-democrats-vote-by-mail-conundrum/616535/
[10] https://www.nbcnews.com/politics/elections/one-five-mail-ballots-rejected-botched-nyc-primary-n1236143),
[11] (https://www.law.com/newyorklawjournal/2020/11/07/state-bar-passes-mandatory-covid-19-vaccination-recommendation/?slreturn=20201016103002).

integrity of mail-in ballots and that they therefore determined to vote in person (just like some hundred million other Americans did). No harm befell these alleged robocall recipients, as they can be sure their votes were counted and are not the subject of any further scrutiny – like many who did vote my mail.

Individual Plaintiffs would have to have been on a desert island to have been entirely unaware of widely reported concerns about the reliability of mail-in ballots. The swirling controversies concerning the relative integrity of mail-in ballots was debated for many months before the November 2020 election and continues to be the subject of scrutiny, litigation and accusation. Individual Plaintiffs note the media reports and social media discussions themselves. Against this backdrop, it is unclear how Defendants allegedly stating something innumerable Congress Members, Senators, Newspapers and media outlets have said and continue to say. *Do not trust mail-in ballots*. *Voting in person is safer and better*. These are opinions.

Defendants' expressions of doubt as to same is in fact a political position and policy preference held by literally millions of Americans. We do not have to agree with it to recognize they have a right to express it. The short of it is that Individual Plaintiffs' allegations amount to no compensable harm. Read plainly, *not one Plaintiff indicates that the call had any suppressive effect on them personally* and, to the extent any suggest that it had a so-called "intimidating effect," this is belayed by the fact that one way or another all recount that they saw right through it and *none indicate that they were undeterred from voting* – but rather, worried that others might be deterred.

Plaintiff Mary Winter of Rockland County voted in the primary by mail-in ballot but concedes that "prior to receiving the robocall, Ms. Winter had doubts about the integrity of voting through the mail-in ballot process due to reports she had seen in the media but was still planning to vote by mail-in ballot. Ms. Winter's receipt of Defendants' robocall *has intimidated* her into changing plans." But what Plaintiff describes is not intimidation. It is called persuasion. Marshalling arguments in favor of one's policy preferences is quintessential *political speech.* If one commands unfounded, demagogic, supercilious, or even scaremongering arguments in favor of same this is absolutely protected free speech. That same reinforced what Ms. Winter had already heard and that she opted to vote in person *is not a harm*. People have been driven to the polls by politicians telling them that their opponent would usher in Armageddon while promising Shangri-La as long as there have been stump speeches, soap boxes, commercials and, yes, robo-calls. Finally, the speculative harm of going to vote in person versus going to the liquor store or supermarket, while engaging in social distancing and the like is not a harm at all. It was a choice and in hindsight probably a sound one.

Again, "Ms. Winter …at first, she thought the robocall might originate from a legitimate source but soon realized the nefarious intentions behind the call when the speaker's allegations turned to mandatory vaccines. Even though she knows that the robocall is fraudulent, the robocall has exacerbated her fears that someone will tamper with her mail-in ballot or violate its secrecy." Respectfully, informing a voter that one form of voting may be more reliable and has more inherent integrity than another is not at all suppressive and not at all proscribed. And yes, one is invariably more secure and more secret then the other. An in-person voter in New York goes up to a table and signs her name, is then handed a ballot in a privacy folder, then goes to fill the ballot vote at a shielded table, and then personally feeds her ballot into a computer ballot system. The latter

8

involves a process prone to mistakes with many hands and eyes laid upon an exterior envelope, interior envelope and ballot. The latter is undeniably more problematic even if Facebook will not allow you to say that.

