UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

NATIONAL COALITION ON BLACK CIVIC  :
PARTICIPATION, et al.,             :
                                   :
            Plaintiffs,            :
                                   :
     - against -                   :
                                   :
JACOB WOHL, et al.,                :
                                   :
            Defendants.            :

------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____                │
│ DATE FILED: January 12, 2021         │
└─────────────────────────────────────┘
```

20 Civ. 8668 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiffs National Coalition on Black Civic Participation ("NCBCP") and Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, and Andrea Sferes (collectively, the "Individual Plaintiffs," and with NCBCP, "Plaintiffs") filed this action against defendants Jacob Wohl ("Wohl"), Jack Burkman ("Burkman"), J.M. Burkman & Associates, LLC ("J.M. Burkman & Associates"), Project 1599, and John and Jane Does 1 through 10 (collectively, "Defendants"). (See Complaint, Dkt. No. 11.) Plaintiffs allege that Defendants sent robocalls containing false information intended to prevent recipients from voting by mail through threats and intimidation in violation of Section 11(b) of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10307(b), and Section 2 of the Ku Klux Klan Act of 1870 ("KKK Act"), 42 U.S.C. § 1985(3).

1

Now before the Court is Defendants' letter motion requesting a pre-motion conference and seeking leave to file a motion to dismiss the Complaint. The Court construes the letter as a motion to dismiss[1] pursuant to Federal Rule of Civil Procedure ("Federal Rule") 12(b)(6) (the "Motion," Dkt. No. 58). For the reasons discussed below, the Motion is DENIED.

## I. BACKGROUND

A. FACTS AND PROCEDURAL BACKGROUND[2]

This Order assumes familiarity with the Court's prior Order granting Plaintiffs' motion for a temporary restraining order, including the factual recitation contained therein. See "TRO Decision," Dkt. No. 38; see also Nat'l Coal. of Black Civic Participation v. Wohl, No. 20 Civ. 8668, 2020 WL 6305325 (S.D.N.Y. Oct. 28, 2020).

In brief, Plaintiffs allege that in late August 2020, thousands of voters in the United States, including voters in

---

[1] See Kapitalforeningen Lægernes Invest. v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (affirming the district court ruling deeming an exchange of letters as a motion to dismiss).

[2] The factual background below, except as otherwise noted, derives from the Complaint and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995)); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Except when specifically quoted, no further citation will be made to the Complaint or the documents referred to therein.

Illinois, Ohio, New York, and Pennsylvania, received robocalls that conveyed the following message:

> Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail.

Complaint ¶ 29.[3]

Plaintiffs allege that this robocall message contains various false statements, including: (1) the claim that police will use vote-by-mail information to track persons with outstanding warrants; (2) the assertion that vote-by-mail information will be used by debt collectors; and (3) the claim that the Centers for Disease Control and Prevention ("CDC") is seeking access to vote-by-mail information to conduct mandatory vaccinations.

Plaintiffs further allege that the robocalls were specifically designed to intimidate Black voters. Plaintiffs estimate that approximately 85,000 robocalls conveying this message were placed as of the filing of the Complaint.

---

[3] Although the Complaint states that the last line of the robocall message said, "stay home safe and beware vote by mail," this was a transcription error, which Plaintiffs corrected in a subsequent filing. (See Dkt. No. 33.)

According to Plaintiffs, the calls targeted areas with large populations of Black voters, such as Detroit, Michigan, as well as urban areas with significant minority populations, such as New York City. Plaintiffs contend that the particular messages conveyed in the robocalls sought "to exploit racially charged stereotypes and false information" in order to dissuade Black voters from participating in the November 3, 2020 election. (Complaint ¶ 4.) Moreover, Plaintiffs allege that the purported speaker on the calls, Tamika Taylor, could be confused by call recipients with the mother of Breonna Taylor -- whose actual name is Tamika Palmer. Given the prominence of Breonna Taylor's name and story, Plaintiffs allege that this reference lent further apparent legitimacy, and therefore duplicitousness, to the robocalls.

The Complaint further alleges that it was Wohl's and Burkman's intent to interfere with the November 3, 2020 election. Plaintiffs contend that this intent was made clear, when, for example, according to a February 26, 2019 article in USA Today, Wohl told reporters that he and Burkman were planning "ways to discredit Democrats in the 2020 election with lies and other disinformation, using his large following on social media to cause disarray similar to what Russians

did during the 2016 election."[4] In addition, the Daily Beast published a document that Wohl later said was a draft of his business plan for the "Arlington Center for Political Intelligence."[5] The goal of this plan was to "suppress turnout."[6]

The Individual Plaintiffs attest that the robocalls caused them to be concerned about voting by mail. For example, plaintiff Gene Steinberg, who has an eighteen-year-old nonviolent criminal conviction, described receiving the call as "particularly traumatic." (Steinberg Decl. ¶ 13.) The claim that law enforcement would use mail-in voters' information to track persons with outstanding arrest warrants made Steinberg frightened and anxious given his criminal history.

