# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES, <br><br>         Plaintiffs, <br><br>   -and- <br><br>People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK <br><br>        Plaintiff-Intervenor, <br><br>   v. <br><br>JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, MESSAGE COMMUNICATIONS, INC., and ROBERT MAHANIAN <br><br>        Defendants. | CIVIL ACTION NO. 1:20-CV-08668 <br><br>**[CORRECTED FPROPOSED] COMPLAINT IN INTERVENTION** |

**PRELIMINARY STATEMENT**

1.    All eligible voters have the right to vote unimpeded by deception or intimidation. The right to vote "in a free and unimpaired manner is preservative of other basic civil and political rights" and "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

1

2.    This case is about a targeted, discriminatory effort to infringe on the fundamental rights of New Yorkers—and others across the country—to vote in a safe, lawful manner. Jacob Wohl and Jack Burkman, through Burkman's lobbying firm, J.M. Burkman & Associates, and the purported organization Project 1599 (collectively "Wohl and Burkman"), concocted a racist campaign that trafficked in stereotypes and spread lies and deception all for their shared goal of intimidating voters and depressing voter turnout to disrupt a presidential election. In doing so, Wohl and Burkman violated several federal and New York laws.

3.    In the summer of 2020, in advance of that November's presidential election, Wohl and Burkman created a robocall recording, i.e. an automated phone call with a pre-recorded message, to discourage voters from voting by mail during a global pandemic in which voting in person posed a significant health risk. That robocall purported to come from a "Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burman and Jacob Wohl," and falsely claimed that voting by mail would subject the voter to having their personal information used by "police departments to track down old warrants," "credit card companies to collect outstanding debts," and by the Centers for Disease Control ("CDC") to "track people for mandatory vaccines."

4.    Wohl and Burkman hired Message Communications, Inc., which is owned and operated by Robert Mahanian (collectively "Message Communications"), to send the robocall message to voters in New York and across the country.

5.    On August 26, 2020, Message Communications sent the robocall to over 85,000 phone numbers nationwide, including approximately 5,500 phone numbers with New York area codes, and predominantly New York City metropolitan area codes.

6.      Wohl and Burkman demonstrated a clear racial animus in carrying out their robocall campaign. For example, on August 25, 2020, the day before the robocalls were placed, Wohl emailed Burkman attaching the audio file for the call and stating that "[w]e should send it to black neighborhoods…" The next day, after the calls were sent and received by thousands of voters, Burkman emailed to congratulate Wohl, stating that "i love these robo calls…getting angry black call backs…win or lose…the black robo was a great jw idea."

7.      The Wohl and Burkman robocall campaign attempted to undermine and interfere with the then-ongoing efforts by the State of New York ("State") to fairly and safely administer its elections and protect its citizens from voter intimidation and harassment. Indeed, in August 2020, as New York's elections officials were taking steps—in light of the ongoing COVID-19 crisis—to make the application process for absentee ballots more accessible, the Wohl and Burkman robocall successfully reached thousands of New York phone numbers, spreading lies and subjecting those who received the call to intimidating and threatening language about what would happen to them if they decided to vote by absentee ballot during a deadly pandemic.

8.      The New York Attorney General ("NYAG") has a substantial interest in safeguarding the rights of New Yorkers who are threatened by voter intimidation. The NYAG seeks to intervene in this action to enforce the various voting rights and other protections provided by 42 U.S.C. § 1985(3) (the Ku Klux Klan Act of 1871), 52 U.S.C. § 10307(b) (the Voting Rights Act of 1965), 52 U.S.C. 10101(b) (the Civil Rights Act of 1957), New York Civil Rights Law §§ 9 and 40-c, otherwise prevent persistent illegality pursuant to New York Executive Law § 63(12), and to ensure that Defendants are not permitted to repeat their discriminatory and harassing conduct in future elections.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This Court may exercise supplemental jurisdiction over claims based on New York law pursuant to 28 U.S.C. § 1367.

10.      This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201, 2202. This Court may also grant injunctive relief pursuant to Federal Rule of Civil Procedure 65.

11.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) because a substantial part of the events giving rise to this Complaint occurred and continue to occur within the Southern District of New York.

## PARTIES

12.      Plaintiff-Intervenor is the People of the State of New York, by its attorney, Letitia James, Attorney General of the State of New York. The Attorney General is the State's chief law enforcement officer and is authorized to pursue this action pursuant to New York Executive Law § 63.

13.      The NYAG also brings this action pursuant to her *parens patriae* authority on behalf of the New York voters who have been intimidated by Defendants' unlawful conduct. Where, as here, the interests, rights, and well-being of a substantial segment of people of the State are implicated, the NYAG possesses *parens patriae* authority to commence legal actions in federal court for violations of federal and state laws.

