UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

National Coalition on Black Civic Participation, et al.    Case No. 20-cv-8668 (VM)

                Plaintiff,                **<u>Motion to Intervene</u>**

     -against-

Jacob Wohl, et al.,,

                Defendant.
------------------------------------------------------- X

**PLEASE TAKE NOTICE** that pursuant to the Federal Rule of Civil Procedure ("FRCP") Rule

24 and 10(c), I, Towaki Komatsu, am submitting this motion to be granted the following relief in

this case:

1.    Permissive intervention pursuant to FRCP Rule 24(b) in order to intervene in this

       case as an interested party or as an amicus curiae.

2.    The immediate revocation of this Court's 5/19/21 order (Dkt. 101) to the extent that

       this Court did the following through that order:

       a.   Granted the New York State Attorney General's Office ("NY AG") permissive

           intervention in this case based upon fraudulent misrepresentations of material fact

           that the NY AG presented to this Court in a fashion that is comparable to that of a

           con artist to mislead this Court into granting the NY AG's motion to intervene in

           this case.

       b.   Erroneously claimed the following about the NY AG on page 11 of that order:

> "There is no doubt that the NY AG has a strong interest in stopping
> Defendants' allegedly discriminatory efforts to impair New York citizens'
> voting rights. <u>Cf</u>. <u>Greens at Chester LLC v. Town of Chester</u>, No. 19 Civ.
> 6770, 2020 WL 2306421, at *6 (S.D.N.Y. May 8, 2020)"

This motion to intervene is supported by the following among other things:

1.    The memorandum of law dated 1/11/19 (Dkt. 81) that Monica Hanna of the NY AG filed on 1/11/19 in the ongoing case of _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) that is hereinafter referred to as "K1".

2.    The letter dated 1/30/21 that I filed in _People of the State of New York v. City of New York_, No. 21-cv-322 (CM) (GWG) (S.D.N.Y.) to request authorization to intervene in that case or otherwise appear as an interested party or amicus curiae.

3.    My submissions in K1 on 5/19/21, 3/26/21 (Dkt. 529), and 8/28/20 (Dkt. 422).

4.    The affidavit in opposition that I submitted on 5/2/19 (Dkt. 177) in K1 in response to motions to dismiss in that case insofar as my opposition in that 5/2/19 filing concerned my 5/23/17 claims in that case.

5.    My submission on 3/5/19 (Dkt. 127) in K1.

6.    The New York State Court Officers Rules and Procedures Manual that is discussed in **a)** _New York State Office of Court Administration v. Dennis Quirk_, No. 451050/2021 (Sup. Ct. New York Cty.) and **b)** _Casey v. State_, 148 A.D.3d 1370, 51 N.Y.S.3d 203 (App. Div. 2017).

7.    The affidavit of Roxanne Delgado dated 12/18/18 that I filed in K1 on that date.

8.    The attached memorandum of law of Towaki Komatsu dated May 22, 2021.


From,                                                                  **Date**: May 22, 2021

Towaki Komatsu

s_/Towaki Komatsu

802 Fairmount Pl., Apt. 4B
Bronx, NY  10460

Tel: 347-316-6180
E-mail: Towaki_Komatsu@yahoo.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

National Coalition on Black Civic Participation, et al.     Case No. 20-cv-8668 (VM)

                         Plaintiff,

           -against-

Jacob Wohl, et al.,,

                       Defendant.

------------------------------------------------------- X

## **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE**

Towaki Komatsu

802 Fairmount Pl., Apt. 4B
Bronx, NY 10460
Tel: 347-316-6180
E-mail: Towaki_Komatsu@yahoo.com

## PRELIMINARY REMARKS

I, Towaki Komatsu, submit this memorandum of law pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 24 and 10(c) in support of my motion to be granted permissive intervention pursuant to FRCP Rule 24(b) in order to intervene in this case as an interested party or to appear in it as an amicus curiae in the alternative. The following sections comprise this memorandum:

|     | **Section** | **Page** |
|-----|-------------|----------|
| 1.  | Information Incorporated by Reference | 7 |
| 2.  | Key Questions Presented | 8 |
| 3.  | Background Facts | 9 |
| 4.  | Legal Standards | 10 |
| 5.  | Statement of Facts | 36 |

a. Audio recordings that I received on 3/19/21 from the New York City Civilian Complaint Review Board ("CCRB") confirm that members of the NYPD and New York City Mayor's Office are among those who rigged and stole the results of the 2017 New York City government elections for Bill de Blasio, other political incumbents, themselves, and their criminal accomplices by engaging in voter suppression and fraud leading up to those elections ......... 36

b. E-mail messages that were sent by New York State Senator Jessica Ramos on 6/28/17 to a whistleblower news censor in journalism named Erin Durkin that confirm that Ms. Ramos was then part of a criminal conspiracy to commit, coordinate, and cover-up illegal acts of voter suppression, voter fraud, and First Amendment retaliation, and viewpoint discrimination to rig and steal the 2017 New York City government elections for Bill de Blasio and other political incumbents in New York City and their supporters ......... 42

c. Additional e-mail messages that were sent by City of New York personnel between 4/11/17 and 10/25/17 that confirm additional senior City of New York personnel participated in a criminal conspiracy to commit, coordinate, and cover-up illegal acts of voter suppression, voter fraud, and First Amendment retaliation, and viewpoint discrimination to rig and steal the 2017 New York City government elections for Bill de Blasio and other political incumbents in New York City and their supporters ......... 49

    d.   My dealings with Letitia James and the NY AG about information that I reported to them about voter suppression, voter fraud, whistleblower retaliation, and viewpoint discrimination before and after she became the New York State Attorney General ................................................................................. 59

        i.   About the public hearing that the Mayor conducted on 3/18/19 inside of City Hall's Blue Room after 4:30 pm. ........................................... 70

            1)   The relationship between the illegal acts that I experienced on 3/18/19 during the public hearing that the Mayor held in City Hall and those that he and a member of his NYPD security detail committed against me on 7/18/17 ................................................................. 73

    e.   The illegal acts and omissions that constituted voter suppression, voter fraud, whistleblower retaliation, First Amendment retaliation, and denial of access to the courts that were committed against me on 5/23/17 inside of the Bronx Supreme Court that the New York State Attorney General's Office condoned by defending some of those who perpetrated them ....................................................... 78

    f.   My dealings with the NY AG before Letitia James became the New York State Attorney General ................................................................................. 102

    g.   My dealings between 4/19/17 and 4/25/17 Letitia James, Jennifer Levy, and Muhammad Umair Khan ........................................................................... 104

6.    Arguments ................................................................................................. 108

7.    Conclusion ................................................................................................. 109

On 5/19/21, this Court stated the following on page 11 of the order (Dkt. 101) that it issued then in this case about the New York State Attorney General's Office ("NY AG"):

"There is no doubt that the NY AG has a strong interest in stopping Defendants' allegedly discriminatory efforts to impair New York citizens' voting rights. Cf. Greens at Chester LLC v. Town of Chester, No. 19 Civ. 6770, 2020 WL 2306421, at *6 (S.D.N.Y. May 8, 2020)".

The information presented in this memorandum will establish that relevant matters of fact, law, and evidence sufficiently instead confirm that Letitia James and other present and former senior personnel of the NY AG demonstrated that they chose not to stop "discriminatory

efforts to impair New York citizens' voting rights" partly in response to information that I provided to them as that decision should equitably and reciprocally cause this Court to immediately rescind its decision to grant the NY AG the ability to intervene in this case partly because allowing the NY AG to intervene in this case constitutes selective-enforcement in violation of the Fourteenth Amendment with respect to equal protection rights and due process as well as the vagueness doctrine because that encourages arbitrary and discriminatory enforcement of applicable laws. This does not meant that I support or condone the alleged acts by the defendants in this case that have caused them to be defendants in it because I certainly don't. The decisions by present and former senior personnel of the NY AG to demonstrate inaction, complacency, and tacit approval of illegal acts and omissions both **a)** in 2017 prior to the 2017 New York City government elections and **b)** thereafter that constituted voter suppression, voter fraud, viewpoint discrimination, whistleblower retaliation, and First Amendment retaliation in response to information that I provided to them about that enabled the 2017 New York City government elections to be rigged and stolen for jobs in New York City's government and that of the State of New York that partly included the following:

1. New York City Public Advocate, Mayor, New York City Comptroller.

2. Those who work as members of the New York City Council ("City Council"), district attorneys, and borough presidents in New York City.

3. Judges who are assigned to the New York State Supreme Court and New York City Civil Court.

The U.S. Office of the Special Counsel issued a notice that is dated 2/15/18 about the federal Hatch Act in which it described town hall meetings as being "campaign activities". That notice is available on the Internet at https://osc.gov/Documents/Hatch Act/Advisory

Opinions/Federal/Candidate_Visits_to_Federal_Agencies.pdf. Also, a news article that William Neuman wrote that is entitled "With Election Near, Mayor de Blasio Loves a Town Hall" that was published on 10/5/17 by the New York Times contains statements that similarly describe town hall meetings as having been conducted as campaign events that Bill de Blasio ("the Mayor") conducted in 2017 with senior members of his administration and other incumbents in politics leading up to the 2017 New York City government elections. That news article is available on the Internet at https://www.nytimes.com/2017/10/05/nyregion/election-mayor-de-blasio-town-hall.html. Those public town hall meetings were conducted with taxpayer resources and many of them were held inside of public schools that are controlled by the New York City Department of Education ("DOE"). Those meetings were consistently recorded on video and broadcast over the Internet to countless others as a result of arrangements that the New York City Mayor's Office ("Mayor's Office") made. Those meetings were conducted in a collaborative manner with members of the public and members of the press as they would regularly be able to freely interact with senior government personnel at the end of those meetings in the rooms in which they were conducted while within earshot of others. The Mayor consistently made remarks to the audience during those meetings as he told the audiences that their members in the rooms in which those meetings were conducted would be able to meet with the members of his administration who attended them at the end of those meetings in those rooms to discuss whatever was on their minds.

Those meetings were also consistently photographed by members of the Mayor's staff, members of the press, and members of the public who attended them as those photographs were then made available on the Internet. The video recordings and photographs that were recorded and taken during those meetings consistently don't show political rivals of the incumbents who

conducted those meetings as having been in the rooms in which those meetings were conducted.
That fact and circumstance establishes that those meetings were illegally conducted inside of
New York City public schools because DOE regulation number D-130 that was issued on
6/22/09 and is available on the Internet at https://www.schools.nyc.gov/docs/default-
source/default-documentlibrary/ d-130-6-22-2009-final-remediated-wcag2-0 required every
political rival of the incumbents who conducted those meetings to have been invited to attend
them before they were conducted in order for those meetings to have been allowed to be
conducted inside of those schools. That decision that was issued in _Bloomberg v. The New York_
_City Department of Education_, No. 17 Civ. 3136 (PGG) (S.D.N.Y. Sept. 24, 2019) confirms that
that specific matter was the subject of litigation against the City of New York.

The acts of illegal voter suppression, voter fraud, viewpoint discrimination,
whistleblower retaliation, and First Amendment retaliation that I referred to above occurred **a)** in
2017 leading up to the 2017 New York City government elections and **b)** thereafter and occurred
largely in relation to public forums that were partly comprised of public town hall meetings,
public resource fair meetings, and public hearings that were recorded on video and broadcast
over the Internet to many others. Those public forums were used by the government personnel
who conducted them as badly disguised campaign events to attract publicity and support from
voters and potential voters at the expense of their political rivals and critics. Such rivals and
critics included me and were pretextually and illegally **a)** excluded from those public forums, **b)**
segregated and discriminated against during them by having our attendance deliberately
restricted to overflow rooms to prevent us from being able to lawfully communicate our views
and opposition to the incumbents in New York City's government and that of the State of New
York by not allowing us access to the rooms in which those meetings were conducted in which

we could have otherwise had non-disruptive conversations with other members of the public and been recorded on video that was broadcast over the Internet to amplify the reach of our views, and **c)** ejected from them in flagrant violation of our rights and the reciprocal rights of the public to receive information from speakers with respect to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, New York State's Open Meetings Law, and other applicable laws that partly include 18 U.S.C. §245(b)(5); 18 U.S.C. §241; 42 U.S.C. §1986, 5 U.S.C. §1502(a)(1), NYPL §240.20, NYPL §195.00, NYC Charter §1116, and NYC Charter §2604(b).

## INFORMATION INCORPORATED BY REFERENCE

Pursuant to FRCP Rule 10(c) and in the interests of brevity, I incorporate by reference the following as though fully set forth herein because they support having this Court promptly grant this application:

1.     The memorandum of law dated 1/11/19 (Dkt. 81) that Monica Hanna of the NY AG filed on 1/11/19 in the ongoing case of _Komatsu v. City of New York_, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y.) that is hereinafter referred to as "K1" that I commenced. K1 is largely about illegal acts of voter suppression, voter fraud, and whistleblower retaliation in relation to public forum campaign events that were used to rig and steal the results of the 2017 New York City government elections that benefited Letitia James and others.

2.     My submission on 5/19/21 in K1.

3.     My submission on 3/26/21 (Dkt. 529) in K1. That submission included detailed information about and links to audio recordings on the Internet of recordings that personnel of the CCRB recorded during interviews that it conducted of members of the NYPD in response to entirely valid complaints that I reported to it. Those recordings included recordings of NYPD

Inspector Howard Redmond. Mr. Redmond is the head of the Mayor's NYPD security detail.

4.      My submission on 8/28/20 (Dkt. 422) in K1. That submission included information from a report that is known as an "Unusual Occurrence Report" that is dated 5/24/17, was assigned the report number of 75089, and was completed by New York State court officer Captain Anthony Manzi in conjunction with New York State court officers Sergeant Matthew Brunner and Sergeant Ramon Dominguez as Mr. Brunner and Mr. Dominguez served as witnesses for the information that I was included in that report. That report was prepared for the New York State Unified Court System and was provided to me on 8/28/20 by the New York State Office of Court Administration ("OCA") in response to a Freedom of Information Law ("FOIL") demand that I submitted to it.

5.      The affidavit in opposition that I submitted on 5/2/19 (Dkt. 177) in K1 in response to motions to dismiss in that case insofar as my opposition in that 5/2/19 filing concerned my 5/23/17 claims in that case.

6.      My submission on 3/5/19 (Dkt. 127) in K1.

7.      The New York State Court Officers Rules and Procedures Manual that is discussed in **a)** _New York State Office of Court Administration v. Dennis Quirk_, No. 451050/2021 (Sup. Ct. New York Cty.) and **b)** _Casey v. State_, 148 A.D.3d 1370, 51 N.Y.S.3d 203 (App. Div. 2017).

8.      The affidavit of an eyewitness of mine named Roxanne Delgado (Dkt. 69) that is dated 12/18/18 that I filed in K1 on that date.

## **KEY QUESTIONS PRESENTED**

1.      How can this Court reconcile its decision to grant the NY AG permissive intervention in this case on the basis of its baseless claim that there "is no doubt that the NY AG has a strong interest in stopping Defendants' allegedly discriminatory efforts to impair New York citizens'

voting rights" with the actual track record of the NY AG's senior personnel that includes Letitia

James with condoning repeated and flagrant acts of voter suppression, voter fraud, and

whistleblower retaliation that rigged and stole the results of the 2017 New York City government

elections for the benefit of New York City Mayor Bill de Blasio, his administration, his political

allies that include Letitia James, and their business partners that this motion largely addresses

and clearly confirms? The simple answer is that it's impossible to reconcile that.

2.      Similar to how Cham Deutsch was the chairman of the City Council's Committee on

Veterans until rather recent events caused him to fired as an employee of the City of New York

for being a crook by engaging in tax evasion, why shouldn't this Court properly also regard

Letitia James as a crook instead of as competent and committed to holding those who commit

acts and omissions that constitute voter suppression and voter fraud properly accountable in the

wake of her failure to have previously done so in response to conversations that I had with her on

10/26/17 in Brooklyn at the site of the public town hall meeting that Bill de Blasio then

conducted as voter suppression and voter fraud was then occurring in her immediate presence

while I clearly apprised her about that then and thereafter on 3/18/18 as she chose to do nothing

about that in violation of applicable laws?

## **BACKGROUND FACTS**

1.      On 1/17/17, New York State Supreme Court Judge Barry Ostrager issued an order on

1/17/17 in _Komatsu v. New York City Human Resources Administration_, No. 100054/2017 (Sup.

Ct., NY Cty.) that is hereinafter referred to as "my HRA lawsuit". I was the petitioner in that

case. When he issued that order, he granted an application that I made in in it to proceed

anonymously in it and have it sealed. The sealing of that case remained in effect continuously

between 1/17/17 and 10/4/18. On 5/22/17, New York State Supreme Court Judge Nancy Bannon

was running for re-election as a judge and signed the order to show cause application that I filed on 5/19/17 in my HRA lawsuit. I then brought a copy of that same 5/19/17 order to show cause application with me to the Bronx Supreme Court while attempting to attend the public resource fair meeting that was conducted in its Veterans Memorial Hall chamber by members of the public in a collaborative manner with Bill de Blasio, members of the press, and other government personnel as that public forum was partly used as a badly disguised campaign event to attract publicity and voter support. I brought that order to show cause application with me then partly to offset the fact that Judge Bannon neglected to immediately grant me relief in that application that I could otherwise seek and perhaps obtain by attending that 5/23/17 public resource fair meeting and talking with the following while doing so:

    a. Journalists, members of the public, the Mayor, and New York City Human Resources Administration ("HRA") Commissioner Steven Banks ("Mr. Banks").

    b. Members of the New York City Department of Housing, Preservation and Development ("HPD"), the New York City Department of Education ("DOE"), the NYPD, CCRB, DOI, and the City Council.

## LEGAL STANDARDS

1.     Section 4 of New York City Mayoral Executive Order 16 states the following about information that all government personnel of the City of New York are required to report to the New York City Department of Investigation ("DOI") and/or an Inspector General:

    d. Every officer and employee of the City shall have the affirmative obligation to report, directly and without undue delay, to the Commissioner or an Inspector General any and all information concerning conduct which they know or should reasonably know to involve corrupt or other criminal activity or conflict of interest,

      i. by another City officer or employee, which concerns his or her office or employment, or

    ii.    by persons dealing with the City, which concerns their dealings with the City. The knowing failure of any officer or employee to report as required above shall constitute cause for removal from office or employment or other appropriate penalty.

2.    What I just discussed appears in a report that DOI issued that is entitled "Reporting Obligations" that is available on the Internet at https://www1.nyc.gov/site/doi/report/reporting-obligation.page. That information is also relevant in this motion because in the information that follows because I will establish that it's objectively reasonable to infer from the totality of the facts and circumstances that Letitia James, Jennifer Levy, Muhammad Umair Khan are people who knowingly violated their legal duty to report the types of information that I just discussed to DOI and/or an Inspector General in violation of New York City Mayoral Executive Order 16, NYC Charter §1116, and their oath of office with respect to the period that they were employed as personnel of the City of New York as those facts sufficiently indicate that they were incompetent as public officers of the City of New York and should have been declared as such by a court of competent jurisdiction pursuant to New York Public Officers Law §30(1)(f) while such a declaration should have caused them to have been terminated as personnel of the City of New York pursuant to New York Public Officers Law §30(1)(g).

