```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
NATIONAL COALITION ON BLACK CIVIC   :
PARTICIPATION, et al.,              :
                                    :
              Plaintiffs,           :
                                    :
    - against -                     :
                                    :
JACOB WOHL, et al.,                 :
                                    :
              Defendants.           :
------------------------------------X
```

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: September 17, 2021   │
└─────────────────────────────────┘
```

20 Civ. 8668 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiffs National Coalition on Black Civic Participation ("NCBCP") and Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, and Andrea Sferes (collectively, the "Individual Plaintiffs," and with NCBCP, "Plaintiffs") filed this action against defendants Jacob Wohl ("Wohl"), Jack Burkman ("Burkman"), J.M. Burkman & Associates, LLC ("J.M. Burkman & Associates"), Project 1599, and John and Jane Does 1 through 10 (collectively, "Defendants"). (See Complaint, Dkt. No. 11.) Plaintiffs allege that Defendants sent robocalls containing false information intended to prevent recipients from voting by mail through threats and intimidation in violation of Section 11(b) of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10307(b), and Section 2 of the Ku Klux Klan Act of 1870 ("KKK Act"), 42 U.S.C. § 1985(3).

1

On May 19, 2021, Letitia James, Attorney General of the State of New York ("NY AG") on behalf of the People of the State of New York, filed a Complaint in Intervention against Defendants as well as Robert Mahanian ("Mahanian") and Message Communications, Inc. ("Message," and with Mahanian, the "Message Defendants"). (See "Complaint in Intervention," Dkt. No. 102.) The NY AG alleges the following: (1) violation of Section 11(b) of the VRA by Defendants and the Message Defendants; (2) violation of Section 2 of the KKK Act by Defendants and the Message Defendants; (3) violation of Section 131(b) of the Civil Rights Act of 1957 by Defendants; (4) violations of Sections 40-c and 40-d of the New York Civil Rights Law by Defendants and the Message Defendants; (5) violation of Section 9 of the New York Civil Rights Law by Defendants; (6) violation of Section 63(12) of the New York Executive Law by Defendants and the Message Defendants. (Id.)

Now before the Court is the Message Defendants' letter motion requesting a premotion conference and seeking leave to file a motion to dismiss the Complaint. The Court construes the letter as a motion to dismiss[1] pursuant to Federal Rule

---

[1] See Kapitalforeningen Lægernes Invest. v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (affirming the district court ruling deeming an exchange of letters as a motion to dismiss).

of Civil Procedure 12(b)(6) (the "Motion," Dkt. No. 126). For the reasons discussed below, the Motion is DENIED.

## I.   **BACKGROUND**

A.   FACTS AND PROCEDURAL BACKGROUND[2]

This Order assumes familiarity with the Court's prior Orders granting Plaintiffs' motion for a temporary restraining order, Nat'l Coal. on Black Civic Participation v. Wohl, 498 F. Supp. 3d 457 (S.D.N.Y. 2020); denying Defendants' motion to dismiss, Nat'l Coal. on Black Civic Participation v. Wohl, 512 F. Supp. 3d 500 (S.D.N.Y. 2021); and granting the NY AG's motion to intervene, "May 19 Order," Dkt. No. 101, including the factual recitation contained therein.

In brief, in summer 2020, Wohl and Burkman created a robocall recording to discourage voters from voting by mail during the COVID-19 pandemic in which voting in person raised a serious health risk. The recording conveyed the following message:

Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob

---

[2] The factual background below, except as otherwise noted, derives from the Complaint in Intervention and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on a motion to dismiss. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995)); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Except when specifically quoted, no further citation will be made to the Complaint in Intervention or the documents referred to therein.

> Wohl. Mail-in voting sounds great, but did you know that
> if you vote by mail, your personal information will be
> part of a public database that will be used by police
> departments to track down old warrants and be used by
> credit card companies to collect outstanding debts? The
> CDC is even pushing to use records for mail-in voting to
> track people for mandatory vaccines. Don't be finessed
> into giving your private information to the man, stay
> safe and beware of vote by mail.

Complaint in Intervention ¶ 54.

The NY AG alleges that this robocall message falsely states that voters who vote by mail would face severe consequences including: (1) the claim that police will use vote-by-mail information to track persons with outstanding warrants; (2) the assertion that vote-by-mail information will be used by debt collectors; and (3) the claim that the Centers for Disease Control and Prevention ("CDC") is seeking access to vote-by-mail information to conduct mandatory vaccinations. The NY AG states that none of these claims is true.

