# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL COALITION ON
BLACK CIVIC PARTICIPATION,
MARY WINTER, GENE
STEINBERG, NANCY HART,
SARAH WOLFF, KAREN SLAVEN,
KATE KENNEDY, EDA DANIEL, and
ANDREA SFERES,

Civil Action No. 20-cv-08668-VM-OTW

                    Plaintiffs,

          -and-

People of the STATE OF NEW
YORK, by its attorney general,
LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF
NEW YORK

                    Plaintiff-Intervenor,

     v.

JACOB WOHL, JACK BURKMAN,
J.M. BURKMAN & ASSOCIATES,
LLC, PROJECT 1599, MESSAGE
COMMUNICATIONS, INC., and
ROBERT MAHANIAN,

                    Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**GERSTMAN SCHWARTZ, LLP**
Randy E. Kleinman, Esq.
David M. Schwartz, Esq.
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
(516) 880 – 8170

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES…………………………………………………………....iv-vii

PRELIMINARY STATEMENT………………………………………………………………1

STATEMENT OF FACTS……………………………………………………………….4

ARGUMENT…………………………………………………………………………...5

I.    LEGAL STANDARD……………………………………………………………..5

II.    PLAINTIFFS' LACK ARTICLE III STANDING………………………………..6

      1.  The Individual Plaintiffs have not shown injuries resulting from the Robocall…..6

      2.  The NCBCP lacks standing……………………………………………………8

III.    THE DEFENDANTS' CONDUCT DID NOT VIOLATE 42 U.S.C. § 1985(3)………...8

      1.  There is no evidence of "racial animus"……………………………………….9

      2.  The Individual Plaintiffs' Lack Standing under the KKK Act…………………..10

IV.    DEFENDANTS' CONDUCT DID NOT VIOLATE SECTION 11(B) OF THE VOTING RIGHTS ACT……………………………………………………………………13

      1.  The Robocall is unequivocally protected speech………………………………..15

      2.  The Robocall does not fall into any category of unprotected speech……………19

      3.  The Robocall was not intimidating, threatening, or coercive to voters………….24

          a.  The Individual Plaintiffs……………………………………………….29

          b.  The NCBCP……………………………………………………….33

V.    DEFENDANTS DID NOT VIOLATE SECTION 131(B) OF THE CIVIL RIGHTS ACT OF 1957………………………………………………………………………34

VI.    DEFENDANTS DID NOT VIOLATE SECTION 40-C AND 40-D OF NEW YORK CIVIL RIGHTS LAW…………………………………………………………...34

VII.    DEFENDANTS DID NOT VIOLATE SECTION 9 OF NY CIVIL RIGHTS LAW…...34

VIII.    DEFENDANTS DID NOT VIOLATE SECTION 63(12) OF THE NY EXECUTIVE

LAW……………………………………………………………………………...34

CONCLUSION…………………………………………………………………………35

**Table of Authorities**

**Cases**

*Afl-CIO v. Scott*,
  463 U.S. 825 (1983) ................................................................................................ 12

*Am. Fed'n of State, Cty. & Mun. Employees, Council*
  25 v. Land, 583 F. Supp. 2d 840 (E.D. Mich. 2008) ........................................ 13

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................. 6

*Ariz. Democratic Party v. Ariz. Republican Party*,
  2016 U.S. Dist. LEXIS 154086 (D. Ariz. 2016) ............................................... 28

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
  564 U.S. 721 (2011) .................................................................................................. 1

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) .................................................................................................. 3

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ....................................................................................... 9, 10, 12

*Bretz v. Kelman*,
  773 F.3d 1026 (9th Cir. 1985) ........................................................................... 9-10

*Brooks v. Nacrelli*,
  331 F. Supp. 1350 (E.D. Pa. 1971) ..................................................................... 26

*Buschi v. Kirven*,
  775 F.2d 1240 (4th Cir. 1985) ......................................................................... 10-11

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .............................................................................................. 6, 8

*Disabled in Action of Penn. v. Se. Penn. Trans Auth.*,
  539 F.3d 199 (3d Cir. 2008) ................................................................................ 25

*Eichenblaub v. Twp. of Indiana*,
  385 F.3d 274--83 (3d Cir. 2004) ......................................................................... 17

*Farber v. City of Paterson*,
  440 F.3d 131 (3d Cir. 2006) ................................................................................ 10

*Gremillion v. Rinaudo*,
  325 F. Supp. 375 (E.D. La. 1971) .................................................................. 14-15

*Greenbelt Coop. Publishing Assn. v. Bresler*,

  398 U.S. 6, 14 (1970) ...................................................................................... 15, 19

*Grimes v. Smith*,

776 F.2d 1359 (7th Cir. 1985) ................................................................................ 10, 13

*Guilford Transportation Industries, Inc. v. Wilner,*
760 A.2d 580 (D.C. 2000) ................................................................................ 16

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,*
515 U.S. 557 (1995) ................................................................................ 22

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.,*
538 U.S. 600 (2003) ................................................................................ 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
572 U.S. 118 (2014) ................................................................................ 6

*Mahoney Area Sch. Dist. V. B.L.,*
141 S. Ct. 2038 (2021) ................................................................................ 18

*Matal, v. Tam,*
137 S. Ct. 1744, 1764-65 (2017) ................................................................................ 21, 22

*McIntyre v. Ohio Elections Comm'n,*
514 U.S. 334 (1995) ................................................................................ 17, 18

*N.Y. Times Co. v. Sullivan,*
376 U. S. 254 (1964) ................................................................................ 3, 15, 16

*Nat'l Review, Inc. v. Mann,*
140 S. Ct. 344 (2019) ................................................................................ 15, 16, 17, 23

*Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199 v. Blackwell,*
467 F.3d 999 (6th Cir. 2006) ................................................................................ 8

*Olagues v. Russoniello,*
770 F.2d 791 (9th Cir. 1985) ................................................................................ 13

*Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin,*
418 U.S. 264 (1973) ................................................................................ 15, 19

*Packingham v. North Carolina,*
137 S. Ct. 1730 (2017) ................................................................................ 19

*Parson v. Alcorn,*
157 F. Supp. 3d 479 (E.D. Va. 2016) ................................................................................ 14

*Paynes v. Lee,*
377 F.2d 61 (5th Cir. 1967) ................................................................................ 14, 26

*Pincham v. Il. Judicial Inquiry Bd.,*
681 F. Supp. 1309 (N.D. Ill. 1988) ................................................................................ 15

*Rickert v. State Pub. Disclosure Comm'n,*
119 P.3d 379 (Wash. 2005) ................................................................................ 4, 5

*Schenck v. U.S.,*

249 U.S. 47 (1919) ................................................................................................................ 20

*Shelby County v. Holder*,
570 U.S. 529 (2013) ........................................................................................................... 32

*Simmons v. Poe*,
47 F.3d 1370 (4th Cir. 1995) ............................................................................................. 10

*Snyder v. Phelps*,
131 S. Ct. 1207 (2011) ............................................................................................... 7, 8, 22

*Tinker v. Des Moines Independent Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ........................................................................................................... 20

*U.S. v. Stewart*,
411 F.3d 825 (7th Cir. 2005) ............................................................................................. 24

*United States by Katzenbach v. Original Knights of the Ku Klux Klan*,
250 F. Supp. 330 (E.D. La. 1965) ..................................................................................... 14

*United States v. Alvarez*,
567 U.S. 709 (2012) ...................................................................... 20-21, 21, 22, 23, 24

*United States v. Beaty*,
288 F.2d 653 (6th Cir. 1961) ....................................................................................... 14, 26

*United States v. Brown*,
494 F. Supp. 2d 440 (S.D. Miss. 2007) ....................................................................... 13, 15

*United States v. Bruce*,
353 F.2d 474 (5th Cir. 1965) ....................................................................................... 14, 26

*United States v. Carrier*,
672 F. 2d 300 (2d Cir. 1982) ............................................................................................. 24

*United States v. Clark*,
249 F. Supp. 720 (S.D. Ala. 1965) ........................................................................... 14, 26, 32

*United States v. Edwards*,
333 F.2d 575 (5th Cir. 1964) ............................................................................................. 26

*United States v. Harvey*,
250 F. Supp. 219 (E.D. La.1966) ...................................................................................... 14

*United States v. McLeod*,
385 F.2d 734 (5th Cir. 1967) ....................................................................................... 14, 26

*United States v. Nguyen*,
673 F.3d 1259 (9th Cir. 2012) ............................................................................. 27, 32, 33, 34

*United States v. Turner*,
720 F.3d 411 (2d. Cir. 2013) ............................................................................................. 25

*United States v. Wood*,

295 F.2d 772 (5th Cir. 1961) ................................................................. 14, 26, 32

*Warth v. Seldin,*
   422 U.S. 490 (1975) ................................................................. 6

