# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES, <br><br> Plaintiffs, <br><br> -and- <br><br> People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, <br><br> v. <br><br> JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, MESSAGE COMMUNICATIONS, INC., ROBERT MAHANIAN, and JOHN and JANE DOES 1-10, <br><br> Defendants. | Civil Action No.: 20-cv-8668-(VM)(OTW) <br><br> **DEFENDANTS JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, AND PROJECT 1599'S EXPERT DISCLOSURES** |

Defendants Jacob Wohl, Jack Burkman, J.M. Burkman & Associates, LLC, and Project 1599 ("Defendants"), by their attorneys, Gerstman Schwartz LLP, set forth expert disclosures under Rule 26(a)(2)(B). Attached to this notice is an expert report and CV for Charles Ribando. Defendants reserve the right to supplement this disclosure or make such disclosure as is requested during the pendency of the litigation.

Dated: Garden City, New York
       May 9, 2022

                                        GERSTMAN SCHWARTZ LLP

                                        <u>s/ Randy E. Kleinman</u>
                                        Randy E. Kleinman
                                        David M. Schwartz
                                        1399 Franklin Avenue, Suite 200
                                        Garden City, NY 11530
                                        (516) 841-7277
                                        rkleinman@gerstmanschwartz.com
                                        dschwartz@gerstmanschwartz.com

To:     Counsel of record via email

I. **Introduction**

The premise that the August 26, 2020 robocall (the "robocall") central to this case constitutes some form of voter intimidation that would involve threatening or coercing voters from participating in elections is unsound because the robocall contains statements that are substantially true or otherwise statements of opinion, which have since proven to be substantially true and accurate.

I was asked to analyze and review the robocall and determine whether the contents were materially true and accurate. I reviewed the robocall, as well as Judge Marrero's October 28, 2020 decision in which he stated, in part, that "[t]he robocall message contains various false statements … the publication of information about voters in public records is a function of voter registration, and unrelated to whether a voter chooses to vote by mail or in person [and that] … Defendants' contention that voting by mail increases the likelihood of dissemination of a voter's personal information is baseless… Defendants provide no credible evidence, and the Court finds none in the record of this proceeding, to support a claim that publicly available voter-registration lists are used by law enforcement, debt collectors, and the CDC in the manner the robocall alleges."[1]

As a licensed investigator with over 30 years of experience in law enforcement with expertise in the methodologies utilized by investigators, litigators, debt collectors, as well as government agencies, I can attest that the content of the robocall is substantially true as it relates to the practices of warrant squads and debt enforcement entities (among other things) utilizing mail-in voter registration lists and other forms of publicly available information that are periodically updated.

II. **Qualifications**

I am a licensed Private Investigator with a distinguished 30-year career in public service. I have been recognized for my successful leadership in government administration, public safety, and law enforcement. I have provided a wide breadth of functions for a number of state and federal law enforcement agencies and have an in-depth comprehension of agency needs in assessment,

---

[1] Judge Victor Marrero's decision and order dated October 28, 2020.

planning, investigation methods, project management, case management, personnel leadership, and fiscal management at all levels of government. I am a recognized leader in investigation methodologies in areas from local street and violent crime to global terrorism and corruption. This includes expert familiarity in locating individuals who do not wish to be found, whether those individuals are evading law enforcement and warrant squads, creditors and collection agencies, or family law obligations.

I have given many notable lectures and advisory services to law enforcement teams internationally, and have spearheaded investigations in foreign lands, critical hostage negotiations, and high-profile crime and terrorism investigations. I have a critical background in areas such as homicide and special victim's investigations, law enforcement computing systems, and gang investigations.

In 2015, I was appointed as Nassau County's Deputy County Executive for Public Safety,[2] and served in a broad capacity beyond the public safety role. I was responsible for leading procurement, contract negotiations, and implementation for various multi-faceted, multimillion-dollar county projects. I was also responsible for ensuring county interests through management of the county contract review process, as well as managing numerous interactions between county, municipal, state, and federal agencies.

