# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
NATIONAL COALITION ON BLACK CIVIC :
PARTICIPATION, MARY WINTER, GENE STEINBERG,:    20 Civ. 8668 (VM)(OTW)
NANCY HART, SARAH WOLFF, KAREN SLAVEN, :
KATE KENNEDY, EDA DANIEL, and ANDREA :    **PLAINTIFF PEOPLE'S**
SFERES, :    **EXPERT DISCLOSURES**
: 
                             Plaintiffs, :
: 
    -against- :
: 
JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & :
ASSOCIATES, LLC, PROJECT 1599, and JOHN and :
JANE DOES 1-10 :
                           Defendants. :
------------------------------------------------------------------------X

      The Office of the Attorney General ("NYAG"), on behalf of the People of the State of New

York ("People"), by their attorney, Letitia James, Attorney General of the State of New York, set

forth expert disclosures under Rule 26(a)(2)(B). Attached to this notice are expert reports and CVs

from Professor Justin Grimmer and Professor Ange-Marie Hancock Alfaro. NYAG reserves the

right to supplement this disclosure or make such disclosure as is requested during the pendency of

the litigation.

Dated:  New York, New York
        April 18, 2022

                                     LETITIA JAMES
                                     Attorney General of the State of New York

                                     By: /s/ Rick Sawyer
                                     Rick Sawyer, Special Counsel
                                     Jessica Clarke, Chief, Civil Rights Bureau
                                     Conor Duffy,
                                     Colleen K. Faherty,
                                     Assistant Attorneys General

                                         28 Liberty Street, 18th Floor
                                         New York, New York 10005

P: (212) 416-6046
F: (212) 416-6009
Colleen.Faherty@ag.ny.gov

To: Counsel of record via email

## I.    Statement of Inquiry

Voter intimidation—threatening or coercing voters from participating in elections or selecting the candidate of their choice—has an unfortunate and long history in the United States.  The best-known examples of voter intimidation come from the Jim Crow south as whites conspired to create a system of terror and laws that deterred African Americans from exercising their franchise.[1]

In more recent elections, voter intimidation has taken on subtler forms. Modern forms of voter intimidation include using online platforms and other mass communication technology to broadly disseminate information intended to confuse, frighten and threaten voters into staying away from the polls.  For example, foreign countries, domestic groups, and individuals have exploited modern communication platforms—like social media and robocalling—to create confusion and distrust about the requirements for voting, and how potential voters' information would be used once they cast a ballot, and in some cases to spread false information about particular candidates. They have also used misinformation to sow fear about the legal consequences of voting.  The Russian intelligence service, in particular, has mastered a particularly effective method of targeting misinformation to voters in an effort to suppress voter turnout.  Their success has inspired others to mount similar disinformation campaigns.[2]

I was asked to analyze the August 22, 2020 robocall from Jack Burkman and Jacob Wohl to determine whether they included the kind of disinformation commonly used to confuse and intimidate voters.  I reviewed that robocall and two others placed by Burkman and Wohl, in addition to a prospectus by their political advocacy group, the Arlington Center for Political Intelligence, and emails exchanged between Wohl and Burkman concerning the August 22 robocall.  Based on my review, I reached the following three findings:

a.  Burkman and Wohl explicitly sought to mimic the successful voter intimidation campaign carried out by the Russian government in 2016.  Like the Russians, Wohl and Burkman spread falsehoods about the dangers of voting primarily to Black voters.  Burkman and Wohl's campaign shared other salient features with the Russian disinformation campaign, including by inventing a fake "civil rights" organization purporting to help voters—while in reality misleading them and suppressing their votes.

b.  Like similar disinformation campaigns, Wohl and Burkman's August 2020 robocall could have the effect of reducing voter turnout, deterring voters from using mail-in ballots, and spreading anti-Black stereotypes. The effect of these robocalls could plausibly cause confusion among voters and create a reluctance to vote out of concern about how their information would be used once voting.

---

[1] Keele, Luke, William Cubbison, and Ismail White. "Suppressing Black votes: A historical case study of voting restrictions in Louisiana." *American Political Science Review* 115.2 (2021): 694-700.
[2] *See* Robert S. Mueller III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (2019) (Mueller Report).

c.  The type of disinformation included in Wohl and Burkman's August 2020 robocall degrades the quality of our democracy by undermining voter confidence in the safety and legitimacy of voting and the ultimate result of an election.  Recent research shows that messages that attack the validity of election results undermines trust in the electoral process.[3]  Worse yet, this work shows that the effect on trust in electoral institutions is difficult to counteract and therefore could endure well beyond one particular election cycle.[4]

## III. Qualifications

I am a Professor of Political Science at Stanford University in Stanford, California. I also hold the titles of Senior Fellow at the Hoover Institution and Co-Director of the Democracy and Polarization Lab. I first joined the Stanford Faculty in 2010 as an Assistant Professor. I was promoted to Associate Professor in 2014, and I held a courtesy appointment in the department of Computer Science from 2016–2017. From 2017–2018, I was an Associate Professor in the Department of Political Science and the College at the University of Chicago. I received my Ph.D. in Political Science from Harvard University in 2010.

My research evaluates political representation and democratic practices in American politics and throughout the world.  To do this I develop and deploy new statistical, machine learning, and data science techniques.  Recently, I have published research on how individuals use the internet to learn about political campaigns and how confusion over electoral rules deters individuals from turning out to vote, including the consequences of voter identification laws and voters' information about those laws. I have also published papers on legislative institutions, election administration, political representation, and statistical methods.  I am the author of three books and my research and writing has been published in American Political Science Review, American Journal of Political Science, Journal of Politics, Political Analysis, the Journal of the American Statistical Association, Proceedings of the National Academy of Science, the Proceedings of the Annual Meeting of the Association for Computational Linguistics, and several other journals.

My CV is attached to this Declaration, which includes a complete list of all publications I have authored in the past 10 years. In the past four years, I have been an expert witness in one other case: *Vote Forward v. Dejoy*, No. 20-cv-2405 (D.D.C. 2020). I am being compensated at a rate of $400 an hour.

## IV. Russian Voter Intimidation Efforts in the 2016 Election

Wohl and Burkman have explicitly admitted their intention to replicate the Russian's strategy deployed in the 2016 election using the Internet Research Agency (IRA). On page 3 of

---

[3] Clayton, Katherine et al. "Elite Rhetoric Can Undermine Democratic Norms" *Proceedings of the National Academy of Sciences.*  2021. 118 (23)
[4] Berlinski, Nicolas et al. "The Effects of Unsubstantiated Claims of Voter Fraud on Confidence in Elections" 2021. *Forthcoming.*

the prospectus for the Arlington Center for Political Intelligence, Burkman and Wohl wrote "As the Russian Internet Research Agency proved in 2016, building up leftwing internet properties that aim to ultimately suppress turnout is an effective strategy." Burkman and Wohl go on to state their goal is to, "Build up left-wing online properties with large following, only to have those properties direct followers to NOT vote come election day."  Given this stated goal, I will first review how the IRA used social media platforms to target Black citizens for intimidation, to undermine their trust in elections, and to harass voters in the 2016 election.

To  suppress Black votes, long before the election the IRA created pages and channels on social media platforms targeting Black voters.  This involved the IRA creating accounts on social media platforms like Facebook and Twitter that intentionally mimicked accounts associated with the Black Lives Matter political movement, along with YouTube content.  For example, the IRA created an account called "blacktivist" on Facebook and Twitter, an account name blending "Black" and activist.  The account initially posted a wide range of content that was intended to appeal to African American activists, such as statements denouncing police brutality and arguments against mass incarceration.[5]

After building a following during the primary elections, the IRA then shifted the content of the groups to make arguments to intimidate or otherwise suppress Black votes.[6]  University of Wisconsin Professor Young Mie Kim argued that the IRA attempted to suppress Black votes using a three-pronged strategy:  "a) turnout suppression/election boycott; b) third-candidate promotion; and c) candidate attack, all targeting nonwhites or likely Clinton voters."[7]

Some of the attacks from the IRA blended these strategies.  For example, Professor Young Mie Kim identified an ad from an IRA backed page called "Williams & Kalvin" that argued "We don't have any other choice this time but boycott the election. This time we choose between two racists. No one represents Black people. Don't go to vote."[8]  This ad attacks Hillary Clinton—the heavily preferred candidate among Black voters—and then argues that because she is racist, those voters should stay home.

**Opinion One: Burkman and Wohl Explicitly Mimicked the 2016 Election IRA Strategy**

Following their stated goal, Burkman and Wohl's robocalls explicitly mimicked most of the IRA strategies described above.  First, they specifically targeted Black voters in their robocalls, mirroring the IRA's 2016 strategy of targeting Black voters in order to suppress Democratic votes.  To assess where Burkman and Wohl intended to target their robocall, I examined the emails between Burkman and Wohl.  Based on these emails, it is clear Burkman

---

[5] *See* Mueller Report; United States Senate, Report of the Select Committee on Intelligence on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election (2016).
[6] https://demtech.oii.ox.ac.uk/wp-content/uploads/sites/93/2018/12/Appendices-for-The-IRA-Social-Media-and-Political-Polarization.pdf
[7] https://journalism.wisc.edu/wp-content/blogs.dir/41/files/2018/09/Uncover.Kim_.v.5.0905181.pdf
[8] https://journalism.wisc.edu/wp-content/blogs.dir/41/files/2018/09/Uncover.Kim_.v.5.0905181.pdf

and Wohl targeted their robocalls at Black neighborhoods.  For example on August 25, 2020, Jacob Wohl wrote "We should send it to black neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte,Richmond, Atlanta, and Cleveland."  Jack Burkman then replied with other cities with a large Black population, writing "Cleveland, Phila, Minn, Chicago, NYC, Detroit."

Burkman and Wohl's reactions to the robocalls further revealed their intent to harass and intimidate Black voters.  After the robocall were disseminated, Burkman and Wohl commented on the call backs they were receiving, writing, "I love these robocalls getting angry black call backs."  This is a clear statement that the intent was to harass Black people and ultimately coerce them to not participate in the 2020 election.

Burkman and Wohl also copied the IRA's strategy of creating fake Black Lives Matter personas and evoking police brutality through their choice of the name "Tamika Taylor" in their robocall. In one robocall that I detail below, Burkman and Wohl spread disinformation about how the information from mail-in ballots could be used by government officials and private actors. Similar to the IRA creating accounts that mimic Black Lives Matters pages, Burkman and Wohl attempted to create the impression that the speaker in the robocall was an important figure in the Black Lives Matter movement.  The robocall begins with the speaker identifying herself as "Tamika Taylor", apparently in an attempt to give the impression that the call came from Breanna Taylor's mother. Burkman and Wohl attempted to create this impression because Breanna Taylor's murder has become a salient example of police brutality cited by Black Lives Matter and referenced in protests, and Breanna Taylor's mother, Tamika, was a vocal advocate for the movement in the wake of her daughter's death.[9] There is strong experimental evidence that messages from trusted sources have a larger effect on behavior than messages in general. By using the name Tamika Taylor, Wohl and Burkman tried to create the false impression that this robocall came from a trustworthy source.[10]  While attempting to make this deception Wohl and Burkman actually made an error: Breanna Taylor's mother's real name is Tamika Palmer. But the intent remains: to disguise the source of the message to increase its potency.

