IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL COALITION ON BLACK CIVIC
PARTICIPATION, MARY WINTER, GENE
STEINBERG, NANCY HART, SARAH
WOLFF, KAREN SLAVEN, KATE KENNEDY,
EDA DANIEL, and ANDREA SFERES,

       Plaintiffs,

        -and-

People of the STATE OF NEW YORK, by its
attorney general, LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK,

       Plaintiff-Intervenor,

       v.

JACOB WOHL, JACK BURKMAN, J.M.
BURKMAN & ASSOCIATES, LLC, PROJECT
1599, and JOHN and JANE DOES 1-10,

       Defendants.

**Oral Argument Requested**

Civil Action No. 20-cv-8668

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' JOINT MOTION FOR
SUMMARY JUDGMENT AS TO LIABILITY ON ALL CLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

I.      Wohl and Burkman planned to suppress votes in the 2020 election. ............... 2

II.     Wohl and Burkman sought to "HIJACK" the 2020 presidential election with a robocall from Project 1599. ........................................................................... 3

III.    NCBCP diverted resources intended to promote Census participation to counteract Defendants' voter suppression attempt. ......................................... 5

IV.     Defendants' robocall discouraged individual Plaintiffs from voting by mail ................ 6

PROCEDURAL HISTORY ................................................................................. 7

LEGAL STANDARD ......................................................................................... 8

ARGUMENT ..................................................................................................... 9

I.      There is no reasonable dispute that Defendants sent the robocall and targeted "black neighborhoods." ................................................................................. 9

II.     Defendants violated the VRA by intimidating, threatening, or attempting to intimidate or threaten voters. ..................................................................... 11

        A.      Defendants' robocall threatened arrest, debt collection, and involuntary vaccination. ............................................................................. 12

                1.      Defendants threatened legal consequences for voting by mail. ............... 13

                2.      Defendants threatened economic consequences for voting by mail. ....... 14

                3.      Defendants threatened physical consequences for voting by mail. ......... 15

        B.      Defendants attempted to threaten or intimidate voters. ..................... 16

III.    Defendants violated the KKK Act by conspiring to disseminate the unlawful robocall to intimidate and threaten voters ...................................................... 18

        A.      Defendants knowingly agreed and engaged in the conspiracy to disseminate the robocall ......................................................................... 19

        B.      The purpose of Defendants' conspiracy was to intimidate and threaten. ........... 20

        C.      Defendants targeted individuals who were lawfully entitled to vote ................. 20

        D.      The robocall injured Plaintiffs. .......................................................... 21

IV.     Defendants intentionally targeted Black voters for intimidation in violation of the Civil Rights Act of 1957. ........................................................................ 22

V.      There is no reasonable dispute that Defendants violated New York Civil Rights Law § 40-c. ............................................................................................... 23

**TABLE OF CONTENTS**

(continued)

**Page**

VI.     There is no dispute Defendants violated New York Civil Rights Law § 9 by
interfering in the State's effort to run a free and fair election. ........................................ 23

VII.    Defendants have engaged in persistent and repeated fraud and illegality in
violation of New York Executive Law Section 63(12). ................................................. 24

CONCLUSION ........................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson* v. *Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................................9

*Burson v. Freeman*,
    504 U.S. 191 (1992)....................................................................................12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................2, 9, 10

*Centennial Life Ins. Co. v. Nappi*,
    956 F. Supp. 222 (N.D.N.Y. 1997)...............................................................10

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017).............................................................................9

*Cine SK8, Inc.* v. *Town of Henrietta*,
    507 F.3d 778 (2d Cir. 2007)...........................................................................19

*People ex rel. Cuomo v. Greenberg*,
    95 A.D.3d 474 (1st Dep't 2012), *aff'd*, 21 N.Y.3d 439 (2013) ...................26

*DiStasio v. Edible Arrangements, LLC*,
    No. 3:16CV538 (DJS), 2017 WL 11604637 (D. Conn. May 10, 2017)..................21

*Dister* v. *Cont'l Grp., Inc.*,
    859 F.2d 1108 (2d Cir. 1988).........................................................................8

*FTC v. Shkreli*,
    No. 20cv00706, 2022 WL 135026 (S.D.N.Y. Jan. 14, 2022)...................25

*Gottlieb v. County of Orange*,
    84 F.3d 511 (2d Cir. 1996)..............................................................................9

*Greenley v. Laborers' Int'l Union of N. Am.*,
    271 F. Supp. 3d 1128 (D. Minn. 2017)..........................................................21

*Hemant Patel, M.D., P.C. v. Bandikatla*,
    No. 18-cv-10227, 2021 WL 4254977 (S.D.N.Y. Sept. 17, 2021) ...........16

*JSC Foreign Econ. Assoc. Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
    386 F. Supp. 2d 461 (S.D.N.Y. 2005)...........................................................10

*United States ex rel. Katzenbach v. Original Knights of the Ku Klux Klan*,
   250 F. Supp. 330 (E.D. La. 1965) ......................................................................12, 14

*King v. Cook*,
   298 F. Supp. 584 (N.D. Miss. 1969) ......................................................................12

*LaVigne v. First Cmty. Bancshares, Inc.*,
   215 F. Supp. 3d 1138 (D.N.M. 2016) ......................................................................21

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int.*
   *Legal Found. (LULAC)*,
   No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ......................................12

*LiButti v. United States*,
   178 F.3d 114 (2d Cir. 1999) ......................................................................10, 14

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,
   263 F.3d 208 (2d Cir. 2001) ......................................................................13

*Mey v. Venture Data, LLC*,
   245 F. Supp. 3d 771 (N.D.W. Va. 2017) ......................................................................21

*Missouri v. McNeely*,
   569 U.S. 141 (2013) ......................................................................15

*Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ......................................................................12

*Nat'l Coal. on Black Civic Participation v. Wohl*,
   498 F. Supp. 3d 457 (S.D.N.Y. 2020) ......................................................................2

*Nat'l Coal. on Black Civic Participation v. Wohl*,
   512 F. Supp. 3d 500 (S.D.N.Y. 2021) ......................................................................1

*New York v. Feldman*,
   210 F. Supp. 2d 294 (S.D.N.Y. 2002) ......................................................................25

*Patriotic Veterans, Inc. v. Zoeller*,
   845 F.3d 303 (7th Cir. 2017) ......................................................................21

*People Helpers, Inc. v. City of Richmond*,
   789 F. Supp. 725 (E.D. Va. 1992) ......................................................................13

*People of State of N.Y. by Abrams v. Holiday Inns, Inc.*,
   656 F. Supp. 675 (W.D.N.Y. 1984) ......................................................................23

*Reno v. Bossier Parish Sch. Bd.*,
   520 U.S. 471 (1997) ......................................................................16

*Rumsfeld v. Forum of Acad. and Inst. Rights, Inc.*,
    547 U.S. 47 (2006)............................................................................................9

*Salonen v. Barbella*,
    65 A.D.2d 753, 409 N.Y.S.2d 759 (1978) ..........................................................23

