# EXHIBIT 39

# CONFIDENTIAL



Transcript of **Gene Steinberg**

Monday, May 9, 2022

*National Coalition on Black Civic Participation, et al.*
*v. Jacob Wohl, et al.*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 115545

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE SOUTHERN DISTRICT OF NEW YORK

3   --------------------------------------------------------

4   NATIONAL COALITION ON BLACK CIVIC PARTICIPATION,
    MARY WINTER, GENE STEINBERG, NANCY HART, SARAH
5   WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL and
    ANDREA SFERES,

6

7                          Plaintiffs,      Civil Action No.

8                                  1:20-cv-08668-VM-OTW
                         -and-
9

10  People of the STATE OF NEW YORK, by its Attorney
    General, LETITIA JAMES, ATTORNEY GENERAL OF THE
11  STATE OF NEW YORK

12                         -vs-

13  JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES,
    LLC, PROJECT 1599, MESSAGE COMMUNICATIONS, INC.,
14  ROBERT MAHANIAN and JOHN and JANE DOES 1-10

15                         Defendants.

16  --------------------------------------------------------

17

18        Deposition of GENE STEINBERG, Plaintiff,

19  herein, taken by Defendant, pursuant to Notice via

20  Zoom, on Monday, May 9, 2022, at 10:00 a.m., before

21  Deirdre Smith, a stenographer and notary public

22  within and for the State of New York.

23

24

25

 1   A P P E A R A N C E S

 2

 3   ORRICK HERRINGTON & SUTCLIFFE, LLP

 4   51 West 52nd Street

 5   New York, NY 10019-6142

 6   Appearing on behalf of the Plaintiff

 7   Phone: (617) 880-1800

 8   Email:  brittany.roehrs@orrick.com

 9           franklin.monsour@orrick.com

10   BY:     BRITTANY ROEHRS, ESQ.

11           FRANKLIN MONSOUR, ESQ.

12

13

14

15   GERSTMAN SCHWARTZ LLP

16   Appearing on behalf of the Defendant

17   60 E. 42nd Street, Suite 4700 Office 21

18   New York, NY 10165

19   Phone:  (212) 227-7070

20   Email:   rkleinman@gerstmanschwartz.com

21   BY:      RANDY KLEINMAN, ESQ.

22

23

24

25

1    A P P E A R A N C E S (continued)

2

3    LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW

4    Appearing on behalf of Plaintiff

5    1500 K Street NW

6    Suite 900

7    Washington, DC 20005

8    BY:    MARC EPSTEIN, ESQ.

9

10

11

12   STATE OF NEW YORK OFFICE OF THE ATTORNEY GENERAL

13   Appearing on behalf of Plaintiff

14   28 Liberty Street

15   Floor 18, New York, NY 10005-1495

16   Phone: (212) 416-6046

17   BY:    COLLEEN FERITY, ESQ.

18

19

20

21

22

23

24

25

1          MS. ROEHRS:  Objection.

2     A.   I'm not sure.

3     Q.   How long did you live in that area for?

4     A.   Six years, maybe.

5     Q.   And you're unable to tell me what the

6  racial demographic was?

7          MS. ROEHRS:  Objection.

8     A.   Correct.

9     Q.   Okay.  In or about August 2020 did you

10  have a landline telephone?

11     A.   I did not.

12     Q.   Did you have a cellphone?

13     A.   I did.

14     Q.   What was your number at that time?  I will

15  not call you.

16     A.   At the time?

17     Q.   Yes?

18     A.   I'm not comfortable providing that phone

19  number.

20     Q.   Okay.  Is there a reason why you're not

21  comfortable providing your phone number from that

22  time?

23     A.   Yes.

24     Q.   Okay.  What's that reason?

25     A.   Since the robocall I've been suffering a

1  lot of emotion, anxiety and stress, and I felt

2  intimidated.  I do not want to provide my phone

3  number where potentially I could at once again be

4  harassed.

5      Q.   Well, actually -- okay.  You know what,

6  that's fine.  We'll get back to all those things

7  that you just talked about in a little bit.

