# EXHIBIT 40

<p style="color:red; text-align:center; font-size:2em;">Confidential</p>



# Transcript of **Eda Daniel**

Saturday, April 9, 2022

*National Coalition on Black Civic Participation, et al. v. Jacob Wohl, et al.*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 115308

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF NEW YORK
 2      -----------------------------------------x
        NATIONAL COALITION ON BLACK
 3      CIVIC PARTICIPATION, MARY WINTER,
        GENE STEINBERG, NANCY HART,
 4      SARAH WOLFF, KAREN SLAVEN, KATE
        KENNEDY, EDA DANIEL, and ANDREA
 5      SFERES,

 6                                Plaintiffs,

 7                 -and-

 8      People of the STATE OF NEW YORK, by its
        attorney general, LETITIA JAMES,
 9      ATTORNEY GENERAL OF THE STATE OF
        NEW YORK
10

11                   V.            Civil Action No:
                                     20-cv-8668(VM)(OTW)
12


13
        JACOB WOHL, JACK BURKMAN, J.M.
14      BURKMAN & ASSOCIATES, LLC, PROJECT 1599,
        MESSAGE COMMUNICATIONS, INC., ROBERT
15      MAHANIAN, and JOHN and JANE DOES 1-10.

16                                Defendants.
        -------------------------------------------x
17

18              EXAMINATION BEFORE TRIAL of the Plaintiff, EDA

19      DANIEL, taken by the Defendant, pursuant to Court Order,

20      held via REMOTE MEANS, on April 9, 2022, at 10:01 a.m.,

21      before a Notary Public of the State of New York.

22
        *******************************************
23

24      *CONFIDENTIAL*

25
```

Eda Daniel     Confidential     4/9/2022
Case 1:20-cv-08668-JSR   Document 216-40   Filed 07/29/22   Page 4 of 15
Page 2

```
 1          A P P E A R A N C E S:

 2          ORRICK, HERRINGTON & SUTCLIFFE LLP
                    Attorneys for Plaintiff
 3                  51 West 52nd Street
                    New York, New York 10019
 4
            BY:     AARON GOLD, ESQ.
 5                  FRANKLIN MONSOUR, ESQ.

 6
            GERSTMAN SCHWARTZ LLP
 7                  Attorneys for Defendant
                    1399 Franklin Avenue, Suite 200
 8                  Garden City, New York 11530


 9          BY:     RANDY E. KLEINMAN, ESQ.

10
            LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
11                  Attorneys for Plaintiff
                    1500 K Street NW, Suite 900
12                  Washington, DC 20005

13          BY:     DAVID BRODY, ESQ.
                    MARC EPSTEIN, ESQ.
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    Q.    What were you studying?
 2    A.    Counseling psychology.
 3    Q.    Are you currently employed?
 4    A.    I'm retired.
 5    Q.    What did you do before you retired?
 6    A.    I was an administrator at the Massachusetts
 7          Institute of Technology.
 8    Q.    Wow.  And how long were you in that position
 9          for?
10    A.    10 years.
11    Q.    And how long have you been retired?
12    A.    Let's see, about 20.
13    Q.    Wow, congratulations.
14    A.    Thank you.
15    Q.    What is your race or ethnicity?
16    A.    I'm Eastern European Jewish.
17    Q.    Me too.  Would you classify yourself as a
18          Caucasian?
19    A.    Yes.
20    Q.    What are your current political affiliations?
21                MR. GOLD:  Objection.  You can answer.
22    A.    I'm a registered Democrat.
23    Q.    And when you say "registered", does that mean
24          you're registered to vote?
25    A.    Yes.
```

```
 1     Q.     And how long have you been registered to vote
 2     for?
 3     A.     Since I turned 18.
 4     Q.     And have you been registered as a Democrat that
 5     entire time?
 6     A.     Yes.
 7     Q.     And the address -- your current residence, is
 8     that the same address that you're registered to vote
 9     under?
10     A.     Yes.
11     Q.     And is that the same address that you were
12     registered to vote under at the time of the November
13     2020 Presidential election?
14     A.     Yes.
15     Q.     By the way, how long have you lived at your
16     residence for?
17     A.     About six and a half years.
18     Q.     And prior to that, were you also in East
19     Cleveland or did you live somewhere else?
20     A.     I lived in Walden Massachusetts.
21     Q.     Did you vote in the 2020 Presidential election?
22     A.     Yes.
23     Q.     Did you vote by mail or in person?
24     A.     I voted in person.
25     Q.     And where did you do that specifically?
```

