# EXHIBIT 61

**The Harmful Impact of Racial Stereotypes**

Stereotypes are preconceived, oversimplified ideas about a particular group that are transmitted culturally. While stereotypes can be overt (think of jokes about who is and who isn't a good driver), they can also be quite subtle and coded. Stereotypes are particularly problematic for the groups associated with them, because they are faced with having to debunk them repeatedly, whether by their words or their deeds. Racial stereotypes in particular tend to be learned through acculturation (being immersed in contexts where they are frequently used) when we are children, making such stereotypes difficult to unlearn for everyone. There is a long history of subtle and coded stereotypes being used in American politics. Often in political advertising, racial stereotypes are cued either subtly or not so subtly. Subtle cues of anti-Black stereotyping are often called "dog whistles" because they are designed to make a white viewer or a listener think of an anti-Black racial stereotype without actually stating the stereotype itself.

Anti-Black stereotypes are particularly enduring in U.S. politics and have been used in American politics since early in our history, when racial stereotypes about Sally Hemings were explicitly used against Thomas Jefferson while he ran for president. In the 20th century Vice President George H.W. Bush's campaign for president distributed a television ad that criticized his opponent for being soft on crime using the case of a Black man, Willie Horton, as the face of crime in America. Three contemporary anti-Black stereotypes are: 1) Blacks are criminals, 2) Blacks are lazy and financially irresponsible, and 3) Blacks are intellectually inferior. There is no empirical evidence supporting these stereotypes, but they persist in our culture and are frequently exploited in our politics.

The use of anti-Black stereotypes has a long history of disempowering Black voices in our democracy. At the founding of the United States, stereotypes that Black people were ignorant or incapable of controlling their emotions were used as justifications for their ongoing enslavement and exclusion from the benefits of U.S. citizenship. After Black male citizenship was incorporated into the U.S. Constitution following the Civil War, these stereotypes persisted and forced Black people to act in ways that proved they were capable of citizenship, a requirement that was not imprinted onto white citizens. During the early part of the 20th century, parts of the New Deal specifically excluded certain sectors that were dominated by Black workers, including domestic and agricultural work. When they chose to speak up, Black families were routinely punished for speaking out about mistreatment, and their claims were summarily dismissed as untrue due to both negative stereotypes. Public opinion surveys routinely find that substantial percentages of non-Black American citizens believe that these kinds of claims do not reflect the truth and instead reflect Black people's unwillingness to work hard and embrace core American values. When Black people express the facts of their lives and that reality is dismissed, it prevents them from obtaining the kind of full citizenship that white Americans have access to.

There are additional harms to the use of anti-Black stereotypes that go beyond the damage to our democracy's ability to provide all citizens equal ability to have their concerns addressed. The response to the use of such stereotypes can generate negative emotional responses in the group being stereotyped, including anger. For example, being exposed to the three anti-Black stereotypes previously listed is likely to generate anger among Black people who hear or see these misrepresentations. While

the anger response seems logical, Black people also have strict societal limitations around how they can respond to such stereotypes even if they feel angry. Political psychologists Davin Phoenix and Antoine Banks have each written books about how anger is expressed or suppressed among white people (Banks) or Black people (Phoenix) and the impact on how they participate in politics. The suppression of such anger in the face of both the racist stereotype and the discriminatory societal constraint on expressing the anger has been empirically linked to multiple negative health outcomes.[1]

The receipt of robocalls that cue anti-Black stereotypes are part of a class of discriminatory experiences called "macro-stressors." These events occur outside of a recipient's control, without warning, triggering emotional reactions such as anger, sadness, and anxiety that has been well documented in the psychological literature. It is the suppression of such reactions and their impacts on the physical body that make the expressions of such stereotypes harmful.

Anti-Black racial discrimination has been associated with negative health outcomes for Black people. For example, Williams and Muhammad documented connections between racial discrimination and intrauterine fibroid tumors and breast cancer in Black women across the United States. Margaret Hicken and her co-authors (2013) found that racial discrimination increases vigilance—a trauma response— which may in turn reduce Black people's ability to get quality sleep.[2] Specifically, such traumas increase what scholars call "perseveration," or vigilance about the next discriminatory experience, in a way that triggers the biological stress system. Anti-Black stereotypes, therefore, both deprive Black voters of democratic agency and threaten their physical health.

**Statement of Inquiry**

I was asked to determine whether the robocall sent on August 26, 2020 included anti-Black stereotypes and their likely effect on Black recipients of the call. To make this determination I reviewed three separate robocalls – one purporting to be from a woman racially coded as Black ["Tamika Taylor"] and two purporting to be from Jack Burkman. I also reviewed multiple emails exchanged between Burkman and Jacob Wohl regarding these calls and the responses such calls generated. I then considered these materials within the context of nearly 100 years of research about the negative impacts of racial stereotypes in U.S. politics.

