UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, et al., <br><br>*Plaintiffs*, <br><br>-and- <br><br>PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, <br><br>*Plaintiff-Intervenor* <br><br>v. <br><br>JACOB WOHL, et al., <br><br>*Defendants* | Civil Action No: 1:20-cv-08668-VM-OTW <br><br>**DECLARATION OF DOUGLAS A. KELLNER** |

Pursuant to 28 U.S.C. § 1746(2), I, Douglas A. Kellner, hereby declare as follows:

1. I am over the age of eighteen and have personal knowledge of all the facts stated herein.

2. I have served as Commissioner and Co-Chair of the New York State Board of Elections ("State Board") since 2005. Before assuming my present position on the State Board, I was a commissioner of the New York City Board of Elections from 1993 until my appointment to the State Board in 2005. I also serve as the New York State representative to the Standards Board of the United States Election Assistance Commission.

**Background on New York's Administration of the 2020 General Election**

3. New York's general elections are administered by its 58 bipartisan boards of election consisting of a board of elections for each county in the state and a single board of elections for the five counties of New York City (collectively "local BOEs"), pursuant to N.Y. Election Law § 3-200 *et seq*.

4. The State Board has significant authority to promulgate policies, regulations, and instructions as to the administration of elections generally, and many of these powers are enumerated in N.Y. Election Law § 3-102. The State Board is comprised of four commissioners, two from each major political party (defined as the parties that receive the highest and second highest number of voters for its candidate in the preceding gubernatorial election).

5. The 2020 election year consisted of the Presidential Election as well as contests to fill all positions in the U.S. House of Representatives, the State Senate, and the State Assembly, in addition to numerous judicial and local elections. The State Board and local BOEs began their preparations for the 2020 elections in 2019, as Presidential Election years result in increased voter turnout, as well as an all-around heightened volume of election processes.

6. In March of 2020, with the outbreak of the COVID-19 pandemic, the State Board and local BOEs were presented with new and complex problems to solve. And while New York has successfully administered elections in times of turmoil—for example, during the Hurricanes Irene, Lee, and Sandy, as well as in the aftermath of the terrorist attacks of September 11, 2001, which was a primary election day in New York City—in terms of

how it affected election administration, the COVID-19 pandemic was a longer, more sustained, and unforeseen crisis.

7. The State Board works tirelessly to ensure voter access and safety, as well as the safety of our staff and poll workers, all the while running elections in a manner to preserve the accountability, integrity, transparency, and verifiability of our elections.

8. During the 2020 election, in the middle of the pandemic, the State and the State Board adopted several measures to ensure that all voters could access the ballot without fear of contracting COVID-19. Chief among these was ensuring that all eligible voters could vote by absentee or so-called vote-by-mail ballots.

9. Under longstanding New York law, absentee voting is an exception to in-person voting and is available upon application to voters who by reason of disability, caretaking responsibilities, illness, absence, or being detained in jail cannot vote in person at the polling place.

10. On April 9, 2020, in advance of the then-imminent federal and state primary elections,[1] the Governor issued an executive order allowing all eligible voters to vote by absentee ballot citing temporary illness due to fear of contracting the coronavirus.[2] The same executive order allowed for the electronic applications for absentee ballots.

11. On April 24, 2020, an executive order was issued to require local BOEs to mail an absentee ballot application with a return postage paid envelope to all eligible voters.[3]

---

[1] On March 28, 2020, the Governor issued an executive order consolidating the Presidential Primacy scheduled for April 28 with the state primary elections, which were held on June 23, 2020. See Exec. Order 202.12 (Mar. 28, 2020).
[2] Exec. Order No. 202.15 (Apr. 9, 2020).
[3] Exec. Order No. 202.23 (Apr. 24, 2020).

3

12. On May 1, 2020, the Governor issued an executive order permitting absentee ballot requests to be made over the phone and mandated that local BOEs provide postage paid return envelopes for the return of completed absentee ballots.[4]

13. On June 7, 2020, the State extended the postmark deadline, or the date by which completed absentee ballots needed to show a postmark in order to be counted, from the day before Election Day to Election Day for the remainder of 2020. The State also authorized the online or electronic submission of absentee ballot applications until the end of 2020 by law, codifying and extending the existing executive orders requiring the same for the primary elections.[5]

14. Following the June 2020 primaries, as the pandemic persisted, the State adopted additional measures to expand voter access and provide the local BOEs with the appropriate resources to meet the very likely demands of increased absentee voting for the general election.

