# EXHIBIT 2

```
                                          Page 1

 1

 2   UNITED STATES DISTRICT COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   Civil Action No. 10-cv-8668

 5   ---------------------------------------x

 6   NATIONAL COALITION ON BLACK CIVIC

 7   PARTICIPATION, MARY WINTER, GENE

 8   STEINBERG, NANCY HART, SARAH WOLFF,

 9   KAREN SLAVEN, KATE KENNEDY, EDA

10   DANIEL, and ANDREA SPERES,

11                          Plaintiffs,

12           - and -

13   People of the STATE OF NEW YORK,

14   By its attorney general, LETITIA JAMES,

15   ATTORNEY GENERAL OF THE STATE OF

16   NEW YORK,

17       - against -

18   JACOB WOHL, JACK BURKMAN, J.M.

19   BURKMAN & ASSOCIATES, LL, PROJECT

20   1599, and JOHN and JANE DOES 1-10,

21                          Defendants.

22   ---------------------------------------x

23                          May 27, 2022

24                          10:00 a.m.

25
```

Page 2

1

2

3

4     VIDEO-RECORDED DEPOSITION of CHARLES

5   RIBANDO, held remotely via Zoom

6   videoconference before Debbie Zaromatidis,

7   a shorthand reporter and Notary Public of

8   the State of New.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1
 2    A P P E A R A N C E S :
 3
 4         OFFICE OF THE NEW YORK STATE
 5         ATTORNEY GENERAL
 6         LETICIA JAMES
 7         Attorneys for Plaintiff
 8         THE STATE OF NEW YORK
 9              28 Liberty Street
10              New York, New York
11         BY:  CONOR R. DUFFY, ESQ.
12              COLLEEN FAHERTY, ESQ.
13              RICHARD SAWYER, ESQ.
14
15         LAWYERS' COMMITTEE FOR CIVIL RIGHTS
16         Attorneys for Private Plaintiffss
17              1500 K Street NW, Suite 900
18              Washington, D.C. 20005
19         BY:  MARC EPSTEIN, ESQ.
20                 - AND -
21         ORRICK HERRINGTON & SUTCLIFFE, LLP
22              51 West 52nd Street
23              New York, New York 10019
24         BY:  BRITTANY ROEHRS, ESQ.
25              FRANKLIN MONSOUR, ESQ.
```

Page 4

1

2   A P P E A R A N C E S:  (CONTINUED)

3

4       GERSTMAN & SCHWARTZ, LLP

5       Attorneys for Defendants

6            1399 Franklin Avenue

7            Garden City, New York

8       BY:  RANDY E. KLEINMAN, ESQ.

9

10

11

12   ALSO PRESENT:

13       NATHANIEL ARMSTRONG, Videographer

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                RIBANDO
 2  last one was I am going to say about five
 3  years ago when I left the county.
 4      Q.    And was that in relation to your
 5  official duties at the county?
 6      A.    Yes.   It was -- it was in
 7  relation to a case I did in the Nassau
 8  County District Attorney's Office when I
 9  was employed by them.
10      Q.    Okay.   And have you
11  been -- have you ever sat for an exespert
12  deposition before?
13      A.    No.
14      Q.    Okay.  So how many times would
15  you say you have been deposed?
16      A.    Can I clarify the last question?
17      Q.    Sure.
18      A.    I was -- I was slated to testify
19  as an expert witness in a murders case in
20  Orange County, but I just never got
21  called.
22      Q.    Okay.   Was -- and there was no,
23  you know, interview or deposition that you
24  gave before that?
25      A.    Excuse me?
```

```
 1              RIBANDO
 2  unless somebody wants me to review a case
 3  just to -- just to look at strengths and
 4  weaknesses, but I don't really get
 5  involved in criminal cases. I have been
 6  on -- I've been on the prosecution side
 7  for many, many years.  So I -- I pretty
 8  much stick with civil.
 9       Q.    Okay.   Just before I move on,
10  when we were talking about Ms. Donnelly's
11  campaign, were any contributions --
12       A.    No.   Ann Donnelly and I worked
13  together for years in the Nassau County
14  District Attorney's office.   It was never
15  returned to me.  It was a fund-raiser for
16  her.
17       Q.    Okay.   Let's move on.
18             Can you -- let's talk a little
19  bit about the other matter that you were
20  retained as an expert for.   How did that
21  retention come about?
22       A.    How did that -- Dennis Ring, who
23  is an attorney who I -- is one my clients,
