UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL COALITION ON BLACK CIVIC
PARTICIPATION, *et al.*,

                Plaintiffs,

        v.

JACOB WOHL, *et al.*,

                Defendants.

20 Civ. 8668 (VM)

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

JOHNATHAN SMITH
  Acting Principal Deputy
  Assistant Attorney General
REBECCA B. BOND
  Acting Deputy Assistant Attorney General
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
JENNIFER J. YUN
 Attorneys
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE
Washington, D.C. 20530

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2733
Fax: (212) 637-0033

ELLEN BLAIN
DAVID J. KENNEDY
Assistant United States Attorneys
— Of Counsel —

## TABLE OF CONTENTS

INTEREST OF THE UNITED STATES ........................................................................................... 1

PRELIMINARY STATEMENT ........................................................................................................ 1

PROCEDURAL BACKGROUND..................................................................................................... 2

LEGAL STANDARD......................................................................................................................... 3

STATUTORY BACKGROUND........................................................................................................ 4

ARGUMENT...................................................................................................................................... 4

    I.     Section 11(b) of the Voting Rights Act Prohibits Non-Violent Intimidation, Threats, and Coercion. ...................................................................................................................... 4

    II.    Section 11(b) of the Voting Rights Act Prohibits Intimidation of All Voters, Regardless of Race. ............................................................................................................................ 12

    III.   Section 11(b) of the Voting Rights Act Prohibits Attempting to Intimidate, Threaten, or Coerce Voters to Avoid Voting by Mail. ............................................................................ 13

CONCLUSION................................................................................................................................. 14

## TABLE OF AUTHORITIES

**Cases**

*Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772 (M.D.N.C. June 2, 2021) ......... 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................... 3

*Biller v. U.S. Merit Sys. Prot. Bd.*, 863 F.2d 1079 (2d Cir. 1988) ................................................... 8

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013) .... 1

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................... 3

*Centeno-Bernuy v. Perry*, 302 F. Supp. 2d 128 (W.D.N.Y. 2003) ................................................. 7

*Daschle v. Thune*, No. 4:04-cv-4177, ECF No. 6 (D.S.D. Nov. 1, 2004) ...................................... 5

*Jackson v. Riddell*, 476 F. Supp. 849 (S.D. Miss. 1979) ............................................................... 4

*League of United Latin Am. Citizens v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ................................................................................ 5

*Leiva v. Clute*, No. 4:19-CV-87-TLS-JPK, 2020 WL 8514822 (N.D. Ind. Dec., 16, 2020) .......... 7

*Nat'l Coal. on Black Civic Participation v. Wohl* (*NCBCP I*), 498 F. Supp. 3d 457 (S.D.N.Y. 2020) ............................................................................................................................. *passim*

*Nat'l Coal. on Black Civic Participation v. Wohl* (*NCBCP II*), No. 1:20-cv-8668, 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020) ............................................................................... 3

*Nat'l Coal. on Black Civic Participation v. Wohl* (*NCBCP III*), 512 F. Supp. 3d 500 (S.D.N.Y. 2021) ................................................................................................................. 3, 6, 11

*Nat'l Coal. on Black Civic Participation v. Wohl* (*NCBCP IV*), No. 1:20-cv-8668, 2021 WL 4254802 (S.D.N.Y. Sept. 17, 2021) .............................................................................. 3

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ................................................. 3

*Sandoval v. Rizzuti Farms, Ltd.*, 656 F. Supp. 2d 1265 (E.D. Wash. 2009) ................................... 7

*Smith v. City of Jackson*, 544 U.S. 228 (2005) .............................................................................. 6

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015) ........... 8

*Tyler v. Douglas*, 280 F.3d 116 (2d Cir. 2001) .............................................................................. 5

*United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961) .................................................................... 9

*United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965) ................................................................... 9

*United States v. Davila*, 461 F.3d 298 (2d Cir. 2006) ................................................................. 11

*United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967) ............................................................... 9

*United States v. Turner*, 720 F.3d 411 (2d Cir. 2013) ................................................................ 11

