**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL,and ANDREA SFERES,<br><br>Plaintiffs,<br>-and-<br><br>People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, MESSAGE COMMUNICATIONS, INC., and ROBERT MAHANIAN,<br><br>Defendants. | Civil Action No. 20-cv-08668-VM-OTW |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**GERSTMAN SCHWARTZ, LLP**
Randy E. Kleinman, Esq.
David M. Schwartz, Esq.
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
(516) 880 – 8170

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES……………………………………………………………i-iii

PRELIMINARY STATEMENT…………………………………………………………..1

I. Defendants' Alleged Conduct Violated Neither Section 11(b) Of The VRA Nor the KKK Act……………………………………………………………………6

a. The Robocall merely expresses a constitutionally protected opinion…………6

b. Context is crucial to the identification of a true threat…………………………9

c. Burkman and Wohl's prior conduct proves that the Robocall was political speech……………………………………………………………11

d. Content-based restrictions are patently unconstitutional………………………12

e. The phrase "intimidate, threaten, or coerce" under the VRA or KKK Act should be given its ordinary meaning suggested by its plain words…………………………………………………………………..13

i. The Individual Plaintiffs……………………………………………16

ii. The NCBCP…………………………………………………………19

II. Defendants Did Not Violate Section 131(b) of the Civil Rights Act of 1957………..20

III. Defendants Did Not Violate Sections 40-c and 40-d of New York Civil Rights Law..21

IV. Defendants Did Not Violate Section 9 of NY Civil Rights Law……………………..21

V. Defendants Did Not Violate Section 63(12) of the NY Executive Law……………...21

CONCLUSION……………………………………………………………………….21

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. United States*,
250 U. S. 616 (1919) .......... 6

*Burson v. Freeman*,
504 U.S. 191 (1992) .......... 2

*Disabled in Action of Penn. v. Se. Penn. Trans Auth.*,
539 F.3d 199 (3d Cir. 2008) .......... 14

*Guilford,*
760 A.2d .......... 12

*Iancu v. Brunetti*,
139 S. Ct. 2294 (2019) .......... 12, 13

*Mahoney Area Sch. Dist. V. B.L.*,
141 S. Ct. 2038 (2021) .......... 8

*MCI Telecomms. Corp. v. AT&T Co.*,
512 U.S. 218–28 (1994) .......... 14

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .......... 7, 8

*Morse v. Frederick*,
551 U.S. 393 (2007) .......... 6

*NAACP v. Thompson*,
357 F.2d 831 (5th Cir. 1966) .......... 16

*Reed*,
576 U. S., 135 S. Ct. 2218 .......... 13

*Rickert v. Pub. Disclosure Comm'n*,
168 P.3d 826 .......... 7

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 12

*Sedition Act of 1798." N.Y. Times v. Sullivan*,
376 U.S. 254 (1964) .......... 8

*Shelby County v. Holder*,
570 U.S. 529 (2013) .......... 19

*Snyder*
S, 562 U.S. .......... 7, 9

*Matal v. Tam*
137 S. Ct. 1744 (2017) .......... 12, 13

*U.S. v. Bagdasarian*,
2011 WL 2803583 (9th Cir. 2010) .......... 10-11

*U.S. v. Nguyen*,
673 F.3d 1259 (9th Cir. 2012) .......... 19, 20

*U.S. v. Stewart*,
411 F.3d 825 (7th Cir. 2005) .......... 13, 14

*U.S. v. Turner*,
720 F.3d 411 (2d. Cir. 2013) .......... 9, 14

*United States v. Alvarez*,
132 S. Ct. 2537 (2012) .......... 2, 7

*United States v. Bly*,
510 F.3d 453 (4th Cir. 2007) .......... 11

*United States v. Carrier*,
672 F. 2d 300 (2d Cir. 1982) .......... 14

*United States v. Clark*,
249 F. Supp. 720 (S.D. Ala. 1965) .......... 18

*United States v. McLeod*,
385 F.2d 734 (5th Cir. 1967) .......... 15, 16

*United States v. Prochaska*,
222 F.2d 1 (7th Cir. 1955) .......... 9

*United States v. Wood*,
295 F.2d 772 (5th Cir. 1961) .......... 18

*Watts v. United States*,
394 U.S. 705 (1969) .......... 13, 14

*Whitney v. California*,
274 U. S. 357 (1927) .......... 6

**Statutes**

42 U.S.C. § 1971 .......... 15

42 U.S.C. § 1973i .......... 15

52 U.S.C.A. § 10101 .......... 21

**Other Authorities**

U.S. Const., Am. 1 .......... 6, 21

## PRELIMINARY STATEMENT

"I am not a crook." "Read my lips: no new taxes!" "I did not have sexual relations with that woman." "Mission accomplished." "If you like your healthcare plan, you can keep it."

George Washington may have been incapable of telling a lie,[1] but it is clear his successors have no such impediments. The campaign promise (and its subsequent violation), as well as disparaging statements about one's opponent, a political stance, or a particular method of voting (whether true, mostly true, mostly not true, or entirely fantastic), are cornerstones of American democracy. Indeed, mocking and satire are as old as America, and if Plaintiffs beg to differ, they can ask Thomas Jefferson, "the son of a half-breed squaw..."[2] Or perhaps it should ponder, as Grover Cleveland was forced to, "Ma, ma, where's my pa?"[3] for that matter.

