IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL COALITION ON BLACK CIVIC
PARTICIPATION, MARY WINTER, GENE
STEINBERG, NANCY HART, SARAH
WOLFF, KAREN SLAVEN, KATE KENNEDY,
EDA DANIEL, and ANDREA SFERES,

           Plaintiffs,

           -and-

People of the STATE OF NEW YORK, by its
attorney general, LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK,

           Plaintiff-Intervenor,

     v.

JACOB WOHL, JACK BURKMAN, J.M.
BURKMAN & ASSOCIATES, LLC, PROJECT
1599, and JOHN and JANE DOES 1-10,

           Defendants.

**Oral Argument Requested**

Civil Action No. 20-cv-8668

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' JOINT MOTION TO
STRIKE DEFENDANTS' RULE 56.1 STATEMENT AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 1

I.   Defendants' untimely Rule 56.1 statement makes repeated factual assertions unsupported by evidence and should be stricken. ................................ 1

     A.   Defendants' Rule 56.1 Statement is untimely and prejudicial. ................. 2

     B.   Defendants' 56.1 Statement and brief are filled with unsupported factual assertions. .................................................................................... 3

II.   Defendants' legal arguments are precluded by the law of the case. ..................... 4

III.   The Court has already rejected Defendants' challenge to Plaintiffs' KKK Act claims. ........................................................................................................ 5

IV.   Defendants ignore material facts establishing Plaintiffs' VRA claims and raise irrelevant legal objections. ........................................................................ 6

     A.   Plaintiffs' reactions to the robocall demonstrate the robocall was intimidating and threatening. .................................................................. 7

     B.   Section 11(b) does not require that Defendants intended to intimidate voters ................................................................................. 8

     C.   The First Amendment does not protect the robocall ............................. 12

V.   New York's Section 131(b) claim survives Defendants' conclusory arguments. ...................................................................................................... 19

VI.   Defendants waived their arguments as to New York's state law claims. ........... 19

VII.   Plaintiffs have standing. .................................................................................. 20

     A.   Defendants do not challenge the People of the State of New York's parens patriae standing. ....................................................................... 21

     B.   NCBCP has standing .......................................................................... 22

     C.   The individual Plaintiffs have standing. ............................................... 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abante Rooter & Plumbing, Inc. v. Pivotal Payments, Inc.*,
  No. 16-cv-05486, 2017 WL 733123 (N.D. Cal. Feb. 24, 2017) ...............................................23

*Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land*,
  583 F. Supp. 2d 840, 846 (E.D. Mich. 2008) ...........................................................................9

*Arizona Democratic Party v. Arizona Republican Party*,
  No. CV-16-03752-PHX-JJT, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ...........................10

*Biden v. Texas*,
  142 S. Ct. 2528 (2022) ..............................................................................................................6

*In re Big Apple Volkswagen, LLC*,
  571 B.R. 43 (S.D.N.Y. 2017) ..................................................................................................24

*Brooks v. Nacrelli*,
  331 F. Supp. 1350 (E.D. Pa. 1971) ...........................................................................................7

*Burson v. Freeman*,
  504 U.S. 191 (1992) .............................................................................................................17, 18

*Cal. Motor Transp. v. Trucking Unltd.*,
  404 U.S. 508 (1977) .................................................................................................................16

*Carzoglio v. Abrams*,
  No. 18-CV-04198 (PMH), 2022 WL 2193376 (S.D.N.Y. June 17, 2022) ..............................3

*Centro de la Communidad Hispana de Locust Valley v. Town of Oyster Bay*,
  868 F.3d 104 (2d Cir. 2017) ....................................................................................................22

*Czyzewski v. Jevic Holding Corp.*,
  137 S. Ct. 973 (2017) ...............................................................................................................22

*Dep't of Com. v. New York*,
  139 S. Ct. 2551 (2019) .............................................................................................................11

*Estate of Hennis v. Balicki*,
  No. CV 16 4216, 2019 WL 7047205 (D.N.J. Dec. 23, 2019) .............................................8, 19

*Friends of the Earth v. Laidlaw Envtl. Servs.*,
  528 U.S. 167 (2000) .................................................................................................................20

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Gadsden v. Jones Lang Lasalle Americas, Inc.*,
   210 F. Supp. 2d 430 (S.D.N.Y. 2002)......................................................................2

*Giannullo v. City of New York*,
   322 F.3d 139 (2d Cir. 2003)..............................................................................1, 3

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949)........................................................................................16

*Griffin v. Breckenridge*,
   403 U.S. 88 (1971)..........................................................................................11

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)............................................................................................18

*Holtz v. Rockefeller & Co., Inc.*,
   258 F.3d 62 (2d Cir. 2001)..................................................................................2

*Johnson v. Holder*,
   564 F.3d 95 (2d Cir. 2009)..................................................................................4

*Konigsberg v. State Bar*,
   366 U.S. 36 (1961)......................................................................................15, 16

*Kush v. Rutledge*,
   460 U.S. 719 (1983)..........................................................................................5

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*
   (*LULAC*),
   No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) .........................................9

*Leibovitz v. N.Y.C. Transit Auth.*,
   252 F.3d 179, 188 (2d Cir. 2001)..........................................................................25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)......................................................................................11, 25

*Leyse v. Lifetime Ent. Servs., LLC*,
   679 F. App'x 44 (2d Cir. 2017) ...........................................................................23

*LiButti v. United States*,
   178 F.3d 114 (2d Cir. 1999)................................................................................3

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Lima v. Hastuhana of USA, Inc.*,
    No. 13 Civ. 3389, 2014 WL 177412 (S.D.N.Y. Jan. 16, 2014)................................................19

*Lyn v. Inc. Vill. of Hempstead*,
    No. 03 Civ. 5041, 2007 WL 1876502 (E.D.N.Y. June 28, 2007) ...........................................19

*Manon v. Pons*,
    131 F. Supp. 3d 219 (S.D.N.Y. 2015)....................................................................................19

*Mathie v. Fries*,
    121 F.3d 808, 813-14 (2d Cir. 1997) .....................................................................................25

*McGowan v. State of Md.*,
    366 U.S. 420 (1961)................................................................................................................22

*Mey v. Venture Data, LLC*,
    245 F. Supp. 3d 771 (N.D.W. Va. 2017) ...............................................................................23

*Moya v. United States Department of Homeland Security*,
    975 F.3d 120 (2d Cir. 2020)...................................................................................................23

*In re N.Y.C. Policing During Summer 2020 Demonstrations*,
    548 F. Supp. 3d 383 (S.D.N.Y. 2021)....................................................................................21

*NAACP v. Button*,
    371 U.S. 415 (1963)................................................................................................................16

*New York v. County of Delaware*,
    82 F. Supp. 2d 12 (N.D.N.Y. 2000).......................................................................................21

*New York v. Griepp*,
    991 F.3d 81 (2d Cir. 2021)......................................................................................................21

*Olagues v. Russoniello*,
    797 F.2d 1511 (9th Cir. 1986) .................................................................................................9

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014)......................................................................................20

*People v. John's Pump House, Inc.*,
    914 F. Supp. 809 (N.D.N.Y. 1996).........................................................................................21

*People v. Mid Hudson Med. Grp.*,
    877 F. Supp. 143 (S.D.N.Y. 1995) .........................................................................................21

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997)..................................................................................15

*Reynolds v. Sims*,
    377 U.S. 533 (1964)..........................................................................................17

*Snyder v. Phelps*,
    562 U.S. 443 (2011)..........................................................................................18

*Stampf v. Long Island R. Co.*,
    761 F.3d 192 (2d Cir. 2014)..................................................................................7

