IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES,

Plaintiffs,

-and-

People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK,

Plaintiff-Intervenor,

v.

JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10,

Defendants.

Civil Action No. 20-cv-8668

**PLAINTIFFS' JOINT COUNTERSTATEMENT IN OPPOSITION TO DEFENDANTS' RULE 56.1 STATEMENT**

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, Plaintiffs National Coalition on Black Civic Participation, Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, Andrea Sferes, and Plaintiff-Intervenor People of the State of New York (collectively, "Plaintiffs") respectfully submit the following Counterstatement in Opposition to Defendants' Rule 56.1 Statement, and additional statements of undisputed fact supporting denial of Defendants' motion

for summary judgment.[1] Plaintiffs incorporate by reference their Joint Local Civil Rule 56.1 Statement of Undisputed Material Facts. D.E. 214.

## COUNTERSTATEMENT IN OPPOSITION TO DEFENDANTS' RULE 56.1 STATEMENT

**1.    On August 26, 2020, Message Communications, Inc. transmitted a robocall from an account to an estimated 85,000 phone numbers across the United States. A far smaller number of recipients are believed to have received the call live or on their answering machines.** *See* **Docket No. 49, establishing that there were 29,117 recipients (*i.e*, live or answering machine) versus the 85,303 transmitted.** *See also* **Docket Nos. 50 and 52, demonstrating approximately 27,760 corrective calls were received versus 29,117.**

**RESPONSE**: Undisputed that Message Communications, Inc. transmitted a robocall from an account to an estimated 85,000 phone numbers across the United States.

Disputed that "[a] far smaller number of recipients are believed to have received the call live or on their answering machines." This statement is immaterial and unsupported by evidence. Docket No. 49 is a Court Order finding Defendants' update regarding compliance with a previous order "insufficient to determine their compliance." D.E. 49 at 1. It discusses that Defendants sent the <u>corrective robocall</u> to 29,117 recipients—not that there were 29,117 recipients of the August 26, 2020 robocall. *See id.* at 1–2. Docket No. 50 is an inadmissible unsworn letter from Defense counsel. Docket No. 52 is a letter from Plaintiffs' counsel stating they had no objection to the manner in which Defendants sought to comply with the Court's order. This statement is also contradicted by Defendants' second statement of undisputed material facts: "the exact number of calls received has never been established." This statement is also immaterial, because it only states

---

[1] Plaintiffs are simultaneously filing a motion to strike Defendants' Rule 56.1 Statement. Submission of this Rule 56.1 counterstatement is not intended and should not be construed as waiver of those arguments.

that there was a certain number of recipients who were "believed to have received the call live or on their answering machines." It does not state by whom this was believed, nor why that belief would establish the number of recipients who in fact received the robocall.

**2. Plaintiffs assert that approximately 5,494 calls were transmitted into New York area codes although the exact number of calls received has never been established. Notwithstanding same, assuming the same effective rate for the 85,303, a simple proportion suggests as many as 1,400 calls may have been received in New York State.**

**RESPONSE**: Undisputed that Plaintiffs assert that approximately 5,494 calls were transmitted into New York area codes. *See* D.E. 214 ¶ 2.

Disputed that "the exact number of calls received has never been established" is material. In addition, based on a review of documents produced in discovery, Defendants' robocall was sent to 85,307 phone numbers. Defendants have not cited any evidence suggesting, let alone demonstrating, that a fewer number of people "received" the robocall, or that there is any basis for differentiating between individuals who were sent the robocall and those who "received" it.

Disputed that "assuming the same effective rate for the 85,303, a simple proportion suggests as many as 1,400 calls may have been received in New York State" is material. In addition, Defendants do not cite any evidence in support of this statement. Defendants also appear to rely on the unsupported assertion that 29,117 calls were received, which for the reasons previously discussed is unsupported by evidence. *See supra* ¶ 1. There also is no evidentiary support for the assumption that if 29,117 out of 85,303 people received the robocall, the same proportion of calls would be received in New York State. This statement also is immaterial because it "suggests as many as 1,400 calls may have been received in New York State," and thus does not purport to state a fact upon which the Court can rely.

