EXHIBIT 69

# CONFIDENTIAL



## Transcript of **Karen Slaven**

Friday, April 8, 2022

*National Coalition on Black Civic Participation, et al.*
*v. Jacob Wohl, et al.*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 115990

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------X
     NATIONAL COALITION ON BLACK CIVIC
 3   PARTICIPATION, MARY WINTER, GENE STEINBERG,
     NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE
 4   KENNEDY, EDA DANIEL, AND ANDREA SFERES,
                                       Plaintiffs,
 5                             Civil Action No.:
                               20-cv-8668 (VM)(OTW)
 6   People of the STATE OF NEW YORK, by its
     attorney general, LETITIA JAMES, ATTORNEY
 7   GENERAL OF THE STATE OF NEW YORK,
                v.
 8   JACOB WOHL, JACK BURKMAN, J.M. BURKMAN &
     ASSOCIATES, LLC, PROJECT 1599, MESSAGE
 9   COMMUNICATIONS, INC., ROBERT MAHANIAN, and JOHN
     and JANE DOES 1-10,
10                                     Defendants.
     ------------------------------------------------X
11                      April 8, 2022
                        3:48 p.m.
12

13

14       REMOTE CONFIDENTIAL EXAMINATION BEFORE

15   TRIAL of KAREN SLAVEN, the Plaintiffs in the

16   above-entitled action, taken on behalf of the

17   Defendants, held at the above date and time,

18   and taken before Dorene Glover, an RSR Reporter

19   and Notary Public within and for the State of

20   New York.

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2


 3   ORRICK, HARRINGTON & SUTELIFFE
        Attorneys for Plaintiffs
 4      51 West 52nd Street
        New York, New York 10019
 5      BY: AARON GOLD, ESQ.
            RYAN LIND, ESQ.
 6


 7

     GERSTMAN SCHWARTZ, LLP.
 8      Attorneys for Defendants
        60 East 42nd Street
 9      New York, New York 10165
        BY: RANDY KLEINMAN, ESQ.
10          DAVID SCHWARTZ, ESQ.

11


12   LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
        1500 K Street, NW
13      Washington, DC 20005
        BY: DAVID BRODY, ESQ.
14

15
     NYS Office of Attorney General
16      Attorneys for Defendants
        28 Liberty Street
17      New York, New York 10005
        BY: RICK SAWYER, ESQ.
18          COLLEEN FAHERTY, ESQ.

19

20

21

22

23

24

25
```

1  back to it later.
2        Q.   Why did you go back to it?
3        A.   To refresh my memory.
4        Q.   For what purpose?
5        A.   One for this.
6        Q.   When you say, "this," you're
7  referring to the lawsuit?
8        A.   Yes, in the deposition.
9        Q.   What was the specific substance of
10 the call?
11       A.   It was called basically
12 intimidating voters and encouraging them not to
13 participate in voting.
14       Q.   How is it intimidating voters?
15       A.   Because it specifically said that
16 their private information would be loaded into
17 a public database and that database could be
18 used by law enforcement by credit card
19 companies and possibly, you know, by the CDC.
20       Q.   What is your understanding of the
21 term intimidation?
22            MR. GOLD:  Objection.  Calls for a
23       legal conclusion.
24       Q.   You can answer.
25       A.   Basically making statements that

1      Q.   Aside from the phrase you just
2  mentioned, is there any reason -- other reason
3  that you think the caller of the Robocall was
4  Black?
5      A.   Just the feeling I had listening to
6  it.
7      Q.   At the time you received the
8  Robocall, were you intimidated by it?
9      A.   No, I was angered by it.
10     Q.   Well, you mentioned before that --
11  withdrawn.
12          What specifically about the
13  Robocall leads you to believe it was designed
14  to intimidate?
15     A.   Because it was threatening that the
16  police would come after you.  Your credit card
17  company would come after you and the CDC would
18  target you for mandatory vaccinations.  That
19  sounds a little threatening to me.
20     Q.   Now, is it fair to say that that is
21  your opinion?
22     A.   Yes.
23     Q.   Did you research the accuracy of
24  any of the statements contained in the
25  Robocall?