Indeed, the following is an excerpt from *The Democrat and Chronicle* on October 12, 2020,

> **Voting by mail-in New York? Avoid these mistakes to ensure your vote counts**
> Jon Campbell [Campbell is a New York State Government reporter for the USA TODAY Network.]
>
> "ALBANY – Hundreds of thousands of New York voters will do something this year many of them have never done before: Vote by mail.
>
> Counties across the state have been flooded with absentee ballot requests for the Nov. 3 election, in large part because of a temporary new law inspired by the COVID-19 pandemic that essentially expanded eligibility to all voters. More than 330,000 voters had requested an absentee ballot as of late last month through New York's recently launched online portal, which was launched in late August and allows voters to fill out a quick form to formally apply for a mail-in ballot, according to the state Board of Elections.That number itself is incomplete: It doesn't include New York City or Erie County, which both have their own portals. Nor does it account for those who have applied for an absentee ballot by mail or in person with their county, as well as those who haven't yet applied.
>
> **If you do choose to vote by mail, be careful: Failure to follow directions could result in your ballot being ruled ineligible.**
> *For the 2016 presidential election, 22,849 of the 405,151 New York voters who cast an absentee ballot had their vote rejected for any number of reasons, such as a forgotten signature or an unsealed envelope, according to a survey by the U.S. Election Assistance Commission."*

Invariably then, a mail-in ballot can be contested on any number of grounds whereas an in-person ballot once cast is cast. In any case, the next Individual Plaintiff Gene Steinberg, Ms. Winter's partner, was not a recipient of the call so it is unclear why he has standing. Mr. Steinberg was supposedly traumatized that law enforcement could use mail-in ballots to track voters and thus decided to vote in-person. With candor, if Mr. Steinberg's 18-year-old non-violent conviction placed him in fear because he was advised of common knowledge skip tracing techniques, *it still did not deter him from voting*. If he has been living off-the-grid, has pending warrants and has been voting out of an old address, voting in person was probably the safer choice because using a mail-in ballot would require using a valid address and the updating of a public record that could be used

to skip trace his location. If such was the case, informing Mr. Steinberg of standard skip tracing techniques is not a harm. Neither is making a political statement that offends or traumatizes a compensable harm and here it had no suppressive effect.

Plaintiff Nancy Hart tells us she was "irate" upon listening to the robocall because she understood the call to be a voter suppression tactic. Ms. Hart's concerns about the robocall have only grown deeper since receiving the robocall because she has observed others on social media repeating the false information disseminated by the robocall….[and]…called the Pennsylvania State Attorney General Office and Secretary of State. In short, Ms. Hart vehemently disagreed with the Defendants' statement and reported it to authorities, so it certainly had no suppressive effect on her. We are left then only with her assumptions as to motives and irritation, *but this is neither compensable nor indicative of a threat, which is a prerequisite to the applicability of the Acts allegedly violated*. If every time a political group said something we found irritating, wrongheaded or stupid, well, we would need to build more houses.

Sara Wolff of New York County says she "knew that the robocall's information was a lie and that the purpose of the robocall was to intimidate her, the robocall infuriated her…[she believed it was] disgusting because it was a clear effort to intimidate voters from exercising their right to vote…because she understood the robocall's contents to be targeting Black voters in particular." Putting aside her speculations as to impure motives*, the robocall clearly had no suppressive effect.* Ms. Wolff was able to use her powers of discernment, just like every other voter, to gauge whether she agreed with a political statement and policy preference. *The same can be said for each and every Individual Plaintiff.*

Plaintiff Kate Kennedy and Plaintiff Karen Slaven allegedly took the call "to be an attempt to scare [them] into not voting by mail…[and]… worried that other voters will be scared by the call." *This is not a compensable harm and their conjecture is beyond speculative.*

Plaintiff Eda Daniel "serves as a precinct official for her county, and she believes that this robocall is an attempt to harass voters and intimidate them…and…was so concerned that Defendants might be successful in their efforts to intimidate voters that she called her congresswoman, U.S. senator and mayor to report them." Clearly then, *she was not actually intimated or deterred in anyway because she disagreed vehemently and acted according to her own political compass*.

Plaintiff Andrea Sferes of Westchester County, New York "understood the call to be an attempt to dissuade people from voting by mail…resulting in emotional distress that lasted multiple days after the call, and led her to voice her dismay to friends" *This is not a compensable injury*. Emotional distress and dismay over a true statement that collection agencies can and do use government records including updated voter rolls to track down debtors is not a harm. A requested mail-in ballot includes an affidavit style application attesting to one's current address. No such attestation is required to vote in-person. Emotional distress and dismay are not a threat of force as contemplated by the KKK act or the Voter's Act.