Plaintiff Andrea Sferes also found the robocall to be distressing and "emotionally upsetting." (Sferes Decl. ¶ 9.) Having outstanding medical debt, Sferes began to doubt

---

[4] See Complaint ¶ 24 (quoting Crystal Hayes & Gus Garcia-Roberts, This Is How Jacob Wohl Created a Sexual Harassment Accusation Against Robert Mueller, USA Today (Feb. 26, 2019), https://www.usatoday.com/story/news/politics/2019/02/26/robertmueller-hoax-how-jacob-wohl-created-sexual-harassmentplot/2993799002/).

[5] See Complaint ¶ 25 (quoting Manuel Roig-Franzia & Beth Reinhard, Meet the GOP Operatives Who Aim to Smear the 2020 Democrats – But Keep Bungling It, Wash. Post (June 4, 2019), https://www.washingtonpost.com/lifestyle/style/meet-the-gop-operatives-who-aim-to-smear-the-2020-democrats--but-keep-bungling-it/2019/06/04/5b70f000-7691-11e9-bd25-c989555e7766_story.html).
[6] Id. (quoting Roig-Franzia & Reinhard, supra).

whether her information would be shared if she voted by mail, and she "had to try and convince [herself] that [the robocall message] was not true." (Id. ¶ 8.)

Plaintiff Nancy Hart, a journalist whose work focuses on the Black community in and around Pittsburgh, became "irate" when she received the call because she recognized it as a deceptive scheme designed to prey upon fears in the Black community about the police, predatory debt collectors, and government-mandated medical programs, and thereby scare Black voters from voting. (Hart Decl. ¶¶ 7-8.)

As a result of the robocalls, at least two Plaintiffs -- Steinberg and Winter -- decided against voting by mail, which they had originally planned to do, because of their fears of exposure to COVID-19. After receiving the call, Steinberg and Winter did not view voting by mail in the 2020 election as reliable.

Plaintiff NCBCP invests significant resources in the Black Women's Roundtable ("BWR"), an empowerment program that promotes Black participation in the Census and elections and engages in on-the-ground organizing. When the robocalls began in late August, NCBCP's BWR program in the Detroit area ("BWR Metro Detroit") learned that Detroit community members were receiving the calls. BWR Metro Detroit became concerned that the calls would intimidate Black voters from participating in

the upcoming elections or scare Black voters who would have voted by mail into voting in person, thereby increasing their risk of contracting COVID-19. Accordingly, BWR Metro Detroit diverted resources allocated toward increasing Census participation to addressing the disinformation communicated in the robocalls. For example, BWR Metro Detroit's co-chair switched from assisting community members with the completion of their Census forms to responding to the robocalls' disinformation.

B.   PROCEDURAL HISTORY

Shortly after filing the Complaint, Plaintiffs moved for a temporary restraining order enjoining Defendants from engaging in any further communications in violation of the VRA or KKK Act. (See "TRO," Dkt. No. 12.) After hearing argument, the Court found that Plaintiffs had demonstrated a likelihood of success on the merits of their claims and that irreparable harm would result if a preliminary injunction was not issued. (See generally TRO Decision.) Therefore, the Court granted the motion, enjoined Defendants from engaging in communications in violation of the VRA or KKK Act, and further ordered Defendants to issue a curative robocall informing recipients of the Court's findings regarding the threatening and intimidating nature of Defendants' original robocall. (Id.)

7

After the Court issued its TRO Decision, Defendants sought leave by letter to file a motion to dismiss the Complaint. (See Motion.) This Motion followed an exchange of letter correspondence between the parties in accordance with the Court's Individual Rules, which included Defendants' letter dated November 17, 2020 (see Dkt No. 58-1), and Plaintiffs' response dated November 24, 2020 (see Dkt No. 58-2). The Court denied leave to file a motion, finding that the pre-motion letters and material already contained in the record were sufficient for the Court to render its decision. (See Dkt. No. 61.) Nonetheless, Defendants submitted additional briefing regarding their motion to dismiss, (see Dkt No. 62), and Plaintiffs were provided an equivalent opportunity to respond (see Dkt. Nos. 63, 64). The Court has considered both the pre-motion letters and the parties' supplemental briefing in connection with this Order.

C.   THE PARTIES' ARGUMENTS

Defendants argue that (1) the robocalls at issue do not actually violate either the VRA or KKK Act; (2) the robocalls constitute protected free speech under the First Amendment; (3) the Individual Plaintiffs have alleged no compensable harm and therefore do not have standing to bring this action; (4) the robocalls are legally compliant with Federal Communications Commission ("FCC") and Federal Trade

Commission ("FTC") rules; and (5) because the 2020 election has passed, and in light of the Court's TRO Decision, this case is now moot.