14.      The NYAG has a "unique status as the representative of the greater public good and [a] concomitant mandate to secure wide-ranging relief that will inure to the direct and indirect benefit of the broader community." *New York v. Utica City Sch. Dist.*, 177 F. Supp. 739, 753-54

4

(N.D.N.Y. 2016). As such, the NYAG has a quasi-sovereign interest in the health and well-being of New Yorkers. A fundamental component of that well-being is New Yorkers' right to vote. The NYAG's interest in protecting its citizens' fundamental voting rights warrants the employment of the NYAG's *parens patriae* authority. *See New York v. Cnty. of Del.*, 82 F. Supp. 2d 12, 13 n. 1 (N.D.N.Y. 2000) (holding that the NYAG has *parens patriae* authority to bring a suit to protect the voting rights of disabled New Yorkers).

15.     Plaintiff-Intervenor, the NYAG, is aggrieved by Defendants' actions and has standing to bring this action.

16.     Defendant Jacob Wohl ("Wohl") is a resident of Los Angeles, California. Wohl is a businessperson and conspiracy theorist.

17.     Defendant Jack Burkman ("Burkman") is a resident of Arlington, Virginia. Burkman is a lobbyist, attorney, and conspiracy theorist.

18.     Defendant J.M. Burkman & Associates, LLC ("Burkman & Associates") is a lobbying firm founded, controlled, and operated by Burkman. Burkman & Associates is headquartered at 1530 Key Blvd., Apt. 1222, Arlington, Virginia, an address affiliated with Burkman.

19.     Defendant Project 1599 is an organization founded by Wohl and Burkman with headquarters at 1599 N. Colonial Terrace, Arlington, an address affiliated with Burkman.

20.     Defendant Message Communications, Inc. is a California corporation that owns, operates, and hosts a telecommunication broadcasting platform, which broadcasts robocalls or pre-recorded telephone messages for a fee. Message Communications, Inc. is headquartered at 505 N. Tigertail Road, Los Angeles, California.

21.     Defendant Robert Mahanian ("Mahanian") is a resident of Los Angeles, California and is the principal agent and owner of Message Communications, Inc.

## FACTUAL BACKGROUND

### Wohl and Burkman Set Out to Disrupt the 2020 Election

22.     In advance of the 2020 presidential election, Wohl and Burkman expressed an interest in interfering in that election by, among other things, spreading disinformation to suppress voter turnout through a self-proclaimed "conservative political intelligence and advocacy organization" called the Arlington Center for Political Intelligence (ACPI).

23.     The details of ACPI's mission to "affect[] political outcomes in the interest of advancing conservative candidates and the financial interests of our backers" were disseminated in a 12-page document, dated January 2019, to solicit donors to fundraise for ACPI's goals.

24.     Indeed, by February 2019, Wohl, who had previously partnered with Burkman to engage in political activities, told USA Today that he was "already plotting ways to discredit Democrats in the 2020 election with lies and other disinformation, using his large following on social media to cause disarray similar to what the Russians did during the 2016 election."

25.     In June 2019, Wohl admitted to The Washington Post that he had sought investors through ACPI to fund the scheme outlined in the ACPI prospectus: to use fraudulent news stories about candidates to suppress voter turnout and manipulate political betting markets.

26.     The fundraising documents for ACPI stated, among other things, that it would create "what appear to be grass-roots" groups to target "voters in swing districts" and conduct a "voter-suppression effort" "[j]ust before the election."

6

27.     ACPI also aimed to swing political betting markets. The document noted that the Center's "backers will affect political outcomes and use our actionable intelligence to reap rewards betting on those outcomes."

28.     Upon information and belief, Wohl and Burkman created Project 1599 as an effort to carry out the goals outlined in the ACPI document: specifically, to spread disinformation, suppress voter turnout, and otherwise interfere in the 2020 election.

## Defendants Planned, Created, and Discharged a Deceptive and Intimidating Robocall Campaign in Advance of the 2020 Election

29.     In the summer leading up to the 2020 general election, Wohl and Burkman planned, funded, and executed a concerted effort to intimidate and threaten voters through a nationwide robocall.

30.     Upon information and belief, on June 17, 2020, Burkman left a voice message for Mahanian to discuss broadcasting a robocall that Burkman and Wohl intended to discourage mail-in voting and suppress voter turnout.

31.     On June 21, 2020, Burkman left a message with Message Communications stating that he wanted to place some robocalls—that he wanted to "buy some"—and asked for a return call to his telephone at 703-795-5364.

32.     Over the next few days, upon information and belief, Burkman discussed with Mahanian the robocalls Burkman wanted to broadcast via Message Communications.

33.     On June 23, 2020, Burkman issued from a Burkman & Associates bank account the first of a series of checks (number 19518) to Message Communications in the amount of $1,000 with a subject of "PR – Robo call."