3.    New York City Charter 1116 states the following:

    Section 1116. Fraud; neglect of duty; willful violation of law relative to office.

    a.    Any council member or other officer or employee of the city who shall wilfully violate or evade any provision of law relating to such officer's office or employment, or commit any fraud upon the city, or convert any of the public property to such officer's own use, or knowingly permit any other person so to convert it or by gross or culpable neglect of duty allow the same to be lost to the city, shall be deemed guilty of a misdemeanor and in addition to the penalties imposed by law and on conviction shall forfeit such office or employment, and be excluded forever after from receiving or holding any office or employment under the city government.

b.  Any officer or employee of the city or of any city agency who shall knowingly make a false or deceptive report or statement in the course of duty shall be guilty of a misdemeanor and, upon conviction, forfeit such office or employment.

4.   The following shows the beginning of New York Public Officers Law §30(1) that has numerous subparagraphs:

"1. Every office shall be vacant upon the happening of one of the following events before the expiration of the term thereof:"

5.   New York Public Officers Law §30(1)(f) states the following:

"f. The entry of a judgment or order of a court of competent jurisdiction declaring him to be incompetent;"

6.   New York Public Officers Law §30(1)(g) states the following:

"g. The judgment of a court, declaring void his election or appointment, or that his office is forfeited or vacant;"

7.   The following excerpt from the U.S. Supreme Court's decision in _Minnesota State Bd. For Community Colleges v. Knight_, 465 U.S. 271, 104 S. Ct. 1058, 79 L. Ed. 2d 299 (1984) is controlling law that confirms that confirms that I had a First Amendment and Fourteenth Amendment right to attend every public town hall meeting, public resource fair meeting, and public hearing that were conducted by members of the public with the Mayor and/or other New York City government personnel:

"The school board meetings at issue there were "opened [as] a forum for direct citizen involvement," 429 U. S., at 175, and "public participation [was] permitted," id., at 169. The First Amendment was violated when the meetings were suddenly closed to one segment of the public even though they otherwise remained open for participation by the public at large."

8.   The following findings from the U.S. Supreme Court's controlling decision in _Grayned v. City of Rockford_, 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) clearly reinforce the point that I just made:

"We held in *Cox v. Louisiana*, 379 U. S. 536, 544-545, that a State could not infringe the right of free speech and free assembly by convicting demonstrators under a "disturbing the peace" ordinance where **all that the students in that case did was to protest segregation and discrimination** against blacks by peaceably assembling and marching to the courthouse where they sang, prayed, and listened to a speech, but where there was no violence, no rioting, no boisterous conduct."

(boldface formatting added for emphasis)

9.      The following excerpt from *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L.

Ed. 2d 510 (1965) further cements these points:

"Those cases involved more than the "right of assembly" —a right that extends to all irrespective of their race or ideology. *De Jonge* v. *Oregon*, 299 U. S. 353. The right of "association," like the right of belief (*Board of Education* v. *Barnette*, 319 U. S. 624), is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion; and while it is not expressly included in the First Amendment its existence is necessary in making the express guarantees fully meaningful."

10.      The following excerpt from *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 60 S.

Ct. 146, 84 L. Ed. 155 (1939) confirms that people have a First Amendment and Fourteenth

Amendment right to lawfully assemble and express themselves in public forums and disregard

orders that receive without an objectively valid legal justification to do so elsewhere:

"It is suggested that the Los Angeles and Worcester ordinances are valid because their operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places. But, as we have said, the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."

11.      This point is further reinforced by remarks that Christopher Droney stated on 3/26/19

during the oral arguments hearing that was conducted in *Knight First Amendment Inst. Columbia*

*v. Trump*, 928 F.3d 226 (2d Cir. 2019) while Mr. Droney was then a judge assigned to the U.S.

Court of Appeals for the Second Circuit ("Second Circuit") and was among the judges who

presided over that oral arguments hearing as that hearing was recorded on video by C-Span. The

video recording of that hearing is available on the Internet at https://www.c-span.org/video/?459092-1/circuit-hears-oral-argument-presidents-twitter-account-case. The following remark that Judge Droney made about First Amendment rights in public forums that exist in such places as streets, sidewalks, and parks as well as town hall meetings, public resource fair meetings, and public hearings instead of the Internet during that oral arguments hearing was recorded at the elapsed time of 13 minutes and 2 seconds in that video:

> "For the First Amendment, it doesn't really have to be much more burdensome. If it's more burdensome at all, if you have to move down the street, that violates the First Amendment."

12.    That video recording includes closed-captioning. The next screenshot is from that video and shows Judge Droney as he made part of the preceding remarks.



13.    Although *Knight First Amendment Inst. Columbia v. Trump* was about how Donald Trump used one or more Twitter accounts, that fact is inconsequential insofar as that doesn't negate the fact that the remarks that Judge Droney and other Second Circuit judges that partly included Barrington Parker expressed during that 3/26/19 oral arguments hearing about First

Amendment and Fourteenth Amendment rights as they pertained to access to and participation in public forums still endure and remain controlling law notwithstanding the fact that the U.S. Supreme Court's reversed the Second Circuit's determinations about *Knight First Amendment Inst. Columbia v. Trump* to a limited degree.

14.     In *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975), the U.S. Supreme Court stated the following about prior restraints on First Amendment rights:

> "a system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: *First,* the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third,* a prompt final judicial determination must be assured."

15.     *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) is controlling law that contains the following relevant findings about unconstitutional unbridled discretion that government personnel may have to impose prior restraints on First Amendment and Fourteenth Amendment rights as that encompasses the constitutional right to lawfully attend public forums leading up to government elections and assemble in all public areas of public courthouses among other things:

> "In contrast, a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official. As demonstrated above, we have often and uniformly held that such statutes or policies impose censorship on the public or the press, and hence are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker."

16.     *Board of Regents of* State *Colleges v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) addresses Fourteenth Amendment liberty rights and confirms that people have such a

right to "acquire useful knowledge" and "enjoy those privileges long recognized . . . as essential

to the orderly pursuit of happiness by free men" that partly include the right to not be

unreasonably interfered with by government personnel inside of courthouses in violation of the

First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and other

applicable laws, rules, policies, and regulations.

17.     _Stokes v. City of Madison_, 930 F.2d 1163 (7th Cir. 1991) confirms that the "First

Amendment protects effective speech, not merely uttered words, and effective speech sometimes

requires that ideas be transformed into" "loud speech" and "other forms of expression that a

casual reading of the First Amendment might not reveal as "speech" as it stated that the decision

in _Federal Election Comm'n v. National Conservative Political Action Comm._,470 U.S. 480,

493, 105 S.Ct. 1459, 1466, 84 L.Ed.2d 455 (1985) seemed to "endorse the idea that amplified

speech is sometimes essential to effective communication and deserves protection." This is

relevant about the use of public town hall meetings, public resource fair meetings, and public

hearings by critics and other rivals of incumbents in politics who conduct such public forums to

use such meetings – especially when those meetings are recorded on video and otherwise

photographed that is broadcast over the Internet in a variety of ways – to clearly express their

views against such incumbents to provide voters, prospective voters, and political rivals of the

incumbents useful information with which to make informed and independent decisions about

such things as who to vote against, whether to vote, and who to otherwise support during election

and leading up to them by perhaps donating funds and other resources to political campaigns

against incumbents to usher in proper leadership instead of maintaining a plague and con artists

in politics by inaction. The following excerpt from _Reno v. American Civil Liberties Union_, 521

U.S. 844, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997) underscores this point about using public

forums that are recorded on video that is broadcast over the Internet and attended by journalists

and members of the public who have the ability to engage in word-of-mouth advertising to

lawfully amplify the reach of views by critics and rivals of incumbents in politics:

> "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. As the District Court found, "the content on the Internet is as diverse as human thought." 929 F. Supp., at 842 (finding 74). We agree with its conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium."

18.   This point is further discussed in the following excerpts from _McCutcheon v. Federal_

_Election Com'n_, 134 S. Ct. 1434, 572 U.S. 185, 188 L. Ed. 2d 468 (2014):

> a.   "The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, ... in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." _Cohen v. California,_ 403 U.S. 15, 24, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). As relevant here, the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. See _Buckley,_ 424 U.S., at 15, 96 S.Ct. 612."

> b.   "Those First Amendment rights are important regardless whether the individual is, on the one hand, a "lone pamphleteer[] or street corner orator[] in the Tom Paine mold," or is, on the other, someone who spends "substantial amounts of money in order to communicate [his] political ideas through sophisticated" means. _National Conservative Political Action Comm.,_ 470 U.S., at 493, 105 S.Ct. 1459. Either way, he is participating in an electoral debate that we have recognized is "integral to the operation of the system of government established by our Constitution." _Buckley, supra,_ at 14, 96 S.Ct. 612."

19.   _Roman Catholic Diocese of Brooklyn v. Cuomo_, 592 S. Ct. (U.S. 2020) contains the

following key findings about First Amendment and Fourteenth Amendment rights:

> a.   "And while those who are shut out may in some instances be able to watch services on television, such remote viewing is not the same as personal attendance"

> b.   "Government is not free to disregard the First Amendment in times of crisis."

> c.   "we may not shelter in place when the Constitution is under attack. Things never go

well when we do."

d.   "judicial deference in an emergency or a crisis does not mean wholesale judicial abdication, especially when important questions of religious discrimination, racial discrimination, free speech, or the like are raised."

e.   "Even if the Constitution has taken a holiday during this pandemic, it cannot become a sabbatical."

f.   "In far too many places, for far too long, our first freedom has fallen on deaf ears."

20.     While _Connick v. Myers_, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)

confirms that "the First Amendment expresses "a profound national commitment to the principle

that debate on public issues should be uninhibited, robust, and wide-open, and that it may well

include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public

officials."", _Snyder v. Phelps_, 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011) includes

the following excerpt that confirms that government personnel are prohibited from retaliating

against people on the basis of how they lawfully express themselves:

> "Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and—as it did here—inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate."

21.     _Whalen v. County of Fulton_, 126 F.3d 400 (2d Cir. 1997) is also controlling law and

confirms that the "constitutional right of access is violated where government officials obstruct

legitimate efforts to seek judicial redress", the "Constitution protects causes of action from

arbitrary interference" by government officials", and that when "government officials thwart

vindication of a claim by violating basic principles that enable civil claimants to assert their

rights effectively," an unconstitutional deprivation of a cause of action occurs".

22.     _Cityspec, Inc. v. Smith_, 617 F. Supp. 2d 161 (E.D.N.Y. 2009) includes the following

relevant findings:

    a.  "The First Amendment protects the right of access to the courts."

    b.  "Also protected is "[t]he right to complain to public officials and to seek administrative and judicial relief.""

23.    In _Avent v. Keybank_, No. 21-cv-01466 (CM) (S.D.N.Y. Apr. 1, 2021), U.S. District Judge Colleen McMahon stated the following as she reinforced the findings in _Cityspec Inc. v. Smith_:

> "this right "cannot be impaired, either directly. . . or indirectly, by threatening or harassing an [individual] in retaliation for filing [a] lawsuit []. . . ." _Harrison v. Springdale Water & Sewer Comm'n_, 780 F.2d 1422, 1428 (8th Cir. 1986)"

24.    _Harrison v. Springdale Water & Sewer Comm'n_ provides a very detailed about the fact that it prohibited to retaliate against people who commence litigation for doing so.

25.    _Kittay v. Giuliani_, 112 F. Supp. 2d 342 (S.D.N.Y. 2000) includes the following related finding about First Amendment and Fourteenth Amendment rights:

> "The right to petition in general guarantees only that individuals have a right to communicate directly to government officials, and that individuals have the right of access to the courts to redress constitutional violations. _See McDonald v. Smith,_ 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); _Mozzochi v. Borden,_ 959 F.2d 1174, 1180 (2d Cir.1992)"

26.    The decision that was issued on 12/9/10 by New York State Judge Alan C. Marin on behalf of the New York State Court of Claims in _Re v. the State of New York_, Ct Cl, Dec. 9, 2010, Marin, A., claim No. 11517, UID No. 2010-016-069 is available on the Internet at http://vertumnus.courts.state.ny.us/claims/html/2010-016-069.html. In that decision, he stated that "the detaining of an individual may be pretextual to remove him or her from a public meeting, speech or demonstration."

27.    _In re Snyder_, 472 U.S. 634, 647 (1985) confirms that all "persons involved in the judicial process—judges, litigants, witnesses, and **court officers—owe a duty of courtesy to all other participants**".

(boldface formatting added for emphasis)

28.    The following excerpts from *Griffin v. City of New York*, No. 16-cv-5790 (ER) (S.D.N.Y.

Jan. 18, 2019) address abuse of process:

   a.    "("[T]he gist of the tort of abuse of process, as distinguished from malicious
         prosecution, is not commencing an action or causing process to issue without
         justification, but misusing or misapplying process justified in itself for an end other
         than that which it was designed to accomplish" (internal quotation marks omitted)),
         with *PSI Metals, Inc. v. Firemen's Ins. Co. of Newark*, 839 F.2d 42, 43 (2d Cir. 1988)
         ("[A]n abuse of process claim has three essential elements: (1) regularly issued
         process, either civil or criminal, (2) *an intent to do harm without excuse or
         justification*, and (3) use of the process in a perverted manner to obtain a collateral
         objective.""

   b.    "Examples of the types of collateral objectives covered by the tort of malicious abuse
         of process include the infliction of economic harm, extortion, blackmail, and
         retribution." *Johnson v. City of New York*, No. 15 Civ. 8195 GHW, 2017 WL
         2312924, at *18 (S.D.N.Y. May 26, 2017)."

29.    *Nation Magazine v. US Dept. of Defense*, 762 F. Supp. 1558 (S.D.N.Y. 1991) states the

following about restrictions that are imposed on First Amendment and Fourteenth Amendment

rights of access to, assembly in, and expression in public forums:

   "Once a limited public forum has been created, the government is under an obligation
   to insure that "access not be denied arbitrarily or for less than compelling
   reasons." *Sherrill v. Knight,* 569 F.2d 124, 129 (D.C.Cir.1977); *see also Southeastern
   Promotions Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448
   (1975). Restrictions on newsgathering must generally be no more "arduous than
   necessary, and ... individual news[persons] may not be arbitrarily excluded from
   sources of information." *Sherrill,* 569 F.2d at 130; *see also Cox Broadcasting Corp.
   v. Cohn,* 420 U.S. 469, 491-92, 95 S.Ct. 1029, 1044-45, 43 L.Ed.2d 328
   (1975); *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943).

   The seminal case suggesting the analysis by which to determine whether regulations
   are discriminatory is *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct.
   2286, 2289, 33 L.Ed.2d 212 (1972).[14] Above "all else," the Court wrote, "the First
   Amendment means that government has no power to restrict expression because of its
   message, its ideas, its subject matter or its content." *Id.* The *Mosley* Court invalidated
   a Chicago ordinance which barred picketing within 150 feet of a school but exempted
   "peaceful picketing of any school involved in a labor dispute." *Id.* at 93, 92 S.Ct. at
   2288. Once a forum is opened to assembly, speaking or observation by some groups,
   the government may not limit access to others who may express controversial or less
   favored views. *Id.* at 96, 92 S.Ct. at 2290. Furthermore, the government "may not

select which issues are worth discussing or debating." *Id.* There is, the Court wrote, "an equality of status in the field of ideas" and the government must afford all points of view an equal opportunity to be heard. *Id.* "

30.     A fact that *Karem v. Trump*, No. 19 Civ. 2514 (D.D.C. Sep. 3, 2019), *Cable News Network, Inc. v. Trump*, No. 18 Civ. 2610 (D.D.C. Nov. 16, 2018), *Nicholas v. Bratton*, No. 15-CV-9592 (JPO) (S.D.N.Y. May 23, 2019) all had in common concerned the fact that government personnel that partly included the NYPD illegally and pretextually violated First Amendment, Fourth Amendment, Fifth Amendment and Fourteenth Amendment rights by revoking press credentials of journalists named Brian Karem, Jim Acosta, and Jason Nicholas that those journalists had a Fifth Amendment property interest in without performing their legal duty to accord those journalists proper due process prior to revoking those press credentials. In the same vein, Fifth Amendment property interests as well as Fourteenth Amendment due process and First Amendment rights apply to registration processes that I completed to RSVP to attend public resource fair meetings, public town hall meetings, and public hearings that were conducted by New York City and New York State government personnel.

31.     The U.S. Supreme Court's decision in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978) is controlling law that confirms that the First Amendment and Fourteenth Amendment rights of the press are no greater than that of the public by acknowledging that "a reporter's constitutional rights are no greater than those of any other member of the public." In the same vein, *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S. Ct. 2588, 57 L. Ed. 2d 553 (1978) confirms that "the Constitution provides the press with no greater right of access to information than that possessed by the public at large".

32.     *Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000), *The Carlton Group, LTD. v. Mirabella SG SpA*, No. 16-cv-6649 (LGS) (S.D.N.Y. July 19, 2018), and *Forcelli v. Gelco Corp.*, 109

A.D.3d 244, 972 N.Y.S.2d 570 (App. Div. 2013) concern promissory estoppel and binding and fully-enforceable agreements that partly includes communications that are sent via e-mail by government personnel to me that clearly indicate that I'm authorized to attend public resource fair meetings, public town hall meetings, and public hearings that are conducted partly by government personnel. Concerning this point, the following is a relevant excerpt from an e-mail message that I received on 5/22/17 at 2:09 pm as a blind courtesy copy recipient ("BCC") in an e-mail message that was sent by the New York City Mayor's Office's Community Affairs Unit ("CAU"):

> **From:** CommunityAffairs <communityaffairs@cityhall.nyc.gov>
> **Subject:** Reminder: Tomorrow is the Bronx Resource Fair!
> **Date:** May 22, 2017 at 2:09:43 PM EDT
>
> A reminder that you are on the RSVP list for tomorrow's Bronx Resource Fair! Top city commissioners and senior staff will be at The Bronx County Building Veteran's Memorial Hall at 851 Grand Concourse tomorrow from 9 AM to 1 PM. We look forward to seeing you there!

33.     I received the preceding e-mail message in response to the fact that I registered with the Mayor's Office prior to 5/22/17 to attend the public resource fair meeting on 5/23/17 that would be conducted by members of the public and others inside of the Veterans Memorial Hall chamber within the Bronx Supreme Court during the U.S. Navy's annual "Fleet Week" event in New York City while I continued to be a U.S. Navy veteran.

34.     A video recording that was recorded by a news organization named Bronxnet of how that public resource fair meeting was conducted is available on the Internet at

https://www.youtube.com/watch?v=B1osTP1mTF8 and confirms that it was conducted as a traditional public forum. That video recording shows members of the public freely moving about and interacting with government personnel on 5/23/17 inside of the Veterans Memorial Hall chamber inside of the Bronx Supreme Court during that 5/23/17 public resource fair meeting.

That video recording also shows the following women at the elapsed time of 10 seconds as they displayed what appears to be a protest sign during that public resource fair meeting.



35.     The fact that those women were able to display that sign during that public resource fair meeting clearly establishes the material fact that I had a clear Fourteenth Amendment and First Amendment right with respect to equal protection, due process, and freedom of expression to both attend that 5/23/17 public resource fair meeting and exhibit information to others while doing so that would be critical of the Mayor's administration and members of the NYPD. The following excerpt from _Calvary Chapel Dayton Valley v. Sisolak_, 140 S. Ct. 2603 (U.S. 2020) reinforces this point:

> "Public protests, of course, are themselves protected by the First Amendment, and any efforts to restrict them would be subject to judicial review. But respecting some First Amendment rights is not a shield for violating others. The State defends the Governor on the ground that the protests expressed a viewpoint on important issues, and that is undoubtedly true, but favoring one viewpoint over others is anathema to the First Amendment."