The NY AG further alleges that the robocalls used "racist stereotypes intended to intimidate and otherwise discourage Black voters from using absentee or mail-in ballots." Id. ¶ 55. The NY AG states that the purported speaker of the robocall message, Tamika Taylor, could be confused by call recipients with the mother of Breonna Taylor -- whose actual name is Tamika Palmer. The NY AG also contends that invocation of outstanding warrants "could be perceived as intimidating

for Black voters who may have legitimate fears of interacting with law enforcement due to a long history of systemic racism in the criminal justice system." Id. ¶ 57.

Wohl and Burkman intended to target Black voters with the robocalls. Wohl wrote in an email containing the audio file of the message that "[w]e should send it to black neighborhoods," and after the calls were placed, Burkman wrote to Wohl, "[I] love these robo calls [sic] . . . getting angry black call backs . . . win or lose . . . the black robo was a great jw idea." Id. ¶ 6. The NY AG further alleges that it was Wohl's and Burkman's intent to interfere with the November 3, 2020 election by referencing a February 2019 article in USA Today in which Wohl told reporters that he was "already plotting ways to discredit Democrats in the 2020 election with lies and other disinformation, using his large following on social media to cause disarray similar to what Russians did during the 2016 election."[3] In addition, in June 2019, Wohl admitted to The Washington Post that he sought investors to fund a scheme to "use fraudulent news stories

---

[3] See Complaint in Intervention ¶ 24 (quoting Crystal Hayes & Gus Garcia-Roberts, This Is How Jacob Wohl Created a Sexual Harassment Accusation Against Robert Mueller, USA Today (Feb. 26, 2019), https://www.usatoday.com/story/news/politics/2019/02/26/robertmueller-hoax-how-jacob-wohl-created-sexual-harassmentplot/2993799002/).

about candidates to suppress voter turnout and manipulate political betting markets." Id. ¶ 25.

Message is a corporation that owns, operates, and hosts a telecommunication broadcasting platform that broadcasts robocalls or prerecorded telephone messages for a fee. Message is owned and operated by Mahanian. Wohl and Burkman hired Message to send the robocall message to voters in New York, Ohio, Michigan, Pennsylvania, and Illinois. On August 26, 2020, Message sent the robocall message to over 85,000 phone numbers nationwide, including approximately 5,500 phone numbers in New York.

The NY AG alleges upon information and belief that "on June 17, 2020, Burkman left a voice message for Mahanian to discuss broadcasting a robocall that Burkman and Wohl intended to discourage mail-in voting and suppress voter turnout." Id. ¶ 30. A few days later, Burkman contacted Message about placing some robocalls. Over the next few days, Burkman and Mahanian continued discussing the robocalls that Burkman wanted Message to broadcast. Burkman then issued a payment in the amount of $1,000 from a Burkman & Associates bank account to Message for the robocall.

In August 2020, Burkman emailed Mahanian, copying Wohl, writing, "Check to you Robert just went out in the 2 day pouch you will have in 2-3 days then we attack." Id. ¶ 35. A second

check in the amount of $1,000 to Message issued. On August
24, 2020, Burkman emailed Mahanian "to confirm that he
received the payment for the voter robocall campaign." Id. ¶
37. Mahanian confirmed receipt of the check and told Burkman
that he was "all set" to begin the robocall campaign. Id. ¶
38. The NY AG alleges upon information and belief that Burkman
and Mahanian set up a call via email and then discussed the
robocalls, including the targeted neighborhoods. On August
26, 2020, Wohl emailed Burkman and Mahanian to inform them
that the audio file for the robocall message had uploaded
successfully, and Mahanian then confirmed that "yes, your
campaign is currently running and recording, uploaded about
20 minutes ago, is running. I believe you are all set." Id.
¶ 46.

The NY AG alleges upon information and belief that
Messsage monitors its robocall campaigns but failed to take
any action to determine whether the robocall Burkman and Wohl
had uploaded constituted voter intimidation. It is further
alleged that Message maintains a database of phone numbers
that can be targeted for purposes of a robocall campaign and
that it was aware of, and directed the robocall message to,
specific communities that Wohl and Burkman had selected. The
Complaint in Intervention alleges more specifically that

Message provided active assistance in identifying target zip codes to maximize the threatening effect of the robocalls.