*Watts v. United States*,
   394 U.S. 705 (1969) ................................................................. 24

*Weinstock v. Columbia Univ.*,
   224 F.3d 33 (2d Cir. 2000) ................................................................. 6

*Ying Jing Gan v. City of N.Y.*,
   996 F.2d 522 (2d Cir. 1993) ................................................................. 6

**Other Authorities**

Civil Rights Act of 1957 ................................................................. 14, 34

Voting Rights Act ................................................................. 13

42 U.S.C. § 1973i ................................................................. 7

42 U.S.C. § 1985 ................................................................. 7, 8, 10, 11, 12

52 U.S.C.A. § 10101 ................................................................. 34

Defendants, Jacob Wohl ("Wohl"), Jack Burkman ("Burkman"), J.M. Burkman & Associates, LLC, and Project 1599 (collectively, "Defendants"), by and through their attorneys, Gerstman Schwartz LLP, submit this Memorandum of Law in Support of their Motion for Summary Judgment seeking to dismiss the 1) Amended Complaint filed by Plaintiffs National Coalition on Black Civic Participation ("NCBCP"), and Mary Winter ("Winter"), Gene Steinberg ("Steinberg"), Nancy Hart ("Hart"), Sarah Wolff ("Wolff"), Karen Slaven ("Slaven"), Kate Kennedy ("Kennedy"), Eda Daniel ("Daniel"), and Andrea Sferes ("Sferes") (collectively, the "Individual Plaintiffs"), and, 2) Intervenor Complaint ("AG's Complaint") (collectively "Complaint" or "Compl.") filed by Plaintiff-Intervenor People of the State of New York, by its Attorney General, Letitia James, Attorney General of the State of New York ("AG") (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

This case is about the attempted suppression of a constitutional right; not the right to vote, but rather, the right to free speech. The "First Amendment embodies our choice as a Nation that, when it comes to [political] speech, the guiding principle is freedom--the unfettered interchange of ideas." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011) (citations omitted). Despite this command, Plaintiffs have regrettably made it necessary to say that which should go without saying: court orders that punish and restrict political speech are contrary to the public interest, impose substantial costs on the electorate, and are appropriate (if ever) only in the most dramatic of circumstances. While there can be no doubt important milestones have been achieved through the efforts of civil rights groups litigating to draw attention to societal evils, the allegations made in *this* Complaint and the testimony of *these* Plaintiffs articulate no violation of the law. Instead, this lawsuit is predicated on vague innuendo, rank

speculation, and a heavy dose of rhetoric—all geared solely toward stifling disfavored political opinions rather than preventing actual misconduct.

The Court should not permit Plaintiffs to enlist it in this political crusade where, as here, Plaintiffs have offered no allegations and presented no evidence of any actual voter intimidation. That is particularly true where, as here, Plaintiffs are asking the Court to take sides on a hotly debated policy issue. Specifically, Plaintiffs are critical of those concerned with mail-in voting and those who believe it is "safer" to vote in person. In one form or another, these policy debates are long-running and legitimate ones. Defendants respectfully submit that whether those views are right or wrong is a political question that is not for the judiciary to decide. Indeed, a pervasive element of this lawsuit is Plaintiffs' attempt to use this Court as a forum for contesting the merits of public policy questions relating to mail-in voting, and to wield monetary (and in other cases, criminal) sanctions against these Defendants as a means of advancing their political position. Courts should be highly reluctant to silence the debate without concrete and compelling evidence that doing so is necessary. Here, no such evidence exists.

Given the serious nature of Plaintiffs' allegations—that Defendants actively sought to deny citizens their fundamental right to vote—one would expect firm evidence supporting such allegations. But that evidence is nowhere to be found. Instead, what exists is a hodgepodge of antics from two muckrakers, Defendants Burkman and Wohl, who routinely use political satire as part of their shtick to gain notoriety and encourage provocative political discourse. Indeed, the record undoubtedly reflects that Defendants are (perhaps incorrigible) goofballs and political hucksters with an irreverent sense of humor, very much like radio shock jocks of another era. Although Plaintiffs attempt to paint them as racists who sought to suppress votes, the speech at issue here is facially neutral and does not tell people not to vote. It merely illustrates the pitfalls of

mail-in voting, which, true or not, is protected opinion. *See N.Y. Times Co. v. Sullivan,* 376 U. S. 254 (1964). Plaintiffs attempt to overcome their dearth of evidence and lack of any actionable injuries by relying on an entirely academic theory supported by two so-called "expert reports" that conflate opinion with fact, and hurtful or offensive, albeit protected, speech with unprotected speech. Their entire case is predicated on an entirely academic theory that imputes a malicious intent to Defendants' alleged conduct. Yet, despite Plaintiffs' legal legerdemain, they simply cannot fit a square peg into a round hole. Their claims that a short and admittedly ineffective Robocall was aimed at suppressing, or that it could have suppressed, voting are absurd and belied by the record.

"Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about the clearer perception and livelier impression of truth, produced by its collision with error." *Sullivan,* 376 U. S. at 279, n.19. While this rationale is perhaps best known, it is not the only reason for protecting speech, irrespective of its truth. Limitations on speech based on the perception of truth also impinges on the First Amendment's role in promoting autonomy, and specifically, the right to be "master of the identity one creates in the world." Laurence H. Tribe, American Constitutional Law 887-88 (1978). The right to autonomy is not protected for instrumental reasons; rather, the "freedom to speak one's mind is … an aspect of individual liberty - and thus a good in itself." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503-04 (1984). To err and exaggerate in heated discussions, to define oneself to the world, to smooth over social situations, and to play devil's advocate are all part of who we are. Limiting speech based on what is perceived as "truth" is a dangerous and slippery slope. It is not inconceivable to imagine a society that viewed the potential danger of strangers meeting over the Internet as significant

enough to permit civil liability for factual lies or exaggerations in dating profiles[1] or that viewed the integrity of elections to require truth-telling at all moments by all candidates for election.[2] In other words, the prospect of such laws if Plaintiffs prevail is not as remote as it might seem. Many ideas now considered true were once considered false, even heretical, and currently held truths can only evolve where there is "a standing invitation to the whole world to prove them unfounded," including by making statements that most people at the time believe to be false.[3] For this reason, it is important that the barriers to entry into the marketplace of ideas be kept low, and not turn on the perceived falsity—or even knowing or suspected falsity—of the statement.

## <u>STATEMENT OF FACTS</u>

On August 26, 2020, several months before the November 2020 presidential election (the "Election"), a robocall (the "Robocall") was distributed *randomly* to residents of New York, Ohio, and Michigan stating:

> Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail.

Plaintiffs' claims are predicated entirely on this single innocuous call. While the Individual Plaintiffs, each of whom are White, claim to have received the Robocall either directly or

---

[1] *See, e.g.*, *Cybersecurity: Protecting America's New Frontier: Hearing Before Subcomm. on Crime, Terrorism, and National Security* 7 (2011) (statement of Richard W. Downing, Dep't of Justice) (arguing that violation of website's terms of service should continue to be a crime

[2] *See Rickert v. State Pub. Disclosure Comm'n*, 119 P.3d 379, 387 (Wash. 2005) (*en banc*) (striking down a statute that prohibited knowingly false statements by candidates for office).

[3] John Stuart Mill, On Liberty 21 (Bantam Classic ed. 1993)) (1859); *see also* Thomas Cooper, A Treatise on the Law of Libel and the Liberty of the Press; Showing the Origin, Use and Abuse of the Law of Libel 6 (1830) ("[D]iscussion of any opinion, generally brings out many important truths collaterally which would never have been known or attended to if the discussed fallacy had not been advanced.").

indirectly, and make sundry claims about how the Robocall invoked a visceral reaction, each admit that they did not believe the call was intimidating, threatening, or coercive, that it did not deter them from voting in the Election, that they have not spoken to anyone in the Black community who received or was intimidated by the robocall call, and that their claims are speculative.[4] The NCBCP concedes that nobody within its organization, nor any of its members, received the call, and that nobody within its leadership spoke to or heard about any person who claims they were deterred from voting as a result of the Robocall (Ex I at 93:6-13), and that the Robocall had nothing to do with fewer people completing the Census, but rather, the reduced Census numbers were due to the pandemic and because "Black people have a distrust for the census already…" *Id.* at 99:8-100:12. The NCBCP further admits that its diversion of resources was negligible at best, amounting to approximately $160. *Id.* at 85:12-15. Thus, although Plaintiffs claims are entirely speculative and they cannot articulate a causally related or actionable injury, they continue to pursue these claims.

## **ARGUMENT**

### I.   **Legal Standard.**

A party is entitled to summary judgment when there are no genuine issues of material fact and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P.