From 2006—2015, I managed investigations for the Nassau County District Attorney ("DA"), originally as the Chief Investigator and then as Executive Chief of the DA's Investigative Division. I have noted achievements in handling high-priority cases and interagency activities, and was also responsible for creation of the Pharmaceutical Crimes Unit, Human Trafficking Task Force, Gun Task Force, and Witness Protection Unit. I also created the County's successful Gun Buyback Program.

From 2003-2006, I was the head supervisor of Detectives and Federal Agents for the New York City Police Department's FBI-NYPD Joint Terrorism Task force, holding National Top Secret and

---

[2] Nassau County's population is 1,395,774. It is the most densely populated and second-most populous county in New York State outside of New York City, with which it maintains extensive rail and highway connectivity, and is considered one of the central counties within the New York metropolitan area. Nassau County contains two cities, three towns, 64 incorporated villages, and more than 60 unincorporated hamlets. Nassau County has a designated police department, fire commission, and elected executive and legislative bodies.

SCI clearances. I coordinated international investigations between many agencies, including the FBI, CIA, US Attorneys, DOD, and US State Department, among others. I have been acknowledged for my creation of counter-terrorism partnerships and investigation/interrogation coordination amongst many foreign governments. I was also responsible for managing critical functions in the NYPD's Elite Hostage Negotiation team.

My CV is attached to this Declaration, which includes a complete list of my training and lectures. Throughout the years, I have testified in hundreds of cases about police methods and practices. I have been retained as an expert witness in one other case, *People v Luis Rondon*, Indictment Number 2019-655. I am being compensated by a $7,500 flat fee.

### III. Voter Registration Records Are Utilized By Law Enforcement, Debt Collectors, and the CDC in the Manner in Which the Robocall Suggests

I can and will attest that, as an experienced lawman and private investigator, I would most certainly utilize public records, including the superior information provided by an executed mail-in voter registration application to identify the whereabouts of an individual with an outstanding warrant or credit card debt to be used for enforcement purposes. In fact, I would utilize such a mail-in voter registration application over and above the data derived from in-person voting because a mail-in voter registration application effectively serves to validate the address of record in a manner that in-person voting simply cannot. There is a notable and important distinction between mail-in voting and in-person voting, which has an important impact on Skip Tracing[3] the whereabouts of an individual.

For example, in New York State, voters are assigned a voting location (i.e., a polling site) based on both the Assembly District (AD) and the Election District (ED) that he or she resides in. As a generalization, it can be understood that people can move. Thus, a voter who moves within a few blocks of where he or she historically resided may still reside within the same ED and may therefore vote at the same polling location he or she has always voted. The net effect would be that the State or City Board of Elections ("BOE") will never correct or purge this record if that person, from time-to-time, votes in-person and never properly records the fact that he or she

---

[3] https://www.accountingtools.com/articles/skip-tracing-techniques ("Skip Tracing is the art of locating a debtor who does not want to be found. Skip tracing is needed in order to collect on overdue accounts receivable" Notably, typical skip tracing sources include voter registrations.

has moved to a new location, albeit within the same ED. Indeed, anecdotally many young people will continue to use their parent's address years after moving from the proverbial nest even though they moved two towns over in an entirely different AD or ED. While not entirely proper it is common place.

As such, for a private investigator working for a collection agency, police officer working for a warrant squad, or a creditor accessing public records, in-person voting records tend to be less accurate and less useful, as these records are more likely to contain inaccurate information and may erroneously list an old and inactive address as being active. Conversely, when an individual requests and receives a mail-in ballot, these iterative steps confirm that the voter is likely domiciled at the location listed on the mail-in voter registration application, or at the very least, that the individual is likely to retrieve mail at this location.

There is, therefore, a material distinction when it comes to Skip Tracing a person's actual whereabouts. This is neither baseless nor immaterial. In such instances, a competent investigator need only dedicate surveillance resources to the address indicated on one's mail-in voting registration and wait for the target to arrive home or retrieve their mail. This comports with standard practices for investigators and law enforcement officers hunting fugitives, enforcing warrants, and locating other individuals who do not want to be found, including those who are avoiding creditors or other enforcement actions. Armed with little more than a name and date of birth, law enforcement and private investigators (like myself) can access many databases that aggregate information from public records, including BOE records. Such records, if regularly updated with data collected from mail-in voting ballot applications, is generally a more reliable method of obtaining an individual's address than an in-person voter registration abstract.