Finally, Burkman and Wohl sent out a robocall that encouraged recipients to boycott the election.  In this call Burkman and Wohl alleged that Joe Biden used a racial slur to refer to African Americans. The purpose of this call was to dampen support for Joe Biden, which was strategically advantageous to Donald Trump's candidacy.  Learning that a candidate uses offensive terms to refer to a group would cause some people, especially people in that group, to no longer vote for the candidate. The Russians deployed a nearly identical strategy during the 2016 election.  In social media posts and YouTube videos the Russians alleged that Hillary Clinton had supported policies that were harmful for African Americans.  For example, in the 2016 election the IRA alleged that Hillary Clinton received donations from the Ku Klux Klan.[11]

---

[9] Police shot and killed Breanna Taylor in her home after serving a warrant at the wrong address

[10] Kuklinski, James H., and Norman L. Hurley. "On hearing and interpreting political messages: A cautionary tale of citizen cue-taking." *The Journal of Politics* 56.3 (1994): 729-751.

[11] https://www.theguardian.com/us-news/2018/dec/17/russian-propagandists-targeted-african-americans-2016-election

This robocall further supports a conclusion that the August 22 robocall, which followed the Biden robocall, was part of a broader strategy inspired by Russia's 2016 disinformation campaign.

**Opinion Two: Wohl and Burkman's robocall included the kind of disinformation likely to deter voter turnout**

During the 2020 election, vote by mail protected voters who were concerned about exposure to COVID-19 while voting in person. Governments across the country, including the State of New York, advocated mail-in voting as a safe alternative to in-person voting due to the pandemic.[12]  Evidence from the 2020 election shows that, nationwide, about 38% of Black voters cast their ballot by mail.[13]

According to the prospectus and emails, Burkman and Wohl's overall goal was to create confusion about using vote by mail and ultimately deter Black voters from participating in the election. This tactic of creating confusion mimics the IRA's efforts to suppress Black votes in 2016. Moreover, there is ample evidence that creating confusion deters voting, while reducing confusion increases voting. [14]  For example, in North Carolina, voters' confusion about what was required to vote caused a decrease in turnout in a general election.[15]

The robocall used Russian-style disinformation to increase confusion about voting by mail and spread falsehoods designed to deter voters from turning out.

First, the robocall falsely claimed that information from mail-in voting could be used to execute old warrants. I have seen no evidence that voting by mail exposes individuals to increased police attention.  The State of New York's Board of Elections has explicitly claimed that such information is not used to execute old warrants. But this false claim could confuse and deter individuals from voting. There is evidence that individuals with prior interactions with the criminal justice system are often confused about whether they are eligible to vote, what is required to vote, and the potentially negative consequences of voting.[16] Further, randomized experiments show that providing prior felons with information that they are eligible to vote causes an increase in electoral participation.[17]  Spreading disinformation that vote by mail can be used to serve old warrants will likely counteract the positive impact of accurate information

---

[12] Thompson, Daniel M., et al. "Universal vote-by-mail has no impact on partisan turnout or vote share." *Proceedings of the National Academy of Sciences* 117.25 (2020): 14052-14056.

[13]  Pew Research "The Voting Experience in 2020" https://www.pewresearch.org/politics/2020/11/20/the-voting-experience-in-2020/

[14] Hopkins, Daniel J., et al. "Results from a 2020 field experiment encouraging voting by mail." *Proceedings of the National Academy of Sciences* 118.4 (2021).

[15] Grimmer, Justin, and Jesse Yoder. "The durable differential deterrent effects of strict photo identification laws." *Political Science Research and Methods* (2021): 1-17.

[16] Meredith, Marc, and Michael Morse. "The politics of the restoration of ex-felon voting rights: The case of Iowa." *Quarterly Journal of Political Science* 10 (2015): 41-100.

[17] Gerber, Alan S., et al. "Can incarcerated felons be (Re) integrated into the political system? Results from a field experiment." *American Journal of Political Science* 59.4 (2015): 912-926.

about felon voting rights by confusing voters, and even cause individuals already uncertain about participation to not cast their vote. Several states where the robocall was placed, including Michigan, Ohio, Illinois, and New York, allow ex-felons to vote, and the confusion wrought by the robocall could reasonably be expected to impact those voters.

Second, the robocall also makes the false claim that credit card companies will use the information collected from mail in ballots to collect outstanding debt.  Again, I have seen no evidence that voting by mail increases an individual's risk of credit card collections. The State of New York's Board of Elections has explicitly claimed that it does not provide vote-by-mail information to creditors in the way implied by the call.  But this information is likely to confuse and deter voters who have credit card debt. Again, the motivation for this information is a racist stereotype that African Americans are negligent in paying debts. But it also implies that voting by mail will enable aggressive debt collectors—disinformation likely to confuse and deter voting.

Third, the robocall contains false claims about how information from vote by mail would be used by the CDC for mandatory vaccinations. Again, I have seen no evidence that this claim is true. The State of New York's Board of Elections has explicitly stated that New York voting records are not given to the CDC. This claim mirrors the racially charged false claims used by the IRA in 2016.   While polling data shows that African Americans are supportive of vaccines overall, the vaccination rates in African American communities lagged behind other racial groups around the time of the election.[18] In part, this skepticism is due to a series of horrific medical experiments like the Tuskegee experiment where some participants were allowed to continue to suffer from syphilis.[19] Evoking forced vaccinations not only is a reminder of this painful history, it also is intended to coerce Black citizens to not cast their ballots using mail voting.

**Opinion Three: The disinformation in Wohl and Burkman's robocall degrades the quality of democracy in the U.S.**

The disinformation in Wohl and Burkman's robocalls are corrosive to US democracy.  Representative democracy requires citizens to trust that their elected representatives reflect the preferences of citizens.  Skepticism about electoral institutions undermines this essential trust.  If citizens perceive their elected officials to be illegitimate, those citizens have reason to be skeptical of the policies their officials enact and ultimately may begin to be skeptical that power should be transferred at all.

Research shows that messages similar to the content of Wohl and Burkman's robocalls increase doubt in electoral institutions and mistrust in election results.  Across studies, experimentally exposing citizens to election-skeptical messages increases doubt about election administration in the US and fosters mistrust in the election results.[20]  What's more, evidence

---

[18] Padamsee, Tasleem J., et al. "Changes in COVID-19 Vaccine Hesitancy Among Black and White Individuals in the US." *JAMA Network Open* 5.1 (2022): e2144470-e2144470.
[19] Moore, Justin Xavier, et al. "Correlates of COVID-19 vaccine hesitancy among a community sample of African Americans living in the Southern United States." *Vaccines* 9.8 (2021): 879.
[20] Clayton, Katherine et al. "Elite Rhetoric Can Undermine Democratic Norms" *Proceedings of the National Academy of Sciences.*  2021. 118 (23)

shows that once trust is lost, it is difficult to restore.  Similar studies show that corrective information from trusted news sources does little to repair the damage the election-skeptical messages have done.[21]

The corrosive effects of Wohl and Burkman's robocalls are both immediate and potentially long-lasting.  Repairing the damage from these disinformation campaigns will require substantial effort, if repair is possible at all.

**VI. Conclusion.**

In this assessment of the August 20 robocall, I have concluded that Wohl and Burkman mimicked key aspects of the Russian IRA's successful 2016 disinformation campaign and that the type of disinformation the robocall conveyed was likely to confuse voters and deter them from voting.

/s/ Justin Grimmer

---

[21] Berlinski, Nicolas et al. "The Effects of Unsubstantiated Claims of Voter Fraud on Confidence in Elections" 2021. *Forthcoming.*

# Justin Grimmer

| | | |
|---|---|---|
| <small>CONTACT INFORMATION</small> | Department of Political Science<br>Stanford University<br>Encina Hall West<br>616 Jane Stanford Way<br>Stanford, CA 94305<br>Office: 212 | *Voice:* (617) 710-6803<br>*email:* `jgrimmer@stanford.edu` |

<small>EMPLOYMENT</small>

**Stanford University**
Assistant Professor, Department of Political Science. 2010-2014.
Associate Professor, Department of Political Science. 2014 - 2017. 2018.
Associate Professor (by courtesy), Department of Computer Science. 2016-2017.
Professor, Department of Political Science. 2018 - Present

**Hoover Institution**
Senior Fellow. 2018-present

**University of Chicago**
Associate Professor, Department of Political Science and the College. 2017-2018.

<small>EDUCATION</small>

**Harvard University** *Department of Government*
Ph.D Political Science, 2010
A.M. Political Science, 2009

**Wabash College**,
A.B. Mathematics and Political Science 2005
*Summa cum laude*, Distinction in Mathematics and Political Science Comprehensive Exams

<small>BOOKS</small>

Representational Style in Congress: What Legislators Say and Why It Matters. *Cambridge University Press*, 2013.

The Impression of Influence: Legislator Communication, Representation, and Democratic Accountability. With Sean Westwood and Solomon Messing. *Princeton University Press*. 2014.

Text as Data: A New Framework for Machine Learning and the Social Sciences. With Margaret E Roberts and Brandon Stewart. *Princeton University Press*. 2022.

<small>PUBLICATIONS</small>

"Naïve regression requires weaker assumptions than factor models to adjust for multiple cause confounding" (with Dean Knox and Brandon Stewart) *Conditional Accept, Journal of Machine Learning Research*

"A Women's Voice in the House: Gender Composition and Its Consequences in Committee Hearings". with Pamela Ban, Jaclyn Kaslovsky, and Emily West *Forthcoming, Quarterly Journal of Political Science*

"Causal Inference with Latent Variables" with Christian Fong. *Forthcoming, American Journal of Political Science.*

"Partisan Enclaves and Information Bazaars: Mapping Selective Exposure to Online News" with Matt Tyler and Shanto Iyengar. *Forthcoming, Journal of Politics*

"No Evidence for Systematic Voter Fraud: A Guide To Statistical Claims About the 2020 Election" (with Andrew C. Eggers and Haritz Garro) *Proceedings of the National Academy of Sciences.* 2021.

"Machine Learning for Social Science: An Agnostic Approach" with Margaret E. Roberts and Brandon Stewart. *Annual Review of Political Science.* 2021

"The Durable Differential Deterrent Effect of Strict Photo Identification Laws" with Jesse Yoder. *Political Science Research and Methods.* 2021.

"Political Cultures". with Lisa Blaydes. *Political Science Research and Methods.* 2020.

"Obstacles to Estimating Voter ID Laws' Effect on Turnout". with Eitan Hersh, Marc Meredith, Jonathan Mummolo, and Clayton Nall. *Journal of Politics.* 2018. 80 (3).

"Mirrors for Princes and Sultans: Advice on the Art of Governance in the Medieval Christian and Islamic Worlds" with Lisa Blaydes and Alison McQueen. *Journal of Politics.* 2018. 80 (4).

"Estimating Heterogeneous Treatment Effects and the Effects of Heterogeneous Treatments with Ensemble Methods" with Solomon Messing and Sean J. Westwood. *Political Analysis* 2017. 25(4). 413-434.