*Schmerber v. California*,
    384 U.S. 757 (1966)..........................................................................................15

*SEC v. Benson*,
    657 F. Supp. 1122 (S.D.N.Y. 1987)..................................................................10

*Sines v. Kessler*,
    324 F. Supp. 3d 765 (W.D. Va. 2018) ..............................................................19

*Skinner v. Ry. Lab. Execs. Ass'n*,
    489 U.S. 602 (1989)..........................................................................................15

*Smith v. Stechel*,
    510 F.2d 1162 (9th Cir. 1975) ..........................................................................14

*People ex rel. Spitzer v. Gen. Elec. Co.*,
    302 A.D.2d 314 (1st Dep't 2003) ......................................................................25

*United States* v. *Beaty*,
    288 F.2d 653 (6th Cir. 1961) ............................................................................14

*United States v. Bruce*,
    353 F.2d 474 (5th Cir. 1965) ......................................................................13, 14

*United States v. Clark*,
    249 F. Supp. 720 (S.D. Ala. 1965)....................................................................22

*United States v. Pugh*,
    945 F.3d 9, 20 (2d Cir. 2019)............................................................................16

*United States v. McLeod*,
    385 F.2d 734 (5th Cir. 1967) ......................................................................13, 22

*United States v. Nguyen*,
    673 F.3d 1259 (9th Cir. 2012) ..........................................................................12

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002)............................................................................11

*United States* v. *Reyes*,
    302 F.3d 48 (2d Cir. 2002)................................................................................19

*People ex rel. Vacco v. World Interactive Gaming Corp.*,
    185 Misc. 2d 852 (Sup. Ct., New York County 1999) ..........................................25

*Victory Processing, LLC v. Fox*,
    937 F.3d 1218 (9th Cir. 2019) ..................................................................................21

*Washington v. Davis*,
    426 U.S. 229 (1976)...................................................................................................16

*Willingham* v. *County of Albany*,
    593 F. Supp. 2d 446 (N.D.N.Y. 2006).....................................................................11

*Winston v. Lee*,
    470 U.S. 753 (1985)...................................................................................................15

**Statutes**

42 U.S.C. § 1985(3) ...........................................................................................................18

52 U.S.C. § 10101(b) .........................................................................................................22

52 U.S.C. § 10307(b) .........................................................................................................11

New York Civil Rights Law ...............................................................................................25

New York Civil Rights Law § 9 ...............................................................................8, 24, 25

New York Civil Rights Law § 40-c ...........................................................................8, 23, 25

New York Civil Rights Law § 40-d ......................................................................................8

New York Executive Law § 63(12) ...........................................................................8, 25, 26

NYS Election Law § 3-103(5) ............................................................................................23

**Other Authorities**

Charles Z. Lincoln, *Constitutional History of New York* 728-32 (1906)........................24

Consent Decree, *United States v. N.C. Rep. Party*,
    91-161-CIV-5-f (E.D.N.C. Feb 27, 1992) ..............................................................13

*Hearing on the Voting Rights Act of 1965 Before the H. Judiciary Comm.*, 89th
    Cong. 12 (1965) ........................................................................................................16

H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2462 (1965) ....................................16

Mandatory, Merriam-Webster, https://www.merriam-
    webster.com/dictionary/mandatory (last visited July 29, 2022) ..............................15

Webster's Third New International Dictionary (1966)...................................................................11

**INTRODUCTION**

This case concerns the use of mass communications technology—robocalling—to engage in a wide-ranging voter intimidation campaign aimed at suppressing the votes of Black Americans. In 2020, Defendants Jacob Wohl and Jack Burkman created and sent a robocall that threatened dire consequences for voting by mail, which, for many voters, was the safest way to vote during the height of the COVID-19 pandemic. The call cost only $1,000 but went to about 85,000 numbers nationwide, including some 5,500 in New York. Purporting to come from a civil rights organization called "Project 1599," Defendants targeted "black neighborhoods"—their words— and used racist stereotypes to sow fear and confusion about voting by mail. The robocall falsely asserted that voting by mail would expose voters' personal information to police, creditors, and the Center for Disease Control and Prevention ("CDC"), which would pursue "old warrants," "collect outstanding debts," and enforce "mandatory vaccinations." The robocall cynically warned recipients against being "finessed into giving your private information to the man" and urged listeners to "stay safe and beware of vote by mail."

Defendants' robocall was a series of threats that violated the Voting Rights Act ("VRA") and the Ku Klux Klan Act ("KKK Act"). The Court previously held Plaintiffs' allegations, if true, would constitute such violations. *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 510–12 (S.D.N.Y. 2021), D.E. 66 at 20–21. Discovery now puts the veracity of those claims beyond dispute. Hard, documentary evidence, including emails, checks, and call records, supports what Defendants admitted in open Court—they created and sent the robocall. And Defendants' own words, recorded in contemporaneous emails and text messages, establish that they targeted "black neighborhoods" with what they termed the "black robo."

Defendants have no evidence—not a single document or page of testimony—contradicting those facts. With respect to their responsibility for creating and disseminating the robocall and

their efforts to target Black voters, there is nothing left for the jury to decide. And because the robocall can only be read one way—as a series of threats—those facts are all that is necessary to establish each of Plaintiffs' claims.

The law requires the Court to enter summary judgment where, as here, there is an "absence of evidence" supporting the nonmoving party's view of the facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Accordingly, Plaintiffs now seek summary judgment on Defendants' liability as to all claims. Plaintiffs further urge the Court to issue a ruling in advance of the federal midterm elections on November 8, 2022. Absent "swift and effective judicial relief," *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 464 (S.D.N.Y. 2020), D.E. 38 at 3, Defendants are likely to repeat their conduct, and others will learn from their example.

## FACTUAL BACKGROUND

### I.      Wohl and Burkman planned to suppress votes in the 2020 election.

In 2019, Defendant Jacob Wohl announced a plan to conduct "a voter suppression effort." Plaintiffs' Joint Local Civil Rule 56.1 Statement of Undisputed Material Facts ("56.1") ¶ 6. In a prospectus for an organization he called the "Arlington Center for Political Intelligence," Wohl promised that he could "affect[] political outcomes" by targeting" "important Demographics of Democratic voters," including Black voters, to suppress their turnout. *Id.* Following the lead of the Russian Internet Research Agency, which conducted similar operations in 2016, Wohl proposed to "[b]uild up left-wing online properties with a large following, only to have those properties direct followers to NOT vote come election day." *Id.* Put succinctly, the plan was to "make shit up"—to spew misinformation that would keep the targeted voters from the polls. *Id.*

Wohl and Defendant Jack Burkman founded Project 1599 as a way to "influence the 2020 presidential election." *Id.* ¶ 5. Burkman described Project 1599 as "the center of Election 2020." *Id.* According to him, "The road to the presidency runs through us." *Id.*

## II.     Wohl and Burkman sought to "HIJACK" the 2020 presidential election with a robocall from Project 1599.

On August 19, 2020, twelve weeks before the 2020 presidential election, Wohl emailed Burkman "we must HIJACK this boring election." *Id.* ¶ 7. Burkman responded, "yes America needs w b [Wohl and Burkman]." *Id.* That same day, Burkman emailed Robert Mahanian, president of Message Communications, Inc., a robocalling company he'd used in the past, and wrote, "i'd like to send another 1000 and buy more calls." *Id.* ¶ 8. He wrote a $1,000 check, number 19921, from the account of his lobbying firm, J.M. Burkman & Associates ("JMBA"), and emailed Mahanian, "[c]heck to you Robert just went out in the 2 day pouch you will have in 2–3 days then we attack." *Id.* ¶¶ 8–9. Over the next several days, Burkman emailed Mahanian multiple times confirming receipt of the check and announced that he and Wohl were "ready to begin the robo calls!!!" *Id.* ¶ 10.