8          Are you married?

9      A.   No.

10     Q.   Do you have any children?

11     A.   No.

12     Q.   What's your highest level of education?

13     A.   I have a bachelors degree.

14     Q.   And what is your bachelors in?

15     A.   Hellenistic.

16     Q.   Can you say that one more time?

17     A.   Hellenistic.  Hellenistic studies.

18     Q.   Where did you get your bachelors?

19     A.   GTU United Seminary.

20     Q.   Are you currently employed?

21     A.   No.

22     Q.   When was the last time you were employed?

23     A.   January of 2014.

24     Q.   And what did you do for a living back in

25  January of 2014?

1      Q.   Have you ever been registered to vote?

2      A.   Yes.

3      Q.   When was the last time you were registered

4 to vote?

5      A.   Possibly a few months ago.

6      Q.   Is there a particular reason you're no

7 longer registered to vote?

8      A.   Yes.

9      Q.   And what is that reason?

10      A.   When I moved I was given the option to

11 update any address to my new location but given what

12 I've experienced as a result of this robocall, the

13 trauma, everything that followed, as much as I would

14 love to vote and I think it's important to vote, I

15 made the difficult decision the only way for my

16 address not to be public, potentially for this to

17 happen again, the only way was for me to not

18 register to vote.  So I requested to be removed from

19 the Board of Elections to be able to vote.  And

20 that's why I'm not registered to vote.

21      Q.   Your understanding is the only way for

22 your address to not be public is not to be on any

23 voter registration, correct?

24      A.   My understanding is voter registration

25 information is public and I can not be regular to

1  vote without my information being public, that's

2  what was explained to me by the Board of Elections.

3      Q.   Why do you not want your information to be

4  public?

5      A.   Because I don't want someone to once again

6  use my information to intimidate me.

7      Q.   Do you have any social media accounts?

8      A.   I do.

9      Q.   What social media do you use?

10         MS. ROEHRS:  Objection.

11     A.   Mainly Facebook.

12     Q.   Is that profile public or private?

13     A.   Depends on what information.

14     Q.   What do you mean by that?

15     A.   Some things are public and some things are

16  private, so I'm not sure what you're asking.

17     Q.   What things where public?

18     A.   Location, where I live, which isn't my

19  actual town where I live, is public.  I'm trying to

20  think.  If I make a post and I set it in public

21  that's public.  My name is public but.

22     Q.   Are you finished?

23     A.   Yeah.

24     Q.   So, when you say location where you live

25  is public are you referring to Rockland County?

1      A.   Yes.

2      Q.   Did you vote in the 2020 presidential

3  election?

4      A.   I did.

5      Q.   Did you vote in person, by mail or

6  something different?

7      A.   In person.

8      Q.   Is there any particular reason you voted

9  in person?

10     A.   Yes.

11     Q.   Why is that?

12     A.   Because after receiving the robocall I was

13 concerned that the potentially the mail and the

14 mail-in vote may be tampered with somehow, some way,

15 and I didn't want to risk that so I opted to vote in

16 person.

17     Q.   Just, I want to be clear, you've mentioned

18 a few times -- you say, robocall.  When you say,

19 robocall, are you referring to August 26, 2020

20 robocall?

21     A.   Yes.

22     Q.   Okay.  We will get back to that shortly.

23 Prior to the November 2020 presidential election had

24 you voted in-person in any other elections before?

25     A.   Well, the answer the is yes.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1      A.    We did.

2      Q.    Okay.   What were the nature -- what

3 exactly did you guys discuss about that call?

4      A.    Certain everything we discussed, like I

5 said, we lived together but we talked about voting

6 in-person as I mentioned.   We talked about the

7 trauma and harm that it caused to me as a result of

8 my prior past -- my criminal conviction, and nature

9 of the call, how it was mentioning law enforcement.

10 Talked about that.   We talked about the fact that I

11 wake up, woke up at night with nightmares,

12 screaming, thinking the FBI was coming to get me as

13 a result of this call.   We talked about, we talked

14 about a lot of things about it.   I'm not sure if

15 you're looking for specifics, spell it out, would be

16 more helpful tying to get you the information to the

17 best of my ability.