```
 1      Q.      Prior to that phone call, did you know who Jack
 2   Burkman was?
 3      A.      I had no idea.  I did not know him.  Did not
 4   know the name.
 5      Q.      And what happened after you answered the call?
 6      A.      I was surprised that it was a robo call.  I
 7   listened to the call.  I was very surprised, I was
 8   actually shocked and a little frightened when they were
 9   talking about the police might try to contact you if you
10   vote by mail, but I think anybody would be sort of
11   surprised getting a phone call like that.  Then I -- the
12   part about the credit cards that they could find you if
13   you have credit card debt, I immediately thought, well,
14   that's not about me and then the part about getting
15   vaccines, at that moment, I realized, oh, this was
16   racist, this was to -- voter intimidation, this was to
17   frighten people in my zip code in East Cleveland, and it
18   made me very, very, angry.  But in addition to that, it
19   also left me a little -- kind of scared for a couple of
20   weeks having such a pernicious call come into my home.
21   We think of our homes as our sanctuary, and it was very
22   distressing.  It also has made me uncomfortable when the
23   phone rings, I always look at caller ID, and even if it
24   says a person's name, I'm still a little hesitant to
25   pick up that phone until I've gone to hear the message
```

```
 1      because I don't ever want to be subjected to that kind
 2      of nastiness in my own home.  I don't want to be
 3      subjected to that again.
 4                     MR. KLEINMAN:  Okay.  I want to go back
 5              and review a few of the things that you just
 6              said.  So Aaron, do you have a copy of the
 7              Complaint printed out or do you want me to pop
 8              it up?  I'll probably pop it up any way, but
 9              it's up to you.
10                     MR. GOLD:  We have a printed copy of
11              the Complaint right next to Ms. Daniel.
12                     MR. KLEINMAN:  Perfect.  I will put it
13              up on the screen for everybody else's benefit
14              and my own.
15      Q.      I'm putting on the screen now what was marked
16      at a deposition on April 8th as Defendant's Exhibit B.
17      Do you -- well, I'll tell you what, I'll scroll at the
18      beginning, do you recognize this document at all Ms.
19      Daniel?
20      A.      Yes, I do.
21      Q.      Great.  What do you recognize it to be?
22      A.      I recognize it to be a Complaint in the United
23      States District Court.  Of -- against Jacob Wohl and
24      Jack Burkman.
25      Q.      Have you seen this document before today?
```

1      the Black community perceives this call?

2                MR. GOLD:  Objection.

3      A.    In a word, no.  But this is not really a

4      question that one can answer with a yes, no answer.

5      Q.    Well, your opinion is based on your assumption

6      about how the Black community would feel about this

7      call; is that not correct?

8      A.    My opinion is based on conversations I've had

9      with Black friends about other things, nothing to do

10     with this call and from reading that I've done my entire

11     life about tactics used against Black people.

12     Q.    So your opinion on how the Black community

13     would perceive this call is based on an assumption,

14     correct?

15               MR. GOLD:  Objection.

16     A.    I'm -- I really am -- an assumption means that

17     there's been no education or learning or experience

18     behind something and one just makes -- has a belief

19     system based on no evidence.  One -- an intelligent

20     person can look at something like the text of this call,

21     can also know -- I personally know how this call

22     impacted and affected me emotionally and to know that

23     this would not play well amongst other people,

24     particularly Black people.

25     Q.    And you don't believe that your opinion on how

1    A.      My expectation when I saw the caller ID was

2    that there was going to be a human being talking at the

3    other end of the line when I picked up.  And instead

4    what I got was a very fast succinct mischief that made

5    threats about voting by mail information being used as a

6    way for the police to track me, that credit card

7    companies would collect outstanding debts based on that

8    information and the CDC would also use these records for

9    mandatory vaccines.  And all of this was shocking and

10   untrue and scary and so I was -- it just made me very

11   uncomfortable, very scared until I realized that I was

12   not really the target of this robo call and then it made

13   me angry.  But, as I said before, there have been

14   lingering cautions that I have taken because of this

15   robo call.  Specifically, even when I see my caller ID

16   come up with a person's name, I don't immediately answer

17   the phone unless I recognize that -- unless that person

18   is a friend of mine and known to me.  I no longer pick

19   up the phone immediately.  I wait to hear what is at the

20   other end.

21   Q.      How long did it take you to recognize the

22   statements in the robo call were allegedly false?

23              MR. GOLD:  Objection.

24   A.      When it got to the second part about

25   outstanding debt collection, I knew that this could not

 1    Q.    And I know you testified in quite some detail
 2    about it, but I just want to be clear, at the time you
 3    received the robo call, were you personally intimidated
 4    by it?
 5          MR. GOLD:  Objection.
 6    A.    I was frightened for a moment until I realized
 7    that this was not -- that I was not the target.
 8    Q.    Is it fair to say that you were able to see
 9    through the alleged intimidation of the robo call?
10    A.    Yes, I was able to see through it, which is why
11    I was so angry that this was happening.
12    Q.    At the time you received the robo call, did you
13    believe that members of the Black community would not be
14    able to see through this alleged intimidation?
15          MR. GOLD:  Objection.
16    A.    That never occurred to me.
17    Q.    Did you feel threatened by the robo call?
18    A.    I think I've already testified to the answer
19    being yes, the first part with the police departments
20    will track down old warrants, I do not have any warrants
21    old or new.  But when one is saying that -- when one
22    picks up the phone -- when I picked up the phone, I did
23    not expect to get this kind of a call.  There's no
24    introduction in terms of preparing -- there's know way
25    to be prepared to receive a phone call like this.

1   about.  So the information would have come from the

2   lawyers or anybody else in the lawsuit, but not from me.

3   Q.   So you have no independent knowledge to

4   substantiate that particular allegation?

5   A.   Correct.

6   Q.   Looking at the next paragraph, paragraph 100

7   also on page 24, just take a minute to read that to

8   yourself, please.

9   A.   Okay.

10  Q.   What irreparable harm, if any, have you faced

11  as a result of the robo call?

12              MR. GOLD:  Objection.  Calls for a

13         legal conclusion.

14  A.   Irreparable, could you define that for me?

15  Q.   Can never be repaired.  Permanent.

16  A.   I don't know that anything is irreparable.  I

17  do know that I continue to be uncomfortable with names

18  that I don't recognize, but I don't feel that this -- as

19  I said before, life brings issues to us and so it's just

20  another one of those things that makes -- is an

21  intrusion into one's happiness.

22  Q.   In your personal opinion, did the robo call

23  cause irreparable harm to anybody?

24              MR. GOLD:  Objection.

25  A.   I can't possibly know that.