**Statement of qualifications**

I am Dean's Professor of Gender Studies and Chair of the Political Science and International Relations Department at the University of Southern California, where I have conducted research and taught for the last 14 years. I previously held appointments at Yale University (5 years; Political Science and African American Studies); Pennsylvania State University (1 year, Political Science and Gender Studies) and the University of San Francisco (2 years; Politics). My career spans **22** years as a professional political scientist. My area of expertise is the impact of race and gender on U.S. politics. As a leading expert in the

---

[1] Banks, A. (2014) *Anger and Racial Politics: The Emotional Foundation of Racial Attitudes in America*. Cambridge: Cambridge University Press; Phoenix, D. (2019). *The Anger Gap: How Race Shapes Emotion in Politics* (pp. I-Ii). Cambridge: Cambridge University Press.
[2] Hicken, M. et al (2013). "Every shut eye, ain't sleep": The role of racism-related vigilance in racial/ethnic disparities in sleep difficulty. *Race and Social Problems* vol. 5,2 (2013): 100-112.

field I have written *The Politics of Disgust and the Public Identity of the "Welfare Queen,"* which analyzes the way racial (and gender) stereotypes are used in debates about welfare reform. I have also written two books about the negative impacts of racism (and sexism) in U.S. politics: *Solidarity Politics for Millennials* and *Intersectionality: An Intellectual History*. These three books and my numerous articles on these subjects have been cited in **21** disciplines beyond political science, including law and medicine. I have not testified as an expert witness in the previous four years. I am being paid $450 an hour for my work on this case.

**Opinion 1: The Robocall is Racially Coded**

My determination that the robocall is racially coded is based on four conclusions I arrived at after listening to the robocall multiple times and an in-depth review of the email exchanges between Burkman and Wohl.

Emails between Wohl and Burkman explicitly indicate that the first robocall from a "Tamika Taylor" should be sent "to black [sic] neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte, Richmond, Atlanta and Cleveland." Each one of these cities has a significant Black population, and each city has a well-developed history of Black democratic participation.

The call purports to come from a Black woman named "Tamika Taylor:" "Hi. This is Tamika Taylor from Project 1599." "Tamika" is a name racially coded as Black, and prior studies in economics and psychology have shown that names are coded Black and White by employers who are hiring (Bertrand and Mullainathan 2004);[3] by Air BnB hosts (Edelman, Luca and Svirsky 2017);[4] and teachers (Rubenson 2021). Moreover, at the time of the robocall the police killing of Breonna Taylor made national news for several months prior to the call (May to August 2020). Her mother, Tamika Palmer, appeared repeatedly in national news media to demand justice for her daughter (and has been repeatedly misidentified in the press as "Tamika Taylor"). I conclude that the attribution of the robocall's voice to a "Tamika Taylor" is therefore racially coded as Black.

Related to the name attribution is the name of the robocall's alleged sponsor. The first full sentence of the call identifies Tamika Taylor as someone from "Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl." There are two additional racially coded pieces of information in this sentence. First, the name "Project 1599" is very similar to the 1619 Project, a very well-known initiative of the *New York Times* that commemorates the 400th anniversary of the first slave ship carrying enslaved Africans, the ancestors of many current Black people in the United States. Second, Project 1599 is described as a "civil rights" organization, implying a connection to other Black-led and Black-focused civil rights organizations like the NAACP, even though the Project 1599 founders are not Black.

Last the script uses dated slang as part of the effort to further authenticate the Blackness of the caller. This racial coding continues later in the call with the use of language supposedly associated with Black

---

[3] Bertrand, M. & Mullainathan, S. (2004). Are Emily and Greg More Employable Than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination. *American Economic Review*, 94 (4): 991-1013.
[4] Edelman, B., Luca, M., & Svirsky, D. (2017). Racial Discrimination in the Sharing Economy: Evidence from a Field Experiment. *American Economic Journal: Applied Economics*, 9 (2): 1-22.

people: "Don't be finessed into giving your private information to the Man…" The Urban Dictionary defines "finessed" as "to steal from someone or scam them."[5] This term has supposedly been in use by urban Black people since 2016. "The Man" has a much longer history that dates to the middle part of the 20th century. As younger civil rights activists entered into the civil rights movement, their brasher style nicknamed white men who were part of the American establishment as "The Man." This usage by activists filtered into what are now called Blaxploitation films of the 1970s like "Shaft" and "Foxy Brown," which were written to attract Black audiences to movie theaters but contained characters and plots that were rife with anti-Black stereotypes very similar to those that appear in this robocall. Recipients of this call are encouraged through these racially stereotypical cues to believe that they are receiving an authentic call from a Black woman on behalf of a civil rights organization that has their best interests at heart and is providing accurate information. However, it is clear through the dated language in particular that something is stereotypical and amiss rather than accurate.