15. For example, in August of 2020, the State enacted numerous election-law related bills related to the expansion of absentee ballots, including: (a) codifying into law that the fear of contracting COVID-19 would be a qualifying justification for the illness exemption entitling voters to an absentee ballot;[6] (b) allowing local BOEs to accept absentee ballot applications more than 30-days before Election Day in an effort to encourage and provide for increased absentee ballot access;[7] (c) requiring local BOEs to accept absentee ballots

---

[4] Exec. Order No. 202.26 (May 1, 2020).
[5] *See* N.Y. Elec. Law § 8-412 (McKinney) (absentee postmark deadline) and N.Y. Elec. Law § 8–400 (McKinney) (absentee ballot application process) as amended by S.8130D, 2020 Leg. Sess. (N.Y. 2020), https://www.nysenate.gov/legislation/bills/2019/s8130. Both the additional day to postmark a completed absentee ballot prior to mailing and the authorization for the online application process terminate at the end of 2020, and therefore only affect the June primary and the November general election.
[6] S.8015D, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 20, 2020).
[7] S.8783A, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 20, 2020).

received by the day after Election Day even if the envelope did not contain a postmark;[8] and (d) establishing a notice and opportunity to cure process for voters to correct certain, minor errors on their completed absentee ballots so that their vote would be properly counted.[9]

16. Separately, on August 24, 2020—just two days before the robocall that is the subject of this litigation was placed—the Governor issued another voting-related executive order, which among other things, required all local BOEs to send information to every registered voter informing them of the process for applying for an absentee ballot for the 2020 general election, and specifying the deadline for applying and explaining that voters could apply over the phone or online as well.[10]

17. Based on my experience as a longstanding elections official, absentee ballots are an efficient and effective voting method. Voting by absentee ballot is often the only viable method for voters who have difficulty or cannot vote in person at the polls. Together, the above-referenced reforms and emergency measures expanding the use and applicability of absentee ballots served a critical public health function and to allow voters to cast ballots without fear of contracting COVID at a public poll site.

**The Project 1599 Robocall and Election Disinformation**

18. I have reviewed a transcription of the robocall message that is the subject of this litigation (the "Project 1599 robocall"). It is my understanding that the Project 1599 robocall was sent out on August 26, 2020. The Project 1599 robocall states:

> "Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burman and Jacob Wohl. Mail-in voting sounds great, but did

---

[8] S.8799, 2020 Leg. Sess. (N.Y. 2020) (enacted Aug. 20, 2020).
[9] S.8370B, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 21, 2020 with modifications made pursuant to Exec. Order 202.58 (Aug. 24, 2020)).
[10] Exec. Order 202.58 (Aug. 24, 2020).

5

> you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail."

19. The Project 1599 robocall contains false and misleading information.

20. The New York State Constitution, art. II § 5 requires that *every* voter—not just absentee voters—register before voting. Article V of the Election Law sets forth the procedure for registering. In addition, the federal Help America Vote Act, 52 U.S.C. § 21083, requires that every state maintain a computerized voter registration list for all elections for federal office. New York Election Law article 5 sets forth the procedures for registration.

21. Election Law § 3-220 provides that:

> 1. All registration records, certificates, lists, and inventories referred to in, or required by, this chapter shall be public records and open to public inspection under the immediate supervision of the board of elections or its employees and subject to such reasonable regulations as such board may impose, provided, however, that a voter's driver's license number, department of motor vehicle non-driver photo ID number, social security number and facsimile number shall not be released for public inspection. No such records shall be handled at any time by any person other than a member of a registration board or board of inspectors of elections or board of elections except as provided by rules imposed by the board of elections.
>
> 2. The central file registration records shall be kept in locked filing cabinets in the office of the board of elections or, in the appropriate branch offices of the board of elections. Such records shall be taken from such file and handled only where necessary to make entries thereon or take other action in connection therewith as required by this article. The board of elections may cause to be made, photostatic copy or copies of the registration poll records of registered voters in any election district and shall cause such photostatic copies to be placed in one or more ledgers in the same manner and in the same order as the original registration poll records appear in the ledger or ledgers containing the registration poll records for such election district. Such photostatic records shall be open to public inspection, in lieu of the original registration records.

22. Most significantly, Election Law § 3-103(5) provides that "The information contained in the statewide voter registration list shall not be used for non-election purposes." Given this provision of law, it is completely false that "if you vote by mail, your personal information will be part of a public database that will be used by police departments to

track down old warrants and be used by credit card companies to collect outstanding debts." Simply put, in New York, there is no database that police departments, credit card companies, the Centers for Disease Control, or anyone else may access to show voters who used or applied for absentee ballots for any purpose other than the conduct of elections.

23. Based on the text of the Project 1599 robocall and my knowledge and experience in administering elections at the local and State levels, I am confident that the robocall, to the extent it was heard by voters, spread disinformation regarding purported negative consequences to voting by absentee ballot.

24. In doing so, the Project 1599 robocall, to the extent it was received by New York voters, would have had the capacity to undermine, interfere, and conflict with the State Board's and the local BOEs' efforts to inform voters of their rights with respect to absentee ballots, as well as the State's common-sense measures to expand the use of absentee ballots in light of the COVID-19 pandemic.

25. The Project 1599 robocall is also the type of message and disinformation campaign that the United States Election Assistance Commissions recommends should be reported to state and federal authorities as potential voter intimidation.[11]

26. As a longstanding election official, I am deeply concerned by the spread of disinformation that has the potential to intimidate or otherwise confuse voters about the safety of our elections process. Among the types of disinformation and intimidation that is particularly appalling are false messages or rumors that threaten or purport to reveal negative consequences from voting. I believe strongly that disinformation and

---

[11] See U.S. EAC, Other National Contact Information, available at: https://www.eac.gov/voters/other-national-contact-information.

intimidation, such as the Project 1599 robocall, should be deterred and prevented to the fullest extent possible.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Dated: April 29, 2022

                                                          *Douglas A. Kellner*
                                                     Douglas A. Kellner