24  he had a murder case in Orange County.
25  He asked me to get involved in it.   I did
```

```
 1              RIBANDO
 2  based on the fact that I do a lot of work
 3  with him.   I reviewed the case.   I
 4  interviewed some people, and when it came
 5  to trial it was -- it was a jury trial.
 6  It was brought to trial, and I was listed
 7  as an expert witness to testify in it, but
 8  I never testified -- but I never had to.
 9      Q.    And do you recall what the facts
10  of that case were?
11      A.    Yes.
12      Q.    And what were they?
13      A.    The facts of the murder case?
14      Q.    Yes.
15      A.    It was a boyfriend and
16  girlfriend.   The male was married.   He
17  was having an affair.   She -- she was
18  murdered in her apartment and beaten with
19  a blunt object, a hammer, and the girl
20  died in her apartment.
21      Q.    And what -- did you prepare a
22  report or a statement in that case?
23      A.    I did not.
24      Q.    And you said you interviewed
25  some people.   Who did you interview?
```

```
                                        Page 37
 1                    RIBANDO
 2       A.    Well, everything -- everything
 3   is subjective.
 4       Q.    Okay.   So this is -- I think
 5   you are getting -- you're agreeing with me
 6   when I was saying that it can be an art
 7   more than a science?
 8       A.    Well, certain -- the only reason
 9   I was asked to clarify is that there were
10   certain parts of the investigation where
11   science comes into play, DNA,
12   fingerprints, that type of thing.
13       Q.    Sure.   But when to and how to
14   employ that scientific analysis is
15   different than sort of setting out an
16   investigation and determining who to talk
17   to and what to do, correct?
18       A.    Correct.   Yes.
19       Q.    Thank you.   That is helpful.
20            So I think you answered this,
21   but I just want to go through my outline.
22   Are there any other instances where you
23   prepared an expert report?
24       A.    Excuse me?
25       Q.    Are there any other instances
```

```
 1                    RIBANDO
 2  where you prepared an expert report or
 3  statement?
 4       A.    No.
 5       Q.    So this is the first time that
 6  you actually wrote down a statement these
 7  are my opinions?
 8       A.    As a person who is now in his
 9  own business, yes.
10       Q.    Okay.  So what about when you
11  were in government? Were you ever retained
12  as an expert there?
13       A.    You know what?  The answer to
14  that is yes.  I just thought of this now.
15  I was -- I was asked by the -- it was a
16  civil case.  I was -- I was in the
17  District Attorney's Office, and I used
18  to -- most of my career was in Brooklyn as
19  an NYPD officer.  So I knew people from
20  the civil department in Brooklyn, civil
21  legal department in Brooklyn, and they had
22  asked me to review a case on a lawsuit
23  against -- against the City
24  regarding -- I'm trying to think because
25  it was back in 2007 I think.  I can't
```

```
 1                    RIBANDO
 2   We didn't monitor the elections.  We had a
 3   team that were on standby if in case there
 4   were issues that arose on election day.
 5   We didn't monitor them.   We -- like I
 6   can't speak for any other county, but, you
 7   know, maybe Nassau is unique.  Maybe it is
 8   not.  You know, there was complaints
 9   coming from everywhere.  So what I decided
10   to do at some point in time was
11   keep -- election day was a day off for the
12   county as every day -- But -- as ever
13   county, but I decided to keep a few
14   investigators and a few Assistant District
15   Attorney's with expertise in the area
16   on -- on election day in the event that
17   something came up.  So I didn't have to
18   scramble to bring people in.  So when you
19   say monitor, there was no monitoring.   It
20   was more of a standby to either answer
21   questions or if something arose.
22        Q.    Okay.  Have you ever personally
23   investigated potentially violations of New
24   York's Election Law?
25        A.    I would have to say yes.  I
```