*Virginia v. Black*, 538 U.S. 343 (2003) ...................................................................................... 11

*Whatley v. City of Vidalia*, 399 F.2d 521 (5th Cir. 1968) ............................................................ 5

*Williams v. City of New York*, 121 F. Supp. 3d 354 (S.D.N.Y. 2015) ......................................... 1

**Statutes**

5 U.S.C. § 6385 ............................................................................................................................. 7

8 U.S.C. § 1324b(a)(5) .................................................................................................................. 7

18 U.S.C. § 594 ............................................................................................................................. 8

28 U.S.C. § 517 ............................................................................................................................. 1

29 U.S.C. § 1855(a) ...................................................................................................................... 6

52 U.S.C. § 10101(b) .................................................................................................................... 9

52 U.S.C. § 10307(b) ......................................................................................................... 1, 2, 4, 12

52 U.S.C. § 10308(d) .................................................................................................................... 1

52 U.S.C. § 10310(c)(1) .......................................................................................................... 4, 13

**Other Authorities**

Complaint, *United States v. N.C. Republican Party*, 92-161-CIV-5-F (E.D.N.C. Feb. 26, 1992)  6

Consent Decree, *United States v. N.C. Republican Party*, 92-161-CIV-5-F (E.D.N.C. Feb. 27, 1992) ........................................................................................................................................ 6

H.R. Rep. No. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437 ................................. 4, 12

H.R. Rep. No. 94-196 (1975) ...................................................................................................... 10

Richard Pilger, Public Integrity Section, U.S. Dep't of Justice, *Federal Prosecution of Election Offenses* (8th ed. 2017) .................... 8

S. Rep. No. 94-295 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774 .................... 10

S. Rep. No. 97-417 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177 .................... 10

*Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong......... 9, 10

**Rules**

Fed. R. Civ. P. 56(a) .................... 3

The United States, by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest, pursuant to 28 U.S.C. § 517,[1] to address issues arising under Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b). In this action, Plaintiffs National Coalition on Black Civic Participation, Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, and Andrea Sferes ("Plaintiffs") and Plaintiff-Intervenor the State of New York bring several claims against Defendants Jacob Wohl, Jack Burkman, J.M. Burkman & Associates, LLC, and Project 1599 ("Defendants"). The United States takes no position on any issues in this case aside from those addressed herein on Section 11(b).

## INTEREST OF THE UNITED STATES

This case presents important questions regarding enforcement of Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b). Congress has vested the Attorney General with authority to enforce Section 11(b) on behalf of the United States. *See* 52 U.S.C. § 10308(d). The United States frequently files Statements of Interest in cases concerning the applicability and interpretation of federal law in which it has enforcement interests. *See, e.g.*, *Williams v. City of New York*, 121 F. Supp. 3d 354, 370 n.18 (S.D.N.Y. 2015); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 641 n.9 (S.D.N.Y. 2013).

## PRELIMINARY STATEMENT

Plaintiffs allege that shortly before the November 2020 election, Defendants sent robocalls to tens of thousands of voters and left intimidating voicemail messages, warning that voting by mail would enable the police to execute outstanding arrest warrants, credit card

---

[1] 28 U.S.C. § 517 states that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

1

companies to collect outstanding debt, and the Centers for Disease Control to pursue mandatory vaccines.[2] Plaintiffs argue that the robocalls constituted unlawful voter intimidation under Section 11(b) of the Voting Rights Act, which states, in relevant part:

> [n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote.

52 U.S.C. § 10307(b).

Defendants misrepresent the scope of Section 11(b), claiming that it does not reach any conduct that (1) threatens economic or legal consequences that are not significantly likely to occur; (2) does not target minority voters; and (3) does not successfully dissuade voters from voting. Defendants' Memorandum of Law in Support of Its Motion for Summary Judgment, July 29, 2022 ("Defs.' Mem.") at 13–34, ECF No. 209. However, as evident in the plain language of the statute, Section 11(b) prohibits threats of non-physical harm, as well as attempts to intimidate, threaten, or coerce, whether they were racially motivated or not.