In modern times, "truthiness" – a "truth" asserted "from the gut" or because it "feels right," without regard to evidence or logic[4] – is also a key part of political discourse. It is difficult to imagine life without it, and our political discourse is weakened by Orwellian policies and legal tactics that try to prohibit it. After all, where would we be without the knowledge that all Democrats are pinko-communist flag-burners who will steal all the guns and invite the UN to take over America? Voters have to decide whether we would be better off electing Republicans, those hateful, assault-weapon-wielding, war mongering, fascist maniacs who believe that the only thing wrong with the death penalty is that it is not administered quickly enough.

---

[1] Apocryphal.

[2] Monticello.org, *Son of a Halfbreed Indian Squaw (Quotation),* http:// www.monticello.org/site/son-half- breed-indian-squaw-quotation (last visited Aug. 11, 2022).

[3] Answer: "Gone to the White House, ha ha ha!" Elisabeth Donnelly, *Ye Olde Sex Scandals: Grover Cleveland's Love Child*, The Awl, http:// ww.theawl.com/2010/02/ye- olde-sex-scandals-grover-clevelands-love-child.

[4] Wikipedia.com, *Truthiness,* http://en.wikipedia.org/wiki/Truthiness (last visited Aug. 11, 2022) (describing the term's coinage by Stephen Colbert during the pilot of his show in October 2005). *See also* Dictionary.com, *Truthiness,* http:// dictionary.reference.com/browse/truthiness (last visited Aug. 11, 2022).

Everybody knows that the economy is better off under [Republican/Democratic][5] presidents – who control it directly with big levers in the Oval Office – and that: President Obama was born in Kenya; President Trump is an inveterate liar and Russian agent; and all Republicans oppose immigration because they are racists. Each of the foregoing statements could be considered "truthy," yet all contribute to our political discourse. Lawsuits, like the one brought by Plaintiffs here, which attack presumptively "false" speech, do not replace truthiness, satire, and snark with high-minded ideas and "just the facts." Instead, they chill speech such that spin becomes silence. More importantly, Plaintiffs' attack of lies and darn lies is inconsistent with the First Amendment.

The Supreme Court has repeatedly held that political speech, including and especially speech about political issues, merits the highest level of protection. *See, e.g., Burson v. Freeman,* 504 U.S. 191, 196 (1992) ("the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office."). Indeed, the Supreme Court has held that the First Amendment protects outright lies with as much force as the truth. *United States v. Alvarez*, 132 S. Ct. 2537 (2012). As such, Plaintiffs have no right to eliminate truthiness from political commentary. Nor are Plaintiffs well-suited for evaluating when a statement crosses the line into a falsehood. The fundamental basis of this lawsuit blatantly violates the First Amendment and directly conflicts with *Alvarez*. This Court should deny Plaintiffs' motion – and indeed, terminate the lawsuit – with prejudice.

Here, Plaintiffs rather boldly miscast so-called "facts" as agreed upon, or not in contention, while making broad assumptions unsupported by the record. Plaintiffs assert that the Robocall was part of a "voter intimidation campaign aimed at suppressing the votes of Black Americans", but conveniently ignore the fact that Mary Winter ("Winter"), Gene Steinberg ("Steinberg"), Nancy

---

[5] Circle as appropriate.

Hart ("Hart"), Sarah Wolff ("Wolff"), Karen Slaven ("Slaven"), Kate Kennedy ("Kennedy"), Eda Daniel ("Daniel"), and Andrea Sferes ("Sferes") (collectively, the "Individual Plaintiffs") are all White, and that not a single Black American who received the call has joined this lawsuit or even complained of anything. Nor did any member of the National Coalition on Black Civic Participation ("NCBCP") receive the call and, in any event, NCBCP does not claim the purpose of the Robocall was to suppress Black votes, but instead claims that it was meant to "trick" black people into voting in person. *See* Docket No. 149 at ¶ 72. Indeed, many of the Individual Plaintiffs agree that mail-in voting is less reliable and subject to partisan hackery. *See*, *e.g.*, Ex. B at 16:6-16 ("I believe there were issues about mailboxes being removed and mailing equipment being taken out of post offices and so it didn't -- it just was -- *it made me feel uncertain and I wanted to be sure my vote was counted*."); Ex. E at 52:15-25 (mail in voting "would be a good option *if it were reliable*").

A political statement intended to encourage traditional, in-person voting over mail-in voting is not voter suppression. This is central to all the claims alleged herein. By extension, even if a statement encouraging traditional voting incorporated puerile arguments, this is not equivalent to intimation, threats, or coercion, and, not surprisingly, none of the Individual Plaintiffs found it to be so (although they did speculate that Black people they have never met or spoken to may have found it so). And while Plaintiffs allege that the call "used racist stereotypes to sow fear and confusion about voting by mail", they conveniently ignore the other robocalls recorded by Defendants that encourage Black voters to go out and vote. Indeed, using robocalls to target the Black community about issues related to voting is consonant with NCBCP's own mission and something NCBCP has itself engaged in.[6] This is irrefutably permissible, as is a robocall designed

[6] https://www.ncbcp.org/news/releases/galvanize_over_150000_bw_vote/index.html;
https://www.ncbcp.org/news/releases/coalition_of_black_women_leaders_ga_vote/index.html

to encourage voters (or even Black voters) to vote in-person, thereby avoiding the widely acknowledged pitfalls of mail-in voting. Ironic, irreverent, provocative – whatever; the (perhaps incorrigible) Defendants were entitled to make a *political statement* that mail-in voting is inherently problematic.