*Suares v. Cityscape Tours, Inc.*,
    No. 11 Civ. 5650, 2014 WL 969661 (S.D.N.Y. Mar. 12, 2014), *aff'd*, 603 Fed. Appx. 16 (2d
    Cir. 2015)......................................................................................................2

*Taylor v. Always Ready & Reliable Sec., Inc.*,
    No. 13 Civ. 8524, 2014 WL 5525745 (S.D.N.Y. Oct. 27, 2014) ...............................2

*Tencza v. TAG Ct. Square, LLC*,
    No. 10 CIV. 3752 PAE, 2013 WL 2449178 (S.D.N.Y. June 6, 2013) ........................3

*Town of Chester v. Laroe Estates, Inc.*,
    137 Ss. Ct. 1645, 1651 (2017) ............................................................................20

*United States v. Alvarez*,
    567 U.S. 709 (2012)....................................................................................15, 16

*United States v. Beaty*,
    288 F.2d 653 (6th Cir. 1961) .............................................................................14

*United States v. Bruce*,
    353 F.2d 474 (5th Cir. 1965) .............................................................................14

*United States v. Carr*,
    557 F.3d 93 (2d Cir. 2009)...................................................................................4

*United States v. Clark*,
    249 F. Supp. 720 (S.D. Ala. 1965).........................................................................7

*United States v. Edwards*,
    333 F.2d 575 (5th Cir. 1964) ...............................................................................7

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Lepowitch*,
    318 U.S. 702 (1943) ................................................................................................15, 16

*United States v. McLeod*,
    385 F.2d 734 (5th Cir. 1967) ...................................................................................9, 10

*United States v. Tan Duc Nguyen*,
    673 F.3d 1259 (9th Cir. 2012) .....................................................................................10

*United States* v. *Turner*,
    720 F.3d 411 (2d Cir. 2013) ..................................................................................13, 14

*United States* v. *Wood*,
    295 F.2d 772 (5th Cir. 1961) ........................................................................................7

*United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*,
    128 F.3d 86 (2d Cir. 1997) ....................................................................................15, 16

*Upsolve, Inc. v. James*,
    No. 22-CV-627, 2022 WL 1639554 (S.D.N.Y. May 24, 2022) ...........................17

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) .................................................................................................24

*Vincent v. Ljubica Contractors LLC*,
    No. 18-cv-419, 2020 WL 2832808 (S.D.N.Y. June 1, 2020) ..................................3

*Virginia* v. *Black*,
    538 U.S. 343 (2003) ...................................................................................................13

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ...................................................................................................17

**Statutes**

42 U.S.C. § 1983 .............................................................................................................25

42 U.S.C. § 1985 .....................................................................................................4, 5, 11

52 U.S.C. § 10310(c) ........................................................................................................7

52 U.S.C. § 10307(b) ...............................................................................................6, 9, 11

New York Civil Rights Law § 9 .............................................................................18, 19, 20

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

New York Civil Rights Law § 40-c ...................................................................................19, 20, 21

New York Executive Law § 63(12) ..................................................................................19, 20, 21

**Other Authorities**

*Hearing on the Voting Rights Act of 1965 Before the H. Comm. on the Judiciary*,
   89th Cong. 12 (1965) ...............................................................................................................9

## INTRODUCTION

Defendants' motion for summary judgment flouts the basic command of Rule 56: to come forward with record evidence showing that there is no dispute of material facts and that they are entitled to judgment as a matter of law. The motion does not grapple with facts or rely on evidence. It simply ignores the undisputed record showing Defendants conspired to "HIJACK" the 2020 presidential election, drafted and recorded a robocall falsely threatening consequences for voting by mail, and distributed that call to over 85,000 phone numbers, specifically targeting "black neighborhoods." Instead of addressing those facts, Defendants assert—without any citation or record support—that they engaged in lawful "political debate" and not an unlawful attempt to suppress votes. But the record belies those unsupported claims. Defendants then reprise a suite of legal arguments that the Court has already rejected. But they do not and cannot explain how they meet the high standard for revisiting settled legal questions.

Summary judgment requires more. Where, as here, "the movant fail[s] to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment," the motion must be denied. *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir. 2003) (cleaned up). As Plaintiffs argued in our own motion for summary judgment, the undisputed record evidence entitles *Plaintiffs* to summary judgment. But even if that were not true, the facts raised there are enough to defeat Defendants' motion. Defendants have not even tried to meet their initial burden of providing admissible evidence supporting their claims, and their motion must be denied.

## ARGUMENT

**I.    Defendants' untimely Rule 56.1 statement makes repeated factual assertions unsupported by evidence and should be stricken.**

Defendants' summary judgment motion does not include a single citation to the statement of undisputed material facts required by Local Civil Rule 56.1, and Defendants failed to timely

file one—in stark violation of the rule. In a belated attempt to cure this oversight, Defendants filed a Rule 56.1 statement on August 4, 2022, almost a week after it was due. Beyond violating the Court's scheduling requirements, Defendants' statement is fatally deficient for a host of other reasons—including making factual assertions unsupported by any citations at all, citing *Plaintiffs' complaint* for numerous assertions, and citing long ranges of deposition transcripts without clarifying what "fact" the citations are meant to support. For these reasons, the Court should strike Defendants' Rule 56.1 Statement and deny Defendants' motion for summary judgment.

     A.     **<u>Defendants' Rule 56.1 Statement is untimely and prejudicial</u>.**

The Court has discretion to deny any motion for summary judgment not properly supported by a Rule 56.1 statement. *See* Loc. Civ. R. 56.1(a); *Suares v. Cityscape Tours, Inc.*, No. 11 Civ. 5650, 2014 WL 969661, at *5 (S.D.N.Y. Mar. 12, 2014), *aff'd*, 603 Fed. Appx. 16, 17 (2d Cir. 2015); *Taylor v. Always Ready & Reliable Sec., Inc.*, No. 13 Civ. 8524, 2014 WL 5525745, at *1–2 (S.D.N.Y. Oct. 27, 2014). It may also strike an untimely Rule 56.1 statement and treat it as a nullity. *See, e.g.*, *Gadsden v. Jones Lang Lasalle Americas, Inc.*, 210 F. Supp. 2d 430, 438 (S.D.N.Y. 2002) (rejecting a late Rule 56.1 statement and deeming the opposing party's factual statement admitted).

Here, Defendants filed their Rule 56.1 statement a week late and a week before Plaintiffs' opposition was due, without requesting Plaintiffs' consent, seeking permission from the Court, or even acknowledging their lateness. And it is clear from its face that it was drafted after the deadline: It draws on Plaintiffs' Rule 56.1 Statement, filed the day Defendants' statement was due. *See* D.E. 226 ¶ 2. Defendants' brief does not cite their Rule 56.1 statement a single time, frustrating Rule 56.1's goal of "streamlining the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records." *Holtz v. Rockefeller & Co., Inc.*,

258 F.3d 62, 74 (2d Cir. 2001). Further, the statement's lateness prejudiced Plaintiffs because Plaintiffs were left with approximately half the time allotted to respond to it. The Rule 56.1 statement should be stricken, and Defendants' motion should be denied.