Disputed that the robocall was sent to 85,303 phone numbers. Defendants do not cite any evidence in support of this statement. Based on a review of documents produced in discovery and developed during the Attorney General's investigation of this matter, Defendants' robocall was sent to a total of 85,307 phone numbers. D.E. 217 ¶ 2.

3.   **The robocall contained the following message:**

> **Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail.**

**RESPONSE**: Undisputed.

4.   **Project 1599 is a fictitious political entity Burkman and Wohl supported consonant with their trademark political buffoonery.**

**RESPONSE**: Disputed that this statement is material. In addition, Defendants do not cite any evidence in support of this statement. Project 1599 is an organization Burkman and Wohl founded to "influence the 2020 presidential election." Ex. 11 at 57:22–58:02.[2] Burkman described Project 1599 as "the center of election 2020," and claimed in a Project 1599 press release that "the road to the Presidency runs through us." Ex. 12 at 0:00-0:09; Ex. 13.

---

[2] Citations to Exhibits 1-63 refer to the exhibits attached to the Declaration of Franklin Monsour Jr. in support of Plaintiffs' Joint Motion for Summary Judgment (D.E. 216). Citations to Exhibits 64 onward refer to the exhibits attached to the Declaration of Marc P. Epstein submitted in Opposition to Defendants' Motion for Summary Judgment.

5. **Jacob Wohl and Jack Burkman are "lobbyists" and "political" provocateurs. FAC at §§ 15-16. That their actions are "political," and that Plaintiffs find their activities "odious" or offensive, is uncontested. FAC at §§ 15-16.**

RESPONSE: Disputed that this statement is material. In addition, Defendants cannot rely on the First Amended Complaint ("FAC") as evidence supporting or opposing summary judgment and Defendants do not cite any other evidence in support of this statement. This statement also mischaracterizes the allegations in the FAC. *See* D.E. 149 ¶¶ 15–16. Among other things, the FAC alleges that Wohl and Burkman are "political scam artist[s], conspiracy theorist[s], and known fraudster[s]." *Id.* (emphasis added). It describes their conspiracy theories as "odious and false," does not anywhere state Plaintiffs' opinions as to Defendants' "activities," and does not use the word "offensive." *See id.*

6. **That each and every Individual Plaintiff is white is undisputed. Ex. A at 12:2-4; Ex. B at 14:17-19; Ex. D at 10:1-2; Ex. E at 12:10-11; Ex. F at 11:22-24; Ex. G at 15:25-16:1; Ex. H at 13:7-8; Ex. I at 78:12-79:1.**

RESPONSE: Disputed that "each and every Individual Plaintiff is white" is material.

7. **That each and every Plaintiff concedes they were not personally harmed is irrefutable. Ex. A at 53:19-54:3; Ex. B at 54:25-55:12; 59:1-7; Ex. D at 80:10-13; Ex. E at 83:24-84:10; Ex. F at 55:23-56:10; Ex. G at 86:12-15; Ex. H at 48:14-23.**

RESPONSE: Disputed. Each Plaintiff was personally harmed. *See infra* ¶¶ 12–19; D.E. 214 ¶¶ 18–26. Whether Plaintiffs were "personally harmed" also calls for a legal conclusion.