```
 1          A.    I think that a lot of those kinds
 2   of statements are used to intimidate people.
 3          Q.    Can you give me an example?
 4          A.    I think the Robocall was the
 5   example.
 6          Q.    Besides the Robocall, do you have
 7   any other example of an instance where you saw
 8   attempts to intimidate a minority member of
 9   your community from voting?
10          A.    Yes.
11          Q.    When?
12          A.    Aggressive people outside of
13   precincts when voting is going on.
14          Q.    When you say, "aggressive," what
15   exactly do you mean by that?
16          A.    People that are standing and
17   blocking the way and clearly trying to
18   intimidate people.
19          Q.    So is it fair to say in these
20   instances these people are using physical
21   intimidation tactics?
22          A.    Yes.
23          Q.    Looking at the Robocall in
24   paragraph 51, is there anything in the content
25   of that call that threatens physical violence
```

1  in any way?
2       A.   I think the idea that policemen
3  might show up at your door and knock on a door
4  for a warrant gives a threat that there might
5  be physical confrontation.
6       Q.   Could that not happen if you have a
7  pending warrant anyway?
8            MR. GOLD:  Objection.
9       A.   I imagine it could.
10      Q.   Is it your testimony at that --
11 withdrawn.
12           Do you think that you are more
13 intelligent than members of the Black
14 community?
15           MR. GOLD:  Objection.  Harassing
16      question.
17      A.   Certainly not.
18      Q.   Have you personally spoken to any
19 member of the Black community who claims to
20 have been intimidated by the Robocall?
21           MR. GOLD:  Objection.  Asked and
22      answered.
23      A.   I said I didn't have any specific
24 conversations to point to.
25      Q.   Not even as a canvasser?

Trustpoint.One  Alderson.    www.trustpoint.one
www.aldersonreporting.com    800.FOR.DEPO
(800.367.3376)

1            MR. GOLD:  Objection.
2       A.   Not anything specific that I
3   recall.
4       Q.   As you sit here today, do you still
5   believe that members of the Black community are
6   unable to see through the alleged intimidation
7   of the Robocall?
8            MR. GOLD:  Objection.
9       Mischaracterizes prior testimony.
10      A.   I never said what anyone else, said
11  that Robocall intended to intimidate.
12      Q.   At the time you received the
13  Robocall, were you threatened by it?
14      A.   Personally, no.
15      Q.   Do you believe the Robocall was
16  designed to be threatening?
17      A.   Yes.
18      Q.   What specifically about the
19  Robocall did you believe it was designed to be
20  threatening?
21      A.   Because it spoke of targeting your
22  private information, making it available on a
23  public database and all kinds of intimidation.
24      Q.   If those statements were true,
25  would you consider that to be threatening?

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1  threatening.
2      Q.   Is it your testimony that the truth
3  is threatening?
4          MR. GOLD:  Objection.
5      Mischaracterizes.
6      Q.   It's a question.
7      A.   It's my opinion that threatening
8  action against an individual is a threat.
9      Q.   Does the Robocall threaten action
10 against any individual?
11     A.   It implied, yes.
12     Q.   How does the Robocall imply action
13 against an individual?
14         MR. GOLD:  Objection.
15     A.   It's saying your information is
16 going to be made public and that various
17 entities would target you for it because of it.
18     Q.   So that's your opinion that's your
19 opinion, correct?
20         MR. GOLD:  Objection.
21     A.   Yes.
22     Q.   What is your basis for your opinion
23 that the Robocall was designed to threaten the
24 Black community?
25     A.   Its words.

```
 1        Q.    Anything else?
 2        A.    No.
 3        Q.    Have you spoken to any member of
 4   the Black community who claims to have been
 5   threatened by the Robocall?
 6              MR. GOLD:  Objection.
 7        A.    I already said I don't recall any
 8   specific conversations.
 9        Q.    Well, before I ask about
10   intimidation.  Now I'm asking about threats.
11        A.    Seems pretty close to the same
12   thing.
13        Q.    Different question.
14        A.    Same answer.
15        Q.    At the time you received the
16   Robocall, were you personally coerced?
17              MR. GOLD:  Objection, vague.
18        A.    I don't even know what you mean by
19   that.
20        Q.    Do you understand what the word
21   coerced means?
22        A.    I do.
23        Q.    Did you feel coerced by the
24   Robocall?
25        A.    I feel like Robocall was trying to
```