## IV.    The Robocall Statement Was Legally Compliant Under FTC and FCC Rules

Several of the individual Plaintiffs also attested that they were on the DO NOT CALL Registry. This, in and of itself, is telling because it reinforces an obvious fact. *These were facially legal political calls made by a political organization*. The Federal Trade Commission ("FTC") in pertinent part on their website notes that "…Americans have been able to opt out of receiving most telemarketing calls by putting their phone numbers on the National Do Not Call Registry…The Registry now has more than 221 million telephone numbers on it … There are some exemptions to the Do Not Call rules. Because of the limits to FTC's authority, **the Registry does not apply to political calls** or calls from non-profits and charities…" (emphasis added).[12]

Plaintiffs acknowledge in Paragraph 18 of their Complaint that "Defendant Project 1599 is a **political organization** founded by Burkman and Wohl." (emphasis added).

Robocall Vendors and those who contract them must also comply with Federal Communication Commission's ("FCC") guidelines.  The FCC in part provides "Rules for Political Campaign Calls and Texts…Political campaign-related autodialed or prerecorded voice calls are permitted when made to landline telephones, even without prior express consent. All prerecorded voice message calls, campaign-related and otherwise, must include certain identification information: The identity of the business, individual, or other entity initiating the call must be clearly stated at the beginning of the prerecorded message. If the calling party is a business or corporate entity, the entity's official business name must be stated clearly at the beginning of the message. The telephone number of the calling party must be provided, either during or after the message."[13]

Based on the FTC and FCC requirements, the *Defendants' robocall Statement was an exempt facially permissible and legally compliant call*. It included all necessary identification information which is a prerequisite for a Robocall vendor to distribute the calls.

The FCC also provides a mechanism for dealing with unwanted calls. "Report Unwanted Calls…If you think you've received a political robocall…that does not comply with the FCC's rules, you can file an informal complaint with the FCC at fcc.gov/complaints…"[14]

Here, the Plaintiffs' remedy for receiving an otherwise legally permissibly and entirely regulatorily complaint call was to file an FCC complaint (which would have gone nowhere because the robocall Statement is a *legally complaint political call*) or simply hang up. Incidentally, literally thousands upon thousands of recipients opted for the latter hanging up within 10 or 20 seconds of receipt of the call (very much like anyone tired of

---

[12] https://www.ftc.gov/news-events/media-resources/do-not-call-registry
[13] https://www.fcc.gov/rules-political-campaign-calls-and-texts
[14] *Id*.

seeing campaign or issue advocacy ads on television clicking off or changing the proverbial calendar).

**V.     Plaintiffs' Claims are Moot.**

Defendants also respectfully argue that Plaintiffs' causes of action should be dismissed as moot. "[A]t all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001). "When the issues in dispute between the parties 'are no longer live,' a case becomes moot." *Lillbask ex rel. Mauclaire*, 397 F.3d at 84 (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "Under Article III of the U.S. Constitution, '[w]hen a case becomes moot, the federal courts lack subject matter jurisdiction over the action.'" *Doyle v. Midland Credit Mgmt.*, 722 F.3d 78, 80 (2d Cir. 2013) (quoting *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994)). Mootness must be judged in the present, not at the time the complaint was filed. *Stronko v. Bergin*, 843 F. Supp. 827, 828-29 (N.D.N.Y. 1994).

Here, Defendants have already fully complied with this Court's curative order undertaking a curative robocall. The election has been concluded and Defendants are the subject of multiple open criminal suits.  Accordingly, there is, 1) no reasonable expectation that the alleged violation will recur; and 2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," thus a finding of mootness is appropriate. *Campbell v. Greisberger*, 80 F.3d 703, 706 (2d Cir. 1996).

Given that Defendants have incurred the cost of a curative robocall and must comply with the terms of their release pending trial in multiple jurisdiction it is absolutely inconceivable that there would be an instance of recurrence of the alleged violation.

**<u>CONCLUSION</u>:**

Finally, we urge Your Honor to reconsider your decision not to extend the deadline for a full briefing and failing same urge that you deem the arguments herein part of our exceedingly brief and incomplete pre-motion letter, which was of course not tendered for that purpose and otherwise constrained.

Thank you in advance for considering these requests

Respectfully Submitted,
/s/

David M. Schwartz
Randy E. Kleinman

Enclosures

cc:     All counsel of record (via ECF)