Plaintiffs respond that (1) the Court has already held that Plaintiffs are likely to succeed on the merits of their statutory claims and thus have adequately alleged a plausible claim; (2) the robocalls do not constitute protected First Amendment speech because they manifest "true threats" and intimidation; (3) the Individual Plaintiffs have adequately shown compensable harm even if they voted in the 2020 election; (4) compliance with FTC and FCC rules is irrelevant because Plaintiffs do not allege violations of those rules; and (5) because Plaintiffs request monetary damages, this case is not moot.

## II.  LEGAL STANDARDS

"To survive a motion to dismiss [pursuant to Federal Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for

9

failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." See Twombly, 550 U.S. at 555. The task of the Court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). Unlike at the preliminary injunction stage, for purposes of a motion to dismiss, a Court must accept all well-pleaded factual allegations in the Amended Complaint as true and draw all reasonable inferences in Plaintiffs' favor. See Chambers, 282 F.3d at 152 (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2011)). Thus, a plaintiff at the preliminary injunction stage has a "heavier burden" than a plaintiff "bears in pleading the plausible claim necessary to avoid dismissal." New Hope Family Servs., Inc. v. Poole, 966 F.3d 146, 165 (2d Cir. 2020).

## III. **DISCUSSION**

A.   VIOLATIONS OF THE VRA AND THE KKK ACT

Defendants' primary contention is that Plaintiffs' allegations fail to establish a violation of either Section 11(b) of the VRA or Section 2 of the KKK Act. Defendants reiterate that the robocall message cannot be considered a

threat or intimidation because it did not place recipients in fear of bodily harm. (Dkt. No. 62, at 2.) Defendants additionally argue that even if communications can constitute intimidation without being explicitly violent, in this case there is no violation of either statute because the message "was dispersed in English, does not name or target any individual or protected class, does not attempt to dissuade anyone from voting, and is facially neutral." (Id. at 3.)

       1. Section 11(b) of the VRA

      Section 11(b) of the VRA states, in relevant part, that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote.

52 U.S.C. § 10307(b). As the Court previously recognized, this statute sweeps broadly in accordance with Congress's goal of realizing, enforcing, and protecting the Fifteenth Amendment's right to vote. See generally H.R. Rep. No. 89-439 (1965). The provision applies to private conduct and can be enforced through suit by a private individual. See League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found. ("LULAC"), No. 18 Civ. 423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018); Ariz. Democratic Party v. Ariz. Republican Party, No. 16 Civ. 3752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016) (citing Allen

v. State Bd. of Elections, 393 U.S. 544, 555-56 & n.18 (1969)).

Notably, "[t]he prohibited acts of intimidation need not be racially motivated." H.R. Rep. No. 89-439, at 30. Accordingly, a plaintiff bringing a Section 11(b) suit need not demonstrate that racial animus motivated the challenged conduct, nor does a plaintiff need to allege discrimination or racial targeting to prevail. See id.; see also, e.g., LULAC, 2018 WL 3848404, at *3-4; Willingham v. County of Albany, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006).

There is limited precedent discussing what "threaten" and "intimidate" mean in the context of Section 11(b). But the plain meaning of those terms, the few cases that interpret Section 11(b), and cases that interpret the same or similar language in other civil rights statutes all indicate that intimidation includes messages that a reasonable recipient, familiar with the context of the message, would interpret as a threat of injury -- whether physical or nonviolent -- intended to deter individuals from exercising their voting rights. "[T]hreats, intimidation or coercion may take on many forms." United States v. Beaty, 288 F.2d 653, 656 (6th Cir. 1961). As the Court explained previously, actions or communications that inspire fear of economic harm, legal repercussions, privacy violations, and even surveillance can

constitute unlawful threats or intimidation under the statute. (See TRO Decision at 34-47.)

Because "the starting point for interpreting a statute is the language of the statute itself," United States v. Piervinanzi, 23 F.3d 670, 677 (2d Cir. 1994), the dictionary definitions of "intimidate" and "threaten" are of particular relevance. "Intimidate" means to "make timid or fearful" or "inspire or affect with fear," especially "to compel to action or inaction (as by threats)." Webster's Third New International Dictionary 1183 (1966). "Threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress." Id. at 2381.

In line with these definitions, courts have held that allegations of conduct that "put [an individual] in fear of harassment and interference with their right to vote" is "intimidation sufficient to support [a] § 11(b) claim." LULAC, 2018 WL 3848404, at *4 (citing Damon v. Hukowitz, 964 F. Supp. 2d 120, 149 (D. Mass. 2013) ("Intimidation means putting a person in fear for the purpose of the compelling or deterring his or her conduct." (citations omitted))). Likewise, courts addressing similar voting-rights statutes have held that nonviolent actions or threats constitute impermissible threats, intimidation, or coercion. See, e.g., United States v. Nguyen, 673 F.3d 1259, 1265 (9th Cir. 2012)

(concluding that the wide distribution of a letter among Latino immigrants warning "that if they voted in the upcoming election their personal information would be collected" and could be provided to anti-immigration organizations constitutes sufficient evidence to find unlawful intimidation under California law); United States v. McLeod, 385 F.2d 734, 740-41 (5th Cir. 1967) (holding that a pattern of baseless arrests of Black individuals attending a voter-registration meeting was intimidating and coercive conduct given its "chilling effect" on voter registration); United States v. Bruce, 353 F.2d 474, 476-77 (5th Cir. 1965) (holding that a landowner's restriction of an insurance collector's access to the landowner's property due to the insurance collector's efforts to register voters constitutes unlawful intimidation); Beaty, 288 F.2d at 654-57 (holding that the eviction of sharecroppers as punishment for voter registration constitutes unlawful intimidation).