34.     As seen below, while Wohl and Burkman were preparing their robocall message, the two discussed their goal of interfering with the upcoming election. On August 19, 2020, Wohl

wrote an email to Burkman regarding Bill Clinton's Democratic Convention speech, saying, "[o]ur press conferences literally get 50-100x more views, which is why we must HIJACK this boring election."



35.     That same day, Burkman wrote an email to Mahanian at Message Communications, copying Wohl, confirming, "Check to you Robert just went out in the 2 day pouch you will have in 2-3 days then we attack."

36.     On August 21, 2020, Burkman & Associates issued check number 19921 to Message Communications for $1,000 with a subject "Robo [illegible] call."

37.     On August 24, 2020, Burkman emailed Mahanian at Message Communications to confirm that he received the payment for the voter robocall campaign.

38.     The next day, Mahanian confirmed receipt of Burkman's check number 19921 and informed Burkman that he was "all set" to begin the robocall campaign.

39.     Throughout the day on August 25, 2020, Wohl and Burkman emailed each other to identify specific neighborhoods to target with their robocall message.

40.     At 12:10 am on that day, Wohl emailed Burkman an audio file of the robocall recording, adding that it should be sent to "black neighborhoods" in several cities (as seen below).

41.     Burkman emailed Wohl back at 5:51 pm, a message with the subject line "working on robo now."

42.     Burkman emailed another update to Wohl at 6:48 pm, confirming "the message says data all loaded, ready. Many zip codes. We have two wavs, the 267,000 calls each. If you could do me one favor, just go in and upload the recording. Message Communications.com account 12013, pass code 5202. Then I will enable, pick days and go in and hit go."

**Subject:** Robo Call Tape
**Date:** 25/08/2020 00:10   **From:** "jacobwohl@gmail.com" <jacobwohl@gmail.com>    **To:** "Jack Burkman" <jackburkman2016@gmail.com>

Attached is the audio file for the robo call. We should send it to black neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte, Richmond, Atlanta and Cleveland.

43.     At 8:27 pm on August 25, Burkman emailed Mahanian "2 mins when u can  almost done    7037955364    thx so much."

44.     Upon information and belief, Burkman and Mahanian then discussed the robocall, including the targeted neighborhoods that Burkman and Wohl's robocall campaign would reach.

45.     Wohl emailed Burkman and Mahanian on August 26 at 10:41 am informing them that the WAV file was uploaded successfully and that he updated the calls-per-minute to the maximum.

46.     Mahanian confirmed to Wohl and Burkman via Mahanian's Message Communications email account that "yes, your campaign is currently running and recording, uploaded about 20 minutes ago, is running. I believe you are all set."

47.     Minutes later, Burkman emailed Wohl and Mahanian to congratulate them for the "great job."

48.     Upon information and belief, Message Communications monitors its robocall campaigns, including recording all calls delivered via the broadcast platform.

49.     Upon information and belief, Message Communications did not perform any due diligence or make any effort to determine whether the robocall provided to him by Wohl and Burkman—two individuals known for spreading conspiracy theories and other disinformation—constituted voter intimidation.

50.     Instead, Message Communications processed the robocall and disseminated it via its broadcast platform to thousands of voters in multiple states, including New York, Ohio, Michigan, Pennsylvania, and Illinois. Message Communications' records show that the messages were sent from 10:36 am to 3:30 pm ET on August 26, 2020.

51.     The robocall message, once dialed, transmitted to caller IDs an origination phone number of 703-795-5364, which belonged to Burkman.

52.     Voters who received the robocall message either received it live, if they answered the call, or through their voicemail system.

53.     Wohl and Burkman's robocall message began with a woman introducing herself as Tamika Taylor from Project 1599. The message then falsely stated that voters who chose to vote by mail would face several severe consequences for doing so. The call stated that the police would use information from mail-in voting to track down old arrest warrants, that credit card companies would collect outstanding debts with the information provided, and that the CDC would use the information to administer mandatory vaccines. None of these statements is true.

54.     Below is a complete transcript of the robocall:

> Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by

credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail.

55.     In addition to containing blatant lies, the robocall traded on racist stereotypes intended to intimidate and otherwise discourage Black voters from using absentee or mail-in ballots.

56.     For example, "Tamika Taylor" bears resemblance to Tamika Palmer, the mother of Breonna Taylor, a Black woman killed by police while sleeping in her home in Louisville, Kentucky in 2020. When Breonna Taylor's death became an important part of the movement for Black lives and racial justice, the media often misidentified Tamika Palmer as Tamika Taylor.

57.     Moreover, as another example, stating that vote by mail information would be used by police to track down old warrants could be perceived as intimidating for Black voters who may have legitimate fears of interacting with law enforcement due to a long history of systemic racism in the criminal justice system.