36.     The following excerpts from _Housing Works, Inc. v. Turner_, 00 Civ. 1122 (LAK)(JCF) (S.D.N.Y. Sept. 15, 2004) further reinforce this point and address First Amendment retaliation:

a. "To prove an Olech-type equal protection claim, the plaintiff must show that there was "no rational basis" for the differential treatment it suffered. <u>Wantanabe, 315 F. Supp. 2d at 396</u>. The Second Circuit has not decided whether an Olech claim also requires a showing a illicit motive or intent on the part of the defendant."

b. "A plaintiff's circumstantial evidence of retaliation could include the timing of the defendant's actions, such as when the alleged retaliation closely follows the plaintiff's speech. <u>Morris, 196 F.3d at 110</u>; <u>McCullough v. Wyandanch Union Free School District, 187 F.3d 272, 280 (2d Cir. 1999)</u>. The plaintiff can also proffer evidence of unequal treatment, or an ongoing campaign of retaliation. <u>Hampton Bays Connections, Inc. v. Duffy, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001)</u>; <u>Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau, 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000)</u> (citing <u>Gagliardi v. Village of Pawling, 18 F.3d 188, 195 (2d Cir. 1994)</u>)."

37.     <u>*Kaluczky v. City of White Plains*, 57 F.3d 202 (2d Cir. 1995)</u> contains the following

findings that further confirm that I had a First Amendment right to attend the 5/23/17 public

resource fair meeting that was both a public forum and a public proceeding:

"Voluntarily appearing as a witness in a public proceeding or a lawsuit is a kind of speech that is protected by the First Amendment. *See <u>Piesco v. City of New York</u>,* 933 <u>F.2d 1149, 1158 (2d Cir.)</u>, *cert. denied,* <u>502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991)</u>; <u>*Bates,* 3 F.3d at 377</u>. There are evident policy reasons for encouraging truthful testimony and for insulating witnesses from retribution or the threat of retribution. *See <u>Piesco,</u> 933 F.2d at 1160</u>* (recognizing the risks of being fired for truthful testimony, committing perjury, or being held in contempt for refusal to testify)."

38.     The following are relevant excerpts from <u>*Piesco v. City of New York, Dept. of Personnel*</u>

underscore what I just discussed:

a. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated*, and all such matters relating to political processes."

b. "The Supreme Court has recognized that one of the critical purposes of the first amendment is to provide society with a basis to make informed decisions about the government."

c. The "first amendment guarantees that debate on public issues is "`uninhibited, robust, and wide open'".

    d.   Speech "on matters of public concern is that speech which lies `at the heart of the First Amendment's protection'".

    e.   A statement that is made about the competency of a police officer "clearly is a matter of public concern" because "the police officer represents the most basic unit of government, one which arguably most affects the day-to-day lives of the citizenry".

    f.   "A court is required to accept as true a plaintiff's allegation that retaliatory actions by the City of New York were precipitated by prior testimony he or she gave to a committee."

    g.   "Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations."

    h.   Summary "judgment is inappropriate when `questions of motive predominate in the inquiry about how big a role" "protected behavior played in" causing an adverse action to occur.

39.    Findings in *Liberty and Prosperity 1776, Inc. v. Corzine*, 720 F. Supp. 2d 622 (D.N.Y. 2010) that are about a police officer and government official acting on behalf of a member of the personal security detail for former New Jersey Governor Jon Corzine to prevent members of the public from attending a town hall meeting also confirm that I had a First Amendment and Fourteenth Amendment right to attend that the public resource fair meeting that was conducted on 5/23/17 inside of the Bronx Supreme Court. *Liberty and Prosperity 1776, Inc. v. Corzine* also confirms that **a)** "supervisory personnel can be held liable under § 1983 if they had knowledge of and acquiesced in subordinates' constitutional violations" and **b)** following orders isn't a defense to 42 U.S.C. §1983 liability when that violates the rights of others. That case was also about the need and constitutional right that exists for different views to be able to coexist during the same public forum that was a town hall meeting in that case.

40.    The next screenshot is from a photograph that was posted on the Internet on 5/24/17 at 1:17 am by a Twitter account that has the username of "@Vanessalgibson" and is registered to

New York City Councilwoman Vanessa Gibson. That Twitter posting is available on the Internet

at https://twitter.com/Vanessalgibson/status/867248209994887170. That photograph was taken

on 5/23/17 inside of the Veterans Memorial Hall chamber located inside of the Bronx Supreme

Court during the 5/23/17 public resource fair meeting that was conducted in it.



41.     The following is a copy of the preceding screenshot that has text labels and arrows that I

added to it to identity people who appear in it.



42.     The fact that both Mr. Gartland and Ms. Delgado were able to attend that 5/23/17 public resource fair meeting confirms that I had a clear First Amendment and Fourteenth Amendment right to have done so as well. I will discuss both Mr. Gartland and Ms. Delgado further later in this memorandum.

43.     The "Handschu Agreement" refers to an agreement that was reached as a result of *Handschu v. Special Services Div.*, 737 F. Supp. 1289 (S.D.N.Y. 1989). According to the terms of that agreement, the NYPD is prohibited from spying on protesters, critics, whistleblowers, and others without an objectively valid legal justification.

44.     *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995) includes the following findings that confirm that government personnel that partly include Letitia James, Jennifer Levy, the Mayor, Mr. Banks, court officers, and members of the NYPD are not to maintain a "laissez-faire attitude" about unconstitutional acts that they witness and are otherwise reported to them that are committed by other government personnel:

"A § 1983 plaintiff injured by a police officer may establish the pertinent custom or policy by showing that the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference. *See, e.g., Fiacco v. City of Rensselaer,* 783 F.2d 319 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *see id.* at 326-27 (municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating").

To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. *See Canton v. Harris,* 489 U.S. at 390, 109 S.Ct. at 1205. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents. *See, e.g., Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d at 123; *Fiacco v. City of Rensselaer,* 783 F.2d at 328"

45.     The following is a pertinent excerpt from *Marom v. City of New York*, No. 15-cv-2017 (PKC) (S.D.N.Y. Mar. 7, 2016) that addresses the legal duty that all law-enforcement personnel have to intervene to protect constitutional rights against infringement:

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [] (2) that a citizen has been unjustifiably arrested [] or (3) that any constitutional violation has been committed by a law enforcement official []." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.""

46.     The following is a pertinent excerpt from *Regional Economic Community v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002) that concerns discriminatory intent and how it may be inferred:

"Discriminatory intent may be inferred from the totality of the circumstances, including ... the historical background of the decision ...; the specific sequence of events leading up to the challenged decision ...; [and] contemporary statements by members of the decision-making body...." *LeBlanc,* 67 F.3d at 425 (citations and internal quotation marks omitted).

47.     *People v. Howard*, 50 N.Y.2d 583, 430 N.Y.S.2d 578, 408 N.E.2d 908 (1980) includes

the following findings that confirm that members of the NYPD and court officers were

prohibited from interfering with my efforts to lawfully **a)** attend the 5/23/17 public resource fair

meeting that I discussed above, **b)** assemble and engage in expression in all public areas in the

Bronx Supreme Court on 5/23/17 that included all public areas within public hallways in that

courthouse, **c)** make use of a table that was not actively in use that was located on the first floor

of that courthouse on 5/23/17, **d)** not have anyone seize property of mine without my consent on

5/23/17 in that courthouse after I completed the security screening process to enter it, and **e)** not

be stalked by members of the NYPD and court officers in that courthouse on 5/23/17:

    a.   "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, **he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions**, even though he ran away."

    b.   "But while the police had the right to make the inquiry, defendant had a constitutional right not to respond. This is so both because the Fifth Amendment to the United States Constitution and its State counterpart (New York Const, art I, § 6) permitted him to remain silent and because the Fourth Amendment and its State counterpart (art I, § 12) protect him from detention amounting to seizure unless there is probable cause. **As Mr. Justice BRANDEIS put it long ago in _Olmstead v United States_ (277 US 438, 478), defendant had "the right to be let alone**.""

    (boldface formatting added for emphasis)

48.    The following are relevant findings from _People v. Alba_, 81 A.D.2d 345, 440 N.Y.S.2d

230 (App. Div. 1981) and _Dotson v. Farrugia_, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012)

that address illegal unofficial arrests that occur by a show of authority in violation of the Fourth

Amendment:

    a.   **_People v. Alba_**:

        "The majority finds that, although defendant was told that he was "under arrest", no arrest, in fact, took place. We disagree. "Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of

movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment". (*People v Cantor*, 36 NY2d, at p 111; see *Terry v Ohio*, 392 US, at p 16.)"

b. ***Dotson v. Farrugia***:

""A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (internal quotations marks and citations omitted) (emphasis in original); see also *Terry*, 392 U.S. at 19 n.16"

49.     The following excerpt from *Zhang Jingrong v. Chinese Anti-Cult World Alliance*, 287 F. Supp. 3d 290 (E.D.N.Y. 2018) addresses the legal standard that applies to establishing the existence of conspiracies to violate legal rights and is applicable to instances that include those in which one group of law-enforcement personnel illegally don't attempt to intervene against other law-enforcement personnel and other government personnel who commit illegal and unconstitutional acts in their immediate presence inside of courthouses and elsewhere:

"The Second Circuit has explained that a plaintiff seeking to make out a conspiracy claim must have "some factual basis supporting a meeting of the minds." *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003). The factual basis need not be direct evidence — a plaintiff may also meet this burden by alleging "facts upon which it may be plausibly inferred that the defendants came to an agreement to violate his constitutional rights." *Green v. McLaughlin*, 480 Fed.Appx. 44, 46 (2d Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "A plaintiff must also show `with at least some degree of particularity, overt acts which the defendants engaged in which were reasonably related to the promotion of the claimed conspiracy.'" *Simpson v. Uniondale Union Free Sch. Dist.*, 702 F.Supp.2d 122, 133 (E.D.N.Y. 2010) (quoting *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999))."

50.     *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134 (2d Cir. 2010) addresses instances in which people are used as agents and proxies by others as such agents commit illegal acts and/or omissions on behalf of a supervisor or other principal while not necessarily aware of why they are committing such illegal acts and/or omissions as that is similar to how marionettes are

controlled by someone who manipulates their strings:

"We believe the court erred in this instruction. In *Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000), we stated, "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." We then rejected the argument that in order to satisfy the causation requirement, a plaintiff must show that the particular individuals who carried out an adverse action knew of the protected activity. *Id.* at 117. Instead, we indicated that a jury may

find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.

*Id. See also Gorman-Bakos v. Cornell Coop Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001) (noting that a plaintiff can establish causation by showing protected activity was closely followed in time by adverse employment action); *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 210 (2d Cir.2006).

*Gordon* directly addressed the situation in which a corporate agent *carries out* an adverse employment action on the *orders,* explicit or implicit, of a superior with knowledge that the plaintiff has engaged in a protected activity. However, in order to show causation in the sense required by *McDonnell Douglas* — that is, a causal connection between the protected activity and the adverse employment action — it is not necessary that the supervisor who has knowledge of the plaintiff's protected activities have *ordered* the agent to impose the adverse action. A causal connection is sufficiently demonstrated if the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity acts pursuant to *encouragement* by a superior (who has knowledge) to disfavor the plaintiff."

51.     Similarly, *US v. Basey,* 816 F.2d 980 (5th Cir. 1987) contains the following findings that

confirm that individual members of a conspiracy are liable for the illegal acts and omissions that

are committed by other members of that conspiracy:

""Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator, even though that party does not participate in the substantive offense or have any knowledge of it. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180 [1184] 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of

substantive acts committed in furtherance of the conspiracy by any of his criminal partners. *United States v. Sullivan,*578 F.2d 121, 122-23 (5th Cir.1978)."

52.     In *Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971), the U.S. Supreme Court confirmed that it "may be that one has a more substantial claim to a recognizable privacy interest when walking through a courthouse corridor than, for example, strolling through Central Park".

53.     Although the decision in *Leibovitz v. Barry*, No. 15-cv-1722 (KAM) (E.D.N.Y. Sept. 20, 2016) states that "the Second Circuit has held that the interior of a courthouse is not a public forum for First Amendment purposes", it properly clarified and materially undercut that remark within the same sentence by also stating that "the court here distinguishes between the areas of a courthouse open to the public as opposed to restricted areas". In short, this means that the following additional excerpt from Leibovitz v. Barry didn't mean to suggest that public hallways in public courthouses and other areas within them that host public resource fair meetings that are conducted as traditional public forums are not public forums:

> "The function of a courthouse and its courtrooms is principally to facilitate the smooth operation of a government's judicial functions," which is "likely to be incompatible with expressive activities inside a courthouse." *Id.* at 91. Consequently, "Supreme Court and Second Circuit precedent are clear that a courthouse is a nonpublic forum." *Washpon v. Parr,* 561 F. Supp. 2d 394, 408 (S.D.N.Y. 2008); *see also United States v. Grace,* 461 U.S. 171, 178 (1983) (holding that the Supreme Court building and its grounds other than public sidewalks are not public forums)."

54.     On 5/17/21, the U.S. Supreme Court issued its decision in *Caniglia v. Strom*, 593 S. Ct. (U.S. 2021). The following is a relevant excerpt from it about fundamental Fourth Amendment rights that confirm that government personnel are prohibited from seizing the property of members of the public without a warrant in instances when they have no objectively valid legal justification to do so:

> "The Fourth Amendment protects "[t]he right of the people be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." The "'very core'" of this guarantee is "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Florida v. Jardines, 569 U. S. 1, 6 (2013).

To be sure, the Fourth Amendment does not prohibit all unwelcome intrusions "on private property," ibid.—only "unreasonable" ones."

55.    The decision that was issued in _Enoch v. Hamilton County Sheriff's Office_, No. 19-3428 (6th Cir. June 11, 2020) confirms that hallways in courthouses are limited public forums and concerned acts that were committed by law-enforcement personnel against the plaintiffs in the hallways of a courthouse that involved warrantless arrests as well as searches and seizures of their personal property.

56.    U.S. Supreme Court Judge Neil Gorsuch issued the decision in _US v. Hill_, 805 F.3d 935 (10th Cir. 2015) while he was assigned to the U.S. Court of Appeals for the Tenth Circuit. That decision includes the following findings about illegal seizure of personal property by government personnel that include citations to U.S. Supreme Court decisions:

   a.    "Courts have routinely held that taking luggage from the direct possession of a traveler amounts to a seizure. See, e.g., _Place_, 462 U.S. at 708, 103 S.Ct. 2637; United States v. Scales, 903 F.2d 765, 766, 769 (10th Cir.1990)"

   b.    "the case law is clear that a traveler's possessory interest in his luggage is at its zenith when the luggage is in his direct possession and is at its nadir when the luggage has been checked with a common carrier"

57.    The decision that was issued in _Robinson v. Ash_, No. 1: 16-CV-879-WKW [WO] (M.D. Ala. Oct. 18, 2017) concerned an instance in which law-enforcement personnel appear to have abused their authority by seizing an attorney's cell phone in a courthouse before thereafter searching the information stored on it in violation of the attorney's Fourth Amendment rights. The following excerpt from that decision is relevant in this motion largely because the NY AG defended the illegal seizure without a warrant by New York State court officer Captain Anthony

Manzi on 5/23/17 inside of the Bronx Supreme Court of a bag that belonged to me after I

completed the security screening process to enter that courthouse and while I conducted myself

in a lawful manner while that bag contained a legal filing of mine that I filed on 5/19/17 in my

HRA lawsuit that was then sealed at my request as that meant that Mr. Manzi was among people

who were prohibited from having access to the legal filings in that case:

> "the seemingly unrestricted search authorized by the warrant Defendant obtained (Doc. #
> 1-2) gives great cause for concern. And that does not even account for the fact that
> Plaintiff is an attorney whose cell phone may very well contain privileged attorney-client
> communications between her and Mr. Bailey. Nor does it account for the fact that
> Plaintiff's cell phone was allegedly seized in a courthouse"

58.     As the ongoing Covid-19 pandemic has established by confirming that the Coronavirus

may be transmitted to others who come in contact with physical surfaces that are contaminated

by it, the fact that Mr. Manzi illegally seized a bag of mine on 5/23/17 inside of the Bronx

Supreme Court established that he certainly violated a major possessory interest that I then had

in that property of mine that pertained to limiting its exposure to trashy Nazis like him and

contagious illnesses that he could spread to me by indirect physical contact.

59.     _Milfort v. Prevete_, 3 F. Supp. 3d 14 (E.D.N.Y. 2014) confirms that obstructing

"pedestrian traffic is "something more than [a] temporary inconvenience" caused by the blocking

of foot traffic"", such as when court officers, members of the NYPD, and members of the New

York City Mayor's Office illegally conspire and act in concert to block someone's ability and

constitutional right to access public forums that are conducted inside of public courthouses and

other public areas inside of such courthouses.

60.     The next screenshot is from information that appears on page 92 in the 94-page PDF file

that results from downloading document number 6 that was filed on 4/19/21 in _New York State_

_Office of Court Administration v. Dennis Quirk_ by using the New York State Court System's

electronic filing system. That information is relevant because it addresses how New York State court officers are required to conduct themselves and confirms that Monica Hanna of the NY AG lied in remarks that she made that appear on page 2 in the memorandum of law that she submitted on 1/11/19 in K1.

> Section II of the Court Officers Training Manual Provides "Law enforcement officers are held "to a higher standard of accountability than the average citizen." Section IV(N) provides , "Remember that the identification card, shield and firearm are all symbols of the public 's trust. Never tarnish them by misconduct on or off duty."
>
> Subsection 1.40 (A)(15) of the NYS Court System, Court Officers Rules and Procedures Manual states "Court Officers shall not engage in any behavior which is prejudicial to the good order, efficiency or discipline of the Unified Court System."
>
> Subsection 1.10 (c)  General Responsibilities of the NYS Court System, Court Officers Rules and  Procedures Manual states "Court  Officers must always be mindful that they are the visible representatives of the Unified Court System and that their appearance and conduct have a direct effect on how the court system is perceived"
>
> Section 50.1  of the Rules of the Chief Judge  contained  in the New York State Unified Court System Employee Handbook,  Code of Ethics for Nonjudicial Employees of the Unified Court System reads as follows:
>
> > "A fair and independent court system is essential to the administration of justice. Court employees must observe and maintain high standards of ethical conduct in the performance of their duties in order to inspire public confidence and trust in the fairness and independence of the courts. This code of ethics sets forth basic principles of ethical conduct that court employees must observe, in addition to laws, rules and directives governing specific conduct, so that the court system can fulfill its role as a provider of Effective and impartial justice".
>
> It is against these  standards that respondents's conduct must be measured.

61.     Moreover, _Casey v. State_, 148 A.D.3d 1370, 51 N.Y.S.3d 203 (App. Div. 2017) contains the following relevant findings that confirm that New York State court officers are not required to comply with orders that they receive from other court officers in situations when they have reason to believe that those orders are illegal and violate constitutional rights:

> "Moreover, the rules that require an officer to comply promptly with lawful orders do not

unequivocally forbid all resistance to every order; they further provide that the officer "shall not obey any order which is inconsistent with the law," must request clarification or confer with a supervisor when in doubt as to whether an order is lawful, and must obey an order that he or she believes to be unlawful only if the supervisor fails to modify the order after being respectfully informed of the subordinate's belief that it is unlawful (Court Officers Rules and Procedures Manual § 1.30 [B], [C])."