The Complaint in Intervention cites to 47 U.S.C. § 227(d)(3)(A) and states that federal law requires prerecorded voice messages state certain information, such as the identity of the calling entity. Based on these requirements, the NY AG alleges that Message, in ensuring that the robocall message complied with federal requirements, knew or should have known the content of the robocall message.

B.    PROCEDURAL HISTORY

As relevant here, on May 19, 2021, the Court granted the NY AG's motion to intervene. (See May 19 Order.) Subsequently, the NY AG filed the Complaint in Intervention against Defendants and the Message Defendants, alleging the following: (1) violation of Section 11(b) of the VRA by Defendants and the Message Defendants; (2) violation of Section 2 of the KKK Act by Defendants and the Message Defendants; (3) violation of Section 131(b) of the Civil Rights Act of 1957 by Defendants; (4) violations of Sections 40-c and 40-d of the New York Civil Rights Law by Defendants and the Message Defendants; (5) violation of Section 9 of the New York Civil Rights Law by Defendants; (6) violation of Section 63(12) of the New York Executive Law by Defendants and the Message Defendants.

8

On July 26, 2021, the Message Defendants filed a letter sent to the NY AG identifying purported deficiencies with the Complaint in Intervention's claims against them and requesting their dismissal. (See Motion.) On August 2, 2021, the NY AG filed a response opposing dismissal of the claims against the Message Defendants. ("Opposition," Dkt. No. 127.) On August 13, 2021, the Message Defendants filed a reply letter in support of its Motion and requested a premotion conference. ("Reply," Dkt. No 132.)

On September 7, 2021, the Court ordered the Message Defendants and NY AG to file supplemental letter briefs addressing the Message Defendants' argument that Section 230 of the Communications Decency Act precludes the NY AG's claims against them. (See Dkt. No. 134.) The Message Defendants filed a supplemental brief on September 10, 2021 ("Message Defs. Supp. Br.," Dkt. No. 136), and the NY AG filed a brief on September 13, 2021 ("NY AG Supp. Br.," Dkt. No. 137.) The Court also granted Plaintiffs' request to file a letter brief on the Section 230 issue. (See "Pls. Br.," Dkt. No. 138-1.)

C.   THE PARTIES' ARGUMENTS

The Message Defendants argue that Message was under no obligation under the Telephone Consumer Protection Act ("TCPA") to prescreen the content of the robocall message at issue because the TCPA does not apply to Message. The Message

Defendants contend that the provision of the TCPA cited in the Complaint in Intervention, 47 U.S.C. § 227(d)(3)(A), governs the use of automatic telephone dialing systems ("ATDSs"). Message is not alleged to use an ATDS as defined by the Supreme Court in Facebook, Inc. v. Duguid, 141 S. Ct. 1163, 1167 (2021). Rather, the Message Defendants argue that the Complaint in Intervention alleges that the recipients of the robocalls were intentionally targeted and not called by a random number generator, thereby undercutting any suggestion that Message uses an ATDS.

The NY AG responds that Mahanian actively conspired with Burkman and Wohl to target voters with a robocall designed to stop them from voting by mail and points to allegations that Mahanian and Burkman held multiple calls over the course of several days discussing the content of the robocall message and the recipient-neighborhoods to target. The NY AG argues that the failure to allege that Message uses an ATDS is immaterial because no cause of action is based on the TCPA, and there are other allegations supporting a finding of knowledge.

The Message Defendants further assert that any liability based on the contents of Defendants' robocall message is barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1). The Message Defendants claim that Message

is a provider of an interactive computer service because users upload their own messages to Message's server through Message's website. They also argue that the robocall message at issue was clearly provided by Wohl and Burkman and that Message did not co-create the message simply by "allow[ing] its customers to select where to send their messages." Message Defs. Supp. Br. at 3.

The NY AG claims that Section 230 immunity does not apply because robocalling is not protected by that statute and the Message Defendants were not passive publishers. The NY AG states that Message was not acting as an interactive computer service when it placed the unlawful telephone calls to landline telephones because it did not provide the call recipients with access to a computer server. The NY AG additionally argue that "Message 'specifically encouraged development of what was offensive about the conduct' by working with Wohl and Burkman to provide the means and methods to target specific voters over traditional landline telephones." NY AG Supp. Br. at 3 (citation omitted).