---

[4] *See* (Ex. A at 22:4-25:1; 12:24-13:7; 28:19-22; 45:15-47:3; 53:19-54:3); (Ex. B at 15:21-24; 50-52; 54:25-55:12; 59:1-7); (Ex. C at 21:2-7); (Ex. D at 11:2-10; 25:11-13; 24:22-25:10; 46:15-20; 38:3-13; 80:10-13); (Ex. E at 27:7-9; 37:16-21, 43:18-24, 47:3-8; 35:22-36:3, 68:4-69:7; 83:24-84:10; 13:1-8); (Ex. F at 12:15-19; 30:23-31:6; 40:4-6; 55:23-56:10); (E. G at 16:15-18; 53:1-2; 43:6-11; 42:7-18; 86:12-15); (Ex. H at 14:24-15:4; 42:9-14; 45:17-19; 37:9-38:12, 40:7-11; 48:14-23).

56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party meets

its initial burden of demonstrating the absence of any genuine issue of material fact, the non-

moving party must set forth specific facts showing that there is a genuine issue for trial.

*Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). The opposing party must provide

evidence in admissible form and "may not rely simply on conclusory statements or on contentions

that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of N.Y.*, 996 F.2d

522, 532 (2d Cir. 1993). Moreover, the non-movant must offer "concrete evidence from which a

reasonable juror could return a verdict in [her] favor." *Liberty Lobby, Inc.*, 477 U.S. at 256.

## II. Plaintiffs' Lack Article III Standing.

To establish standing, a plaintiff must demonstrate that it has "suffered or [is] imminently

threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the

challenged action of the defendant and likely to be redressed by a favorable judicial

decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 125

(2014) (citation omitted). Faithful adherence to those requirements is essential to maintaining "the

proper-and properly limited-role of the courts in a democratic society," *Warth v. Seldin,* 422 U.S.

490, 498 (1975), and "prevent[ing] the judicial process from being used to usurp the powers of the

political branches," *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013).

### 1. The Individual Plaintiffs have not shown injuries resulting from the Robocall.

The relevant facts illustrate just how frivolous this case is. There is no evidence—none—that

Plaintiffs' imagined harms came to pass. Plaintiffs' original request for emergency relief rested

upon an alleged "assault on the right to vote in the Election through lies and disinformation,

resulting in intimidation of legally registered voters…These voters may not vote at all." Docket

No. 13. While Plaintiffs may have arguably had standing to seek a Temporary Restraining Order

("TRO") to prevent any additional robocalls it speculated could affect voting, the TRO issued by this Court alleviated any prospective harm leaving no redressable injury.

The Individual articulate no personal injuries and otherwise speculate as to prospective harm to others. Plaintiffs Winter, Hart, Wolff, Slaven, Kennedy, Daniel, and Sferes, each concede that they were entirely undeterred by the Robocall, voted in the Election, and sustained no articulable injuries;[5] however, they claim to be bringing this lawsuit on behalf of Black voters whom they speculate, albeit without even a scintilla of evidence, *could have* been affected by the call. Plaintiff Steinberg, who did not actually receive the call, but rather heard it only after Plaintiff Winter, his then live-in romantic partner, played it for him, likewise concedes that he voted in the Election but claims that the call triggered a deep-seated anxiety with law enforcement.[6] The Acts upon which Plaintiffs' claims are predicated, however, do not shield against protected speech that may otherwise offend someone's delicate sensibilities; rather, they were enacted to prevent voter suppression. The Robocall unequivocally did not intimidate, threaten, or coerce any of the Individual Plaintiffs as it relates to the act of voting.

While section 11(b) and the KKK Act each proscribe voter suppression by intimidation, threats, or coercion,[7] neither Act proscribes political speech that merely offends, even if it causes a severe visceral response. *See, e.g.*, *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (First Amendment protects "even hurtful speech on public issues to ensure that we do not stifle public debate"). Thus, by their own testimony, Plaintiffs fail to establish a concrete and particularized injury in fact that is fairly traceable to Defendants' alleged conduct.

Accordingly, the Individual Plaintiffs' claims should be dismissed in their entirety.

**2. The NCBCP lacks standing.**

---

[5] *See*, *infra*, note 4.
[6] Ex. C at 21:2-7.
[7] *See* 42 U.S.C. § 1973i(b) and 157.42 U.S.C. § 1985(3), respectively.

The Court's prior ruling that the NCBCP "demonstrated that the injury alleged - - the diversion of resources – stems directly from Defendants' robocalls", and that it therefore has standing to request a TRO, is no longer relevant. Docket No. 38. The Court enjoined Defendants from disseminating any further calls. *Id*. Thus, although Tameka Brown, the head of NCBCP's Michigan Coalition (the "Coalition"), testified that it sustained de minimis pecuniary damages of approximately $160 as a result of the Robocall,[8] this is insufficient to establish a claim under either section 11(b) and the KKK Act. Indeed, NCBCP's concedes that neither it, nor any of its members, received the Robocall. NCBP's damages are self-inflicted and do not provide standing. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 416 (2013). When a plaintiff takes voluntary action because of their misguided view about prospective harm, any "ongoing injuries that [they] are suffering" as a result of that action "are not fairly traceable to" the defendant's conduct itself. *Id*. The injury asserted by NCBCP is self-inflicted in exactly that way and it does not have standing to complain that it was injured by that voluntary decision. *See Clapper*, 568 U.S. at 416. Moreover, NCBCP cannot assert standing on behalf of the community it serves. *See, e.g., Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1013 (6th Cir. 2006) ("standing on behalf of the group served by the organization" would be "a form of representational standing never recognized by any court.").

## III.    The Defendants' Conduct Did Not Violate 42 U.S.C. § 1985(3)

In cases alleging conspiracy by private actors, the Supreme Court carved out a narrow ambit of private conspiracies actionable under Section 1985(3). Specifically, the Court explained that "to

---

[8] Ex. I at 85:12-15.

prove a private conspiracy in violation of the first clause of § 1985(3), a plaintiff must show, *inter alia,* (1) that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action,' and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993). Neither element is satisfied here.

### 1. There is no evidence of "racial animus"

Section 1985(3) consists, in relevant part, of two distinct provisions. The first makes actionable any conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" (the "*Equal Privileges Clause*"). The second provides a cause of action for any conspiracy "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election … or to injure any citizen in person or property on account of such support or advocacy" (the "*Support and Advocacy Clause*"). Despite the Plaintiffs' efforts to conflate them, the distinction is material.

Courts have held consistently that private conspiracies predicated on political or partisan rationales are not actionable under Section 1985(3). *See, e.g., Bretz v. Kelman*, 773 F.3d 1026, 1028 (9th Cir. 1985) (dismissing Section 1985(3) conspiracy claim, explaining that "[e]ven construing [the] complaint liberally, we cannot find an allegation of racial or class-based discrimination. [The plaintiff], therefore, cannot state a cause of action under the first clause of § 1985(3).").[9]

---

[9] *See also Farber v. City of Paterson*, 440 F.3d 131, 142 (3d Cir. 2006) ("Allowing § 1985(3) to reach politically motivated conspiracies would involve the federal courts in policing the political arena in ways that the drafters of § 1985(3) could not have intended."); *Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir. 1985) ("[W]e join the conclusion of the Fourth Circuit . . . that § 1985(3) does not reach nonracial political conspiracies.").

The Supreme Court has interpreted these provisions of § 1985 narrowly, and has held that a plaintiff must establish as an element of the cause of action that the conspirators were motivated by a purpose to discriminate against a recognized class of persons. *Bray*, 506 U.S. at 268-272. This "discriminatory purpose" for purposes of § 1985, "**implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group**." *Id.* at 271-72 (emphasis added). This discriminatory intent must be shared by all of the conspirators, and "willful blindness" to the discriminatory intent of others is insufficient to establish a claim under § 1985. *See Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995). Thus, to establish a claim under the provisions of § 1985 at issue in the present case, Plaintiffs must allege that all of the conspirators were motivated by a purpose to discriminate against a recognized class of persons of which Plaintiffs themselves were members.