Therefore, based on my knowledge and decades of law enforcement and investigative experience, I can confirm that publicly available voter-registration lists, including mail-in voter ballot applications, are used by law enforcement, debt collectors, and the CDC in the exact manner the robocall alleges, and that information contained within the robocall is materially true and accurate.

As Nassau County's former Deputy for Public Safety, I would also note that it stands to reason that in a particularly virulent pandemic, the CDC operating in accord with state and local

governments, would use <u>all</u> available public records (of any kind) to facilitate the tracking of COVID-19 to identify clusters and allocate resources. These public records include school records, hospital records, arrest records, DMV records, tax records, licensing records, and voter registration records. If there is an existential threat to the public, there is every reason to believe that federal, state, and local authorities will use every tool at their disposal and within the public domain to combat this threat.

In addition, I would note that a simple "Google" search confirms generally these observations. Standard Skip Tracing tools referenced above make it clear that updated voter registration data are part of the initial Skip Tracing methods utilized by debt collectors and investigators. Debt collectors and police are known to use public records, including voter registration data, to locate persons and, as described above, a mail-in voter registration applications are a better, more reliable record than an in-person voter record. In fact, depending on the jurisdiction, an individual's voter record can be requested and shared with public and private entities, including political parties and candidates, law enforcement, government officials, businesses, scholars, journalists, and even members of the general public.[4] Law enforcement and government records are primary sources for locating debtors for debt collectors. For example, in New York, an individual's voter registration status, including political party affiliation and home address, is available with nothing more than the person's county of residence, last name, first name, date of birth, and zip code.[5]

IV.  **The Robocall Is Not Intimidating**

Mail-in voting ballots are also fundamentally less reliable that in-person ballots for reasons beyond those delineated in the robocall.

A recent 2020 report published by Harvard University highlights some of the inherent problems created by mail-in ballots.  Indeed, "some experts argue that mail-in voting includes an inherent flaw in that unrequested ballots sent to addresses of registered voters can be stolen by those who may want to influence the election. Several alleged voter fraud scenarios are

---

[4] https://www.findlaw.com/voting/how-u-s--elections-work/what-information-is-public-from-your-voting-record.html.
[5] https://voterlookup.elections.ny.gov/.

perpetuated that include perpetrators anticipating the delivery of the mail-on ballots and stealing the mail-in ballots en route to the registered voters."[6] Additionally, the report states that a percentage of mail-in votes are likely to be rejected "due to noncompliance of ballot requirements (*e.g.*, voter signature mismatch, absence of witness signature, absence of envelope signature, naked ballot, *etc.*)", and that "some experts fear that the rejected mail-in[] ballots can reach up to 10% of the total votes cast" in the 2020 presidential election.[7]

Having overseen government processes as a Deputy for Public Safety, and otherwise, for many years, it is also my opinion with a reasonable degree of certainty that in-person voting is less prone to these infirmities, and that given the obvious problems with mail-in voting, the robocall, which merely highlights some of the intrinsic infirmities of mail-in voting, cannot be perceived as intimidating because it is true and accurate.

As a law enforcement official, I have investigated, located, arrested, and helped prosecute individuals found guilty of intimidating, threatening, coercing, or menacing others in a variety of criminal contexts. I have listened to and analyzed the robocall and find that it contains none of the hallmarks associated with intimidation. For example, relying on New York Penal Code's definition of intimidation, the robocall simply does not have these elements.[8] Likewise, looking to the purpose of the original criminal Ku Klux Klan Act, from which the civil Ku Klux Klan Act was derived, the original Act was designed to eliminate the extralegal violence of the Ku Klux Klan. In my view, the Plaintiffs are trying to fit a square peg into a round hole.