"Discovery of Treatments from Text Corpora" with Christian Fong. *In Proceedings of the Annual Meeting of the Association for Computational Linguistics* (ACL 2016) Berlin, Germany

"Money in Exile: Campaign Contributions and Committee Access" with Eleanor Neff Powell. *Journal of Politics.* 2016. 78(4). 974-988.

"Measuring Representational Style in the House: The Tea Party, Obama, and Legislators' Changing Expressed Priorities" in *Data Analytics in Social Science, Government, and Industry* Edited Volume from *Cambridge University Press.* 2016.

"TopicCheck: Interactive Alignment for Assessing Topic Model Stability" *North America Chapter of the Association for Computational Linguistics: Human Language Technologies (NAACL HLT).* Jason Chuang, Molly Roberts, Brandon Stewart, Rebecca Weiss, Dustin Tingley, Justin Grimmer, and Jeffrey Heer. 2015.

"We're All Social Scientists Now: How Big Data, Machine Learning, and Causal Inference Work Together" Part of Symposium on "Formal Theory, Causal Inference, and Big Data" *PS: Political Science & Politics* , 2015. 48(1), 80-83

"Computer-Assisted Content Analysis: Topic Models for Exploring Multiple Subjective Interpretations." *Advances in Neural Information Processing Systems Workshop on Human-Propelled Machine Learning.* Jason Chuang, John D. Wilkerson, Rebecca Weiss, Dustin Tingley, Brandon M. Stewart, Margaret E. Roberts, Forough Poursabzi-Sagdeh, Justin Grimmer, Leah Findlater, Jordan Boyd-Graber, and Jeffrey Heer. 2014.

"Congressmen in Exile: The Politics and Consequences of Involuntary Committee Removal" with Eleanor Neff Powell. *The Journal of Politics*, 2013. 75 (4), 907–920

"Appropriators not Position Takers: The Distorting Effects of Electoral Incentives on Congressional Representation". *American Journal of Political Science*, 2013. 57 (3), 624–642.

"Text as Data: The Promise and Pitfalls of Automatic Content Analysis Methods for Political Documents" with Brandon Stewart. *Political Analysis*, 2013. 21 (3), 267–297.

"Evaluating Model Performance in Fictitious Prediction Problems". Discussion of "Multinomial Inverse Regression for Text Analysis" by Matthew Taddy. *Journal of the American Statistical Association* 2013.108 (503) 770-771

"Elevated Threat-Levels and Decreased Expectations: How Democracy Handles Terrorist Threats" with Tabitha Bonilla. *Poetics*, 2013. 41, 650-669.
   - Special issue on topic models in the social sciences

"How Words and Money Cultivate a Personal Vote: The Effect of Legislator Credit Claiming on Constituent Credit Allocation" with Solomon Messing and Sean Westwood. *American Political Science Review*, 2012. 106 (4), 703–719.

"General Purpose Computer-Assisted Clustering and Conceptualization" with Gary King. *Proceedings of the National Academy of Sciences*, 2011. 108 (7), 2643-2650.

"An Introduction to Bayesian Inference Via Variational Approximations" *Political Analysis*, 2011. 19(1), 32–47.
   - Included in *Political Analysis* virtual issue on Big Data in Political Science

"Approval Regulation and Endogenous Provision of Confidence: Theory and Analogies to Licensing, Safety, and Financial Regulation" with Daniel Carpenter and Eric Lomazoff. *Regulation and Governance*. 2010. 4(4) 383-407.

"A Bayesian Hierarchical Topic Model for Political Texts: Measuring Expressed Agendas in Senate Press Releases" *Political Analysis*, 2010. 18(1), 1–35.
   - Included in *Political Analysis* virtual issue on Bayesian methods in Political Science

WORKING PAPERS    "How to Make Causal Inferences Using Texts" with Naoki Egami, Christian Fong, Margeret E. Roberts, and Brandon Stewart *Revise and Resubmit*

"What Can We Learn About How Political Campaigns Activate Attitudes?" with Will Marble and Cole Tanigawa-Lau.

"American Support for Political Violence is Lower than Expected" with Sean Westwood, Clayton Nall, and Matt Tyler. *Revise and Resubmit*

"Causal Inference in Natual Language Processing: Estimation, Prediction, Interpretation, and Beyond". with Amir Feder, Katherine A. Keith, Emaad Manzoor, Reid Pryzant, Dhanya Sridhar, Zach Wood Doughty, Jacob Eisenstein, Roi Reichart, Margaret E. Roberts, Brandon M. Stewart, Victor Veitch, Diyi Yang. *Revise and Resubmit*

"The Unreliability of Measures of Intercoder Reliability, and What to do About it". with Gary King and Chiara Superti.

"Estimating the Contribution of Voting Blocs to Candidate's Victories" with Will Marble. *Invited to Resubmit*

"Potomac Fever or Constituent Ombudsman?: TestingTheory of Legislative Capacity and Priorities". with Devin Judge-Lord and Eleanor Neff Powell. (Under Review).

"Assessing the Reliability of Probabilistic US Presidential Election Forecasts May Take Decades" with Dean Knox and Sean Westwood (Under Review).

| | |
|---|---|
| REVIEWS AND OTHER WRITING | Review of *Cyberwar: How Russian Hackers and Trolls Helped Elect a President* Public Opinion Quarterly. 2019. 83, 1. |
| | "Dismantling Trump's Election Fraud Claims". Washington Times, February 8,2021. with Andrew B. Hall |
| | "In the voter fraud debate, be wary of junk science". The Hill, August 27, 2021. with Andrew B. Hall and Daniel Thompson |
| **Public Engagement** | "Strengthening the Integrity of Presidential Elections" American Enterprise Institute Panel. June, 2021. https://www.c-span.org/video/?512799-1/strengthening-integrity-presidential-elections |
| HONORS AND AWARDS | 2018. Wabash College Jeremy R. Wright Young Alumnus Distinguished Service Award |
| | 2015. Political Methodology section emerging scholar award. Awarded to a young researcher, within ten years of their degree, who is making notable contributions to the field of political methodology. |
| | 2015. School of Humanities and Sciences Dean's award for achievement in teaching. |
| | 2014. The Richard F. Fenno, Jr. Prize. Awarded to the best book in legislative studies published in 2013. |
| | 2013. *Political Analysis* Editor's Choice Award for an article providing an especially significant contribution to political methodology. |
| | 2012. School of Humanities and Sciences Dean's award for achievement in the first years of teaching at Stanford. |
| | 2011. Warren Miller Prize. Awarded for the best paper published in *Political Analysis* in 2010. |
| | 2010. Senator Charles Sumner Prize. Awarded by the Harvard Government faculty for the best dissertation from the legal, political, historical, economic, social, or ethnic approach, dealing with any means or measures tending toward the prevention of war and the establishment of universal peace. |
| | 2010. Robert H. Durr award, for the best paper presented at the 2009 Midwest Political Science Association meeting applying quantitative methods to a substantive problem. |
| | 2010. Certificate of Distinction in Teaching, Gov 2010: Qualitative and Quantitative Research Design. |
| | 2008. John T. Williams Prize. Awarded by the Society for Political Methodology for best dissertation proposal. |
| | 2005. Phi Beta Kappa, Wabash College. |
| | 2005. John Maurice Butler Prize. Awarded to the senior who, by vote of the Wabash College faculty, has highest achievements in scholarship and character. |
| | 2005. N. Ryan Shaw II Political Science Award. Awarded to the outstanding senior political science major. |
| | 2005. George E. Cascallen Prize in Mathematics. Awarded to the outstanding senior Mathematics |

major.

| | |
|---|---|
| FELLOWSHIPS AND GRANTS | 2013-2016. Stanford University Victoria Schuck Faculty Scholar in the School of Humanities and Sciences. |

2013-2014. Stanford University, United Parcel Service Endowment Fund Grant, "Infrastructure Spending in American Cities".

2013-2014. National Fellow, Hoover Institute.

2012-2013. Faculty Fellow, Institute for Research in the Social Sciences.

2011-2013. Visiting Fellow, Hoover Institute.

2010. Dirksen Center Congressional research award, for "It's the Flow Not the Stock: Congressional Staff and Their Influence on Policy Outcomes" (with Matt Blackwell).

2009-2010. Center for American Political Studies (CAPS) dissertation completion fellowship.

2009. Eliot Dissertation Completion Grant. A competitive, merit-based Graduate School of Arts and Sciences fellowship for the Social Sciences (declined).

2008-2009. CAPS dissertation research fellowship.

2005-2006. National Science Foundation Graduate Research Fellowship, Honorable Mention.

SOFTWARE AND PATENTS

**Patent Number: US 8,438,162 B2** Method and Apparatus for Selecting Clusterings to Classify a Predetermined Data Set (with Gary King)

**Patent Number: US 9,519,705 B2** Method and Apparatus for Selecting Clusterings to Classify a Data Set. (with Gary King)

**Consilience: Software for Understanding Large Volumes of Unstructure Text** (with Merce Crosas, Gary King and Brandon Stewart) (consilience.com).
  Implements a general purpose methodology to facilitate discovery in large collections of texts

**textEffect (CRAN)**
  Implements text as intervention method introduced in Fong and Grimmer (2016).

**"arima: ARIMA time series models"** in Kosuke Imai, Gary King, and Olivia Lau "Zelig: Everyone's Statistical Software". 2006.

INVITED PRESENTATIONS AND WORKSHOPS (LAST 3 YEARS)

Department of Political Science. Northwestern University. 2018.
Methods Workshop. Northwestern University. 2018.
Methods Workshop. Department of Political Science. Yale University. 2018.
Methods Workshop. Department of Political Science. Texas A&M University. 2018.
MIDAS Interdisciplinary Seminar Series. University of Michigan. 2019.
American Politics Workshop. Department of Political Science. UC Berkeley. 2019.
American Politics Workshop. Department of Political Science. New York University. 2019.
Summer Institute in Computational Social Science. Princeton University. 2019.
Empirical Implementations of Theoretical Models. Emory University. 2019.
Southern California Methods Workshop. UC Riverside. 2019.
Data Science Institute. Columbia University. 2019.

Department of Politics and CSDP. Princeton University. 2019.
Text as Data Workshop. US Census Bureau. 2019.
TextXD Keynote Address. UC Berkeley. 2019.
Department of Political Science. University of North Carolina. 2020.
Institute for Advanced Study. Princeton University. 2020
Duke Law School. 2020.
International Methods Colloquim. 2021.
MIT Election Administration Workshop. 2021. Princeton Elections Workshop. 2021.
Chicago Committee of Quantitative Methods. 2021.