On August 24, Wohl hired voice actress Jana Hunt, who responded to a Craigslist ad titled "Los Angeles Black Female Voice Over." *Id.* ¶¶ 11–12. Hunt agreed to record the robocall for $250 and Wohl emailed her the following script:

> Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. . . . Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail.

*Id.* ¶ 11; Ex. 9.[1] Wohl paid Hunt $250 over two transactions through Cash App, an electronic payment platform, using the memo "For Vote By Mail VO." 56.1 ¶ 13. Upon full payment, Hunt

---

[1] All cites to "Ex." refer to the exhibits attached to the Declaration of Franklin Monsour Jr.

sent Wohl an audio file reading his script; it would later become the audio of Defendants' robocall. *Id.* ¶ 13.

Just after midnight the next day, Wohl emailed Burkman the voiceover and wrote, "Attached is the audio file for the robo call. We should send it to black neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte, Richmond, Atlanta, and Cleveland." *Id.* ¶ 14. Burkman responded, "cleveland phila minn chicago nyc detroit." *Id.* Burkman then entered Message Communications' robocalling platform and set it to send the robocall to Cleveland, Minneapolis, Chicago, Pittsburgh, Detroit, New York City, Philadelphia, and his hometown of Arlington, Virginia. *Id.* ¶ 15. Once the target cities were set, Burkman asked Wohl to "do me one favor just go in and upload the recording," and gave Wohl the login information for the JMBA account. *Id.*

The next day, August 26, Wohl uploaded the audio file to Message Communications and initiated the robocall. *Id.* ¶ 16. Records provided by Message Communications confirm that JMBA's check paid for the call and that Defendants used Message Communications' platform to broadcast their robocall to approximately 85,000 phone numbers nationwide, including nearly 5,500 phone numbers in New York. Declaration of Rick Sawyer ("Sawyer Decl.") ¶ 2. Burkman's name and personal phone number appeared on recipients' caller ID, as shown in the following photo taken by Plaintiff Nancy Hart of her own caller ID. 56.1 ¶ 3.



The day after the robocall went out, Burkman emailed Wohl: "i love these robo calls getting angry black call backs win or lose the black robo was a great jw [Jacob Wohl] idea." *Id.* ¶ 17.

### III. NCBCP diverted resources intended to promote Census participation to counteract Defendants' voter suppression attempt.

Plaintiff National Coalition on Black Civic Participation ("NCBCP") is a non-partisan, nonprofit organization dedicated to increasing civic engagement and voter participation in Black and underserved communities. *Id.* ¶ 18. NCBCP seeks to engage people in all aspects of public life, including voting, and to encourage participation in a fair, just, and barrier-free democracy. *Id.* Black Women's Roundtable (BWR) is a program run by NCBCP that works to engage, educate, organize, and mobilize Black Americans of all ages to participate in our democracy. *Id.* The Metro Detroit chapter of BWR had been running a call center in the Detroit area to promote participation in the 2020 U.S. Census. *Id.* Upon learning of Defendants' robocall, the chapter knew that deceptive and false information about voting by mail would intimidate and scare the communities it serves, especially Black voters. *Id.* It diverted staff and resources from its census operation. *Id.* The chapter used the call center instead to disseminate accurate information about voting to safeguard voters against Defendants' voter intimidation campaign. *Id.*

5

**IV.     Defendants' robocall discouraged individual Plaintiffs from voting by mail**.

Plaintiffs Mary Winter and Gene Steinberg were residents of Rockland County, New York, where they were registered to vote and received the robocall. *Id.* ¶¶ 19–20. They had planned on voting by mail in the general election because they were afraid of contracting COVID-19, but because of the robocall, they voted in person. *Id.* ¶¶ 19–20. Steinberg, who has a past nonviolent criminal conviction, also testified extensively to the continuing emotional distress he suffers because of the robocall. *Id.* ¶ 20. Even though he had been registered to vote for many years, he decided not to re-register after moving because he did not "want someone to once again use my information to intimidate me." *Id.* Steinberg is no longer registered to vote as a result of the robocall. *Id.*

Plaintiff Eda Daniel resided and was registered to vote in East Cleveland, Ohio. *Id.* ¶ 21. The robocall made her feel angry and powerless, and she is apprehensive of answering the phone when it rings. *Id.*

Plaintiff Andrea Sferes, a resident of Westchester, New York, where she was registered to vote, had outstanding medical debt when she received the robocall. *Id.* ¶ 22. She found the robocall "highly persuasive" and worried whether her information would be shared with debt collectors. The robocall left her "alarmed," "anxious," and "scared." *Id.*

Plaintiffs Karin Slaven and Kate Kennedy were residents of Cuyahoga County, Ohio, where they were registered to vote and received the robocall, which angered them. *Id.* ¶¶ 23–24. Slaven also testified that she was angry and frustrated because she spends hours canvassing her

6

neighborhood trying to educate people about voting, and the robocall detracted from her efforts. *Id.* ¶ 23.

Plaintiff Sarah Wolff is registered to vote in New York County, New York, where she is a resident and received the robocall. *Id.* ¶ 25. The efforts to dissuade people from voting infuriated her. *Id.*

Plaintiff Nancy Hart is registered to vote in Allegheny County, Pennsylvania, where she lives and received the robocall. *Id.* ¶ 26. She was irate because of the robocall. *Id.* The robocall particularly angered her because she spends a lot of time encouraging other people to vote and promoting voting as a civic duty, and the robocall sought to undermine confidence in the voting process. *Id.*

## PROCEDURAL HISTORY

On October 16, 2020, NCBCP and the eight individual Plaintiffs sued Defendants for unlawful voter intimidation under the VRA and KKK Act. D.E. 1. At the hearing on a pending motion for a temporary restraining order, the following colloquies took place:

> THE COURT: My question was whether you, acting alone or with anyone else, prepared that message and caused it to be sent?
>
> MR. BURKMAN: Oh, yes, your Honor, yes. That is our call, yes, yes.
>
> THE COURT: You don't deny that you caused this call to be made and that you—don't deny the content of it?
>
> MR. BURKMAN: No, your Honor, we do not.
>
> . . . .
>
> THE COURT: All right. Thank you. Mr. Wohl, you indicated that you echo all of what Mr. Burkman said. Does that include acknowledgment that you participated in the preparation of the content of the message and its communication to plaintiffs through the entity in California?