18      Q.    Only what you remember.   And I appreciate

19 you doing your best to do that for me.   What,

20 specifically, did you discuss with Ms. Winter about

21 proceeding as a plaintiff in this lawsuit?

22        MS. ROEHRS:   Objection.   I'm directing the

23       witness not to discuss anything that he

24       discussed with attorneys present.

25      Q.    Yes, again, I don't want to know anything

1  about discussions with your attorneys, I just want

2  to know about conversations you had with Ms. Winter

3  outside of the presence of your attorney, if any,

4  what did you discuss about becoming a plaintiff in

5  this lawsuit?

6       A.  I recall discussing that her name may be

7  listed as, and case may be known as, Winter, and

8  asked her if she's okay with that.  I remember

9  discussing with her whether as much as I felt I

10  should proceed with the, with this case, whether I

11  should actually do it, whether this is good for my

12  mental wellbeing, given how much anxiety and trauma

13  it has already caused me without being part and

14  being part of this may make me relive both my past

15  with law enforcement and the robocall and what

16  transpired afterward emotionally, so I discussed

17  that as well.

18       Q.  Anything else?

19       A.  I don't recall.

20       Q.  Okay.  And why did you ultimately decide

21  to move forward as a plaintiff?

22          MS. ROEHRS:  Objection.

23       A.  Because I've been suffering and I've been

24  traumatized.  I feel intimidated and I feel that,

25  from my perspective, that I want to make sure that,

1          A.    Because my partner was playing a message

2     that she thought I should hear so I listened to it.

3          Q.    Okay.  Do you recall the substance of the

4     message?

5          A.    Yes.

6          Q.    To the best of your recollection what did

7     the robocall say?

8          A.    It said that this is, I don't remember the

9     full name but Tamika-something, and the substance

10    that I recall was that if -- something about if you

11    vote by mail then law enforcement can use your

12    information for outstanding warrants and that

13    creditors may come after you for your debts and last

14    was that the CDC may force you to take vaccines.

15         Q.    Anything else that you recall?

16         A.    Yeah, at the end it said beware of vote by

17    mail --

18         Q.    You have a pretty good memory.

19         A.    -- stay safe.  Making me think that

20    voting, voting may not be safe.

21         Q.    As you sit here today how many times have

22    you listened to the robocall?

23         A.    I don't know that I listened to it again

24    since that day.

25         Q.    Have you read the transcript?

1          Q.    You testified that the robocall was

2    traumatic for you, receiving the robocall; is that

3    correct?

4          A.    Yes.

5          Q.    Which parts of the robocall in particular

6    caused trauma?

7          A.    The part that law enforcement may come

8    after you.  Involving law enforcement, connecting it

9    to mail-in voting.

10         Q.    Why did this cause trauma for you?

11         A.    Because it bought up my interactions with

12   law enforcement and the voting by mail, feeling as a

13   threat.

14         Q.    On the date you received the call, or you

15   listened to the call, did you have any outstanding

16   warrants?

17         A.    No.

18         Q.    Did you believe at the time you heard the

19   robocall that the contents were true and accurate?

20         A.    No.

21         Q.    So, why did it cause you trauma if you

22   knew, if you believed it wasn't true and accurate?

23              MS. ROEHRS:  Objection.

24         A.    I'm not a psychologist.  I'm not a brain

25   specialist.  And I can't explain why part of my

1          MR. KLEINMAN:  Tell me when you're

2     finished.

3               (Witness peruses document.)

4          THE WITNESS:  I've read it.

5          MR. KLEINMAN:  Okay.

6     Q.   Do you recognize the content of paragraph

7     51?

8     A.   Yes.

9     Q.   And what do you recognize that to be?

10    A.   This looks like the transcript of the

11    robocall that I listened to.

12    Q.   Okay.  Can you please direct me to the

13    first statement in this robocall that you are

14    alleging caused you trauma?

15    A.   Where it says mail-in voting sounds great

16    but did you know if you vote by mail your personal

17    information will be part of a public database that

18    will be used by police departments to track down old

19    warrants.