```
 1     Q.     Do these type of intrusions happen in your life
 2     every day?
 3     A.     No.
 4     Q.     Every month?
 5     A.     No.
 6     Q.     Has any type of intrusion at this level
 7     happened to you since you received the robo call?
 8     A.     No.
 9     Q.     Earlier you testified in your participating in
10     get out the vote efforts, correct?
11     A.     Yes.
12     Q.     Can you describe some more of that work for us?
13     A.     It's very basic.  It's knocking on doors, just
14     going up to people's homes, leaving literature, if
15     they're home, helping answer their questions.  It's just
16     a lot of foot work.
17     Q.     And why do you do this work?
18     A.     Because I feel it's very, very, important that
19     people vote.  It was something that was -- when I was a
20     kid, my father always took me with him to vote.  I
21     remember going probably starting at age 5.  And it just
22     seemed that it was a sacred part of our democracy.  And
23     I believe strongly in democracy.
24     Q.     And how many hours do you think that you've
25     spent on your voter canvassing efforts?
```

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    A.    I can't even begin to put a number on it, but
2    it's in the hundreds.  Over the course of my life, in
3    the thousands.
4    Q.    And how did the robo call that you received
5    make you feel about the work that you had done as a
6    canvasser?
7    A.    I felt diminished because it was directly
8    opposing something that I value very highly.
9    Q.    Why was it directly opposing what you valued
10   very highly?
11   A.    It was trying to tell people not to vote and
12   that is appalling to me.
13   Q.    Now earlier you were played the curative robo
14   call that was issued by the Defendants in this case,
15   correct?
16   A.    Yes.
17   Q.    Do you recall the voice that you heard?
18   A.    You know, I don't recall, whether it was male
19   or female.
20   Q.    Was it a computerized generated?
21   A.    I don't think so.  If it was, it was a very
22   good one.
23   Q.    Are you talking about the robo call or the
24   curative call?
25   A.    The curative call.

```
 1                    C E R T I F I C A T E

 2

 3              I, BROOKE E. PERRY, hereby certify that the

 4       Examination Before Trial of EDA DANIEL was held before

 5       me on the 9th day of April, 2022; that said witness was

 6       duly sworn before the commencement of her testimony;

 7       that the testimony was taken stenographically by myself

 8       and then transcribed by myself; that the party was

 9       represented by counsel as appears herein;

10       That the within transcript is a true record of the

11       Examination Before Trial of said witness;

12              That I am not connected by blood or marriage

13       with any of the parties; that I am not interested

14       directly or indirectly in the outcome of this matter;

15       that I am not in the employ of any of the counsel.

16              IN WITNESS WHEREOF, I have hereunto set my

17       hand this 9th day of April, 2022.

18
                        *Brooke E. Perry* (signature)
19

20                      BROOKE E. PERRY

21

22

23

24

25
```