My review of email exchanges between Wohl and Burkman, in which the robocall is described as a "black robocall" that elicits further supports the conclusion that the call was racially coded with anti-Black stereotypes.

**Opinion 2: The Robocall Cued the Stereotype that Black People are Criminals**

When the caller states, "Mail in voting sounds great. But did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants…" they are cuing the stereotype of Black people as criminals. There is a long history of stereotyping Black people as criminals that began in slavery, criminalizing basic actions afforded to whites. Enslaved Black people were arrested for daring to go out after dark in violation of curfews applied to slaves, or daring to run away from forced enslavement. These "violations" of law began to curdle into stereotypes of Black people as excitable and dangerous in Thomas Jefferson's Notes on the State of Virginia and persisted through the establishment of the U.S. prison system. In addition to the historical record, social psychological research has also documented the presence of the stereotype. Author Brent Staples described his own personal encounters with this anti-Black stereotype throughout his life, and shares that he developed a coping mechanism to handle white people's stereotyping of him as a criminal: he would literally whistle non-threatening music from classical composer Antonio Vivaldi or the Beatles in an attempt to set white people who were stereotyping him at ease (Steele 2011).[6] This stereotype of Black people as criminals is also described in Ta Nehisi Coates' *Between the World and Me* (2015) when he discusses the police killing of Prince Jones.[7]

**Opinion 3: The Robocall Cued the Stereotype that Black People are Financially Irresponsible**

After mentioning the use of the public database by police the message continues, "and be used by credit card companies to collect outstanding debts?" This part of the call is connected to a longstanding stereotype of Black people as lazy and financially irresponsible. In my first book, *The Politics of Disgust*, I empirically documented the presence of this stereotype in U.S. politics and its connotation with Black

---

[5] *Finessed*. (2016, December 14). Urban Dictionary.
[6] Steele, C. M. (2011). *Whistling Vivaldi: How stereotypes affect us and what we can do*. W. W. Norton & Co.
[7] Coates, T. (2015). *Between the World and Me.* Spiegel & Grau.

women in particular. Comments like this abounded in my findings from members of the U.S. Congress and in the news media when talking about the racially coded "welfare recipient:" "It's not hard to clothe your kids, folks. Go to second-hand shops."[8] This racial coding was successful in shifting the political conversation because it relied on a chronically accessible stereotype of Blacks as lazy, which then delegitimized anything Black women voters organizing around poverty issues might say that contested the stereotype. Historian Brenda Stevenson has traced this stereotype back to slavery, when it was used as a way to justify why enslaved Black people could not be freed, and to justify brutal physical violence to "force" them to work.

For most Black people who are neither lazy nor irresponsible, these kinds of stereotypes are enraging, as author Ellis Cose documented in *The Rage of a Privileged Class: Why are Middle-Class Blacks Angry? Why Should America Care?*[9] Moreover as Davin Phoenix has documented in *The Anger Gap*, the presence of anger from stereotypes and racial injustices drive many Blacks to alternative forms of political participation like protest instead of voting.[10] As I noted above the stereotypes also reduce Black participation in democratic negotiation by attaching stigmatizing, emotionally charged codes to their political claims that make them less likely to attract support from others and ultimately less likely to get issues affecting them resolved. Negative health outcomes are also a serious risk after exposure to any of the three calls shared with me.

**Opinion 4: The Robocall Employed the Stereotype that Black people are Intellectually Inferior**

The call's final allegation, that the CDC is pushing for access to the mail-in voting database, defies credulity: "The CDC is even pushing to use records from mail-in voting to track people for mandatory vaccines." Together these three allegations, which are easily disproved, represent an effort to stereotype Black people as intellectually inferior. Here the notion is to provide a conspiracy theory tied to vaccine skepticism that Black people are gullible enough to believe.

Journalist Harriet Washington traced the history of nonconsensual medical experimentation on Black people to the era of slavery in her 2006 book, *Medical Apartheid: The Dark History of Medical Experimentation on Black Americans from Colonial Times to the Present*. While this dark history undoubtedly disturbing despite the many medical advances that emerged from it, there has been an equally robust effort among Black people throughout the centuries to obtain equal medical care through the pursuit of medical degrees and provision of community health care services.