1              RIBANDO
2  don't know if I personally did, but there
3  was Election Law violations that we had
4  investigations on in the public corruption
5  bureau.  So I don't -- I didn't
6  personally -- I might not -- look, I
7  oversaw the whole division.  There was
8  hundreds and hundreds of investigations
9  going on at any given time.  So when you
10 say -- I don't want to misspeak and say I
11 did it, but I don't want to speak and say
12 I -- I led the investigation.  In other
13 words, my role as the chief of
14 investigations and the chief investigator
15 was to oversee and deploy people as
16 necessary and conference -- and when I got
17 promoted was to conference cases or
18 conference cases for plea bargains and
19 oversee every investigation, but obviously
20 I wasn't minutely involved in every single
21 investigation other than maybe getting an
22 update every once in a while.  I had
23 weekly meetings with my bureau chiefs.
24 Every division had a bureau
25 chief -- excuse me.  Every bureau had a

```
 1                    RIBANDO
 2   bureau chief.  So I would have weekly
 3   meetings scheduled for every bureau to go
 4   over all their active cases and all of
 5   their -- all of new complaints that came
 6   in and whether or not we were going to
 7   take a case or not.  I hope that answers
 8   your question.
 9       Q.    It does.  So just one
10   follow-up.
11            When you talk about the public
12   corruption bureau and electronic law, is
13   it fair to say that those cases that were
14   investigated didn't deal with voting
15   rights or voter intimidation?
16       A.    No.  I -- I would say that is
17   fair, but I would say that voter
18   intimidation would come up on a regular
19   basis on election day from both parties.
20       Q.    Okay.  But you personally
21   weren't --
22       A.    I don't think we ever
23   substantiated any of them.
24       Q.    Okay.  And you personally wasn't
25   the one that was doing the voter
```

```
                                           Page 167

 1                      RIBANDO

 2              MR. KLEINMAN:    Objection.

 3       A.    Specifically?

 4       Q.    Yes.

 5       A.    I don't recall.

 6       Q.    Okay.   Are you familiar with

 7   the New York State Election Law?

 8       A.    Somewhat.

 9       Q.    Are you familiar with the crimes

10   that are listed in Article 17 of the New

11   York Election Law?

12       A.    Not off the top of my head.  I

13   don't.

14       Q.    Are you familiar with the

15   specific statute governing voter

16   intimidation at the State?

17       A.    Well, if you are asking me to

18   recite it, I don't --  I can't do that.

19       Q.    Have you ever been part of a

20   team that prosecuted a voter intimidation

21   case?

22       A.    No.

23       Q.    Are you familiar with the

24   requirements of the voting rights act of

25   1965?
```

```
 1                RIBANDO
 2      A.    Not that I recall, no.
 3      Q.    Have you ever been asked to give
 4  a lecture, an internal lecture to one of
 5  the offices about voting rights?
 6      A.    No.
 7      Q.    Election protection?
 8      A.    No.  I have never lectured on
 9  voting law.
10      Q.    Okay.
11      A.    If that is your question.
12      Q.    Have you ever had reason or --
13            MR. DUFFY:  Strike that.
14      Q.    Have you ever read what the
15  elections laws of other states are?
16      A.    Not that I recall.  No.
17      Q.    Have you ever had to make
18  yourself familiar about what the voter
19  registration laws for other states are?
20      A.    No.
21      Q.    In preparing this opinion here
22  today, did you research what the voting
23  rights of other states were?
24      A.    That wasn't the scope of what I
25  was asked to opine on.
```

1                     RIBANDO

2    voter intimidation?

3        A.     The simple definition in blue

4    collar terms is being intimidated not to

5    vote for whatever reason.

6        Q.     And is that the only definition

7    you could provide right now?

8        A.     I don't know the -- I am not

9    reading off a document the exact

10   definition.  I am just giving you an

11   example.

12       Q.     In preparing your report, did

13   you go and look at the Election Law and

14   how it defines voter intimidation?

15       A.     For this particular instance?

16       Q.     Yes.

17       A.     No.

18       Q.     Okay.  And is there a reason why

19   you wouldn't do that?