## PROCEDURAL BACKGROUND

On October 16, 2020, Plaintiffs filed suit, alleging that Defendants had "engaged in a disinformation campaign by bombarding lawfully registered voters with robocalls containing blatant lies about mail-in voting in order to intimidate those voters into not exercising their right to vote." Compl. ¶ 20, ECF No. 1. On October 28, 2020, this Court issued a temporary restraining order against Defendants, barring them from sending unauthorized robocalls or similar communication through the November 2020 election and directing them to send a

---

[2] The content of the robocall message is undisputed and appears in both parties' Rule 56.1 filings. See Pls.' Rule 56.1 Statement ¶ 4, ECF No. 214; Defs.' Rule 56.1 Statement ¶ 3, ECF No. 226.

2

curative message to the recipients of the original robocalls. *Nat'l Coal. on Black Civic Participation v. Wohl* (*NCBCP I*), 498 F. Supp. 3d 457, 489–90 (S.D.N.Y. 2020); *see also Nat'l Coal. on Black Civic Participation v. Wohl* (*NCBCP II*), No. 20 Civ. 8668 (VM), 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020) (denying reconsideration). This Court subsequently denied Defendants' motion to dismiss. *See Nat'l Coal. on Black Civic Participation v. Wohl* (*NCBCP III*), 512 F. Supp. 3d 500 (S.D.N.Y. 2021).[3] The parties have now completed discovery and moved for summary judgment on all claims.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material is if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, courts "must draw all reasonable inferences in favor of the nonmoving party" and "may not make credibility determinations or weigh evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Anderson*, 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial . . . .").

---

[3] This Court also permitted the State of New York to intervene as a plaintiff and denied a motion to dismiss filed by additional defendants named by the State. *See Nat'l Coal. on Black Civic Participation v. Wohl* (*NCBCP IV*), No. 20 Civ. 8668 (VM), 2021 WL 4254802 (S.D.N.Y. Sept. 17, 2021). The State of New York and those additional defendants entered into a consent decree on June 2, 2022. *See* Consent Decree, ECF No. 196.

**STATUTORY BACKGROUND**

Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), broadly prohibits any person from intimidating, threatening, coercing any other person—or attempting to do so—for voting, attempting to vote, urging or aiding another person to vote or attempt to vote, or exercising powers or duties under specific provisions of the Voting Rights Act. Section 11(b) does not require proof of racial motivation or "subjective purpose or intent." H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462. Section 11(b) "is to be given an expansive meaning," *Jackson v. Riddell*, 476 F. Supp. 849, 859 (S.D. Miss. 1979), and incorporates the comprehensive definition of "vote" and "voting" in Section 14 of the Voting Rights Act, 52 U.S.C. § 10310(c)(1).

**ARGUMENT**

Section 11(b)'s plain language supports this Court's earlier holding that Section 11(b) prohibits threats and attempted threats of non-physical harm, such as economic harm or legal consequences, and that no showing of racial targeting is required.

**I.     Section 11(b) of the Voting Rights Act Prohibits Non-Violent Intimidation, Threats, and Coercion.**

The plain language of Section 11(b) of the Voting Rights Act of 1965 and relevant case law all demonstrate that Section 11(b) broadly prohibits non-violent intimidation, threats, and coercion. Defendants' argument that threats of non-violent harm must meet a heightened standard of creating "a *significant probability* that harm will occur," Defs.' Mem. at 26 (emphasis in original), has no basis in the statutory text or relevant case law, and the First Amendment does not compel a different result.