That Plaintiffs claim to have "[h]ard, documentary evidence, including emails, checks, and call records, supports" that Defendants sent the robocall to Black neighborhoods is of no moment, and misses the forest for the trees, because there is not one scintilla of evidence demonstrating a racial animus. If merely communicating to a broader audience that mail-in voting is replete with pitfalls constitutes voter suppression, then the justice system will be very busy indeed. Perplexingly, Plaintiffs contend that "the robocall can only be read one way—as a series of threats." But this is a ludicrous supposition that belies the Individual Plaintiffs' own testimony. *See*, *e.g.*, (Exhibit A at 22:4-25:1; Exhibit B at 59:1-7; Exhibit D 25:11-13; Exhibit E at 27:7-9; Exhibit F at 30:23-31:6; Exhibit G at 53:1-2; Exhibit H at 42:9-14). In fact, their testimony leaves no surviving claims, let alone any basis whatsoever to award summary judgment.

Even assuming, *arguendo*, the evidence establishes that Defendants were responsible for the transmission of the Robocall, this is a far cry from proving that there is *no evidence* supporting Defendants' view of the facts or that Plaintiff's have satisfied each and every element to their claims. By Plaintiffs' logic, between Defendants pre-litigation, *pro se* "admissions" and the Court's injunction-related ruling that the Robocall can only be viewed as "intimidating and threatening," Plaintiffs had already proven their case in October of 2020. As such, the discovery stage to date has merely been a symbolic exercise in futility, presumably to allow counsel for Plaintiffs to bill their clients, waste taxpayer dollars, and run up the damages award. Of course, this reasoning also requires entirely ignoring the record developed during Plaintiffs' depositions,

which cannot be reconciled with Plaintiffs' claims. Given that Plaintiffs' and Defendants' have differing interpretations of the record, at the very least, this raises questions of fact precluding a finding of summary judgment for Plaintiffs.

Lastly, Plaintiffs flippant and revelatory statement that "Defendants are likely to repeat their conduct, and others will learn from their example" is not only inaccurate but lays bare that the true intent of this lawsuit is to repurpose both section 11(b) of the VRA and the KKK Act as cudgels to asphyxiate politically controversial, and otherwise odious and offensive, *free speech*. It is more than just ironic that Plaintiffs accuse Defendants of engaging in "Russian-style disinformation" tactics—notwithstanding that, unlike a foreign actor such as Russia, it is entirely legal for an American citizen to spread politically discordant speech, propaganda, and even outright lies—when Plaintiffs themselves are employing tactics straight out of the Bolshevik playbook for crushing political dissent. Indeed, this is not "irony," but rather something far more sinister and insidious: it is gaslighting in the most Orwellian sense of the word. Plaintiffs, seemingly empowered by the Court's earlier rulings, no longer hide their true motives – to use Defendants as an "example," or warning, to others who may dare speak out against the self-proclaimed nouveau Ministry of Truth: Beware: we will denigrate you; we will imprison you; we will bankrupt you; so, "toe the line." This is not hyperbole. This is *exactly* what Plaintiffs intend to do.

This country has a long and estimable history of pundits and satirists exposing the exaggerations and prevarications of political rhetoric. Like it or not, Defendants' alleged actions are a piece of that tradition. "Lenny Bruce is not Afraid." In fact, even in the absence of the First Amendment, no court or government agency (such as the Attorney General's Office) could do a

better job policing political honesty than the myriad personalities and entities who expose charlatans, mock liars, lambaste arrogance, and unmask truthiness for a living.

As the Supreme Court has stated: The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. *The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth. See Whitney v. California,* 274 U. S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence"). The theory of our Constitution is "that the best test of truth is the power of the thought to get itself accepted in the competition of the market," *Abrams v. United States,* 250 U. S. 616, 630 (1919) (Holmes, J., dissenting). The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person. *And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse.* These ends are not well served when citizens seek to orchestrate public discussion through content-based sanctions.

## I. Defendants Alleged Conduct Violated Neither Section 11(b) Of The VRA Nor the KKK Act.

### a. The Robocall merely expresses a constitutionally protected opinion.

Because democracy depends upon the free exchange of ideas, the First Amendment forbids laws "abridging the freedom of speech." U.S. Const., Am. 1. Political speech "is at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403 (2007). The Supreme Court has thus long interpreted that Amendment as "afford[ing] the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for

the bringing about of political and social changes desired by the people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) (per curiam)). Plaintiffs rely on statements that are unambiguously protected political speech. As Plaintiffs are well aware, supporters of in-person voting are perfectly within their rights to debate the pitfalls of mail-in voting. However upsetting or deplorable the Plaintiffs may find these views, they cannot restrict them. "As a Nation we have chosen a different course--to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 461.

Many political statements cannot easily be categorized as simply "true" or "false." More importantly, even if such a categorization *could* be made, false (and truthy) speech is protected by the First Amendment, especially if it is political. In *United States v. Alvarez,* the Supreme Court held that there is no "general exception to the First Amendment for false statements." 132 S. Ct. at 2544. In that case, the speech was entirely false, and there was no reasonable way to interpret it as truthful. Yet if *Alvarez* confirmed that the First Amendment protects even blatant lies made in the political context, surely it protects spin, parody, and truthiness.