**B.    Defendants' 56.1 Statement and brief are filled with unsupported factual assertions.**

Separately, Defendants' Rule 56.1 statement does not come close to meeting the substantive requirements of the Rule because it does not support its alleged facts "with citation[s] to the admissible evidence of record." *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003); *see also, e.g.*, *Carzoglio v. Abrams*, No. 18-CV-04198 (PMH), 2022 WL 2193376, at *1 (S.D.N.Y. June 17, 2022). Defendants repeatedly make factual assertions without *any* citation at all. *See, e.g.*, D.E. 226 ¶¶ 2, 3, 4, 20–21, 23. Other assertions rely on allegations in Plaintiffs' First Amended Complaint ("FAC"), *see id.* ¶¶ 5, 8, which is not admissible evidence, *see, e.g.*, *Tencza v. TAG Ct. Square, LLC*, No. 10 CIV. 3752 PAE, 2013 WL 2449178, at *8 (S.D.N.Y. June 6, 2013) ("Allegations in a complaint are not evidence." (cleaned up)).[1] Numerous assertions include unexplained groupings of record citations, with no guidance for Plaintiffs or the Court. *See, e.g.*, D.E. 226 ¶¶ 6, 7, 9. For these reasons, too, Defendants' motion for summary judgment should be denied. *See, e.g.*, *Vincent v. Ljubica Contractors LLC*, No. 18-cv-419, 2020 WL 2832808, at *6

---

[1] Defendants' brief is similarly riddled with unsupported facts. For example, the evidence establishes that Wohl and Burkman drafted a prospectus for the "Arlington Center for Political Intelligence" that promised to conduct a "voter-suppression effort" based on strategies used in 2016 by a Russian intelligence agency. D.E. 214 ¶ 6. Without citing any record evidence, Defendants assert this document "was a work of literary fiction that was never disseminated." D.E. 209 at 28. Such smuggled facts unsupported by evidence do not comply with Rule 56. *See, e.g.*, *Giannullo*, 322 F.3d at 141 n.2 (holding that a movant may not prevail on summary judgment by "simply asserting [a] fact . . . without any supporting evidence whatever"). At their depositions, when given an opportunity to explain the ACPI prospectus, both Wohl and Burkman took the Fifth. Declaration of Marc P. Epstein ("Epstein Decl.") Ex. 75 at 97:21-99:09; *id.* Ex. 76 at 268:21-269:25. The Court may therefore conclude that counsel's post-hoc justification for that smoking-gun document is false. *See LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (holding adverse inferences from invoking the Fifth Amendment may be "accorded considerable weight" on summary judgment).

(S.D.N.Y. June 1, 2020) (denying summary judgment because the movants "provide[d] no admissible evidence for a single one of their factual contentions").

## II.     Defendants' legal arguments are precluded by the law of the case.

Not only have Defendants failed to support their legal arguments with evidence, but the arguments themselves are already precluded by the Court's previous orders. "The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (cleaned up). Because the doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality," courts reconsider prior decisions in light of three "compelling circumstances": "(1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009).

Defendants do not even try to meet this burden, but their motion nevertheless relies on legal arguments the Court has already rejected. Contrary to Defendants' renewed arguments, the Court has already found that:

- The "support and advocacy" clause of 42 U.S.C. § 1985 does not have a racial animus requirement. D.E. 38 at 59 (*contra* D.E. 209 at 8–10).

- The VRA does not require a showing that victims were "ultimately intimidated, threatened, or coerced" because the statute also prohibits attempts to intimidate, threaten, and coerce. D.E. 38 at 54 (*contra* D.E. 209 at 26–34).

- Defendants' robocall is not protected by the First Amendment. D.E. 66 at 27–28 (*contra* D.E. 209 at 13–24).

- The individual Plaintiffs' emotional injuries are enough to confer standing without a showing that the robocall successfully intimidated, threatened, or coerced them not to vote. D.E. 66 at 29–30 (*contra* D.E. 209 at 6–7).

4

Plaintiffs' claims survive any level of legal scrutiny. But the Court may deny summary judgment for the simple reason that it has already rejected each of Defendants' primary legal arguments, and Defendants have given no justification for revisiting those decisions now.

**III.    The Court has already rejected Defendants' challenge to Plaintiffs' KKK Act claims.**

Defendants' motion does not address *any* of the elements the Court has held is required for Plaintiffs' claims. *See* D.E. 213 at 18–21. And the Court has already rejected Defendants' sole argument against Plaintiffs' claims under 42 U.S.C. § 1985(3)—that they require a showing of "racial animus." *See* D.E. 209 at 8–13; D.E. 38 at 59. Of course, if it *were* required, Plaintiffs could easily establish "racial animus" based on abundant record facts, including that Defendants explicitly targeted "black neighborhoods." *See* D.E. 214 ¶¶ 6–7, 12, 14–15, 17. But it is not required. Plaintiffs sued under the KKK Act's Support or Advocacy Clause, which has no racial animus requirement. *See* D.E. 38 at 59 ("Unlike plaintiffs suing under the Equal Protection Clause of the KKK Act, plaintiffs suing under the Support or Advocacy Clause need not demonstrate that defendants act with discriminatory, class-based animus.") (citing *Kush v. Rutledge*, 460 U.S. 719, 726 (1983)). The Court explained the distinction between the Support or Advocacy Clause and Equal Protection Clause in detail, noting that the Support or Advocacy Clause does not require the violation of a separate constitutional right, but rather only the independent substantive right "to vote and participate in voting-related activities." *Id.* at 57 n.30.[2] Defendants' argument that Plaintiffs lack standing because they are "white," therefore, is simply irrelevant. *See* D.E 209 at 11.[3]

---

[2] Inexplicitly, Defendants note this distinction in referring to Section 1985(3)'s "two distinct provisions," but then proceed to discuss only the irrelevant Equal Protection Clause provision. D.E. 209 at 9.

[3] There is no danger that courts will become "the monitors of campaign tactics," D.E. 209 at 12—the robocall did not try to influence recipients to vote for one candidate over another, it did not present a political dispute, and it cannot be construed as politicking. As the Court has previously held, there is only one reasonable interpretation of the robocall—as threat or intimidation. *See* D.E. 66 at 19.

**IV.    Defendants ignore material facts establishing Plaintiffs' VRA claims and raise irrelevant legal objections.**

Similarly, Defendants' arguments against Plaintiffs' VRA claims fail at the outset because they do not address the overwhelming record establishing *Plaintiffs'* entitlement to summary judgment on those claims. Under the VRA, intimidation, threats, and coercion are all independent bases for liability under Section 11(b). 52 U.S.C. § 10307(b); *see Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022) (courts must "give effect, if possible, to every clause and word of the statute." (cleaned up)). The undisputed evidence puts Defendants' liability for the robocall beyond dispute. *See* D.E. 213 at 9–10. And, as the Court has already held, it need go no further than the robocall's message to find that it was intimidating, threatening, and coercive. The robocall told recipients to "beware of vote by mail." *Id.* at 11. It threatened arrest, debt collection, and involuntary vaccination. *Id.* at 11–16. And it raised the specter of exposure of recipients' personal information. *Id.* at 214. These undisputed facts are not only sufficient to defeat Defendants' summary judgment motion—they are also sufficient to establish Plaintiffs' claims as a matter of law.

Rather than grapple with the facts, Defendants raise three legal arguments that the Court has already rejected. First, Defendants argue that because Plaintiffs did not alter their voting behavior, the call was not unlawfully intimidating or threatening. That assertion is belied by the record, but it is also precluded by the Court's prior rulings that the VRA prohibits *attempts* to threaten and coerce voters—even when they are unsuccessful. Second, Defendants argue that Section 11(b) requires Plaintiffs to demonstrate a specific intent to intimidate. As the Court has already recognized, the statute has no such requirement. Finally, Defendants argue that the First Amendment immunized their conduct, but the Court has already rejected that argument as well.