8. **That Plaintiff National Coalition on Black Civic Participation ("NCBCP") did not view the robocall as an attempt to suppress the Black vote, but rather saw it as an attempt to have "Black voters … tricked" into voting in person is undisputed. FAC at § 72.**

5

**RESPONSE**: Disputed. Defendants cannot rely on the FAC as evidence supporting or opposing summary judgment and Defendants do not cite any other evidence in support. To the contrary, NCBCP stated, "[t]his was a voter suppression effort." Ex. 32 ¶ 7. Defendants also mischaracterize the FAC by asserting NCBCP viewed the robocall as "an attempt to have Black voters . . . . tricked" into voting in person "<u>rather</u>" than as an attempt to suppress the Black vote. The FAC alleges that BWR Metro Detroit had at least two concerns. First, "BWR Metro Detroit was immediately and seriously concerned that Defendants' lies and disinformation would intimidate and suppress Black voters." D.E. 149 ¶ 71 (emphasis added). Second, BWR Metro Detroit was "<u>also</u> concerned" that "if more Black voters were tricked into voting in person," they would be in danger because of COVID-19. *Id.* ¶ 72 (emphasis added). Indeed, the FAC does not even allege that NCBCP saw the robocall as an attempt to trick voters into voting in person—just that "<u>if</u> more Black voters were tricked into voting in person," they would be in danger because of COVID-19. *Id.* ¶ 72 (emphasis added).

9. **That all Individual Plaintiffs merely speculated that others would be confused or deterred by the Robocall but were not personally deterred from voting is undisputed. Ex. A at 12:24-13:7; 45:15-47:3; Ex. B at 15:21-24; 50:16-52:18; Ex. C at 21:2-7; Ex. D at 11:2-10; 24:22-25:10; 46:15-20; 38:3-13; Ex. E at 35:22-36:3, 68:4-69:7; 13:1-8; Ex. F at 12:15-19; 40:4-6; Ex. G at 16:15-18; 42:7-18; Ex. H at 14:24-15:4; 37:9-38:12, 40:7-11; Ex. I at 93:6-13.**

**RESPONSE**: Disputed. Plaintiffs' testimony demonstrates that they were "deterred from voting." *See infra* ¶¶ 12–19; D.E. 214 ¶¶ 19–26. Defendants' statement that Individual Plaintiffs were not "deterred by the Robocall" or "personally deterred from voting" is vague and incorrect to the extent it implies that Plaintiffs could not have been deterred from voting if they ultimately

6

voted. *See, e.g.*, Deter, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/deter (last visited Aug. 12, 2022) (defining "deter" as "to prevent someone from doing something or to make someone less enthusiastic about doing something by making it difficult for that person to do it or by threatening bad results if they do it"). Whether Plaintiffs "speculated that others would be confused or deterred by the Robocall" is immaterial.

**10.    NCBCP, a nonpartisan, nonprofit organization describes itself as dedicated to increasing civic engagement and voter participation in Black and underserved communities. NCBCP and its affiliates conceded that NCBCP never received that Robocall. Ex I at 47:1-24; 85:3-25.**

**RESPONSE**: Undisputed that NCBCP is a nonpartisan, nonprofit organization that describes itself as dedicated to increasing civic engagement and voter participation in Black and underserved communities.

Disputed that "NCBCP and its affiliates conceded that NCBCP never received the robocall" is material. In addition, the evidence cited by Defendants does not support this statement. Ramsey testified that she spoke to at least one Black individual whose child received the robocall who described the robocall as "an attack on Black men in the City of Detroit." Ex. 64 at 75:21-77:15. Likewise, her co-chair, Chenita Gary, told Ramsey she was aware of a person who had received the call. *Id.* at 52:18-53:05.

**11.    NCBCP conceded that it did not investigate the accuracy of the Robocall. Ex I.**

**RESPONSE**: Disputed that this statement is material. In addition, Defendants include a single citation to the entirety of Tameka Ramsey's deposition transcript, which does not support

7

this statement. In fact, Ramsey testified that she spoke with an Election Protection work group about the robocall, read a tweet from the Michigan secretary of state saying that "the call in its entirety was false," and had personal knowledge of elections that led to her conclusion that the robocall contained false information. *Id.* at 49:03-10, 50:11-51:02, 74:21-75:02.