```
 1   intimidate me.
 2        Q.   Were you manipulated by the
 3   Robocall?
 4             MR. GOLD:  Objection.
 5        A.   I was angered by the Robocall.
 6        Q.   Do you typically sue people when
 7   you're angered?
 8             MR. GOLD:  Objection.
 9        Q.   You can answer.
10        A.   No.
11        Q.   Do you think being angry is a
12   reasonable grounds to sue somebody?
13             MR. GOLD:  Objection.
14        A.   The reason I joined the lawsuit is
15   that I believe elections should be fair and all
16   voters should have an equal opportunity to
17   participate and I feel that Robocall was trying
18   to intimidate a portion of our voters into not
19   participating in exercising their rights.
20        Q.   You don't know -- do you know
21   anybody who was -- withdrawn.
22             Do you know anybody who did not
23   vote as a result of receiving the Robocall?
24        A.   I cannot say what people's reasons
25   for not voting would be.
```

1     A.    Very little.
2     Q.    Looking back at Exhibit B to
3  paragraph 51 which has the contents of the
4  Robocalls.  What is your interpretation of the
5  phrase stay safe and be ware of vote by mail?
6         MR. GOLD:  Objection.
7     A.    What was the beginning of the
8  question again?
9     Q.    Sure.  Drawing your attention to
10 the paragraph 51 of the complaint which
11 contains the transcript, what is your
12 interpretation of the phrase, stay safe and be
13 ware of vote by mail?
14    A.    That voting by mail would put you
15 in jeopardy.
16    Q.    What type of jeopardy?
17    A.    Any of those threats that the
18 Robocall listed.
19    Q.    Anywhere in the Robocall does it
20 tell people not to vote at all?
21         MR. GOLD:  Objection.
22    A.    It tells you to be aware of voting
23 by mail.
24    Q.    Does it specifically say do not
25 vote?

```
 1          A.    No.   As I said I don't know who
 2   wrote it.
 3          Q.    What's the nature of your
 4   relationship with the National Coalition of
 5   Black Civic partnership?
 6                MR. GOLD:  Objection.
 7          A.    I don't have one.
 8          Q.    Have you ever spoken to a
 9   representative from the NCPCP?
10          A.    Not that I'm aware.
11          Q.    Are you aware they're a plaintiff
12   in the lawsuit?
13          A.    I wasn't particularly but hearing
14   that in this call --
15          Q.    Aside from Ms. Kennedy and
16   Ms. Daniel, have you had any conversations with
17   any of the other plaintiffs in this lawsuit?
18          A.    I don't think so.
19          Q.    As a result of the Robocall, did
20   you sustain any financial losses?
21                MR. GOLD:  Objection.
22          A.    A waste of my time.
23          Q.    Would you characterize that as a
24   financial loss?
25          A.    Sure.  I could have been working.
```

Karen Slaven     CONFIDENTIAL     4/8/2022
Case 1:20-cv-08668-JSR  Document 242-6  Filed 08/12/22  Page 15 of 16
Page 83

```
 1         Q.    How much work did you miss out on
 2   because of the Robocall?
 3               MR. GOLD:   Objection.
 4         A.    No idea.
 5         Q.    How much money did you lose out on
 6   because of the Robocall?
 7         A.    No idea.
 8         Q.    Are you paid hourly or are you on
 9   salary?
10               MR. GOLD:   Objection.
11         A.    Salary.
12         Q.    Were you -- are you alleging that
13   you took time off of work because of the
14   Robocall?
15         A.    No.
16         Q.    So how is it that the Robocall
17   forced you to miss work?
18         A.    I'm just saying it's wasting my
19   time.  You are the one that asked me to
20   quantify how that time would cost me.
21         Q.    Aside from your wasted time, did
22   you waste time as a result of the Robocall?
23         A.    No.
24         Q.    As a result of the Robocall, did
25   you sustain any psychological or emotional
```

```
                    C E R T I F I C A T E


STATE OF NEW YORK      )
                   ss.:
COUNTY OF BRONX        )



        I, DORENE GLOVER, a Notary Public for
and within the State of New York, do hereby
certify:
        That the witness whose examination is
hereinbefore set forth was duly sworn and that
such examination is a true record of the
testimony given by that witness.
        I further certify that I am not related
to any of the parties to this action by blood
or by marriage and that I am in no way
interested in the outcome of this matter.
        IN WITNESS WHEREOF, I have hereunto set
my hand this 26th day of April, 2022.


                        _____
                                DORENE GLOVER
```