That subtle, nonviolent forms of intimidation are actionable under Section 11(b) is supported by two additional considerations. First, two other civil rights statutes -- the Fair Housing Act ("FHA") and Americans with Disabilities Act ("ADA") -- use analogous language and encompass subtle forms of intimidation. See, e.g., Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n, 388 F.3d 327, 330 (7th Cir.

14

2004) (finding that the defendants' nonviolent actions, including writing "H-town property," taking down flyers, and destruction of board meeting minutes, constitutes a FHA violation); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (holding that a jury could find the defendant had intimidated or threatened the plaintiff in violation of the ADA by sending a letter stating that if she continued her behavior, it would "have no choice but to address [her] behavior through legal channels"); see also Walker v. City of Lakewood, 272 F.3d 1114, 1128-29 (9th Cir. 2001) (holding that the relevant civil provision of the FHA "does not require a showing of force or violence for coercion, interference, intimidation, or threats to give rise to liability"); People Helpers, Inc. v. City of Richmond, 789 F. Supp. 725, 733 n.5 (E.D. Va. 1992). And when interpreting a civil rights statute, the Second Circuit has relied on other civil rights statutes with "language very similar" to that which is being interpreted. See, e.g., New York v. Davis, 411 F.2d 750, 753 (2d Cir. 1969); see also Smith v. City of Jackson, 544 U.S. 228, 233 (2005) (noting "the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress

intended that text to have the same meaning in both statutes").

Second and relatedly, the interpretation of Section 11(b) detailed above as prohibiting both violent and nonviolent forms of intimidation accords with courts' typical practice of reading remedial pieces of legislation broadly so as to give proper effect to the legislative intent. See Peyton v. Rowe, 391 U.S. 54, 65 (1968) (noting the "canon of construction that remedial statutes should be liberally construed"); N.C. Freed Co. v. Bd. Of Governors of Fed. Reserve Sys., 473 F.2d 1210, 1214 (2d Cir. 1973) ("Since the statute is remedial in nature, its terms must be construed in liberal fashion . . . .").

Based on the foregoing, the Court concludes that Plaintiffs' allegations plausibly state an actionable Section 11(b) claim. Plaintiffs allege that the robocall message states that if recipients of the message were to vote by mail, the recipients' personal information "will be" used by creditors and law enforcement to collect debts and execute old, outstanding warrants. (Complaint ¶ 29.) Similarly, it states that the CDC is attempting to use vote-by-mail records to track people for mandatory vaccinations. (Id.) Thus, the robocall message communicates threats of adverse legal, economic, and even physical consequences stemming from mail-

in voting. These threats undoubtedly engender a "chilling effect" on voting-related activity and, as such, plausibly constitute intimidation. See McLeod, 385 F.2d at 740-41; see also, e.g., Lovejoy-Wilson, 263 F.3d at 208; Beaty, 288 F.2d at 657. Indeed, the threat of dissemination of personal information alone could plausibly support a Section 11(b) claim. See LULAC, 2018 WL 3848404, at *4; cf. Nguyen, 673 F.3d at 1265.

Defendants' arguments to the contrary are unavailing. Defendants attempt to distinguish LULAC and Nguyen. (See Dkt. No. 62, at 2-3.) While LULAC is not factually identical to the present case, any variance amounts to a distinction without a difference. In LULAC, the defendants "linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium." 2018 WL 3848404, at *4. In other words, the LULAC defendants disseminated the plaintiffs' personal information in a manner that put them at risk of negative consequences. That dissemination was actionable because of its chilling effect; the defendants' conduct plausibly "put [the plaintiffs] in fear of harassment and interference with their right to vote." Id. Although Defendants in the present case did not themselves disseminate Plaintiffs' personal information, their conduct,

which warns Plaintiffs that information they provided in connection with mail-in voting will be obtained and used by various entities for adverse actions, has no less of a chilling effect because it too plausibly "put [Plaintiffs] in fear of harassment and interference with their right to vote." Id.