58.     By instructing Black voters to "stay safe" during a global pandemic, the call also discouraged any exercise of the franchise. Voters intimidated from voting by mail were left with the choice of voting in person—and risking death or lifelong debilitation from COVID-19—or not voting at all.

59.     Wohl and Burkman's emails further reveal the shared racial animus that motivated the robocall campaign.

60.     At 12:36 pm on August 26, 2020, Burkman sent an email to Wohl, stating "I love these robo calls…getting angry black call backs…win or lose…the black robo was a great jw idea."

11



61.     Upon information and belief, Message Communications maintains a database of phone numbers that can be targeted for purposes of a robocall campaign and it was aware of and directed the robocall message to specific communities selected by Wohl and Burkman.

62.     The purpose of this robocall campaign, though devious in its intended result, was plain to Wohl and Burkman, and should have been equally so to Mahanian and Message Communications: to prevent voters, especially Black voters in specific cities, from accessing absentee or mail-in ballots, which would prove to be a critical and secure method for preserving the elective franchise during the COVID-19 pandemic.

63.     Message Communications and Mahanian failed to prevent Wohl and Burkman from directing the robocall message to specific communities based on race.

64.     Upon information and belief, Message Communications maintains real time analytics, such as response rate analyses and geographic response analyses, for robocall campaigns to identify how to increase robocall performance. Upon information and belief, Message Communications maintained these analyses for the Project 1599 robocall campaign.

65.     Federal law prescribes the technical and procedural standards for systems that are used to transmit artificial or prerecorded voice messages via telephone, including the requirement that such messages state certain information such as the identity of the calling entity. 47 U.S.C.

§ 227(d)(3)(A). Based on these federal requirements, to ensure that a robocall message complied with federal law, Message Communications knew or should have known the content of the Wohl and Burkman robocall message.

66.      Defendants' illegal robocall was sent to approximately 85,000 potential voters in advance of the 2020 presidential election, including approximately 5,500 New York phone numbers.

**Defendants' Robocall Subjected New York Voters to Intimidation and Hindered and Disturbed New York's Elections**

67.      The Wohl and Burkman robocall sought to subject New York voters to intimidation and attempted to interfere in the State's efforts to provide for free and fair elections in a safe manner during the COVID-19 pandemic.

68.      As noted, approximately 5,500 New York phone numbers received the Wohl and Burkman robocall on August 26, 2020. Of this group, the vast majority of calls were sent to numbers with New York City area codes; at least 4,186 calls were sent to the 212 area code; at least 703 calls were sent to the 646 area code; at least 198 calls were sent to the 347 area code; and at least 170 calls were sent to the 917 area code.

69.      Within several days, New York voters who received the robocall had realized that the purpose of the call was to discourage Black voters from voting by absentee ballot, a safe alternative to voting in person during the COVID-19 pandemic, and thereby suppress Black votes.

70.      Beyond targeting New York's voters for intimidation, the Wohl and Burkman robocall campaign sought to interfere with the State's efforts to encourage and expand absentee ballot access as a lawful, proven, and safe method for voting.

71.      For example, in the lead-up to the 2020 election, and in response to the exigencies of the COVID-19 pandemic, the State took steps to expand access to absentee ballots by: (1)

13

expanding the qualified excuses for obtaining an absentee ballot to cover the risk of contracting COVID-19;[1] (2) allowing voters to request an absentee ballot more than 30 days before Election Day;[2] (3) modernizing the ways in which voters could request an absentee ballot to include over-the-phone applications as well as via electronic submissions;[3] and (4) directing local boards of elections to send voters information mailings specifying the relevant voting deadlines, including the deadlines for absentee ballot applications and procedures.[4]

72.     Wohl and Burkman's robocall, which approximately 5,500 New York voters received, sought to undermine and hinder these efforts by casting doubt on the security of voting by absentee ballot and threatening severe, harmful collateral consequences for voters who sought to do so.

### Wohl and Burkman Admitted to their Role in the Deceptive Robocall Scheme

73.     On October 16, 2020, the National Coalition on Black Civic Participation and others initiated this lawsuit.

74.     On October 22, 2020, Plaintiffs in this case sought a temporary restraining order and preliminary injunction to prevent Wohl and Burkman from engaging in any further robocall campaigns to interfere in the 2020 Presidential election.

75.     On October 26, 2020, Your Honor heard arguments concerning Plaintiff's temporary restraining order and preliminary injunction. Plaintiffs were represented by counsel and Wohl and Burkman appeared *pro se*.