62.   _Allah v. Annucci_, No. 16-cv-1841 (KMK) (S.D.N.Y. June 10, 2020) addresses mendacity

and is relevant about the discussion that follows that concerns what appears in a video recording:

> ""[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." _Scott v. Harris_, 550 U.S. 372, 380 (2007)."

## STATEMENT OF FACTS

**Audio recordings that I received on 3/19/21 from the New York City Civilian Complaint Review Board ("CCRB") confirm that members of the NYPD and New York City Mayor's Office are among those who rigged and stole the results of the 2017 New York City government elections for Bill de Blasio, other political incumbents, themselves, and their criminal accomplices by engaging in voter suppression and fraud leading up to those elections**

1.      On 8/18/17 and 11/6/17, a woman named Judith Le worked for the CCRB as an investigator as she interviewed NYPD Inspector Howard Redmond in response to entirely valid complaints that I reported against him and other members of the NYPD about illegal acts and omissions that they committed against me on 7/25/17 and 8/30/17 in public areas that were public forums as they were used by the Mayor and others as badly disguised campaign events and publicity stunts that were attended by members of the public and trashy censors in journalism. Through their censorship, such censors aided and abetted the actions that were taken by members of the NYPD and Mayor's Office to rig and steal the 2017 New York City government elections for political incumbents. That was largely achieved by acts of voter

suppression, voter fraud, and First Amendment retaliation that partly consisted of whistleblower retaliation and retaliation for litigation activity, and viewpoint discrimination largely at public forums that included public town hall meetings, public resource fair meetings, and public hearings that were conducted by members of public in a collaborative manner with the Mayor and other government personnel.

2.     On 3/19/21, the CCRB provided me the audio recordings that it recorded of the interviews that Ms. Le conducted of Mr. Redmond on 8/18/17 and 11/6/17 in response to my complaints against him as well as additional audio recordings of additional interviews that it conducted of additional members of the NYPD in response to complaints that I reported to the CCRB against them and others. Those additional audio recordings were of interviews that the CCRB conducted of members of the NYPD that partly included NYPD Detective Raymond Gerola, former NYPD Lieutenant Ralph Nieves, NYPD Officer Rafael Beato, NYPD Officer Yue Li, NYPD Sergeant Jemaal Gungor, and NYPD Captain Richard Taylor.

3.     After receiving those recordings, I played them and carefully listened to most of them as I recorded notes about the remarks in those recordings that I heard. Such remarks included numerous lies about me that were expressed to illegally cover-up illegal acts and omissions that members of the NYPD, Mayor's Office, and HRA committed against me. Those recordings also include remarks in which Mr. Redmond clearly incriminated himself, other members of the NYPD, and members of the Mayor's Office as he confirmed both explicitly and implicitly that he, other members of the NYPD, and members of the Mayor's Office committed acts in 2017 leading up to the 2017 New York City government elections of voter suppression, voter fraud, First Amendment retaliation that partly consisted of whistleblower retaliation and litigation activity, viewpoint discrimination, and standardless discretion, illegal segregation and

discrimination, abuse of process, selective-enforcement, and illegal seizures of me at public forums that were conducted by members of the public in a collaborative manner with the Mayor, censors in journalism, and other government personnel.

4.      On 3/26/21, I submitted a legal filing (Dkt. 529) in K1 in which I provided a thorough analysis of relevant remarks that I heard in the audio recordings of the CCRB's interviews of Mr. Redmond on 8/18/17 and 11/6/17 as well as audio recordings that the CCRB recorded of other members of the NYPD. That legal filing included links to those audio recordings on the Internet. The relatively short discussion that follows summarizes some of the critically significant remarks that are heard in the CCRB's audio recordings of its interviews of Mr. Redmond on 8/18/17 and 11/6/17.

5.      The audio recording that the CCRB provided to me of the interview that Ms. Le conducted of Mr. Redmond on 8/18/17 has the filename of "201706052_Interview_201706052_20170818_1403.mp3" and is available on the Internet at https://drive.google.com/file/d/1bdvEZSznI-m4zg0hzkXMTCGDiQ2Qx37g/view?usp=sharing. That interview was conducted in response to a complaint that I reported to the CCRB about illegal acts and omissions that the Mr. Redmond and other members of the NYPD committed against me on 7/25/17 in a subway station located below Broadway near Warren Street in Manhattan as the Mayor conducted a publicity stunt inside of that subway station in an area and manner that violated the MTA's Rules in stark contrast to how I conducted myself in that subway station that was authorized by the MTA's Rules as well as my First Amendment and Fourteenth Amendment rights. The CCRB assigned my complaint about 7/25/17 a complaint number of 201706052.

6.      The audio recording that the CCRB provided to me of the interview that Ms. Le

conducted of Mr. Redmond on 11/6/17 has the filename of

"201707345_Interview_201707345_20171106_1035.mp3" and is available on the Internet at

https://drive.google.com/file/d/1oIrXB6qQp4fuotLoCG6xybTi_6b_pXFF/view?usp=sharing.

That interview was conducted in response to a complaint that I reported to the CCRB about

illegal acts and omissions that the Mr. Redmond and other members of the NYPD committed

against me on 8/30/17 in Brooklyn in relation to the fact that Mr. Redmond illegally both ordered

members of the NYPD to cause me to be illegally ejected from the building that hosted the

public town hall meeting that members of the public conducted partly with the Mayor, trashy

censor in journalism, and other government personnel shortly before that town hall meeting

began after I registered in advance to attend that town hall meeting and conducted myself in a

lawful manner on 8/30/17 throughout the entire time that was inside of the building that hosted

that town hall meeting. The CCRB assigned my complaint about 8/30/17 a complaint number of

201707345.

7.      On 8/18/17, Mr. Redmond blatantly lied as he clearly told Ms. Le during the interview

that she conducted of him for the CCRB that I could attend any event. He was then referring to

public meetings that were conducted by the Mayor and/or other government officials that

included public town hall meetings, public resource fair meetings, and public hearings. He is

heard stating that in the audio recording of that interview at the elapsed time of 30:15.164 in that

recording as that time format corresponds to minutes that are separated by sections with the

colon (":") symbol that is followed by a decimal point and fraction of a second. As a result, the

elapsed time of 30:15.164 corresponds to 30 minutes and 15.164 seconds. Prior to 8/18/17, he

was personally involved with others in illegally causing me to be prevented from attending

public town hall meetings and public resource fair meetings that were conducted partly by the

Mayor on 4/13/17, 4/27/17, and 5/23/17. On 7/25/17, Mr. Redmond was recorded on video and observed by many censors in journalism and members of the public as he illegally seized one of my arms and dragged me away from where I then lawfully stood while lawfully engaging in First Amendment expression against the Mayor and his administration while I stood on the uptown subway platform for the "R" subway train inside of the subway station that is located below Broadway and near Warren Street in Manhattan. When he illegally seized me then, I was certainly was no obstructing anyone's ability to freely move about in that subway station. I instead lawfully then stood in close proximity to a vertical metal partition that extended from the ground to the ceiling that separated where I stood from where the Mayor and trashy censors in journalism then were illegally assembled near a staircase in violation of the MTA's Rules as they illegally obstructed the movements of people in that subway station at the same time that the Mayor also illegally then used a microphone during that publicity stunt in further violation of the MTA's Rules. The Mayor's decision to conduct that publicity stunt in that subway station was inherently stupid primarily because subway stations are naturally very noisy and he did so between 5:30 pm and 6:30 pm that meant that he was also dealing with rush-hour traffic that meant that conditions in that subway station would likely be even noisier on account of the higher volume of people in it during that period.

8.     On 11/6/17, Ms. Le asked Mr. Redmond during the interview that she conducted of him for the CCRB why I wasn't allowed to attend the public town hall meeting that was conducted partly by the Mayor on 8/30/17 in Brooklyn. He responded to that at the elapsed time of 11:27.524 by telling her that I wasn't allowed to attend town hall meetings that the Mayor conducted to begin with and that I was "banned" from attending them "as per City Hall". His remarks about that is clear smoking gun evidence that confirms that he, other members of the

NYPD, and members of the Mayor's Office that he didn't identify committed acts and omissions that were both illegal and pretextual directly against me in 2017 leading up to the New York City government elections that constituted voter suppression, voter fraud, First Amendment retaliation that partly consisted of whistleblower retaliation and retaliation for litigation activity, illegal prior restraints on First Amendment and Fourteenth Amendment rights, standardless discretion, abuse of process, selective-enforcement, illegal segregation and discrimination, and viewpoint discrimination in relation to public town hall meetings, public resource fair meetings, and public hearings that were conducted partly by the Mayor. Such acts and omissions constituted voter suppression and voter fraud largely because I sought to lawfully attend those public forums to lawfully provide views and information to members of the public and journalists while attending them and through broadcasts of video recordings that were recorded of those meetings to help them make informed and independent decisions about voting by providing them information that would hopefully persuade a sufficient number of them to vote against the Mayor and other political incumbents in the 2017 New York City government elections and to otherwise engage in widespread word-of-mouth advertising for that purpose.

9.     At the elapsed time of 12:08.088 in the audio recording of the CCRB's 11/6/17 interview of Mr. Redmond, he told Ms. Le that the reason why I was barred from attending public meetings that were conducted partly by the Mayor after Mr. Redmond previously talked with her about me in August of 2017 was strictly because of the nature of my speech as he told her on 11/6/17 that my speech had worsened since August of 2017. However, he fraudulently omitted the material fact that my speech had remained lawful, protected, and entirely valid speech and criticism since August of 2017 against him and other City of New York personnel that was primarily response to illegal acts and omissions that they committed against me partly by

illegally violating my constitutional rights in relation to my efforts to lawfully attend public forums that were partly conducted by the Mayor as he and others then ran for re-elections and those who supported him were illegally rigging that election by engaging in illegal acts that constituted voter suppression and voter fraud among other things.

**E-mail messages that were sent by New York State Senator Jessica Ramos on 6/28/17 to a whistleblower news censor in journalism named Erin Durkin that confirm that Ms. Ramos was then part of a criminal conspiracy to commit, coordinate, and cover-up illegal acts of voter suppression, voter fraud, and First Amendment retaliation, and viewpoint discrimination to rig and steal the 2017 New York City government elections for Bill de Blasio and other political incumbents in New York City and their supporters**

10.     On 2/15/19, I received a 374-page PDF file from the Mayor's Office in response to a FOIL demand that I submitted to it on 7/1/17 to receive records of all communications that the New York City Mayor's administration has engaged in about me. Much of the information in that PDF file was presented to me with redaction applied to it and other information in it isn't related to illegal acts of voter suppression, voter fraud, First Amendment retaliation, viewpoint discrimination. However, information nonetheless exists in it that confirms that members of the NYPD and members of the Mayor's Office acted in concert in 2017 to commit illegal acts of voter suppression, voter fraud, First Amendment retaliation, and viewpoint discrimination against me and the general public leading up to the 2017 New York City government elections. Although I repeatedly and clearly shared material information with U.S. District Judge Lorna Schofield from that 374-page PDF file in K1 to substantiate my claims in that case in relation to the fact that the 2017 New York City government elections were rigged and stolen by members of the NYPD and members of the Mayor's staff, Judge Schofield opted to illegally engage in criminal obstruction of justice and witness tampering in K1 by ignoring that information

completely as she issued her 9/30/19 order and thereafter in her capacity as a dutiful, obsequious, and heinous cat's paw of the Mayor's administration and NYPD.

11.     What follows shows the text of the e-mail message that appears on pages 369 and 370 in the 374-page page PDF file that I just discussed. That e-mail message is about me and was sent by New York State Senator Jessica Ramos on 6/28/17 at 3:27 pm to a trashy whistleblower news censor in journalism named Erin Durkin while **a)** Ms. Durkin then worked for the New York Daily News and Ms. Ramos worked for the Mayor's Office. Ms. Ramos lied about me in that e-mail message and referred to Mr. Redmond as the member of the Mayor's NYPD security detail who touched my arm while talking with me as Mr. Redmond illegally did so then while having absolutely no objectively valid legal justification to have done so.

> From: Ramos, Jessica
> Sent: Wednesday, June 28, 2017 3:27 PM
> To: Erin Durkin
> Cc: Phillips, Eric
> Subject: RE: town halls
>
> Hi Erin,
>
> Mr. Komatsu has never RSVP'd to a town hall. He is allowed to enter the overflow room.
>
> Security detail first learned he's threatened Commissioner Steve Banks at the LIC town hall. When approached, Mr. Komatsu made a physical threat against a member of the security detail after one of them lightly touched his arm while speaking. This threat was officially investigated by the NYPD. He has also made several threats against other members of the security detail.
>
> Jessica

12.     In that e-mail message, Ms. Ramos was referring to the public town hall meeting that the was conducted partly by the Mayor on 4/27/17 in Long Island City in Queens with respect to her remark about "the LIC town hall". She lied in that e-mail message by claiming that I never RSVP'd to a town hall, I threatened Mr. Banks, I made a physical threat against a member of the

Mayor's NYPD security detail, and that I made threats against other members of the Mayor's

NYPD security detail. Contrary to her lies, I registered in advance with the Mayor's Office to

attend every single town hall meeting and resource fair meeting that was conducted partly by

personnel of the City of New York and I have never unlawfully threatened Mr. Banks nor

members of the NYPD that doesn't mean that I haven't apprised them of my intent to commence

litigation against them and otherwise file entirely valid complaints against them that is not

unlawful behavior.

13.     Page 369 of that 374-page PDF file also show an e-mail message that Ms. Ramos sent to

Ms. Durkin on 6/28/17 at 4:55 pm that she also sent to Eric Phillips while he then worked for the

Mayor as his mouthpiece. The following shows the text of that e-mail message in which Ms.

Ramos further lied about me:

> On Wed, Jun 28, 2017 at 4:54 PM, Ramos, Jessica <JRamos@cityhall.nyc.gov> wrote:
>
> In response to your follow-ups…
>
> Mr. Komatsu was not allowed to enter the first town hall because of his alarming behavior. Upon speaking with security detail, he stated that if they continued to prevent his entry, he would use physical force to enter. He stated that he is a U.S. Navy veteran and is trained in hand to hand combat.
>
> Working on the Commissioner Banks bit...

14.     Ms. Ramos lied about me in that e-mail message by fraudulently **a)** claiming that I wasn't

allowed to enter because of alarming behavior that I exhibited, **b)** insinuating that I stated that I

would use physical force against someone to attend the public town hall meeting that was

conducted partly by the Mayor on 4/27/17, and **c)** claiming that I stated that I was trained in

hand-to-hand combat while fraudulently suggesting that I received training about that that was

different than what many kids receive from being picked on by bullies when they're kids that

forces them to have to learn how to try to defend themselves from bullies. Contrary to her lies, I

didn't exhibit any alarming behavior on 4/27/17 while I sought to attend that town hall meeting. The fact that the DOE illegally didn't provide mea video recording that was recorded on 4/27/17 between 5:30 pm and 6:30 pm while it was recorded by a video security camera that was then installed near the entrance to the school that hosted that 4/27/17 town hall meeting is likely because that video recording would clearly establish that I conducted myself in a lawful manner at the site of that town hall meeting then and was issued an admission ticket by a Black female member of the Mayor's staff to enter that school to observe how that town hall meeting would be conducted in a different room while my attendance in that school was illegally restricted to an overflow room for that town hall that meant that an invidious discriminatory intent existed to preemptively prevent me from being able to attend that town hall meeting within the room in which it was conducted. Also, I never stated nor suggested that I would use physical force against anyone to try to attend that 4/27/17 town hall meeting. Instead, obstructions that were put in front of me and otherwise existed to impede my ability to attend that town hall meeting included a metal barrier that the NYPD used and the doors to that school by its entrance. This means that I would need to use physical force to move that barrier out of my way and additional physical force to pull the handle on a door to that school to open it to attend that town hall meeting. Although Mr. Redmond told the CCRB during an interview that I made a remark about possibly overtaking him on 4/27/17, that remark was analogous to how people who participate in a track meet race against each other to determine who wins while not having physical contact with each other. Physical force on 4/27/17 also simply meant treating Mr. Redmond like a traffic jam and walking around him into that school. If he and/or others decided to initiate physical contact with me while I lawfully then attempted to do so, that circumstance would have certainly provided me with sufficient legal grounds to engage in legal self-defense against them. Also, I

never received any formal or special training in hand-to-hand combat and I have never claimed that I have received such training.

15.    Pages 368 and 369 in that 374-page PDF file also show an e-mail message about me that Ms. Ramos sent to Ms. Durkin on 6/28/17 at 5:42 pm. The following shows the text of that e-mail message in which Ms. Ramos further lied about me:

> On Wed, Jun 28, 2017 at 5:42 PM, Ramos, Jessica <JRamos@cityhall.nyc.gov> wrote:
>
> Mr. Komatsu wanted a storage allowance, for which he was ineligible because he had an apartment. We also referred him to multiple legal services providers about this specifically and all of them denied him.
>
> Mr. Komatsu has been served an Order to Show Cause due to his appearance at HRA in June, when he showed disruptive behavior. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision.
>
> Sent from my BlackBerry 10 smartphone.

16.    The following facts confirm that Ms. Ramos lied about me to Ms. Durkin and otherwise fraudulently misled her about me in that e-mail message:

a.    Although HRA fraudulently claimed that I was ineligible to have it issue a storage benefit on my behalf while I resided where I reside, it nonetheless issued me that benefit continuously between April of 2017 and July of 2017 as well as thereafter while I resided where I reside. That fact and circumstance confirmed that HRA lied by claiming that I was ineligible to have it issue me that benefit while I resided where I reside and that Ms. Ramos lied about that by regurgitating and spewing out HRA's lies about that.

b.    Hindsight confirms that the fact that legal services providers chose not to provide me legal assistance for my claims against HRA that concerned storage benefit matters simply means that those providers were wrong about that, lazy, stupid, and chose not

to bite the hand that feeds them as they had a clear conflict of interest because they

are funded by HRA. Also, not all of the legal services providers to which I was

referred that Ms. Ramos referred to in her e-mail message were referrals that I was

issued for storage benefit matters. Some of those referrals were instead about other

legal matters while those providers also decided not to assist me about storage benefit

matters because that matter wasn't among their areas of practice.

c. Ms. Ramos proved that she is a total idiot as she blatantly also lied in her e-mail

message by claiming that I was served an order to show cause application. Contrary

to her deceit, the order to show cause application to which she referred in that e-mail

message was an order to show cause application that I prepared, submitted in my

HRA lawsuit, and lawfully served upon HRA in its offices that are located at 150

Greenwich Street in Manhattan.

17.    Page 368 in that 374-page PDF file also shows the following e-mail message about me

that Ms. Durkin sent to Ms. Ramos and Mr. Phillips on 6/28/17 at 5:51 pm in which Ms. Durkin

**a)** politely confirmed that she was aware that Ms. Ramos had lied to her about me by having

claimed that I hadn't registered in advance with the Mayor's Office to attend town hall meetings

and **b)** requested clarification about the threat that Mr. Ramos lied to her about by having

fraudulently claimed that I had threatened Mr. Banks:

> From: Erin Durkin
> Sent: Wednesday, June 28, 2017 17:51
> To: Ramos, Jessica
> Cc: Phillips, Eric
> Subject: Re: town halls
>
> Thanks. What was the threat against Banks?
>
> Also, on the RSVP issue - he has now provided emails he sent RSVP'ing for the LIC and
> Rego Park town hall. He also sent an RSVP confirmation from the Bronx Resource Fair

(believe I said Bronx town hall before but it was actually the resource fair he was barred from). Want to double check on this?