In their brief, Plaintiffs argue that expanding Section 230 to apply to the offline conduct of disseminating robocalls would jeopardize civil-rights enforcement. Plaintiffs also claim that doing so would be inconsistent with Congress and the Executive Branch's attempts to curtail illicit robocalls.

## II.  **LEGAL STANDARDS**

"To survive a motion to dismiss [pursuant to Federal Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." See Twombly, 550 U.S. at 555. The task of the Court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig., 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (citation omitted).

## III. **DISCUSSION**

The Message Defendants raise two primary arguments as to why the claims against them are defective. First, the Message Defendants argue that they were not aware of the contents of the robocall message at issue. Second, the Message Defendants contend that they are protected by the immunity conferred to

interactive computer service providers and users under Section 230 of the Communications Decency Act. The Court is not persuaded.

A.    Allegations of Knowledge

The Court agrees with the Message Defendants that the Complaint in Intervention has failed to allege that Message uses an ATDS. The TCPA applies to "automatic telephone dialing systems," or ATDSs, which the Supreme Court has recently defined as having "the capacity to use a random or sequential number generator to either store or produce phone numbers to be called." Facebook, 141 S. Ct. at 1173. The NY AG does not seem to dispute that the Complaint in Intervention fails to allege Message uses an ATDS. Therefore, it is not apparent from the face of the Complaint in Intervention whether the TCPA imposes an obligation on Message to review robocall messages' contents.[4]

However, there are sufficient allegations in the Complaint in Intervention to give rise to a reasonable inference that the Message Defendants were aware of the robocall message's contents or purpose. For instance, Burkman left a voicemail for Mahanian to "discuss broadcasting a

_____

[4] The Court passes no judgment on whether the NY AG was required to plead that Message uses an ATDS to support the inference that it prescreens the content of the robocall messages it disseminates. Because the Court concludes that other allegations support an inference of knowledge here, the Court need not address the adequacy of the NY AG's TCPA allegations.

robocall that Burkman and Wohl intended to discourage mail-
in voting and suppress voter turnout." Complaint in
Intervention ¶ 30. Subsequently, "Burkman discussed with
Mahanian the robocalls Burkman wanted to broadcast via
Message Communications." Id. ¶ 32. These allegations, when
read in the light most favorable to the NY AG, give rise to
the reasonable inference that Mahanian knew of the content or
purpose of the robocalls. In addition, Burkman sent Mahanian
an email stating, "Check to you Robert just went out in the
2 day pouch you will have in 2-3 days then we attack." Id. ¶
35. The use of "we attack" in this email between Burkman and
Mahanian reinforces the notion that Mahanian was aware of the
robocalls' disruptive purpose and intimidating nature. These
allegations, in conjunction with the numerous other alleged
communications between Mahanian and Defendants, "raise a
right to relief above the speculative level," see Twombly,
550 U.S. at 555, and "raise a reasonable expectation that
discovery will reveal evidence of the wrongdoing alleged,"
Whiteside v. Hover-Davis, Inc., 995 F.3d 315, 323 (2d Cir.
2021) (internal quotation marks and citation omitted).

The Message Defendants seek to undermine the
plausibility or weight of these allegations because they are
based upon information and belief. But "[t]he Twombly
plausibility standard . . . does not prevent a plaintiff from

pleading facts alleged 'upon information and belief' where
the facts are peculiarly within the possession and control of
the defendant, or where the belief is based on factual
information that makes the inference of culpability
plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120
(2d Cir. 2010) (internal quotation marks and citations
omitted). Here, the Court is persuaded that facts regarding
the content of Burkman and Mahanian's telephone discussions
are uniquely within their possession and control. Moreover,
as discussed above, the substance of the emails included in
the Complaint in Intervention, such as the one in which
Burkman says "we attack," supports the assertion that Burkman
and Mahanian discussed the content or purpose of the robocall
message, as alleged upon information and belief. The Message
Defendants have provided no basis to find that the NY AG
improperly pled allegations upon information and belief.