## 2.  The Individual Plaintiffs' Lack Standing under the KKK Act.

Plaintiffs contend that they have alleged race discrimination as White plaintiffs. However, the § 1985 claims based on this contention fails for two reasons. First, the Supreme Court has articulated its intent to limit the protections of § 1985 to discrimination against "'those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan *violence*.'" *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985) (quoting omitted (emphasis added); *see also Cloaninger v. McDevitt*, 2006 U.S. Dist. LEXIS 65913 (W.D.N.C. 2006) ("the only class of persons protected by Section 1985(3) are African Americans." (internal quotations omitted); *Stock v. Universal Foods Corp.,* 817 F. Supp. 1300, 1310 (D. Md. 1993) (dismissing § 1985(3) claim because plaintiff, as a white male, was not a member of a class that has suffered historically pervasive

discrimination); *Blackmon v. Perez*, 791 F. Supp. 1086, 1093 (E.D. Va. 1992) (dismissing § 1985(3) claims by white plaintiffs because "plaintiffs do not represent a class of persons who [do] not enjoy the possibility of [ ]effective state enforcement of their rights" (internal quotations omitted)). This alone vitiates the Individual Plaintiffs' KKK Act claim.

Second, even if the Court decided to extend § 1985 to additional classes of persons, including "White plaintiffs" as a class, Plaintiffs here have not sufficiently alleged facts in support of such a claim.  Crucially, Plaintiffs have adduced no statement, representation, or conduct by Defendants that plausibly evinces the "invidious racial animus" required under *Bray*. Indeed, while Plaintiffs have cherry-picked certain records demonstrating that Defendants referenced the Black community, the record is entirely devoid of any overt racial animus or pejoratives. Indeed, even assuming, *arguendo*, that the Robocall targeted the Black community, merely targeting these individuals to raise awareness of a politically charged issue that has a potentially disparate impact on their community does not demonstrate a racial animus. In fact, just the opposite, as the NCBCP itself has targeted the Black community by using its own Robocalls to disseminate messages related to voting.[10] Simply stated, a so-called "racial motivation" does not automatically amount to racial animus, as there are myriad benevolent justifications for targeting a particular demographic, and indeed doing so is inherent in political outreach like the Robocall. Moreover, while the main thrust of Plaintiffs' Complaint regarding the substance of the robocall *speculates* that it targets the Black community (Docket No. 149 Am. Compl. at ¶¶ 55-57), their arguments, at best, demonstrate that the Robocall targeted a particular socio-economic, rather than racial, demographic. Plaintiff Hart concedes this point. *See* Ex. G at 46:16-47:15. For example, poor people of all races will likely have negative feelings toward the police and bad experiences with

---

[10] https://www.ncbcp.org/news/releases/galvanize_over_150000_bw_vote/index.html; https://www.ncbcp.org/news/releases/coalition_of_black_women_leaders_ga_vote/index.html

creditors. *Id.* at ¶¶ 55-56. Similarly, the government targeted people from lower socio-economic backgrounds of all ethnicities during the Cold War-era MK-Ultra mind control experiments. *Id.* at ¶ 57.[11] Thus, although Plaintiffs allege that the "the totality of the circumstances and in the context of the historical inequities they connote, the language and content of the robocall was designed to resonate with Black voter", this is an exiguous, speculative, and biased interpretation lacking any factual support. There is simply no basis to impute a racial animus to any of these Defendants or to prove that Defendants sent the Robocall "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray*, 506 U.S. at 271-272.[12]

This lawsuit encapsulates precisely the type of dispute federal courts have long eschewed as political warfare through judicial means. Expressing skepticism of the notion that Section 1985(3) can be utilized as broadly as Plaintiffs suggest, the Supreme Court cautioned that such a proposition "would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume. If [this] submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings." *Afl-CIO v. Scott*, 463 U.S. 825, 836 (1983). Mindful that "§ 1985(3) is not to be construed as a general federal tort law," *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992), courts have consistently turned a jaundiced eye toward quintessentially political disputes between private parties cloaked in the lexicon of civil rights. *See Grimes*, 776 F.2d at 1366 (holding that alleged private conspiracy to mislead voters by running a "sham" candidate was not actionable

---

[11] https://www.history.com/topics/us-government/history-of-mk-ultra ("MK-Ultra was a top-secret CIA project in which the agency conducted hundreds of clandestine experiments—sometimes on unwitting U.S. citizens—to assess the potential use of LSD and other drugs for mind control, information gathering and psychological torture.")
[12] Moreover, the Individual Plaintiffs all identify as White Democrats.

under Section 1985(3), reasoning that "this case presents a far greater danger that, in the words of *Scott*, § 1985(3) would provide 'a remedy for every concerted effort by one political group to nullify the influence of or do injury to a competing group by use of otherwise unlawful means'").

In sum, because Plaintiffs have offered no evidence whatsoever that Defendants engaged in a conspiracy born of racial animus, they cannot undergird a Section 1985(3) claim against private persons such as the Defendants. Accordingly, Plaintiffs' claim under the Ku Klux Klan Act fails as a matter of law.

## IV.   Defendants' Conduct Did Not Violate Section 11(b) of the Voting Rights Act.

Plaintiff's VRA claim fares no better. To prevail under Section 11(b) of the Voting Rights Act of 1965, a plaintiff must prove "(1) that there was an intimidation, threat or coercion, or an attempt to intimidate, threaten or coerce and (2) that the intimidation or attempt was for the purpose of interfering with the right to vote." *Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land*, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008); *see Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985) ("[T]he organizations' claims under the Voting Rights Act against these officials do not appear to have merit. Assuming that the search of voting records intimidated bilingual voters, such intimidation would satisfy only one part of a two-pronged test for violations of [Section 11(b)]: the voters and organizations were intimidated, but the officials did not *intend* to intimidate."). Claims under this provision are exceedingly difficult to establish. *See United States v. Brown*, 494 F. Supp. 2d 440, 477 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009) (noting that the court itself "has found no case in which plaintiffs have prevailed under this section"); *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498-99 (E.D. Va. 2016) (finding no likelihood of success on the merits).

In fact, there has never been a successful civil section 11(b) lawsuit[13] and the case law on federal civil voter intimidation is sparse, consisting of only approximately two dozen published decisions. Only eight of the cases resulted in a court upholding at least one of the plaintiff's claims.[14] Significantly, only *one* of these cases involved a KKK Act claim[15] (the remaining cases involved claims under section 131(b) of the Civil Rights Act of 1957 ("section 131(b)"); however, *none* have ever involved a Section 11(b) claim. The sole case involving a successful KKK Act claim, *Paynes v. Lee*, 377 F.2d 61, 63 (5th Cir. 1967), involved egregiously overt acts and threats of physical violent that are starkly different facts than the instant matter; namely, the defendant and other white men "assailed appellant in the nighttime and threatened to destroy or to annihilate appellant, his possessions and his family should he again attempt to become a registered voter."

The extant cases do, however, provide guidance as to what does *not* constitute threats, intimidation, or coercion under Section 11(b) (a necessary element to establish Defendant's culpability in the instant matter). *See United States v. Harvey*, 250 F. Supp. 219, 231-7 (E.D. La.1966) (firing black tenant-farmers because they had registered to vote, evicting them from rental homes, and discharging them from salaried jobs was not intimidation under Section 11(b), but was instead the termination of a business relationship); *Gremillion v. Rinaudo*, 325 F. Supp. 375, 376-78 (E.D. La. 1971) (dismissing claim of intimidation based on assistance from a uniformed officer, holding that the officer's presence, without more, did not establish a violation);

---

[13] There are, however, unreported cases (albeit with no precedential value) where plaintiffs have brought section 11(b) claims that have led to successful outcomes such as emergency injunctive relief and favorable consent decrees. *See, e.g., Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 2:81-cv- 03876-DRD-SDW (D.N.J. filed Feb. 11, 1982).

[14] *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967); *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967); *United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965); *United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961); *United States v. Wood*, 295 F.2d 772 (5th Cir. 1961); *United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965); *United States by Katzenbach v. Original Knights of the Ku Klux Klan*, 250 F. Supp. 330 (E.D. La. 1965); *United States v. Deal*, 6 Race Rel. L. Rep. 474 (W.D. La. 1961).

[15] *See Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967).

*Pincham v. Il. Judicial Inquiry Bd.*, 681 F. Supp. 1309, 1312-17 (N.D. Ill. 1988) (refusing to allow plaintiff to amend his complaint to include a claim under Section 11(b) alleging the defendants brought a retaliatory disciplinary action, finding in part an absence of intent); *United States v. Brown*, 494 F. Supp. 2d 440, 472 (S.D. Miss. 2007) (Section 11(b) was not violated by a public official who threatened to arrest voters, as the threat may have been based on a mistaken application of state law; nor by a published threat to challenge particular voters).

### 1.   The Robocall is unequivocally protected speech.

Speakers who engage in protected expression on matters of public controversy often use vigorous language and rhetorical hyperbole to make their point. They do not hew to strict literalism but regularly use words "in a loose, figurative sense" to express "strong disagreement," *Old Dominion Branch No. 496, Nat'l Assoc. of Letter Carriers v. Austin,* 418 U.S. 264, 284 (1973), and attack their intellectual opponents through "rhetorical hyperbole" or "vigorous epithets." *Greenbelt Coop. Publ'g,* 398 U.S. at 14. Such vigorous expression is an inherent feature of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks." *Sullivan,* 376 U. S. at 270. "The constitutional guarantee of freedom of expression serves many purposes, but its most important role is protection of robust and uninhibited debate on important political and social issues … If citizens cannot speak freely and without fear about the most important issues of the day, real self-government is not possible." *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 346-347 (2019).