This assessment is further supported by my review of the deposition transcripts of Plaintiffs Andrea Sferes, Eda Daniel, Karen Slaven, Kate Kennedy, and Nancy Hart, none of whom testified that they were deterred from voting in the 2020 presidential election, intimidated, or coerced as a result of the robocall, nor that they changed the method by which they voted.

---

[6] *Mitigating Potential Vote-By-Mail Fraud While Simultaneously Increasing Vote-By-Mail Ballot Acceptance By Utilizing Facial Recognition and Multifactor Authentication Technology*, Harvard Journal of Law & Technology, Volume 34, Digest Fall 2020, Das, Atanu, https://jolt.law.harvard.edu/digest/mitigating-potential-vote-by-mail-fraud-while-simultaneously-increasing-vote-by-mail-ballot-acceptance-by-utilizing-facial-recognition-and-multifactor-authentication-technology (last accessed May 5, 2022).

[7] *Id*.

[8] Under New York Penal Code § 215.17, "a person is guilty of intimidating a victim or witness in the first degree when…he: Intentionally causes serious physical injury to another person for the purpose of obstructing…or impeding the communication by such other person relating to a criminal transaction to any court, grand jury, prosecutor, police officer or peace officer."

Instead, the Plaintiffs merely appear to have been offended by the content of the robocall and expressed concern that members of the Black community would not be able to identify the satirical nature and tone of the content, although each of them were immediately apparently able to do so. I further note that not one of these Plaintiffs even spoke with a member of the Black community about their impression of the robocall.

In my over thirty years in law enforcement, I have worked very closely with the Black community in New York City, Nassau County, and elsewhere. It goes without saying that an overwhelmingly majority of this community are savvy, sophisticated, educated, and engaged. The idea that members of the Black community could not listen to the robocall with the same level of discernment as their White counterparts in order to decide for themselves whether they preferred in-person or mail-in voting is both insulting and unsound. In fact, if any law enforcement official or prosecutor had made such a suggestion to me in any of my prior offices or appointments, I would admonish them that this line of thinking is discriminatory, illogical, and wholly lacking in judgment.

## V.  Conclusion

In my assessment of the robocall, I have concluded that the contents of the robocall are substantially true and accurate, not in any way designed to have a suppressive effect, and devoid of any intimidation, threat, or coercion.


/s/ Charles Ribando

# CHARLES RIBANDO

24 Jefferson Road
Farmingdale, New York 11735
(516) 293-6551
Cell (516-313-5767
chuck@ribandoconsulting.com

| | | |
|---|---|---|
| **PERSONAL BUSINESS LAW ENFORCEMENT EXPERIENCE** | **President of Ribando Consulting LLC**<br>Law Enforcement Advisory and Consultant<br>Licensed Private Investigator #11000203176 | **1/18-Present** |

- Criminal and civil investigations
- Insurance fraud investigations
- Litigation support
- Cybercrime

| | | |
|---|---|---|
| **MUNICIPAL MANAGEMENT EXPERIENCE** | **NASSAU COUNTY OFFICE OF THE COUNTY EXECUTIVE**<br>DEPUTY COUNTY EXECUTIVE OF PUBLIC SAFETY | **2014 to 01/18** |

- Provide administrative oversight for the Nassau County Police Department, Correctional Center, Fire Commission, Traffic & Parking Violations Agency, Probation Department, Office of Consumer Affairs, Office of Emergency Management, Medical Examiner and the Taxi and Limousine Commission.
- Facilitated the recent $28M overhaul and relocation of the Medical Examiner Crime Lab.
- Oversight of Federal and State grant funding for various County-sponsored programs and events and also FEMA funding for County emergencies.
- Provided oversight for the selection of a vendor to provide healthcare services to NCCC Inmates. Selected, negotiated and secured a $21M contract with Nassau County University Medical Center. Currently interviewing candidates to serve as the administrator of the Healthcare Contract with NUMC, insuring quality care is provided to the inmates by NUMC.
- Act on behalf of the Office of the County Executive as final review and approval for all contracts entered into by County.
- Act as ERP/PeopleSoft Executive Director providing administrative and operational oversight of the roll-out of the County's new $41M integrated Human Resources, Payroll and Civil Service software.
- Facilitate the $6.4M purchase of the property located 510 Grumman Avenue, including bid of property and purchase of asset. This County building is utilized by the Office of Emergency Management and the Narcotics Division of NCPD has now been moved to this site.
- Organize and provide support for the 2016 Presidential Debate at Hofstra University. This required working closely with the United States Secret Service to establish emergency routes, public safety and handle confidential information related to the event.