PROFESSIONAL AND DEPARTMENTAL SERVICE

Reviewer for *American Political Science Review, American Journal of Political Science, Journal of Politics, Journal of the American Statistical Association, Proceedings of the National Academy of Sciences, British Journal of Political Science, Political Analysis, State Politics and Policy Quarterly, Public Opinion Quarterly, Journal of Public Economics, Legislative Studies Quarterly, Congress and the Presidency, Journal of Political Communication, Political Science Research and Methods, Research and Politics, American Politics Research, Political Behavior, Journal of Information Technology & Politics, Journal of Information Science, Journal of Artificial Intelligence Research, Evaluation and Program Planning, National Science Foundation, Journal of Social Structure, Sociological Methodology, Cambridge University Press, Oxford University Press, Social Forces, Chapman & Hall (CRC Press), North American Chapter of the Association for Computational Linguistics: Human Language Technologies (NAACL HLT), Association for Computational Linguistics Annual Conference (ACL), Social Science Computer Review, Swiss National Science Foundation*

Interim President, Text as Data Society Member, Department Policy and Planning Committee (2015-2017, 2018-present) Member, Department DEI Committee (2020-2021)
Co-Director, Democracy and Polarization Lab. 2018-Present
Chair, Omnibus Faculty Search Committee. 2018
Organizer Text as Data. 2019. (TADA2019)
Editorial Board Member, *Political Analysis* (2014-2015)
Co-Editor, *Political Analysis Letters* (2014-2018)
Editorial Board Member, *Journal of Politics* (2015-Present)
Graduate Admissions Committee, 2010-2011
Omnibus Faculty Search Committee, 2011-2012
Award Committee, Warren Miller Prize, 2012-2013
Award Committee, Fenno Prize, 2014-2015
Methods Curriculum Committee, 2013-2014
Undergraduate Curriculum Committee, 2013-2014, 2014-2015
Policy and Planning Committee, 2014-2016, 2018-Present
Director of Undergraduate Studies, 2015-2016.
Co-organizer: Stanford Conference on Computational Social Science. June 1st, 2012.
Section Chair for Legislative Campaigns and Elections. MPSA, 2013.
Program Committee: Neural Information Processing Systems (NIPS), Computational Social Science Workshop, 2011, Topic Modeling Workshop 2013

## The Harmful Impact of Racial Stereotypes

Stereotypes are preconceived, oversimplified ideas about a particular group that are transmitted culturally. While stereotypes can be overt (think of jokes about who is and who isn't a good driver), they can also be quite subtle and coded. Stereotypes are particularly problematic for the groups associated with them, because they are faced with having to debunk them repeatedly, whether by their words or their deeds. Racial stereotypes in particular tend to be learned through acculturation (being immersed in contexts where they are frequently used) when we are children, making such stereotypes difficult to unlearn for everyone. There is a long history of subtle and coded stereotypes being used in American politics. Often in political advertising, racial stereotypes are cued either subtly or not so subtly. Subtle cues of anti-Black stereotyping are often called "dog whistles" because they are designed to make a white viewer or a listener think of an anti-Black racial stereotype without actually stating the stereotype itself.

Anti-Black stereotypes are particularly enduring in U.S. politics and have been used in American politics since early in our history, when racial stereotypes about Sally Hemings were explicitly used against Thomas Jefferson while he ran for president. In the 20th century Vice President George H.W. Bush's campaign for president distributed a television ad that criticized his opponent for being soft on crime using the case of a Black man, Willie Horton, as the face of crime in America. Three contemporary anti-Black stereotypes are: 1) Blacks are criminals, 2) Blacks are lazy and financially irresponsible, and 3) Blacks are intellectually inferior. There is no empirical evidence supporting these stereotypes, but they persist in our culture and are frequently exploited in our politics.

The use of anti-Black stereotypes has a long history of disempowering Black voices in our democracy. At the founding of the United States, stereotypes that Black people were ignorant or incapable of controlling their emotions were used as justifications for their ongoing enslavement and exclusion from the benefits of U.S. citizenship. After Black male citizenship was incorporated into the U.S. Constitution following the Civil War, these stereotypes persisted and forced Black people to act in ways that proved they were capable of citizenship, a requirement that was not imprinted onto white citizens. During the early part of the 20th century, parts of the New Deal specifically excluded certain sectors that were dominated by Black workers, including domestic and agricultural work. When they chose to speak up, Black families were routinely punished for speaking out about mistreatment, and their claims were summarily dismissed as untrue due to both negative stereotypes. Public opinion surveys routinely find that substantial percentages of non-Black American citizens believe that these kinds of claims do not reflect the truth and instead reflect Black people's unwillingness to work hard and embrace core American values. When Black people express the facts of their lives and that reality is dismissed, it prevents them from obtaining the kind of full citizenship that white Americans have access to.

There are additional harms to the use of anti-Black stereotypes that go beyond the damage to our democracy's ability to provide all citizens equal ability to have their concerns addressed. The response to the use of such stereotypes can generate negative emotional responses in the group being stereotyped, including anger. For example, being exposed to the three anti-Black stereotypes previously listed is likely to generate anger among Black people who hear or see these misrepresentations. While

the anger response seems logical, Black people also have strict societal limitations around how they can respond to such stereotypes even if they feel angry. Political psychologists Davin Phoenix and Antoine Banks have each written books about how anger is expressed or suppressed among white people (Banks) or Black people (Phoenix) and the impact on how they participate in politics. The suppression of such anger in the face of both the racist stereotype and the discriminatory societal constraint on expressing the anger has been empirically linked to multiple negative health outcomes.[1]

The receipt of robocalls that cue anti-Black stereotypes are part of a class of discriminatory experiences called "macro-stressors." These events occur outside of a recipient's control, without warning, triggering emotional reactions such as anger, sadness, and anxiety that has been well documented in the psychological literature. It is the suppression of such reactions and their impacts on the physical body that make the expressions of such stereotypes harmful.

Anti-Black racial discrimination has been associated with negative health outcomes for Black people. For example, Williams and Muhammad documented connections between racial discrimination and intrauterine fibroid tumors and breast cancer in Black women across the United States. Margaret Hicken and her co-authors (2013) found that racial discrimination increases vigilance—a trauma response—which may in turn reduce Black people's ability to get quality sleep.[2] Specifically, such traumas increase what scholars call "perseveration," or vigilance about the next discriminatory experience, in a way that triggers the biological stress system. Anti-Black stereotypes, therefore, both deprive Black voters of democratic agency and threaten their physical health.

**Statement of Inquiry**

I was asked to determine whether the robocall sent on August 26, 2020 included anti-Black stereotypes and their likely effect on Black recipients of the call. To make this determination I reviewed three separate robocalls – one purporting to be from a woman racially coded as Black ["Tamika Taylor"] and two purporting to be from Jack Burkman. I also reviewed multiple emails exchanged between Burkman and Jacob Wohl regarding these calls and the responses such calls generated. I then considered these materials within the context of nearly 100 years of research about the negative impacts of racial stereotypes in U.S. politics.

**Statement of qualifications**

I am Dean's Professor of Gender Studies and Chair of the Political Science and International Relations Department at the University of Southern California, where I have conducted research and taught for the last 14 years. I previously held appointments at Yale University (5 years; Political Science and African American Studies); Pennsylvania State University (1 year, Political Science and Gender Studies) and the University of San Francisco (2 years; Politics). My career spans **22** years as a professional political scientist. My area of expertise is the impact of race and gender on U.S. politics. As a leading expert in the

---

[1] Banks, A. (2014) *Anger and Racial Politics: The Emotional Foundation of Racial Attitudes in America*. Cambridge: Cambridge University Press; Phoenix, D. (2019). *The Anger Gap: How Race Shapes Emotion in Politics* (pp. I-Ii). Cambridge: Cambridge University Press.

[2] Hicken, M. et al (2013). "Every shut eye, ain't sleep": The role of racism-related vigilance in racial/ethnic disparities in sleep difficulty. *Race and Social Problems* vol. 5,2 (2013): 100-112.

field I have written _The Politics of Disgust and the Public Identity of the "Welfare Queen,"_ which analyzes the way racial (and gender) stereotypes are used in debates about welfare reform. I have also written two books about the negative impacts of racism (and sexism) in U.S. politics: _Solidarity Politics for Millennials_ and _Intersectionality: An Intellectual History_. These three books and my numerous articles on these subjects have been cited in **21** disciplines beyond political science, including law and medicine. I have not testified as an expert witness in the previous four years. I am being paid $450 an hour for my work on this case.

**Opinion 1: The Robocall is Racially Coded**

My determination that the robocall is racially coded is based on four conclusions I arrived at after listening to the robocall multiple times and an in-depth review of the email exchanges between Burkman and Wohl.

Emails between Wohl and Burkman explicitly indicate that the first robocall from a "Tamika Taylor" should be sent "to black [sic] neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte, Richmond, Atlanta and Cleveland." Each one of these cities has a significant Black population, and each city has a well-developed history of Black democratic participation.

The call purports to come from a Black woman named "Tamika Taylor:" "Hi. This is Tamika Taylor from Project 1599." "Tamika" is a name racially coded as Black, and prior studies in economics and psychology have shown that names are coded Black and White by employers who are hiring (Bertrand and Mullainathan 2004);[3] by Air BnB hosts (Edelman, Luca and Svirsky 2017);[4] and teachers (Rubenson 2021). Moreover, at the time of the robocall the police killing of Breonna Taylor made national news for several months prior to the call (May to August 2020). Her mother, Tamika Palmer, appeared repeatedly in national news media to demand justice for her daughter (and has been repeatedly misidentified in the press as "Tamika Taylor"). I conclude that the attribution of the robocall's voice to a "Tamika Taylor" is therefore racially coded as Black.

Related to the name attribution is the name of the robocall's alleged sponsor. The first full sentence of the call identifies Tamika Taylor as someone from "Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl." There are two additional racially coded pieces of information in this sentence. First, the name "Project 1599" is very similar to the 1619 Project, a very well-known initiative of the _New York Times_ that commemorates the 400th anniversary of the first slave ship carrying enslaved Africans, the ancestors of many current Black people in the United States. Second, Project 1599 is described as a "civil rights" organization, implying a connection to other Black-led and Black-focused civil rights organizations like the NAACP, even though the Project 1599 founders are not Black.

Last the script uses dated slang as part of the effort to further authenticate the Blackness of the caller. This racial coding continues later in the call with the use of language supposedly associated with Black

---

[3] Bertrand, M. & Mullainathan, S. (2004). Are Emily and Greg More Employable Than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination. _American Economic Review_, 94 (4): 991-1013.
[4] Edelman, B., Luca, M., & Svirsky, D. (2017). Racial Discrimination in the Sharing Economy: Evidence from a Field Experiment. _American Economic Journal: Applied Economics_, 9 (2): 1-22.

people: "Don't be finessed into giving your private information to the Man…" The Urban Dictionary defines "finessed" as "to steal from someone or scam them."[5] This term has supposedly been in use by urban Black people since 2016. "The Man" has a much longer history that dates to the middle part of the 20th century. As younger civil rights activists entered into the civil rights movement, their brasher style nicknamed white men who were part of the American establishment as "The Man." This usage by activists filtered into what are now called Blaxploitation films of the 1970s like "Shaft" and "Foxy Brown," which were written to attract Black audiences to movie theaters but contained characters and plots that were rife with anti-Black stereotypes very similar to those that appear in this robocall. Recipients of this call are encouraged through these racially stereotypical cues to believe that they are receiving an authentic call from a Black woman on behalf of a civil rights organization that has their best interests at heart and is providing accurate information. However, it is clear through the dated language in particular that something is stereotypical and amiss rather than accurate.

My review of email exchanges between Wohl and Burkman, in which the robocall is described as a "black robocall" that elicits further supports the conclusion that the call was racially coded with anti-Black stereotypes.