>MR. WOHL: Yes, your Honor, as to Mr. Burkman's specific
>representation, yes, yes.[2]

D.E. 53 at 12–13, 15.

Two days after the TRO hearing, this Court granted the motion and issued a temporary restraining order. D.E. 38. The Court ordered Defendants to cease making robocalls and to disseminate a curative robocall to the recipients of the original call explaining that the original "contained false information that has had the effect of intimidating voters, and thus interfering with the upcoming presidential election, in violation of federal voting-rights laws." D.E. 38 at 64–66.

The People of the State of New York, by and through Attorney General Letitia James, intervened as a Plaintiff on May 19, 2021, asserting both federal and New York state law claims. D.E. 102. Discovery concluded on May 29, 2022. D.E. 193, 197. All Plaintiffs now jointly move for summary judgment as to Defendants' liability on all claims.[3]

## LEGAL STANDARD

A motion for summary judgment must be granted if, in "viewing the record in the light most favorable to the nonmoving party . . . the evidence offered demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Dister* v. *Cont'l Grp., Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (citations omitted). "[T]he mere

---

[2] In ongoing criminal proceedings in Michigan, Defendants have also admitted that they sent the robocall. 56.1 ¶ 27. And during discovery, Magistrate Judge Wang held that "Defendants admitted to 'participating in the preparation of the content of the message and its communication to plaintiffs[.]'" D.E. 190 at 1.

[3] Specifically, Plaintiffs NCBCP, Winter, Steinberg, Hart, Wolff, Slaven, Kennedy, Daniel, and Sferes move for summary judgment as to Defendants' liability on their claims under Section 11(b) of the VRA and Section 2 of the KKK Act. The People of the State of New York moves for summary judgment on its federal claims under Section 11(b) of the VRA, Section 2 of the KKK Act, Section 131(b) of the Civil Rights Act of 1957, and state law claims under Sections 9, 40-c, and 40-d of the New York Civil Rights Law, and Section 63(12) of the New York Executive Law.

existence of *some* alleged factual dispute" is not sufficient to "defeat an otherwise properly supported motion for summary judgment." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents . . . the opposing party is required to come forward with [similar] materials, setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). A "genuine" dispute exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A plaintiff can satisfy this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 327.[4]

## ARGUMENT

### I. There is no reasonable dispute that Defendants sent the robocall and targeted "black neighborhoods."

The evidence from discovery definitively resolved the only material facts at issue in this litigation: Defendants produced, paid for, and sent the robocalls—and they specifically targeted "black neighborhoods." 56.1 ¶ 14. Emails establish that Wohl and Burkman agreed to "HIJACK this boring election," and checks and payment records show that J.M. Burkman & Associates paid $1,000 for robocalls to do just that. *Id.* ¶¶ 7, 9. More emails and other payment records show that Wohl solicited and paid a "Black Female" voice actress $250 to read the robocall script, the text of which includes Wohl and Burkman's own names. *Id.* ¶¶ 12–13. Emails and call records show that Wohl uploaded the audio to the robocalling platform after Burkman asked him to, and

---

[4] "[W]here, as here, multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (quoting *Rumsfeld v. Forum of Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Burkman's name and phone number appeared on recipients' caller ID. *Id.* ¶¶ 3, 15–16. And Wohl and Burkman later admitted in open Court that they sent the call. *Id.* ¶ 27. Other emails show that Wohl and Burkman agreed to send the robocall to "black neighborhoods," and call records show that they did. *Id.* ¶ 14; Sawyer Decl. ¶ 3. Nearly 85,000 calls went to urban areas with large Black populations. Sawyer Decl. ¶ 3. Burkman referred to the robocall as "the black robo" in emails with Wohl and celebrated the "angry black call backs" he received. 56.1 ¶ 17.

While these facts are uncontroverted and proven, Defendants asserted the Fifth Amendment at their depositions as to all of them. Both took the Fifth Amendment when asked if they sent the robocall. Ex. 56 at 163:03–64:08; Ex. 57 at 165:16–66:17. And both took the Fifth Amendment when asked if they targeted Black voters with the call. Ex. 56 at 181:17–82:02, 184:21–25, 287:19–23; Ex. 57 at 185:15–24, 194:14–95:14. Thus, the Court may draw adverse inferences supporting each of those facts. In weighing summary judgment, such adverse inferences may be "accorded considerable weight." *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999); *see also JSC Foreign Econ. Assoc. Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 463, 476 (S.D.N.Y. 2005) (granting summary judgment to plaintiffs where Fifth Amendment invocation precluded question of fact); *Centennial Life Ins. Co. v. Nappi*, 956 F. Supp. 222, 230 (N.D.N.Y. 1997) (granting summary judgment to plaintiff where adverse inferences supported plaintiff's uncontested evidence); *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987) (similar).

With or without adverse inferences, there is "an absence of evidence" to refute the facts set forth in the preceding paragraphs, *Celotex Corp.*, 477 U.S. at 325, and the Court should thus accept them as proven. Consequentially, each element of Plaintiffs' causes of action falls into place.

## II.     Defendants violated the VRA by intimidating, threatening, or attempting to intimidate or threaten voters.

To prove a violation of the VRA, a plaintiff need show only that the defendant "intimidated, threatened, or coerced someone for voting or attempting to vote, or has attempted such intimidation, threat, or coercion." D.E. 38 at 34.[5] Section 11(b) does not require proof that voters were ultimately intimidated, threatened, or coerced, D.E. 38 at 54, although that proof is present here. *See* 56.1 ¶¶ 19–26. Nor does it "require proof that racial discrimination motivated the intimidation, threats, or coercion." *Willingham* v. *County of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); D.E. 38 at 33–34. Intimidation and threats include any message that "a reasonable recipient familiar with the context of the message would interpret as a threat of injury tending to deter individuals from exercising their voting rights." D.E. 38 at 34–35. Intimidating conduct need not be violent or physical, nor must it promise violent or physical injury. *Id.* at 35. As the Court previously explained, "[t]o 'intimidate' means 'to make timid or fearful,' or to 'inspire or affect with fear,' especially 'to compel to action or inaction (as by threats).'" *Id.* (quoting Webster's Third New International Dictionary at 1183 (1966)). Indeed, the Court's decision that intimidating conduct need not be violent or physical is law of the case, and absent "cogent" or "compelling" reasons, should be adhered to. *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).

As the Court has already found, there is no reasonable characterization of the robocall except as intimidating and threatening. D.E. 66 at 19. It told recipients to "beware of vote by mail" and promised dire consequences to anybody voting by mail with unambiguous language, including

---

[5] Section 11(b) of the VRA provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). As this Court previously concluded, Section 11(b)'s scope extends to private conduct because it explicitly includes those "acting under color of law *or otherwise*." 52 U.S.C. § 10307(b) (emphasis added); D.E. 38 at 32.

three distinct threats that bear no other reasonable interpretation. 56.1 ¶ 4. Each threat independently violated the VRA, as did the entire message taken as a whole. To prevail under Section 11(b), Plaintiffs need not show a specific intent to interfere with voting, but the undisputed evidence here demonstrates that threatening voters, particularly Black voters, was the plan all along. Faced with abundant examples of Defendants' own words that they targeted Black voters with a "voter suppression effort," no reasonable jury could conclude otherwise.