20    Q.   Okay.  Let's stop there.  So, what

21    specifically about this statement caused you trauma?

22    A.   Bringing up that voting, using mail-in

23    voting, could cause the, cause law enforcement to

24    come after me.

25    Q.   But it's fair to say that you had no

Gene Steinberg           CONFIDENTIAL          5/9/2022
Case 1:20-cv-08668-JSR  Document 216-39  Filed 07/29/22  Page 16 of 27
Page 51

1   it was anxiety and stress at the time.

2      Q.   Did you contract Covid in or around

3   November of 2020?

4         MS. ROEHRS:  Objection.

5      A.   Not to my knowledge.

6      Q.   In August of 2020 how often did you leave

7   your home?

8      A.   I wouldn't know the answer to that but if

9   I left home it wasn't to meet up with anyone.

10      Q.   For what reasons did you leave home in

11   August of 2020?

12      A.   I like to go hiking.  Walk my dogs.  Well,

13   I said I didn't meet people, I just want to clarify,

14   there were three people that we met regularly

15   because it was a pod.  They didn't meet anyone and

16   we didn't meet anyone and if they did end up meeting

17   anyone they would let you know and wait two weeks

18   before we met up again.

19      Q.   This group that you're talking about, how

20   many people were in this group?

21      A.   Three or four.

22      Q.   Three including yourself?

23      A.   No, three, myself and Mary.

24      Q.   So, five people?

25      A.   Yeah.

1      Q.   How often did you meet with these other

2   three individuals?

3      A.   Hard to say.  We were literally -- I can't

4   say with certainty but I would say four days or

5   nights out of the week is a pretty accurate answer

6   but I don't know exactly.

7      Q.   Approximately, when did you start meeting

8   with these other individuals four or five nights a

9   week?

10      A.   Four, five nights is an average throughout

11   the entire time.  I don't recall but it was fairly

12   early on when we realized that we should not be

13   meeting people so we tried to come up with a plan so

14   we could still hang out.  So, as information became

15   available, I would say fairly early on in the

16   epidemic, we were trying to use the best information

17   we had and decided that we should be a pod only on

18   the condition that no one meets anyone else.

19      Q.   Understood.  Approximately, how many times

20   in August of 2020 did you meet with these three

21   other people in this group?

22      A.   I'm not sure.  Like I said, best estimate

23   is three or four times a week but I can't give you

24   an accurate answer.

25      Q.   Sure.  Approximations are fine.  So, is it

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1           MS. ROEHRS:  Let's do ten.

2           MR. KLEINMAN:  Got it.

3                (Off the record.)

4           MR. KLEINMAN:  Ready?

5           MS. ROEHRS:  We just want to correct one

6   of his answers.

7           THE WITNESS:  I don't recall the exact

8   question when you asked whether I was ever

9   under oath in Court and it occurred to me that

10   I believe when I entered my plea, I'm assuming,

11   I was under oath, which I wanted to correct

12   that in case I said no.

13           MR. KLEINMAN:  I appreciate the

14   clarification.  I believe you said you weren't

15   sure but the clarification is always helpful

16   and I appreciate that.

17   Q.  So, in the months between August of 2020

18  and March of 2021, approximately, how many times per

19  day did you leave your home?

20           MS. ROEHRS:  Objection.

21   A.  I don't recall.

22   Q.  Is it more than once?

23   A.  I don't recall.

24   Q.  Okay.  Between August of 2020 and March of

25  '21, how often would you go grocery shopping?

1      A.   Zero.

2      Q.   How did you get your groceries at the

3  time?

4      A.   An online app.

5      Q.   Between August 2020 and March of '21,

6  roughly, how many times per week would you leave

7  your home?

8      A.   The short answer is I don't know.

9      Q.   Okay.  Now, you testified earlier that

10  after receiving the robocall you started to

11  experience nightmares.  Is that correct?

12      A.   Correct.

13      Q.   What specifically about the robocall

14  caused these nightmares in your estimation?