As in the previous opinions, this stereotype of Black intellectual inferiority and rampant vaccine skepticism is easily debunked. Recent public health research has shown exactly the opposite reality: vaccine hesitancy has decreased more quickly among Black Americans than among white Americans, according to an article published in the *Journal of the American Medical Association* in January 2022.[11]

---

[8] Hancock, A. (2004). *The Politics of Disgust: The Public Identity of the Welfare Queen*. NYU Press.
[9] Cose, E. (1994). *The Rage of a Privileged Class: Why Are Middle-Class Blacks Angry? Why Should America Care?* Harper Perennial.
[10] Phoenix, D. (2019). *The Anger Gap: How Race Shapes Emotion in Politics*. Cambridge University Press.
[11] Padamsee, T. et al., (2022). Changes in COVID-19 Vaccine Hesitancy Among Black and White Individuals in the US. *Journal of the American Medical Association* 5(1).

Between December 2020 and June 2021, just two months prior to the robocall, Black Americans' openness to the vaccine increased by greater rates during that period than did whites' openness. The authors therefore attribute different vaccination rates to reasons other than vaccine hesitancy stereotype Blacks are often associated with.

The history of this stereotype is a key part of the debate over U.S. slavery, when scholars pursued academic studies designed to prove that Black people were not fully human and therefore not worthy of equal status. Thomas Jefferson and Benjamin Banneker were two prominent Americans on either side of this debate, with Banneker writing a letter to Jefferson and providing an entire book he had written "in his own hand[writing]" in order to prove that Black people were not intellectually inferior to whites. This stereotype persisted into the 20th century. In _The Rage of a Privileged Class_ Cose talked to a lawyer who realized he was stereotyped as a Black lawyer and what that meant: "Though he generally did well, he sensed that he was not really seen as a litigator, but as a *black* litigator [sic]: 'I would go to court and do a workman like job, nothing special,' and receive rave reviews, not only from colleagues but from judges. 'They were impressed with me because their assumption was that I should have been dumb and ignorant.'"[12] Public opinion experts Kinder and Sanders estimate that as many as 10% of white Americans still believe Black people are inferior to white people and that the percentage has now remained stable for over 50 years.

**Opinion 5: The Impact of Receiving This Robocall Filled with Anti-Black Stereotypes is Anger and Detrimental Health Effects**

Based on the above review of the social science and public health literature, the impact of receiving this call as a Black voter is profoundly negative. It is clear from the emails exchanged between Wohl and Burkman that the robocall was associated with Black people, and the racially coded language is similarly clear. To receive a call like this would lead to Black voters feeling anger that is, according to scholars, difficult to articulate in public or in political conversations without serious repercussions. Where, then, does that anger go?

Over the past thirty years a number of public health scholars have determined that experiences of racial discrimination – both verbal (like a phone call) and behavioral (like a physical strike) – have significant negative health impacts on Black people. In addition to the specific health outcomes described in the introduction to this brief, public health scholar Arline Geronimus has coined the term "weathering" to account for the collective disruption to the cardiovascular, metabolic, and immune systems generated by exposure to racial stressors. The increased negative impact of weathering on Black people leads to faster aging and earlier death than among white people.[13] A longitudinal study (1970-2004) of these mortality differentials led the scholars to conclude that excess Black mortality dampens Black political

---

[12] Cose, E. (1994). *The Rage of a Privileged Class: Why Are Middle-Class Blacks Angry? Why Should America Care?* Harper Perennial.
[13] *See, e.g.*, Geronimus, Hicken, Keene and Bound (2006). "Weathering and age patterns of allostatic load scores among Blacks and Whites in the US" American J of Public Health; also a 2010 article: https://link.springer.com/article/10.1007/s12110-010-9078-0

voices in the United States.[14] It is for these reasons that I conclude that the robocall's anti-Black stereotypes are emotionally damaging and that the negative impact of such calls goes far beyond typical politics.

/s/ Ange-Marie Hancock Alfaro

---

[14] Rodriguez, Geronimus, Bound, and Darling (2015) "Black Lives Matter: Differential Mortality and the Racial Composition of the U.S. Electorate, 1970-2004." Social Science & Medicine.