20       A.     Well, because -- well, if I

21   thought there was a possibility of voter

22   intimidation regarding this call I might

23   have done that, but there was nothing in

24   this call that was intimidating to

25   anybody.   Nobody told anybody don't vote.

```
 1                    RIBANDO
 2      A.     Correct.
 3              MR. DUFFY: Okay.   Can we take
 4          a two-minute break.    I just have to
 5          run to the restroom.    Is that okay?
 6              MR. KLEINMAN: Okay.
 7              THE VIDEOGRAPHER:    The time is
 8          1:50 p.m. We are now off the record.
 9          This is the end of unit 5.
10              (Recess taken.)
11              THE VIDEOGRAPHER:    This marks
12          unit number 6.   The time is 1:54
13          p.m.   We are back on the record.
14          You may proceed.
15      Q.    So I just want -- you offered
16   two opinions in this report, and we were
17   discussing opinion number 2, and that is
18   your conclusion that the call is not
19   intimidating, correct?
20      A.     Correct.
21      Q.    So we may save time by doing it
22   right now, but your -- the entirety of
23   your expert opinion with respect to that
24   opinion 2 is that because you believe the
25   call is true, you found it not to be
```

```
 1                  RIBANDO
 2   intimidating, correct?
 3             MR. KLEINMAN:   Objection.
 4        A.    Yes.   Yes.   Not -- in other
 5   words, I was asked to review the call for
 6   its accuracy.   If somebody were to feel
 7   intimidated by that, I can't put myself in
 8   somebody else's shoes.   I could only say
 9   is the content of that call accurate.   I
10   can't put myself in somebody else's shoes
11   and say well to me I was intimidated by
12   that because nothing in that call to me in
13   my expertise was inaccurate.
14        Q.    And your expertise is from your
15   understanding of the law you determined
16   that the call was not intimidating,
17   correct?
18        A.    Correct, but again if -- if
19   somebody is stating a fact, I don't know
20   how that can be intimidating.   Somebody
21   could take it as that, but I can't opine
22   on what somebody else's perception of the
23   call was.   That wasn't my job.   I mean I
24   guess you can let a hundred people listen
25   to that call, and you might get somebody
```

                    RIBANDO

1

2  to say I am intimidated for whatever

3  reason.   But again my job was to look at

4  the call and say is there anything -- to

5  be honest with you to go into it deeper I

6  thought the woman on the call was

7  very -- sounded very professional on the

8  phone, and she just merely stated to me

9  what the facts were.

10     Q.    And I think you referred

11 to -- it is a term that I heard that you

12 referred to yourself as a law man?

13     A.    I never said I was a law man.

14     Q.    I believe your report refers to

15 you as a law man, and I can pull it up.

16     A.    Maybe it did.  Maybe it did.  It

17 is a poor choice of words.   I don't like

18 that term to begin with.

19     Q.    But as someone who has

20 experience in law enforcement, it is your

21 legal conclusion that that call is not

22 intimidating, correct?

23     A.    Not intimidating?

24     Q.    Yes?

25     A.    It is my opinion that it is

```
 1              RIBANDO
 2      Q.    And here based on your decades
 3  in law enforcement your legal conclusion
 4  is that this was not intimidating,
 5  correct?
 6      A.    Yes.
 7            MR. DUFFY:  Okay.  Let's
 8        actually take a break right there
 9        because I will switch topics when we
10        get back, so I will give you a few
11        minutes.  Thank you.
12            MR. KLEINMAN:   Thanks.
13            THE VIDEOGRAPHER:  The time is
14        1:57 eastern daylight time on May 27,
15        2022.   We are now off the record.
16            (Recess taken.)
17            THE VIDEOGRAPHER:   This marks
18        media number 7.  The time is now 2:17
19        p.m. on May 27, 2022.
20            You may proceed.
21            MR. DUFFY:  Rick, can we pull
22        up whatever the report is.  I think
23        Exhibit 140 something.  Sorry.
24            MR. SAWYER:   It is 146.
25
```

1               RIBANDO
2    investigator I would mostly utilize public
3    records including the superior information
4    provided by an executed mail-in voter
5    registration information to identify the
6    whereabouts of an individual with an
7    outstanding warrant or credit card debt to
8    be used for enforcement purposes."
9            Did I read that accurately?
10       A.    Yes.
11       Q.    So what is the basis for your
12   position here that voter -- mail-in voter
13   registration applications are superior to
14   other types of voter data?
15       A.    Well, that's -- two reasons.
16   One of the main reasons is New York
17   specifically I can only speak to, but in
18   New York you still have to request a
19   mail-in ballot.   As far as where you
20   vote, that -- you could remain going to
21   the same voting location even if you move
22   to another location, but if you want
23   an -- if you want -- if you request a
24   mail-in ballot, obviously you are going to
25   want -- you are going to want to make sure

1                    RIBANDO

2    percent, but there is a number of

3    different ways I could find somebody's

4    address.

5        Q.    Okay.  And one of which

6    is -- look it is hard to explain.

7    Transunion takes their information one of

8    which is from them getting correspondence

9    to that address -- mailed to that address

10   or whatever.  That is one of the ways

11   they get their information.