"In determining the proper interpretation of a statute, this court will 'look first to the plain language of a statute and interpret it by its ordinary, common meaning.'" *Tyler v. Douglas*, 280

4

F.3d 116, 122 (2d Cir. 2001) (internal citation omitted).  As this Court noted, the plain meaning of the phrase "intimidate, threaten, or coerce" indicates that threatening non-physical harm for voting or attempting to vote is prohibited under Section 11(b).  *NCBCP I*, 498 F. Supp. 3d at 477.  The words "intimidate," "threaten," and "coerce" have overlapping dictionary definitions illustrating that putting someone in fear of adverse consequences, whether in the form of physical violence or not, qualifies as intimidation, threat, and coercion: "[t]o 'intimidate' means to 'make timid or fearful,' or to 'inspire or affect with fear,' especially 'to compel to action or inaction (as by threats)'"; "[t]o 'threaten' means to 'utter threats against' or 'promise punishment, reprisal, or other distress'"; and "[t]o 'coerce' means to 'restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation).'"  *Id.* (internal citations omitted).

Although relevant case law is limited, courts have interpreted Section 11(b) to encompass non-violent intimidation, threats, and coercion, in line with the plain language of the statute.  *See, e.g.*, *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (holding that "spurious prosecutions" of those aiding voter registration fell within the scope of Section 11(b)); *League of United Latin Am. Citizens v. Pub. Int. Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (finding that accusing voters of committing felonies and publishing their personal information constituted a Section 11(b) violation because those actions put the voters "in fear of harassment and interference with their right to vote"); *Daschle v. Thune*, No. 4:04-cv-4177, ECF No. 6 (D.S.D. Nov. 1, 2004) (issuing a temporary restraining order

because recording license plate numbers of Native American voters likely violated Section 11(b)).[4]

This reading of Section 11(b), as this Court noted in *NCBCP III*, is further supported by the way courts have interpreted the same operative language "intimidate, threaten, or coerce" in other civil rights statutes. *See Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). In addition to the retaliation provisions in the Fair Housing Act and the Americans with Disabilities Act, *see NCBCP III*, 512 F. Supp. 3d at 510 (finding that those two civil rights statutes "use analogous language and encompass subtle forms of intimidation"), Congress used the same phrase "intimidate, threaten, or coerce" in the retaliation provision of the Migrant and Seasonal Agricultural Worker Protection Act ("MSPA") to prohibit retaliatory economic intimidation. The MSPA of 1983 states that "[n]o person shall intimidate, threaten, coerce, blacklist, discharge, or in any manner discriminate against any migrant or seasonal agricultural worker because such worker has, with just cause, exercised his rights afforded by the act," 29 U.S.C.

---

[4] In addition, the United States challenged under Section 11(b) a political campaign's mailing of over 100,000 postcards targeting Black voters and falsely claiming that voters must have lived in their current precinct for more than 30 days to vote and that they will be asked at the polling place to state the length of their current residence. Complaint ¶¶ 21–30, *United States v. N.C. Republican Party*, 92-161-CIV-5-F (E.D.N.C. Feb. 26, 1992). The postcard message ended with a warning that "[i]t is a Federal Crime, punishable up to five years in jail, to knowingly give false information about your name, residence, or period of residence to an Election Official." *Id.* ¶ 21. The case resulted in a consent decree that enjoined the defendants from engaging in "any activity or program which is designed, in whole or in part, to intimidate, threaten, coerce, deter, or otherwise interfere with a qualified voter's lawful exercise of the franchise or which, based on objective factors, would reasonably be expected to have that effect" or "any ballot security program directed at qualified voters in which the racial minority status of some or all of such voters is a factor in the decision to target those voters." Consent Decree, *United States v. N.C. Republican Party*, 92-161-CIV-5-F (E.D.N.C. Feb. 27, 1992).