In declaring unconstitutional an equivalent ban on false political speech, the Washington Supreme Court held that the government's claimed interest in prohibiting false statements of fact was invalid, in part because it "presupposes the State possesses an independent right to determine truth and falsity in political debate, a proposition fundamentally at odds with the principles embodied in the First Amendment. Moreover, it naively assumes that the government is capable of correctly and consistently negotiating the thin line between fact and opinion in political speech." *Rickert v. Pub. Disclosure Comm'n,* 168 P.3d 826, 849-850 (Wa. 2007). "[N]either factual error nor defamatory content suffices to remove the constitutional shield from criticism of official

conduct, the combination of the two elements is no less inadequate. This is the lesson to be drawn from the great controversy over the Sedition Act of 1798." *N.Y. Times v. Sullivan*, 376 U.S. 254, 273 (1964). By the same logic, false statements about mail-in voting are also constitutionally protected. Statements that are merely false, and not *inherently threatening*, must therefore also be protected.

This case began with a message – "beware of vote by mail" – that could have caused consternation if uttered at a bar or dinner party. Surreally, it ended up in a Federal Court. Even worse, the substance of the Robocall is substantially true, or, at the very least truthy. Statements of this kind – call them truthiness, spin, smear, or anything else – are as politically important as their "factually pure" counterparts. Democracy is based on the principle that the people can speak about their beliefs and values, and what they trust. Plaintiffs seek to stifle, chill, and punish rhetorical hyperbole and political satire. A publication like *The Onion* – which regularly puts words in political figures' mouths, or makes up outlandish stories about them – could be next.

That Defendants' advocacy occurred in the months leading up to a controversial presidential election only strengthens the protection afforded to Defendants expression: "Urgent, important, and effective speech can be no less protected than impotent speech, lest the right to speak be relegated to those instances when it is least needed." *McIntyre*, 514 U.S. at 347. No form of speech is entitled to greater constitutional protection than Defendants'. And although "[i]t might be tempting to dismiss [the Robocall] as unworthy of the robust First Amendment protections discussed herein [] sometimes it is necessary to protect the superfluous in order to preserve the necessary. *Mahoney Area Sch. Dist. V. B.L.*, 141 S. Ct. 2038, 2048 (2021) "We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated." *Id.*

(internal quotations omitted). Indeed, it is hard to imagine a court ruling more inimical to the public interest than one aimed at chilling a citizen's political speech. Plaintiff's sweeping request for relief thus runs roughshod over the First Amendment. And the supposed legal violations are based on pure speculation. The Robocall is clearly political speech protected by the First Amendment. It offers opinions on a highly charged issue – mail-in voting – and expressed views that this method of voting has some considerable pitfalls. Plaintiffs' suggestion that Defendants seek to suppress voter participation by invoking concerns about mail-in voting is troubling. Regardless of whether Plaintiffs believe these pitfalls are real or imaginary, these issues have been the subject of a robust public debate for many years.

**b. Context is crucial to the identification of a true threat**.

Context is crucial to identification of a true threat. *U.S. v. Turner*, 720 F.3d 411, 420 (2d. Cir. 2013). The context here does not bespeak danger. The nature and specific content of the Robocall are not the only contextual factors making it obvious that the allegedly intimidating statements are instead political speech. This kind of language permeates today's public discourse. A statement need not be "refined social or political commentary" to be constitutionally protected. *Snyder*, 131 S. Ct. at 1217 (placards stating "God Hates the USA/Thank God for 9/11," "Thank God for IEDs," "God Hates Fags," and "Thank God for Dead Soldiers" protected by First Amendment because they touched on matters of public importance). Judging coarse social or political commentary by examining the words and phrases in a vacuum, apart from their cultural context, is contrary to common sense and unlikely to yield a reasonable interpretation. *See United States v. Prochaska*, 222 F.2d 1, 3 (7th Cir. 1955) ("[T]he slang expressions employed [in threatening letter for which defendant was prosecuted] are part of a stereotyped vocabulary of the Holly woodesque underworld and are essentially synonymous with a promise of a 'one-way ride.' As such, they have become a universally understood part of our vocabulary.").

The internet and other media today publish vast amounts of uninhibited discussion on highly divisive social issues that elicit strong visceral reactions. All manner of crude, insulting, and vituperative expressions of opinion on matters of public concern are now routine and widely available, including endless examples of speech rhetorically calling for the murder of a reviled opponent. *See*, *e.g.*, *"Salon Publishes Call for Murder of Sarah Palin* (Liberal online political magazine *Salon.com* published a letter to the editor yesterday that called for the murder of 2008 Republican vice presidential nominee former Alaska Governor Sarah Palin. . . ."); *see* article dated December 18, 2010, available at http://www.freepublic.com/focus/f-news/2644544/posts; *'Kill Rumsfeld' Ad Withdrawn*, The Washington Times, April 14, 2004. ("A Florida Democratic club has taken out a newspaper advertisement urging the assassination of Secretary of Defense Donald H. Rumsfeld"); Glenn Beck radio show, 5/17/05, Available at https://www.youtube.com/watch?v=ctwqnkWdCJg (Beck: "I'm thinking about killing Michael Moore, and I'm wondering if I could kill him myself, or if I would need to hire somebody to do it. No, I think I could. I think he could be looking me in the eye, you know, and I could just be choking the life out - is this wrong? I stopped wearing my What Would Jesus - band - Do, and I've lost all sense of right and wrong now. I used to be able to say, "Yeah, I'd kill Michael Moore," and then I'd see the little band: What Would Jesus Do? And then I'd realize, "Oh, you wouldn't kill Michael Moore. Or at least you wouldn't choke him to death." And you know, well, I'm not sure.).