6

**A.**   **Plaintiffs' reactions to the robocall demonstrate the robocall was intimidating and threatening.**

As the Court has already held, Plaintiffs do not need to show they changed the way they voted to prove that the robocall was intimidating and threatening. D.E. 38 at 54; *see also United States v. Wood*, 295 F.2d 772, 784 (5th Cir. 1961); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965).[4] But even if such a showing were required, Plaintiffs Gene Steinberg and Mary Winter both testified they were planning to vote by mail in the November 2020 election, but because of the robocall, they voted in person. D.E. 214 ¶¶ 19–20; Plaintiffs' Rule 56.1 Counterstatement ("Pls' 56.1 CS") ¶¶ 12–13; *see* 52 U.S.C. § 10310(c)(1) ("vote" includes "all action necessary to make a vote effective"). And as a direct result of the robocall, Steinberg stopped voting altogether: he let his voter registration lapse when he moved and does not vote anymore. D.E. 214 ¶ 20. Thus, the robocall also suppressed at least one individual from voting in the future.[5]

The other Plaintiffs' reactions to the robocall only reinforce the conclusion that the robocall was intimidating and threatening. All Plaintiffs described the robocall as threatening and intimidating or testified as to the intimidating and threatening effects the robocall had on them. *See* Pls' 56.1 CS ¶¶ 12–19; D.E. 214 ¶¶ 19–26.

---

[4] Nor is there any requirement that there be a "significant probability" that harm will occur—language that Defendants conjure without any citation or reference to statute, case, or any other source. *See* D.E. 209 at 26. The two nonbinding cases Defendants do cite are easily distinguishable. In *Brooks v. Nacrelli*, 331 F. Supp. 1350, 1353 (E.D. Pa. 1971), a 50-year-old case from a district court in another circuit, the court concluded that the presence of policemen at a polling place, without more, did not constitute intimidation. Nowhere were there allegations of explicit threats in any way comparable to those in this case. In *United States v. Edwards*, 333 F.2d 575, 579 (5th Cir. 1964), the court upheld the denial of a preliminary injunction because it did not believe the conduct was likely to recur. But as to the underlying merits, the trial court stated that the plaintiffs were "probably entitled to redress." *Id.* at 579. And because it was a Section 131(b) claim, *see infra* Part IV.B (discussing difference between Section 131(b) and Section 11(b)), "[f]indings as to the design, motive and intent" of perpetrators were integral to the court's holding, *id.* at 578.

[5] Defendants have no factual or legal basis for the myriad ways in which they demean and disparage Steinberg. *E.g.*, D.E. 209 at 31. They might quibble with the amount of harm Steinberg suffered, but that is a damages question for trial. *Cf. Stampf v. Long Island R. Co.*, 761 F.3d 192, 208 (2d Cir. 2014) ("[A] defendant must take a plaintiff as she finds him." (cleaned up)). And whether Steinberg asserted an intentional infliction of emotional distress claim has no bearing on whether his testimony is relevant to the intimidating, threatening, and coercive nature of the robocall.

Defendants raise a host of other faulty arguments. First, it is irrelevant that the individual Plaintiffs are white or whether they discussed the robocall with Black individuals, *see* D.E. 209 at 29. The VRA does not require racial animus—all that matters is Defendants intimidated and/or attempted to intimidate voters. Second, contrary to Defendants' contorted citations to the FAC, *see* D.E. 209 at 33—which in any event is not admissible evidence, *see supra* Part I.B—NCBCP unequivocally viewed the robocall as "a voter suppression effort," as stated in both the FAC and Tameka Ramsey's declaration. *See* D.E. 149 ¶ 71 ("BWR Metro Detroit was immediately and seriously concerned that Defendants' lies and disinformation would intimidate and suppress Black voters"); D.E. 216-32 ¶ 7 ("This was a voter suppression effort. We knew that deceptive and false information about voting by mail would intimidate and scare the communities BWR-MD serves, especially Black voters.").[6] And third, NCBCP's diversion of resources to respond to the robocall—which in any event is not relevant to Plaintiffs' VRA claim—was significant. Ramsey testified that NCBCP reallocated approximately $10,000 to $20,000 worth of time, technological resources, and paid staff to respond to the robocall. Pls' 56.1 CS (Additional Statements) ¶ 3.

## B. Section 11(b) does not require that Defendants intended to intimidate voters.

The undisputed evidence—none of which Defendants discuss in their brief—demonstrates that Defendants intended to intimidate voters with the robocall. *See* D.E. 213 at 16–18.[7] But that

---

[6] Defendants also mischaracterize Ramsey's testimony. Ramsey testified that voting in person, going to the supermarket, and going to the bank were "equally dangerous"; that she spoke to at least one Black person whose child received the robocall, and who described the robocall as "an attack on Black men in the City of Detroit"; and her co-chair Chenita Gary was aware of another individual who received the call. *See* Epstein Decl. Ex. 64 at 52:18–53:05, 75:21–77:15, 94:3–23. Regarding the census, Ramsey testified that the robocall "[a]ffected our time on doing the work around the census." *Id.* at 100:23–24.

[7] Defendants' counsel proposes numerous benign purposes to the call, including engaging in "public debate" and warning people of the "pitfalls of mail-in voting." *E.g.*, D.E. 209 at 16, 20, 33. Not only are these suppositions belied by the text of the call itself—as the Court has already found, D.E. 38 at 4, 48–54; D.E. 66 at 19—they are completely unsupported by citations of any evidence and must be disregarded. *See, e.g.*, *Est. of Hennis v. Balicki*, No. CV 16 4216, 2019 WL 7047205, at *5 (D.N.J. Dec. 23, 2019) ( "counsel's unsubstantiated assertions of 'fact' are not evidence for the purpose of summary judgment").

showing is not required. This is true even for attempt liability, which requires only that Defendants "inten[ded] to commit the [prohibited act] and . . . conduct amounting to a substantial step towards the commission of" that offense." *Hemant Patel, M.D., P.C. v. Bandikatla*, No. 18-cv-10227, 2021 WL 4254977, at *3 (S.D.N.Y. Sept. 17, 2021) (quoting *United States v. Pugh*, 945 F.3d 9, 20 (2d Cir. 2019)).

As the Court has already found, the plain language of Section 11(b) does not contain an intent requirement. D.E. 38 at 42–43, 54; *see* 52 U.S.C. § 10307(b); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) ("*LULAC*"). And the legislative history—along with a simple comparison of two statutes—shows that Congress intended to remove the *mens rea* requirement that had rendered Section 131(b) of the Civil Rights Act of 1957 "largely ineffective." D.E. 215-1 at 4–5 (quoting *Hearing on the Voting Rights Act of 1965 Before the H. Comm. on the Judiciary*, 89th Cong. 12 (1965) (statement of Nicholas Katzenbach, Att'y Gen. of the United States)); *see also* D.E. 213 at 16 n.10. While the text of Section 11(b) is nearly identical to the language of Section 131(b), Congress intentionally omitted the phrase "for the purpose of" to broaden the statute's reach. *See* D.E. 215-1 at 4–5; *LULAC*, 2018 WL 3848404, at *4 ("The text of § 11(b), unlike § 131(b), plainly omits "for the purpose of," suggesting § 11(b)'s deliberately unqualified reach.").

In arguing to the contrary, Defendants and the cases upon which they rely conflate Section 131(b) and Section 11(b). *Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land* is a Section 131(b) case, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008). And *Olagues v. Russoniello* contains a single line of dicta that relies on *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967)—a Section 131(b) case. 797 F.2d 1511, 1522 (9th Cir. 1986); *see also LULAC*, 2018 WL

3848404, at *4 (noting that cases that "trace back to *United States v. McLeod*" were "unpersuasive" because *McLeod* "adjudicated claims brought under the 1957 Civil Rights Act"); D.E. 215-1 at 5.