**12.     Plaintiff Mary Winter attested she voted in person because she felt it was the more secure way of voting, and because she was afraid mail-in voting might be subjected to partisan tampering. Ex. F at 12:15-19, 30:23-25, 31:1-6.**

<u>**RESPONSE**</u>: Disputed. The evidence cited by Defendants does not support this statement. In the sections of the transcript cited by Defendants, Winter testified that she was "personally intimidated by the robocall," that she found it "very scary and threatening <u>and</u> made me not sure that I could trust that methods of voting were not being targeted for partisan reasons." Ex. 35 at 30:23-31:06. Elsewhere, Winter testified that she had planned on voting by mail in the general election because she was afraid of contracting COVID-19, but because of the robocall she voted in person. Ex. 34 ¶¶ 9, 12–16; Ex. 35 at 30:23-31:06, 33:25-34:05, 39:05-06. She specifically testified that she was "intimidating against voting" by mail. Ex. 65 at 42:18-20. Winter believed the "fear[]mongering about vaccines" and "[t]he threats about outstanding debts and people with criminal histories" were intimidating. *Id.* at 22:05-20, 42:18-20; Ex. 35 at 30:23-31:01. To Winter, the statement, "beware of vote by mail" was intimidating because it "implies that there is something unsafe and something to be wary of." Ex. 35 at 30:06-17. If Winter had fears of partisan tampering with her mail-in ballot, it was because of the robocall: according to Winter, her fear was that "[i]f someone is willing to go to the lengths of creating a false robocall to lie and scare people from voting by mail, I also wonder what else they might be willing to do to block my mail-in

8

ballot." *Id.*; *see also id.* at 31:16-18. Winter also was scared that her "mail-in ballot could be used by someone who wants to track or intimidate [Steinberg]." Ex. 34 ¶ 14.

**13.    Plaintiff Gene Steinberg conceded that he never received the Robocall, but rather that his then live-in girlfriend played it for him. He also testified that he did not find the Robocall intimating or threatening at the time but did not like finding out that voting records are public records, which he finds upsetting. He also voted in-person to be certain that his vote would be counted. Ex. C at 21:2-17.**

<u>RESPONSE</u>: Undisputed that Steinberg's "live-in girlfriend played [the robocall] for him."

Disputed that Steinberg "conceded that he never received the Robocall." Defendants do not cite any evidence in support of this statement. Moreover, Steinberg and Winter lived together and were within a few feet of each other when they received the robocall. Ex. 65 at 21:14-15. Steinberg testified that he "received the robocall," Ex. 66 at 26:12, including several times in response to Defense counsel's own questions that assumed he "received the robocall," *id.* at 31:21-24; Ex. 39 at 45:1-4, 45:14-17, 59:16-22, 63:20-24.

Disputed that Steinberg "testified that he did not find the Robocall intimating or threatening at the time but did not like finding out that voting records are public records, which he finds upsetting." Moreover, Steinberg testified multiple times that he felt "intimidated" by the robocall. *Id.* at 12:25-13:04, 28:24; *see also* Ex. 37 ¶ 11. He also testified that the robocall caused him trauma, Ex. 37 ¶ 13; Ex. 39 at 12:25-13:04, 27:07-13, 28:06-17, 28:23-24, 45:01-13, 48:12-24, 57:13-60:16, 62:19-63:15, 66:14-15, 67:23-25, and that despite not missing a vote since age 18, he is no longer registered to vote and "requested to be removed from the Board of Elections" after

9

moving because he does not want "someone to once again use my information to intimidate me." Ex. 39 at 16:06-17:06, 62:19-63:15.

Disputed that Steinberg "voted in-person to be certain that his vote would be counted." Defendants' statement mischaracterizes Steinberg's testimony. Steinberg testified that he voted in person "<u>because after receiving the robocall</u> I was concerned that the potentially the mail and the mail-in vote may be tampered with somehow, . . . ." *Id.* at 21:12-16.