Defendants attempt to distinguish Nguyen on even flimsier grounds. First, Defendants argue that the letter sent in Nguyen "informed recipients that, if they voted in the upcoming election in November their personal information *would be* collected by a newly implemented government computer system." (Dkt. No. 62, at 3.) But here, the Complaint alleges that the robocall message said that Plaintiffs' information "will be used" by creditors and law enforcement. (Complaint ¶ 29.) The Court fails to see the analytical significance in the distinction between the language "would be collected" and "will be used" -- especially considering that the more affirmative "will be used" language of the robocall message conveys an arguably greater privacy violation and consequence. Second, Defendants seem to suggest that because their robocall message was allegedly disseminated in English, it is distinguishable from the letter in Spanish at issue in Nguyen. But nothing in Nguyen suggests that the court's analysis there turned on the language in which the message

was communicated. Nor does the Court see any principled basis it should.

Defendants' next argument contends that "Plaintiffs' insinuation that the [robocall message] constitutes a threat of physical harm is untenable." (Dkt. No. 62, at 3.) For instance, Defendants claim that the message contains no language threatening arrest because it "merely states that, '*if you vote by mail*, your personal information will be part of a public database that will be used by police departments to *track down old warrants*.'" (Id.) The Court finds Defendants' assertion that this language does not communicate a threat of arrest astonishing. The plain reading of this message by any reasonable person is that if robocall message recipients vote by mail, those voters' information will become public and will be used by law enforcement authorities to execute any outstanding arrest warrants against them. There is no other reasonable characterization of this message except as a threat or risk of arrest.

In addition, Defendants argue that the purported threat of mandatory vaccination is specious because the message does not target the Black community and merely states that the CDC was attempting to use mail-in voting records to track people to administer mandatory vaccines. (Id.) This argument too is unpersuasive. As an initial point, the Complaint

unequivocally alleges that "Defendants [] specifically targeted their robocalls to areas with large Black populations" (Complaint ¶ 37), which the Court is required to accept as true at this stage of the litigation. Moreover, even though the robocall message stated only that the CDC was "pushing" to use mail-in voting information to track individuals for mandatory vaccines, the statement nonetheless has a chilling effect on mail-in voting. A reasonable recipient of the message may very well choose to not exercise the right to vote by mail based on this language, given the alleged historical mistrust of the medical community among Black populations. (See Complaint ¶ 35.)

For the foregoing reasons, as well as those detailed in the Court's TRO Decision, the Court holds that Plaintiffs have sufficiently alleged a plausible violation of Section 11(b). Defendants' counterarguments are devoid of merit.

2. Section 2 of the KKK Act

Section 2 of the KKK Act, 42 U.S.C. § 1985(3), prohibits conspiracy

> to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy.

20

As the Court noted in the TRO Decision, the terms
"intimidation" and "threat" appear both here and in Section
11(b) of the VRA. The Court sees no reason to interpret these
terms differently for purposes of the KKK Act, and Defendants
provide none. To the contrary, as discussed above, canons of
statutory interpretation support interpreting the same term
consistently across similar statutes unless legislative
intent indicates otherwise. See Smith, 544 U.S. at 233 (noting
"the premise that when Congress uses the same language in two
statutes having similar purposes, . . . it is appropriate to
presume that Congress intended that text to have the same
meaning in both statutes"). Therefore, the Court's analysis
with respect to whether the alleged conduct violates Section
11(b)'s prohibition on intimidation and threats applies
equally to defeat Defendants' argument that there was no
intimidation under Section 2 of the KKK Act. The Court
accordingly concludes that Plaintiffs have pled sufficient
facts, which, if true, would establish a violation of the KKK
Act.

B.   THE FIRST AMENDMENT

As they did in opposing the TRO, Defendants argue in
their motion to dismiss that the robocalls communicated a
message entitled to First Amendment protection. But the Court
is no more persuaded by these arguments now than it was at

21

the TRO stage. In construing the statutes consistently with the First Amendment, as required, the Court previously held that the VRA and KKK Act prohibited the robocalls insofar as the calls' message constitutes a "true threat," and thus, Plaintiffs' claims are not constitutionally barred. (See generally TRO Decision at 36-43.) Now, on a motion to dismiss, the Court's only task is to determine the legal feasibility of the Complaint. In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d at 574. Having concluded already that Plaintiffs met their "heavier burden" of demonstrating a likelihood of success on the merits, see New Hope Family Servs., Inc., 966 F.3d at 165, the Court has no trouble finding here that the Complaint meets the less onerous standard of legal feasibility.

As a threshold matter, and as the Court previously recognized, the VRA and the KKK Act proscribe speech based on whether the content of the message is threatening or intimidating to voters. But not all content-based speech restrictions are unconstitutional. (See, e.g., TRO Decision at 37 (citing examples).) As relevant here, "true threats" are not entitled to First Amendment protection. See Watts, 394 U.S. at 708.

Speech amounts to a "true threat" when "an ordinary, reasonable recipient who is familiar with the context of the

[communication] would interpret it as a threat of injury."