---

[1] [1] S.8015D, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 20, 2020),
https://www.nysenate.gov/legislation/bills/2019/s8015.
[2] S.8783A, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 20, 2020),
https://www.nysenate.gov/legislation/bills/2019/s8783/amendment/a. (This provision expires on December 31, 2020).
[3] Exec. Order 202.58 (Aug. 24, 2020), https://www.governor.ny.gov/news/no-20258-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.
[4] *Id*.

76.     During the October 26 hearing, Wohl and Burkman each made various representations about their role in the robocall campaign, including Burkman's admission to the court that "Yes, that is our call. Yes, yes," and his confirmation that "we do not" deny the content of the robocall message. *See* Court Hrg. Tr. Oct. 26, 2020 beginning at 12:17.

77.     Additionally, when Wohl was subsequently examined by the Court, he answered that he "would second everything that Mr. Burkman pointed out." Wohl confirmed that this meant that he acknowledges that he "participated in the preparation of the content of the messages and its communication to plaintiffs through [Message Communications] the entity in California." *Id*. beginning at 14:20.

78.     In its decision and order on October 28, 2020, (the October Order), the Court granted plaintiffs request for a temporary restraining order restraining defendants from engaging in further robocall campaigns without prior consent of the court through at least November 3, 2020, and ordered that Wohl and Burkman issue a curative message to be distributed to numbers dialed by the voter intimidation robocall campaign.

79.     In the October Order, the Court made certain factual findings in support of the temporary restraining order, including that "the information Defendants' calls convey is manifestly false and meant to intimidate citizens from exercising voting rights."

80.     The October Order also found Wohl and Burkman's statements denying targeting particular demographic groups with the robocall, "lacking in credibility," which were belied by their other admissions.

### Defendants' Conspired to Intimidate Voters from Exercising Their Right to Vote

81.     Defendants conspired, through intimidation and thinly veiled threats, to prevent lawfully registered New York voters from giving their support and advocacy toward candidates to

serve as an elector for President and Vice President and to serve as Members of Congress of the United States.

82.     The conspiracy consisted of Wohl and Burkman, their related entities, and Message Communications.

83.     Defendants committed numerous overt acts in furtherance of the conspiracy as outlined above.

84.     For instance, Wohl and Burkman used Burkman & Associates and Project 1599 to plan, draft, and fund a strategically deceptive, racially targeted, and threatening robocall designed to suppress the vote in advance of the general election ending on November 3, 2020.

85.     The purpose of the Project 1599 robocall was to sow distrust in the use of mail-in or absentee ballots among voters, specifically Black voters, to suppress their votes in the general election ending on November 3, 2020.

86.     To fund Project 1599's deceptive and threatening robocall, Wohl and Burkman used Burkman & Associates to pay for robocalls to be broadcast by Message Communications.

87.     Upon information and belief, Message Communications worked with Wohl and Burkman to target specific zip codes to maximize the threatening effects the robocall would have on Black voters in New York and other large metropolitan areas.

88.     Message Communications, once fully paid by Burkman & Associates, broadcast the robocall as well as monitored and recorded its broadcast.

89.     On information and belief, at no point did Mahanian or Message Communications, nor any other Defendant, attempt to prevent the robocall from being broadcast.

## CAUSES OF ACTION

### COUNT I
### Violation of Section 11(b) of the Voting Rights Act of 1965
### (Against all Defendants)

90.  Plaintiff-Intervenor repeats, realleges, and incorporates herein by reference the allegations set forth in paragraphs 1 through 89 of this Complaint.

91.  Section 11(b) of the Voting Rights Act provides in relevant part that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to threaten, intimidate, or coerce any person" for voting, attempting to vote, or aiding any person who is voting or attempting to vote, in any election. 52 U.S.C. § 10307(b).

92.  Defendants' conduct violates Section 11(b) of the Voting Rights Act, which prohibits actual or attempted intimidation, threats, and/or coercive conduct against a person "for voting or attempting to vote." 52 U.S.C. § 10307(b).

93.  Wohl and Burkman targeted Black communities with their robocall campaign in an effort to intimidate Black voters from voting by mail and thereby suppress their votes, voters whose rights and interests the NYAG asserts and protects.

94.  In furtherance of their efforts to intimidate voters, Wohl and Burkman, through Message Communications, coordinated to ensure the maximum rate at which the robocall campaign would be broadcast to reach the greatest number of dialed-calls.

95.  Mahanian and Message Communications were aware or should have been aware of the false information and the communities targeted to receive the call but nevertheless failed to prevent the message's broadcast. Instead, Mahanian and Message Communications sent the intimidating and inaccurate message to thousands of phone numbers in New York and other states and actively monitored its spread.

96.     Defendants attempted to intimidate New York voters from exercising their right to vote. Defendants' robocall message contained thinly veiled threats that were received by approximately 5,500 New York phone numbers. Those voters who heard the message were subjected to those threats, which were intended to raise doubts and fears about absentee or mail-in ballots, and thereby undermine their confidence in the general election for President, Vice President, and other offices ending on November 3, 2020.