18.    Page 368 in that 374-page PDF file further shows the following e-mail message about me that Ms. Ramos sent on 6/28/17 at 6:01 pm to Ms. Durkin in which she retracted her lie about my having threatened Mr. Banks as Ms. Ramos nonetheless lied about me again by fraudulently claiming that I engaged in disruptive behavior:

On Jun 28, 2017, at 6:01 PM, Ramos, Jessica <JRamos@cityhall.nyc.gov> wrote:

On the former, there was only disruptive behavior.

Working on latter.

Sent from my BlackBerry 10 smartphone.

19.    Page 368 in that 374-page PDF file also shows the following additional e-mail messages about me that Ms. Durkin and Ms. Ramos sent to each other on 6/28/17 as Ms. Durkin caught Ms. Ramos again making no sense in her remarks about me as Ms. Ramos continued to lie about me by claiming that I was disruptive while visiting HRA's offices that are located at 4 World Trade Center in Manhattan that is also known as ("4WTC") and 150 Greenwich Street:

From: Durkin, Erin
To: Ramos, Jessica
Subject: Re: town halls
Date: Wednesday, June 28, 2017 6:18:56 PM

But isn't that after the first town hall where he was stopped because the detail learned he had threatened Banks? Is that a separate incident?

Sent from my iPhone

On Jun 28, 2017, at 6:13 PM, Ramos, Jessica <JRamos@cityhall.nyc.gov> wrote:

He showed up to HRA (4 WTC) in early June and was disruptive.

Sent from my BlackBerry 10 smartphone.

From: Durkin, Erin

> Sent: Wednesday, June 28, 2017 18:10
> To: Ramos, Jessica
> Subject: Re: town halls
>
> Not totally following the Banks thing. What was the appearance where he behaved disruptively and what did he do, how was Banks involved?
>
> Sent from my iPhone

20.     Page 365 in that 374-page PDF file shows the following e-mail message about me that Jaclyn Rothenberg sent on 6/28/17 at 5:18 pm to Mr. Redmond, Mr. Phillips, and other senior members of the Mayor's administration that partly included Emma Wolfe (she is the Mayor's Chief of Staff) and Marco Carrion (he was then the Commissioner of the CAU) as Ms. Rothenberg included information in that e-mail message that confirms that Ms. Ramos stupidly lied Ms. Durkin about an order to show cause application that I prepared and served upon HRA in my HRA lawsuit:

> **From**: Rothenberg, Jaclyn
> **Sent**: Wednesday, June 28, 2017 17:18
> **To**: Ramos, Jessica
> **Cc**: Phillips, Eric; Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
> **Subject**: RE: town halls
>
> Confirmed that he appeared at 4WTC on June 6 and served an Order to Show Cause. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision.

**Additional e-mail messages that were sent by City of New York personnel between 4/11/17 and 10/25/17 that confirm additional senior City of New York personnel participated in a criminal conspiracy to commit, coordinate, and cover-up illegal acts of voter suppression, voter fraud, and First Amendment retaliation, and viewpoint discrimination to rig and steal the 2017 New York City government elections for Bill de Blasio and other political incumbents in New York City and their supporters**

21.     The information that I have discussed above about the fact that both Ms. Rothenberg and

Ms. Ramos made remarks about an order to show cause application that I prepared in my HRA

lawsuit and served upon HRA is also significant because that information sufficiently establishes

that personnel of HRA illegally violated the sealing order that New York State Supreme Court

Judge Barry Ostrager granted me on 1/17/17 in my HRA lawsuit that prohibited Ms. Rothenberg,

Ms. Ramos, and those to whom they sent e-mail messages about my HRA lawsuit to have

information about the legal filings in that case. By violating that sealing order, all of the

personnel of the City of New York who did so by providing information about my HRA lawsuit

to other City of New York personnel while they didn't then work for HRA and otherwise didn't

have legal grounds to have access to that information reciprocally caused every restriction and

prohibition that would thereafter be imposed upon me that would hinder my ability to freely

share information that I received about them to be void and unenforceable by virtue of **a)** my

Fourteenth Amendment equal protection rights in relation to compliance with sealing orders,

protective orders, and confidentiality orders, **b)** the vagueness doctrine, and **c)** selective-

enforcement. In other words, those who violated my privacy rights in this way permanently shot

themselves in their feet by causing the concept of offsetting penalties that exists in football to

apply in litigation between me on one hand and the City of New York and its personnel on the

other. I have made this point perfectly clear to U.S. Magistrate Judge Gabriel Gorenstein who is

assigned to K1 long after he previously worked for HRA as a General Counsel. Judge Gorenstein

issued a void and unenforceable protective order and confidentiality order on 1/15/21 in K1 that

prohibits me from freely sharing information about discovery material that I have received since

then from the attorneys for the defendants in that case. Since those orders are void and

unenforceable for the reasons that I have stated above, I will next share some of the pertinent and

critically significant information that exists in the 185-page PDF file that I received on 2/1/21

from the attorneys for the defendants in K1 that further confirms that members of the Mayor's

administration engaged in voter suppression, voter fraud, First Amendment retaliation, and

viewpoint discrimination in 2017 leading up to the 2017 New York City government elections.

The following e-mail messages appear on page 142 in that PDF file and further confirm that I

never threatened Mr. Banks and that I was illegally retaliated against simply for lawfully

expressing dissatisfaction to Mr. Banks on 4/11/17 in Staten Island in response to him having

again lied to my face while I talked with him as we stood on a public sidewalk that is a

traditional public forum:

> **From**: Rothenberg, Jaclyn
> **Sent**: Wednesday, June 28, 2017 17:55
> **To**: Hagelgans, Andrea; Phillips, Eric
> **Cc**: Ramos, Jessica; Redmond, Howard DI.; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
> **Subject**: RE: town halls
>
> He has never threatened Steve. He sued HRA.
> Only shown disruptive behavior. Believe per below he threatened security.

> **From**: Hagelgans, Andrea
> **Sent**: Wednesday, June 28, 2017 5:42 PM
> **To**: Phillips, Eric; Rothenberg, Jaclyn
> **Cc**: Ramos, Jessica; Redmond, Howard DI.; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
> **Subject**: RE: town halls
>
> Why did we use the term "threat" if he didn't?

> **From**: Phillips, Eric
> **Sent**: Wednesday, June 28, 2017 5:41 PM
> **To**: Rothenberg, Jaclyn
> **Cc**: Ramos, Jessica; Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
> **Subject**: Re: town halls
>
> He didn't threaten Steve?

> On Jun 28, 2017, at 5:38 PM, Rothenberg, Jaclyn <JRothenberg@cityhall.nyc.gov>
> wrote:

The threat was that he was dissatisfied with the outcome of our help. There was no physical violence suit. Though he has shown disruptive behavior.

**From**: Ramos, Jessica
**Sent**: Wednesday, June 28, 2017 5:37 PM
**To**: Rothenberg, Jaclyn; Phillips, Eric
**Cc**: Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
**Subject**: Re: town halls

Thanks. I'll let her know. Stil need to know what the threat against Banks was. Physical violence?

Sent from my BlackBerry 10 smartphone.

22.     The following e-mail messages appear on page 140 and 141 in that PDF file and confirm

that Jessica Ramos knew that she had been lied to by me by other City of New York personnel

before she then regurgitated those lies and spewed them out at Ms. Durkin in her e-mail

messages to her while committing defamation against me:

**From**: Ramos, Jessica
**Sent**: Wednesday, June 28, 2017 8:32 PM
**To**: Carrion, Marco A.; Da Costa, Ricky
**Cc**: Rothenberg, Jaclyn; Hagelgans, Andrea; Phillips, Eric; Redmond, Howard DI.; Casca, Michael; Arslanian, Kayla; Wolfe, Emma; Lynch, Jeff; Stribula, Shauna
**Subject**: Re: town halls

Pls confirm if your piece on my timeline are correct— CAU and HRA. And if so, what are the reasons we did not let this man in? What am I missing? I need to tell this reporter a coherent story. Thanks.

Sent from my BlackBerry 10 smartphone.

**From**: Ramos, Jessica
**Sent**: Wednesday, June 28, 2017 20:21
**To**: Carrion, Marco A.; Da Costa, Ricky
**Cc**: Rothenberg, Jaclyn; Hagelgans, Andrea; Phillips, Eric; Redmond, Howard DI.; Casca, Michael; Arslanian, Kayla; Wolfe, Emma; Lynch, Jeff; Stribula, Shauna
**Subject**: Re: town halls

This is the time line as I understand it. Big question here is why didn't we allow TK access if he wasn't "disruptive" until early June at HRA as we're alleging.

Also unclear to me is when incident w security detail took place.

April 27" Lie town hall- TK not allowed to enter

May 23" BX Resource Fair- TK allowed to enter but not line to meet mayor? Unclear.

June 6" TK shows up at HRA and is disruptive

June 8 - Rego Park town hall- TK goes to overflow room

Sent from my BlackBerry 10 smartphone.

23.     The following e-mail message about me that Mr. Redmond sent on 6/28/17 at 2:18 pm

appears on page 137 in that 185-page PDF file and confirms that he lied about me in that e-mail

message to cover-up the illegal acts and omissions that he and others committed against me on

4/27/17 in relation to preventing me from attending the public town hall meeting that was

conducted partly by the Mayor on that date in Queens:

> **From**: Redmond, Howard DI.
> **Sent**: Wednesday, June 28, 2017 2:18 PM
> **To**: Phillips, Eric; Ramos, Jessica; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
> **Subject**: Re: town halls
>
> Hello all,
> Mr. Komatsu, originally had not RSVP'd when he appeared at the Queens town hall. This was the first time I met him and it was brought to my attention that he had been threatening Commissioner Banks. Upon being interviewed he appeared very agitated and accused me of assault when I simply touched him on his arm while talking, he was not permitted to enter. Since then he had made a physical threat against me which was officially investigated by the NYPD. He also has made several CCRB's against myself and other members of the detail. He has since been permitted to enter other Town Halls in the overflow rooms as he has not been on the RSVP
>
> Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

24.     Contrary to Mr. Redmond's lies in the preceding e-mail message, I registered in advance

on 4/24/17 during a telephone call that I had with Nick Gulotta of the CAU to attend the 4/27/17

town hall meeting in Queens and I recorded a video recording on 4/27/17 as I stood in front of

Harold Miller of the CAU near the entrance to the school that hosted that town hall meeting as I held the red admission ticket that I was issued by a Black female member of the Mayor's staff to enter that school and enter the overflow room for that town hall meeting. She issued me that ticket instead of a ticket to attend that town hall meeting from within the room in which it was conducted in spite of the fact that I was among the first 30 people who waited in line in a lawful manner next to that school on 4/27/17 shortly before that town hall meeting began to be issued admission tickets for that town hall meeting and to be granted access to that school in the order in which we waited in line for that purpose that is comparable to how people line to receive services in the order in which they line up, such as receiving testing and vaccination shots for Covid-19 as well as buying concert tickets. The following shows the e-mail message that Mr. Gulotta sent to me on 4/24/17 after I talked with him on that date and registered in advance during that call to attend the 4/27/17 town hall meeting.

> **From:** "Gulotta, Nick" <NGulotta@cityhall.nyc.gov>
> **Subject:** My email
> **Date:** April 24, 2017 at 12:54:33 PM EDT
> **To:** "'towaki_komatsu@yahoo.com'" <towaki_komatsu@yahoo.com>
>
>
> **Nick Gulotta**
> Queens Borough Director
> Community Affairs Unit
> Office of Mayor Bill de Blasio
> (212) 788-4282

25.     The e-mail messages shown next are about me and were sent on 4/13/17 by Jeff Lynch while he worked for the CAU, Rachel Lauter while she then worked for the Mayor as his Deputy Chief of Staff, and Raquel Lucas while she then worked for Mr. Banks as a special assistant. Those e-mail messages appear on page 5 in that 185-page PDF file and confirm that they and others participated in a criminal and pretextual scheme and conspiracy to engage in acts of voter

suppression, voter fraud, First Amendment retaliation, viewpoint discrimination, illegal

segregation and discrimination, and abuse of process by illegally arranging for me to be

prevented from attending the public town hall meeting that was conducted partly by the Mayor

and Mr. Banks in Staten Island on 4/13/17. That was just 2 days after I learned that personnel of

HRA engaged in illegal acts in my HRA lawsuit by **a)** stealing my scheduled 4/12/17 oral

arguments hearing in it by engaging in illegal and pretextual ex-parte communications with New

York State Supreme Court Judge Nancy Bannon to request an adjournment of that while illegally

concealing that from me and **b)** having caused the agenda substantially changed in flagrant

violation of my due process and First Amendment rights from how it had originally been

scheduled for the fair hearing that I participated in against HRA on 4/11/17 that the New York

State Office of Temporary and Disability Assistance ("OTDA") conducted.

> **From**: Lynch, Jeff [JLynch@cityhall.nyc.gov]
> **Sent**: 4/13/2017 1:59:31 PM
> **To**: REDMOND, HOWARD [howard.redmond@nypd.org]
> **CC**: Carrion, Marco A. [mcarrion@cityhall.nyc.gov]; Da Costa, Ricky
> [RDaCosta@cityhall.nyc.gov]; Miller, Harold [HMiller@cityhall.nyc.gov]
> **Subject**: FW: Townhall Tonight Re: Towaki Komatsu
>
> Inspector - I wanted to flag this below for you. Right now, he hasn't RSVPed for tonight.
>
> **From**: Lynch, Jeff
> **Sent**: Thursday, April 13, 2017 1:58 PM
> **To**: Lauter, Rachel; Lucas, Raquel (HRA); Arslanian, Kayla; Gillroy, Elizabeth
> Cc: Bray, Jackie; Carrion, Marco A.; Miller, Harold; Stribula, Shauna
> **Subject**: RE: Townhall Tonight Re: Towaki Komatsu
>
> + Harold and Shauna
>
> Yes, we alerted HRA about his RSVPing for the Resource Fair, and Harold talked to him
> when he came in, and outside in the hallway.
>
> He has not RSVPed for tonight's town hall, so if he shows, he will likely be sent to the
> overflow room. We will also flag for the detail.
>
> **From**: Lauter, Rachel

**Sent**: Thursday, April 13, 2017 9:43 AM
**To**: Lucas, Raquel (HRA); Arslanian, Kayla; Gillroy, Elizabeth
**Cc**: Bray, Jackie; Carrion, Marco A.; Lynch, Jeff

Subject: RE: Townhall Tonight Re: Towaki Komatsu
Adding Marco and Jeff who are point there

**From**: Lucas, Raquel [mailto:quezadar(@hra.nyc.gov)]
**Sent**: Thursday, April 13, 2017 9:40 AM
**To**: Lauter, Rachel; Arslanian, Kayla; Gillroy, Elizabeth
**Cc**: Bray, Jackie
**Subject**: Townhall Tonight Re: Towaki Komatsu

+Elizabeth and Jackie

Good Morning,

Jackie Bray had spoken to the Commissioner this morning about this client Towaki Komatsu who has been extremely disruptive at events with the Mayor and Commissioner Banks. His case history is below. His behavior has been borderline harassment to the Commissioner, and he is increasingly belligerent despite our best efforts to assist him. Is there any way without making a scene to not allow him in the town hall tonight from a safety perspective? Jackie Bray and I are both around if you want to talk further. Thanks.

26.     The e-mail message shown next is about me, appears on page 6 in that 185-page PDF file, and was sent by Mr. Banks on 4/11/17 as he fraudulently mischaracterized the nature of the conversation that I lawfully had with him then on a public sidewalk near Borough Hall in Staten Island as the Mayor and others conducted a public resource fair meeting then inside of Borough Hall there:

On Apr 11, 2017, at 12:48 PM, Banks, Steven <banksst@hra.nyc.gov> wrote:

++++ Fyi" he just showed up at the IDNYC Command Center parked by Borough where Nisha and I were doing a stand up for social media that had just finished, was belligerent, tried to tape our conversation and did film me walking away from he - he is headed back into Borough Hall saying he is going to the press.

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

27.     The excerpt from the e-mail message shown next is about me, appears on page 107 in that 185-page PDF file, and was sent by Jaclyn Rothenberg on 6/29/17 at 9:43 am as she clarified

that I actually wasn't belligerent towards Mr. Banks on 4/11/17 while I talked with him in Staten

Island as I instead immediately ended my conversation with him by pointedly and angrily telling

him that I was done talking with him as I did so in response to the fact that he was again lying to

my face about being provided legal assistance from HRA's legal services partners through

referrals from HRA:

> **From**: Rothenberg, Jaclyn
> **Sent**: Thursday, June 29, 2017 9:43 AM
> **To**: Ramos, Jessica; Carrion, Marco A.; Da Costa, Ricky
> **Cc**: Hagelgans, Andrea; Phillips, Eric; Redmond, Howard DI.; Casca, Michael;
> Arslanian, Kayla; Wolfe, Emma; Lynch, Jeff; Stribula, Shauna
> **Subject**: RE: town halls
>
> He then signed up to come to the SI resource center during CH in Staten Island to see the
> mayor and was not allowed in because he had already spoken to the mayor in the prior
> town hall - he then came to the IDNYC mobile outreach vehicle while Nisha and Banks
> were doing a social media taping - when he said that we should give him a storage
> allowance because he had just sued us Banks said that he did not think he would win his
> case and he became very angry and stormed off saying that he would go to the press.

28.     The e-mail messages about me that are shown next were sent on 10/25/17 by Mr.

Redmond and Scott French of HRA (Mr. Banks' Chief of Staff) and appear on page 157 in that

185-page PDF file. Those e-mail messages are further clear evidence of illegal acts of voter

suppression, voter fraud, and First Amendment retaliation leading up to the 2017 New York City

government elections by senior government personnel. Those e-mail concern the fact that I was

illegally prevented by Mr. Redmond and other members of the NYPD from attending the public

resource fair meeting that the Mayor and others conducted with members of the public on

10/25/17 in Brooklyn at Brooklyn College just 1 day before I talked with Letitia James in

Brooklyn at the site of the public town hall meeting that the Mayor conducted with New York

City Councilman Brad Lander and others as I told her then that I was being illegally prevented

from attending that town hall meeting.

**From**: Redmond, Howard Dl. [/0=NYCMAY0R/0U=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=REDMOND, HOWARD CAPT.EB2]
**Sent**: 10/25/2017 9:53:47 AM
**To**: Carrion, Marco A. [mcarrion@cityhall.nyc.gov]
**Subject**: Re: Resource FAiur

Good morning Marco, he is not will permitted to enter.
Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From**: Carrion, Marco A.
**Sent**: Wednesday, October 25, 2017 09:01
**To**: Redmond, Howard DI.
**Subject**: Fwd: Resource FAiur

FYI
Begin forwarded message:

**From**: "French, Scott" <frenchs@hra.nyc.gov>
**Date**: October 25, 2017 at 8:54:48 AM EDT
**To**: "Haley, Molly (MHaley@cityhall.nyc.gov)" <MHaley@cityhall.nyc.gov>. "Lauter, Rachel" <rlauter@cityhall.nyc.gov >."mcarrion@cityhall.nyc.gov" <mcarrion@cityhall.nyc.gov >
**Cc**: "Banks, Steven" <banksst@cityhall.nyc.gov >
**Subject**: Resource FAiur

Hi Rachel, Molly and Commissioner Carrion -

I just wanted to make you aware that Mr. Komatsu, who has attended several events where the Mayor and Commissioner Banks are in attendance, indicated at a Access to Counsel Town Hall last night that CM Levine and CM Perkins held that he was planning on attending today's Resource Fair and expected that he wouldn't be allowed in to the Fair.