Nor does the Court consider the allegation that "Message
Communications did not perform any due diligence or make any
effort to determine whether the robocalls provided to [them]
by Wohl and Burkman – two individuals known for spreading
conspiracy theories and other disinformation – constituted
voter intimidation" to be inconsistent with an inference of
knowledge, as the Message Defendants argue. See Complaint in
Intervention ¶ 49. Mahanian and Message may very well have

known of the contents of the robocall message yet nonetheless failed to take steps to verify the accuracy of the contents or whether the message would constitute unlawful voter intimidation. In other words, the message's *contents* and their *legal effect* are distinct concepts; knowledge of one does not require knowledge of the other. For this reason, the allegation that Mahanian and Message failed to conduct any due diligence does not undermine the allegations that they knew what the robocall message contained or its intended purpose.

The many allegations that Mahanian communicated with Burkman and Wohl about the robocall message, as well as the email exchanges between the two, are sufficient to make plausible Mahanian's knowledge of the robocall message or its purpose. Accordingly, the NY AG's allegations against the Message Defendants are adequate.

B.   Section 230 of the Communications Decency Act

The Court is further unpersuaded that Section 230 of the Communications Decency Act precludes the Message Defendants' potential liability. There are three elements of immunity under Section 230(c)(1). First, a defendant claiming immunity must be a "provider or user of an interactive computer service." 47 U.S.C. § 230(c)(1). Second, the plaintiff's claim must treat the defendant as a "publisher or speaker."

<u>Id.</u> Third, the plaintiff's claim must be based on information "provided by another information content provider." <u>Id.</u>; <u>see also</u> <u>Force v. Facebook, Inc.</u>, 934 F.3d 53, 64 (2d Cir. 2019).

"[D]ismissal is only appropriate pursuant to § 230 on a motion to dismiss 'if the statute's barrier to suit is evident from the face of the complaint.'" <u>Elliott v. Donegan</u>, 469 F. Supp. 3d 40, 55-56 (E.D.N.Y. 2020) (quoting <u>Ricci v. Teamsters Union Local 456</u>, 781 F.3d 25, 28 (2d Cir. 2015)). A plaintiff is not required to anticipate affirmative defenses when formulating a complaint, and therefore, the absence of allegations cannot justify dismissal under Section 230. <u>See id.</u> (citing cases).

Whether Section 230 immunity precludes liability for violations of civil-rights statutes against a telecommunications broadcast platform like Message that disseminates robocalls containing prerecorded messages uploaded to a website appears to be an issue of first impression.[5] But the Court is not persuaded that in the

---

[5] This Court is only aware of one other court that has thus far addressed whether Section 230 precludes liability "for the activities of third-party telemarketers who make auto-dialed calls using their services." <u>Cunningham v. Montes</u>, 378 F. Supp. 3d 741, 750 (W.D. Wis. 2019). But <u>Cunningham</u> addresses a separate question related to Section 230. The court there held that Section 230 immunity did not shield a provider of telemarketing services from liability under the TCPA because "the harm addressed by the TCPA is not related to the content of the robocalls," but rather, the nuisance imposed by the robocalls. <u>Id.</u>

circumstances alleged in this case, dismissal of the NY AG's claims is appropriate.

As an initial matter, it is not evident from the face of the Complaint in Intervention whether Message constitutes a provider or user of an interactive computer service. The statute defines an "interactive computer service," a term that courts typically interpret expansively, Dyroff v. Ultimate Software Grp., 934 F.3d 1093, 1097 (9th Cir. 2019), as "any [1] information service, system, or access software provider that [2] provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). An access software provider is defined, in relevant part, as "a provider of software (including client or server software), or enabling tools that do any one or more of the following . . . (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." Id. § 230(f)(4). "Courts typically have held that internet service providers, website exchange systems, online message boards, and search engines fall within this definition." F.T.C. v. LeadClick Media, LLC, 838 F.3d 158, 174 (2d Cir. 2016).

It is apparent that users, such as Burkman and Wohl in this case, can upload audio files to Message's website, which are then transmitted via robocalls. But it is not apparent

18

from this fact alone whether Message satisfies the definition of a provider or user of an interactive computer service. As the NY AG argues, there remain outstanding factual questions that must be resolved before the Court can make such an assessment. For instance, it is unclear what means Message uses to send robocalls,[6] or whether Message hosts a connection between users' devices and a server as required by the statutory definition. In the absence of allegations affirmatively demonstrating that Message is a provider or user or an interactive computer service such that it is entitled to immunity, dismissal at this stage is inappropriate.[7]

Even assuming that Message is a provider or user of an interactive computer service, however, the Court is persuaded that the NY AG has sufficiently alleged that the Message Defendants acted as more than a passive publisher or neutral intermediary in the circumstances of this case.