If courts did not provide strong protection for caustic criticism in public debate, the threat of litigation would cast a "pall of fear and timidity... upon those who would give voice to public criticism," thus creating "an atmosphere in which the First Amendment freedoms cannot survive." *Sullivan,* 376 U.S. at 278.  "To ensure that our democracy is preserved and is permitted

to flourish, this Court must closely scrutinize any restrictions on the statements that can be made on important public policy issues. Otherwise, such restrictions can easily be used to silence the expression of unpopular views." *Nat'l Review, Inc.*, 140 S. Ct. at 346-347. The realm of public debate is full of caustic rhetorical hyperbole. For example, Pulitzer Prize-winning columnist Charles Krauthammer penned a column in the *Washington Post* asserting that "intelligent design may be interesting as theology, but as science it is a fraud."[16] New York Times columnist Thomas Friedman asserted that "the climate-denier community, funded by big oil, has published all sorts of bogus science for years."[17] In the heat of public debate, such rhetorical hyperbole is fully protected under the First Amendment. Indeed, if authors and publishers could be sued every time they used figurative language about "fraudulent" methodology, "bogus" science, or misleading statistics on matters of public controversy, the scope of free speech in our national discourse would be dramatically curtailed. "[A]uthors of every sort would be forced to provide only dry, colorless descriptions of facts, bereft of analysis or insight. There would be little difference between the editorial page and the front page, between commentary and reporting, and the robust debate among people with different viewpoints that is a vital part of our democracy would surely be hampered." *Guilford Transportation Industries, Inc. v. Wilner*, 760 A.2d 580, 599 (D.C. 2000) (quoting *Partington v. Bugliosi,* 56 F.3d 1147, 1154 (9th Cir. 1995)).

The Supreme Court has made clear that the First Amendment provides broad leeway for rhetorical hyperbole on matters of public controversy. "The protection of even speech as trivial as a naughty trademark for jeans can serve an important purpose: It can demonstrate that this Court is deadly serious about protecting freedom of speech … [and] serve[s] as a promise that we will

---

[16] Charles Krauthammer, "Phony Theory, False Conflict," *The Washington Post* (Nov. 18, 2005), http://www.washingtonpost.com/wp-dyn/content/article/2005/11/17/AR2005111701304.html.
[17] Thomas L. Friedman, "Going Cheney on Climate," New York Times (Dec. 8, 2009), http://ww.nytimes.com/2009/12/09/opinion/09friedman.html.

be vigilant when the freedom of speech and the press are most seriously implicated, that is, in cases involving disfavored speech on important political or social issues." *Nat'l Review, Inc.*, 140 S. Ct. 347-348.

This is just such a case. Mail-in voting has staked a place at the very center of this Nation's political discourse. Politicians, journalists, academics, and ordinary Americans discuss and debate various aspects of mail-in voting daily—its causes, consequences, and the appropriate policies for addressing it. The core purpose of the constitutional protection of freedom of expression is to ensure that all opinions on such issues have a chance to be heard and considered. *See id.* at 347-348.  Plaintiffs here fail to clear even the first hurdle and their claims are novel in accepting the nebulous harm that this case presents. Their various allegations of "intimidation" are nothing more than legitimate exercises of free speech. There is a clear the distinction between speech that is wholly unprotected by the First Amendment and protected speech that may be subject to government regulation in some circumstances. The Supreme Court has recognized only a few "narrow categories" of unprotected speech, including obscenity, fighting words, incitement, and defamation. *e.g.*, *Eichenblaub v. Twp. of Indiana*, 385 F.3d 274, 282--83 (3d Cir. 2004). Other than these categories, "all speech is protected by the First Amendment." *Id*. at 282-83.

The speech in which Defendants were allegedly engaged—disseminating a Robocall in the advocacy of a politically controversial viewpoint—is the essence of First Amendment expression. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). That this advocacy occurred in the months leading up to a controversial presidential election only strengthens the protection afforded to Defendants expression: "Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed." *McIntyre*, 514 U.S. at 347. No form of speech is entitled to greater constitutional

protection than Defendants'. And although "[i]t might be tempting to dismiss [the Robocall] as unworthy of the robust First Amendment protections discussed herein [] sometimes it is necessary to protect the superfluous in order to preserve the necessary. *Mahoney Area Sch. Dist. V. B.L.*, 141 S. Ct. 2038, 2048 (2021) "We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated." *Id.* (internal quotations omitted). Indeed, it is hard to imagine a court ruling more inimical to the public interest than one aimed at chilling a citizen's political speech. Plaintiff's sweeping request for relief thus runs roughshod over the First Amendment. As explained *infra*, the supposed legal violations are based on pure speculation. The Robocall is clearly political speech protected by the First Amendment. It offers opinions on a highly charged issue—mail-in voting—and expressed views that this method of voting has some considerable pitfalls. Plaintiffs' suggestion that Defendants seek to suppress voter participation by invoking concerns about mail-in voting is troubling. Regardless of whether Plaintiffs believe these pitfalls are real or imaginary, these issues have been the subject of a robust public debate for many years.

For example, the National Conference of State Legislatures outlines advantages and disadvantages of mail-in voting including financial considerations, an increase in voter "errors" or "residual votes", tradition and, notably a "[d]isparate effect on some populations … Low-income citizens move more frequently and keeping addresses current can pose problems. Literacy can be an issue for some voters, as well, since election materials are often written at a college level … If a voter is marking a ballot at home … there may be more opportunity for coercion...[18] Moreover, although currently subject to a preliminary nationwide injunction, the federal government imposed

---

[18]   https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx; *see  also*, Derek Thompson, *How Voting by Mail Could Cost Biden the Election - While in-person voting looks safer than expected, mail-in voting looks more dangerous—not because of fraud, but because of human error and partisan politics*, The Atlantic, September 30, 2020.

a COVID-10 vaccination requirement in September 2020 pursuant to Executive Order 14043 on *Requiring Coronavirus Disease 2019 Vaccination for Federal Employees*. Yet Plaintiffs seek to infringe on Defendants' First Amendment right to express their opinion on these very issues. Plaintiff cites to no countervailing legal precedent that support its claim that the Robocall's language was capable of suppressing votes. That is because such conduct is protected by the First Amendment.

"To permit the infliction of financial liability" for such a statement, "would subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments." *Greenbelt Coop. Publishing Assn. v. Bresler*, 398 U.S. 6, 14 (1970) As the Supreme Court noted, "to use loose language or undefined slogans that are part of the conventional give-and-take in our economic and political controversies - like 'unfair' or 'fascist' - is not to falsify facts." *Letter Carriers v. Austin,* 418 U.S. 264, 284 (1974). Instead, such caustic terminology deployed in the heat of public controversy was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members towards those who refuse to join." *Id.* at 286.

Thus, the Robocall was purely political speech.

**2.  The Robocall does not fall into any category of unprotected speech.**

Even if provocative, annoying, or scurrilous, a political robocall, like a social media post, does not fall outside the ambit of the First Amendment. To the contrary, it is exactly what the First Amendment seeks to protect. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017) (explaining that social media is often the "principal source[] for . . . speaking and listening in the modern public square"). In the eyes of the law, when the Robocall was disseminated, it was no different than John F. Tinker wearing his black armband in the halls of the Des Moines public

schools, and its content deserves the same degree of protection. *See Tinker v. Des Moines Independent Cmty. Sch. Dist.*, 393 U.S. 503 (1969).

But Plaintiffs disagree. In their view, Defendants forfeited their constitutional protection when they allegedly sent a Robocall that caused concern in the community and led to emails and phone calls to various public and private entities. *See*, *e.g.*, Docket No. 149 at ¶¶ 70-74; 83-84. Although Plaintiffs apparently think this is akin to "falsely shouting fire in a theater and casing panic", this argument fails. *Schenck v. U.S.*, 249 U.S. 47 (1919). While content-based speech restrictions are permissible in limited circumstances (incitement, obscenity, defamation, fighting words, child pornography, etc.), the Supreme Court "has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage . . . based on an ad hoc balancing of relative social costs and benefits.'" *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (quoting *U.S. v. Stevens*, 559 U.S. 460, 470 (2010). Labeling censorship societally beneficial does not render it lawful. If it did, nearly all censorship would evade First Amendment scrutiny. Plaintiffs would have preferred to keep their various communities ignorant to the pitfalls of mail-in voting for a while longer, so they could gain a political advantage in the Election, but that preference did not give them authority to hunt down and eradicate inconvenient robocalls. *See Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) (holding that speech is protected against censorship or punishment unless likely to produce "a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest"). The Robocall is not captured by any of the categorical exceptions to the First Amendment, so the Court should not balance the social utility of curtailing it against its government-assigned value. Plaintiffs' claims elide the distinction between unprotected speech and protected speech that may be regulated in the political context. It is axiomatic that the neither the government nor the courts may, consistent with the First

Amendment, prohibit the expression of certain disfavored viewpoints. The idea that the government or the court "has an interest in preventing speech expressing ideas that offend" is an idea that "strikes at the heart of the First Amendment." *Matal v. Tam*, 137 S. Ct. 1744, 1764-65 (2017).