| | | |
|---|---|---|
| **LAW ENFORCEMENT EXPERIENCE** | **NASSAU COUNTY DISTRICT ATTORNEY'S OFFICE**<br>EXECUTIVE CHIEF OF INVESTIGATIVE DIVISION | **2006 to 2014**<br>**May 2012 to December 2014** |

- Promoted to Executive in charge of entire Investigative Division, while simultaneously continuing to serve as Chief Investigator.
- Responsible for supervising 46 attorneys, 51 investigators, and 27 support staff in investigation and prosecution of Organized Crime/Rackets; Street Narcotics, Gangs, and Guns; Economic Crimes; Government and Consumer Frauds; and Public Corruption.
- Oversee Complaints Bureau and Assets Forfeiture Bureau.
- Created Human Trafficking Task Force to work jointly with and coordinate efforts of DA's Office, Nassau County Police Department, and Immigrations and Customs Enforcement.

- Created Pharmaceutical crimes unit to combat rising crime involving abuse of prescription controlled substances.

**CHIEF INVESTIGATOR**                                                                    2006 to 2014

- Supervise 51 investigators assigned both to internal investigative bureaus, as well as outside agencies including DEA, NICB, and HUD, with the responsibility of investigating white collar, environmental, animal cruelty, public corruption, rackets, computer, on-line sexual predators, vehicular, drug, and gang-related crimes.
- Liaison with numerous outside agencies (NCPD, Village Police Departments, Sheriff's office, NICB, ICE, NYS Police, ATF, FBI, JTTF, NYPD etc.).
- Personally responsible for investigating sensitive/high priority cases, including cold cases and a multi-state adoption scam.
- Oversee District Attorney's debriefing program
- Created Nassau County Gun Task Force along with New York State Police
- Created and oversee Witness Protection/Relocation Unit.
- Developed and coordinate District Attorney's security detail.
- Created and implement County's Gun Buy Back Program.
- Coordinate countywide defendant DNA Collection.
- Manage all undercover bank and credit card accounts, as well as investigative buy money.
- Handle all special and immediate requests from the administration.
- Handle all immediate requests from ADAs regarding witness location and enhancement of prosecutions.

LAW ENFORCEMENT EXPERIENCE (CONTINUED)

**NEW YORK CITY POLICE DEPARTMENT**                                                       1986 to 2006
**F.B.I.-N.Y.P.D. JOINT TERRORISM TASK FORCE**                                            2003 to 2006
New York, NY

*Supervisor Of Detectives And Federal Agents*
- Supervised 34 team members of the Joint Terrorist Task Force (22 Federal Agents and 12 Detectives), charged with investigating cases of terrorism overseas including Central Asia and Europe.
- Granted Top Secret and other sensitive clearances to work with intelligence agencies worldwide to locate, disrupt and apprehend terrorist networks or cells.
- Liaison between 33 other agencies, including the U.S. State Department, U.S. Secret Service, Department of Defense, the Bureau of Immigration and Customs Enforcement, the C.I.A. and the Department of Homeland Security.
- Responsible for all stages of criminal investigations including coordination with the U.S. Attorney's Office and F.B.I. Headquarters.
- Created counter-terrorism partnerships with security services in several foreign countries and helped to formalize information and intelligence sharing protocol.
- Supervised investigations in the United Kingdom, Pakistan, Italy, Afghanistan, Cuba, and the former Soviet Union.
- Oversaw the interrogation of suspects to obtain intelligence relating to terrorist activity development enabling arrests of otherwise unidentified accomplices or enemy combatants.
- Worked with law enforcement partners worldwide to locate, disrupt or apprehend members of terrorist cells or networks.
- Directed the gathering and relay of information in real time regarding members of the Al-Qaeda terrorist network, from Usama bin Laden to lower-level soldiers.
- Supervised intelligence gathering and other investigative functions, including the identification and interrogation of high-value prisoners.
- Administered the development of investigative leads, collection and preparation of evidence for use at trial, witness interviews and preparation before trial.