**Opinion 2: The Robocall Cued the Stereotype that Black People are Criminals**

When the caller states, "Mail in voting sounds great. But did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants…" they are cuing the stereotype of Black people as criminals. There is a long history of stereotyping Black people as criminals that began in slavery, criminalizing basic actions afforded to whites. Enslaved Black people were arrested for daring to go out after dark in violation of curfews applied to slaves, or daring to run away from forced enslavement. These "violations" of law began to curdle into stereotypes of Black people as excitable and dangerous in Thomas Jefferson's Notes on the State of Virginia and persisted through the establishment of the U.S. prison system. In addition to the historical record, social psychological research has also documented the presence of the stereotype. Author Brent Staples described his own personal encounters with this anti-Black stereotype throughout his life, and shares that he developed a coping mechanism to handle white people's stereotyping of him as a criminal: he would literally whistle non-threatening music from classical composer Antonio Vivaldi or the Beatles in an attempt to set white people who were stereotyping him at ease (Steele 2011).[6] This stereotype of Black people as criminals is also described in Ta Nehisi Coates' _Between the World and Me_ (2015) when he discusses the police killing of Prince Jones.[7]

**Opinion 3: The Robocall Cued the Stereotype that Black People are Financially Irresponsible**

After mentioning the use of the public database by police the message continues, "and be used by credit card companies to collect outstanding debts?" This part of the call is connected to a longstanding stereotype of Black people as lazy and financially irresponsible. In my first book, _The Politics of Disgust_, I empirically documented the presence of this stereotype in U.S. politics and its connotation with Black

---

[5] _Finessed_. (2016, December 14). Urban Dictionary.
[6] Steele, C. M. (2011). _Whistling Vivaldi: How stereotypes affect us and what we can do_. W. W. Norton & Co.
[7] Coates, T. (2015). _Between the World and Me_. Spiegel & Grau.

women in particular. Comments like this abounded in my findings from members of the U.S. Congress and in the news media when talking about the racially coded "welfare recipient:" "It's not hard to clothe your kids, folks. Go to second-hand shops."[8] This racial coding was successful in shifting the political conversation because it relied on a chronically accessible stereotype of Blacks as lazy, which then delegitimized anything Black women voters organizing around poverty issues might say that contested the stereotype. Historian Brenda Stevenson has traced this stereotype back to slavery, when it was used as a way to justify why enslaved Black people could not be freed, and to justify brutal physical violence to "force" them to work.

For most Black people who are neither lazy nor irresponsible, these kinds of stereotypes are enraging, as author Ellis Cose documented in *The Rage of a Privileged Class: Why are Middle-Class Blacks Angry? Why Should America Care?*[9] Moreover as Davin Phoenix has documented in *The Anger Gap*, the presence of anger from stereotypes and racial injustices drive many Blacks to alternative forms of political participation like protest instead of voting.[10] As I noted above the stereotypes also reduce Black participation in democratic negotiation by attaching stigmatizing, emotionally charged codes to their political claims that make them less likely to attract support from others and ultimately less likely to get issues affecting them resolved. Negative health outcomes are also a serious risk after exposure to any of the three calls shared with me.

**Opinion 4: The Robocall Employed the Stereotype that Black people are Intellectually Inferior**

The call's final allegation, that the CDC is pushing for access to the mail-in voting database, defies credulity: "The CDC is even pushing to use records from mail-in voting to track people for mandatory vaccines." Together these three allegations, which are easily disproved, represent an effort to stereotype Black people as intellectually inferior. Here the notion is to provide a conspiracy theory tied to vaccine skepticism that Black people are gullible enough to believe.

Journalist Harriet Washington traced the history of nonconsensual medical experimentation on Black people to the era of slavery in her 2006 book, *Medical Apartheid: The Dark History of Medical Experimentation on Black Americans from Colonial Times to the Present*. While this dark history undoubtedly disturbing despite the many medical advances that emerged from it, there has been an equally robust effort among Black people throughout the centuries to obtain equal medical care through the pursuit of medical degrees and provision of community health care services.

As in the previous opinions, this stereotype of Black intellectual inferiority and rampant vaccine skepticism is easily debunked. Recent public health research has shown exactly the opposite reality: vaccine hesitancy has decreased more quickly among Black Americans than among white Americans, according to an article published in the *Journal of the American Medical Association* in January 2022.[11]

---

[8] Hancock, A. (2004). *The Politics of Disgust: The Public Identity of the Welfare Queen*. NYU Press.
[9] Cose, E. (1994). *The Rage of a Privileged Class: Why Are Middle-Class Blacks Angry? Why Should America Care?* Harper Perennial.
[10] Phoenix, D. (2019). *The Anger Gap: How Race Shapes Emotion in Politics*. Cambridge University Press.
[11] Padamsee, T. et al., (2022). Changes in COVID-19 Vaccine Hesitancy Among Black and White Individuals in the US. *Journal of the American Medical Association* 5(1).

Between December 2020 and June 2021, just two months prior to the robocall, Black Americans' openness to the vaccine increased by greater rates during that period than did whites' openness. The authors therefore attribute different vaccination rates to reasons other than vaccine hesitancy stereotype Blacks are often associated with.

The history of this stereotype is a key part of the debate over U.S. slavery, when scholars pursued academic studies designed to prove that Black people were not fully human and therefore not worthy of equal status. Thomas Jefferson and Benjamin Banneker were two prominent Americans on either side of this debate, with Banneker writing a letter to Jefferson and providing an entire book he had written "in his own hand[writing]" in order to prove that Black people were not intellectually inferior to whites. This stereotype persisted into the 20th century. In _The Rage of a Privileged Class_ Cose talked to a lawyer who realized he was stereotyped as a Black lawyer and what that meant: "Though he generally did well, he sensed that he was not really seen as a litigator, but as a _black_ litigator [sic]: 'I would go to court and do a workman like job, nothing special,' and receive rave reviews, not only from colleagues but from judges. 'They were impressed with me because their assumption was that I should have been dumb and ignorant.'"[12] Public opinion experts Kinder and Sanders estimate that as many as 10% of white Americans still believe Black people are inferior to white people and that the percentage has now remained stable for over 50 years.

**Opinion 5: The Impact of Receiving This Robocall Filled with Anti-Black Stereotypes is Anger and Detrimental Health Effects**

Based on the above review of the social science and public health literature, the impact of receiving this call as a Black voter is profoundly negative. It is clear from the emails exchanged between Wohl and Burkman that the robocall was associated with Black people, and the racially coded language is similarly clear. To receive a call like this would lead to Black voters feeling anger that is, according to scholars, difficult to articulate in public or in political conversations without serious repercussions. Where, then, does that anger go?

Over the past thirty years a number of public health scholars have determined that experiences of racial discrimination – both verbal (like a phone call) and behavioral (like a physical strike) – have significant negative health impacts on Black people. In addition to the specific health outcomes described in the introduction to this brief, public health scholar Arline Geronimus has coined the term "weathering" to account for the collective disruption to the cardiovascular, metabolic, and immune systems generated by exposure to racial stressors. The increased negative impact of weathering on Black people leads to faster aging and earlier death than among white people.[13] A longitudinal study (1970-2004) of these mortality differentials led the scholars to conclude that excess Black mortality dampens Black political

---

[12] Cose, E. (1994). _The Rage of a Privileged Class: Why Are Middle-Class Blacks Angry? Why Should America Care?_ Harper Perennial.

[13] _See, e.g._, Geronimus, Hicken, Keene and Bound (2006). "Weathering and age patterns of allostatic load scores among Blacks and Whites in the US" American J of Public Health; also a 2010 article: https://link.springer.com/article/10.1007/s12110-010-9078-0

voices in the United States.[14] It is for these reasons that I conclude that the robocall's anti-Black stereotypes are emotionally damaging and that the negative impact of such calls goes far beyond typical politics.

/s/ Ange-Marie Hancock Alfaro

---

[14] Rodriguez, Geronimus, Bound, and Darling (2015) "Black Lives Matter: Differential Mortality and the Racial Composition of the U.S. Electorate, 1970-2004." Social Science & Medicine.

**Curriculum Vitae**
**Ange-Marie Hancock Alfaro, PhD**
**Dean's Professor & Chair**
**Political Science & International Relations Department**
**University of Southern California**
**Los Angeles, CA 90089-0044**
**Cell: 310-994-5563**
**ahancock@usc.edu**

Academic Positions:
University of Southern California (2008 - present)
    Dean's Professor, Political Science, Gender and Sexuality Studies (with tenure) (2019)
    Professor, Political Science & Gender and Sexuality Studies (with tenure) (2016)
    *Current Administrative Positions:*
- Chair, Department of Political Science & International Relations (2020-2023)
- Director, USC Institute for Intersectionality & Social Transformation (USC-IIST 2020 -)
- Director, Center for Leadership by Women of Color (2020 - )

    *Previous Administrative Position:*
- Director, Center for Feminist Research (2017-2021)
        Created new interdisciplinary writing and teaching opportunities for graduate students
- Chair, Gender and Sexuality Studies Department (2017-2020)
        Transformed the program into a regular academic department
- Dornsife Dean's Leadership Fellow (2017-2020)
        Assisted the vice-dean of social sciences with academic planning and administrative restructuring
- Associate Director, Center for the Study of Immigrant Integration (CSII) (2010-2013)

    *Affiliated Faculty*, Program for Environmental & Regional Equity (PERE) (2009-2013); Department of American Studies & Ethnicity

Yale University (2003 – 2008)
    Assistant Professor, African American Studies / Political Science
    *Previous Administrative Position*:
- Director of Undergraduate Studies, Ethics, Politics and Economics Program (2004-2007)

Pennsylvania State University (2002-2003)
Assistant Professor, Political Science / Women's Studies

University of San Francisco (1999-2002)
James Irvine Foundation Dissertation Fellow / Assistant Professor, Politics

**Education:**
Doctor of Philosophy (2000) University of North Carolina, Chapel Hill (Political Science)
Master of Arts (1997) University of North Carolina, Chapel Hill (Political Science)
Bachelor of Arts (1991) New York University (Politics)

**Projects in Progress**
Hancock Alfaro, Ange-Marie. *African American Political Thought: Contestation and Change*.

*Status:* Under contract with Polity Press; the first comprehensive survey of African American political theory from the founding of the United States to present.

**Hancock Alfaro, Ange-Marie**, Nancy Hernandez, Chaerim Kim and Meghana Maddali. "High Risk, High Reward: Examining the Ramifications of Vice President Kamala Harris' Policy Portfolio."
*Status:* Presented at Woman of Color Leads: Kamala Harris' First 100 Days Symposium; submitted to WPSA and NCOBPS conferences for 2022 presentations

Parmar, Parveen, **Hancock Alfaro, Ange-Marie**, Chun Lok Lam. "Intersectional Analysis of Patient Experience Presenting with COVID-19-like Syndromes to LAC+USC ED"
*Status:* Data Analysis

Garcia-Bedolla, Lisa, Marisa Abrajano, **Ange-Marie Hancock Alfaro**, Jane Junn and Sheryl Lightfoot, eds. *SAGE Handbook of Race, Ethnicity and Politics*.
*Status:* Under contract with SAGE

Hancock, Ange-Marie. Scaling Up Stories for Justice (Book Project)
*Status:* Proposal in preparation for submission to Oxford University Press; Research Design and Methodology companion book to *Intersectionality: An Intellectual History*.