### A.     <u>Defendants' robocall threatened arrest, debt collection, and involuntary vaccination</u>.

The only reasonable interpretation of the robocall was as a series of threats for voting by mail. The plain language of the script threatened legal, economic, and bodily harm for voting by mail. At its root, the robocall threatened that recipients' personal information would be disseminated and abused if they voted by mail. It is well established that the "fear of exposure" of one's personal information can have a chilling effect on political participation, *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958),[6] and the robocall follows the same threat pattern. *See, e.g.*, *United States v. Nguyen*, 673 F.3d 1259, 1261 (9th Cir. 2012) (warning individuals if they voted in upcoming election their personal information would be collected by government computer system); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (*LULAC*) (publishing names and personal information); *King v. Cook*, 298 F. Supp. 584, 587 (N.D. Miss. 1969) (publishing in local newspaper names and addresses of individuals applying for voter registration); *United States ex rel. Katzenbach v. Original Knights of the Ku Klux Klan*, 250 F. Supp. 330, 342 (E.D. La. 1965) (distributing handbills identifying advocates of desegregation). Each of the robocall's threats is independently

---

[6] *See also, e.g., Burson v. Freeman*, 504 U.S. 191, 200–08 (1992) (discussing history and importance of ballot secrecy).

actionable, and they also made the robocall threatening and intimidating when viewed in its totality.

### 1.   Defendants threatened legal consequences for voting by mail.

As the Court previously explained, there is only one "reasonable characterization" of Defendants' false claim about tracking down old warrants: It was "a threat or risk of arrest" if robocall recipients voted by mail. D.E. 66 at 19. The Second Circuit has long held that a warning to "address . . . behavior through legal channels" qualifies as intimidating or threatening conduct. *Lovejoy-Wilson* v. *NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001); *see also, e.g.*, *United States v. McLeod*, 385 F.2d 734, 747 (5th Cir. 1967) ("baseless arrests and prosecutions"); *United States v. Bruce*, 353 F.2d 474, 477 (5th Cir. 1965) (invocation of trespass law); *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 733 (E.D. Va. 1992) (city investigations); Ex. 63 (Consent Decree, *United States v. N.C. Rep. Party*, 91-161-CIV-5-f (E.D.N.C. Feb 27, 1992) (consent decree under VRA § 11(b) over allegations that defendant sent thousands of postcards threatening Black voters with five years in jail for giving false information to election officials)). Here, such a threat is especially pernicious because it seeks to exploit voters' confusion and uncertainty about the criminal consequences of voting. As the People's unrebutted expert observed, "[I]ndividuals with prior interactions with the criminal justice system are often confused about whether they are eligible to vote, what is required to vote, and the potentially negative consequences of voting." Ex. 60 at 5. The intended result: Those with prior criminal justice involvement would be wary of voting by mail—or even voting at all. *See id.* at 5–6.

That commonsense conclusion accords with private Plaintiffs' experience. They understood the calls to be threats of legal action if they voted by mail. Gene Steinberg, who had a previous nonviolent conviction, was so profoundly scared by the call that he began reliving earlier traumas related to his nonviolent criminal conviction. 56.1 ¶ 20. The robocall caused him and his

partner at the time, Mary Winter, to vote in person rather than by mail, despite their fear of contracting COVID-19 at a time when many people were hospitalized and dying every day. *Id.* ¶¶ 19–20. And Steinberg later requested that his name be removed from the Board of Elections' voter roll. *Id.* ¶ 20.[7]

### 2. Defendants threatened economic consequences for voting by mail.

The Court also correctly concluded that under a plain reading of the robocall, "the reference to credit card companies and debt collection could instill fears that voters would face adverse economic consequences if they exercised their right to vote by mail." D.E. 38 at 51. Such threats of adverse economic consequences fit squarely within the plain meaning of "intimidation." *See id.* at 46; *see also, e.g.*, *Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975) (Fair Housing Act prohibition on coercion, intimidation, and threats applicable to employer who allegedly fired employees for renting apartments to Black and Mexican-American tenants); *Bruce*, 353 F.2d at 477 ("economic sanctions" constitute coercion or intimidation); *United States* v. *Beaty*, 288 F.2d 653, 656–57 (6th Cir. 1961) (explaining that "threats, intimidation or coercion may take on many forms" and concluding that "eviction or threatened eviction" qualified); *Katzenbach*, 250 F. Supp. at 356 (economic coercion constituted intimidation). This threat was likely to reverberate with many of the millions of Americans with outstanding debt. As the People's expert observed, the message could "confuse and deter voters who have credit card debt." Ex. 60 at 6.

---

[7] The Court can draw the adverse inference that Defendants also believed this statement to be a threat. *See LiButti*, 178 F.3d at 120. Each took the Fifth when asked about it at their depositions. Ex. 56 at 171:16–22, 172:05–11; Ex. 57 176:25–77:06.

Again, Plaintiffs' lived experience bore out the Court's reasoning.[8] Andrea Sferes found the robocall to be "highly persuasive" and believed that her information might really be shared with debt collectors. 56.1 ¶ 22. The robocall left her "alarmed and anxious" about voting because of her outstanding medical debt, and she worried whether her information would really be shared with debt collectors. *Id.*

### 3.   Defendants threatened physical consequences for voting by mail.

The robocall contained a third threat—the statement concerning mandatory vaccinations—which the Court correctly perceived as "a threat of bodily harm." D.E. 38 at 50. "Mandatory" implies that coercion, force, or threat of adverse consequences will be used to vaccinate unwilling recipients, the quintessence of a true threat. *See* Mandatory, Merriam-Webster, https://www.merriam-webster.com/dictionary/mandatory (last visited July 29, 2022) (providing "compulsory," "forced," and "involuntary" as synonyms). It also promises to force those unwilling participants to undergo a medical treatment they do not desire—a coerced violation of bodily integrity at the hands of the state. *See Missouri v. McNeely*, 569 U.S. 141, 148 (2013) ("[A]n invasion of bodily integrity [by the government] implicates an individual's 'most personal and deep-rooted expectations of privacy.'" (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985))); *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 616 (1989) ("[P]hysical intrusion, penetrating beneath the skin, infringes an expectation of privacy."); *Schmerber v. California*, 384 U.S. 757, 772 (1966) ("The integrity of an individual's person is a cherished value of our society."). As the People's expert observed, such threats evoke the "painful history" of "horrific medical experiments like the Tuskegee experiment" where the medical establishment mistreated Black people. Ex. 60

---

[8] And, again, the Court can make the adverse inference that Defendants agreed the reference to credit card companies was a threat. Each took the Fifth when specifically asked that at their depositions. Ex. 56 at 171:23-72:04, 172:12-19; Ex. 57 at 176:25-77:12.

at 6. Evoking that history was a way to coerce Black voters into not voting by mail.[9] Moreover, Defendants disseminated the robocall at the height of the COVID-19 pandemic, when federal and state governments had still not determined policies on how to administer COVID-19 vaccines, which were not yet available. *See* D.E. 38 at 50. The robocall capitalized on the confusion surrounding COVID-19 vaccinations, making this statement even more threatening.