15      MS. ROEHRS:  Objection.

16      A.   As I said I'm not a psychologist or a

17  brain specialist but this robocall brought up this

18  fear and this trauma of the FBI coming for me.  And

19  I'm not sure that it started on day one, it took

20  time to set in, but again, as I mentioned the law

21  enforcement coming after you with mail-in voting is

22  what, to my understanding, that's what caused me to

23  have nightmares.  While I was dreaming in my sleep

24  she would ask me, what's going on?  I would tell her

25  the FBI is here to get me.

1          MS. ROEHRS:  Do you need a break?

2          THE WITNESS:  No, I can cry on camera.

3          MR. KLEINMAN:  If you need a break I'll be

4    happy to give it to you.

5          THE WITNESS:  No, I'm okay.

6    Q.  So, you said your understanding is the

7 robocall caused these nightmares.  What do you base

8 this understanding on?

9    A.  My thinking is that I had this fear when I

10 was awake, I did not have it before that robocall.

11 I started having it afterwards.  Only that I didn't

12 tell anyone that I'm was part of the lawsuit, would

13 only mention it vaguely to someone about the lawsuit

14 and if they asked what it's about, I would say, oh,

15 it doesn't matter.  I couldn't talk about it because

16 I didn't want them to ask for details as to why,

17 which then I would had to explain to them the trauma

18 I'm dealing with, which is why I'm part of this

19 lawsuit.  I guess I'm not an expert but I very much

20 associate it based on the timing and how it made me

21 feel and how it continues to make me feel.

22    Q.  When did this fear begin?

23    A.  Fear specifically of?  Explain, please,

24 the question?

25    Q.  Well, you just testified that you felt

1   fear after the robocall.  So, when after receiving

2   the robocall did this fear first begin for you?

3        A.   Like I said, it wasn't on day one.  I

4   mean, the anxiety, the trauma was coming up, that it

5   brought up was soon after but when I started having

6   nightmares and when -- that I can't answer, because

7   I don't recall exactly.

8        Q.   And I just want to make sure that it's

9   clear, do you recall when the nightmares began after

10  receiving the robocall?

11       A.   I don't recall a date.  I don't remember

12  how many days but if I had to speculate -- maybe I

13  shouldn't be speculating.  But it was soon after.

14  And soon after would be a month, two weeks but I

15  don't specifically recall.

16       Q.   I want to narrow it down as best you can.

17  Would you say, approximately, more or less than a

18  month after you received the robocall that the

19  nightmares began?

20            MS. ROEHRS:  Objection.

21       A.   If you want me to approximate I have to

22  continue to say I'm not sure.

23       Q.   I want you to approximate not guess.  So,

24  an approximation?

25       A.   Then I can't answer that.

1      Q.   So, is it fair to say that you don't know

2  if it's one month, two months --

3      A.   It's difficult --

4           MS. ROEHRS:  Objection.

5      A.   -- it's difficult for me to tell you that.

6      Q.   Okay.

7      A.   It's not -- it was not on day one.

8      Q.   Have your nightmares stopped?

9      A.   I have not had them, I would say, for the

10 past two months.  I have cried about it during the

11 day when I had to schedule time for this deposition

12 or when I have to do anything related to this case

13 during the day it literally ruins my day.  I mean by

14 me not being able to focus on what I normally want

15 to focus on because this is on my mind and this is

16 super stressful and it makes me feel anxious.

17      Q.   And aside from the therapist you mentioned

18 earlier have you, did you seek any other type of

19 mental health counseling as a result of these

20 feelings?

21           MS. ROEHRS:  Objection.

22      A.   No.

23      Q.   In the approximately twenty years since

24 your criminal conviction have you seen or heard

25 anything besides the robocall that gave you

1   the robocall, this was directed at the listener,

2   don't do this because -- don't vote by mail because

3   of the three things I mentioned earlier will happen

4   to you.  So that was more of, felt to me like a

5   threat.

6        Q.   Do you watch the news?

7        A.   News?  Not really.

8        Q.   In August of 2020 did you watch the news

9   at all?

10       A.   No.

11       Q.   In August of 2020 --

12       MR. KLEINMAN:  Withdrawn.

13       Q.   In the months leading up to 2020

14  presidential election did you see or hear any type

15  of political adds?