Hancock Alfaro, October 2021

**Curriculum Vitae**
**Ange-Marie Hancock Alfaro, PhD**
**Dean's Professor & Chair**
**Political Science & International Relations Department**
**University of Southern California**
**Los Angeles, CA 90089-0044**
**Cell: 310-994-5563**
**ahancock@usc.edu**

Academic Positions:
University of Southern California (2008 - present)
    Dean's Professor, Political Science, Gender and Sexuality Studies (with tenure) (2019)
    Professor, Political Science & Gender and Sexuality Studies (with tenure) (2016)
    *Current Administrative Positions:*
- Chair, Department of Political Science & International Relations (2020-2023)
- Director, USC Institute for Intersectionality & Social Transformation (USC-IIST 2020 -)
- Director, Center for Leadership by Women of Color (2020 - )

    *Previous Administrative Position:*
- Director, Center for Feminist Research (2017-2021)
  Created new interdisciplinary writing and teaching opportunities for graduate students
- Chair, Gender and Sexuality Studies Department (2017-2020)
  Transformed the program into a regular academic department
- Dornsife Dean's Leadership Fellow (2017-2020)
  Assisted the vice-dean of social sciences with academic planning and administrative restructuring
- Associate Director, Center for the Study of Immigrant Integration (CSII) (2010-2013)

    *Affiliated Faculty*, Program for Environmental & Regional Equity (PERE) (2009-2013); Department of American Studies & Ethnicity

Yale University (2003 – 2008)
    Assistant Professor, African American Studies / Political Science
    *Previous Administrative Position*:
- Director of Undergraduate Studies, Ethics, Politics and Economics Program (2004-2007)

Pennsylvania State University (2002-2003)
Assistant Professor, Political Science / Women's Studies

University of San Francisco (1999-2002)
James Irvine Foundation Dissertation Fellow / Assistant Professor, Politics

**Education:**
Doctor of Philosophy (2000) University of North Carolina, Chapel Hill (Political Science)
Master of Arts (1997) University of North Carolina, Chapel Hill (Political Science)
Bachelor of Arts (1991) New York University (Politics)

**Projects in Progress**
Hancock Alfaro, Ange-Marie. <u>*African American Political Thought: Contestation and Change*</u>.

*Status:* Under contract with Polity Press; the first comprehensive survey of African American political theory from the founding of the United States to present.

**Hancock Alfaro, Ange-Marie**, Nancy Hernandez, Chaerim Kim and Meghana Maddali. "High Risk, High Reward: Examining the Ramifications of Vice President Kamala Harris' Policy Portfolio."
*Status:* Presented at Woman of Color Leads: Kamala Harris' First 100 Days Symposium; submitted to WPSA and NCOBPS conferences for 2022 presentations

Parmar, Parveen, **Hancock Alfaro, Ange-Marie**, Chun Lok Lam. "Intersectional Analysis of Patient Experience Presenting with COVID-19-like Syndromes to LAC+USC ED"
*Status:* Data Analysis

Garcia-Bedolla, Lisa, Marisa Abrajano, **Ange-Marie Hancock Alfaro**, Jane Junn and Sheryl Lightfoot, eds. *SAGE Handbook of Race, Ethnicity and Politics*.
*Status:* Under contract with SAGE

Hancock, Ange-Marie. Scaling Up Stories for Justice (Book Project)
*Status:* Proposal in preparation for submission to Oxford University Press; Research Design and Methodology companion book to *Intersectionality: An Intellectual History*.

**Publications:**
Hancock, Ange-Marie. *Intersectionality: An Intellectual History* (2016, Oxford University Press)
**Reception:** Cited across 22 fields: American Studies, Business, Critical Military Studies, Education, Environmental Studies, Ethnic Studies, Gender Studies, Geography, Human Resource Management, Journalism, Law and Society, LGBT Studies, Medicine, Migration Studies, Nursing, Political Science, Psychology, Public Health, Rhetoric, Sociology, Social Work, Theology

Hancock, Ange-Marie. *Solidarity Politics for Millennials: A Guide to Ending the Oppression Olympics* (2011, Palgrave-Macmillan; Revised paperback ed. December 2013)
**Reception:** Adopted as a required text in higher education, literary theory, political science and sociology courses in U.S. and Canada

Hancock, Ange-Marie. *The Politics of Disgust and the Public Identity of the "Welfare Queen"* (New York University Press, December 2004)
**Reception:** Winner, 2006 W.E.B. Du Bois Best Book Award, National Conference of Black Political Scientists; Winner, 2006 Best First Book Award, Race & Ethnic Politics Organized Section, American Political Science Association

*Peer-Reviewed Articles, Chapters, Special Journal Issues, and Symposia*
Hancock Alfaro, Ange-Marie. "When Words Don't Disappear: An Intersectional Analysis of Hate Speech." In: Hirschman, Nancy and Deborah Thomas, Eds. *Citizenship on the Edge*. Philadelphia: University of Pennsylvania Press, Forthcoming 2021.
Hancock Alfaro, Ange-Marie. "Stewardship of Intersectionality: A Complex Story." In: Fenstermaker, Sarah and Stewart, Abigail, Eds. *Gender Reconsidered*. New York: Palgrave, 2021.
Mendez Garcia, Matthew and **Ange-Marie Hancock Alfaro**, Eds. (2020) "Where Do We Begin? Preliminary Thoughts on Racial and Ethnic Diversity Within Political Science." In: Symposium: Racial and Ethnic Diversity in Political Science. *PS: Political Science and Politics*, 1-3.
Mendez Garcia, Matthew and **Ange-Marie Hancock Alfaro**, Eds. (2020) Symposium: Racial and Ethnic Diversity in Political Science. *PS: Political Science and Politics*.
Hancock Alfaro, Ange-Marie. "Black Masculinity Achieves Nothing without Restorative Care: An Intersectional Rearticulation of Frederick Douglass" A Political Companion to Frederick Douglass