12       Q.    I understand that, but I am

13   focused on the board -- the source of that

14   information because the claims in this

15   case are that if you vote by mail you're

16   more likely -- it seems to be the most

17   relevant opinion you are making is that if

18   you vote by mail you are more likely to be

19   tracked by law enforcement than if you

20   vote in person, and would you agree with

21   that?

22       A.    I'm saying it is more accurate.

23   I won't specifically go off a voter

24   registration for somebody's address.   I

25   would say there is a number of different

```
1                    RIBANDO
2   things that come into play, and one of
3   which is if somebody registers a mail-in
4   ballot that will -- that will enhance that
5   is the address I am looking for.
6        Q.    But it seems to me that that you
7   are still based on --
8        A.    So --
9        Q.    Let me ask a question.
10            MR. KLEINMAN:    Let him finish.
11       A.    I have to finish.
12       Q.    You answered my question.    Let
13   me ask you another question.
14       A.    I didn't answer your question
15   wholly.
16       Q.    Let me ask a question.
17            MR. KLEINMAN:    Let's both make
18        sure that the other is finished
19        before we go on.  That way we avoid
20        any confusion.
21       Q.    So is it more accurate to say
22   that you are not likely to be tracked
23   simply by voting by mail?
24            MR. KLEINMAN:    Objection.
25       A.    Say that again.
```

```
 1                    RIBANDO
 2        Q.     In terms of what law enforcement
 3   is reviewing, you're saying that mail in
 4   voter data is superior, correct?
 5        A.     Superior to what?
 6        Q.     To voting in person.  That is
 7   what your report says.
 8        A.     I wanted to finish my answer
 9   from before.  When I say -- when I say
10   these databases take information in order
11   to locate somebody, one of which is where
12   they receive mail from, Part of that
13   information, mail information, they would
14   take from mail that goes to that address
15   including -- including a voting ballot.
16        Q.     So your opinion here is based on
17   the assumption that the State of Board of
18   Elections when they collect that data is
19   disclosing where the absentee ballot was
20   sent, correct?
21        A.     No.  It's disclosing -- that is
22   another way.  I would have to go a little
23   further to get it, but what I am saying is
24   if that mail was going to that specific
25   address, whether it was a utility bill or
```

```
1                    RIBANDO
2   whether it was an absentee ballot, it is
3   going to confirm the address of that
4   person.
5        Q.    Okay.   You --
6        A.    I hope I am articulating that
7   correctly.
8        Q.    I think we are in agreement.
9   You are focusing on utilities.  I want you
10  to focus --
11       A.    I am not focusing on any one
12  thing.  I am saying part of the way they
13  gather information to know that a person
14  resides at that address or has ties to
15  that address is by mail they receive
16  there, any mail including ballots.
17       Q.    Okay.  But if you vote by mail,
18  I think what I am trying -- what I am
19  trying to understand is what you are
20  saying is that you're assuming that the
21  State Board of Elections is disclosing
22  where you receive in your public data the
23  mail-in ballot?
24            MR. KLEINMAN:  Objection.
25       A.    I am answering the question, but
```