§ 1855(a), and courts have found that threats of economic harm or legal consequences qualified as unlawful intimidation. *See Sandoval v. Rizzuti Farms, Ltd.*, 656 F. Supp. 2d 1265, 1274 (E.D. Wash. 2009) (holding that a reasonable jury could find threatening an employer's instructions to workers not to return to work if they refused to work at a rate lower than what was originally negotiated); *see also Leiva v. Clute*, No. 4:19-CV-87-TLS-JPK, 2020 WL 8514822, at *9 (N.D. Ind. Dec. 16, 2020), *report and recommendation adopted*, No. 4:19-CV-87 RLM-JPK, 2021 WL 307302 (N.D. Ind. Jan. 29, 2021) (finding that an employer's threat to withhold owed wages from workers gave rise to a claim under the MSPA's retaliation provision); *Centeno-Bernuy v. Perry*, 302 F. Supp. 2d 128, 132, 137 (W.D.N.Y. 2003) (finding that plaintiffs were likely to succeed on the merits of an MSPA claim alleging that their employer called authorities with a baseless claim that migrant workers were terrorists in response to their filing a lawsuit). The Family and Medical Leave Act and the Immigration and Nationality Act also use the same phrase "intimidate, threaten, or coerce" to prohibit retaliatory economic intimidation. *See* 5 U.S.C. § 6385(a) ("An employee shall not directly or indirectly intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce, any other employee for the purpose of interfering with the exercise of any rights [under the Family and Medical Leave Act]."); 8 U.S.C. § 1324b(a)(5) ("It is also an unfair immigration-related employment practice for a person or other entity to intimidate, threaten, coerce, or retaliate against any individual for the purpose of interfering with any right or privilege secured under this section.").

The history of voter intimidation statutes leading up to the Voting Rights Act of 1965 bolsters this reading of the plain language of the statute as encompassing non-violent intimidation, threats, and coercion. The phrase "intimidate, threaten, or coerce" first appeared in the voter intimidation context in the 1939 Hatch Act, which imposed criminal penalties on

anyone who "intimidate[d], threaten[ed], coerce[d]," or attempted to do so, "for the purpose of interfering with the right of such other person to vote" in a federal election. 18 U.S.C. § 594; *see* Richard Pilger, Public Integrity Section, U.S. Dep't of Just., *Federal Prosecution of Election Offenses* 52 (8th ed. 2017), https://perma.cc/4CQH-R4ZY. This language was "aimed at prohibiting the blatant economic coercion used during the 1930s to force federal employees and recipients of federal relief benefits to perform political work and to vote for and contribute to the candidates supported by their supervisors."[5] Pilger, *supra*, at 52; *see also Biller v. U.S. Merit Sys. Prot. Bd.*, 863 F.2d 1079, 1085 (2d Cir. 1988) (citing legislative history of the original Hatch Act that Congress had "heard from the lips of our people who are working on the W.P.A., and those [who] are receiving direct relief, that intimidation, threats, and coercion have been exerted upon them respecting their vote at our elections." (quoting 84 Cong. Rec. H9604 (daily ed. July 20, 1939) (statement of Rep. Raymond S. Springer))). In other words, the phrase "intimidate, threaten, or coerce" was specifically intended to reach non-physical intimidation and had been interpreted as targeting such intimidation for over 25 years by the time the Voting Rights Act was passed. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536–37 (2015) ("If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012))).

---

[5] The Criminal Division of the Department of Justice, which is responsible for enforcing 18 U.S.C. § 594, has therefore long understood the criminal offense of voter intimidation as "to deter or influence voting activity through threats to *deprive voters of something they already have, such as jobs, government benefits*, or, in extreme cases, their personal safety." *See* Pilger, *supra*, at 49–50 (emphasis added).

In 1957, Congress used the same operative language—"intimidate, threaten, or coerce"—when creating a civil voter-intimidation provision, Section 131(b), as part of the Civil Rights Act of 1957. *See* 52 U.S.C. § 10101(b). Under this provision, the Department of Justice brought cases involving threats of economic harm or legal consequences, such as eviction, loss of employment, or arrests and prosecutions for unrelated offenses. *See, e.g.*, *United States v. McLeod*, 385 F.2d 734, 738–41 (5th Cir. 1967) (applying Section 131(b) to threats of arrests and prosecutions of those attempting to register to vote and noting that "[i]t is difficult to imagine anything short of physical violence which would have a more chilling effect on a voter registration drive than the pattern of baseless arrests and prosecutions revealed in this record"); *United States v. Bruce*, 353 F.2d 474, 476–77 (5th Cir. 1965) (holding that keeping an insurance collector off property constituted intimidation under Section 131(b)); *United States v. Beaty*, 288 F.2d 653, 654–57 (6th Cir. 1961) (finding that threats of eviction constituted unlawful intimidation under Section 131(b)).