The Robocall is no more of a threat than the speech in these examples, none of which could or should subject the speaker to civil liability. If anything, the Robocall's rhetorical devices, passive syntax, and informed opinions of mail-in voting differentiate this commentary on its face from the raw calls for violence in the foregoing examples. *See U.S. v. Bagdasarian*, 2011 WL 2803583 (9th Cir. 2010) (words that are predictive or exhortatory do not objectively express a threat by the

speaker and are not criminalized by a threat statute). Indeed, the syntax is inherently that of an opinion – shorthand for "in my opinion, mail-in voting has many pitfalls" – not a statement of definitive action. The Robocall addresses a matter of public concern and expressly ends with the statement: "Stay safe and beware of vote by mail", clearly telling the reader that what preceded it was an expression of opinion. Here, the contextual factors point unequivocally to one conclusion: That the Robocall is political speech protected by the First Amendment. *Compare, e.g., United States v. Bly*, 510 F.3d 453, 459 (4th Cir. 2007) (factors supporting conclusion that letter was unprotected "true threat" included that "[it] was not addressed to a public audience and[] ... it was delivered privately to specific individuals").

**c. Burkman and Wohl's prior conduct proves that the Robocall was political speech.**

Prior robocalls sanctioned by the Defendants provide another essential context showing that the Robocall at issue was political. Significantly, in the months leading up to the November 2020 presidential election, Burkman and Wohl recorded the following robocall urging citizens to go out and vote (the "Kanye Robocall"):

> Did you know that Joe Biden wrote the 1994 crime bill that locked up millions of black people for non-violent drug crimes? He was so proud he even called it "The Biden Bill." His VP pick Kamala Harris was a corrupt prosecutor for most of her career. She kept Black people in jail beyond their sentences for free prison labor! She refused to charge her fellow cop for police brutality. Joe and Kamala do not stand with Black people! Kanye West is the only presidential candidate that would stand up for Black Americans, and he's on the ballot! Vote Kanye on November 3rd!

Notably, nobody has sought to prosecute Defendants for the Kanye Robocall despite the fact that the call targets the Black community. This is because Defendants are *encouraging* the Black community to go out and vote. It is therefore illogical to suggest that Defendants were simultaneously engaged in a campaign to deter voting, rather than merely pointing out the pitfalls

of mail-in voting. In fact, the Kanye Robocall is little different than the Robocalls the NCBCP itself disseminated in 2018 "from Black celebrities including Sheryl Lee Ralph, Judge Glenda Hatchett, Judge Penny Brown Reynolds, Susan L. Taylor and others for a digital social media campaign targeted in Georgia to over 50,000 households of Black women voters"[7] encouraging the Black community to vote. The Robocall at issue in this case was merely satire used to give Defendants' political commentaries both political pedigree and shock value.

Courts must serve as gatekeepers to ensure that protected speech on matters of public controversy is not subject to the burdens of litigation and potential liability. As the Supreme Court has emphasized, "it is the court, not the jury, that must vigilantly stand guard against even slight encroachments on the fundamental constitutional right of all citizens to speak out on public issues without fear of reprisal." *Guilford,* 760 A.2d at 583 (internal quotations omitted).

**d. Content-based restrictions are patently unconstitutional**

Plaintiffs' claims elide the distinction between unprotected speech and protected speech that may be regulated in the political context. It is axiomatic that neither the government nor the courts may, consistent with the First Amendment, prohibit the expression of certain disfavored viewpoints. The idea that the government or the Court "has an interest in preventing speech expressing ideas that offend" is an idea that "strikes at the heart of the First Amendment." *Matal v. Tam*, 137 S. Ct. 1744, 1764-65 (2017). Viewpoint discrimination is an "egregious form of content discrimination" and "presumptively unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). It is the "essence of viewpoint discrimination" for the government to allow speech that is "positive," but not speech that is "derogatory." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (quoting *Matal*, 137 S. Ct. at 1766). Thus, the Supreme

[7] https://www.ncbcp.org/news/releases/coalition_of_black_women_leaders_ga_vote/ (last accessed July 15, 2022).

Court invalidated an anti-disparagement provision that precluded trademark owners from registering marks that disparaged any group of people, but permitted non-disparaging marks. *Matal*, 137 S. Ct. at 1763. Likewise, in *Iancu*, the Supreme Court invalidated a provision that precluded trademark owners from registering "immoral or scandalous" marks, but permitted marks that the government deemed moral, and not scandalous. *Iancu*, 139 S. Ct. at 2299--2302.

The so-called "false" or "negative" information that Plaintiffs allege is contained within the Robocall, and upon which their claims are based, is viewpoint discriminatory for the same reason that the anti-disparagement rule at issue in *Matal* and the "immoral or scandalous" rule at issue in *Iancu* were: They seek to prevent information critical to a political issue based on the underlying message itself, to permit positive information but not negative information, and to engage in speech that supports a certain political perspective, but not others. As the Supreme Court has explained, censoring speech because some people may take issue with the viewpoint is viewpoint discrimination. *Child Evangelism Fellowship v. Stafford Twp. Sch. Dist.*, 386. F. 3d 514, 527 (3d Cir. 2004); *Reed*, 576 U. S., at 163, 135 S. Ct. 2218 (A regulation of speech is facially content based under the First Amendment if it "target[s] speech based on its communicative content"—that is, if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U. S. 155, 163 (2015).