Defendants' reliance on *Arizona Democratic Party v. Arizona Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) and *United States v. Tan Duc Nguyen*, 673 F.3d 1259 (9th Cir. 2012), likewise is misplaced. Nowhere in *Arizona Democratic Party* does the court say that Section 11(b) requires a showing of intent. Moreover, the evidence in that case showed the "voter suppression" campaigns at issue were mere "efforts to persuade voters not to vote for Hillary Clinton"—unlike the threats of the kind in this case. *Arizona Democratic Party*, 2016 WL 8669978 at *9. Likewise, *Nguyen*, as Defendants recognize, *see* D.E. 209 at 27, dealt with a California statute with different legislative history—it was not drafted with the infirmities of Section 131(b) in mind. *See Nguyen*, 673 F.3d at 1265. And that statute includes additional language that is not present in the VRA that speaks directly to intent: it prohibits any "tactic of coercion or intimidation, *to induce or compel any other person to refrain . . . from voting*." *Nguyen*, 673 F.3d at 1265 (omission in original). Thus, unlike the Ninth Circuit's findings on "intimidation" and "coercion," which apply with equal force to this case, *see* D.E. 38 at 53; D.E. 66 at 18–19, its holding regarding intent is not relevant.[8]

---

[8] Defendants' attempts to distinguish *Nguyen* on other grounds is unavailing. They claim the robocall was "not targeted toward specific races or ethnicities," D.E. 209 at 31, but they explicitly targeted "black neighborhoods" and called the robocall the "black robo." D.E. 213 at 17–18, 22. (And racial animus is not a requirement for Plaintiffs' VRA claim. D.E. 38 at 33–34.) They argue that the robocall "had no effect whatsoever," but Plaintiffs testified extensively to the negative reactions they had to the robocall. *See* Pls' 56.1 CS ¶¶ 12–19; D.E. 214 ¶¶ 19–26. They assert that the neighborhoods targeted by the robocall "are not currently plagued by the same level of racial disenfranchisement that existed in the Deep South in the 1950s or 1960s," but offer no evidence in support of that assertion and do not explain why Jim Crow racial segregation must exist to sustain a claim under Section 11(b). And relying on *Nguyen*, they argue that because the content of the robocall is substantially true, it cannot be deemed intimidating, threatening, or coercive. D.E. 209 at 32. The contents of the robocall were false. *See infra* Part IV.C.2. But in any event, that aspect of *Nguyen* dealt with a statute criminalizing conspiracies to "fraudulently advise any person that he or she is not eligible to vote when in fact that person is eligible" because there was no fraudulent conduct. *Nguyen*, 673 F.3d at 1265. It says nothing about whether true statements could constitute voter intimidation.

Defendants' argument that intent must be an element of a Section 11(b) claim because Plaintiffs "republished" the robocall also misses the point. D.E. 209 at 30–31. Putting aside that Defendants have not introduced any evidence of republication, the difference between Defendants sending the robocall and Plaintiffs allegedly republishing it is not just intent; it is context. *See* D.E. 38 at 48. For example, Defendants argue that Winter published the robocall on social media "to raise a hoopla." D.E. 209 at 30. But unlike Defendants, Winter warned readers that the robocall was "fear-mongering to suppress voting." Epstein Decl. Ex. 73 at WINTER002.

As for the fact that Winter played the robocall for Steinberg, which Defendants argue constitutes an intervening cause of Steinberg receiving the robocall, D.E. 209 at 30, the VRA does not include a proximate cause requirement, nor does it require that a person be the direct target of the intimidating and threatening conduct. *See* 52 U.S.C. § 10307(b).[9] And "proximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). But even if there were such a requirement, Defendants were still the proximate cause of Steinberg hearing the robocall because it was foreseeable that by sending the robocall to Winter, Steinberg would also hear the robocall. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (respondents met their burden of demonstrating standing because they showed that "third parties will likely react in predictable ways" to government conduct). Steinberg and Winter lived together when they received the robocall—indeed, Steinberg was only a few feet away from Winter when she first listened to it. Pls' 56.1 CS ¶ 13.

---

[9] Nor does the KKK Act include a proximate cause requirement. In fact, the KKK Act permits claims where "another is injured in his person or property" because of an unlawful conspiracy. 42 U.S.C. § 1985(3); *see Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971) (plaintiffs adequately stated a claim under § 1985(3) "whether or not the nonparty Grady was the main or only target of the conspiracy")

### C.      **The First Amendment does not protect the robocall.**

Defendants also contend that they did not violate the VRA because the robocall was protected speech under the First Amendment. The most notable aspect of this defense—which they raise *only* as to Plaintiffs' VRA claim, s*ee* D.E. 209 at 15–24—is what is missing: any discussion of the actual robocall they wrote and paid to have disseminated. Nor is there any discussion of the Court's prior holding—that the robocall is not protected by the First Amendment and their claims that it was innocuous political speech have no support. D.E. 38 at 36–43, 52 n.25; D.E. 66 at 21–28. Nowhere in their nine-page ode to the First Amendment and the values of free speech do they even once discuss the content of the call or explain how it accords with the lofty principles they espouse. Instead, they wax poetic about the need for protection for "caustic criticism" and "rhetorical hyperbole" while voicing concern for "authors and publishers" who "use[] figurative language . . . on matters of public controversy" and the need "to ensure that all opinions on [hot-button political] issues have a chance to be heard and considered." D.E. 209 at 15–18. None of these exaltations is relevant because none has anything to do with the issue in this case. *See* D.E. 66 at 25-27.

Because the robocall made only a series of lies and knowing misrepresentations to threaten or intimidate voters, it enjoys no protection for at least four reasons. First, the robocall conveyed true threats. Second, it used false statements to impinge a cognizable legal right. Third, the robocall was speech integral to unlawful conduct. And, finally, even if the robocall is speech under the First Amendment, applying the VRA to the robocall survives strict scrutiny.

### 1.      **The robocall conveyed true threats.**

The First Amendment does not protect the robocall because the robocall conveyed intimidation and thus is not protected speech under the "true threats" exception—just as this Court previously concluded. D.E. 38 at 37–43. Statutes that prohibit "true threats" are "fully consistent

with the First Amendment" and thus do not violate it. *United States* v. *Turner*, 720 F.3d 411, 420 (2d Cir. 2013). Whether speech constitutes a "true threat" turns on "whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *Id.* The threat communicated does not need to be explicit and can threaten nonphysical harm. *Id.* at 420–23. After all, the purpose of true threat prohibitions are to "protect individuals from the fear of violence and the disruption that fear engenders," as well as "from the possibility that the threatened violence will occur." *Virginia* v. *Black*, 538 U.S. 343, 360 (2003) (cleaned up). Accordingly, threats of nonphysical harm that manifest "the disruption that fear engenders" may constitute true threats. *Id.*[10]

The robocall here warned of legal, economic, *and* physical injury to intimidate its recipients and keep them from voting in the 2020 election. The robocall falsely warned that the police would use vote-by-mail records to look for "outstanding warrants," a scare tactic that recipients would reasonably interpret as warning of legal consequences if they voted by mail. That is exactly how Steinberg interpreted the call, and hearing that warning "was particularly traumatic" for him because of a decades-old nonviolent conviction. D.E. 214 ¶ 20. The threat of legal wrongs grave enough to amount to emotional disturbance is precisely the kind of conduct the Second Circuit contemplated when it explained that the potential for nonphysical harm may constitute true threats. *Turner*, 720 F.3d at 420.