**14.     Plaintiff Eda Daniel testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call, and that she did not find the Robocall intimidating or threatening. Ex B at 15:21-24, 50:12-15; 59:1-10.**

**RESPONSE**: Disputed that Daniel "testified that the Robocall did not deter her from voting" and that Daniel "did not find the Robocall intimidating or threatening." Defendants' statement is vague and incorrect to the extent it implies that Daniel could not have been deterred from voting if she ultimately voted. *See supra* ¶ 9. Moreover, the evidence cited by Defendants does not support this statement. And the evidence demonstrates Daniel was in fact deterred from voting and found the robocall intimidating and threatening. Daniel testified she was "scared" by the robocall," felt the robocall was "trying to scare me into not voting," Ex. 6 ¶ 5; *see also* Ex. 40 at 32:18-20, 53:09-11, 59:01-07; Ex. 67 at 77:11-13, and that she felt threatened by the robocall, Ex. 67 at 60:17-25. She was "very surprised," "shocked," and "a little frightened" when the robocall said "the police might try to contact you if you vote by mail." Ex. 40 at 32:07-10. She felt "vulnerable by having this stranger invading my home with such pernicious lies." Ex. 6 ¶ 9; Ex. 67 at 38:17-25. The robocall was a "very dark moment" for her. *Id.* at 77:20-24. She is apprehensive of answering the phone when it rings. Ex. 6 ¶ 9; Ex. 40 at 32:18-33:03, 53:01-20,

70:17-25. The robocall also made Plaintiff Eda Daniel feel "diminished" because Daniel has spent thousands of hours on "get out the vote" efforts by knocking on people's doors, going to their homes, leaving literature, and helping to answer questions. *Id.* at 78:09-79:12.

Disputed that Daniel "did not know or speak to any member of the Black community who received the call" is material.

**15.     Plaintiff Andrea Sferes testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call, and that she did not find the Robocall intimidating or threatening. Ex A.at 13:1, 28:19-22; 22:4-25:1.**

**RESPONSE**: Disputed that Sferes "testified that the Robocall did not deter her from voting" and that Sferes "did not find the Robocall intimidating or threatening." Defendants' statement is vague and incorrect to the extent it implies that Sferes could not have been deterred from voting if she ultimately voted. *See supra* ¶ 9. Moreover, the evidence cited by Defendants does not support this statement. And the evidence demonstrates Sferes was in fact deterred from voting and found the robocall intimidating and threatening. Sferes believed the robocall was aimed to dissuade people from voting. Ex. 7 ¶ 7. Listening to the robocall, Sferes was "shocked, furious and sickened," found the robocall "highly persuasive," and "had to try and convince myself that it was not true." *Id.* ¶¶ 7–8. She worried whether her information would be shared with debt collectors. *Id.* ¶ 8. Receiving the robocall caused her to feel "alarmed," "anxious," "angry," and "scared." Ex. 42 at 29:11-15, 43:01-08, 62:10-13. Sferes testified the experience was "emotionally upsetting and impacted me for days after the call." Ex. 7 ¶ 9; *see also* Ex. 68 at 50:07-09.

Disputed that Sferes "did not know or speak to any member of the Black community who received the call" is material.

11

**16.     Plaintiff Karen Slaven testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call, and that she did not find the Robocall intimidating or threatening. Ex E at 13:1-8; 27:7-9; 36:18-25; 37:16-21; 43:18-24; 47:3-8.**