United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013)
(internal quotation marks and citations omitted); see also
United States v. Santos, 801 F. App'x 814, 816 (2d Cir. 2020)
(applying the Turner test). In addition, prohibitions on true
threats are constitutional "even where the speaker has no
intention of carrying them out." Turner, 720 F.3d at 420. And
the alleged threat need not be communicated explicitly or
directly to qualify as a "true threat." Id. at 421-23. Indeed,
as the Second Circuit has explained, "rigid adherence to the
literal meaning of a communication" would render restrictions
"powerless against the ingenuity of threateners who can
instill in the victim's mind as clear an apprehension of
impending injury by an implied menace as by a literal threat."
Turner, 720 F.3d at 422 (quoting United States v. Malik, 16
F.3d 45, 50 (2d Cir. 1994), and citing United States v.
Shoulberg, 895 F.2d 882, 886 (2d Cir. 1990)); see also
Virginia v. Black, 538 U.S. 343, 354, 357, 363 (2003)
(explaining that cross burnings can constitute true threats
even though they communicate no explicit message).

Likewise, the Court previously concluded that under
Black, the threatened injury need not be physical or violent
to constitute a "true threat." (TRO Decision at 40-41.)
Instead, "true threat" prohibitions "protect[] individuals

from the fear of violence and the disruption that fear engenders, as well as from the possibility that the threatened violence will occur." Black, 538 U.S. at 360 (internal quotation marks and citations omitted). This reasoning logically extends to threats of a nonviolent nature that nonetheless engender "disrupting fear." Thus, in keeping with this rationale, the Second Circuit has signaled that threats of serious nonphysical harm are unprotected true threats. See Turner, 720 F.3d at 420 (explaining that a legislature could make it criminal for a person "to threaten a specific legal wrong grave enough to be likely either to cause substantial emotional disturbance . . . or to require the employment of substantial resources for investigation or prevention") (quoting Kent Greenawalt, Speech, Crime and the Uses of Language 91 (1989))); see also Lovejoy-Wilson, 263 F.3d at 213–14, 223 (holding that dismissal was inappropriate because a reasonable jury could find that an employee had been "intimidated" or "threatened" based on her employer's statement that "[i]f [she] continue[d] this behavior, we will have no choice but to address [the] behavior through legal channels"). The Turner test therefore requires only that a reasonable recipient "would interpret [the message] as a threat of injury," physical or not. See Turner, 720 F.3d at 420 (emphasis added) (citation omitted).

24

The Court's conclusion that the robocall message at issue here may plausibly constitute a "true threat" is unaffected by the consideration that it remains unresolved whether "true threats" must be *intended* as such. (<u>See</u> TRO Decision at 42-43.) The Second Circuit in <u>Turner</u> declined to resolve this question because on the facts of that case, "a true threat was established pursuant to both the objective and subjective tests." 720 F.3d at 420 n.4. So too here. The Court previously found that "Defendants' prior conduct and expressed goals, together with the language of the robocall and its context, provide strong basis to support a reasonable conclusion that Defendants *intended* the robocall to harm Democrats by suppressing turnout among Black voters." (TRO Decision at 55 (emphasis added).) In light of these considerations, even if intent is required for speech to constitute a "true threat," the <u>Turner</u> standard has been plausibly met on the facts alleged here.

In their submissions on the instant motion, Defendants offer various propositions of law that, while generally uncontroversial, have no bearing on the present dispute. For example, Defendants argue that the robocall message is not categorically stripped of First Amendment protection because it was disseminated via telephone, rather than a newspaper or public square. (<u>See</u>, <u>e.g.</u>, Dkt. No. 58-1, at 1; Dkt. No. 62,

at 7.) The Court does not disagree. But the Court's conclusion that the First Amendment is inapplicable rests not on the robocall message's dissemination by telephone, but rather on its bearing all the hallmarks of an unprotected "true threat."

Likewise, Defendants argue that that "the mere fact that a statement *could* ultimately be proven false does not deprive it of constitutional protection." (Dkt. No. 58, at 2; <u>see also</u> Dkt. No. 62, at 4.) Indeed, the Court itself previously recognized that "[f]alse statements are not categorically excluded from First Amendment protection." (TRO Decision at 37.) But again, this principle has no impact on the Court's finding that the Complaint alleges sufficient facts to plausibly meet the "true threat" standard. The Court's conclusion turns on the intimidating and threatening quality of the message, not on its falsity or truth.

The Court further recognizes, as Defendants repeatedly point out, that speech is not to be restricted merely because it expresses an unpopular view. (<u>See</u>, <u>e.g.</u>, Dkt. No. 58, at 2.) But this proposition is yet again inapposite. Whether expressing an unpopular view or not, "true threats" are not protected by the First Amendment.