## COUNT II
### Violation of Section 2 of the Ku Klux Klan Act
### (Against all Defendants)

97.     Plaintiff-Intervenor repeats, realleges, and incorporates herein by reference the allegations set forth in paragraphs 1 through 89 of this Complaint.

98.     The Ku Klux Klan Act of 1871 prohibits "two or more persons [from] conspir[ing] to prevent by force, intimidation, or threat" any "citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States." 42 U.S.C. § 1985(3). The statute also provides that "in any case of conspiracy…if one or more person engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation against any one or more of the conspirators." 42 U.S.C. § 1985(3).[5]

99.     Defendants have violated 42 U.S.C. § 1985(3) because they have conspired to intimidate and threaten thousands of lawfully registered New York voters during the general

---

[5] Section 1986 of the Ku Klux Klan Act permits any person with knowledge of a conspiracy, who had the power to stop it but failed to do so, to be joined as a defendant in a Section 1985 suit. 42 U.S.C. § 1986.

election ending on November 3, 2020, voters whose rights and interests the NYAG asserts and protects.

100.    Wohl and Burkman planned and conspired to spread a false, deceptive, and inflammatory robocall message targeted at Black voters in New York. The purpose of this robocall was to "HIJACK" the election and suppress the vote by encouraging voters to "stay safe" and intimidating voters from obtaining and voting by absentee ballot for fear of suffering significant collateral consequences for doing so—such as the enforcement of warrants by law enforcement, collection of old debts, and forced vaccination.

101.    Wohl and Burkman conspired to target Black voters to receive the robocall and then celebrated receiving "angry black call backs" after thousands of voters, including voters in New York, received it.

102.    Wohl and Burkman, through Burkman's business, Burkman & Associates, and Project 1599, enlisted Mahanian and his company Message Communications to place the robocall and target specific cities to receive the robocall message.

103.    Defendants coordinated targeting specific communities to receive the intimidating robocall message.

104.    Each defendant, including Mahanian and Message Communications, was aware or should have been aware of the conspiracy and had the opportunity to stop it by, for instance, not placing and/or transmitting the robocall message.

105.    Defendants' conspiracy also sought to deprive Black voters of the equal protection of the laws. Defendants targeted specific zip codes in cities in an effort to target Black voters for the robocall message.

106.    Each robocall message that was sent was an act in furtherance of the object of

defendants' Section 1985(3) conspiracy.

## COUNT III
### Violation of Section 131(b) of the Civil Rights Act of 1957
### (Against Defendants Wohl, Burkman, Project 1599, and Burkman & Associates)

107.   Plaintiff-Intervenor repeats, realleges, and incorporates herein by reference the allegations set forth in paragraphs 1 through 89 of this Complaint.

108.   Section 131(b) of the Civil Rights Act of 1957 prohibits intentional voter intimidation by any person in federal elections. 52 U.S.C. § 10101(b). Under the statute, "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not vote for," any candidate for federal office. *Id.*

109.   Wohl and Burkman have violated Section 131(b) because they attempted to intimidate and threaten thousands of lawfully registered New York voters during the general election ending on November 3, 2020, voters whose rights and interests the NYAG asserts and protects.

110.   Wohl and Burkman planned and spread a false, deceptive, and inflammatory robocall message targeted at Black voters in New York. The purpose of this robocall was to suppress the vote by encouraging voters to "stay safe" and intimidating voters out of obtaining and voting by absentee ballots for fear of suffering significant collateral consequences for doing so— such as the enforcement of warrants by law enforcement, collection of old debts, and forced vaccination.

111.   Wohl and Burkman conspired to target Black voters to receive their deceptive and harassing robocall by selecting specific zip codes and communities to receive the call, including

approximately 5,500 New York voters. Those voters who heard the message were subjected to thinly veiled threats, which were intended to raise doubts and fears about absentee or mail-in ballots, and thereby undermine their confidence in the general election for President, Vice President, and other offices ending on November 3, 2020.

112.    Wohl and Burkman also demonstrated the racial animus of their actions by, among other statements, celebrating receiving "angry black call backs" after their robocall message was placed and sent to thousands of voters, including voters in New York.

**COUNT IV**
**Violation Sections 40-c and 40-d of the New York Civil Rights Law**
**(Against all Defendants)**

113.    Plaintiff-Intervenor repeats, realleges, and incorporates herein by reference the allegations set forth in paragraphs 1 through 89 of this Complaint.