Wanted to flag for you so you could let Redmond know (who is very familiar with Mr. Komatsu). He may ultimately not show up but wanted to flag as a possibility.

Thanks
Scott

**Scott French** | *Chief of Staff*
Office of the Commissioner
150 Greenwich St. Floor 42, New York, NY 10007
T: 929-221-7371
*frenchs@hra.nyc.gov* | *NYC.gov/dss*

**My dealings with Letitia James and the NY AG about information that I reported to them about voter suppression, voter fraud, whistleblower retaliation, and viewpoint discrimination before and after she became the New York State Attorney General**

29.     The next screenshot is from a draft e-mail message that I saved at 8:35 pm on 10/26/17 after I just briefly talked with Letitia James right after she arrived near the entrance to the school that hosted the public town hall meeting in Brooklyn on that date that was conducted by members of the public in a collaborative manner with the Mayor, Mr. Banks, New York City Councilman Brad Lander, and others that NYPD Inspector Howard Redmond and others illegally prevented me from attending. Mr. Redmond is the head of the Mayor's NYPD security detail and a defendant in several closely-related and entirely valid sets of litigation that I commenced. I used that draft e-mail mainly to record the approximate time when I talked with Ms. James on that date about the fact that I was then being illegally prevented from attending that public forum as she told me then that she would look into that before she walked into the school that hosted that town hall meeting. Hindsight confirms that she lied to my face on that date by claiming that she would look into why I was being illegally being barred from attending that public forum. By not doing so, she violated New York City Charter §1116, 42 U.S.C. §1986, and her oath of office as an employee of the City of New York.

| Towaki Komatsu <Towaki_Komatsu@yahoo.com> | Drafts - Yahoo! | October 26, 2017 at 8:35 PM |
| --- | --- | --- |

(No Subject)

8:30 pm

Public advocate arrives

30.     The next screenshot is from a photograph that I took at 9:45 pm on 10/26/17 of the screen of the cell phone that Jerry Ioveno of the Mayor's NYPD security detail was using on 10/26/17

as he let me take that photo after he used that cell phone to take a photo of Mr. Redmond and I as I was continuing to be illegally prevented from attending the Mayor's 10/26/17 town hall and forced to stand behind a metal barricade that was being used to prevent me from attending that public forum in flagrant violation of my constitutional rights after I registered in advance with the Mayor's Office to attend that public forum and conducted myself in a lawful manner at the site of that town hall meeting before, while, and after I was illegally prevented from attending that town hall meeting. How I used my middle finger then accurately conveys how I felt about everyone who was illegally preventing me from attending that town hall meeting in violation of my constitutional rights through their acts and omissions as Mr. Redmond expressed satisfaction and pleasure in this photo about the fact that he was succeeding in violating my constitutional rights and stealing the outcome of the 2017 New York City government elections by engaging in voter suppression, voter fraud, and whistleblower retaliation at public forums for the Mayor's benefit, his own, and the benefit of others who support the NYPD's criminal mob.



31.     The next screenshot is from the elapsed time of 5 seconds in a video recording that is

available on the Internet at

https://drive.google.com/file/d/1rfCuUONgfNAJjDNlcUpm3ZBQJP5Q0XOn/view?usp=sharing

that I recorded on 3/18/18 at 2:51 pm as I stood in Foley Square in Manhattan in an area in front

of the Thurgood Marshall federal courthouse near Letitia James as she was being interviewed

while I waited for a chance to talk with her afterwards.



32.     The next screenshot is from the elapsed time of 3 seconds in that same video and

confirms that I was then holding a copy of the order that U.S. District Judge Mark Barnett issued

on 3/5/18 in *Sherrard v. City of New York*, No. 15-cv-7318 (MAB)(KNF) (S.D.N.Y. March 5,

2018) to signal that I intended to talk with Ms. James about civil rights abuse by Mr. Redmond.



Case 1:15-cv-07318-MB-KNF   Document 106   Filed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————X

KALAN SHERRARD,
                    Plaintiff,                    MEMORAN

                                                  15 CV

        -against-

DEPUTY INSPECTOR REDMOND,
                    Defendant.
———————————————————X

MARK A. BARNETT[1]
UNITED STATES DISTRICT JUDGE

        Plaintiff Kalan Sherrard ("Plaintiff" or "Sherrard") br

U.S.C. § 1983 against Defendant Deputy Inspector Howa

"Deputy Inspector Redmond") asserting a Fourth Amend

First Amendment claim of violation of his rights to freedo

assembly.  Before the court is Defendant's motion for su

claims.  For the following reasons, Defendant's motion i

Amendment claim and granted as to Plaintiff's First Am

                                        BACKGROUND

I.   Factual Background

33.     Right after Ms. James finished her interview, I struck up a conversation with her as I

began to record an audio recording of it that is available on the Internet at

https://drive.google.com/open?id=1KVLmVu_oBcl7CJT_YD6qOsZL3Vvi-h9R. My

conversation with her begins at the elapsed time of 7 seconds in that audio recording. The

following is entirely true and accurate about what is heard in that audio recording during my

conversation with Ms. James:

a. At the elapsed time of 9 seconds, I reminded her about the fact that she and I previously

talked towards the end of October of 2017 at the site of where the Mayor conducted a

public town hall meeting as I was being illegally prevented from attending it while she

entered the building that hosted that town hall meeting. I further reminded her on 3/18/18

that she told me then that she would look into that. She told me on 3/18/18 in response

that she didn't remember that.

b. At the elapsed time of 19 seconds, I told her that the head of the Mayor's NYPD security

detail was defending a federal civil rights lawsuit as I was then referring to Mr. Redmond

and *Sherrard v. City of New York*.

c. At the elapsed time of 25 seconds, I told her that Mr. Redmond was repeatedly violating

civil rights and asked her if there was something that she could do about that. She is

heard at the elapsed time of 30 seconds as she lied to me by claiming that she couldn't do

anything about that as she stated that the Mayor had managed to disallow her from

intervening in lawsuits due to a lack of standing. She omitted the fact that she could have

otherwise still done something about that by conducting press conferences among other

things and perhaps having the City Council to conduct a public hearing about that issue to

draw attention to it and hold the Mayor's feet to the fire as well as the NYPD's in the

process.

d. At the elapsed time of 40 seconds, she suggested that I should possibly resort to dealing

with the CCRB about my complaints against Mr. Redmond. In response, I told her that I

had already done so and that the CCRB hadn't done anything about that.

e.  At the elapsed time of 44 seconds, she lied to my face again by telling me that she would

follow-up about my complaints against Mr. Redmond.

34.  The next screenshot that is shown on the left is from the elapsed time of 38 seconds in a

video recording that is available on the Internet at

https://drive.google.com/file/d/12d_ISpRFGIkQ_ljY64Meo7uDR2tAVgkS/view?usp=sharing

that I recorded on 5/21/18 at 12:51 pm as I stood in front of Ms. James in front of what was then

her office building that is located at 1 Centre Street as she stonewalled me and essentially blew

me off about the conversation that I had with her on 3/18/18. I recorded that video of her shortly

after she parted ways with the useless New York City Councilman Corey Johnson to whom I

testified in detail and at length on 12/14/17 against the NYPD's criminal mob as he sat next to

the equally useless New York City Councilwoman Vanessa Gibson in the Committee Room in

New York City Hall ("City Hall"). As I talked with Ms. James then and there on 5/21/18, I

reminded her that she told me on 3/18/18 that she would look into my complaints against Mr.

Redmond. The screenshot that appears on the right shows how she blew me off on 5/21/18 about

that as she then continued to be a con artist like both her predecessor (Bill de Blasio) and her

successor (Jumaane Williams) as the New York City Public Advocate were and have otherwise

proven to be.

 

35.     The next screenshot is from the elapsed time of 1 second in a video recording that I

recorded on 5/16/18 at 2:40 pm in Brooklyn that is available on the Internet at

https://drive.google.com/file/d/11EUVZV3S2HU_CI_LjWSU8KP5kGXiltaD/view?usp=sharing

while attending the event that Ms. James conducted as she announced that she was running to be

elected as New York State's Attorney General while I sought to undermine her aspirations by

using her track record of apathy, complacency, and grandstanding against her in a very public

way. As Ms. James left that event, I clumsily crafted a question for her to see if she would

answer it while expecting that she wouldn't as I tried to ask her if she would ask a military

veteran's question then and there. She ignored me and left as I sought to follow-up with her

about my previous conversations with her about Mr. Redmond. Ibrahim Khan who was then her

Chief of Staff stood directly in front of me as I recorded that video. He now works for the NY

AG too.



36.     Prior to commencing submitting this motion, Ms. James conducted public hearings

remotely on 6/17/20 and 6/18/20 about the NYPD's terrorism during the Summer of 2020 in

New York City. I was illegally prevented from testifying in hearings after I registered in advance

with the NY AG to lawfully do so. By being prevented from testifying in those hearings, that

violated my First Amendment and Fourteenth Amendment rights as well as my rights pursuant to

_Kittay v. Giuliani_ that I discussed earlier. By having been prevented from testifying in those

hearings, that also constituted standardless discretion, abuse of process, and discrimination by

those who were responsible for that. While Ms. James conducted her 6/18/20 public hearing

about the NYPD's terrorism, she flagrantly violated the restrictions that were applicable to that

limited public forum by instead talking about irrelevant matters that wasted time that should have

otherwise been used to allow me to testify about relevant matters during either that hearing or the

hearing that she conducted on 6/17/20. For example, as she talked with a man named Jeffrey

Ouriel on 6/18/20 during the public hearing that she conducted on that date, she talked with him

about dogs that he and his wife were taking care of as foster parents for them that was entirely

unrelated to the subject matter of that hearings. Concerning this point, the video recording of that

public hearing on 6/18/20 is available on the Internet at

https://vimeo.com/430764584/70a54323df. At the elapsed time of 3 hours, 55 minutes, and 5

seconds in that video, Mr. Ouriel is shown. As he testified in that hearing, dogs are shown in that

video and he and Ms. James talked about how he and his wife were taking care of them. The next

screenshot is from the elapsed time of 3 hours, 55 minutes in that video and shows Mr. Ouriel as

he let dogs outside of his residence while another dog was shown in the lower-right corner.



37.     Although I love dogs, I would have also enjoyed not having Ms. James and her team

flagrantly violate my First Amendment and Fourteenth Amendment right to testify lawfully

against the NYPD, her, the Mayor, members of the City Council, and whistleblower news

censors in journalism during that hearing in a way that would have all been relevant to that hearing's agenda.

38.      Prior to submitting this application to intervene in this case, I have long known that Letitia James is utterly useless, phony, and grandstands quite often. Long before the NY AG sought to intervene in this case, the Mayor was recorded as he blew a kiss to Ms. James at the elapsed time of 13 seconds in the video recording that the Mayor's Office arranged to be recorded on 3/15/17 of the public town hall meeting that I and other members of the public conducted with the Mayor, Mr. Banks, New York City Councilman Corey Johnson. That video recording is available on the Internet at https://www.youtube.com/watch?v=i5LjWB2d2vc. Ms. James appears in the lower-right corner of this screenshot.



39.      The next screenshot shows Ms. James in that same video as she exhibited body language to reciprocate to the Mayor.



**My dealings with the NY AG on 3/22/19 that concerned the public hearing that the Mayor conducted on 3/18/19 inside of City Hall's Blue Room after 4:30 pm**

40.      The next screenshot is from a photograph that I took on 3/22/19 at 3:52 pm with my cell phone as I stood outside of the "Managing Attorney's Office" for the NYAG that is located on the 16th floor at 28 Liberty Street in Manhattan.



41.    When I took that photograph, I was there to drop off an entirely valid complaint that I prepared against the Mayor, NYPD Detective Gilbert Pierre-Louis and other members of his NYPD security detail, and other members of the NYPD in response to illegal acts and omissions that they committed against me on 3/18/19 that were mostly recorded on video. Those illegal acts and omissions were in relation to a public hearing that the Mayor conducted after 4:30 pm inside of the Blue Room inside of City Hall.  The next screenshot is from the video recording that the Mayor's Office arranged to be recorded of that public hearing that the Mayor conducted with me and other members of the public as a public forum. That video is available on the Internet at https://www.youtube.com/watch?v=rqwyR7ZD23M and this screenshot corresponds to the elapsed time of 17 minutes and 27 seconds in that video.



42.    Mr. Pierre-Louis is clearly shown on the right in this screenshot as he illegally assaulted me by making what I immediately regarded as offensive physical contact with me by seizing my left arm and putting his right hand on my back in flagrant violation of my constitutional rights and other laws. He did so then while I was in the middle of lawfully testifying in that hearing as I lawfully resisted the Mayor's criminal acts as he deliberately and pretextually interfered with my

ability to testify in that hearing at his expense in flagrant violation of my constitutional rights and other laws as well. I then sought to lawfully do so to firmly establish for the benefit of the public's interest in transparency and government accountability that he is a con artist. I intended to do so then by playing back video recordings from my laptop in order to enable that to be seen by members of the audience who sat behind me in that room and for the microphones that were used for that meeting to record the audio from those video recordings to share that information with everyone who was otherwise then watching the video broadcast of that public hearing or would later do so. The video recordings that I then intended to play back were of earlier conversations that I had with the Mayor about labor rights. Labor rights was the subject matter of that 3/18/19 public hearing as well. The next screenshot is from the elapsed time of 17 minutes and 32 seconds in that same video and clearly shows that the Mayor was grinning immediately after Mr. Pierre-Louis criminally assaulted, seized, and caused me to be illegally ejected from that public hearing.



**The relationship between the illegal acts that I experienced on 3/18/19 during the public hearing that the Mayor held in City Hall and those that he and a member of his NYPD security detail committed against me on 7/18/17**

43.     Prior to 3/18/19, I previously met both Mr. Pierre-Louis and the Mayor on 7/18/17 during the public resource fair meeting that members of the public that included me conducted then in Kew Gardens in Queens with the Mayor, Mr. Banks, other government personnel, and trashy whistleblower news censors in journalism that partly then included Michael Gartland, Gloria Pazmino, and Jillian Jorgensen.  That meeting was partly used as a campaign event by the Mayor to try to shore up voter support for his re-election bid as the primary and general election were less than 2 months and 4 months later, respectively. The Mayor's Office arranged to have that meeting recorded on video, but has illegally concealed it from the public. However, the Mayor's Office temporarily provided me access to that video recording in response to a Freedom o Information Law demand that I submitted to it. I then downloaded a video clip from that video recording. That video clip is available on the Internet at https://drive.google.com/open?id=1-ZUN22r8q4qARLEbMk8FVg4KuLqfTtcc and shows the entirety of my conversation with the Mayor during that meeting. That clip confirms that Mr. Pierre-Louis illegally assaulted me at the end of that conversation by illegally initiating physical contact with my back as he illegally pushed me from behind without any valid legal justification shortly after the Mayor tried to harass me by trying to make what I immediately made clear by my body language and movements was offensive physical contact with my right shoulder as I leaned away from the Mayor in response to that.

44.     The next screenshot from that video clip clearly shows Mr. Pierre-Louis as he illegally and deliberately made contact with his right hand with a backpack that I then wore without any objectively valid legal justification at the elapsed time of 2 minutes and 9 seconds in that clip.



45.    With respect to temporal proximity and First Amendment retaliation, he did so right after I told the Mayor about the fact that Mr. Redmond had illegally prevented me from attending the public town hall meeting that he (the Mayor) and others conducted on 4/27/17 in Queens and that Mr. Redmond continued to be a defendant in a civil rights lawsuit on 7/18/17. I was then referring to *Sherrard v. City of New York*, No. 15-cv-7318 (MB)(KNF) (S.D.N.Y. Jun. 13, 2018). Mr. Redmond committed perjury about material matters of fact in regards to that case both while he testified in it at trial in June of 2018 and during a deposition that he gave on 5/19/17. The New York City Law Department gave me a copy of the transcript of that deposition and video recordings that were recorded on 9/17/12 about the incident that gave rise to Kalan Sherrard's claims against Mr. Redmond that caused *Sherrard v. City of New York* to be commenced. The New York City Law Department did so in response to a FOIL demand that I submitted to it. The Mayor is similarly shown in the screenshot above as he began to then reach toward me without any valid basis. New York State Senator Jessica Ramos then worked for the Mayor's Office and is shown in the lower-right corner in that screenshot. Juanita Holmes was then a senior member

of the NYPD as she then stood immediately to the left of Mr. Pierre-Louis and illegally didn't attempt to intervene against him by ordering him to immediately remove his right hand away from me in spite of the fact that she had a clear line of sight about that and a Fourteenth Amendment affirmative legal duty to do so. Mr. Banks then stood to the right of the Mayor, is bald, and wore eyeglasses and a red tie. Gloria Pazmino, Michael Gartland, Jillian Jorgensen, and other censors in journalism then sat and/or stood within 12 feet from us that meant that they were within earshot as they also appeared to have separately recorded our conversation on audio.

46.     The next screenshot from that video clip clearly shows Mr. Pierre-Louis as he illegally continued to have his right hand on my backpack at the elapsed time of 2 minutes and 10 seconds in that clip as the Mayor clearly moved his hand closer to me while attempting to spread his filth on my right shoulder by touching it.



47.     The next screenshot from that clip shows Mr. Pierre-Louis as he illegally continued to have his right hand on my backpack at the elapsed time of 2 minutes and 10 seconds in that clip

as the Mayor clearly moved his hand even closer to my right shoulder and I leaned backwards somewhat to avoid that contact and to signal to members of the public and trash censors in journalism nearby that the Mayor was such garbage that I didn't want to be touched by him.



48.     The next screenshot from that clip shows Mr. Pierre-Louis as he illegally still had his right hand on my backpack at the elapsed time of 2 minutes and 11 seconds as he began to push me from behind without a legal justification as I was voluntarily ridding myself of the trashy company that he, the Mayor, and Mr. Banks all then certainly were.



49.     The next screenshot from that clip shows Mr. Pierre-Louis as he was finishing illegally pushing me and assaulting me in the process from behind as he was shown having his right arm fully extended while doing so. My forehand and nose are shown behind the Mayor's back. Part of the conversation that I had with the Mayor on 7/18/17 was among the video recordings that I intended to playback on 3/18/19 as I testified to the Mayor.



**The illegal acts and omissions that constituted voter suppression, voter fraud, whistleblower retaliation, first amendment retaliation, and denial of access to the courts that were committed against me on 5/23/17 inside of the Bronx Supreme Court that the NY AG condoned by defending some of those who perpetrated them**

50.    I was illegally prevented from attending the 5/23/17 public resource fair meeting inside of the Bronx Supreme Court before and after I talked with a whistleblower news censor in journalism named Michael Gartland on 5/23/17 inside of the Bronx Supreme Court on its first floor in a public hallway while he then worked for the New York Post. The New York Daily

News now employs him. When I talked with him on 5/23/17 in that courthouse, I clearly told

him that I was then being illegally prevented from attending that 5/23/17 public resource fair

meeting while I had ongoing litigation against HRA while I briefly then showed him a copy of

the order to show cause application that I filed on 5/19/17 in my HRA lawsuit that was inside of

a large white bag of mine that I brought with me to that courthouse partly to discuss with Mr.