An information content provider is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided

---

[6] The Second Circuit has expressed skepticism that traditional telephone calling is covered by Section 230. See Force, 934 F.3d at 67 n.23 (noting that the Circuit's holding would not necessarily immunize an acquaintance who brokers a connection between two authors and facilitates sharing of their works via telephone call).

[7] Because outstanding factual issues preclude a finding that Section 230 can definitively apply to the act of robocalling, the Court does not address Plaintiffs' policy arguments at this time.

through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The Tenth Circuit has noted that to "develop" means to make visible, active, or usable, and that "a service provider is 'responsible' for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content." F.T.C. v. Accusearch Inc., 570 F.3d 1187, 1198 (10th Cir. 2009). Thus, "a defendant who paid researchers to uncover confidential phone records protected by law, and then provided that information to paying customers, fell within the definition because he did not merely act as a neutral intermediary, but instead 'specifically encouraged development of what was offensive about the content.'" LeadClick, 838 F.3d at 174 (brackets omitted) (quoting Accusearch, 570 F.3d at 1199). Similarly, the Ninth Circuit has held that "a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1168 (9th Cir. 2008). The Second Circuit has adopted these principles espoused by the Tenth and Ninth Circuits. See, e.g., LeadClick Media, 838 F.3d at 174.

According to the Complaint in Intervention, Message did not merely transmit the robocall message that Burkman and Wohl uploaded. As discussed above, it is alleged that Mahanian and Burkman discussed the content or purpose of the robocall message. It is further alleged upon information and belief that "Message Communications maintains a database of phone numbers that can be targeted for purposes of a robocall campaign and it was aware of and directed the robocall message to specific communities selected by Wohl and Burkman." Complaint in Intervention ¶ 61. Most importantly, it is alleged that "Burkman and Mahanian . . . discussed the robocall, including the targeted neighborhoods that Burkman and Wohl's robocall campaign would reach," and "Message Communications worked with Wohl and Burkman to target specific zip codes to maximize the threatening effects the robocall would have on Black voters in New York and other large metropolitan areas." Id. ¶¶ 44, 87.

The Court's prior decisions granting the temporary restraining order and denying Defendants' motion to dismiss explain at length that the intimidating nature of the message, which gives rise to Plaintiffs' and the NY AG's claims, is based, at least in part, on the racial targeting, use of racially charged stereotypes, and fact "that this message was conveyed directly to individual voters by phone." See, e.g.,

Nat'l Coal. on Black Civic Participation, 498 F. Supp. 3d at
482-85. Accordingly, the Message Defendants' active efforts
in targeting Black neighborhoods for dissemination of the
robocall message so as to maximize its threatening effect
"contribute[] materially to the alleged illegality of the
conduct," Roommates.com, 521 F.3d at 1168, and transform the
Message Defendants into much more than a "neutral
intermediary," LeadClick, 838 F.3d at 174.

The Second Circuit and Ninth Circuit's decisions in
Force v. Facebook, Inc., 934 F.3d 53 (2d Cir. 2019), and
Gonzalez v. Google LLC, 2 F.4th 871 (9th Cir. 2021), are not
to the contrary. In Force, the Second Circuit addressed claims
against social-media company Facebook brought by victims,
estates, and family members of victims of terrorist attacks
in Israel who alleged that Facebook provided material support
to Hamas in violation of the Anti-Terrorism Act. 934 F.3d at
57. Facebook uses algorithms based on a variety of inputs,
such as users' prior behavior on Facebook, users' behavioral
and demographic data, users' common membership in Facebook's
online groups, or users' mutual friend connections, to
determine what content to display to users on their newsfeed
webpage, suggest friend connections to users, and display
third-party groups, products, services, or events that may
interest users. Id. at 58. Facebook uses advertising

algorithms as well to "allow advertisers on Facebook to target specific ads to its users who are likely to be most interested in them." Id. at 58-59. In relevant part, the plaintiffs alleged that Facebook's algorithms directed Hamas's terrorist-related content to the personalized newsfeeds of the individuals who harmed the plaintiffs. Id. at 59.