Nor does it matter that Plaintiffs allege the content of the Robocall is false. Plaintiffs support their theory with so-called "expert" reports that similarly rely on speculation and hearsay to reverse engineer their desired result. Ex. K. For example, Professor Justin Grimmer's report improperly attributes the fictitious Arlington Center with Defendants Burkman and Wohl. *Id.* The Arlington Center, however, is a fictitious entity whose "prospectus" was a work of literary fiction that was never disseminated. *Id.* Yet, Professor Grimmer imputes Defendants' alleged intent to suppress Black voters by comparing the literary musings of these amateur political hucksters with limited funds to the strategies used by well-trained Russian intelligence agencies with countless resources whose actions amount to espionage, whereas ignoring entirely the fact that Defendants' conduct amounts to protected political activism. His conclusion that the Robocall was "likely to confuse voters and deter them from voting" is an obvious red herring as it is not unlawful to confuse voters, nor does he rely on any factual support for his opinion that the Robocall would deter voting. *Id.* Instead, he takes a purely academic approach, resulting in a long and meandering report filled with tenuous logic and baseless opinions (*i.e.*, speculation). *Id.* While his report may one day be a good academic case study, it is not based on facts, reality, or any of the *actual testimony* in this case (which, in fact, states the opposite). This is tantamount to junk science.

Professor Ange-Marie Hancock Alfaro's report fares no better as it, once again, is an obvious red herring. Indeed, her *opinion* that the Robocall contains "emotionally damaging" racial stereotypes with a "negative impact…[that] goes far beyond typical politics" (*i.e.*, offensive) is

purely visceral and cannot be conflated with—and is not analogous to—*unlawful* conduct. *Id.* "Such speech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder*, 562 U.S. at 458. If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id.* The "point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). Thus, even if the Robocall contained racial stereotypes (which it does not), it is protected by the First Amendment. *See Matal*, 137 S. Ct. at 1764 ("[The idea that the government may restrict] speech expressing ideas that offend … strikes at the heart of the First Amendment. Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express "the thought that we hate.").

Moreover, Defendants' expert, Chuck Ribando, concludes the opposite: That the Robocall contains none of the hallmarks associated with intimidation and is "substantially true and accurate, not in any way designed to have a suppressive effect, and devoid of any intimidation, threat, or coercion." Ex. J. Mr. Ribando's Report, in pertinent part, opines that the Robocall contains statements that are substantially true or otherwise statements of opinion, which have since proven to be substantially true. *Id.* This includes the fact that publicly available voter-registration lists are routinely used by licensed investigators, law enforcement, debt collectors, and other authorities, and that it is reasonable to expect that during a pandemic, the Center for Disease Control would use all available public records (including voter registration records) to facilitate the tracking of

COVID-19 including the federal government's mandatory vaccine requirements for federal employees. *Id*.

The Robocall was, therefore, at worst, incomplete. Regardless, these differing opinions should not be surprising as "[p]olitical debate frequently involves claims and counterclaims about the validity of academic studies, and today it is something of an understatement to say that our public discourse is often "uninhibited, robust, and wide-open." *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 348 (citations omitted). This does not create a question of fact, but rather proves that the Robocall is protected by the First Amendment. The notion that the long arm of the court (or the government)—redaction pen in hand—can extend to this sort of incomplete speech is plainly wrong. Plaintiffs had no more ability to silence Defendants than it would to silence the many talking heads on cable news, who routinely pronounce one-sided hot takes on the issues of the day, purposefully ignoring any inconvenient facts that might disrupt their preferred narratives.

Indeed, even if the Robocall had been untruthful, no court has ever suggested that noncommercial false speech is exempt from First Amendment scrutiny. *See Alvarez*, 567 U.S. at 718 ("Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee.") *see also Sullivan, supra,* at 271, 84 S. Ct. 710, 11 L. Ed. 2d 686 ("Th[e] erroneous statement is inevitable in free debate"). The Supreme "Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment. The statement must be a knowing or reckless falsehood." *Alvarez*, 567 U.S. at 719; *see also Garrison*, *supra* at *379* U.S. at 73 ("[E]ven when the utterance is false, the great principles of the Constitution which

secure freedom of expression . . . preclude attaching adverse consequences to any except the knowing or reckless false-hood"); *Illinois ex rel. Madigan* v. *Telemarketing Associates, Inc.*, 538 U.S. 600 (2003) ("False statement alone does not subject a fundraiser to fraud liability"). The Supreme Court has emphasized: "[t]he remedy for speech that is false is speech that is true. This is the ordinary course in a free society." *Id.* at 727. Plaintiffs had every opportunity to counter the Robocall, but it opted, at least in part, to engage in the objectionable practice of censorship. Because the Robocall was undoubtedly protected by the First Amendment, Plaintiffs' claims fail.

### 3.    The Robocall was not intimidating, threatening, or coercive to voters.

Statutes such as the VRA "must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969); *U.S. v. Stewart*, 411 F.3d 825, 828 (7th Cir. 2005) (same). The constitutional requirements are well settled: the First Amendment requires the government or a civil plaintiff to prove a "true threat," a term coined in *Watts* to distinguish genuinely threatening and unprotected speech from constitutionally protected "political hyperbole." *Watts*, 394 U.S. at 708. *Watts* established the distinction between "political hyperbole," however "vituperative, abusive," "crude," or "offensive," and a true threat. *Id*. at 708. Under *Watts*, only a true threat can be punished, and, conversely, in order to punish "pure speech," the Government must prove that the speech is a "true threat." *Id*. at 707; *see also Stewart*, 411 F.3d at 828; *United States v. Carrier*, 672 F. 2d 300, 306 (2d Cir. 1982).

The Supreme Court considered the implications of the First Amendment on anti-intimidation laws in *Virginia v. Black*, which addressed the constitutionality of a state statute criminalizing cross burning. 538 U.S. 343 (2003). The Court examined the longstanding rule that the First Amendment permits restrictions on "true threats," which are a type of expression "where the

speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Id*. at 359.  As the Court explained, "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Id*. at 360. The conduct at issue here clearly falls outside the parameters of the "true threat" exception to First Amendment Speech, as defined by the Supreme Court. This presents an insurmountable challenge for Plaintiff in the context of their section 11(b) (as well as their KKK Act) claim because they simply cannot prove that Defendants intended to place them (or anyone for that matter) "in fear of bodily harm or death", let alone that their conduct constitutes intimidation as a threshold matter. *Id*.

The Second "Circuit's test for whether conduct amounts to a true threat "is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a **threat of injury**." *United States v. Turner*, 720 F.3d 411, 420 (2d. Cir. 2013) (citations omitted) (emphasis added).  It has been noted generally that Section 11(b) should be interpreted through the plain and ordinary meaning of its language. *Disabled in Action of Penn. v. Se. Penn. Trans Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (citations omitted) ("We assume that 'Congress expresses its intent through the ordinary meaning of its language' and therefore begin 'with an examination of the plain language of the statute.' If the language is unambiguous, our inquiry is at an end.").