*N.Y.P.D. Intelligence Division-Dignitary Protection Unit*

- Work with the Secret Service and State Department to provide protection for heads of state and dignitaries while in N.Y.C.
- Performed advanced reconnaissance of locations, pre-planned trips and alternate routes to destinations with possible escape routes and emergency contingency plans.
- Protective assignments have included numerous heads of state and world leaders.

### *N.Y.P.D. Hostage Negotiation Team*
- Member of the Elite Hostage Negotiations team successfully diffusing tense hostage situations through negotiations or coaching. Dealt effectively with people in crisis and ensured that all civilians, officers and perpetrators were unharmed.
- Utilized and maintained heavy weapons

---

**LAW ENFORCEMENT EXPERIENCE**

(CONTINUED)

**75 PRECINCT DETECTIVE SQUAD**                                             1999 to 2003
East New York, Brooklyn, New York

*Detective Sergeant*
- Supervisor of an elite group of Detectives investigating homicides, shootings and serious assaults.
- Coordinated investigations into reported and suspected criminal behavior, unidentified bodies, missing persons and youthful offenders.
- Worked closely with the District Attorney's office regarding extraditions as well as search and arrest warrants.
- Supervised the development of sources for warrants, including confidential informants and warrant enforcement.
- Responsible for all managerial/administration duties, including scheduling, training and selection of personnel.
- Maintained detailed records of investigations.
- Represented the 75 Precinct Detective Squad at bi-weekly and monthly Compstat meeting.

**INTERNAL AFFAIRS BUREAU**                                                  1997 to 1999
New York, NY

*Sergeant-Supervisor*
- Supervised investigations of allegations of Police Corruption and excessive force against members of the service.
- Coordinated with the District Attorney's office and Federal Prosecutors enforcing civil rights.

**STREET CRIMES UNIT**                                                       1995 to 1997
All Five Boroughs, New York City, New York

*Sergeant*
- Supervised the day to day operations of the Street Crime Unit including all arrests and investigation.
- Deployed officers in high crime areas based on the necessary complaint response to ensure the sufficient amount of manpower was allocated to guarantee maximum enforcement.
- Developed resources for confidential informants, warrant enforcement and executing over 200 search warrants annually.

**SURFACE CRIME UNIT**                                                       1992 to 1995
All Five Boroughs, New York City, NY

*Sergeant Investigator*
- Supervised investigations relative to crime on city buses to include homicide, robbery, and all other crime.
- Disseminated cases and monitored progress of investigations.
- Formulated and revised investigative strategies.
- Evaluated crime patterns, inspected troubled areas and implemented measures to combat crime.

| | | |
|---|---|---|
| **SPECIALIZED TRAINING** | • Basic Methods of Instructions<br>• Criminal Investigation Course<br>• OCCB: Narcotics Investigations<br>• Computer Technology Training<br>• Special Victims' Training | • F.B.I Tactical Weapons, Counterterrorism<br>• Homicide Investigations<br>• Dignitary Protection Training<br>• Hostage Negotiation Training<br>• Gang Investigations Training |
| **EDUCATION** | Empire State University<br>New York, NY<br>Associates Degree | |
| **LECTURES/ TV** | • Investigation Techniques for Prosecution of Corruption, Yerevan, Armenia, 2008<br>• *American Greed,* Season 6, Episode 53: Baby Broker Scam (air date February 15, 2012) | |
| **CITATIONS** | Recipient of 2 Commendations, 2 Honorable Mentions, 24 Excellence in Police Duty Awards and 9 Meritorious Police Duty Awards. | |