**Publications:**
Hancock, Ange-Marie. ***Intersectionality: An Intellectual History*** (2016, Oxford University Press)
**Reception:** Cited across 22 fields: American Studies, Business, Critical Military Studies, Education, Environmental Studies, Ethnic Studies, Gender Studies, Geography, Human Resource Management, Journalism, Law and Society, LGBT Studies, Medicine, Migration Studies, Nursing, Political Science, Psychology, Public Health, Rhetoric, Sociology, Social Work, Theology

Hancock, Ange-Marie. ***Solidarity Politics for Millennials: A Guide to Ending the Oppression Olympics*** (2011, Palgrave-Macmillan; Revised paperback ed. December 2013)
**Reception:** Adopted as a required text in higher education, literary theory, political science and sociology courses in U.S. and Canada

Hancock, Ange-Marie. ***The Politics of Disgust and the Public Identity of the "Welfare Queen"*** (New York University Press, December 2004)
**Reception:** Winner, 2006 W.E.B. Du Bois Best Book Award, National Conference of Black Political Scientists; Winner, 2006 Best First Book Award, Race & Ethnic Politics Organized Section, American Political Science Association

*Peer-Reviewed Articles, Chapters, Special Journal Issues, and Symposia*
Hancock Alfaro, Ange-Marie. "When Words Don't Disappear: An Intersectional Analysis of Hate Speech." In: Hirschman, Nancy and Deborah Thomas, Eds. *Citizenship on the Edge*. Philadelphia: University of Pennsylvania Press, Forthcoming 2021.
Hancock Alfaro, Ange-Marie. "Stewardship of Intersectionality: A Complex Story." In: Fenstermaker, Sarah and Stewart, Abigail, Eds. *Gender Reconsidered*. New York: Palgrave, 2021.
Mendez Garcia, Matthew and **Ange-Marie Hancock Alfaro**, Eds. (2020) "Where Do We Begin? Preliminary Thoughts on Racial and Ethnic Diversity Within Political Science." In: Symposium: Racial and Ethnic Diversity in Political Science. *PS: Political Science and Politics*, 1-3.
Mendez Garcia, Matthew and **Ange-Marie Hancock Alfaro**, Eds. (2020) Symposium: Racial and Ethnic Diversity in Political Science. *PS: Political Science and Politics*.
Hancock Alfaro, Ange-Marie. "Black Masculinity Achieves Nothing without Restorative Care: An Intersectional Rearticulation of Frederick Douglass" A Political Companion to Frederick Douglass

(Series: Political Companions to Great American Authors), Neil Roberts, Volume Editor; Patrick Deneen, Series Editor. (Fall 2018)

Beltran, Cristina and **Ange-Marie Hancock**, co-editors (equal contribution & seniority). Latino/a Political Theory Special Issue of *Politics, Groups, and Identities* (June 2014)

Hancock, Ange-Marie**.** "Intersectional Representation or Representing Intersectionality? Reshaping Empirical Analyses of Intersectionality." In: Escobar-Lemmon, Maria and Michelle Taylor, Eds. Representation: The Case of Women (Oxford University Press), 2014

Hancock, Ange-Marie. "Trayvon Martin, Intersectionality and the Politics of Disgust." *Theory and Event*. (September 2012) 15:3

**Hancock, Ange-Marie** and Evelyn Simien. "Mini-Symposium: Intersectionality Research: New Directions for Scholarship in Political Science and its Applied Use Across Fields," *Political Research Quarterly* (March 2011).

Hancock, Ange-Marie. "An Untraditional Intersectional Analysis of the 2008 Election." *Politics and Gender* 5:1 (2009), 96-105

Hancock, Ange-Marie. "When Multiplication Doesn't Equal Quick Addition: Examining Intersectionality as a Research Paradigm." *Perspectives on Politics* 5:1 (2007), 63-69

**Hancock, Ange-Marie** and Issac Unah (Unah lead author) "Supreme Court Decision-Making, Subissue Salience and the Attitudinal Model," *Law & Policy* 28:3 (2006), 295-320

Hancock, Ange-Marie. "W.E.B. Du Bois: Intellectual Forefather of Intersectionality?" *SOULS* 7:3-4 (Summer/Fall 2005), 76-87

Hancock, Ange-Marie. "Overcoming Willful Blindness: Building Egalitarian Multicultural Women's Coalitions." Female Circumcision and the Politics of Knowledge: African Women in Imperialist Discourses. Obioma Nnaemeka, Ed., Greenwood Press (published 2005, 245-274)

Hancock, Ange-Marie. "Contemporary Welfare Reform and the Public Identity of the 'Welfare Queen'" *Race, Gender, Class* 10:1 (2003), 31-5

*Law Review Articles:*

Hancock, Ange-Marie. When is Fear for One's Life Race-Gendered? An Intersectional Analysis of the Bureau of Immigration Appeals In Re A-R-C-G Decision." *Fordham Law Review*, (May 2015)

Hancock, Ange-Marie. "Empirical Intersectionality: Two Approaches." *University of California, Irvine Law Review*, (May 2013)

*Externally Funded Policy Reports:*

Hancock Alfaro, Ange-Marie et al. (2021) "The Road to Thriving Black Communities" Black Equity Collective

Hancock Alfaro, Ange-Marie (2019) Finding Home, Staying Home: Women of Color's Experiences in California's Housing Crisis. California YIMBY

**Hancock Alfaro, Ange-Marie** and Chris Towler, editors (2019), "Agenda for California: An African American Perspective"

Sacha, Jeffrey (graduate assistant), Jared Sanchez (data analyst), Manuel Pastor (principal investigator) and **Ange-Marie Hancock** (researcher). "A Foot in Both Worlds: Institutionalizing Progressive Research Centers within Universities." Program for Environmental and Regional Equity (USC) and Atlantic Philanthropies. December 2013.

**Hancock, Ange-Marie**, Principal Investigator. "Giving Black in Los Angeles: Donor Profiles and Opportunities." Funded by the Liberty Hill Foundation. December 2011.

*Selected Invited Articles and Edited Works*

Hancock, Ange-Marie. "Intersectionality's Will Toward Social Transformation" *New Political Science*. 37:4 (December 2015), 620-627.

Hancock, Ange-Marie, Managing Editor. "Dialogue: Charles Mills' _The Racial Contract_ Today" *Politics, Groups, and Identities*. 3:3 (July 2015), 469-557.

Hancock, Ange-Marie. "Bridging the Feminist Generation Gap: Intersectional Considerations" *Politics and Gender* Volume 10:2 (June 2014), 292-296.

Hancock, Ange-Marie. "Thinking about the Book You Might Have Written: A Dialogues Response" *Politics, Groups and Identities*. 2:1 (March 2014), 160-163

Sacha, Jeffrey, Jared Sanchez, Manuel Pastor and **Ange-Marie Hancock**. A Foot in Both Worlds: Challenges in Institutionalizing Engaged Research. December 2013.

Hancock, Ange-Marie. "Neurobiology, Intersectionality, and Politics: Paradigm Warriors in Arms?" *Perspectives on Politics* 11:2 (June 2013), 504-507

**Ange-Marie Hancock** and Charles R. Hancock (Charles Hancock lead author). "Don't All Veins Look Alike? Comprehensively Attending to Diversity in the Vascular Surgery Specialty," with Charles R. Hancock. *Journal of Vascular Surgery*, Volume 51, Issue 4 Supplement (April 2010), S42-S46

Hancock, Ange-Marie. "DuBois, Race, and Diversity." The Cambridge Companion to W.E.B. DuBois. Shamoon Zamir, Editor. New York: Cambridge University Press (2008)

Hancock, Ange-Marie. "Intersectionality, Multiple Messages, and Causal Complexity: Commentary on Patricia Hill Collins' Black Sexual Politics" *Studies in Gender and Sexuality* 9 (2008), 14-31

Hancock, Ange-Marie. "Black Female Athletes." African Americans and Popular Culture, Todd Boyd, Editor. Westport, CT: Praeger (2008), 1-10.

Hancock, Ange-Marie. "Intersectionality as a Normative and Empirical Research Paradigm" *Politics and Gender*, June 2007:248-254

Bouwer, Karen and **Ange-Marie Hancock** (equal seniority and contribution) "UBUNTU: Humane Solutions and Success Stories from Africa," *Peace Review* 15:3 (2003), 251-316; 357-368

**Datasets/Archives**

*The Kamala Harris Project (Lead Convener; 2020 - )*
National nonpartisan research project to collect and analyze all elements of the first United States woman of color to serve as Vice President of the United States. Administered by a board of nationally-recognized scholars in political science, history, American studies and communications studies.

*2012 Collaborative Multiracial Political Survey (co-investigator)*
National telephone survey of registered voters with comparably large samples of African Americans, Latinos and Whites that partially replicates the 2008 survey design – available in six languages with robust samples of the four largest racial/ethnic groups: Whites, Latinos, Blacks, Asians. The 2012 CMPS contains 2,400 respondents registered to vote in the November 2012 election and partially replicates the 2008 CMPS.

*2008 Collaborative Multiracial Political Survey: (co-principal investigator)*
National telephone survey of registered voters with comparably large samples of African Americans, Asian Americans, Latinos, and Whites that is *the first multiracial and multilingual survey of registered voters across multiple states and regions in a presidential election*. In contrast to the 2008 American National Election Study (ANES), which oversampled Black and Latino voters, and was available in Spanish, the CMPS was available in six languages and contains robust samples of the four largest racial/ethnic groups: Whites, Latinos, Blacks, Asians. The CMPS contains 4,563 respondents who registered to vote in the November 2008 election and who self-identified as Asian, Black, Latino, and White. The survey was available in English, Spanish, Mandarin, Cantonese, Korean, Vietnamese and respondents were offered the opportunity to interview in their language of choice. Six of eighteen states that were sampled to produce robust samples of all four major racial groups include California, Texas, New York, Florida, Illinois, and New Jersey, and the statewide samples range from 243 to 669 cases.