**B.    Defendants attempted to threaten or intimidate voters**.

Separately and independently, Plaintiffs are entitled to summary judgment because uncontroverted evidence demonstrates Defendants *attempted* to intimidate and threaten voters. They created the robocall, sent the robocall, and attempted to make it intimidating and threatening—that is a complete attempt to intimidate regardless of whether or how many voters were actually intimidated. *See Hemant Patel, M.D., P.C. v. Bandikatla*, No. 18-cv-10227, 2021 WL 4254977, at *3 (S.D.N.Y. Sept. 17, 2021) (liability for an "attempt" crime requires "intent to commit the crime and . . . conduct amounting to a substantial step towards the commission of a crime." (quoting *United States v. Pugh*, 945 F.3d 9, 20 (2d Cir. 2019))).[10] Wohl plotted for over a year to conduct "a voter suppression effort based on contemporaneous news." 56.1 ¶ 6. He and Burkman founded Project 1599 to "influence the 2020 presidential election" and concocted the

---

[9] The Court may draw the adverse inference that Defendants believed that this, too, was a threat based on their invocation of the Fifth Amendment at their depositions. Ex. 56 at 173:17–74:10; Ex. 57 at 177:07–19.

[10] Although this evidence also demonstrates Defendants' specific intent to interfere with voting, that showing is not required under Section 11(b). D.E. 38 at 42–43, 54; *see also Hearing on the Voting Rights Act of 1965 Before the H. Judiciary Comm.*, 89th Cong. 12 (1965) (Statement by Att'y Gen. Katzenbach) ("[N]o subjective 'purpose' need be shown . . . in order to prove intimidation under [Section 11(b)].  Rather, defendants would be deemed to intend the natural consequences of their acts."); H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2462 (1965) ("[N]o subjective purpose or intent need be shown."). To the contrary, Defendants are "presumed to have intended the natural consequences" of their deeds. *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring); *see also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) ("[P]eople usually intend the natural consequences of their actions."). Here, the natural consequence of sending the robocall was to intimidate and threaten voters. *See supra* Section II.A.

robocall to "HIJACK" that election. *Id.* ¶ 7. In accordance with Wohl's plan to emulate Russian election suppression and "make shit up," they drafted a robocall script conveying false information designed to confuse voters and made false threats meant to keep them from voting. *Id.* ¶¶ 4, 11. As the People's unrebutted voting interference expert explained, the robocall "used Russian-style disinformation to increase confusion about voting by mail and spread falsehoods designed to deter voters from turning out." Ex. 60 at 5.[11]

The robocall followed Wohl's explicitly described "voter suppression effort" nearly step by step. 56.1 ¶ 6. He specifically planned to "[b]uild up left-wing online properties with a large following, only to have those properties direct followers to NOT vote come election day." *Id.* And he identified Black voters as an "important Demographic[] of Democratic voters" to target with his "voter suppression effort." *Id.* With some modifications, the robocall was precisely what Wohl had described. Although it was not an "online property," the robocall purported to come from a "civil rights organization," in other words a "left-wing" group, and was purportedly delivered by "Tamika Taylor," a name intended to deceive the listener into believing the call came from a civil rights advocate. *Id.* ¶ 4. ("Tamika Taylor" resembles the name of Breonna Taylor's mother, Tamika Palmer, a racial justice activist known for her advocacy after her daughter was killed by police. D.E. 38 at 10; *see also* Ex. 60 at 4; Ex. 61 at 3.) Wohl and Burkman sent the robocall to "black neighborhoods" in select cities, the call was delivered by a "Black Female Voice Actress," and the script was replete with racially coded terms. 56.1 ¶¶ 12, 14. Defendants used dated Black slang, including the terms "finessed" and "The Man," and drew on offensive racial stereotypes that

---

[11] The Court can also draw an adverse inference that each intended the call to suppress the vote of Black voters. *See* Ex. 56 at 176:04-09; Ex. 57 at 178:17-22.

were likely to deter Black voters from voting. *See* Ex. 60 at 6; *id.* Ex. 61 at 1, 3–4.[12] And they

celebrated receiving "angry black call backs," calling "the black robo" a "great jw [Jacob Wohl]

idea." 56.1 ¶ 17.

### III.   Defendants violated the KKK Act by conspiring to disseminate the unlawful robocall to intimidate and threaten voters.

Similar to their violation of the VRA, Defendants violated the KKK Act by conspiring to

intimidate and threaten voters participating in the 2020 election. Specifically, the KKK Act

prohibits two or more individuals from conspiring:

> to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States. . . .

42 U.S.C. § 1985(3). This section, known as the "Support or Advocacy Clause," D.E. 38 at 57,

has three elements: "(1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten;

(3) an individual legally entitled to vote who is engaging in lawful activity related to voting in

federal elections." *Id.* at 57–58. There is no genuine dispute of material fact about any of these

elements, and there is no genuine dispute that Plaintiffs suffered injuries as a result. Therefore,

summary judgment is warranted.

---

[12] Plaintiffs need not prove *why* Defendants targeted Black voters. But circumstantial evidence establishes that Wohl and Burkman viewed Black turnout as a liability for Republican candidates. In a radio show broadcast shortly after the robocall, Burkman mused that increasing Black turnout would be bad for the Republican party: "If you double Black turnout, you still lose." Ex. 58. And in a December 2020 post on Gab, Wohl complained, "One can predict who will win a given precinct with 100% certainty, so long as that precinct is predominately made up of demographic groups which were not included in the Founders' original conception of who should be voting." Ex. 59. He posted a picture with the post that contained the prompt, "How the Electoral Map would look like if only _____ voted." *Id.* Underneath the heading "People of Color" is a blue map showing a Democratic sweep if only people of color voted. *See id.*

A. **Defendants knowingly agreed and engaged in the conspiracy to disseminate the robocall**.

Defendants engaged in a conspiracy to disseminate their unlawful robocall. A conspiracy requires proof of: "(1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the object of the conspiracy; and (3) commission of an 'overt act' by one or more members of the conspiracy in furtherance of the conspiracy." D.E. 38 at 58 (quoting *United States* v. *Reyes*, 302 F.3d 48, 53 (2d Cir. 2002)). There is no material dispute that all three prongs are present here and that Plaintiffs were injured as a result of Defendants' conspiracy.