16       A.   May have come on when I watched sports but

17  I try not to pay any attention.  I try to avoid adds

18  all together.

19       Q.   Now, you testified that you found the call

20  to be intimidating.  Is that correct?

21       A.   Yes.

22       Q.   So, what specifically about the call did

23  you feel to be intimidating?

24       MS. ROEHRS:  Objection.

25       A.   The fact it made me question whether my

1   vote by mail would be safe to the point that I

2   changed plans from voting by mail to actually voting

3   in the presidential election in-person, exposing

4   myself potentially to Covid when I had been so

5   careful the entire time to not be meeting people.

6           The fact that it made me feel, like I

7   said, that law enforcement might come after me,

8   despite the fact that I know it's not real, the

9   robocall -- my brain still produced trauma that it

10  might be real and gave me nightmares and intimidated

11  me to the point that I removed myself from voter

12  registration -- that since the I was eighteen I

13  don't think I've missed a vote -- to the point that

14  I removed my information from voter registration

15  because I don't want it to be public.

16      Q.   Do you believe the robocall was designed

17  for any particular voters?

18          MS. ROEHRS:   Objection.

19      A.   I'm not sure.

20      Q.   At the time you received the robocall did

21  you recognize the name Tamika Taylor?

22      A.   I can't recall exactly but I knew Brianna

23  Taylor, I don't know a Tamika, so I don't know if I

24  associated it with her or not.  I don't recall.

25      Q.   Earlier you testified that you lost some

1 various things to help the party, but I don't

2 necessarily recall exactly what.

3   Q. Have you ever spoken to Mr. Burkman at

4 all?

5   A. I don't think so.

6   Q. You said, I don't think so?

7   A. No, not certain if it was a prank call,

8 that's why I'm saying I don't know.

9   Q. Sorry, I wasn't sure if I actually heard

10 what you had said.  That was all.  What's your

11 opinion of Mr. Burkman?

12   MS. ROEHRS:  Objection.

13   A. I'm not sure who he is as a person but my

14 opinion is that his actions caused me a lot of

15 trauma and anxiety and I would hope that he would

16 not do this again because no one deserves to suffer.

17   Q. Do you plan on seeking any additional

18 mental health treatment as a result of the trauma

19 that you claim you suffered as a result of the

20 robocall?

21   MS. ROEHRS:  Objection.

22   A. I don't know at the moment.

23   Q. Why not?

24   A. Because it's difficult for me to ask for a

25 professional help because that means that I have to

1   talk about it.  I can't ask for help without

2   specifying what I need help for so that means that I

3   have to relive that again.

4          MR. KLEINMAN:  We don't have too much

5       longer.  I'm doing my best to get through this

6       as quickly as I can but if you need a break,

7       Mr. Steinberg, I'll be happy to give you

8       another break.

9          THE WITNESS:  I'll be fine.

10       MR. KLEINMAN:  Let's go off the record for

11       a second.

12                (Off the record.)

13       MR. KLEINMAN:  Back on.

14    Q.  Prior to receiving the, prior to hearing

15   the robocall did you know who Jacob Wohl was?

16    A.  No.

17    Q.  Do you currently know who he is?

18    A.  To the same extent I know about the other

19   party.

20    Q.  Is it fair to say that you've never spoken

21   to Mr. Wohl?

22    A.  Right.

23    Q.  Is it fair to say that your opinion of Mr.

24   Wohl is the same as it is for Mr. Burkman?

25    A.  Correct.

1

2             C E R T I F I C A T I O N

3

4

5       THIS IS TO CERTIFY, THAT I, DEIRDRE M. SMITH,

6 on Monday, May 9th of 2022, reported the proceedings

7 contained in the foregoing 71 pages at the time and

8 place as set forth in the heading in the foregoing

9 matter. That the transcript is a true and accurate

10 transcription of my stenographic notes, using

11 Computer Aided Transcription, to the best of my

12 ability.

13       IN WITNESS WHEREOF, I have hereunto set my had

14 this 23rd day of May, 2022.

15

16                 _____

17                 Deirdre M. Smith

18

19

20

21

22

23

24

25