Hancock Alfaro, October 2021

(Series: Political Companions to Great American Authors), Neil Roberts, Volume Editor; Patrick Deneen, Series Editor. (Fall 2018)

Beltran, Cristina and **Ange-Marie Hancock**, co-editors (equal contribution & seniority). Latino/a Political Theory Special Issue of *Politics, Groups, and Identities* (June 2014)

Hancock, Ange-Marie. "Intersectional Representation or Representing Intersectionality? Reshaping Empirical Analyses of Intersectionality." In: Escobar-Lemmon, Maria and Michelle Taylor, Eds. Representation: The Case of Women (Oxford University Press), 2014

Hancock, Ange-Marie. "Trayvon Martin, Intersectionality and the Politics of Disgust." *Theory and Event*. (September 2012) 15:3

**Hancock, Ange-Marie** and Evelyn Simien. "Mini-Symposium: Intersectionality Research: New Directions for Scholarship in Political Science and its Applied Use Across Fields," *Political Research Quarterly* (March 2011).

Hancock, Ange-Marie. "An Untraditional Intersectional Analysis of the 2008 Election." *Politics and Gender* 5:1 (2009), 96-105

Hancock, Ange-Marie. "When Multiplication Doesn't Equal Quick Addition: Examining Intersectionality as a Research Paradigm." *Perspectives on Politics* 5:1 (2007), 63-69

**Hancock, Ange-Marie** and Issac Unah (Unah lead author) "Supreme Court Decision-Making, Subissue Salience and the Attitudinal Model," *Law & Policy* 28:3 (2006), 295-320

Hancock, Ange-Marie. "W.E.B. Du Bois: Intellectual Forefather of Intersectionality?" *SOULS* 7:3-4 (Summer/Fall 2005), 76-87

Hancock, Ange-Marie. "Overcoming Willful Blindness: Building Egalitarian Multicultural Women's Coalitions." Female Circumcision and the Politics of Knowledge: African Women in Imperialist Discourses. Obioma Nnaemeka, Ed., Greenwood Press (published 2005, 245-274)

Hancock, Ange-Marie. "Contemporary Welfare Reform and the Public Identity of the 'Welfare Queen'" *Race, Gender, Class* 10:1 (2003), 31-5

*Law Review Articles:*

Hancock, Ange-Marie. When is Fear for One's Life Race-Gendered? An Intersectional Analysis of the Bureau of Immigration Appeals In Re A-R-C-G Decision." *Fordham Law Review*, (May 2015)

Hancock, Ange-Marie. "Empirical Intersectionality: Two Approaches." *University of California, Irvine Law Review*, (May 2013)

*Externally Funded Policy Reports:*

Hancock Alfaro, Ange-Marie et al. (2021) "The Road to Thriving Black Communities" Black Equity Collective

Hancock Alfaro, Ange-Marie (2019) Finding Home, Staying Home: Women of Color's Experiences in California's Housing Crisis. California YIMBY

**Hancock Alfaro, Ange-Marie** and Chris Towler, editors (2019), "Agenda for California: An African American Perspective"

Sacha, Jeffrey (graduate assistant), Jared Sanchez (data analyst), Manuel Pastor (principal investigator) and **Ange-Marie Hancock** (researcher). "A Foot in Both Worlds: Institutionalizing Progressive Research Centers within Universities." Program for Environmental and Regional Equity (USC) and Atlantic Philanthropies. December 2013.

**Hancock, Ange-Marie**, Principal Investigator. "Giving Black in Los Angeles: Donor Profiles and Opportunities." Funded by the Liberty Hill Foundation. December 2011.

*Selected Invited Articles and Edited Works*

Hancock, Ange-Marie. "Intersectionality's Will Toward Social Transformation" *New Political Science*. 37:4 (December 2015), 620-627.

Hancock Alfaro, October 2021

Hancock, Ange-Marie, Managing Editor. "Dialogue: Charles Mills' *The Racial Contract* Today" *Politics, Groups, and Identities*. 3:3 (July 2015), 469-557.