Page 230

```
 1                RIBANDO
 2           MR. DUFFY:  Yes, you have the
 3      right one.
 4           MR. SAWYER:   Okay.
 5           MR. DUFFY:  And this will be
 6      Exhibit 152.
 7           (Exhibit 152 marked for
 8      identification.)
 9      Q.    So this is a printout or a
10 screen shot from the New York State Board
11 of Elections website.   It has -- this is
12 where if you want to FOIL something, this
13 is how you would do it for public voter
14 registration data.
15           Do you see that?
16      A.    Yes.
17      Q.    And have you used this before?
18      A.    I have not.
19      Q.    Okay.  If you see down here it
20 says notice.   Do you see where it says
21 that?
22      A.    Yes.
23      Q.    "New York State Election Law
24 Section 3-1035 prohibits using information
25 derived from voter registration records
```

```
 1              RIBANDO
 2  for nonelection purposes."
 3          Did I read that accurately?
 4      A.    Yes.
 5      Q.    And then it says "The Applicant
 6  hereby requests access to voter
 7  registration records requested, accepts
 8  and understands the conditions outlined
 9  above and certifies that they have a right
10  to access to the records."
11          Did I read that accurately?
12      A.    Yes.
13      Q.    And it says "Any person who
14  knowingly and willfully violates this
15  provision is guilty of a misdemeanor," and
16  it cites the law we just read, correct?
17      A.    Correct.
18      Q.    Okay.  So what do you understand
19  this to mean?
20      A.    They are talking about the
21  public, are they not?
22      Q.    I am asking what your
23  understanding is.
24      A.    I am understanding that they are
25  talking about the public.
```

```
 1                    RIBANDO
 2       Q.    Okay.  So you don't understand
 3   this to apply to law enforcement?
 4       A.    I don't.
 5       Q.    Okay.  What about credit card
 6   collectors, debt collectors?
 7       A.    I would say yes.  That's -- that
 8   would be prohibited.  I've never been
 9   hired by a debt collector, but I would
10   assume they would -- they would engage a
11   private investigator to help them with
12   debt collections.
13       Q.    Okay.  Is it your position that
14   this doesn't apply to private
15   investigators?
16       A.    Yes.
17       Q.    Okay.  Have you ever -- can you
18   point to any law or guidance that confirms
19   what your position is?
20       A.    No, but it is -- this is -- the
21   law specifically says to the public.
22       Q.    Where does it say that?
23       A.    Didn't you just read it in the
24   last -- in the last -- when you said the
25   public could not use any information other
```

```
 1                  RIBANDO
 2   than for voter registration -- other than
 3   for -- other than -- you can't use it for
 4   anything personal or any other reason
 5   other than Election Law, other than
 6   elections.
 7              MR. DUFFY:  That is Section
 8        3-103.  Rick, do you mind pulling
 9        that back up.  I believe it was page
10        71 of the PDF, No. 5 there.
11       Q.    Is there anything in here that
12   says if you are a private investigator you
13   can use it for nonelection purposes?
14              MR. KLEINMAN:   Objection.
15       A.    Is there anything that says that
16   law enforcement can't use in there as
17   well?
18       Q.    Is there anything that says -- I
19   am asking you.  Answer my question first.
20       A.    No.
21       Q.    Is there anything that says that
22   a private investigator can use  --it is
23   excepted from this requirement?
24       A.    No.
25       Q.    Is there anything that says law
```

```
 1                     RIBANDO
 2  enforcement is excepted from this
 3  requirement?
 4       A.    No.
 5       Q.    Is there anything that says the
 6  CDC is excepted from this requirement?
 7       A.    No.
 8       Q.    Now, is --
 9       A.    Is there -- is there anything in
10  there that says this includes law
11  enforcement and private investigators,
12  licensed private investigators?
13       Q.    I am not here to answer
14  questions.
15       A.    I'm just asking.
16       Q.    I move to strike that, but let
17  me ask my next question.
18             Is the enforcement of a warrant
19  an election purpose?
20       A.    Is the enforcement of a warrant
21  for an --
22       Q.    Does it have anything to do with
23  elections? Is that for an election
24  purpose?
25       A.    I -- that is a very vague
```

```
 1                RIBANDO
 2      Q.    So do you still stand by your
 3  position that the call is accurate?
 4             MR. KLEINMAN:    Objection.
 5      A.    I am simply saying that part of
 6  identifying someone -- part of -- one of
 7  many, many different things that helps
 8  identify somebody is where they are
 9  registered to vote, so your -- I think
10  your -- and correct me if I am wrong, and
11  I am not trying to be combative, I think
12  you are say to -- making a statement to
13  say the only way I identify somebody is
14  where they vote or where they get their
15  absentee ballot, and that is not an
16  accurate statement.   It is one of 10,000
17  different things you use.   So your -- you
18  are absolutely right with the questions
19  you asked me, but that would be pertaining
20  to if the only way I was identifying where
21  somebody lives is specifically based on
22  their voter registration.   I am saying
23  that is one of many.
24      Q.    Okay.  I think it's helpful.
25  Let's move on.   I want to go back to -- I
```

Page 246

1               RIBANDO

2        C E R T I F I C A T I O N

3

4

5

6      I, DEBBIE ZAROMATIDIS, a Shorthand

7   Reporter and a Notary Public, do hereby

8   certify that the foregoing witness,

9   CHARLES RIBANDO, was duly sworn on the

10   date indicated, and that the foregoing is

11   a true and accurate transcription of my

12   stenographic notes.

13      I further certify that I am not

14   employed by nor related to any party to

15   this action.

16

17

18

19

20

21

22

23           DEBBIE ZAROMATIDIS

24

25