Eight years later, Congress extended the coverage of Section 131(b) by enacting Section 11(b) of the Voting Rights Act, again using the same phrase "intimidate, threaten, or coerce." In explaining how Section 11(b) would improve upon its predecessor statute, Attorney General Nicholas Katzenbach, the author of the Voting Rights Act of 1965, explained that "many types of intimidation, particularly economic intimidation," proved hard to prosecute under Section 131(b) because of its proof of intent requirement, making clear that those non-violent types of intimidation had already been understood as falling within the definition of "intimidate, threaten, or coerce." *Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 12 (1965) (statement of Nicholas deB. Katzenbach, Att'y Gen. of the United States), https://perma.cc/N9S4-KH2P. Attorney General Katzenbach then noted that Section 11(b),

9

which had no proof of intent requirement, would make it easier to bring successful voter intimidation claims, especially those involving "*subtle* forms of pressure" that did not threaten bodily harm but nonetheless intimidated voters from exercising their right to vote. *Id.* (emphasis added). Put differently, Section 11(b) did away with the specific intent requirement of Section 131(b), rather than imposing a supercharged intent requirement—one that shows a "*significant probability* that harm will occur"—for cases of non-violent threats, as Defendants suggest.[6] Defs.' Mem. at 26 (emphasis in original). In addition to Attorney General Katzenbach's statement, the Department of Justice also submitted to Congress its 1964 status report on enforcement actions under the Civil Rights Act of 1957, which included numerous cases involving threats of non-physical harm. *See Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 1175, 1290–92 (1965) (documenting, for example, a case under Section 131(b) where white citizens of Haywood County, Tennessee, circulated a list of Black citizens to be threatened with eviction, loss of jobs, and denial of credit after they began registering to vote). Taken together, this history illustrates that when Congress wrote "intimidate, threaten, or coerce" in Section 11(b) of the Voting Rights Act, it intended to carry forth the same plain meaning of that phrase as it was used previously—to prohibit non-violent intimidation, threats, and coercion.[7]

---

[6] Even if specific intent were required under a civil enforcement statute like Section 11(b), this Court already found that "Defendants' prior conduct and expressed goals, together with the language of the robocall and its context, provide strong support for a conclusion that Defendants intended the robocall to harm Democrats by suppressing turnout among Black voters." *NCBCP I*, 498 F. Supp. 3d at 485; *see also* Pls.' Mem. at 16–18, 16 n.10.

[7] The subsequent amendments of the Voting Rights Act confirm this reading. For example, in amending the Voting Rights Act to include protections for language minority citizens in 1975, Congress sought to remedy "physical, economic, and political intimidation" of those voters. H.R. Rep. No. 94-196, at 18 (1975); S. Rep. No. 94-295, at 26 (1975), *as reprinted in* 1975 U.S.C.C.A.N. 774, 793; *see also* S. Rep. No. 97-417, at 54–55, 54 n.185 (1982), *as*

The First Amendment does not lead to a contrary conclusion here, as it affords no protection for threats of non-violent harm. As this Court held, the First Amendment does not protect speech that constitutes "true threats." *See NCBCP III*, 512 F. Supp. 3d at 512–13; *NCBCP I*, 498 F. Supp. 3d at 479. The Second Circuit's test for identifying a true threat is "whether an ordinary, reasonable recipient who is familiar with the context of the [statement] would interpret it as a threat of injury." *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006). And that "injury" being threatened need not rise to the level of physical violence to qualify as a true threat. *See United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (categorizing threats of "a specific legal wrong grave enough to be likely either to cause substantial emotional disturbance in the person threatened or to require the employment of substantial resources for investigation or prevention" as a type of "true threat" (quoting Kent Greenawalt, *Speech, Crime, and the Uses of Language* 91 (1989))); *see also Virginia v. Black*, 538 U.S. 343, 369 (2003) (explaining that "true threats . . . *encompass* those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence" (emphasis added)). Therefore, no First Amendment defense is available in a Section 11(b) case where a voter is intimidated, threatened, or coerced with non-violent harm for voting or attempting to vote.