**e. The phrase "intimidate, threaten, or coerce" under the VRA or KKK Act should be given its ordinary meaning suggested by its plain words.**

Statutes such as the VRA "must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969); *U.S. v. Stewart*, 411 F.3d 825, 828 (7th Cir. 2005) (same). The constitutional requirements are well settled: the First Amendment requires the government or a civil plaintiff to prove a "true threat," a term coined in *Watts* to distinguish

genuinely threatening and unprotected speech from constitutionally protected "political hyperbole." *Watts*, 394 U.S. at 708. *Watts* established the distinction between "political hyperbole," however "vituperative, abusive," "crude," or "offensive," and a true threat. *Id*. at 708. Under *Watts*, only a true threat can be punished, and, conversely, in order to punish "pure speech," the Government must prove that the speech is a "true threat." *Id*. at 707; *see also Stewart*, 411 F.3d at 828; *United States v. Carrier*, 672 F. 2d 300, 306 (2d Cir. 1982).

The Second "Circuit's test for whether conduct amounts to a true threat "is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a **threat of injury**." *Turner*, 720 F.3d at 420 (citations omitted) (emphasis added).[8] It has been noted generally that Section 11(b) should be interpreted through the plain and ordinary meaning of its language. *Disabled in Action of Penn. v. Se. Penn. Trans Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (citations omitted) ("We assume that 'Congress expresses its intent through the ordinary meaning of its language' and therefore begin 'with an examination of the plain language of the statute.' If the language is unambiguous, our inquiry is at an end.").

Courts follow the common practice of consulting dictionary definitions to discern ordinary meaning, often looking to how a word was defined when the statute was adopted. *See, e.g.*, *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 225–28 (1994) (relying on dictionaries to ascertain a term's meaning, and reviewing current editions of dictionary and edition in use when the statute was enacted). The definitions in Webster's Third New International Dictionary, the general usage

[8] How can any Court ignore the fact that none of the Plaintiffs here perceived a threat of injury, intimidation, or coercion?

dictionary most commonly cited by the Supreme Court,[9] are typical. Webster's Third defines "intimidate" as "to make timid or fearful; inspire or affect with fear; frighten, especially to compel to action or inaction (as by threats)." Webster's Third New International Dictionary at 1184 (1961). The relevant definition of "threat" in Webster's Third is "an expression of an intention to inflict evil, injury, or damage on another, usually as punishment for something done or left undone." *Id*. The relevant definition of "coercion" is "the act of coercing; use of physical or moral force to compel to act or assent." *Id*. at 439. Thus, the ordinary and natural meaning of these terms is unambiguous.

In *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967), the court afforded the phrase "intimidate, threaten, or coerce" the ordinary meaning suggested by its plain words. While *McLeod* was an action brought under the 1957 Civil Rights Act, rather than Section 11(b), both statutes use the same phrase, "intimidate, threaten, or coerce," pertaining to voting. *Compare* 42 U.S.C. § 1971(b) with 42 U.S.C. § 1973i(b). In *McLeod*, the Fifth Circuit reversed the district court's dismissal of an action seeking to enjoin the mass arrest of African Americans seeking to vote or register to vote, as well as police surveillance of private associations active in registering voters. 385 F.2d at 739. The Fifth Circuit, examining whether the statutory standard of "coercion" was satisfied, said its "first task, then, is to determine whether the record required the district court to find that the arrests, prosecutions and other acts complained of had a coercive effect and were for the purpose of interfering with the right to register and to vote." *Id*. at 740. Noting that "[i]t is difficult to imagine anything short of physical violence which would have a more chilling effect on a voter registration drive than the pattern of baseless arrests and prosecutions revealed in this

---

[9] Jeffrey L. Kirchmeier & Samuel A. Thumma, *Scaling the Lexicon Fortress: The United States Supreme Court's Use of Dictionaries in the Twenty-First Century*, 94 MARQ. L. REV. 77, App. C (2010) (listing instances where the Court cited each dictionary).

record," the Court found that the district court "clearly erred in failing to find that the defendants' acts threatened, intimidated, and coerced" prospective voters. *Id*. at 740-41; cf. *NAACP v. Thompson*, 357 F.2d 831, 838 (5th Cir. 1966) (characterizing "arrest[s] en masse on frivolous or unfounded charges" as intimidation).

**i. The Individual Plaintiffs**

Applying the plain language of relevant statutes to the facts of this case, it is amply clear that Defendants' conduct was (1) objectively not the kind of conduct that would intimidate, threaten, or coerce voters; and (2) not, a fortiori, an attempt to intimidate, threaten, or coerce voters, in violation of Section 11(b) of the Voting Rights Act or the KKK Act. The Individual Plaintiffs concede that: 1) they were not intimidated or harmed in any way by the call (aside from being inconvenienced or irritated, which is not actionable); 2) believed the substance of the call to be false; 3) have not spoken to anyone in the Black community who received or was intimidated, threatened, or coerced by the call; 4) they were merely speculating that certain members of the Black community *could* have been intimidated by the Robocall; and 5) each of them voted in the November 2020 presidential election despite the Robocall.[10] The foregoing does not establish the elements of a viable 11(b) claim. Similarly, the NCBCP never received the call and speculates that Black people could have been "tricked," into voting in-person rather than by mail. Docket No. 149 at ¶ 72. This, too, fails to create a viable 11(b) claim. In fact, Plaintiffs, by their own testimony, clearly conflate dissuasion or deterrence from mail-in voting with "threatening," "intimidating," or "coercing" a person against voting at all.