The robocall also warned of economic consequences. As the Court previously explained, "the reference to credit card companies and debt collection could instill fears that voters would

---

[10] Whether a defendant must subjectively intend to make a threat is an open question in the Second Circuit but irrelevant for this case. *See Turner*, 720 F.3d at 420 n.4; Dkt. 38 at 42. Plaintiffs have produced overwhelming evidence of Defendants' intent for the robocall to intimidate recipients into not voting by mail. Taken together, Wohl's explicitly stated intent to interfere with the 2020 election, Defendants' combined efforts to target Black voters in "Black neighborhoods," and the content of the robocall leave no material dispute that Defendants intended to intimidate the robocall's recipients into not voting by mail.

face adverse economic consequences if they exercised their right to vote by mail." D.E. 38 at 51. That is how Sferes interpreted the call. Because it "alleged that bad things could happen if you vote by mail," she "began to second guess whether [her] information would be shared" because she had "outstanding debt related to medical bills." D.E. 216-7 ¶¶ 7–8. Multiple courts have recognized that economic harm can give rise to unlawful intimidation. *United States v. Beaty*, 288 F.2d 653, 654–57 (6th Cir. 1961); *United States v. Bruce*, 353 F.2d 474, 476–77 (5th Cir. 1965).

Finally, the robocall made recipients believe that violence may follow if they voted by mail. As this Court earlier explained, "[c]ontext indicates that a reasonable recipient would likely interpret the prospect of a forced vaccination, in particular, as a threat of bodily injury to voters who vote by mail." D.E. 38 at 50; *see also* D.E. 66 at 16–17 (concluding that forced vaccination was a "physical consequence"). Daniel drew the same conclusion, worrying that "if I vote by mail[,] the police will be able to track me down, or . . . I will be forced to get a vaccination." D.E. 216-6 ¶ 5.

None of these facts is genuinely disputed. As the Court previously recognized, "[t]he plain reading of this message by any reasonable person is that if robocall message recipients vote by mail," they may suffer economic, legal, or physical harm. D.E. 66 at 19. Defendants even concede that "economic coercion, baseless prosecution, and threats thereof" can be true threats. D.E. 209 at 26. And this Court correctly concluded that any argument that the robocall was not conveying a threat of economic and legal harm would be "astonishing" based on the "plain text" of the call. D.E. 66 at 19. "There is no other reasonable characterization of this message except as a threat or risk of arrest," economic, or physical harm. *Id.* Nothing in discovery has changed that. Defendants' robocall is therefore not entitled to First Amendment protection because they constitute "true threats." *Turner*, 720 F.3d at 420.

14

## 2.   The robocall used false statements to infringe a legal right.

It has always been the case that the First Amendment is not a defense when a Defendant causes "legally cognizable harm associated with a false statement" that includes either "a knowing or reckless falsehood." *United States v. Alvarez*, 567 U.S. 709, 719 (2012). That tenet describes a wide swath of cases. Most basically, torts like "defamation" and "fraud" are not protected by the First Amendment even though they involve speech. *Id.* But far more examples abound. Perjury, for instance, punishes speech yet is unprotected. *See Konigsberg v. State Bar,* 366 U.S. 36, 49 n.10 (1961). The same is true of impersonating an FBI agent, *see United States v. Lepowitch,* 318 U.S. 702, 704 (1943), or using someone else's registered service mark as part of a political campaign, *United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 93 (2d Cir. 1997).

Defendants' First Amendment defense can be rejected for this reason alone. The VRA confers the right to vote in our nation's elections free from intimidation. Defendants violated that right—imposing a "legally cognizable harm" with statements that were, at the very least, recklessly false. *Alvarez*, 567 U.S. at 719. All the evidence that does exist shows that they endeavored to "HIJACK" the election by "mak[ing] shit up." D.E. 214 ¶ 7; *see also* D.E. 38 at 8–9 (this Court recognizing the call was full of "false statement[s]" and "baseless"). In contrast, Defendants have cited zero evidence that they believed the robocall was true and pleaded the Fifth when asked if they had such a belief. Epstein Decl. Ex. 75 at 170:06-71:15; *id.* Ex. 76 at 175:12-76:17. Because the robocall conveys a false message and imposes cognizable harms, and Defendants knew it was false or were recklessly indifferent to its falsity, it is not protected under the First Amendment.[11]

---

[11] Defendants' attempt to build a factual basis for the robocall's statements through their expert Charles Ribando— after they took the Fifth at their depositions on the issue—should be rejected. As Plaintiffs argued, that report should be stricken as unreliable. *See* D.E. 219. And because it is not substantive evidence, "an expert's report is not a talisman against summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

Defendants' only response is to assert that "even if the Robocall had been untruthful, no court has ever suggested that noncommercial false speech is exempt from First Amendment scrutiny." D.E. 209 at 23. But the only case they rely on is *Alvarez*, which confirms that the opposite is true. 567 U.S. at 719. And none of *Konigsberg*, *Lepowitch*, or *United We Stand* involved commercial speech, yet all found no First Amendment defense. The same is true here.

### 3.   The robocall was speech integral to unlawful conduct.

Just as true threats are not protected by the First Amendment, neither is speech integral to unlawful conduct. *See, e.g.*, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). The Courts may hold defendants liable where, as here, their speech is used as "an integral part of conduct which violates a valid statute." *Cal. Motor Transp. v. Trucking Unltd.*, 404 U.S. 508, 511 (1977). Parties that violate valid statutes, such as those prohibiting "conspiracy, incitement, and solicitation," *United States v. Williams*, 553 U.S. 285, 298 (2008), "cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Cal. Motor Transp.*, 404 U.S. at 513. "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." *Id.* at 515 (quoting *NAACP v. Button*, 371 U.S. 415, 444 (1963)). Here, the undisputed evidence shows that the robocall was integral to Defendants' conduct in violation of the VRA and in their unlawful conspiracy to suppress votes in violation of the KKK Act. As Plaintiffs' motion for summary judgment established, the robocall was the lynchpin of Defendants' operation to "HIJACK" the 2020 presidential election. And, as the means of attempting to suppress lawful votes, the robocall does not enjoy First Amendment protection. Suppressing lawful votes is a "substantive evil" the legislature has the power to control—putting Defendants' attempt to do so with language, as opposed to brute force, beyond the scope of First Amendment protection.

**4.    The statutes at issue in this case survive Defendants' as-applied challenge even under strict scrutiny.**

Even if all of the foregoing exceptions to the First Amendment did not apply here, Defendants' arguments would still fail because punishing Defendants' attempts to intimidate voters survives strict scrutiny—assuming that standard applies. Strict scrutiny requires laws that regulate speech to serve "a compelling state interest" and be narrowly tailored "to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992). When, as here, a party raises only an as-applied challenge and not a facial attack on a statute's constitutionality, the "issue . . . is a narrow one: whether the First Amendment protects the precise" speech at issue. *Upsolve, Inc. v. James*, No. 22-CV-627, 2022 WL 1639554, at *9 (S.D.N.Y. May 24, 2022).

Almost since the passage of the KKK Act, it has been axiomatic that the right to vote is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *accord Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Both the federal and New York governments indisputably have a compelling interest in protecting that right, and Defendants' advance no countervailing First Amendment interests. Like the electioneering statute in *Burson*, the VRA "protect[s] voters from confusion and undue influence" and "preserv[es] the integrity of its election process." *Burson*, 504 U.S. at 199. In *Burson*, the Supreme Court held that these interests are compelling enough to warrant regulating speech. *Id.* The Court then upheld against a facial attack a state law that prohibited solicitation of votes and displays or distributions of campaign materials within 100 feet of a polling place. *Id.* at 206. It did so based on the well-established "problems with voter intimidation and election fraud" both in the United States and in other English common-law

jurisdictions throughout the 19th century. *Id.* at 202–203.[12] Because the challenged statutes was narrowly drawn to combat those "two evils," *id.* a 206, it survived strict scrutiny.