**RESPONSE**: Disputed that Slaven "testified that the Robocall did not deter her from voting" and that Slaven "did not find the Robocall intimidating or threatening." Defendants' statement is vague and incorrect to the extent it implies that Slaven could not have been deterred from voting if she ultimately voted. *See supra* ¶ 9. Moreover, the evidence cited by Defendants does not support this statement. And the evidence demonstrates Slaven was in fact deterred from voting and found the robocall intimidating and threatening. Slaven testified she believed the robocall was "was trying to intimidate me." Ex. 69 at 47:25-48:01; *see also* Ex. 44 ¶ 7. Slaven testified it was "intimidating voters and encouraging them not to participate in voting," because it "said that their private information would be loaded into a public database and that database could be used by law enforcement by credit card companies and possibly . . . by the CDC." Ex. 69 at 24:11-19. She felt that the robocall "was threatening that the police would come after you" and that "[y]our credit card company would come after you and the CDC would target you for mandatory vaccinations." *Id.* at 27:12-19. She also testified she believed the robocall was "designed to be threatening" because "it spoke of targeting your private information, making it available on a public database." *Id.* at 44:15-23; *see also id.* at 46:12-17. Slaven also felt that "the idea that policemen might show up at your door and knock on a door for a warrant gives a threat that there might be physical confrontation." *Id.* at 42:23-43:05. She believed the robocall's statement, "stay safe and beware of vote by mail implied that "voting by mail would put you in

jeopardy" of the threats that the robocall listed. *Id.* at 55:14-18. The robocall also wasted Slaven's time. *Id.* at 82:19-83:20.

Disputed that Slaven "did not know or speak to any member of the Black community who received the call" is material.

**17.     Plaintiff Kate Kennedy testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call, and that she did not find the Robocall intimidating or threatening. Ex D at 11:2-10; 25:11-14.**

**RESPONSE**: Disputed that Kennedy "testified that the Robocall did not deter her from voting" and that Kennedy "did not find the Robocall intimidating or threatening." Defendants' statement is vague and incorrect to the extent it implies that Kennedy could not have been deterred from voting if she ultimately voted. *See supra* ¶ 9. Moreover, the evidence cited by Defendants does not support this statement. And the evidence demonstrates Kennedy was in fact deterred from voting and found the robocall intimidating and threatening. Kennedy testified she believed the robocall "obviously wanted to dissuade [people] from using vote-by-mail because certain people might collect information that would be to their detriment." Ex. 70 at 13:14-19. Kennedy, who helps people register to vote by going "door to door" and by staffing tables at festivals, *id.* at 28:09-18, "knew it was someone trying to scare me into not voting or at least not voting by mail," Ex. 47 ¶ 8. The robocall was designed to intimidate by suggesting to people that if you vote by mail, people would use your information to pursue outstanding warrants, collect outstanding debts, or for mandatory vaccinations. Ex. 70 at 25:23-26:13; 38:14-39:06, 57:10-14, 71:12-23, 82:01-03.

Disputed that Kennedy "did not know or speak to any member of the Black community who received the call" is material.

18.     **Plaintiff Sarah Wolff testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call, and that she did not find the Robocall intimidating or threatening. Ex. H at 14:24-25; 45:17-19; 42:9-16.**

**RESPONSE**: Disputed that Wolff "testified that the Robocall did not deter her from voting" and that Wolff "did not find the Robocall intimidating or threatening." Defendants' statement is vague and incorrect to the extent it implies that Wolff could not have been deterred from voting if she ultimately voted. *See supra* ¶ 9. Moreover, the evidence cited by Defendants does not support this statement. The evidence also demonstrates Wolff was in fact deterred from voting and found the robocall intimidating and threatening. Wolff knew when she picked up the phone that the senders of the robocall were "trying to intimidate me." Ex. 8 ¶ 6. Her impression of the call, based on the "overall tone" and "language," was that it "wanted people to be afraid to vote by mail." Ex. 71 19:13-20:08; *see also id.* at 26:08-19, 38:07-12, 40:02-06, 45:08-16. She believed there was a "mix of borderline truth and an attempt to create doubt in people's minds about the problems that might be involved with voting by mail," which were "scare tactics" in this context because "[y]ou are talking to people who might be concerned because they owe money to a credit card company or might have a warrant." *Id.* at 43:21-44:04. When Wolff received the robocall, she "stopped doing what I was doing, which was my job." Ex. 49 at 47:18-48:13, 49:22-50:04.