Lastly, the Court declines Defendants' repeated invitation to construe the facts according to their implausible characterizations. Nor would it be appropriate to

26

do so on a motion to dismiss. Defendants argue that the robocall message was a "political opinion" and "hyperbole." (See Dkt. No. 62, at 4, 5-7.) But this argument, that the robocall message was merely "vigorous criticism of mail-in voting" (Dkt. No. 62, at 4), is not only inconsistent with the allegations in the Complaint but defies common sense. It also raises factual issues that go to the merits of the dispute and Defendants' state of mind, and thus not properly resolved on a motion to dismiss. The robocall message stated that voting by mail would expose would-be voters' private information to law enforcement, debt collectors, and potentially the CDC. It further threatened that these institutions would use the information to enforce outstanding warrants, collect debts, and perhaps force voters to take a vaccine. Far from merely criticizing mail-in voting, the robocall threatened -- falsely -- that real, serious injury would befall the specifically targeted Black voters if they voted by mail. In light of the history within the Black community that Plaintiffs describe or the Court notes entailing discriminatory policing, discriminatory lending and debt collection practices, and unethical medical procedures;[7] because these calls were communicated by a

---

[7] As before, the Court takes judicial notice of the historical existence of discriminatory policing, lending, debt collection, and medical practices within the Black community. (See TRO Decision at 49 n.23.)

purportedly trusted source; and because the robocalls were
placed directly to individual recipients, Plaintiffs
plausibly allege that Defendants' robocall message
constituted a true threat. See Turner, 720 F.3d at 420
(holding that speech is unprotected by the First Amendment
when "an ordinary, reasonable recipient who is familiar with
the context of the [communication] would interpret it as a
threat of injury" (citation omitted)).

Generally, whether speech "constitutes a threat is an
issue of fact for the trial jury." United States v. Davila,
461 F.3d 298, 304 (2d Cir. 2006) (internal quotation marks
and citation omitted). At this stage, the Court merely
concludes that, on the facts alleged, the First Amendment
does not bar Plaintiffs' claims, and the Complaint is "legally
feasible." In re Initial Pub. Offering Sec. Litig., 383 F.
Supp. 2d at 574.

C.   INJURY

Next, Defendants appear to argue that the Individual
Plaintiffs lack standing because they have failed to plead
injury-in-fact as a result of the allegedly unlawful
robocalls.[8] To establish an "injury in fact" sufficient to
confer standing, a plaintiff must demonstrate an injury "that

---

[8] The Defendants do not challenge NCBCP's standing, and the Court notes
it has already held that NCBCP has standing. (See TRO Decision at 20-22.)

is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181–82 (2000). The Second Circuit has "repeatedly described" the requirement to show injury in fact on a motion to dismiss as "a low threshold." John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736 (2d Cir. 2017) (citation omitted).

Plaintiffs here meet this "low threshold." In the Complaint, each Individual Plaintiff describes "concrete and particularized" harm he or she suffered as a result of the allegedly threatening or intimidating robocall message. (See Complaint ¶¶ 45-54.) Further, the Individual Plaintiffs submitted affidavits in support of their TRO, detailing how the robocalls affected them, including the emotional impact the calls had and whether the robocall message changed their election day voting plans, among other effects. (See Dkt. Nos. 15-22.) For example, Plaintiff Winter described how receiving the robocall "irreversibly undermined [her] confidence in voting by mail," and she thus changed her voting plans. (See Dkt. No. 15 ¶ 12.) Plaintiff Steinberg described hearing the robocall as "particularly traumatic." (See Dkt. No. 16 ¶ 13.) The other Individual Plaintiffs make similar allegations. On a motion to dismiss, these statements are sufficient to show a "concrete and particularized" injury for

29

the purposes of standing. LULAC, 2018 WL 3848404, at *1 (denying a motion to dismiss in a case in which the individual plaintiffs alleged similar emotional harms); see also Denny v. Deutche Bank AG, 443 F.3d 253, 265 (2d Cir. 2006) ("[A]esthetic, emotional or psychological harms also suffice for standing purposes.").

Despite these allegations, Defendants argue that because each Individual Plaintiff voted in the 2020 election, they cannot have suffered actual injury. (See Dkt No. 62, at 7-8.) But the statutes at issue in this case do not proscribe only threatening and intimidating language that successfully prevents a person from voting. See 52 U.S.C. § 10307(b); 42 U.S.C. § 1985(3); see also United States v. Clark, 249 F. Supp. 720, 728 (S.D. Ala. 1965) ("The success or failure of intimidation, threats or coercion, is immaterial, since 'attempts' are equally proscribed."). Defendants point to no authority that supports their contention that Individual Plaintiffs cannot, as a matter of law, have suffered an "actual injury" simply because they voted.

Finally, although somewhat unclear, Defendants appear to suggest that Plaintiffs have suffered no "actual injury" sufficient to confer standing because any harm they suffered is not "compensable." (Dkt. No. 62, at 7.) Having already found that Plaintiffs have plausibly pled actual injury, the

amount of damages that may be awarded to them, even if eventually none, is irrelevant to the standing inquiry on a motion to dismiss.[9]

D.   MOOTNESS

Defendants next argue that because they complied with the Court's Order to cause issuance of a curative robocall, and because the election is now over, Plaintiffs' claims are moot. But "[i]t is well settled that a defendant's voluntary cessations of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Friends of the Earth, 528 U.S. at 189 (internal quotation marks and citation omitted). The party asserting mootness bears a "formidable burden" to make "absolutely clear [that] the allegedly wrongful behavior could not reasonably be expected to recur." Id. (quoting United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968)).