114.    The right to be free from discrimination and harassment in the exercising of civil rights, including voting rights, is protected and guaranteed by New York Civil Rights Law § 40-c, which provides that, "no person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation or disability…be subjected to any discrimination in his or her civil rights, or to any harassment, in the exercise thereof, by any other person." N.Y. Civ. R. § 40-c.

115.    New York Civil Rights Law § 40-d provides that any person who violates § 40-c "or who shall aid or incite the violation" of that section shall be liable for a penalty of up to five hundred dollars "for each and every violation." N.Y. Civ. R. § 40-d.

116.    Wohl and Burkman have, because of race or color, subjected New York residents to discrimination and harassment aimed at preventing those who received the call from exercising their full voting rights, rights and interests which the NYAG asserts and protects.

117.    Defendants  Wohl  and  Burkman,  their  related  entities,  and  Message

Communications and Mahanian also aided and incited the discrimination of New York voters on the basis of race or color.

118.    Defendants Wohl and Burkman spread a false, deceptive, and inflammatory robocall message targeted at Black voters in New York, the purpose of which was to suppress the vote by encouraging voters to "stay safe" and intimidating voters out of obtaining and voting by absentee ballots.

119.    After approximately 5,500 New York residents received the robocall message, Wohl and Burkman celebrated their efforts to discriminate against and harass Black voters.

**COUNT V**
**Violation of Section 9 of the New York Civil Rights Law**
**(Against Defendants Wohl, Burkman, Project 1599, and Burkman & Associates)**

120.    Plaintiff-Intervenor repeats, realleges, and incorporates herein by reference the allegations set forth in paragraphs 1 through 89 of this Complaint.

121.    New York Civil Rights Law § 9 states: "[a]ll elections ought to be free; and no person by force of arms, malice, menacing, or otherwise, should presume to disturb or hinder any citizen of this state in the free exercise of the right of suffrage." N.Y. Civ. R. § 9.

122.    Defendants have violated New York Civil Rights Law § 9 because they caused to be sent an intimidating and blatantly false robocall message in an effort to "HIJACK" the 2020 election.

123.    Defendants' robocall campaign was intended to dissuade New York voters from freely exercising their full voting rights, voters whose rights and interests the NYAG asserts and protects.

124.    Defendants' deceptive and menacing robocall message, which contained thinly veiled threats concerning harms that would befall someone who voted by absentee or mail-in

ballot, was received by approximately 5,500 New York phone numbers.

125.    New York voters who heard the message were subjected to those thinly veiled threats, which were intended to raise doubts and fears about absentee or mail-in ballots and thereby undermine a New York voter's confidence in the general election ending on November 3, 2020.

126.    Defendants' purpose in broadcasting the robocall message was to sow doubts and raise fears about absentee or mail-in ballots, and in doing so suppress the vote in specific communities, including Black communities in New York.

127.    Defendants have further violated New York Civil Rights Law § 9 by attempting to interfere with and hinder the State's efforts to provide for a free and fair election during the COVID-19 pandemic.

128.    In advance of the general election ending on November 3, 2020, the State adopted several measures to secure a free and fair election while allowing those voters who feared contracting COVID-19 to vote via absentee or mail-in ballots.

129.    Defendants sent a blatantly intimidating robocall to New York voters, which falsely claimed that harmful consequences would befall voters who voted via absentee or mail-in ballot. This conduct was an attempt to interfere with and hinder the State's contemporaneous efforts to provide a free and fair election during the COVID-19 pandemic.

**COUNT VI**
**Violation of Section 63(12) of the New York Executive Law**
**(Against all Defendants)**

130.    Plaintiff repeats, realleges, and incorporates herein by reference the allegations set forth in paragraphs 1 through 89 of this Complaint.

131.    New York Executive Law § 63(12) empowers the Attorney General to seek restitution, disgorgement, and injunctive relief when any person or business entity has engaged in

repeated fraudulent or illegal acts or otherwise demonstrates persistent fraud or illegality in the carrying on, conducting, or transaction of business.

132.     A violation of any state law or regulation constitutes "illegality" within the meaning of § 63(12) and is actionable thereunder when the violation is persistent or repeated. *See, e.g.*, *Princess Prestige Co.*, 42 N.Y.2d 106 (1977) (violations of the Home Solicitation Act, P.P.L. Art. 10-A); *Applied Card,* 27 A.D.3d at 104 (violations of debt collection laws); *State v. Frink Am., Inc.*, 2 A.D.3d 1379 (4th Dep't 2003) (violations of Labor Law).