Banks during that 5/23/17 public resource fair meeting. While I talked with Mr. Gartland then,

he handed me a notepad on which I wrote the index number of that lawsuit to assist him in being

able to thereafter look into that case. I also told him then that the illegal acts that were being

committed against me on 5/23/17 inside of that courthouse that were causing me to be illegally

prevented from attending that 5/23/17 public resource fair meeting were a continuation of related

illegal acts that were committed against me on 4/27/17 by some of the same government

personnel that caused me to be illegally prevented from attending the public town hall meeting

that members of the public conducted on 4/27/17 in Queens with the Mayor, Mr. Banks, and

others.

51.      In the memorandum of law that Ms. Hanna filed in K1 on 1/11/19 that I referred to

earlier, she committed perjury by making the following fraudulent claims on page 2 in it about

me, my efforts to have attended the 5/23/17 public resource fair meeting, and the fact that New

York State Court Officer Anthony Manzi illegally seized a large white bag that belonged to me

on 5/23/17 inside of the Bronx Supreme Court after I completed the security screening process to

enter that courthouse and while I was conducting myself in a lawful manner in contrast to him

and others:

   a. "PLAINTIFF FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE
      GRANTED".

   b. "Plaintiff Does Not Adequately Allege the State Defendants' Participation In the

Deprivation of Any Constitutional Right"

c. "The State Defendants Did Not Illegally Prevent Plaintiff From Engaging in Protected Speech Inside the Courthouse"

d. "Plaintiff Had No Constitutionally Protected Right to Attend the Public Resource Fair in the Courthouse"

e. "State Defendant Captain Manzi Did Not Interfere with Plaintiff's Possessory Interest In Any Property

52.     The "State Defendants" that Ms. Hanna referred to in her 1/11/19 memorandum were New York State court officer Anthony Manzi, Matthew Brunner, and Ramon Dominguez. The discussion that follows will firmly, clearly, and overwhelmingly establish that Ms. Hanna committed perjury by having made the preceding fraudulent claims in her 1/11/19 memorandum instead of having properly arranged to have the NY AG immediately and comprehensively prosecute everyone who was involved in committing illegal acts and omissions against me directly and the public by extension in 2017 leading up to the 2017 New York City government elections as such acts and omissions were part of a criminal scheme to rig and steal those elections largely to achieve job security and access to other job opportunities in politics as both Letitia James and New York State Senator Jessica Ramos proved.

53.     OCA provided me video recordings that were recorded on 5/23/17 by video security cameras that are installed in locations on the first floor of the Bronx Supreme Court that it controls. OCA provided me those video recordings in response to a FOIL demand that I submitted to it.

54.     The next screenshot is from a video recording that OCA provided to me that was recorded on 5/23/17 by the video security camera that was then installed above Room 105 inside of the Bronx Supreme Court. That video recording is available on the Internet at https://drive.google.com/file/d/1Mdj55D4XnCDanRdVwM56DFhv5zS2R94l/view?usp=sharing.

The time in that screenshot was 9:35:18.944 am. That time appears in the upper-left corner in

that screenshot. I'm shown in that screenshot making a hand gesture with my left hand towards

Mr. Gartland as I wore a black shirt and a backpack as I held a large white bag in my right hand

while a press credential hung from Mr. Gartland's neck as he wore eyeglasses and looked in my

direction. A sign is posted on the wall in that screenshot in the lower-left corner about the

5/23/17 public resource fair meeting.



55.     The next screenshot is from that same video and the time in that screenshot was

9:36:15.303 am. Mr. Gartland and I are shown in that screenshot on the far-right as NYPD

Detective Raymond Gerola walked past where we sat as I told Mr. Gartland that Mr. Gerola was

among those who were personally involved in illegally preventing me from attending that

5/23/17 public resource fair meeting after Mr. Gerola was also personally involved in the illegal

acts that were committed against me on 4/27/17 in relation to my efforts to have attended the

town hall meeting on that date in Queens that I discussed earlier.



56.     The next screenshot is from that same video and the time in that screenshot was 9:36:21.553 am. Mr. Gartland and I are shown in that screenshot as I then am shown briefly showing Mr. Gartland what was then inside of the large white bag of mine by opening that bag for him as I did so mainly to prove that I was neither wasting his time nor lying to him by showing him the copy of the bulky order to show cause application that I filed on 5/19/17 in my lawsuit against HRA that was then in that bag and in a 3-ring binder because of its page length.



57.     The next screenshot is from that same video and the time in that screenshot was 9:36:49.428 am. I'm shown in that screenshot **writing** something on the notepad that Mr. Gartland handed to me.



58.     The next screenshot is from that **same** video and the time in that screenshot was 9:37:31.678 am. Former NYPD Lieutenant Ralph Nieves is shown on the left in that screenshot as he sharply turned his head to his left to look at Mr. Gartland and I in a manner that suggests that he was then flagrantly violating the terms of the Handschu Agreement by spying on us and subjecting us to selective-enforcement in violation of the Fourteenth Amendment.



59.     The next screenshot is from that same video and the time in that screenshot was 9:38:18.053 am. Jeff Lynch of the Mayor's Office and an unknown Black female who also then worked for the Mayor's Office are shown is shown on the left in that screenshot as Mr. Lynch sharply turned his head to his left to look at Mr. Gartland and I in a manner that suggests that he was also then flagrantly violating the terms of the Handschu Agreement by spying on us and subjecting us to selective-enforcement in violation of the Fourteenth Amendment. Back then, Mr. Lynch worked for the CAU.



60.     The next screenshot is from that same video and the time in that screenshot was 9:40:27.928 am. I'm shown using my cell phone then with my left hand as I recorded a video recording partly of New York State court officer Sergeant Matthew Brunner, New York State court officer Sergeant Ramon Dominguez, and NYPD Lieutenant Ralph Nieves as they met in front of the entrance to Room 105 in that courthouse while I believed that they were then acting in concert in furtherance of an illegal scheme and conspiracy to prevent me from attending the 5/23/17 public resource fair meeting. Mr. Brunner (just his bald head), Mr. Dominguez, and Mr. Nieves partly appear from left to right at the bottom of this screenshot. Roxanne Delgado is also shown in this screenshot at the top of it as she then walked in the direction of where I stood.



61.     The next screenshot is from the video recording that I recorded then with my cell phone

and shows Mr. Dominguez, Mr. Nieves, NYPD Detective Andrew Berkowitz, Mr. Gerola, and

Mr. Brunner from left to right. That video recording is available on the Internet at

https://drive.google.com/file/d/18oedUwVNFHKhTASxTFeUDm0HFGPO7ztB/view?usp=shari

ng.



62.     The next screenshot is from that same video and shows Mr. Nieves as he made a hang

gesture with his left hand to apparently explain something and/or issue an order as he faced Mr.

Berkowitz and stood near Mr. Gerola, and Mr. Brunner.



63.     The next screenshot is from that same video and shows Mr. Nieves as he looked in my

direction while he continued to stand near Mr. Berkowitz, Mr. Gerola, and Mr. Brunner.



64.     Returning to my earlier discussion about the video recording that I received from OCA
that was recorded on 5/23/17 by a video security camera that was then installed above Room105
in the Bronx Supreme Court, Rachel Atcheson is shown at the top of the next screenshot from
that video as she illegally violated the First Amendment and Fourteenth Amendment rights of
Ms. Delgado. She did so then by directing her to move away from where Ms. Delgado lawfully
then as Ms. Delgado sought to attend the 5/23/17 public resource fair meeting. Ms. Atcheson's
display of a show of authority towards her by directing her to move away from where she then
was by extending her right arm and hand to behave like a traffic cop while directing Ms. Delgado
to move to an area in that hallway that was near where I then stood violated Ms. Delgado's
constitutional rights to attend that 5/23/17 resource fair meeting without unreasonable
interference. The time in that screenshot was 9:41:13.303 am.



65.     The next screenshot is from that same video and correspond to the time of 9:41:32.569 am. Ms. Delgado and I are shown standing next to one another as we began to interact while I remained where I stood in the preceding screenshot. I recall suggesting to her then in a somewhat joking manner that perhaps the reason why she was not being allowed to attend that 5/23/17 public resource fair meeting was because she was also a whistleblower against the Mayor's administration like me.



66.     The next screenshot is from that same video and corresponds to the time of 9:46:51.288 am. Mr. Manzi and I are shown in the top-left corner by the entrance to a short public corridor as he willfully and illegally violated 18 U.S.C. §245(b)(5); 18 U.S.C. §241; NYPL §240.20; my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, New York State's Open Meetings Law; and other laws by engaging in a pretextual show of authority in furtherance of a criminal scheme and conspiracy in concert with Mr. Nieves, Mr. Gerola, Mr. Berkowitz, Mr. Redmond, Ms. Atcheson, and others to engage in voter suppression, voter fraud, and whistleblower retaliation by assisting in causing me to be illegally barred from attending the 5/23/17 public resource fair meeting and otherwise illegally prevented

from lawfully assembling in the short public corridor in close proximity to the entrance to the

Veterans Memorial Hall chamber that I could and would have otherwise done to exercise my

rights to lawful assembly in a public forum and public corridor near members of the public as

they entered that chamber to engage in whistleblowing about matters of both public and private

concern that would partly have addressed the fact that I was yet again being criminally prevented

from attending a public meeting that was a public forum that members of the public conducted

with the Mayor and others that was being used as a badly disguised campaign event for the

benefit of the Mayor, those in administration, members of the City Council, and other

government personnel to attract publicity and voter support at the expense of their political rivals

and other critics. Mr. Manzi is shown in this screenshot with his right arm extended towards me

as he behaved like a traffic cop making a hand gesture to signal to someone that he or she needed

to stop. A woman wearing a blue shirt is also shown in this screenshot in the lower-right corner

and was then a member of the NYPD who was assigned to its Community Affairs division. She

illegally made no effort to intervene on my behalf against those who illegally prevented me from

attending the 5/23/17 resource fair meeting and otherwise illegally seized property of mine in

that courthouse on that date while she had a direct line of sight to that activity. At that time in

that screenshot, Ms. Delgado stood near Mr. Manzi and I and was blocked from view by our

bodies.



67.     The next screenshot is from that same video and correspond to the time of 9:47:43.913 am. Mr. Manzi, Ms. Delgado, and I are shown in the top-left corner as Mr. Manzi extended his left arm as he illegally directed me to move from where I lawfully then stood while not obstructing the flow of pedestrian traffic in stark contrast to him to an area near Room 105 in that courthouse. *People v. Alba*, 81 A.D.2d 345, 440 N.Y.S.2d 230 (App. Div. 1981) and *Dotson v. Farrugia*, No. Civ. 1126 (PAE) (S.D.N.Y. Mar. 26, 2012) both contain findings that confirm that Mr. Manzi was then illegally subjecting me to an unlawful arrest in violation of my Fourth Amendment rights with respect to my First Amendment and Fourteenth Amendment right to freely move about in all public areas on that date inside of that courthouse without unreasonable interference in that regard. This screenshot also shows Mr. Dominguez and Mr. Brunner as they stood to the left of Mr. Manzi and illegally made no effort to intervene on my behalf against him in flagrant violation of their Fourteenth Amendment affirmative legal duty to have then

intervened to uphold my constitutional rights as they were violated in their immediate presence

by another fake law-enforcement officer, namely Mr. Manzi.



68.    The next screenshot is from that same video and corresponds to the time of 9:49:11.038

am. Mr. Manzi, Jeff Lynch, Mr. Brunner, Mr. Dominguez, and I are shown in the top-left corner

as Mr. Manzi used his right hand to criminally seize the large white bag of mine that I discussed

earlier as he did so like an ordinary thief and mugger. He did so then shortly after I very briefly

placed that bag on the table that is shown in this screenshot while it wasn't then actively in use

by anyone. He illegally seized that bag then as I certainly was not **a)** obstructing anyone's ability

to freely move about in that hallway and **b)** in any magnetometer area that was instead then

located behind Mr. Brunner and Mr. Dominguez in an area that was across the hallway from

where we then stood. That magnetometer area was instead located more than roughly ten feet

from where I then stood. That magnetometer area then existed behind a vertical fan that is shown

on the right side of that screenshot and where someone who then wore a dark wardrobe extended

his arms horizontally away from his body as he stood in front of another court officer who wore

a dark uniform. I'm shown in the screenshot as I lawfully seized my bag back from Mr. Manzi.



69.    The next screenshot is from that same video and corresponds to the time of 9:49:11.788

am. Mr. Manzi, Mr. Lynch, Mr. Brunner, Mr. Dominguez, and I are shown in the top-left corner

as Mr. Manzi illegally hadn't yet let go of my bag. Mr. Brunner is shown in this screenshot as he

then had his left hand on his bald head.



70.     The next screenshot is from that same video and corresponds to the time of 9:49:26.428 am. Mr. Manzi, Mr. Brunner, Mr. Dominguez, a female member of the NYPD who wore a blue shirt that I discussed earlier, another male court officer who wore a dark uniform, and I are shown in this screenshot. At roughly this time back then, Mr. Manzi said "Fuck you" to my face in response to my having immediately, assertively, and lawfully confronted him about the fact that he just criminally seized my bag while he and others were then illegally preventing me from attending the 5/23/17 public resource fair meeting and otherwise exercising my constitutional rights to lawfully in the short public corridor in close proximity to the entrance to the Veterans Memorial Hall chamber in that courthouse. I genuinely regret that I didn't break Mr. Manzi's jaw, his teeth, and his eyes, and his nose by immediately punching him in his face in response to

his use of profanity towards me to add insult to injury towards me. In hindsight, I believe that I should have done exactly that largely because though I have conscientiously tried to handle things in the appropriate manner in regards to the illegal acts and omissions that were committed against me on 5/23/17 inside of the Bronx Supreme Court partly by commencing K1, no appropriate corrective action has been taken about that. Instead, Mr. Manzi was able to keep his job as a court officer partly because U.S. District Judge Lorna Schofield fraudulently condoned his illegal acts against me in her 9/30/19 in K1 as she illegally ignored the sworn affidavit of Ms. Delgado that I filed in K1 on 12/18/18 and otherwise lied in the footnote section on page 2 in that 9/30/19 order by fraudulently suggesting that she properly considered the entirety of my 5/2/19 affidavit in opposition (Dkt. 177) that I filed in K1.



71.     What I discussed above about where I stood on 5/23/17 inside of the Bronx Supreme

Court in relation to a magnetometer area when Mr. Manzi illegally seized a large white bag of

mine is very significant. This is largely because of fraudulent claims that he reported on 5/24/17

in the Unusual Occurrence Report that is assigned the report number of 75089 that he prepared

for the New York State Unified Court System partly about the interactions that I had with him

and New York State court officers Matthew Brunner and Ramon Dominguez on 5/23/17 inside

of the Bronx Supreme Court. Mr. Manzi completed that report in conjunction with Mr. Brunner

and Mr. Dominguez as Mr. Brunner and Mr. Dominguez served as witnesses for the information

that I was included in that report. That report was provided to me on 8/28/20 by OCA in

response to a FOIL demand that I submitted to it. That report appears within the annexed

**Exhibit A**. The following is entirely true, accurate, and relevant about the information in that

report and that was otherwise fraudulently omitted from to cover-up the illegal acts and

omissions that Mr. Manzi, Mr. Brunner, Mr. Dominguez, and other law-enforcement personnel

committed against me on 5/23/17 inside of the Bronx Supreme Court:

a. Information that is shown in the upper-left corner in that report indicates that the information in that report concerned the time of 9:50 am on 5/23/17.

b. Information that is shown in the lower-right corner of that report's section that is entitled "Nature of Unusual Occurrence" indicates that that report was about a denial of entry.

c. Information that is shown in the center of that report within its "Details" section states the following about me:

> "AT ABOVE T/P/O, THE ABOVE UNKNOWN SUBJECT WAS DENIED ENTRY INTO A CITY HALL EVENT BEING HELD IN THE ROTUNDA BY CITY HALL STAFF AND MAYOR DEBLASIO'S NYPD DETAIL. SUBJECT WAS ASKED TO VACATE THE AREA HE WAS STANDING IN BECAUSE HE WAS BLOCKING PEDESTRIAN TRAFFIC TO BOTH THE EVENT IN THE ROTUNDA AND ACCESS TO THE PUBLIC

> ELEVATORS. AFTER SOME RESISTANCE TO THIS REQUEST, SUBJECT DID COMPLY BUT MOVED INTO A MAGNETOMETER PROCESSING AREA. SUBJECT WAS ASKED TO MOVE FROM THIS AREA, AND ONCE AGAIN COMPLIED AFTER SOME INITIAL RESISTANCE"

d. The following is entirely true, accurate, and relevant about the preceding excerpt from that report:

   i. "T/P/O" is an abbreviation that was used in it that likely stands for "Time, Place, and Occurrence".

   ii. I was the "unknown subject" that it referred to.

   iii. Mr. Manzi blatantly lied by claiming that the place and occurrence that excerpt concerned was in a magnetometer processing area. The screenshots that I presented above from a video recording clearly confirm that he lied about that.

   iv. Mr. Manzi acknowledged that I members of the Mayor's NYPD security detail and members of the Mayor's staff denied me access to the 5/23/17 public resource fair meeting that was conducted inside of the Veterans Memorial Hall chamber inside of the Bronx Supreme Court that he referred to as having been a "City Hall event" that was held in the rotunda in that courthouse.

   v. Mr. Manzi fraudulently concealed the material fact that he and all other New York State court officers and members of the NYPD who were inside of the Bronx Supreme Court on 5/23/17 had a Fourteenth Amendment affirmative legal duty to have immediately and decisively intervened on my behalf on 5/23/17 inside of that courthouse to enable me to attend the 5/23/17 public

resource fair meeting because I had a patently clear and obvious constitutional right to do so.

vi.    Mr. Manzi fraudulently concealed the material fact that he and all other New York State court officers and members of the NYPD who were inside of the Bronx Supreme Court on 5/23/17 illegally violated their Fourteenth Amendment affirmative legal duty to have immediately and decisively intervened on my behalf on 5/23/17 inside of that courthouse to enable me to attend the 5/23/17 public resource fair meeting by not having made any effort to do so.

vii.    Mr. Manzi fraudulently concealed the material fact that he and New York State court officers Matthew Brunner and Ramon Dominguez illegally acted in concert with former NYPD Lieutenant Ralph Nieves, NYPD Inspector Howard Redmond, NYPD Detective Andrew Berkowitz, NYPD Detective Raymond Gerola, Rachel Atcheson, and other members of the Mayor's staff as criminal accomplices and co-conspirators to illegally prevent me from attending the 5/23/17 public resource fair meeting and otherwise accessing other public areas inside of the Bronx Supreme Court on 5/23/17 that I had a clear constitutional right to attend and otherwise access then.

viii.    Mr. Manzi fraudulently omitted the material fact that he illegally seized a large white bag of mine on 5/23/17 inside of the Bronx Supreme Court that I discussed and substantiated above.

ix.    Mr. Manzi fraudulently concealed the material fact that all other New York State court officers and members of the NYPD who were inside of the Bronx

Supreme Court on 5/23/17 illegally violated their Fourteenth Amendment affirmative legal duty to have immediately and decisively intervened on my behalf on 5/23/17 inside of that courthouse against him for having illegally both **a)** seized my bag in that courthouse on 5/23/17 and **b)** said "Fuck you" to my face immediately thereafter.

x.     Mr. Manzi fraudulently claimed that I obstructed pedestrian traffic in that courthouse on 5/23/17. Contrary to his lie, I didn't do so and estoppel equitably barred him from making such a fraudulent claim due to the fact that he and others criminally prevented me from attending the 5/23/17 public resource fair meeting and otherwise lawfully assembling in a corner within a short public corridor on the first floor of that courthouse in an area that would have been located right outside of an entrance in that corridor to the Veterans Memorial Hall chamber while I certainly wouldn't have obstructed pedestrian traffic by standing in that corner.

xi.     Mr. Manzi fraudulently omitted the sum and substance of the conversations that he, Mr. Brunner, and Mr. Dominguez had on 5/23/17 inside of the Bronx Supreme Court about me with former NYPD Lieutenant Ralph Nieves, NYPD Inspector Howard Redmond, NYPD Detective Andrew Berkowitz, NYPD Detective Raymond Gerola, Rachel Atcheson, and other members of the Mayor's staff.

xii.     Mr. Manzi fraudulently omitted the material fact the illegal acts and omissions that he, Mr. Brunner, Mr. Dominguez, and other New York State court officers committed against me on 5/23/17 inside of the Bronx Supreme Court

clearly violated provisions within the New York State Court Officers Rules

and Procedures Manual that governs how New York State court officers are

required to conduct themselves while they are on-duty as such.