A divided panel of the Second Circuit held that the plaintiffs' claims were barred under Section 230. As to Facebook's use of algorithms, the Force majority rejected the plaintiffs' argument that Facebook does not act as a publisher when using algorithms to suggest content to users. Id. at 65-66. The majority explained that "arranging and distributing third-party information inherently forms 'connections' and 'matches' among speakers, content, and viewers of content, whether in interactive internet forums or in more traditional media," and forms "an essential result of publishing." Id. at 66. The majority also rejected the argument that Facebook's algorithms had created or developed Hamas's content by directing that content to users most interested in Hamas and its terrorist activities. Id. at 69. The majority reasoned that Facebook does not edit the content that its users post and that Facebook's algorithms are content neutral in that they "take the information provided by Facebook users and 'match' it to other users--again, materially unaltered--based

on objective factors applicable to any content, whether it concerns soccer, Picasso, or plumbers." Id. at 70.

Chief Judge Katzmann dissented in part in Force. Chief Judge Katzmann contended that Facebook does not act as a mere publisher when its algorithms suggest content to users because in suggesting content, Facebook sends its *own* message to users about what it believes they will like. Chief Judge Katzmann also considered the targeting perpetuated by the algorithms to be problematic: "Facebook 'does not merely provide a framework that could be utilized for proper or improper purposes; rather, [Facebook's] work in developing' the algorithm and suggesting connections to users based on their prior activity on Facebook, including their shared interest in terrorism, 'is directly related to the alleged illegality of the site.'" Id. at 83 (Katzmann, C.J., dissenting in part) (quoting Roommates.Com, 521 F.3d at 1171).

In Gonzalez, 2 F.4th 871, the Ninth Circuit also addressed terrorism-related claims brought against social-media companies for their use of algorithms and reached the same conclusion as did the majority in Force. The Ninth Circuit held that "a website's use of content-neutral algorithms, without more, does not expose it to liability for content posted by a third-party." Id. at 896. The Ninth

Circuit rejected Chief Judge Katzmann's arguments, which it construed as based on a misreading of Roommates. The Gonzalez Court explained that in Roommates, the "website required users to identify themselves by sex, sexual orientation, and whether they had children, then directed users to describe their preferred tenant or landlord using pre-populated answers concerning the same criteria. In this way, the website prompted discriminatory responses that violated fair housing laws. Because the website itself generated the options for selecting a tenant or landlord based on discriminatory criteria, our en banc court concluded the website materially contributed to the unlawfulness of the posted content." Id. (citations omitted).

The Gonzalez panel was, like the Force panel, split. Judge Berzon concurred in the majority opinion in Gonzalez based on Ninth Circuit precedent but agreed with Chief Judge Katzmann's view that "websites' use of machine-generated algorithms to recommend content and contacts are not within the publishing role immunized under section 230." Id. at 917 (Berzon, J., concurring). Judge Gould dissented in part for the reasons stated by Chief Judge Katzmann in his partial dissent in Force.

This Court reads Force and Gonzalez to stand for the proposition that the provision of neutral tools that could be

used for a discriminatory or illegal purpose is not *in and of itself* sufficient to abrogate Section 230 immunity. Thus, the use of neutral algorithms does not constitute content development. But that proposition does not preclude the NY AG's claims here. The NY AG's claims are, unlike those in Force and Gonzalez, not based on Message's mere provision or use of content-neutral tools in a neutral manner. Rather, the NY AG alleges that the Message Defendants actively and specifically aided Wohl and Burkman by identifying target zip codes for the robocall message. Combined with the allegations that the Message Defendants were aware of the intimidating contents and/or purpose of the robocall message, the allegation that the Message Defendants curated a list of target zip codes for Burkman and Wohl takes this case well outside the bounds of Force and Gonzalez.

By aiding Wohl and Burkman through the identification of predominantly Black zip codes to amplify the intimidating nature of the robocall message and thereby achieve the goal of voter suppression, as the NY AG has alleged, the Message Defendants' role "far exceeded that of neutral assistance." LeadClick, 838 F.3d at 176. Just as in Roommates, they themselves "generated the options" for the target zip codes based on discriminatory criteria. See Gonzalez, 2 F.4th at 896. In other words, by actively curating the zip codes to

further Wohl and Burkman's discriminatory and illegal purpose, the Message Defendants crossed the line from just "taking actions . . . to . . . display . . . actionable content" and instead have "responsibility for what makes the displayed content [itself] illegal or actionable." Force, 934 F.3d at 68 (quoting Kimzey v. Yelp! Inc., 836 F.3d 1263, 1269 n.4 (9th Cir. 2016)). By actively and knowingly aiding Wohl and Burkman in targeting Black recipients with the robocall message, the Message Defendants made the message more visible and usable,[8] materially contributed to the illegality of the alleged conduct, and exceeded the scope of a publisher.