Although economic coercion[19], baseless prosecution[20], and threats thereof[21] could *conceivably* reach this threshold, the intimidating, threatening, or coercive conduct at issue must be so pervasive, targeted, and concrete that it creates a *significant probability* that harm will occur. Notably, courts have routinely dismissed claims where the plaintiffs could not identify specific individuals who were deterred from voting. *See United States v. Edwards*, 333 F.2d 575, 579 (5th Cir. 1964) (finding that only one "isolated" incident occurred and plaintiffs failed to show that incident actually reduced the number African Americans who registered to vote); *Brooks v. Nacrelli*, 331 F. Supp. 1350, 1353 (E.D. Pa. 1971) ("Plaintiffs have failed to show that the challenged activities have, in fact, had an intimidating effect upon the voters of the City of Chester. There was, for example, no testimony from any registered voter that he is hesitant to vote or to vote in a certain way because of the presence of the policemen on Election Day. . ."). The few courts that have permitted intimidation to be inferred from the nature of a defendant's actions without requiring a plaintiff to identify a particular victim were in the context of the systemic and pervasive racism that existed in the 1960s Deep South. *See, e.g.*, *United States v. Wood,* 295 F.2d 772, 781 n.9 (5th Cir. 1961) ("On the basis of the record in this Court and in view of the conditions and circumstances prevailing in Mississippi, it is most unlikely that, if the appellees are allowed to proceed with Mr. Hardy's trial, further Negro registration will take place."); *United States v.*

---

[19] *U.S. v. Beaty*, 288 F.2d 653 (6th Cir 1961) (white landowners evicted and refused to deal in good faith with black tenant farmers for purpose of interfering with their voting rights); *U.S. Deal*, Race Rel. L. Rep. 474 (W.D.La. 1961) (white business owners refused to engage in business transactions with black farmers who attempted to register to vote); *U.S. v. Bruce*, 353 F.2d 474 (white landowners ordered black defendant, an insurance collector active in encouraging voter registrations, to stay off their property, preventing him from reaching business clients).

[20] *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967) (baseless arrests and prosecutions of black citizens seeking to vote and voter registration volunteers); *U.S. v. Wood*, 295 F.2d 772 (baseless arrest and prosecution of voting rights volunteer); U.S.  v. Clark, 249 F. Supp. 720 (S.D. Ala. 1965) (baseless arrests and prosecutions of black citizens seeking to vote and voter registration volunteers).

[21] *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967) (white citizens threatened to "destroy" and "annihilate" Black man who tried to register to vote).

*Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (reasoning that the "inevitable effect" of the conduct at issue in the case is deterrence of African Americans from voting).

Notably, while this Court has previously relied on *United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012), for the proposition that "nonviolent actions or threats constitute impermissible threats, intimidation, or coercion"[22], respectfully, this interpretation misapprehends the holding in *Nguyen*, which is inapposite to this case insofar as 1) the statute at issue in *Nguyen* has a *materially different* standard that section 11(b) (and the KKK Act); and 2) the defendant's conduct in *Nguyen* was not analogous to the facts and circumstances here. In *Nguyen*, the losing candidate in the election, was convicted of obstruction of justice for failing to disclose the full extent of his knowledge regarding the mailing of the letter and appealed. *Id*. at 1261. On appeal, the Ninth Circuit considered only one very "narrow question": whether the warrant for the search of his campaign headquarters— which had yielded incriminating information about his connection to the letter—was supported by probable cause. *Id*. at 1263. The court held that although "an individual may violate [the statute] through subtle rather than forcefully coercive means, [] this **intimidation must be intentional**." *Id*. at 1264 (emphasis supplied). The gravamen of the court's decision was that the defendant's *intent* to intimidate was demonstrated vis-à-vis the operative letter that targeted Latino immigrants and was **mailed to a specific subset of voters** who were registered as Democrats (the opposing political party) and **would therefore be expected to vote for the defendant's direct political opponent in the upcoming election**. *Id* at 1264. The court expressly noted that "[t]he statute punishes an individual who uses any of a number of various means 'to induce or compel' an individual to vote or refrain from voting, **not merely those who engage in actions that may have the ultimate effect of affecting an individual's decision to vote**." *Id*. at n. 3 (emphasis supplied

---

[22] *See* Docket No. 66 at p. 13.

and in original). Thus, the defendant's *intent to intimidate* prospective voters was critical to the court's decision.

Most recently, in *Ariz. Democratic Party v. Ariz. Republican Party*, 2016 U.S. Dist. LEXIS 154086, *24 (D. Ariz. 2016), the plaintiffs alleged, *inter alia*, that "various statements made by the candidate, his surrogates and campaign officials … show both an intent on the part of the Trump Campaign to intimidate voters and intimidation in fact" after a Trump Campaign official told reporters that "'[w]e have three major voter suppression operations under way,' which Plaintiff summarized as targeting 'Latinos, African Americans, and other groups of voters.'" *Id*. at *24-25. The plaintiffs introduced as evidence, several media reports that, among other things, campaign spokespersons were emphasizing certain talking points involving " voting irregularities across the country from Pennsylvania to Colorado and an increase in unlawful voting by illegal immigrants"; comments made by President Trump encouraging voters to "'not just vote on the eighth [but] go around and look and watch other polling places and make sure that it's 100 percent fine. . . .Go down to certain areas and watch and study, make sure other people don't come in and vote five times….go out and watch' for voter fraud, and 'when I say 'watch' you know what I'm talking about, right?'"; and pages from the Trump Campaign website encouraging people to be a "'Trump Election Observer to 'Help [Trump] Stop Crooked Hillary From Rigging This Election.'" *Id*. at *26.

The court held that this evidence does "not persuade at all that they evince **an intent** to intimidate voters, or to coordinate or conspire with others to deny the vote to anyone; nor when read in full would the statements have the effect of intimidating a voter." *Id*. at *27. The court also held that "whether true or false, and whether appealing or repugnant to the listener, these statements and actions did not prove actual or likely intimidation. *Id*. at 29.

28

Applying the plain language of statute to the facts of this case, it is amply clear that Defendants' conduct was (1) objectively not the kind of conduct that would intimidate, threaten, or coerce voters; and (2) not, a fortiori, an attempt to intimidate, threaten, or coerce voters, in violation of Section 11(b) of the Voting Rights Act.

### a.  The Individual Plaintiffs.

Perhaps the most reliable—and indeed, ironic—measure regarding the viability (and veracity) of Plaintiffs' claims is that *all* of the Individual Plaintiffs are White. *None* of the Plaintiffs could identify a single member of the Black community who received, or was in any way affected by, the Robocall.[23] Ms. Brown testified that the reason for this is because "Black people don't normally do these type of things. They can't take off work, they don't have the personal capacity or they distrust the legal system."[24] But this overbroad generalization on behalf of each and every member of the Black community is not only offensive, it is both dubious and unseemly. The more logical and likely explanation is that any Black recipient of the call, like their White counterparts, understood that the call was political opinion and hyperbole, and were therefore entirely unaffected by the Robocall. Most likely, they did what nearly every other person does when they receive a robocall: reflexively hang up and never think about it again.

This is particularly true given that each of the Individual Plaintiffs concede that: 1) they were not intimidated or harmed in any way by the call (aside from being inconvenienced or irritated, which is not actionable); 2) believed the substance of the call to be false; 3) have not spoken to anyone in the Black community who received or was intimidated, threatened, or coerced by the call; 4) they were merely speculating that certain members of the Black community *could* have been intimidated by the Robocall; and 5) each of them voted in the November 2020 presidential

---

[23] *See* Ex. I at 93:6-13.
[24] *Id*. at 78:19-79:7.

election despite the Robocall.[25] The foregoing does not establish the elements of a viable 11(b) claim. Similarly, the NCBCP never received the call and speculates that Black people could have been "tricked," into voting in-person rather than by mail. Docket No. 149 at ¶ 72. This, too, fails to create a viable 11(b) claim. In fact, Plaintiffs, by their own testimony, clearly conflate dissuasion or deterrence from mail-in voting with "threatening," "intimidating," or "coercing" a person against voting at all.

Ironically, several Plaintiffs admit that they republished the allegedly offensive Robocall by either replaying it or by distributing it electronically, including on social media websites, text messages, and emails. Indeed, Ms. Winter chose to play the Robocall for her partner, Mr. Steinberg, who was not a direct recipient of the Robocall himself, whom she presumably knew had an allegedly idiosyncratic dissuasion toward anything involving the police, and who was the *only* Plaintiff whose apparently rarified sensibilities were triggered by the mere mention of the police. Apparently, Ms. Winter (who was the proximate cause, or at the very least, intervening cause of, Mr. Steinberg's alleged emotional trauma) and the other Individual Plaintiffs were not concerned that by redistributing this message it could intimidate, threaten, or coerce anyone from voting. Presumably, the Individual Plaintiffs' republication and dissemination of the Robocall was protected speech. By this logic, Plaintiffs' conduct in re-disseminating the Robocall was permissible *because of their intent*. Thus, if Defendants did not have the *specific intent* to intimidate, threaten, or coerce anyone from voting, even assuming, *arguendo*, the Robocall conceivably could have an intimidating, threatening, or coercive effect (which is could not), Defendants cannot be liable. Any other result would be inconsistent, unjust, and unconstitutional. For example, it appears that Ms. Winter republished the Robocall on social media to raise a hoopla,

---

[25] *See, supra*, note 4.

which was assuredly her right to do, just as it would have been Defendants' right to express their opinion that mail-in voting had numerous pitfalls.