***Selected* Awards, Grants and Fellowships:**
USC Award for Excellence in Mentoring Graduate Students (2020)
USC Provost New Directions in Research Award (2020) ($119,000)
USC Dornsife Faculty Led Initiative, Center for Leadership by Women of Color (2020) ($150,000)
Alice Paul Visiting Diversity Scholar, University of Pennsylvania (March 14-24, 2017)
Outstanding Faculty Award, USC Center for Black Cultural Student Affairs (2016)
Best Paper in Black Politics Award, Western Political Science Association (2014) "Black Community
Organizing in the Age of Obama" authored by Melina Abdullah, Regina Freer, and **Ange-Marie
Hancock.**
ASHSS Early Career Sabbatical Competition Winner, University of Southern California (Fall 2013)
Faculty Lead, Dornsife College 2020 Competition Winning Proposal: Enhancing Graduate Education
about Immigrant Integration (2011-2013) $300,000
Dornsife College Faculty Fellow (2011-2013)
Director, New Directions in Feminist Research Seminar, Center for Feminist Research, USC (2009-2010)
$30,000
USC Lambda Ally Award (USC LGBT Resource Center) 2009
Nomination, Yale College Teaching Award (2006)
Visiting Faculty Fellowship, Research Institute for Comparative Studies in Race & Ethnicity, Stanford
University (2006-2007)
Center for the Study of American Politics Grant, Institution for Social and Political Studies, Yale
University (2005)
Betty Nesvold Award for the Best Paper on Women & Politics, 2002 WPSA Conference
Vizuri Kabisa Award for Outstanding Faculty, University of San Francisco (2002)
USF Jesuit Foundation Grant (2001)


**Keynote Speeches:**
Tripodi Lecture in Research Methodology, UC Berkeley (2018)
Keynote Speaker, Sonja Haynes Stone Memorial Lecture, University of North Carolina, Chapel Hill
(2016)
Keynote Speaker, "Imagine Otherwise Summer School," Interdisciplinary Centre for Gender Studies,
University of Bern [Switzerland] (2016)
Keynote Speaker, Southeast Women's Studies Association Conference, Winthrop University (2016)
Keynote Speaker, Harvard Westlake High School Black History Month (2016)
Keynote Speaker, International Intersectionality Conference, Simon Fraser University [Canada] (2014)
Keynote Speaker, Social Justice Day, UC Santa Barbara (2013)
Keynote Presenter, Empirical Approaches to Critical Race Theory, UC Hastings School of Law (2011)
Keynote Speaker, Intersectionality and Public Health Workshop, Simon Fraser University [Canada]
(2008)


**Service to the Field:**
*Editorial Leadership:*
Editorial Board, *Perspectives on Politics* (2013 – 2019)
Co-Editor, *Politics and Gender* (2013 – 2016)
Inaugural Co-Editor, *Politics, Groups and Identities* (journal of the Western Political Science
Association) (2010- Present)
Co-Editor, "The Politics of Intersectionality" Series, with Nira Yuval-Davis (Palgrave Macmillan) (2009-
2018)
Editorial Board, *Journal of Politics* (2005-2007)
Editorial Board, *Peace Review* (2000 – 2005)
*General Service to the Field (Peer Review and Peer Training):*

Manuscript Reviewer (ongoing): *American Political Science Review, American Sociological Review, Communication Theory, DuBois Review*, *Hypatia*, *NWSA Journal* (now *Feminist Formations*), *Perspectives on Politics, Political Research Quarterly*, *Politics and Gender*, *Religion and Politics, Social Science Quarterly*, Cambridge University Press, New York University Press, Oxford University Press, Routledge, Temple University Press
Committee on the Status of Blacks, APSA (2010 - 2013); WPSA (2008-2010)
Co-Convener, Politics of Race, Immigration & Ethnicity Consortium (PRIEC) at USC (with Jane Junn and Veronica Terriquez) (October 2011)
Grant Reviewer, National Science Foundation (2002, 2005, 2012)
Committee on Professional Development, Western Political Science Association (2002-2004)
Program Co-Chair, APSA Short Course on Intersectionality (2008)
Program Co-Chair, APSA 2008 Annual Meeting, Race and Ethnic Politics Section (2007-2008)
Roundtable Panelist, APSA Short Course on Teaching Intersectionality (2011)
Section Program Chair, Western Political Science Association Annual Meetings (2005, 2006, 2008)
Section Program Chair, National Conference of Black Political Scientists Annual Meetings (2004)
Tenure and Promotion Reviewer (2008- Present): University of Alabama, Johns Hopkins University, the Ohio State University, Oklahoma State University, Providence College, University of Rochester, Santa Clara University, Sonoma State University, Whitman College, Yale University

**Assessment and Professional Training Experience:**
USC Dornsife Lead Consultant, City of Los Angeles (2021-2022) $350,000
USC Dornsife Lead Consultant, Black Experience Action Team (BEAT) Committee for Greater Los Angeles (2021) ($240,000)
USC Dornsife Lead Consultant, Los Angeles Homeless Services Agency (LAHSA) (2020-2021) ($186,000)
Consultant, Black Equity Initiative/Collective of Southern California, JIB Foundation (2017 - 2021)
Intersectionality Trainer, Women's Foundation of California Women's Policy Institute (State and County Cohorts) (2017)
Internal Reviewer, USC Center for Black Cultural Student Affairs (CBCSA) (2017)
Intersectionality Workshop Leader, California State University, Long Beach; The California Endowment (2014)
Fuzzy-Set QCA Workshop Presenter & Discussant, University of California, Irvine Dept. of Sociology (May 2013)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

| | | |
|---|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES, | : : : : : : : | 20 Civ. 8668 (VM)(OTW)   **PLAINTIFF PEOPLE'S EXPERT DISCLOSURE** |
| Plaintiffs, | : : | |
| -against- | : : : | |
| JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10 | : : : | |
| Defendants. | : | |

-----------------------------------------------------------------------X

The Office of the Attorney General ("NYAG"), on behalf of the People of the State of New York ("People"), by their attorney, Letitia James, Attorney General of the State of New York, set forth the following expert disclosure under Rule 26(a)(2)(B).  Attached to this notice is an expert report, curriculum vitae, and testimony and publications list for Douglas Kellner.

NYAG reserves the right to supplement this disclosure or make such disclosure as is requested during the pendency of the litigation.


Dated:  New York, New York
        May 28, 2022

                                        LETITIA JAMES
                                        Attorney General of the
                                         State of New York

                                        By:
                                    /s/ Colleen K. Faherty_____
                                        Jessica Clarke,
                                          Bureau Chief, Civil Rights Bureau
                                        Conor Duffy,
                                        Colleen K. Faherty,
                                          Assistant Attorneys General
                                        Rick Sawyer,
                                          Special Counsel for Hate Crimes

                                        28 Liberty Street, 18th Floor
                                        New York, New York 10005
                                        P: (212) 416-6046
                                        F: (212) 416-6009
                                        Colleen.Faherty@ag.ny.gov

To: Counsel of record via email

## I.      Introduction

The so-called "Project 1599" robocall at issue in this litigation spread disinformation regarding purported negative consequences to voting by absentee ballot in the November 2020 general election. In doing so, the Project 1599 robocall, to the extent it was received by New York voters, would have had the capacity to undermine, interfere, and conflict with the State of New York's ("State") election administration and its efforts to inform voters of their rights with respect to absentee ballots, as well as the State's common-sense measures to expand the use of absentee ballots in light of the COVID-19 pandemic.

## II.      Statement of Inquiry

Given my knowledge and experience in administering elections in New York and my service on the U.S. Election Assistance Commission Standards Board, I was asked to review the Project 1599 robocall and determine whether and to what extent it could interfere with New York's election administration, as well as whether the claims regarding absentee or "vote-by-mail" ballots were truthful.

## III.      Qualifications

I am a licensed attorney and have served as Commissioner and Co-Chair of the New York State Board of Elections ("State Board") since 2005. Before assuming my present position on the State Board, I was a commissioner of the New York City Board of Elections from 1993 until my appointment to the State Board in 2005. I also serve as the New York State representative to the Standards Board of the United States Election Assistance Commission. My curriculum vitae, listing my relevant education and professional experiences, is attached as "exhibit A." Additionally, I have added at "exhibit B" a list of other cases for which I have served as an expert or provided testimony (whether at trial or at a deposition), including those from the past four years.

It also includes a list of my publications. As a public servant for the State of New York, I receive a salary of $25,000 per year as commissioner (NY Election Law § 3-100(3)); I did not receive any additional compensation for issuing this report or for my expert opinions and testimony.

## IV.    Expert Opinions Formed

### Opinion 1: The Project 1599 robocall contains false and misleading information

I have reviewed a transcription of the robocall message that is the subject of this litigation (the "Project 1599 robocall"). It is my understanding that the Project 1599 robocall was sent out on August 26, 2020. The Project 1599 robocall states:

> "Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail."

The Project 1599 robocall contains false and misleading information. The New York State Constitution, Art. II § 5 requires that every voter—not just absentee voters—register before voting. Article V of the Election Law sets forth the procedure for registering. In addition, the federal Help America Vote Act, 52 U.S.C. § 21083, requires that every state maintain a computerized voter registration list for all elections for federal office.

Concerning voter registration records, including their preservation and accessibility, New York Election Law § 3-220 provides that:

> 1.    All registration records, certificates, lists, and inventories referred to in, or required by, this chapter shall be public records and open to public inspection under the immediate supervision of the board of elections or its employees and subject to such reasonable regulations as such board may impose, provided, however, that a voter's driver's license number, department of motor vehicle non-driver photo ID number, social security number

and facsimile number shall not be released for public inspection.   No such records shall be handled at any time by any person other than a member of a registration board or board of inspectors of elections or board of elections except as provided by rules imposed by the board of elections.

2.   The central file registration records shall be kept in locked filing cabinets in the office of the board of elections or, in the appropriate branch offices of the board of elections. Such records shall be taken from such file and handled only where necessary to make entries thereon or take other action in connection therewith as required by this article.   The board of elections may cause to be made, photostatic copy or copies of the registration poll records of registered voters in any election district and shall cause such photostatic copies to be placed in one or more ledgers in the same manner and in the same order as the original registration poll records appear in the ledger or ledgers containing the registration poll records for such election district.   Such photostatic records shall be open to public inspection, in lieu of the original registration records.

Most significantly, Election Law § 3-103(5) provides that "The information contained in the statewide voter registration list shall not be used for non-election purposes." Given this provision of law, it is completely false that "if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts." In New York, there is no database that police departments, credit card companies, the Centers for Disease Control, or anyone else may lawfully access for non-election purposes, such as enforcing old warrants, collecting debts, or in any public health vaccination effort.

**Opinion 2: To the extent the Project 1599 Robocall was heard by New York voters, it had the capacity to undermine the State's election administration**

New York's general elections are administered by its 58 bipartisan boards of election consisting of a board of elections for each county in the state and a single board of elections for the five counties of New York City (collectively "local BOEs"), pursuant to N.Y. Election Law § 3-200 *et seq*. The State Board has significant authority to promulgate policies, regulations, and instructions as to the administration of elections generally, and many of these powers are enumerated in N.Y. Election Law § 3-102. The State Board is comprised of four commissioners,

two from each major political party (defined as the parties that receive the highest and second highest number of voters for its candidate in the preceding gubernatorial election).

The 2020 election year consisted of the Presidential Election as well as contests to fill all positions in the U.S. House of Representatives, the State Senate, and the State Assembly, in addition to numerous judicial and local elections. The State Board and local BOEs began their preparations for the 2020 elections in 2019, as Presidential Election years result in increased voter turnout, as well as an all-around heightened volume of election processes. In March of 2020, with the outbreak of the COVID-19 pandemic, the State Board and local BOEs were presented with new and complex problems to solve. And while New York has successfully administered elections in times of turmoil—for example, during the Hurricanes Irene, Lee, and Sandy, as well as in the aftermath of the terrorist attacks of September 11, 2001, which was a primary election day in New York City—in terms of how it affected election administration, the COVID-19 pandemic was a longer, more sustained, and unforeseen crisis.

The State Board works tirelessly to ensure voter access and safety, as well as the safety of our staff and poll workers, all the while running elections in a manner to preserve the accountability, integrity, transparency, and verifiability of New York elections. During the 2020 election, in the middle of the pandemic, the State and the State Board adopted several measures to ensure that all voters could access the ballot without fear of contracting COVID-19. Chief among these was ensuring that all eligible New York voters could vote by absentee or so-called vote-by-mail ballots.