*Agreement and Knowledge*: The undisputed evidence demonstrates that Defendants agreed to send the unlawful robocall and knowingly participated in the conspiracy. An agreement to commit an unlawful act need not be explicit; a plaintiff can prove this element by showing merely that the defendants "have a tacit understanding to carry out the prohibited conduct." *Id.* at 58 (quoting *Cine SK8, Inc.* v. *Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007)). Here, however, Defendants could not have been more explicit. Wohl and Burkman agreed to "HIJACK this boring election" and send an intimidating robocall to "black neighborhoods" in major U.S. cities. 56.1 ¶¶ 7, 14. Wohl and Burkman's agreement and knowledge is further demonstrated by their work together to produce and send the robocall, which JMBA paid for. *Id.* ¶¶ 8–17. Wohl and Burkman later ratified the conspiracy by celebrating its effects on Black voters. *Id.* ¶ 17; *see also, e.g.*, *Sines v. Kessler*, 324 F. Supp. 3d 765, 791, 796–97 (W.D. Va. 2018) (holding that ratification statements evidenced defendants' agreement to join Section 1985 conspiracy).

*Overt Acts*: Nor is there any disputing that Defendants committed overt acts in furtherance of their conspiracy. Defendants' overt acts consisted of producing, sending, and paying for the robocall. 56.1 ¶¶ 8–17. As discussed above, there is no reasonable dispute that Burkman solicited

a robocalling company; Wohl paid a "Black Female" voice actress to record the robocall and he sent it; or that JMBA paid $1,000 for the robocall. *See supra* Section I; 56.1 ¶¶ 8–13. And Wohl and Burkman ultimately admitted before this Court and others that they were responsible for the content and distribution of the robocall. D.E. 53 at 12–13, 15; 56.1 ¶ 27.

> **B.      The purpose of Defendants' conspiracy was to intimidate and threaten**.

There is likewise no genuine dispute that the purpose of Defendants' conspiracy was to "force, intimidate, or threaten." D.E. 38 at 57–58. This Court previously explained that "[t]he terms 'intimidation' and 'threat' appear" in both the KKK Act and "in Section 11(b) of the VRA," and there is "no reason to interpret these terms differently." D.E. 66 at 21. For the reasons explained above in Section II.A, and previously found by the Court, there is no plausible interpretation of the robocall except as a series of threats against voters. And the record indisputably shows that Defendants devised their robocall to intimidate and threaten voters for exercising their right to vote. *See supra* Section II.B. Defendants set out to interfere with the election, "suppress turnout," target "important Demographics of Democratic voters in swing districts," including Black voters, and employ "a voter-suppression effort." 56.1 ¶ 6. There is no genuine dispute of fact about the purpose of Defendants' conspiracy.

> **C.      Defendants targeted individuals who were lawfully entitled to vote**.

The final element of the KKK Act is satisfied because Defendants targeted individuals who were lawfully entitled to vote and were going to engage in the lawful activity of voting in federal elections. *See* D.E. 38 at 58. Defendants targeted "black neighborhoods" in major metropolitan areas, where millions of lawfully registered voters reside. 56.1 ¶ 14. They placed roughly 85,000 calls, discouraging recipients from engaging in the lawful activity of voting by mail in the 2020 federal election. *See* Sawyer Decl. ¶ 2. Among the recipients were nearly 5,500 New Yorkers, and Plaintiffs Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Kate Kennedy, Karen Slaven,

Eda Daniel, and Andrea Sferes—all lawfully registered voters who were preparing to vote by mail when they received the robocall. *Id.*; 56.1 ¶¶ 19–26. Plaintiff NCBCP—a civil rights organization focused on protecting the voting rights of Black Americans—also saw the robocall as targeted at individuals who were lawfully entitled to vote. *Id.* ¶ 18. It thus diverted resources from another critically important mission (promoting Census participation) to help mitigate the pernicious effects of the robocall on lawfully registered voters in the Detroit area. *Id.*

### D.    The robocall injured Plaintiffs.

All Plaintiffs suffered injuries because of the robocall. NCBCP diverted resources to respond to the robocalls from its campaign to encourage Black people in Detroit to participate in the Census. *Id.* Plaintiffs testified as to the emotional toll the robocall had on them, ranging from anger and frustration to anxiety, stress, and trauma. *Id.* ¶¶ 19–26. Some Plaintiffs also testified to the many hours they have spent volunteering and working on elections and the added emotional burden they sustained as a result of the robocall diminishing their work. *Id.* ¶¶ 23, 26. And all the individual Plaintiffs suffered injuries because unlawful robocalls are inherently injurious: they are an invasion of privacy, waste the recipient's time, and deplete phone batteries and thus cost electricity. *See* 56.1 ¶¶ 18–26; *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1227 (9th Cir. 2019); *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305–06 (7th Cir. 2017); *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1135 (D. Minn. 2017); *DiStasio v. Edible Arrangements, LLC*, No. 3:16CV538 (DJS), 2017 WL 11604637, at *4 (D. Conn. May 10, 2017); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 777 (N.D.W. Va. 2017); *LaVigne v. First Cmty. Bancshares, Inc.*, 215 F. Supp. 3d 1138, 1146 (D.N.M. 2016).

IV.   **Defendants intentionally targeted Black voters for intimidation in violation of the Civil Rights Act of 1957.**[13]

Section 131(b) of the Civil Rights Act of 1957 prohibits any person, acting under color of law or otherwise, from intentionally intimidating or attempting to intimidate another person for the purpose of interfering with that person's right to vote. 52 U.S.C. § 10101(b). Unlike Section 11(b) of the VRA, courts have held that Section 131(b) requires a showing "that the intimidation was for the purpose of interfering with the right to vote." *United States v. McLeod*, 385 F.2d 734, 739 (5th Cir. 1967).

Even under this heightened intent standard, the undisputed evidence establishes Defendants' liability. Defendants' emails speak for themselves and show that the robocall was carefully designed to intimidate Black voters. Defendants discussed sending the robocall to specific "black neighborhoods" in cities across the country, including New York City. 56.1 ¶ 14. Defendants referred to the robocall as "the black robo," viewed its release as an "attack," and had previously discussed wanting to "HIJACK" the election. *Id.* ¶¶ 7–8, 17. Defendants' private reaction to the robocall—in which Defendant Burkman relished in the receipt of "angry black call backs"—further illuminates its intent. *Id.* ¶ 17. But there is even more. Defendants' investor prospectus, the so-called ACPI document, says the quiet part loud in plainly stating that Defendants planned to "target niche interest groups and demographics" including "African American voters" for voter suppression. 56.1 ¶ 6; Ex. 14 at DEF004341. Taken together, there can be no doubt that the "inevitable effect" Defendants sought was to "severely discourage, intimidate, threaten and coerce" Black voters from voting by mail in the 2020 election. *Cf. United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965).

---

[13] Sections IV–VII concern claims brought by Plaintiff-Intervenor's People of the State of New York.