Hancock, Ange-Marie. "Bridging the Feminist Generation Gap: Intersectional Considerations" *Politics and Gender* Volume 10:2 (June 2014), 292-296.

Hancock, Ange-Marie. "Thinking about the Book You Might Have Written: A Dialogues Response" *Politics, Groups and Identities*. 2:1 (March 2014), 160-163

Sacha, Jeffrey, Jared Sanchez, Manuel Pastor and **Ange-Marie Hancock**. A Foot in Both Worlds: Challenges in Institutionalizing Engaged Research. December 2013.

Hancock, Ange-Marie. "Neurobiology, Intersectionality, and Politics: Paradigm Warriors in Arms?" *Perspectives on Politics* 11:2 (June 2013), 504-507

**Ange-Marie Hancock** and Charles R. Hancock (Charles Hancock lead author). "Don't All Veins Look Alike? Comprehensively Attending to Diversity in the Vascular Surgery Specialty," with Charles R. Hancock. *Journal of Vascular Surgery*, Volume 51, Issue 4 Supplement (April 2010), S42-S46

Hancock, Ange-Marie. "DuBois, Race, and Diversity." The Cambridge Companion to W.E.B. DuBois. Shamoon Zamir, Editor. New York: Cambridge University Press (2008)

Hancock, Ange-Marie. "Intersectionality, Multiple Messages, and Causal Complexity: Commentary on Patricia Hill Collins' Black Sexual Politics" *Studies in Gender and Sexuality* 9 (2008), 14-31

Hancock, Ange-Marie. "Black Female Athletes." African Americans and Popular Culture, Todd Boyd, Editor. Westport, CT: Praeger (2008), 1-10.

Hancock, Ange-Marie. "Intersectionality as a Normative and Empirical Research Paradigm" *Politics and Gender*, June 2007:248-254

Bouwer, Karen and **Ange-Marie Hancock** (equal seniority and contribution) "UBUNTU: Humane Solutions and Success Stories from Africa," *Peace Review* 15:3 (2003), 251-316; 357-368

**Datasets/Archives**

*The Kamala Harris Project (Lead Convener; 2020 - )*
National nonpartisan research project to collect and analyze all elements of the first United States woman of color to serve as Vice President of the United States. Administered by a board of nationally-recognized scholars in political science, history, American studies and communications studies.

*2012 Collaborative Multiracial Political Survey (co-investigator)*
National telephone survey of registered voters with comparably large samples of African Americans, Latinos and Whites that partially replicates the 2008 survey design – available in six languages with robust samples of the four largest racial/ethnic groups: Whites, Latinos, Blacks, Asians. The 2012 CMPS contains 2,400 respondents registered to vote in the November 2012 election and partially replicates the 2008 CMPS.

*2008 Collaborative Multiracial Political Survey: (co-principal investigator)*
National telephone survey of registered voters with comparably large samples of African Americans, Asian Americans, Latinos, and Whites that is *the first multiracial and multilingual survey of registered voters across multiple states and regions in a presidential election*. In contrast to the 2008 American National Election Study (ANES), which oversampled Black and Latino voters, and was available in Spanish, the CMPS was available in six languages and contains robust samples of the four largest racial/ethnic groups: Whites, Latinos, Blacks, Asians. The CMPS contains 4,563 respondents who registered to vote in the November 2008 election and who self-identified as Asian, Black, Latino, and White. The survey was available in English, Spanish, Mandarin, Cantonese, Korean, Vietnamese and respondents were offered the opportunity to interview in their language of choice. Six of eighteen states that were sampled to produce robust samples of all four major racial groups include California, Texas, New York, Florida, Illinois, and New Jersey, and the statewide samples range from 243 to 669 cases.

Hancock Alfaro, October 2021

**Selected Awards, Grants and Fellowships:**
USC Award for Excellence in Mentoring Graduate Students (2020)
USC Provost New Directions in Research Award (2020) ($119,000)
USC Dornsife Faculty Led Initiative, Center for Leadership by Women of Color (2020) ($150,000)
Alice Paul Visiting Diversity Scholar, University of Pennsylvania (March 14-24, 2017)
Outstanding Faculty Award, USC Center for Black Cultural Student Affairs (2016)
Best Paper in Black Politics Award, Western Political Science Association (2014) "Black Community Organizing in the Age of Obama" authored by Melina Abdullah, Regina Freer, and **Ange-Marie Hancock.**
ASHSS Early Career Sabbatical Competition Winner, University of Southern California (Fall 2013)
Faculty Lead, Dornsife College 2020 Competition Winning Proposal: Enhancing Graduate Education about Immigrant Integration (2011-2013) $300,000
Dornsife College Faculty Fellow (2011-2013)
Director, New Directions in Feminist Research Seminar, Center for Feminist Research, USC (2009-2010) $30,000
USC Lambda Ally Award (USC LGBT Resource Center) 2009
Nomination, Yale College Teaching Award (2006)
Visiting Faculty Fellowship, Research Institute for Comparative Studies in Race & Ethnicity, Stanford University (2006-2007)
Center for the Study of American Politics Grant, Institution for Social and Political Studies, Yale University (2005)
Betty Nesvold Award for the Best Paper on Women & Politics, 2002 WPSA Conference
Vizuri Kabisa Award for Outstanding Faculty, University of San Francisco (2002)
USF Jesuit Foundation Grant (2001)