---

*reprinted in* 1982 U.S.C.C.A.N. 177, 233 (citing both violent and non-violent forms of intimidation while considering another extension of the Voting Rights Act's protections).

11

## II.  Section 11(b) of the Voting Rights Act Prohibits Intimidation of All Voters, Regardless of Race.

The plain language of Section 11(b) shows that the victims of voter intimidation need not be minority voters in order to establish a violation.[8]  Defendants appear to argue that proof of an affected Black voter is a prerequisite for "creat[ing] a viable 11(b) claim," and that the robocalls were not "targeted to specific races or ethnicities."  Defs.' Mem. at 29–31.  However, even if those statements were true, intimidating voters of "racially diverse, middle-class neighborhoods," *id.* at 32, would still fall under the proscription of Section 11(b) that "[n]o person . . . shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce *any person* for voting or attempting to vote."  52 U.S.C. § 10307(b)  (emphasis added).  Likewise, as this Court held earlier in the case, Section 11(b) requires no proof of racial animus, as clearly indicated by its text.  *See NCBCP III*, 498 F. Supp. 3d at 476–77 (finding that "the statutory text prohibits intimidation, threats, and coercive conduct, without any explicit or implicit reliance on the motivation of the actor."); *Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *7 (M.D.N.C. June 2, 2021) (finding no need to show that the conduct at issue was racially motivated to prove a Section 11(b) claim, because "nothing in § 11(b) mentions race or color"); *see also* H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462 ("The prohibited acts of intimidation need not be racially motivated . . . no subjective purpose or intent need be shown.").

---

[8] Even though no evidence of racial targeting is required to prevail under Section 11(b), this Court already found that "[t]he robocalls here target[ed] Black voters."  *NCBCP I*, 498 F. Supp. 3d at 484; *see also* Pls.' Mem. at 9–10.

### III.   Section 11(b) of the Voting Rights Act Prohibits Attempting to Intimidate, Threaten, or Coerce Voters to Avoid Voting by Mail.

Defendants also suggest that the individual Plaintiffs' claim under Section 11(b) is not "viable" because they voted in the November 2020 election. Defs.' Mem. at 29–30. But Section 11(b) expressly prohibits any *attempts* to intimidate, threaten, or coerce, as well as completed acts of intimidation, threat, or coercion. *See* 52 U.S.C. § 10307(b) ("No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, *or attempt to intimidate, threaten, or coerce* any person for voting or attempting to vote . . . ." (emphasis added)). The fact that individual Plaintiffs ultimately voted in the November 2020 election is therefore immaterial to whether Defendants are liable under Section 11(b). Moreover, the term "vote" in the Voting Rights Act is defined broadly as "all action necessary to make a vote effective." *Id.* § 10310(c)(1). Such an expansive definition of "vote" supports this Court's earlier ruling that an attempt to dissuade voters from voting by mail through intimidation falls within the scope of Section 11(b). *See NCBCP I*, 498 F. Supp. 3d at 485.

## CONCLUSION

Section 11(b) of the Voting Rights Act reaches intimidating or threatening conduct that promises non-physical harm, regardless of any racial motivation. Section 11(b) also reaches attempts to intimidate or threaten voters to avoid voting by mail.

Dated:      New York, New York
            August 12, 2022

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States

By: *[signature]*
ELLEN BLAIN
DAVID J. KENNEDY
Assistant U.S. Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2733
Fax: (212) 637-0033

JOHNATHAN SMITH
  Acting Principal Deputy
  Assistant Attorney General
REBECCA B. BOND
  Acting Deputy Assistant Attorney General
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
JENNIFER J. YUN
 Attorneys
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE
Washington, D.C. 20530