[10] *See* (Ex. A at 22:4-25:1; 12:24-13:7; 28:19-22; 45:15-47:3; 53:19-54:3); (Ex. B at 15:21-24; 50-52; 54:25-55:12; 59:1-7); (Ex. C at 21:2-7); (Ex. D at 11:2-10; 25:11-13; 24:22-25:10; 46:15-20; 38:3-13; 80:10-13); (Ex. E at 27:7-9; 37:16-21, 43:18-24, 47:3-8; 35:22-36:3, 68:4-69:7; 83:24-84:10; 13:1-8); (Ex. F at 12:15-19; 30:23-31:6; 40:4-6; 55:23-56:10); (E. G at 16:15-18; 53:1-2; 43:6-11; 42:7-18; 86:12-15); (Ex. H at 14:24-15:4; 42:9-14; 45:17-19; 37:9-38:12, 40:7-11; 48:14-23).

Ironically, several Plaintiffs admit that they republished the allegedly offensive Robocall by either replaying it or by distributing it electronically, including on social media websites, text messages, and emails. Indeed, Ms. Winter chose to play the Robocall for her partner, Mr. Steinberg, who was not a direct recipient of the Robocall himself, whom she presumably knew had an allegedly idiosyncratic dissuasion toward anything involving the police, and who was the *only* Plaintiff whose apparently rarified sensibilities were triggered by the mere mention of the police. Apparently, Ms. Winter (who was the proximate cause, or at the very least, intervening cause of, Mr. Steinberg's alleged emotional trauma) and the other Individual Plaintiffs were not concerned that by redistributing this message it could intimidate, threaten, or coerce anyone from voting. Presumably, the Individual Plaintiffs' republication and dissemination of the Robocall was protected speech. By this logic, Plaintiffs' conduct in re-disseminating the Robocall was permissible *because of their intent*. Thus, if Defendants did not have the *specific intent* to intimidate, threaten, or coerce anyone from voting, even assuming, *arguendo*, the Robocall conceivably could have an intimidating, threatening, or coercive effect (which is could not), Defendants cannot be liable. Any other result would be inconsistent, unjust, and unconstitutional. For example, it appears that Ms. Winter republished the Robocall on social media to raise a hoopla, which was assuredly her right to do, just as it would have been Defendants' right to express their opinion that mail-in voting had numerous pitfalls.

Moreover, Mr. Steinberg's purported emotional trauma is irrelevant because he has not asserted a claim from intentional infliction of emotional distress (nor could he sustain such a claim) and neither 11(b) nor the KKK Act provide a remedy for an individual who is merely viscerally affected by speech. Neither Mr. Steinberg, nor any of the other Plaintiffs, were intimidated, threatened, or coerced from voting in the November 2020 presidential election. Indeed, Mr.

Steinberg testified that he voted in the November 2020 presidential election, thereby proving that the Robocall itself did not deter or suppress his ability to vote, despite his unusually fragile emotional state.[11] Mr. Steinberg's testimony that he was emotionally traumatized after the Robocall accurately informed him certain voter information is publicly available does not convert his idiosyncratic mental state into a claim under either 11(b) or the KKK Act. Mr. Steinberg's peculiar idiosyncrasies are, by definition, unreasonable and not normative, and therefore cannot be taken into account when assessing whether a *reasonable person* would *objectively* perceive the Robocall to be intimidating, threatening, or coercive.

The Robocall was distributed by a third-party using an auto dialer that distributed a prerecorded message to randomized telephone numbers within certain designated area codes; it was not targeted toward specific races or ethnicities. There are no demographic tags on these phone lists. Moreover, not only is there no evidence Defendants intended to induce or compel an individual to refrain from voting, the evidence proves that it had no effect whatsoever. Even if Defendants targeted Black voters, this in and of itself, is not unlawful, as demonstrated by NCBCP uses robocalls to target black woman to raise voter awareness.[12] The Michigan, New York, and Ohio neighborhoods targeted by the Robocall and resided in by Plaintiffs are not currently plagued by the same level of racial disenfranchisement that existed in the Deep South in the 1950s or 1960s, which is what section 11(b) sought to combat.[13] By all accounts, these are racially diverse, middle-

[11] Ex. C at 21:2-7.

[12] https://www.ncbcp.org/news/releases/galvanize_over_150000_bw_vote/index.html; https://www.ncbcp.org/news/releases/coalition_of_black_women_leaders_ga_vote/index.html

[13] *See*, *e.g.*, ALEXANDER KEYSSAR, THE RIGHT TO VOTE 18 (2d ed. 2009) note 44, at 212 ("Within a few months of the [VRA's] passage, the Justice Department dispatched examiners to more than thirty counties in four states; scores of thousands of blacks were registered by the examiners, while many more were enrolled by local registrars who accepted the law's dictates to avoid federal intrusion. . . .In the [Deep South] as a whole, roughly a million new voters were registered within a few years after the bill became law, bringing African-American registration to a record 62 percent."); *see also United States v. Wood*, 295 F.2d 772, 781 n.9 (5th Cir. 1961); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965).

class neighborhoods. *See*, *e.g.*, *Shelby County v. Holder*, 570 U.S. 529, 531 (2013) (citations omitted) ("Nearly 50 years later, things have changed dramatically. Largely because of the Voting Rights Act, voter turnout and registration rates in covered jurisdictions now approach parity. Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels. The tests and devices that blocked ballot access have been forbidden nationwide for over 40 years.").