Compare the robocall here to the prohibited speech in *Burson*. Displaying and distributing campaign materials and soliciting votes, like in *Burson*, is unquestionably political speech. "Speech on matters of public concern," particularly political speech, "is at the heart of the First Amendment." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up). And yet in *Burson*, the Court held that regulations that prohibit improper interference with the right to vote may restrict such speech. 504 U.S. at 211. In contrast, here Defendants were not distributing campaign literature, urging people to vote for a candidate, or undertaking other aspects of political speech. "Rather, Defendants carry out electoral terror using telephones, computers, and modern technology adapted to serve the same deleterious ends [as the KKK]." D.E. 38 at 3. They made false and misleading statements to try to intimidate voters. If valid and valiant political speech survived strict scrutiny in *Burson*, then surely enforcement of the VRA against a voter intimidation robocall can survive strict scrutiny as well. *See, e.g., Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010) (upholding statute prohibiting material support to terrorist organization against as-applied First Amendment challenge).

Likely for this reason, the Court previously correctly concluded that "[e]ven if the robocall were not a true threat," the "content-based speech restrictions imposed by the VRA and KKK . . . are narrowly tailored to advance compelling government interests" and thus survive strict scrutiny. D.E. 38 at 56 n.29. Nothing that has emerged during discovery alters that conclusion.

---

[12] The laws at issue here have similarly long pedigrees. For example, N.Y. Civ. Rights Law § 9 was first enacted in 1787 to protect the fundamental access to the franchise. *See* D.E. 227-1 at 5 (NYCLU Amicus Br.). Federal laws prohibiting voter intimidation date back to at least 1871. *See* Civil Rights Act of 1871, 16 Stat. 433 (1871).

**V.      New York's Section 131(b) claim survives Defendants' conclusory arguments.**

Defendants have waived their argument as to Section 131(b) of the Civil Rights Act of 1957 because they have asserted it "in a perfunctory manner, unaccompanied by some effort at developed argumentation." *See infra* Part VI. In any event, their conclusory assertions that the robocall was not a form of intimidation and that they did not intend to "interfere with any citizens [sic] right to vote," D.E. 209 at 34, cannot be credited based on the undisputed facts of this matter. As Plaintiffs have already noted, there are ample, undisputed facts showing that Defendants' robocall was intimidating, threatening, and coercive. *See* D.E. 213 at 11–18. There also is sufficient evidence to show that Defendants intended their robocall to interfere with the election and that it was part of a planned effort to suppress votes, particularly Black votes. D.E. 213 at 22. To the extent they argue that the robocall was political "muckraker" activity, D.E. 209 at 2, the Court should ignore it because Defendants offer no evidence in support. *See, e.g.*, *Estate of Hennis*, 2019 WL 7047205, at *5. In any event, such a proposition is belied by the exhaustive record developed by Plaintiffs. D.E. 214 ¶¶ 5–7, 15–17.

**VI.     Defendants waived their arguments as to New York's state law claims.**

Defendants' fail to meaningfully contest violating New York Civil Rights Law §§ 9, 40-c and New York Executive Law § 63(12). The "standard rule" in this Circuit is that "arguments may not be made for the first time in a reply brief," and that "applies with equal force in the District Court." *Manon v. Pons*, 131 F. Supp. 3d 219, 238–39 (S.D.N.Y. 2015) (cleaned up) (collecting cases). It is similarly "well established that '[i]ssues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Lima v. Hastuhana of USA, Inc.*, No. 13 Civ. 3389, 2014 WL 177412, at *1 (S.D.N.Y. Jan. 16, 2014) (quoting *Lyn v. Inc. Vill. of Hempstead*, No. 03 Civ. 5041, 2007 WL 1876502, at *16 n. 13 (E.D.N.Y. June 28, 2007) (alteration in original)). Defendants' mere passing mention of Plaintiffs'

state-law causes of action—with no claim garnering more than two sentences—falls far below the threshold of developed argumentation. Defendants do not, for example, explain how their federal-voting-rights arguments preclude a finding of fraudulent activity under Executive Law § 63(12). Nor do Defendants discuss in *any* depth the different standards between Civil Rights Law §§ 9, 40-c and Plaintiffs' federal claims. Defendants have thus waived their opposition to these causes of action. *See also In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014) (noting that the defendants had "ample notice from the Complaint that plaintiffs alleged a [statutory] violation . . . yet failed to address the theory in their opening memorandum of law" and therefore the court need not consider arguments to the contrary in their reply brief).

**VII.   Plaintiffs have standing.**

Defendants challenge this Court's jurisdiction by claiming that neither the Individual Plaintiffs nor NCBCP has standing. D.E. 209 at 6-8. Article III requires that a plaintiff have suffered a concrete and particularized injury that is fairly traceable to the defendant and redressable by a favorable decision. *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000); D.E. 38 at 16. Defendants do not dispute traceability or redressability; they argue only that Plaintiffs have not suffered a constitutionally cognizable injury. *See* D.E. 209 at 6–8.

For starters, Defendants' argument fails on its own terms because they do not argue that the State of New York lacks standing. And so long as one plaintiff has standing, then the Court has Article III jurisdiction over the proceedings. *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Regardless, both NCBCP and the Individual Plaintiffs have standing based on material facts that Defendants either do not dispute or expressly concede.

**A.      Defendants do not challenge the People of the State of New York's parens patriae standing.**

Defendants do not mention, let alone challenge, the State's standing. Nor can they. Where, as here, the interests, rights and well-being of a substantial segment of the people of the State are affected, the New York Office of Attorney General possesses parens patriae authority to commence legal actions in federal court to remedy violations of law. *See*, *e.g.*, *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 398–99 (S.D.N.Y. 2021). There are three requirements for parens patriae standing: (1) an injury to a sufficient number of the State's citizens; (2) a quasi-sovereign interest; and (3) a barrier to individual plaintiffs obtaining the complete relief the State could obtain. *See New York v. Griepp*, 991 F.3d 81, 131 (2d Cir. 2021).

The State easily clears each of those requirements. First, it is beyond dispute that Defendants sent their robocall to nearly 5,500 New Yorkers, satisfying the "sufficient number" requirement. *See, e.g.*, *People v. John's Pump House, Inc.*, 914 F. Supp. 809, 812–13 (N.D.N.Y. 1996) (holding "there is no numerical talisman to establish parens patriae standing" and affirming the State's standing where complaint alleged only *eight* incidents of misconduct); *People v. Mid Hudson Med. Grp.*, 877 F. Supp. 143, 147 (S.D.N.Y. 1995) (finding standing where complaint cited misconduct against only *one* individual). Second, it is well-established that protecting New Yorkers' right to vote constitutes a quasi–sovereign interest supporting standing. *See*, *e.g.*, *New York v. County of Delaware*, 82 F. Supp. 2d 12, 13 n. 1 (N.D.N.Y. 2000). Finally, the State seeks relief that is not available to an individual private plaintiff, exercising its exclusive authority under New York Executive Law § 63(12), and bringing claims under Civil Rights Law § 40-c that would provide relief for all 5,500 New Yorkers who received Defendants' intimidating robocall. *See, e.g.*, *In re N.Y.C. Policing*, 548 F. Supp. 3d at 399 (holding that the "sheer breadth of relief" that the State sought justified standing). And, unlike a private litigant, the State has the resources and

incentives to pursue more substantial injunctive relief. *See id.*; *People v. Peter & John's Pump House*, 914 F. Supp 809, 813 (N.D.N.Y. 1996).