Disputed that Wolff "did not know or speak to any member of the Black community who received the call" is material.

19.     **Plaintiff Nancy Hart testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call,**

14

**and that she did not find the Robocall intimidating or threatening. Ex. G 16:15-18; 43:6-11, 53:1-2.**

**RESPONSE**: Disputed that Hart "testified that the Robocall did not deter her from voting" and that Hart "did not find the Robocall intimidating or threatening." Defendants' statement is vague and incorrect to the extent it implies that Hart could not have been deterred from voting if she ultimately voted. *See supra* ¶ 9. Moreover, the evidence cited by Defendants does not support this statement. The evidence also demonstrates Hart was in fact deterred from voting and found the robocall intimidating and threatening. Hart testified she believed the robocall was "menacing" and intended "to intimidate" her, Ex. 72 at 88:22-89:15; *see also id.* at 52:17-19; the robocall wasted her time personally and professionally, *id.* at 53:03-54:13; and her credibility suffered because of the robocall. Ex. 51 at 71:24-72:18, 93:06-94:10.

Disputed that Hart "did not know or speak to any member of the Black community who received the call" is material.

**20.     All Plaintiffs found the call annoying or offensive but voted and speculated that other voters might be intimated by it even though they were not personally intimated by it.**

**RESPONSE**: Disputed. Defendants do not cite any evidence in support of this statement. Moreover, the evidence demonstrates that Plaintiffs were intimidated by the robocall. *See supra* ¶¶ 12–19.

**21.     All concede Mr. Burkman and Mr. Wohl are two conservative political provocateurs, although though Plaintiffs bandy about many more derogatory adjectives to describe the satirical antics of this pair of political muckrakers and publicity hounds.**

15

**RESPONSE**: Disputed. Defendants do not cite any evidence in support of this statement. Moreover, whether Burkman and Wohl are "conservative political provocateurs," "political muckrakers," or "publicity hounds" is immaterial.

**22.     Defendants have illustrated innumerable examples of databases relied upon by investigators and others to locate fugitives and debtors that abstract from Boards of Election records including New York State Board of Election records. Ex J at 7.**

**RESPONSE**: Disputed that this statement is material. Further, the Court should strike the expert report relied upon by Defendants for the reasons discussed in Plaintiffs' letter-motion for leave to file a motion to strike. *See* D.E. 219. Defendants also mischaracterize the expert report, which does not give any examples—let alone "innumerable examples"—of databases relied upon by investigators, but rather describes in general terms Charles Ribando's view of standard practices for investigators and law enforcement officers. This statement also is immaterial because it states that the databases abstract from Board of Elections data, but does not state that the databases use mail-in voting data. It also is immaterial because it is illegal in New York state to using information derived from voter registration records for nonelection purposes. NYS Election Law Section 3-103(5); Ex. 62 at 3.

**23.     In the months preceding the 2020 Election, officials in New York,[3] Michigan,[4] and Ohio[5] confirmed that voting in-person could be undertaken safely and all other relevant states put out information that it was in fact safe to vote in person provided voters followed CDC guidelines.**

---

[3] *See* https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-voting.pdf.
[4] *See* https://www.michigan.gov//media/Project/Websites/coronavirus/Folder14/Recommendations_for_Poll_Workers_and_Election_Officials.pdf?rev=45b773d17ba8442c91c0a2979ec55329.
[5] *See* https://www.ohiosos.gov/globalassets/elections/directives/2020/2020-09-25.pdf.

**RESPONSE**: Disputed. Defendants do not cite any admissible evidence in support of this statement, and it is immaterial. Moreover, the websites cited by Defendants in footnotes (one of which does not work) do not support this statement. They outline steps voters and election officials needed to take to make it <u>safer</u> for them to vote in person, but do not say "it was in fact safe to vote in person provided voters followed CDC guidelines."