---

[9] The Court notes Plaintiffs may not even be required to show they are entitled to "compensable damages" for this case to proceed through verdict. Courts are empowered to award nominal damages based on the deprivation of constitutional rights. Carey v. Piphus, 435 U.S. 247, 266 (1978); Amato v. City of Saratoga Springs, 170 F.3d 311, 317 (2d Cir. 1999) (noting that under 42 U.S.C. § 1983, "a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury."). "By making the deprivation of [absolute] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed." Carey, 435 U.S. at 266. "The primary purpose of nominal damages in these cases is thus to guarantee that a defendant's breach of these duties will remain actionable regardless of their consequences in terms of compensable damages." Amato, 170 F.3d at 318.

Defendants do not carry their burden to establish mootness here. Although they argue that because the 2020 national election has concluded the conduct at issue cannot recur, Defendants ignore that other elections will continue to be held and present new opportunities for Defendants to employ similar tactics. Given Defendants' own pre-lawsuit admissions of perpetrating lies, deceit, and disinformation (see Complaint ¶ 25), the Court is not persuaded that a few assurances from Defendants make it remotely close to "absolutely clear" that the alleged conduct would not recur on other occasions. Defendants' argument ignores that compensatory damages, when warranted, seek not only to make plaintiffs whole for injuries caused by defendants, but embody a punitive element: to punish and deter similar conduct, both generally and by the particular defendant. See State Farm Mut. Ins. Co. v. Campbell, 538 U.S. 408, 426 (2003) (noting that the award of compensatory damages for the injury at issue "likely were based on a component which was duplicated in the punitive award, as "[c]ompensatory damages . . . already contain this punitive element"); see also Andrew W. Marrero, Note, *Punitive Damages: Why the Monster Thrives*, 105 Geo. L.J. 767, 789 (2017).

Furthermore, even if the Defendants could adequately persuade the Court that the robocalls would not recur, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." Chafin v. Chafin, 568 U.S. 165, 172 (2013) (citation omitted). Because Plaintiffs bring causes of action for both injunctive relief and monetary damages, as long as Plaintiffs can properly recover monetary damages, this action is not moot. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 478 n. 1 (1989) (holding that although the ordinance at issue expired, there remained "a live controversy between the parties over whether" the action taken pursuant to the ordinance was "unlawful and thus entitles appellee to damages"). And because the KKK Act is both privately enforceable and allows for the recovery of money damages, all Plaintiffs maintain a concrete interest in the outcome of this litigation. See 42 U.S.C. § 1985(3) ("[T]he party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation . . . .") Therefore, this case is not moot.

E.   FCC AND FTC RULES

Defendants' arguments that the robocall message was legally compliant under FTC and FCC rules is entirely irrelevant because Plaintiffs have not alleged that

33

Defendants violated any such rules. Accordingly, the Court will not address these arguments, as they have no bearing on the legal feasibility of the causes of action Plaintiffs asserted in the Complaint.

F.   NEW YORK'S ANTI-SLAPP STATUTE

Finally, Defendants argue that New York's anti-SLAPP statute,[10] New York Civil Rights Law § 76-a, authorizes them to seek dismissal of Plaintiffs' claims because they are without merit and brought because Defendants exercised their First Amendment rights. (Dkt No. 58-1, at 3.) New York's statute states that:

> In an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

N.Y. Civ. Rights Law § 76-a(2). An "action involving public petition and participation" is a claim based on any communication in a public space or forum or "any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public

---

[10] "SLAPP is an acronym for a 'strategic lawsuit against public participation,' which is a suit that is brought primarily to chill the valid exercise of a defendant's right to free speech . . . ." Ernst v. Carrigan, 814 F.3d 116, 117 (2d Cir. 2016).

interest, or in furtherance of the exercise of the constitutional right of petition." Id. § 76-a(1)(a).

But because the Court is persuaded that Plaintiffs have plausibly alleged threats and intimidation in violation of the VRA and KKK Act, which do not receive First Amendment protection, Defendants' alleged conduct is not "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest." Accordingly, Defendants' invocation of New York's anti-SLAPP law is unavailing.

## IV.   ORDER

Accordingly, for the reasons stated above, the letter-motion so deemed by the Court as filed by defendants Jacob Wohl, Jack Burkman, J.M. Burkman & Associates, LLC, Project 1599, and John and Jane Does 1 through 10 to dismiss the complaint of plaintiffs National Coalition on Black Civic Participation, Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, and Andrea Sferes (Dkt. No. 58) is hereby **DENIED**.

**SO ORDERED.**

Dated:   New York, New York
         12 January 2021

_____
Victor Marrero
U.S.D.J.