133.     Similarly, "[i]t long has been recognized that [Executive Law § 63(12)] affords the Attorney General broad authority to enforce federal as well as state law, unless state action in the area of federal concern has been precluded utterly or federal courts have exclusive jurisdiction of the matter." *Oncor Commc'ns, Inc. v. State,* 165 Misc. 2d 262, 267 (Sup. Ct. Albany Cnty. 1995), *aff'd*, 218 A.D.2d 60 (3d Dep't 1996*).* Indeed, the Attorney General's authority to enforce federal law has been described as not simply a power but an "obligation." *State v. Anderson*, 137 A.D.2d 259, 267 (4th Dep't 1988). Violations of state and federal criminal law have been found actionable under Executive Law § 63(12). *See, e.g., Expressions Hair Design v. Schneiderman*, 975 F. Supp. 2d 430 (S.D.N.Y. 2013).

134.     Persistent or repeated conduct under Executive Law § 63(12) includes the repetition of any number of "separate and distinct fraudulent or illegal act[s], or conduct which affects more than one person." *See, e.g., State v. Wilco Energy Corp.*, 284 A.D.2d 469, 471 (2d Dep't 2001).

135.     Defendants have engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting, or transaction of their deceptive robocall campaign for purposes of Executive Law § 63(12).

136.     Defendants' targeted robocall campaign was fraudulent conduct, as defined under

Executive Law section 63(12), because it "has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud." *People v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 107 (3d Dep't 2005), *aff'd on other grounds*, 11 N.Y.3d 105 (2008).

137.    As described above, Defendants' robocall campaign, funded and carried out through Burkman's business entity, was a violation of the New York Civil Rights laws, the Ku Klux Klan Act of 1871, the Civil Rights Act of 1975, and Section 11-b of the Voting Rights Act of 1965.

138.    Wohl and Burkman created and disseminated the robocalls, which falsely stated that the police would use information from mail-in voting to track down old arrest warrants, that credit card companies would collect outstanding debts with the information provided, and that the CDC would use the information to administer mandatory vaccines.

139.    None of the statements asserted in the Wohl and Burkman robocalls is true.

140.    Wohl and Burkman's robocalls were created to deceive or had the capacity to deceive dialed-callers.

141.    The robocall campaign successfully dialed thousands of New Yorkers' telephone numbers.

142.    Wohl and Burkman, through Burkman & Associates and Project 1599, enlisted Mahanian and his company Message Communications to place the robocall and target specific areas.

143.    Defendants coordinated targeting specific communities to receive the intimidating robocall message.

144.    Each Defendant, including Mahanian and Message Communications, had knowledge or should have had knowledge of the discriminatory robocall campaign and the

opportunity to stop it, by for instance not placing or transmitting the robocall message.

145.     Upon information and belief, Mahanian and Message Communications maintained real time analyses about the Project 1599 robocall campaign once it broadcasted, including geographic response analyses and overall response analyses, in order to increase the performance of the robocall campaign.

146.     Mahanian and Message Communications had obligations to ensure the broadcast message complied with statutory regulations and either failed to properly monitor the Project 1599 robocall campaign or otherwise ignored the deceptive message it spread.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Intervenor pray this Court:

(a) Declare that Defendant(s)' actions as described above violate Section 11(b) of the Voting Rights Act of 1965, Section 2 of the Ku Klux Klan Act of 1871, Section 131(b) of the Civil Rights Act of 1957, New York Civil Rights Law § 9, and New York Civil Rights Law § 40-c;

(b) Enter a permanent injunction enjoining Defendants Wohl, Burkman, Burkman & Associates, and Project 1599 from further engaging or undertaking in any of the challenged actions or conduct set forth in this Complaint;

(c) Enter a permanent injunction requiring Defendants Mahanian and Message Communications to establish policies and procedures to prevent unlawful, discriminatory, and intimidating robocalls directed at voters;

(d) Disgorge Defendants from any and all profits or payments associated with the illegal robocall campaign;

(e) Order Defendants to pay a penalty of up to $500 for each violation of New York Civil Rights Law § 40-c committed against New Yorkers who received the robocall message pursuant to New York Civil Rights Law § 40-d;

(f) Award reasonable attorneys' fees and costs; and

(g) Grant other such relief as this Court may deem proper.

Dated: May 07, 2021     Respectfully submitted,


**LETITIA JAMES**
*Attorney General*
*State of New York*

By: /s/ Colleen K. Faherty
Jessica Clarke,
  Bureau Chief, Civil Rights Bureau
Conor Duffy,
Colleen K. Faherty,
  Assistant Attorneys General
Richard Sawyer,
  Special Counsel for Hate Crimes
Hannah Bernard,
  Volunteer Assistant Attorney General

28 Liberty St., 20th Floor
New York, NY 10005
(212) 416-8252; -8637; -6046; -6182; -6308
Jessica.Clarke@ag.ny.gov
Conor.Duffy@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Richard.Sawyer@ag.ny.gov
Hannah.Bernard@ag.ny.gov


Meghan Faux,
Chief Deputy Attorney General
for Social Justice

*Of Counsel*