72.     The exhibit within the annexed **Exhibit B** shows the online form that I completed to

register with the Mayor's Office to attend the 5/23/17 public resource fair meeting.

73.     The next screenshot is from that same video and corresponds to the time of 9:57:01.647

am. I'm shown standing near Mr. Brunner in it as I then had my hands over my hand that I

naturally raised in that manner out of frustration for the fact that I acutely knew then that Mr.

Brunner and others were illegally, willfully, and flagrantly violating applicable and fundamental

laws to my detriment and that of others on whose behalf I visited that courthouse on that date to

advocate on their behalf as well as mine by attending that 5/23/17 public resource fair meeting as

I sought to do so to ultimately try to persuade a sufficient number of people to engage in word-

of-mouth advertising against the Mayor, his administration, its business partners, the Mayor's

NYPD security detail to have a sufficient number of votes cast in the 2017 New York City

government elections to effectively and belatedly fire the Mayor's entire administration and

hopefully his NYPD security detail as well in order to usher in proper leadership for New

Yorkers instead of preserving the status quo as a plague that can give Covid-19 a run for its

money for crooked politicians like Bill de Blasio to indefatigably chase after that as well. This

screenshot clearly shows someone who was walking into the short public corridor that I just

discussed without being prevented from doing so by Mr. Manzi and Ms. Atcheson in flagrant

violation of my Fourteenth Amendment equal protection rights and those that prohibit

discrimination, selective-enforcement, and abuse of process.



74.     Information that appears on page 11 in numbered paragraph 35 within the verified

petition that was filed in *New York State Office of Court Administration v. Dennis Quirk*

confirms that Part 50 of the Rules of the Chief Judge of the State of New York required the

avoidance of impropriety by all New York State court officers and for them to "be patient and

courteous to all persons who come in contact with them". The discussion that I have presented

above about Mr. Manzi certainly confirms that he wasn't patient nor courteous towards me on

5/23/17 inside of the Bronx Supreme Court and instead violated my Fourteenth Amendment due

process and equal rights to be accorded such patience and courtesy by him then throughout the

entire time that I was inside of that courthouse. That same paragraph on that page in that verified

petition also confirms that section 1.40(A)(15) within the New York State Court Officers Rules

and Procedures Manual prohibits "behavior which is prejudicial to the good order, efficiency or

discipline of the Unified Court System." This confirms that Mr. Manzi, Mr. Brunner, Mr.

Dominguez, and an unknown male New York State court officer who wore a dark uniform on

5/23/17 inside of the Bronx Supreme Court all violated that prohibition by illegally preventing

me from attending the 5/23/17 public resource fair meeting, otherwise preventing me from

lawfully assembling in other public areas in that courthouse on that date, and/or otherwise having

not attempted to intervene on my behalf to uphold my constitutional rights in that courthouse on

that date in relation to what I just discussed.

**My dealings with the NY AG before Letitia James became the New York State Attorney General:**

75.      Before Letitia James became the New York State Attorney General, the following is

entirely true, accurate, and relevant:

a.   I met and briefly talked with Lourdes Rosado on 3/13/17 during a meeting that a legal

assistance organization named the Urban Justice Center conducted on 3/13/17. Back then,

she was the head of the NY AG's civil rights division and she gave me her business card

then. I thereafter followed-up with her via e-mail on 6/6/17, 9/1/17, 9/9/17, and 9/13/17

in response to illegal acts and omissions that were committed against me by members of

the Mayor's NYPD security detail and the Mayor's CAU that caused me to be illegally

barred from public town hall meetings, public resource fair meetings, and a public

hearing that were public forums that were partly used as badly disguised campaign events

for the benefit of the Mayor and other government personnel as such illegal acts and

omissions constituted voter suppression, voter fraud, and whistleblower retaliation. No

corrective action was taken in response to those e-mail messages that I sent.

b.   On 5/24/17, I attended a public meeting that Eric Schneiderman conducted with New

York State Assemblywoman Liz Krueger that was held at the CUNY Graduate Center

that is located at the intersection of 34th Street and Fifth Avenue in Manhattan. The next

screenshot is from a video recording that I recorded of them during that meeting.



c.   During that meeting, I wrote the following question on a comment card that I was issued

before I handed it back to a coordinator for that meeting to see if Mr. Schneiderman

would **a)** be asked the questions that I wrote on that card during that meeting's question

and answer session, **b)** answer those questions then, or **c)** thereafter answer those

questions or have someone else do so:

> "How soon will you have Howard Redmond, Lieutenant Nieves, Officer Gerola, and
> Officer Beato (badge #: 13326) arrested for flagrant civil rights violations and battery
> committed on 4/27/17 & 5/23/17?"

d.   Mr. Schneiderman wasn't asked any of the questions that I wrote on that comment card

during that meeting and I never received any responses to them thereafter in spite of the

fact that the preceding question was about the illegal acts that were committed against me

on 4/27/17 and 5/23/17 that I discussed earlier. Perhaps Mr. Schneiderman was

preoccupied during that 5/24/17 meeting and thereafter with thinking about slapping

women around or otherwise doing so to earn early retirement as the NY AG while

establishing that the NY AG actually didn't have a strong interest in law-enforcement.

**My dealings between 4/19/17 and 4/25/17 Letitia James, Jennifer Levy, and Muhammad Umair Khan:**

76.     In addition to Letitia James presently being the New York State Attorney General, both Jennifer Levy and Muhammad Umair Khan are now senior members of the NY AG. While Ms. James was previously the New York City Public Advocate, Ms. Levy and Mr. Khan also then worked for her as senior members of the New York City Public Advocate's office. On 4/19/17, I briefly talked with Ms. James face-to-face during a town hall that she conducted in the Bronx. On 4/24/17, I talked with Mr. Khan while meeting with him inside of the offices of the New York City Public Advocate and thereafter sent him a follow-up e-mail message on that date. On 4/25/17, I received an e-mail message from Ms. Levy in response to my dealings with Mr. Khan on 4/24/17. I then had a telephone conversation with Ms. Levy later on 4/24/17. The following is a link to a news report that is entitled, "Public Advocate Hosts Town Hall Meeting in South Bronx" that a news organization named News 12 The Bronx published on the Internet on 4/19/17 about the town hall meeting that Ms. James conducted in the Bronx during which I briefly talked with Ms. James:

   http://bronx.news12.com/story/35193561/public-advocate-hosts-town-hall-meeting-in-south-bronx

77.     That news report previously included a video recording that is no longer available in that report as it previously showed how that town hall meeting was conducted that included the fact that I was shown in it at the elapsed time of 48 seconds as I waited in line to talk with Ms. James a she was also shown at that point in that video. Upon information and belief, when I talked with Ms. James during that meeting, I engaged in protected whistleblowing activity against HRA and the slumlord of the building in which I reside (Urban Pathways, Inc.) that is a business partner of HRA. That whistleblowing was partly about the building in which I reside and claims that I

asserted against HRA in litigation that was assigned to the New York State Supreme Court in Manhattan that I referred to earlier. In short, hindsight confirms that Ms. James was useless then insofar as I was concerned because nothing thereafter changed in regards to the status quo about issues that I apprised her about during that meeting for which I sought assistance from her as a result of actions that may have otherwise been taken by personnel of the New York City Public Advocate's office. When I met with her then, that occurred 8 days after I learned that personnel of HRA criminally stole the oral arguments hearing that I was scheduled to have on 4/12/17 in my lawsuit against HRA by using an illegal ex-parte adjournment application to accomplish that illegal gamesmanship. I also learned on 4/11/17 that personnel of HRA similarly and illegally caused the agenda for a fair hearing that OTDA conducted between HRA and I on 4/11/17 by telephone that OTDA and I both legally recorded on audio to have been materially changed from its original agenda while illegally not causing me to be apprised of that change prior to that fair hearing in violation of my rights pursuant to the First Amendment and Fourteenth Amendment to have received prior notice about that revised agenda and to otherwise contest that revision prior to that fair hearing. That litigation that was assigned to OTDA was parallel litigation with respect to my lawsuit against HRA about which HRA stole my scheduled 4/12/17 oral arguments hearing to rob me of my clear legal right to testify on 4/12/17 during that oral arguments hearing about how my 4/11/17 OTDA fair hearing had been conducted.

78. The following is a relevant excerpt from an e-mail message that I sent to Mr. Khan on 4/24/17 at 8:24 pm to follow-up with him about the meeting that I had with him on that date:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Request for urgent help before 2:30 pm on 4/25 re: matters against HRA and OTDA
> **Date:** April 24, 2017 at 8:24:23 PM EDT
> **To:** khan@pubadvocate.nyc.gov

Dear Mr. Khan,

This is Towaki Komatsu.

I'm sending you this message to follow-up on the discussion we had in your office this afternoon.

79.   Mr. Khan's LinkedIn profile on the Internet is available at

https://www.linkedin.com/in/umair-khan-42a41a/ and reflects his career and educational

background. That information confirms that he worked for the New York City Public Advocate's

Office in April of 2017, he is an attorney, and that he presently works for the NY AG.

80.   The following is a relevant excerpt from an e-mail message that I received from Ms.

Levy on 4/25/17 at 8:50 am in response to the e-mails that I sent to Mr. Khan on 4/24/17:

> **From:** Jennifer Levy <jlevy@pubadvocate.nyc.gov>
> **Subject:** Fair hearing at 2:30 today
> **Date:** April 25, 2017 at 8:50:46 AM EDT
> **To:** towaki_komatsu@yahoo.com
> **Cc:** Muhammad Umair Khan <khan@pubadvocate.nyc.gov>
>
> Good morning Mr. Komatsu,
>
> I reviewed the papers that Mr. Khan sent me.

81.   I vividly recall that when I talked with Ms. Levy by telephone on 4/25/17, I told her that

an attorney for HRA illegally stole my 4/12/17 oral arguments hearing in my lawsuit against

HRA that was then assigned to the New York State Supreme Court in Manhattan as I explained

to her that he did so by using an illegal ex-parte adjournment application to engage in illegal

gamesmanship for that pretextual purpose. I also vividly recall that Ms. Levy told me then in

response that attorneys for the City of New York always do that instead of performing her legal

duty to have taken appropriate corrective action about that known and patently illegal behavior.

Back then, she was required by the terms of New York City Mayoral Executive Order 16, NYC

Charter §1116, and her oath of office as an employee of the City of New York to have promptly

reported that illegal gamesmanship to the New York City Department of Investigations ("DOI") and/or an Inspector General because that concerned a conflict of interest by HRA and its personnel as well as corruption by them. On 4/25/17, Ms. Levy was the General Counsel for the New York City Public Advocate's Office. Ms. Levy's LinkedIn profile on the Internet is available at https://www.linkedin.com/in/jennifer-levy-647b711a/ and reflects her career and educational background. It also confirms that she worked for the New York City Public Advocate's Office in April of 2017 and that she presently works for the NY AG.

82.     Prior to talking with Ms. Levy on 4/25/17, someone named Fernando Fernandez was among her coworkers in the New York City Public Advocate's Office and sent an e-mail message to her and others on my behalf on 4/24/17 at 5:08 pm that ultimately accomplished nothing as that further confirms that Ms. Levy is useless insofar as I'm concerned. The following is a relevant excerpt from that e-mail message that concerned the fact that though I prevailed against HRA in litigation on 9/15/16 that was assigned to OTDA, HRA thereafter illegally refused to fully comply with what OTDA ordered it to do in the fair hearing decision that OTDA issued in my favor against HRA on 9/15/16:

> **From**: Fernando Fernandez [mailto:ffernandez@pubadvocate.nyc.gov]
> **Sent**: Monday, April 24, 2017 5:08 PM
> **To**: Best-Childers, Jacqueline (HRA) <best-childersj@hra.nyc.gov>; Scalia, Ann Marie (HRA) <scaliaa@hra.nyc.gov>; Donovan, Jackie (OTDA) <Jackie.Donovan@otda.ny.gov>
> **Cc**: Julissa Gonzalez <jgonzalez@pubadvocate.nyc.gov>; Jennifer Levy <jlevy@pubadvocate.nyc.gov>; Tai Johnson <tjohnson@pubadvocate.nyc.gov>
> **Subject**: RE: Won HRA Fair Hearing, HRA Has Not Paid Storage Fees

83.     As a reminder and with respect to temporal proximity to protected activity that I engaged in, just 3 days after that e-mail message was sent and 2 days after I talked with Ms. Levy on 4/25/17, I was illegally prevented from attending the public town hall meeting that members of the public conducted with the Mayor, Mr. Banks, and other government personnel in Queens that

I had registered in advance with the Mayor's Office to attend.

## **ARGUMENTS**

84.     This application for authorization to intervene in this case as an interested party or as an amicus curiae in the alternative is timely with respect to the date when this this Court granted the NY AG authorization to intervene in this case. It wasn't until this Court authorized the NY AG to do so that I learned that the NY AG had submitted an application to intervene in this case.

85.     With respect to FRCP Rule 24(a)(2), I have a genuine and strong interest relating to the transactions in this case with respect to exposing the material fact that the NY AG actually pretends to combat voter suppression and voter fraud that are among things that materially impair the voting rights of New York citizens. Also, I'm so situated that disposing of this action may as a practical matter impair or impede my ability to protect my interests. Furthermore, the parties in this case certainly do not adequately represent my interests in exposing the NY AG as a con artist that grandstands far too often and primarily for publicity.

86.     With respect to FRCP Rule 24(b)(1)(B), a claim that I have that shares with this action a common question of law and perhaps fact is about the qualifications that the NY AG actually lacks and instead pretends to have that should have been a prerequisite that it needed to meet and prove it possessed in order to have been granted authorization to intervene in this case. This is comparable to the fact that though Donald Trump claimed he was a great leader while he was the former President, a sufficient number of voters proved that he and his supporters can keep dreaming.

**<u>CONCLUSION</u>**

For the foregoing reasons, I request that this Court grant this motion in its entirety and for such

other and different relief as this Court may deem just and equitable.


From,                                                                    **<u>Date</u>**: May 22, 2021

Towaki Komatsu


s_/Towaki Komatsu

802 Fairmount Pl., Apt. 4B
Bronx, NY  10460

Tel: 347-316-6180
E-mail: Towaki_Komatsu@yahoo.com

# Exhibit A

# STATE OF NEW YORK
## UNIFIED COURT SYSTEM
# UNUSUAL OCCURRENCE REPORT



| DATE OF OCCUR. | TIME | COURT/FACILITY | PLACE OF OCCURRENCE | UNUSUAL NUMBER | | |
|---|---|---|---|---|---|---|
| | | | | LOC. CODE | REP. NO | YEAR |
| 05/23/2017 | 0950 | BRONX SUPREME COURT - GRAND CONCOURSE | MAGNETOMETER POST D | G | 75089 | 2017 |

**NATURE OF UNUSUAL OCCURRENCE**

☐ ARREST ☐ ATTEMPTED ESCAPE ☐ BOMB THREAT

☐ DISRUPTIVE PRISONER ☐ DISRUPTIVE SPECTATOR ☐ JUDICIAL THREAT

☐ PRISONER ESCAPE ☐ PROPERTY DAMAGE ☐ PROPERTY THEFT

☐ REPORT OF CRIME ☐ SUMMONS ☒ OTHER (SPECIFY BELOW)
*DENIED ENTRY*

| LASTNAME | FIRSTNAME | M.I. | EMPLOYEE | SEX | AGE |
|---|---|---|---|---|---|
| *UNK.* | | | *NO* | *M* | |

**ADDRESS**

| LASTNAME | FIRSTNAME | M.I. | EMPLOYEE | SEX | AGE |
|---|---|---|---|---|---|
| | | | | | |

**ADDRESS**

**DETAILS: (Include pertinent information regarding nature of unusual occurrence. If arrest, include Arrest No., Pct., Charges, Complainant's Name and Address, Court, Judge, Disposition)**

*AT ABOVE T/P/O, THE ABOVE UNKNOWN SUBJECT WAS DENIED ENTRY INTO A CITY HALL EVENT BEING HELD IN THE ROTUNDA BY CITY HALL STAFF AND MAYOR DEBLASIO'S NYPD DETAIL. SUBJECT WAS ASKED TO VACATE THE AREA HE WAS STANDING IN BECAUSE HE WAS BLOCKING PEDESTRIAN TRAFFIC TO BOTH THE EVENT IN THE ROTUNDA AND ACCESS TO THE PUBLIC ELEVATORS. AFTER SOME RESISTANCE TO THIS REQUEST, SUBJECT DID COMPLY BUT MOVED INTO A MAGNETOMETER PROCESSING AREA. SUBJECT WAS ASKED TO MOVE FROM THIS AREA, AND ONCE AGAIN COMPLIED AFTER SOME INITIAL RESISTANCE.*

**NAME AND ADDRESS OF WITNESS**

*RAMON DOMINGUEZ*
*SGT. SH. #508*

*....Continue to next page*

| SUBMITTED BY | TITLE | SHIELD NO. | DATE |
|---|---|---|---|
| *ANTHONY MANZI* | *CAPTAIN* | *182* | *05/24/2017* |

| REPORTED TO | TITLE | SHIELD NO. | DATE |
|---|---|---|---|
| *OSTACIO NEGRON* | *MAJOR* | *31* | *05/24/2017* |

| APPROVED BY | TITLE | SHIELD NO. | DATE |
|---|---|---|---|
| *FRANK ZALOGA* | | | *06/28/2017* |

**LINKED REPORTS** *75377*

FINAL APPROVED



**STATE OF NEW YORK**
**UNIFIED COURT SYSTEM**
**UNUSUAL OCCURRENCE REPORT**

**REPORT ID:**  *75089*

**Continuation ....NAME AND ADDRESS OF WITNESS**

*MATHEW  BRUNNER*
*SGT.  SH. #478*

# <u>Exhibit B</u>



OverviewNewsMayor's BioOfficials

# Join us for the Bronx City Hall in Your Borough: City Resource Fair!

**We will be at Borough Hall Tuesday, May 23rd from 9:00 A.M to 1:00 P.M.**

**We look forward to seeing you there!**



## Meet with top city commissioners and senior staff during scheduled office hours to address your questions and concerns.

**Para español, por favor siga este enlace.**

## Email*

towaki_komatsu@yahoo.com

## First Name*

Towaki

## Last Name*

Komatsu

## Address*

One Penn Plaza

Ste. 6321

## City

Bronx

## Zip Code*

10119

## Phone Number

## Organization

## Let us know what questions you will bring to the resource fair!*

Proof NYC a