Rather, this case is more analogous to Doe v. Mindgeek USA Incorporated, No. 21 Civ. 338 (C.D. Cal. Sept. 3, 2021), ECF No. 66. There, plaintiff Jane Doe brought suit against the defendants for allegedly violating federal sex-trafficking and child-pornography laws by "knowingly posting, enabling the posting of, and profiting from pornographic

---

[8] That Mahanian or Message did not necessarily aid Wohl and Burkman in creating the substance of the robocall message is immaterial. It is as yet possible that the substance of the message was discussed during the many communications between Burkman and Mahanian. Regardless, the Message Defendants nonetheless can be said to have developed the message at issue by making the message more visible to the Black voters they helped target and to whom the robocalls were sent. See Accusearch, 570 F.3d at 1198. And while Wohl and Burkman were the primary masterminds of the robocall campaign, this does not absolve the Message Defendants of liability. Section 230 does not protect those who are only partially responsible for development of the content at issue, as long as they did indeed help develop it. See id.

videos featuring persons under the age of 18." Id. at 2. The
defendants asserted a Section 230 defense, but the district
court rejected it, agreeing with the plaintiff that the
defendants acted as content creators. The district court
noted that the defendants were alleged to have "established
guidelines for categories, tags, and titles that Defendants
direct traffickers to create and promote child pornography to
target the 'right' fans," knew of illegal child pornography
on their platforms, and profited from the posting of such
content, along with curating video playlists with titles such
as "less than 18." Id. at 20. Here, too, the Message
Defendants' assistance in identifying the zip codes of
predominantly Black residents helped Wohl and Burkman target
their intended audience, and they both knew of and profited
from Wohl and Burkman's voter-suppression campaign. The
Message Defendants thereby facilitated "both the
dissemination" of the robocall message "*and* the development"
of the message. See id. at 20-21. As such, this conduct "goes
far beyond the neutral tools the Ninth Circuit" -- and Second
Circuit -- have "protected within the ambit of Section 230
immunity." See id. at 20.

The Message Defendants' argument that they are entitled
to immunity because "[l]ike many distribution platforms,
Message Communications allows its customers to select where

to send their messages" misses the point. See Message Defs. Supp. Br. at 3. If Message's liability were solely predicated on its provision of a tool or functionality by which users can specify the target recipients of robocalls, then there is little doubt that Message would be shielded. Under Force, a neutral tool provided in a neutral manner, even if it could be misused, would not turn Message into a content creator or more than a passive publisher. But the Complaint in Intervention does not simply allege that Message *allows* individuals to identify robocall recipients. It alleges that "Message Communications worked with Wohl and Burkman to target specific zip codes to maximize the threatening effects the robocall would have on Black voters in New York and other large metropolitan areas." Complaint in Intervention ¶ 87. Put differently, Message did not impartially provide a neutral tool that was then misused by third parties -- Message itself engaged in misuse that materially contributed to the illegality of the complained-of conduct.

In sum, the Message Defendants' entitlement to Section 230 immunity is not apparent from the face of the Complaint in Intervention. There are insufficient facts from which the Court can conclude that Message is a user or provider of an interactive computer service. Moreover, the allegations establish that the Message Defendants acted as much more than

neutral intermediaries as a result of their active efforts in helping Wohl and Burkman target Black residents' zip codes to further the campaign's voter-suppression goal. For these reasons, the NY AG's claims are not barred by Section 230 at this stage.

### IV.   ORDER

Accordingly, for the reasons stated above, the letter motion so deemed by the Court as filed by defendants Robert Mahanian and Message Communications, Inc. to dismiss the Complaint in Intervention of Letitia James, Attorney General of the State of New York on behalf of the People of the State of New York (Dkt. Nos. 126, 132) is hereby **DENIED**.

**SO ORDERED.**

Dated:   New York, New York
         17 September 2021

_____
            Victor Marrero
              U.S.D.J.