Moreover, Mr. Steinberg's purported emotional trauma is irrelevant because he has not asserted a claim from intentional infliction of emotional distress (nor could he sustain such a claim) and neither 11(b) nor the KKK Act provide a remedy for an individual who is merely viscerally affected by speech. Neither Mr. Steinberg, nor any of the other Plaintiffs, were intimidated, threatened, or coerced from voting in the November 2020 presidential election. Indeed, Mr. Steinberg testified that he voted in the November 2020 presidential election, thereby proving that the Robocall itself did not deter or suppress his ability to vote, despite his unusually fragile emotional state.[26] Mr. Steinberg's testimony that he was emotionally traumatized after the Robocall accurately informed him certain voter information is publicly available does not convert his idiosyncratic mental state into a claim under either 11(b) or the KKK Act. Mr. Steinberg's peculiar idiosyncrasies are, by definition, unreasonable and not normative, and therefore cannot be taken into account when assessing whether a *reasonable person* would *objectively* perceive the Robocall to be intimidating, threatening, or coercive.

Further, as discussed above, this case is not analogous to *Nguyen*. Here, the Robocall was distributed by a third-party using an auto dialer that distributed a prerecorded message to randomized telephone numbers within certain designated area codes; it was not targeted toward specific races or ethnicities. Not only is there no evidence Defendants intended to induce or compel an individual to refrain from voting, the evidence proves that it had no effect whatsoever. Even if Defendants targeted Black voters, this in and of itself, is not unlawful, as demonstrated by NCBCP

---

[26] Ex. C at 21:2-7.

uses robocalls to target black woman to raise voter awareness.[27] The Michigan, New York, and Ohio neighborhoods targeted by the Robocall and resided in by Plaintiffs are not currently plagued by the same level of racial disenfranchisement that existed in the Deep South in the 1950s or 1960s, which is what section 11(b) sought to combat.[28] By all accounts, these are racially diverse, middle-class neighborhoods. *See*, *e.g.*, *Shelby County v. Holder*, 570 U.S. 529, 531 (2013) (citations omitted) ("Nearly 50 years later, things have changed dramatically. Largely because of the Voting Rights Act, voter turnout and registration rates in covered jurisdictions now approach parity. Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels. The tests and devices that blocked ballot access have been forbidden nationwide for over 40 years.").

Finally, because the content of the Robocall is substantially true, it cannot be deemed intimidating, threatening, or coercive as a matter of law. *Nguyen*, 673 F.3d at 1264 (finding that because the portion of the letter stating that "those illegally in the country or 'legal residents' cannot legally vote and may be subject to incarceration and deportation" was true, there was no statutory violation). Simply stated, insofar as the Plaintiffs' testimony is devoid of any indicia that the Robocall was intimidating, threatening, or coercive, and there is no evidence whatsoever aside from speculation and hearsay that the Robocall influenced, or could have influenced, voting in the 2020 presidential election, there is no 11(b) violation.

---

[27] https://www.ncbcp.org/news/releases/galvanize_over_150000_bw_vote/index.html; https://www.ncbcp.org/news/releases/coalition_of_black_women_leaders_ga_vote/index.html

[28] *See*, *e.g.*, ALEXANDER KEYSSAR, THE RIGHT TO VOTE 18 (2d ed. 2009) note 44, at 212 ("Within a few months of the [VRA's] passage, the Justice Department dispatched examiners to more than thirty counties in four states; scores of thousands of blacks were registered by the examiners, while many more were enrolled by local registrars who accepted the law's dictates to avoid federal intrusion. . . .In the [Deep South] as a whole, roughly a million new voters were registered within a few years after the bill became law, bringing African-American registration to a record 62 percent."); *see also United States v. Wood*, 295 F.2d 772, 781 n.9 (5th Cir. 1961); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965).

**b.  The NCBCP.**

According to the Complaint, one of NCBCP's primary concerns with the Robocall is that it could "trick" Black voters into voting in-person rather than voting by mail. Docket No. 149 at ¶ 72. But being "tricked" into voting in-person is not disenfranchisement, nor is it equivalent to being threatened, intimidated, or coerced into not voting at all. Indeed, in the months preceding the 2020 Election, officials in New York,[29] Michigan,[30] and Ohio[31] confirmed that voting in-person could be undertaken safely. Marshalling one's opinions or beliefs, even if they are objectionable or deceptive, regarding the pitfalls of mail-in voting is protected speech and merely encourages in-person voting.[32] Indeed, Ms. Brown testified that 1) in-person voting was no more dangerous in 2020 than going to the supermarket or bank (Ex. I at 94:3-23); 2) she did not speak to or hear of any person who claims they were deterred from voting as a result of the Robocall (*id.* at 93:6-13); and 3) the Robocall had nothing to do with fewer people completing the Census, but rather, the reduced Census numbers were due to the pandemic and because "Black people have a distrust for the census already…" *Id.* at 99:8-100:12. This demonstrates the speculative and conclusory nature of NCBCP's allegations and supports summary judgment in Defendants' favor.

Ms. Brown's testimony also demonstrates that any "diversion" of resources by NCBCP was negligible, at best, having little, if any, impact on the organization's resources or finances. Ms. Brown testified that about half of the Coalition's $80,000 budget in 2020 came from the NCBCP (*Id*. 24:21-25:1), and that forty percent of the Coalition's 2020 budget, or approximately

---

[29] *See* https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-voting.pdf.
[30] *See* https://www.michigan.gov//media/Project/Websites/coronavirus/Folder14/Recommendations_for_Poll_Workers_and_Election_Officials.pdf?rev=45b773d17ba8442c91c0a2979ec55329
[31] *See* https://www.ohiosos.gov/globalassets/elections/directives/2020/2020-09-25.pdf
[32] In fact, encouraging in-person voting actually increases the likelihood a person's vote will be counted. *See, e.g.*, https://www.pbs.org/wgbh/frontline/article/2020-election-couldhinge-on-whose-votes-dont-count/ ("A more pervasive problem, experts say, is disenfranchisement caused by the proportion of mail-in ballots that are discarded on technicalities: For example, over 23,000 voters in the April 2020 primary election in Wisconsin, a battleground state, had their ballots rejected").

$32,000 ($16,000 of which came from NCBCP), went toward get out to vote ("GOTV") activities. *Id.* 85:7-11. Ms. Brown further testified that only *one to two percent*, or about $320, of the Coalition's GOTV budget was expended as a result of the Robocall; half of which, or $160, was provided by NCBCP. *Id.* at 85:12-15. This is hardly significant and it is clear that NCBPC's allegations that it diverted resources and its "efforts to promote Census participation were impaired and few people completed the Census" causing "irreparable" harm because of the Robocall, is grossly exaggerated. Docket No. 149 at ¶ 73.

For the foregoing reasons, Plaintiffs' 11(b) claim must fail.

## V.   Defendants' Did Not Violate Section 131(b) of the Civil Rights Act of 1957

Section 131(b) of the Civil Rights Act of 1957 ("section 131(b)") expressly requires that the proscribed "[i]ntimidation, threats, or coercion" be undertaken "for the purpose of interfering with" the plaintiff's right to vote. 52 U.S.C.A. § 10101(b), Section 131(b). As described herein, the AG's section 131(b) claims fail for two reasons. First, there was no intimidation, threats, or coercion. Second, there is no evidence that Defendants' *intended* to interfere with any citizens right to vote. Accordingly, the AG's section 131(b) claims must be dismissed.

## VI.   Defendants Did Not Violate Sections 40-c and 40-d of New York Civil Rights Law

For the reasons stated herein, because Plaintiffs did not, and cannot, prove that Defendants discriminated against anyone in the exercise of his or her civil rights, this claim must be dismissed. Accordingly, the AG's section 40-c and 40-d claims must be dismissed.

## VII.   Defendants Did Not Violate Section 9 of NY Civil Rights Law

For the reasons stated herein, Defendants did not intimidate or intend to intimidate anyone to suppress votes. Accordingly, the AG's section 9 claim must be dismissed.

## VIII.   Defendants Did Not Violate Section 63(12) of the NY Executive Law

For the reasons stated herein, Defendants did not commit any fraudulent or illegal acts, but rather engaged in free speech protected by the First Amendment. Accordingly, the AG's section 63(12) claim must be dismissed.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in their favor, dismiss the respective Complaints in their entirety, and grant such other and further relief as the Court deems just and proper.

Dated: July 29, 2022

**GERSTMAN SCHWARTZ LLP**

By: <u>/s/ *Randy E. Kleinman*</u>
Randy E. Kleinman
David M. Schwartz
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
Telephone: (516) 880-8170
Facsimile: (516) 880-8171
rkleinman@gerstmanschwartz.com
dschwartz@gerstmanschwartz.com

*Attorneys for Defendants*