Under longstanding New York law, absentee voting is an exception to in-person voting and is available upon application to voters who by reason of disability, caretaking responsibilities, illness, absence, or being detained in jail cannot vote in person at the polling place. On April 9,

2020, in advance of the then-imminent federal and state primary elections,[1] the Governor issued an executive order allowing all eligible voters to vote by absentee ballot citing temporary illness due to fear of contracting the coronavirus.[2] The same executive order allowed for the electronic applications for absentee ballots. On April 24, 2020, an executive order was issued to require local BOEs to mail an absentee ballot application with a return postage paid envelope to all eligible voters.[3]

On May 1, 2020, the Governor issued an executive order permitting absentee ballot requests to be made over the phone and mandated that local BOEs provide postage paid return envelopes for the return of completed absentee ballots.[4] On June 7, 2020, the State extended the postmark deadline, or the date by which completed absentee ballots needed to show a postmark in order to be counted, from the day before Election Day to Election Day for the remainder of 2020. The State also authorized the online or electronic submission of absentee ballot applications until the end of 2020 by law, codifying and extending the existing executive orders requiring the same for the primary elections.[5]

After the June 2020 primaries, in advance of November's election and as the pandemic persisted, the State adopted additional measures to expand voter access and provide the local BOEs with the appropriate resources to meet the very likely demands of increased absentee voting for

---

[1] On March 28, 2020, the New York Governor issued an executive order consolidating the Presidential Primacy scheduled for April 28 with the state primary elections, which were held on June 23, 2020. See Exec. Order 202.12 (Mar. 28, 2020).

[2] Exec. Order No. 202.15 (Apr. 9, 2020).

[3] Exec. Order No. 202.23 (Apr. 24, 2020).

[4] Exec. Order No. 202.26 (May 1, 2020).

[5] *See* N.Y. Elec. Law § 8-412 (McKinney) (absentee postmark deadline) and N.Y. Elec. Law § 8–400 (McKinney) (absentee ballot application process) as amended by S.8130D, 2020 Leg. Sess. (N.Y. 2020), https://www.nysenate.gov/legislation/bills/2019/s8130. Both the additional day to postmark a completed absentee ballot prior to mailing and the authorization for the online application process terminate at the end of 2020, and therefore only affect the June primary and the November general election.

the general election. For example, in August of 2020, the State enacted numerous election-law related bills related to the expansion of absentee ballots, including: (a) codifying into law that the fear of contracting COVID-19 would be a qualifying justification for the illness exemption entitling voters to an absentee ballot;[6] (b) allowing local BOEs to accept absentee ballot applications more than 30-days before Election Day in an effort to encourage and provide for increased absentee ballot access;[7] (c) requiring local BOEs to accept absentee ballots received by the day after Election Day even if the envelope did not contain a postmark;[8] and (d) establishing a notice and opportunity to cure process for voters to correct certain minor errors on their completed absentee ballots so that their vote would be properly counted.[9]

Separately, on August 24, 2020—just two days before the Project 1599 robocall was placed—the Governor issued another voting-related executive order, which among other things, required all local BOEs to send information to every registered voter informing them of the process for applying for an absentee ballot for the 2020 general election, and specifying the deadline for applying and explaining that voters could apply over the phone or online as well.[10]

Based on my experience as a longstanding elections official, absentee ballots are an efficient and effective voting method. Voting by absentee ballot is often the only viable method for voters who have difficulty or cannot vote in person at the polls. Together, the above-referenced reforms and emergency measures expanding the use and applicability of absentee ballots served a critical public health function and allowed voters to cast ballots without fear of contracting COVID

---

[6] S.8015D, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 20, 2020).
[7] S.8783A, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 20, 2020).
[8] S.8799, 2020 Leg. Sess. (N.Y. 2020) (enacted Aug. 20, 2020).
[9] S.8370B, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 21, 2020 with modifications made pursuant to Exec. Order 202.58 (Aug. 24, 2020)).
[10] Exec. Order 202.58 (Aug. 24, 2020).

at a public poll site. The Project 1599 robocall, however, had the capacity to undermine all of the above-described reforms and emergency measures because the robocall delivered false information about purported negative consequences that would result from absentee or mail-in voting.

The Project 1599 robocall is also the type of message and disinformation campaign that the United States Election Assistance Commission recommends should be reported to state and federal authorities as potential voter intimidation.[11]

## V.      Conclusion

As a longstanding election official, I am deeply concerned by the spread of disinformation that has the potential to intimidate or otherwise confuse voters about the safety of our elections process. Among the types of disinformation and intimidation that is particularly appalling are false messages or rumors that threaten or purport to reveal negative consequences from voting. I believe strongly that disinformation and intimidation, such as the Project 1599 robocall, should be deterred and prevented to the fullest extent possible.

/s/ Douglas Kellner

---

[11] See U.S. EAC, Other National Contact Information, available at: https://www.eac.gov/voters/other-national-contact-information.

# EXHIBIT A

# DOUGLAS A. KELLNER

132 Manhattan Avenue                          470 Park Avenue South
New York, New York 10025                      New York, New York 10016
(212) 866-0752                                (212) 889-2121


## PROFESSIONAL EXPERIENCE

1982 - present          KELLNER HERLIHY GETTY & FRIEDMAN LLP
                        Partner in law firm specializing in international asset recovery, commercial
                        and real estate litigation (formerly known as Kellner Chehebar & Deveney)

1977 - 1982             DEWEY BALLANTINE
                        Associate attorney. handling real estate and antitrust litigation.

1979 - 1980             NEW YORK STATE ASSEMBLY COMMITTEE ON BANKS
                        Special Counsel to Chairman Herman D. Farrell, Jr. Supervised
                        committee staff, drafted and revised legislation.

## EDUCATION

COLUMBIA UNIVERSITY SCHOOL OF LAW, J. D., 1977
Harlan Fiske Stone Scholar; Certificate with Honors, Parker School of Foreign and
Comparative Law; elected to the University Senate.

INTERNATIONAL INSTITUTE OF HUMAN RIGHTS, STRASBOURG
(FRANCE), 1975, Certificate in International Human Rights Law.

GEORGETOWN UNIVERSITY SCHOOL OF FOREIGN SERVICE, B.S.F.S. *magna cum
laude,* 1973; Phi Beta Kappa; Tropais Valedictorian; Maguire Medal as outstanding
student; President, Undergraduate Student Body; Dean's Citation for Outstanding
Achievement.

## COMMUNITY SERVICE

NEW YORK STATE BOARD OF ELECTIONS, Commissioner and Co-Chair 2005-present;
New York State Representative on the Standards Board of the United States Election Assistance
Commission, 2015-present

NEW YORK CITY BOARD OF ELECTIONS, New York County Elections Commissioner
1993-2005

NEW YORK COUNTY DEMOCRATIC COMMITTEE, Co-Chair, Law Committee, 1981-1993, Chair Rules Committee, 1997-2005

NEW YORK CITY COMMUNITY SCHOOL BOARD #3, Member 1992-93

INTERNATIONAL CHAMBER OF COMMERCE—FRAUDNET, Chair, North America Region, 2013-present

VERIFIED VOTING FOUNDATION, Board of Advisors, 2005-present

ACCURATE VOTING FOUNDATION, Board of Advisors, 2006-2012

MCBURNEY YMCA, Board of Directors, 1991-1993

MANHATTAN VALLEY HOUSING CLINIC, Founding member, President, 1982- 1987, Community based volunteer organization providing housing assistance.to low income residents.

HARLEM WASHINGTON HEIGHTS COMMUNITY RENAISSANCE CORPORATION, Chairman of Board, 1976-1979; Helped to organize this program to provide alternative housing and employment opportunities.

# EXHIBIT B

# DOUGLAS A. KELLNER

## TESTIMONY ON ELECTION MATTERS SINCE JANUARY 1, 2017

Eve Silberberg et al. v. Board of Elections of the State of New York et al., 16-cv-08336(PKC) SDNY

In re Gordon Boyd v. William Fruci et al., Sup. Ct., Saratoga County No. 3418/17

Andrew Yang et al. v. New York State Board of Elections et al., 20-cv-03325 (AT) SDNY

Emily Gallagher et al. v. New York State Board of Elections et al., 20-cv-5504(AT) SDNY

Mathew Harley et al. v. Peter S. Kosinski et al., 20-cv-4664(BMC) EDNY

State of New York et al. v. Donald J. Trump et al., 20-cv-2340 (EGS) US District Court for the District of Columbia


## PUBLICATIONS AND STATEMENTS ON ELECTIONS MATTERS SINCE JANUARY 1, 2012

Testimony before the New York City Council Committee on Government Operations, August 8, 2012

Testimony before the New York City Council Committee on Government Operations, November 21, 2013

Memorandum to the Commissioners of the Board of Elections in the City of New York, December 10, 2013

Testimony before the New York State Assembly Standing Committee on Election Law Subcommittee on Election Day Operations and Voter Disenfranchisement,

November 28, 2017

Statement for the New York City Council Committee on Governmental Operations, December 13, 2017

Statement for the Election Assistance Commission, April 18, 2018

Statement for the New York City Council Committee on Governmental Operations and Committee on Oversight and Investigations, November 20, 2018

Statement for the New York City Council Committee on Governmental Operations, December 13, 2017

Memorandum to the Commissioners of the Board of Elections in the City of New York, August 4, 2020

Testimony Provided to the Senate Standing Committee on Elections, Senate Standing Committee on Local Government, Assembly Standing Committee on Election Law Assembly Standing Committee on Local Governments: Elections in a Pandemic: A Review of the 2020 Primaries, August 11, 2020

Report to the Senate Committee on Elections: Review of Elections Administration and Voting Rights in New York State, September 21, 2021

"Cordell Cleare Poised to Join Storied History of Harlem-West Side Senate District" Gotham Gazette, September 30, 2021 https://www.gothamgazette.com/public-safety/130-opinion/10800-cordell-cleare-history-harlem-west-side-state-senate-district

# DOUGLAS A. KELLNER

## TESTIMONY ON ELECTION MATTERS

Bethany Kosmider v. Mark Whitney et al., Sup. Ct., Essex Co.  265/16

Matter of Alan Flacks et al. v. Board of Elections in the City of New York et al.,, Sup. Ct., N.Y. Co. 101057/13

Randy Credico et al. v. New York State Board of Elections, SDNY 10 Civ 4555

Liberty Election Systems, LLC v. New York State Board of Elections et al., Sup. Ct., Albany Co., 789-08

Avante International Technology, Inc. v. New York State Board of Elections et al., Sup. Ct., Albany Co., 1055-08

United States v New York State Board of Elections et al., NDNY 06 Civ 263

Assemblyman Reed Gusciora et al. v. James E. McGreevey et al., N.J. Superior Ct., Mercer Co. MER-L-2691-04

Margarita Lopez Torres et al. v. New York State Board of Elections et al., SDNY 04 Civ 1129

Douglas A. Kellner v Board of Elections in the City of New York, et al., Sup. Ct., N.Y Co. 1995

Sequoia Pacific Voting Equipment, Inc. v New York State Board of Elections et al., Sup. Ct., Albany Co. 963-96

Mary France et al. v. Mario M. Cuomo et al., SDNY 92 Civ 1144

Angel del Toro et al. v. Mario M. Cuomo et al., SDNY 92 Civ 7739