**V.     There is no reasonable dispute that Defendants violated New York Civil Rights Law § 40-c**.

New York Civil Rights Law § 40-c prohibits subjecting a person to "discrimination in his or her civil rights" based on race and other protected characteristics. The statute encompasses broad categories of civil rights, and it is well established that an attempt to deny the right to vote without a reasonable basis is a violation of the statute. *See, e.g.*, *Salonen v. Barbella,* 65 A.D.2d 753, 755, 409 N.Y.S.2d 759 (1978); *People of State of N.Y. by Abrams v. Holiday Inns, Inc.,* 656 F. Supp. 675, 682 (W.D.N.Y. 1984).

As discussed in the previous section, there is no dispute that Defendants targeted New Yorkers because of their race. Wohl and Burkman targeted the robocall to "black neighborhoods," and Burkman specifically identified New York City as one of the targeted areas. 56.1 ¶ 14. Burkman described the robocall as the "black robo" and celebrated the "angry black call backs" he received. *Id.* ¶ 17.

Nor is there any dispute that Defendants attempted to deny New Yorkers the right to vote. As the Court has found, and Plaintiffs describe in Section II.A above, there is no reasonable interpretation of Defendants' robocall except as a threat of harm for voting by mail. And Defendants' specific claims that voter information would be used to track down warrants, pursue debt collection, or for mandatory vaccines have no reasonable basis. In New York, it is a misdemeanor to use election data in this way. NYS Election Law Section 3-103(5); Ex. 62 at 3.

**VI.     There is no dispute Defendants violated New York Civil Rights Law § 9 by interfering in the State's effort to run a free and fair election**.

Dating back to England's 1689 Bill of Rights and adopted in New York in 1787 as one of thirteen fundamental guarantees, New York Civil Rights Law § 9 prohibits any person "by force of arms, malice, menacing or otherwise" from "presum[ing] to disturb or hinder any citizen of this state in the free exercise of the right of suffrage." Civil Rights Law § 9; *see* 1 Charles Z. Lincoln,

*Constitutional History of New York* 728–32 (1906). Defendants violated this foundational right when they designed and executed a "voter-suppression effort" falsely suggesting that those who voted by mail could be incarcerated, hounded by debt collectors, and forcibly vaccinated for doing so. 56.1 ¶¶ 4, 6. That Defendants intended to "disturb or hinder" New Yorkers' "free exercise of the right of suffrage" is beyond doubt, for they spoke repeatedly of aiming to suppress voter turnout and even described their own efforts as an "attack." *Id.* ¶¶ 6–8.

Defendants' target, voting by mail, was a crucial component of the State's efforts to provide a free and fair election in light of the COVID-19 pandemic. In 2020, the State adopted several emergency measures to ensure that all voters could access the ballot without fear of contracting COVID-19. 56.1 ¶ 29; Ex. 62 at 4–6. The State determined in particular that vote-by-mail was necessary to ensure voter access and safety, but Defendants sought effectively to remove that option for Black voters by spreading misinformation about its purportedly negative consequences. As there is no genuine dispute that vote-by-mail presented a lawful alternative for the "free exercise of the right of suffrage" in the 2020 elections, and as Defendants sought to hinder its use by sowing doubt, fear, and confusion in "black neighborhoods," they have violated one of New York's oldest and most basic guarantees. 56.1 ¶ 14.

## VII. Defendants have engaged in persistent and repeated fraud and illegality in violation of New York Executive Law Section 63(12).

New York Executive Law § 63(12) empowers the Attorney General to seek damages and injunctive relief against "any person" engaged in persistent or repeated fraud or illegality in the carrying on, conducting, or transaction of business. Courts interpret "illegality" broadly to include "[a]ny conduct which violates state or federal law." *See FTC v. Shkreli*, No. 20cv00706, 2022 WL 135026, at *34 (S.D.N.Y. Jan. 14, 2022) (quoting *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852, 856 (Sup. Ct., New York County 1999)). The statute defines

"repeated" in similarly broad terms as the "repetition of any separate and distinct fraudulent or illegal act, *or conduct which affects more than one person*." N.Y. Exec. L. § 63(12) (emphasis added). "[A]ll business activity accompanied by repeated acts of illegality" falls within the law's purview. *See New York v. Feldman*, 210 F. Supp. 2d 294, 300 (S.D.N.Y. 2002) (citation omitted).

The undisputed evidence shows that Defendants, acting through Burkman's business—JMBA—engaged in repeated illegality under § 63(12). First, they used JMBA funds to pay for the robocall service, and they uploaded and sent the recording via JMBA's Message Communications account—all in violation of federal and state law, including the VRA, the KKK Act, the Civil Rights Act of 1957, and Sections 9 and 40-c of the New York Civil Rights Law. *See supra* Sections I-VI. Second, their conduct was "repeated," as the calls reached roughly 85,000 numbers nationally—including several thousand in New York—and clearly "affect[ed] more than one person." *See* N.Y. Exec. L. § 63(12).

Defendants' conduct rose also to the level of fraud, which represents its own § 63(12) cause of action. *See People ex rel. Spitzer v. Gen. Elec. Co.*, 302 A.D.2d 314, 314 (1st Dep't 2003). Fraud under the statute is more expansive than at common law and includes "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions." N.Y. Exec. L. § 63(12). Though the "Attorney General need not prove scienter or intent to defraud," *People ex rel. Cuomo v. Greenberg*, 95 A.D.3d 474, 483 (1st Dep't 2012), *aff'd*, 21 N.Y.3d 439 (2013), she would have no problem doing that here, as it is plain that the very purpose of Defendants' scheme was to deceive Black voters by spreading false information about the consequences of voting by mail.

25

## CONCLUSION

For the reasons set forth above, the Court should grant the Plaintiffs' motion for summary

judgment as to liability on all claims.


Dated: New York, New York          Respectfully submitted,
       July 29, 2022

**LETITIA JAMES**
*Attorney General*
*State of New York*
                                   By:   */s/ Franklin Monsour Jr.*

By: /s/ *Rick Sawyer*              Amy Walsh
Jessica Clarke, Chief, Civil Rights Bureau     Franklin Monsour Jr.
Rick Sawyer, Special Counsel       Rene Kathawala
Conor Duffy, Assistant Attorney General        Brittany Roehrs
Colleen Faherty, Assistant Attorney General    ORRICK, HERRINGTON & SUTCLIFFE LLP
28 Liberty St., 20th Floor         51 West 52nd Street
New York, NY 10005                 New York, NY 10019-6142
(212) 416-8252                     (212) 506-5000
Jessica.Clarke@ag.ny.gov           awalsh@orrick.com
Richard.Sawyer@ag.ny.gov           rkathawala@orrick.com
Conor.Duffy@ag.ny.gov              fmonsour@orrick.com
Colleen.Faherty@ag.ny.gov          broehrs@orrick.com


                                   By: /s/ *David Brody*

                                   David Brody (admitted *pro hac vice*)
                                   Marc Epstein
                                   LAWYERS' COMMITTEE FOR CIVIL
                                   RIGHTS UNDER LAW
                                   1500 K St. NW, Suite 900
                                   Washington, DC 20005
                                   (202) 662-8600
                                   dbrody@lawyerscommittee.org
                                   mepstein@lawyerscommittee.org


                                   *Attorneys for Plaintiffs*