**Keynote Speeches:**
Tripodi Lecture in Research Methodology, UC Berkeley (2018)
Keynote Speaker, Sonja Haynes Stone Memorial Lecture, University of North Carolina, Chapel Hill (2016)
Keynote Speaker, "Imagine Otherwise Summer School," Interdisciplinary Centre for Gender Studies, University of Bern [Switzerland] (2016)
Keynote Speaker, Southeast Women's Studies Association Conference, Winthrop University (2016)
Keynote Speaker, Harvard Westlake High School Black History Month (2016)
Keynote Speaker, International Intersectionality Conference, Simon Fraser University [Canada] (2014)
Keynote Speaker, Social Justice Day, UC Santa Barbara (2013)
Keynote Presenter, Empirical Approaches to Critical Race Theory, UC Hastings School of Law (2011)
Keynote Speaker, Intersectionality and Public Health Workshop, Simon Fraser University [Canada] (2008)

**Service to the Field:**
*Editorial Leadership:*
Editorial Board, *Perspectives on Politics* (2013 – 2019)
Co-Editor, *Politics and Gender* (2013 – 2016)
Inaugural Co-Editor, *Politics, Groups and Identities* (journal of the Western Political Science Association) (2010- Present)
Co-Editor, "The Politics of Intersectionality" Series, with Nira Yuval-Davis (Palgrave Macmillan) (2009-2018)
Editorial Board, *Journal of Politics* (2005-2007)
Editorial Board, *Peace Review* (2000 – 2005)
*General Service to the Field (Peer Review and Peer Training):*

5

Manuscript Reviewer (ongoing): *American Political Science Review, American Sociological Review, Communication Theory, DuBois Review*, *Hypatia*, *NWSA Journal* (now *Feminist Formations*), *Perspectives on Politics, Political Research Quarterly*, *Politics and Gender*, *Religion and Politics, Social Science Quarterly*, Cambridge University Press, New York University Press, Oxford University Press, Routledge, Temple University Press
Committee on the Status of Blacks, APSA (2010 - 2013); WPSA (2008-2010)
Co-Convener, Politics of Race, Immigration & Ethnicity Consortium (PRIEC) at USC (with Jane Junn and Veronica Terriquez) (October 2011)
Grant Reviewer, National Science Foundation (2002, 2005, 2012)
Committee on Professional Development, Western Political Science Association (2002-2004)
Program Co-Chair, APSA Short Course on Intersectionality (2008)
Program Co-Chair, APSA 2008 Annual Meeting, Race and Ethnic Politics Section (2007-2008)
Roundtable Panelist, APSA Short Course on Teaching Intersectionality (2011)
Section Program Chair, Western Political Science Association Annual Meetings (2005, 2006, 2008)
Section Program Chair, National Conference of Black Political Scientists Annual Meetings (2004)
Tenure and Promotion Reviewer (2008- Present): University of Alabama, Johns Hopkins University, the Ohio State University, Oklahoma State University, Providence College, University of Rochester, Santa Clara University, Sonoma State University, Whitman College, Yale University

**Assessment and Professional Training Experience:**
USC Dornsife Lead Consultant, City of Los Angeles (2021-2022) $350,000
USC Dornsife Lead Consultant, Black Experience Action Team (BEAT) Committee for Greater Los Angeles (2021) ($240,000)
USC Dornsife Lead Consultant, Los Angeles Homeless Services Agency (LAHSA) (2020-2021) ($186,000)
Consultant, Black Equity Initiative/Collective of Southern California, JIB Foundation (2017 - 2021)
Intersectionality Trainer, Women's Foundation of California Women's Policy Institute (State and County Cohorts) (2017)
Internal Reviewer, USC Center for Black Cultural Student Affairs (CBCSA) (2017)
Intersectionality Workshop Leader, California State University, Long Beach; The California Endowment (2014)
Fuzzy-Set QCA Workshop Presenter & Discussant, University of California, Irvine Dept. of Sociology (May 2013)