Finally, because the content of the Robocall is substantially true, it cannot be deemed intimidating, threatening, or coercive as a matter of law. *U.S. v. Nguyen*, 673 F.3d 1259, 1264 (9th Cir. 2012) (finding that because the portion of the letter stating that "those illegally in the country or 'legal residents' cannot legally vote and may be subject to incarceration and deportation" was true, there was no statutory violation). Simply stated, insofar as the Plaintiffs' testimony is devoid of any indicia that the Robocall was intimidating, threatening, or coercive, and there is no evidence whatsoever aside from speculation and hearsay that the Robocall influenced, or could have influenced, voting in the 2020 presidential election, there is no 11(b) violation.

**ii. The NCBCP**

According to the Complaint, one of NCBCP's primary concerns with the Robocall is that it could "trick" Black voters into voting in-person rather than voting by mail. Docket No. 149 at ¶ 72. But being "tricked" into voting in-person is not disenfranchisement, nor is it equivalent to being threatened, intimidated, or coerced into not voting at all. Indeed, in the months preceding the 2020 Election, officials in New York,[14] Michigan,[15] and Ohio[16] confirmed that voting in-person could be undertaken safely. Marshalling one's opinions or beliefs, even if they are

---

[14] *See* https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-voting.pdf.

[15] *See*https://www.michigan.gov//media/Project/Websites/coronavirus/Folder14/Recommendations_for_Poll_Workers_and_Election_Officials.pdf?rev=45b773d17ba8442c91c0a2979ec55329

[16] *See* https://www.ohiosos.gov/globalassets/elections/directives/2020/2020-09-25.pdf

objectionable or deceptive, regarding the pitfalls of mail-in voting is protected speech and merely encourages in-person voting.[17] Indeed, Ms. Brown testified that 1) in-person voting was no more dangerous in 2020 than going to the supermarket or bank (Ex. I at 94:3-23); 2) she did not speak to or hear of any person who claims they were deterred from voting as a result of the Robocall (*id.* at 93:6-13); and 3) the Robocall had nothing to do with fewer people completing the Census, but rather, the reduced Census numbers were due to the pandemic and because "Black people have a distrust for the census already…" *Id.* at 99:8-100:12. This demonstrates the speculative and conclusory nature of NCBCP's allegations and supports summary judgment in Defendants' favor.

Ms. Brown's testimony also demonstrates that any "diversion" of resources by NCBCP was negligible, at best, having little, if any, impact on the organization's resources or finances. Ms. Brown testified that about half of the Coalition's $80,000 budget in 2020 came from the NCBCP (*Id*. 24:21-25:1), and that forty percent of the Coalition's 2020 budget, or approximately $32,000 ($16,000 of which came from NCBCP), went toward get out to vote ("GOTV") activities. *Id.* 85:7-11. Ms. Brown further testified that only *one to two percent*, or about $320, of the Coalition's GOTV budget was expended as a result of the Robocall; half of which, or $160, was provided by NCBCP. *Id*. at 85:12-15. This is hardly significant and it is clear that NCBPC's allegations that it diverted resources and its "efforts to promote Census participation were impaired and few people completed the Census" causing "irreparable" harm because of the Robocall, is grossly exaggerated. Docket No. 149 at ¶ 73.

For the foregoing reasons, Plaintiffs' 11(b) and KKK Act claims must fail.

## II. Defendants Did Not Violate Section 131(b) of the Civil Rights Act of 1957

[17] In fact, encouraging in-person voting actually increases the likelihood a person's vote will be counted. *See*, *e.g.*, https://www.pbs.org/wgbh/frontline/article/2020-election-couldhinge-on-whose-votes-dont-count/ ("A more pervasive problem, experts say, is disenfranchisement caused by the proportion of mail-in ballots that are discarded on technicalities: For example, over 23,000 voters in the April 2020 primary election in Wisconsin, a battleground state, had their ballots rejected").

Section 131(b) of the Civil Rights Act of 1957 ("section 131(b)") expressly requires that the proscribed "[i]ntimidation, threats, or coercion" be undertaken "for the purpose of interfering with" the plaintiff's right to vote. 52 U.S.C.A. § 10101(b), Section 131(b). As described herein, the AG's section 131(b) claims fail for two reasons. First, there was no intimidation, threats, or coercion. Second, there is no evidence that Defendants' *intended* to interfere with any citizens right to vote. Accordingly, the AG's section 131(b) claims must be dismissed.

**III. Defendants Did Not Violate Sections 40-c and 40-d of New York Civil Rights Law**

For the reasons stated herein, because Plaintiffs did not, and cannot, prove that Defendants discriminated against anyone in the exercise of his or her civil rights, this claim must be dismissed. Accordingly, the AG's section 40-c and 40-d claims must be dismissed.

**IV. Defendants Did Not Violate Section 9 of NY Civil Rights Law**

For the reasons stated herein, Defendants did not intimidate or intend to intimidate anyone to suppress votes. Accordingly, the AG's section 9 claim must be dismissed.

**V. Defendants Did Not Violate Section 63(12) of the NY Executive Law**

For the reasons stated herein, Defendants did not commit any fraudulent or illegal acts, but rather engaged in free speech protected by the First Amendment. Accordingly, the AG's section 63(12) claim must be dismissed.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment, award summary judgment to Defendants on all claims, and grant such other and further relief as the Court deems just and proper.

Dated: August 12, 2022

**GERSTMAN SCHWARTZ LLP**

By: /s/ *Randy E. Kleinman*
Randy E. Kleinman
David M. Schwartz
1399 Franklin Avenue, Suite 200
Garden City, New York 11530
Telephone: (516) 880-8170
Facsimile: (516) 880-8171
rkleinman@gerstmanschwartz.com
dschwartz@gerstmanschwartz.com

*Attorneys for Defendants*