### B.   **NCBCP has standing.**

Defendants claim that NCBCP lacks standing while expressly conceding that the organization suffered $160 of pecuniary damages. D.E. 109 at 8. They label this injury "de minimis," *id.*, but "[f]or standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017); *McGowan v. State of Md.*, 366 U.S. 420, 424, 430 (1961) (finding standing for a $5 fine plus costs). NCBCP has elsewhere explained that it diverted tens of thousands of dollars in resources to combat the robocall, Pls' 56.1 CS (Additional Statements) ¶ 3, but the precise amount is immaterial here. By agreeing that NCBCP suffered a financial injury, Defendants have conceded that the organization has standing.

Defendants alternatively argue that NCBCP lacks standing because "neither it, nor any of its members, received the Robocall" and because its "damages are self-inflicted." D.E. 209 at 8. This ignores that NCBCP has organizational standing, as this Court previously explained. *See* D.E. 38 at 19–20. An organization has standing when it "diverts money from its other current activities to advance its established organizational interests" in response to defendants' conduct. *Id.* (quoting *Centro de la Communidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)). Here, it is undisputed that NCBCP was running a campaign to promote Census participation and diverted resources from that campaign to combat the robocall. D.E. 214 ¶ 18; Pls' 56.1 CS (Additional Statements) ¶¶ 1–2. NCBCP thus suffered two injuries: its Census outreach mission was frustrated, and it expended unnecessary resources to counter the robocall. D.E. 214 ¶ 18; Pls' 56.1 CS (Additional Statements) ¶ 3. It does not matter whether NCBCP's

members received the robocall (because NCBCP is not asserting associational standing) or that its actions were voluntary (because the robocall indisputably interfered with its established mission). Every case based on organizational standing stems from activity the organization voluntarily undertakes; when illegal conduct "drain[s] . . . the organization's resources" and "leav[es] less time for [the organization's] other clients," the organization has standing to sue. *Moya v. United States Department of Homeland Security*, 975 F.3d 120, 129 (2d Cir. 2020). Because Defendants do not dispute that their conduct had this exact effect on NCBCP, they have conceded that the organization has standing. *See also* D.E. 38 at 20–22 (holding NCBCP has standing).

### C. The individual Plaintiffs have standing.

Defendants also assert that the Individual Plaintiffs lack standing because "[t]here is no evidence—none—that Plaintiffs' imagined harms came to pass." D.E. 209 at 6. That argument fails out of the gate because "[t]he vast majority of courts that have addressed this question have concluded that the invasion of privacy, annoyance and wasted time associated with robocalls is sufficient to demonstrate concrete injury" and satisfy standing. *Abante Rooter & Plumbing, Inc. v. Pivotal Payments, Inc.*, No. 16-cv-05486, 2017 WL 733123, at *6 (N.D. Cal. Feb. 24, 2017) (collecting cases). And the Second Circuit has affirmed a decision for similar reasons, concluding that a defendant that "left a prerecorded voicemail message, to which [plaintiff] later listened, on an answering device in the place where [plaintiff] resided and to which he had legitimate access," had triggered an injury sufficient for standing. *Leyse v. Lifetime Ent. Servs., LLC*, 679 F. App'x 44, 46 (2d Cir. 2017); *see also Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 777 (N.D.W. Va. 2017) (explaining the various "tangible harm" and "intangible injuries" that robocalls cause through use of electricity, invasion of privacy, and more). That is in keeping with the Supreme Court's recent decision—relying heavily on a voting rights case at common law—that "*every* legal

injury necessarily causes damage" and is sufficient to establish standing. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021) (emphasis in original). By receiving the robocall, Plaintiffs suffered a constitutionally cognizable injury, and Defendants' argument fails for this reason alone.

Beyond that, each individual plaintiff has explained the emotional damage that the robocall inflicted, and this Court previously concluded that this "emotional impact" was sufficient for standing. D.E. 66 at 29. Mary Winter found the robocall "very scary and threatening"; as a result of the call, she changed her plans to vote by mail and instead voted in person. D.E. 214 ¶ 19. Gene Steinberg found the call "particularly traumatic" because of his own previous convictions—the robocall's threat that law enforcement may use his records caused him to "relive earlier traumas." *Id.* ¶ 20. The call also spurred Steinberg to change his plans to vote by mail and instead vote in person. *Id.* And as a direct result of the robocall, Steinberg allowed his voter registration to lapse out of fear that someone may "again use [his] information to intimidate [him]." *Id.* And each of the remaining Plaintiffs testified that the call caused feelings of anger and fear—testimony Defendants do not dispute. *See id.* ¶¶ 21–26. All of these facts—none of which Defendants dispute—is sufficient to establish standing because "[i]n general . . . emotional distress plainly constitutes a concrete injury for purposes of Article III standing." *In re Big Apple Volkswagen, LLC*, 571 B.R. 43, 50 (S.D.N.Y. 2017).

Defendants' primary response is that Plaintiffs "were entirely undeterred by the Robocall," and "[t]he Robocall unequivocally did not intimidate, threaten, or coerce any of the Individual Plaintiffs as it relates to the act of voting." D.E. 209 at 7. For starters, this simply isn't true. Defendants do not dispute that Steinberg and Winter both planned to vote by mail but changed those plans and instead voted in person because of the robocall. D.E. 214 ¶¶ 19–20. Even under Defendants' narrow theory, those two plaintiffs have standing.

Defendants also misunderstand the injuries Plaintiffs are asserting. Nothing in the VRA or KKK Act limits a Plaintiff to recovering only if they did not vote. Assuming that Defendants violated those Acts, *see* D.E. 209 at 11–21, then Defendants are liable for any foreseeable harm their conduct caused. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) (explaining that the question is "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits"). Defendants offer no reason why Congress would not want to allow Plaintiffs to recover for the loss of resources or the emotional distress stemming from conduct that threatens, coerces, or intimidates voters for voting. *Cf. Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001) (emotional distress damages available under Title VII of the Civil Rights Act of 1964); *Mathie v. Fries*, 121 F.3d 808, 813–14 (2d Cir. 1997) (same for constitutional claim under 42 U.S.C. § 1983). For this same reason, there is no merit to Defendants' attempt to dismiss Steinberg's injuries as irrelevant just because the VRA and KKK Act "were enacted to prevent voter suppression," not to guard against "offend[ing] someone's delicate sensibilities." D.E. 209 at 7.[13] So long as Defendants' conduct violated the VRA or KKK Act and foreseeably caused Steinberg's injuries—and there is no genuine dispute that they did— then he has standing based on those injuries.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' joint motion to strike and deny Defendants' motion for summary judgment.

---

[13] Defendants' argument largely relies on the mistaken premise that the First Amendment protects their conduct, and the lone case they cite has nothing to do with either the VRA or KKK Act. *See* D.E. 209 at 7.

Dated:  New York, New York
        August 12, 2022

**LETITIA JAMES**
*Attorney General*
*State of New York*

By: */s/ Rick Sawyer*
Jessica Clarke, Chief, Civil Rights Bureau
Rick Sawyer, Special Counsel
Colleen Faherty, Assistant Attorney General
28 Liberty St., 20th Floor
New York, NY 10005
(212) 416-8252
Jessica.Clarke@ag.ny.gov
Richard.Sawyer@ag.ny.gov
Colleen.Faherty@ag.ny.gov

Respectfully submitted,

By:  */s/ Franklin Monsour Jr.*

Amy Walsh
Franklin Monsour Jr.
Rene Kathawala
Brittany Roehrs
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
(212) 506-5000
awalsh@orrick.com
fmonsour@orrick.com
rkathawala@orrick.com
broehrs@orrick.com

By: */s/ David Brody*

David Brody (admitted *pro hac vice*)
Marc Epstein
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8600
dbrody@lawyerscommittee.org
mepstein@lawyerscommittee.org

*Attorneys for Plaintiffs*