### ADDITIONAL STATEMENTS OF UNDISPUTED FACT SUPPORTING DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In addition to the following statements of undisputed fact, Plaintiffs incorporate by reference their Joint Local Civil Rule 56.1 Statement of Undisputed Material Facts. D.E. 214.

**Plaintiff National Coalition on Black Civic Participation ("NCBCP") Diverted Resources to Respond to the Robocall**

1.      Tameka Ramsey (now Tameka Brown) is the lead convenor for the Metro-Detroit affiliate of Black Women's Roundtable and for the Michigan Coalition on Black Civic Participation ("MCBCP"). Ex. 64 at 10:16-20, 22:05-08. NCBCP donated approximately $40,000 to MCBCP in 2020. *Id.* at 24:21-23. MCBCP's budget was approximately $75,000-80,000 in 2020. *Id.* at 24:24-25:02. Its goals in 2020 were "[t]o make sure that all Black people in our respective states were counted for census and to make sure that people voted in the November election." *Id.* at 35:04-18.

2.      Ramsey learned of the August 26, 2020 robocall through an Election Protection working group. *Id.* at 49:03-10, 74:21-75:02. She then reached out to Chenita Gary, a co-chair of the Metro-Detroit affiliate of Black Women's Roundtable in 2020. *Id.* at 32:15-20, 33:01-17; 52:15-53:08, 59:11-16. Ramsey asked Gary if she would do some phone banking in response to the robocall, and to redesignate some of the people making census-related calls in Detroit to calls responding to the robocall. *Id.* at 53:08-24, 55:11-18, 57:14-17, 57:22-58:08.

3.      NCBCP reallocated approximately $10,000 to $20,000 worth of time, technological resources, and paid staff to respond to the robocall. *Id.* at 59:21-60:10. Ultimately, NCBCP spent less time doing census work because of the robocall. *Id.* at 100:23-24. Ramsey and Gary had to spend their own time to focus on the robocall and create a script to respond to the robocall that did not spread further false information, which they used for all of Michigan through the November election. *Id.* at 54:13-22, 55:19-25, 57:01-08, 59:25-60:06; Ex. 74. They had to decide with whom they should be talking and make sure they had the tools and technology to accomplish their goals. Ex. 64 at 59:25-60:06. They had to reallocate dials on ThruTalk, a system that allows individuals to connect directly with recipients without having to dial the numbers themselves. *Id.* at 60:11-15, 61:19-62:05, 20-23. Ramsey also had to speak with Melanie Campbell, the CEO and president of the National Coalition on Black Civic Participation and the convenor of the Black Women's Roundtable, to make her aware of what was going on and to make sure they could do this work in the name of the Michigan coalition. *Id.* at 20:16-20, 60:07-10.

Dated: New York, New York  
           August 12, 2022

Respectfully submitted,

**LETITIA JAMES**  
*Attorney General*  
*State of New York*

By: */s/ Rick Sawyer*  
Jessica Clarke, Chief, Civil Rights Bureau  
Rick Sawyer, Special Counsel  
Colleen Faherty, Assistant Attorney General  
28 Liberty St., 20th Floor  
New York, NY 10005  
(212) 416-8252  
Jessica.Clarke@ag.ny.gov  
Richard.Sawyer@ag.ny.gov  
Colleen.Faherty@ag.ny.gov

By:  */s/ Franklin Monsour Jr.*

Amy Walsh  
Franklin Monsour Jr.  
Rene Kathawala  
Brittany Roehrs  
ORRICK, HERRINGTON & SUTCLIFFE LLP  
51 West 52nd Street  
New York, NY 10019-6142  
(212) 506-5000  
awalsh@orrick.com  
fmonsour@orrick.com  
rkathawala@orrick.com  
broehrs@orrick.com

By: */s/ David Brody*

David Brody (admitted *pro hac vice*)
Marc Epstein
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8600
dbrody@lawyerscommittee.org
mepstein@lawyerscommittee.org

*Attorneys for Plaintiffs*