IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES,<br><br>Plaintiffs,<br><br>-and-<br><br>People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1–10,<br><br>Defendants. | Civil Action No. 20-cv-8668 |

**PLAINTIFFS' JOINT REPLY TO DEFENDANTS' LOCAL CIVIL RULE 56.1 COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York, Plaintiffs National Coalition on Black Civic Participation, Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, Andrea Sferes, and Plaintiff-Intervenor People of the State of New York (collectively, "Plaintiffs") respectfully submit this Reply to Defendants' Local Civil Rule Counter-Statement to Defendants' Local Civil Rule 56.1 Counter-Statement of Undisputed Material Facts. Plaintiffs incorporate by reference their Counterstatement in Opposition to Defendants' Rule 56.1 Statement and additional

statements of undisputed fact supporting denial of Defendants' motion for summary judgment. D.E. 241.

As a preliminary matter, the Court may treat Defendants' use of "demurrer" in response to paragraphs 4, 7–10, 12–17, and 27 as admissions that the factual content of the respective statements is undisputed. *See Valenzuela v. Putnam County.*, No. 17-CV-8923 (CS), 2020 WL 5370195, at *1 n.2 (S.D.N.Y. Sept. 8, 2020) (considering assertions of fact that opposing parties "failed to properly address" to be undisputed); *Cruz v. Wyckoff Heights Med. Ctr.*, No. 13 CIV. 8355 (ER), 2016 WL 4533568, at *1 (S.D.N.Y. July 19, 2016) (deeming admitted paragraphs to which there were "boilerplate responses").

Moreover, the Court can strike Defendants' responses that do not cite or rely on admissible evidence and deem undisputed the underlying statements, including paragraphs 1–4, 6–18, 27, and 29–30. *See, e.g.*, *Feis v. United States*, 394 F. App'x 797, 799–800 (2d Cir. 2010) (affirming district court's decision to decline to consider as disputed "any statement supported by admissible evidence to which Plaintiff objects, *but does not support with evidence*"); *Cruz*, 2016 WL 4533568, at *2 (refusing to consider statements that "do not cite to any admissible evidence in the record"); *Dasrath v. Stony Brook Univ. Med. Ctr.*, No. 12-CV-1484 (SJF)(SIL), 2015 WL 1223797, at *1 n.1 (E.D.N.Y. Mar. 17, 2015) ("Statements in the Def. 56.1 Stmt. to which plaintiff objected but failed to provide a citation to the evidence as required by Local Rule 56.1(d) are not considered disputed.").

Finally, Defendants cannot prevent summary judgment by asserting disputes of immaterial facts. *See, e.g.*, *Creaven v. Erickson*, No. 19-CV-330(DRH)(SIL), 2022 WL 2643500, at *2 n.3 (E.D.N.Y. Mar. 24, 2022) (granting summary judgment where there was dispute as to immaterial fact).

**Defendants send a robocall urging voters to "beware of vote by mail."**

1.      On August 26, 2020, Message Communications, Inc. transmitted a robocall from an account held by Defendant J.M. Burkman and Associates ("JMBA") to approximately 85,000 phone numbers across the United States. Ex. 1 at MESSAGE0000035–36; Ex. 2 at 56:04-18, 58:03–64:25; Sawyer Decl. ¶¶ 2–3.

**RESPONSE**: Agree that Message Communications, Inc. transmitted a robocall but dispute that this number constituted the actual number of recipients. Indeed, a far smaller number of recipients are believed to have received the call live or on their answering machines. *See* Docket No. 49 (demonstrating approximately 29,117 "recipients" – *i.e.*, live answer or answering machine versus the 85,303 calls "transmitted"); *see also* Docket Nos. 50 and 52 (demonstrating that (See approximately 29,117 corrective calls were issued.).

**REPLY TO RESPONSE**: Defendants do not dispute that Message Communications, Inc. transmitted a robocall to tens of thousands of recipients from an account held by Defendant JMBA. Defendants' additional response is immaterial and unsupported. *See* D.E. 241 ¶ 1.

2.      Among the recipients of the robocall were 5,494 phone numbers with New York area codes. Sawyer Decl. ¶ 2.

**RESPONSE**: Dispute that 5,494 New Yorkers *received* the robocall. Given the effective ratio of calls transmitted versus calls received, it suggests that only approximately 1,400 calls were received in New York State. *See*, *e.g.*, Docket No. 50.

**REPLY TO RESPONSE**: Defendants do not dispute that at least 1,400 calls were received in New York State. Defendants' additional response is immaterial and unsupported. *See* D.E. 241 ¶ 2.

3. **Caller ID showed that the robocall came from Defendant Jack Burkman's personal phone number under his name. Ex. 3 at MESSAGE0007669; Ex. 4 at MESSAGE0007700; Ex. 1 at MESSAGE0000035–36; Ex. 5 ¶¶ 3, 5; Ex. 6 ¶ 3; Ex. 7 ¶ 4; Ex. 8 ¶ 4.**

**RESPONSE**: Agree, but note that the Robocall was transmitted by Message Communications, Inc.

**REPLY TO RESPONSE**: Paragraph 3 is undisputed.

4. **The robocall contained the following message: "Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail." Ex. 9; Ex. 10 at DEF005683.**

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 4 is undisputed.

5. **Project 1599 is an organization Burkman and Wohl founded to "influence the 2020 presidential election." Ex. 11 at 57:22–58:02. Burkman described Project 1599 as "the center of election 2020," and claimed in a Project 1599 press release that "the road to the Presidency runs through us." Ex. 12 at 0:00-0:09; Ex. 13 at AFarragut-00000076.**

**RESPONSE**: Disputed. Project 1599 is a fictitious political entity Burkman and Wohl supported consonant with their trademark political buffoonery. As conceded in the Federal

4

Communications' Commissions' Notice of Apparent Liability for Forfeiture "Project-1599" is not a legal entity. *See* FCC Notice of Apparent Liability for Forfeiture at fn. 6.

**REPLY TO RESPONSE**: Defendants do not dispute that Burkman and Wohl founded Project 1599. Defendants' additional response is unsupported by evidence and immaterial—whether Project 1599 is a legal entity has no effect on its capacity to be sued. *See* Fed. R. Civ. P. 17(b)(3) (an "unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws").

**6. In 2019, Wohl drafted a "confidential brief" for the Arlington Center for Political Intelligence, "a conservative political intelligence and advocacy organization" that could "affect[] political outcomes" by targeting "important Demographics of Democrat voters," including Black voters. Ex. 14 at DEF004340, 4347; Ex. 15. According to the brief, "the Russian Internet Research Agency proved in 2016[] building up leftwing internet properties that aim to ultimately suppress turnout is an effective strategy," and proposed to conduct "a voter-suppression effort"; "[b]uild up left-wing online properties with a large following, only to have those properties direct followers to NOT vote come election day"; and "make shit up." Ex. 14 at DEF004341, DEF004345, DEF004347.**

**RESPONSE**: Disputed insofar as the record does not establish authorship (or relevance) of the so-called "confidential brief" for the Arlington Center for Political Intelligence.

**REPLY TO RESPONSE**: Defendants do not dispute the content of the ACPI document. Defendants' response regarding the authorship of the ACPI brief does not cite any evidence nor explain how Plaintiffs' evidence does not establish this paragraph. *See* D.E. 216-15 at 11 ("[I]n an interview with The Post, Wohl acknowledged that the document was in fact a draft of his plan

. . . ."). To the contrary, in Defendants' memorandum of law in support of their motion for summary judgment, Defendants admitted that the ACPI document was "Defendants' conduct" and characterized it as Defendants' "literary musings." *See* D.E. 209 at 21. Plaintiffs are also entitled to adverse inferences from Defendants pleading the Fifth Amendment at their depositions and in their responses to Requests for Admission. Reply Declaration of Franklin Monsour Jr. Ex. 77 at 258:05-22 (pleading the Fifth in response to questions asking whether Wohl drafted the ACPI brief), 264:02-14 (pleading the Fifth in response to questions asking whether Wohl admitted to the Washington Post that he authored the ACPI document); *id.* Ex. 78 at 16 (pleading the Fifth in response to RFA that "Jacob Wohl and Burkman created the ACPI Prospectus produced in discovery as DEF004335-DEF004351"); D.E. 213 at 10 (discussing Plaintiffs' entitlement to adverse inferences).

7. **On August 19, 2020, Wohl emailed Burkman, "we must HIJACK this boring election." Ex. 16 at NYOAG0009794. Burkman responded, "yes America needs w b."** *Id.*

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 7 is undisputed.

8. **That same day, Burkman emailed Robert Mahanian saying that "[I]'d like to send another 1000 and buy more calls." Ex. 17 at MESSAGE0007724. Mahanian replied to Burkman's email with payment instructions, and Burkman responded "[c]heck to you Robert just went out in the 2 day pouch you will have in 2-3 days then we attack."** *Id.* **at MESSAGE0007723.**

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 8 is undisputed.

9.     **Burkman paid Message Communications $1,000 for the robocall with check number 19921 from the JMBA bank account at Chase Bank. Ex. 18 at DEF003635; Ex. 1 at MESSAGE0000035–36; Ex. 19 at 168:16-169:08. JMBA is Burkman's lobbying firm. Ex. 19 at 24:03-12, 26:05-20.**

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 9 is undisputed.

10.     **Burkman subsequently emailed Mahanian multiple times to confirm whether Mahanian had received the check and told Mahanian that he and Wohl were "ready to begin the robo calls!!!" Ex. 20 at MESSAGE0007729; Ex. 4 at MESSAGE0007700. Mahanian later confirmed, "I did receive the check (Check # 19921) today and credited your account just a moment ago. You are all set, thank you!" Ex. 4 at MESSAGE0007700. A record of account activity for the JMBA account at Message Communications shows that check number 19921 paid for the robocall. Ex. 1 at MESSAGE0000035–36.**

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 10 is undisputed.

11.     **On August 24, 2020, Wohl hired a voice actress named Jana Hunt to read "1599 Spot Script 1.dox," a document with the text of the Project 1599 Robocall. Ex. 22 at DEF005559–60, DEF005562; Ex. 10 at DEF005683.**

**RESPONSE**: Disputed as to the characterization of the term "hired," and otherwise demurrer.

**REPLY TO RESPONSE**: Defendants do not dispute the accuracy of paragraph 11 and do not explain the basis for their objection to the term "hired." Defendants produced the documents

showing that they hired Ms. Hunt in response to an order from this Court compelling them to produce records of who voiced the robocall on their behalf. D.E. 190.

12.     **Wohl found Hunt through a Craigslist post titled "Los Angeles Black Female Voice Over," and corresponded with Hunt via the email address nexcapitalmanagement@gmail.com. Ex. 22 at DEF005559–60. Nex Capital Management was the name of Wohl's investment firm. Ex. 23 at 2.**

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 12 is undisputed.

13.     **Wohl paid Hunt a retainer fee of $50 through Cash App with the memo "For voice over." Ex. 24 at DEF005571. Hunt then sent Wohl a watermarked audio recording of her reading the robocall script. Ex. 22 at DEF005568; Ex. 25. Wohl responded, "This sounds wonderful. Please send normal file," and paid Hunt $200 via Cash App with the memo "For Vote By Mail VO, remaining payment." Ex. 22 at DEF005569 (nexcapitalmanagement@gmail.com email to Jana Hunt); Ex. 24 at DEF005572 (Cash App screenshot to Jana Hunt). That day, Hunt sent Wohl a non-watermarked copy of the audio. Ex. 22 at DEF005570 (Email with Jana Vote By Mail VO.wav attached); Ex. 26.**

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 13 is undisputed.

14.     **On August 25 at 12:10 am, Wohl emailed Burkman an audio file named "1599 Vote By Mail Robo Call.wav" and wrote, "Attached is the audio file for the robo call. We should send it to black neighborhoods in Milwaukee, Detroit, Philadelphia, Charlotte, Richmond, Atlanta, and Cleveland." Ex. 27 at DEF003283 (Email Wohl to Burkman). Burkman responded, "cleveland phila minn chicago nyc detroit."** *Id.* **at DEF003284**

8

**(Burkman email to Wohl). The audio file was the one that Wohl later uploaded as the Project 1599 Robocall and was identical to the one Hunt sent to Wohl. Ex. 25; Ex. 26; Ex. 9.**

**RESPONSE**: Demurrer, while noting that this is indicative of Defendants' trademark political satire and hyperbole.

**REPLY TO RESPONSE**: Paragraph 14 is undisputed. Defendants' additional response is immaterial and unsupported by evidence.

**15.    Later that day, Burkman logged into the JMBA Message Communications account from IP address 73.172.31.180 and set the system to send the robocall to ZIP codes in the following cities: Cleveland, Ohio (44104, 44108, 44112), Minneapolis, Minnesota (55454), Chicago, Illinois (60649, 60623, 60653), Pittsburgh, Pennsylvania (15218, 15219), Detroit, Michigan (48219, 48223, 48234), New York, New York (10004, 10001), Philadelphia, Pennsylvania (19132, 19133, 19120, 19121, 19134, 19135), and Arlington, Virginia (22209). Ex. 1 at MESSAGE0000035; Ex. 28 at MESSAGE0007929; Ex. 29 at MESSAGE0007675; Ex. 19 at 9:19-24. Burkman emailed Wohl with the message "data all loaded ready many zip codes," and asked Wohl to "do me one favor just go in and upload the recording message communications.com account 12013 passcode 5202." Ex. 27 at DEF003285.**

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 15 is undisputed.

**16.    On August 26, 2020, Wohl uploaded the Project 1599 Robocall's audio, a file titled "1599VotebyMailRoboCall.wav," to JMBA's Message Communications' account, account number 12013, and initiated the robocalls from the IP address 216.207.67.2. Ex. 1 at MESSAGE0000035–36. Wohl later emailed Mahanian and Burkman from the same IP**

9

address to confirm that the Project 1599 Robocall upload was successful. Ex. 30 at MESSAGE0007716–19 (email Wohl to Mahanian and Burkman).

**RESPONSE**: Demurrer.

**REPLY TO RESPONSE**: Paragraph 16 is undisputed.

17.     Hours after the Project 1599 Robocall was broadcasted, Burkman emailed Wohl, "i love these robo calls getting angry black call backs win or lose the black robo was a great jw idea." Ex. 31 at DEF003819.

**RESPONSE**: Demurrer, while noting that this is indicative of Defendants' trademark political satire and hyperbole.

**REPLY TO RESPONSE**: Paragraph 17 is undisputed. Defendants' additional response is immaterial and unsupported by evidence.

18.     Plaintiff National Coalition on Black Civic Participation ("NCBCP") is a non-partisan nonprofit organization dedicated to increasing civic engagement and voter participation in Black and underserved communities. Ex. 21 at NCBCP003. NCBCP seeks to engage people in all aspects of public life, including voting, and to encourage participation in a fair, just and barrier-free democracy. Ex. 21 at NCBCP003, 005. Black Women's Roundtable ("BWR") is a program run by NCBCP that "works to engage, educate, organize, and mobilize Black Americans of all ages to participate in our democracy." Ex. 32 ¶ 4. The Metro Detroit chapter of BWR had been running a call center in the Detroit area to promote participation in the 2020 U.S. Census. *Id.* ¶¶ 6, 10; Ex. 33 at 25:19-25, 35:14-21, 53:17-22. Upon learning of Defendants' robocall, the chapter knew that deceptive and false information about voting by mail would intimidate and scare the communities it serves, especially Black voters. Ex. 32 ¶¶ 7, 10; Ex. 33 at 77:08-15, 80:24-81:01. It diverted staff and

**resources from its census operation and instead used the call center instead to respond to the robocall. Ex. 32 ¶ 10; Ex. 33 at 53:09-54:05, 55:11-25, 59:05-60:10.**

**RESPONSE**: Disputed as to allegations that the Robocall contained "deceptive and false information about voting by mail" and any intimation that the Robocall was intimidating. *See e.g.*, Docket No. 211 at Ex. J; *U.S. v. Turner*, 720 F.3d 411, 420 (2d. Cir. 2013); *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967).

**REPLY TO RESPONSE**: Defendants do not dispute any of the factual statements in paragraph 18. The Court also can strike Defendants' response because it merely asserts an improper legal conclusion. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015) (disregarding improper legal conclusions in Rule 56.1 statement), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019). Moreover, Plaintiffs have moved to strike Defendants' expert. D.E. 219.

**19.    Plaintiff Mary Winter was a resident of and registered to vote in Rockland County, New York, when she received the robocall. Ex. 34 ¶¶ 3–4; Ex. 35 at 12:02-10; Ex. 36. Winter found the robocall to be "very scary and threatening." Ex. 35 at 31:03-04. Winter had been taking precautions during the COVID-19 pandemic to protect herself and Plaintiff Gene Steinberg, including socially distancing from others and minimizing in-person interactions. Ex. 34 ¶ 8; Ex. 35 at 54:09-11. Winter had planned on voting by mail in the general election because she was afraid of contracting COVID-19, but because of the robocall she voted in person. Ex. 34 ¶¶ 9, 12–16; Ex. 35 at 30:23-31:06, 33:25-34:05, 39:05-06.**

**RESPONSE**: Disputed, Plaintiff Mary Winter attested she voted in person because she felt it was the more secure way of voting, and because she was afraid partaking in Mail-in-Voting might be subject to partisan tampering. *See* Ex. F at 12:15-19, 30:23-25, 31:1-6.

**REPLY TO RESPONSE**: Defendants' response is unsupported and contradicted by Winter's testimony. *See* D.E. 241 ¶ 12.

20. **Plaintiff Gene Steinberg was a resident of and registered to vote in Rockland County, New York, when he heard the robocall. Ex. 37 ¶¶ 3–4; Ex. 38; Ex. 39 at 16:01-05, 63:12-13. Steinberg had been taking precautions during the COVID-19 pandemic to protect himself and Winter, including socially distancing from others and minimizing in-person interactions. Ex. 37 ¶ 7; Ex. 39 51:06-18, 52:11-18, 56:24-57:04. Steinberg had planned on voting by mail in the general election because he was afraid of contracting COVID-19, but because of the robocall he voted in person. Ex. 37 ¶¶ 8, 11–12, 14–15; Ex. 39 at 21:08-16, 43:19-20. Steinberg has a past nonviolent criminal conviction. Ex. 37 ¶ 13. "The robocall was particularly traumatic" for Steinberg because of his past nonviolent criminal conviction, and the robocall's threats regarding law enforcement caused him to "relive earlier traumas." *Id.*;** *see also* **Ex. 39 at 12:25-13:04, 27:07-13, 28:06-17, 28:23-24, 45:01-13, 48:12-24, 57:13-60:16, 62:19-63:15, 66:14-15, 67:23-25. Steinberg further testified that, despite not missing a vote since age 18, he is no longer registered to vote and "requested to be removed from the Board of Elections" after moving because he does want "someone to once again use my information to intimidate me." Ex. 39 at 16:06-17:06, 62:19-63:15.**

**RESPONSE**: Disputed, Plaintiff Gene Steinberg conceded that he never received the Robocall, but rather that his then live-in girlfriend played it for him. He also testified that he did not find the Robocall intimating or threatening at the time but did not like finding out that voting

records are public records, which he finds upsetting. He also voted in-person to be certain that his vote would be counted. *See* Ex. C at 21:2-17.

**REPLY TO RESPONSE**: Defendants' response is unsupported and contradicted by Steinberg's testimony. *See* D.E. 241 ¶ 13.

21.     **Plaintiff Eda Daniel was a resident of and registered to vote in East Cleveland, Ohio, when she received the robocall on her cordless landline phone. Ex. 6 ¶¶ 3–4; Ex. 40 at 14:20-15:03; Ex. 41. The robocall made her feel "angry," powerless," and "threatened." Ex. 6 ¶ 9; Ex. 40 at 32:08-18, 51:21-22, 59:17-25, 78:09-79:12. She is apprehensive of answering the phone when it rings. Ex. 6 ¶ 9; Ex. 40 at 32:18-33:03, 53:01-20, 70:17-25.**

**RESPONSE**: Disputed, Plaintiff Eda Daniel testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call, and that she did not find the Robocall intimidating or threatening. *See* Ex. B at 15:21-24, 50:12-15; 59:1-10.

**REPLY TO RESPONSE**: Defendants' response is unsupported and contradicted by Daniel's testimony. *See* D.E. 241 ¶ 14.

22.     **Plaintiff Andrea Sferes was a resident of and registered to vote in Westchester County, New York, when she received the robocall. Ex. 7 ¶ 3; Ex. 42 at 12:05-18; Ex. 43. Sferes had outstanding medical debt when she received the robocall. Ex. 7 ¶ 8. Sferes found the robocall "highly persuasive" and worried whether her information would be shared with debt collectors. *Id.* ¶¶ 7–8. Receiving the robocall caused her to feel "alarmed," "anxious," "angry," and "scared." Ex. 42 at 29:11-15, 43:01-08, 62:10-13.**

**RESPONSE**: Disputed, Plaintiff Andrea Sferes testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received

13

the call, and that she did not find the Robocall intimidating or threatening. *See* Ex A.at 13:1, 28:19-22; 22:4-25:1.

**REPLY TO RESPONSE**: Defendants' response is unsupported and contradicted by Sferes's testimony. *See* D.E. 241 ¶ 15.

**23.     Plaintiff Karin Slaven was a resident of and registered to vote in Cuyahoga County, Ohio, when she received the robocall on her and Plaintiff Kate Kennedy's cordless landline phone. Ex. 44 ¶¶ 3–4; Ex. 45 at 12:12-25; Ex. 46. The robocall angered her. Ex. 44 ¶ 7; Ex. 45 at 37:22–23. She was particularly angry and frustrated because she spends hours canvassing her neighborhood trying to educate people about voting, and the robocall detracted from her efforts. Ex. 45 at 85:23-86:14.**

**RESPONSE**: Disputed, Plaintiff Karen Slaven testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call, and that she did not find the Robocall intimidating or threatening. *See* Ex. E at 13:1-8; 27:7-9; 36:18-25; 37:16-21; 43:18-24; 47:3-8.

**REPLY TO RESPONSE**: Defendants' response is unsupported and contradicted by Slaven's testimony. *See* D.E. 241 ¶ 16.

**24.     Plaintiff Kate Kennedy was a resident of and registered to vote in Cuyahoga County, Ohio, when she received the robocall on her and Slaven's cordless landline phone. Ex. 47 ¶¶ 3–4; Ex. 48 at 10:09-11:04; Ex. 46. The robocall upset and angered her. Ex. 47 ¶¶ 7–8; Kennedy Dep. 61:06-11, 81:12-18.**

**RESPONSE**: Disputed, Plaintiff Kate Kennedy testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who

14

received the call, and that she did not find the Robocall intimidating or threatening. *See* Ex D at 11:2-10; 25:11-14.

**REPLY TO RESPONSE**: Defendants' response is unsupported and contradicted by Kennedy's testimony. *See* D.E. 241 ¶ 17.

**25.     Plaintiff Sarah Wolff was a resident of and registered to vote in New York County, New York, when she received the robocall. Ex. 8 ¶¶ 3–4; Ex. 49 at 13:22-14:11; Ex. 50. The efforts to dissuade people from voting infuriated her. Ex. 8 ¶ 7; Ex. 49 at 47:18-48:13, 49:25-50:04.**

**RESPONSE**: Disputed, Plaintiff Sarah Wolff testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received the call, and that she did not find the Robocall intimidating or threatening. *See* Ex. H at 14:24-25; 45:17-19; 42:9-16.

**REPLY TO RESPONSE**: Defendants' response is unsupported and contradicted by Wolff's testimony. *See* D.E. 241 ¶ 18.

**26.     Plaintiff Nancy Hart was registered to vote in Allegheny County, Pennsylvania, when she received the robocall on her cordless landline phone. Ex. 5 ¶¶ 2–3; Ex. 51 at 16:10-11; Ex. 52. Hart was "irate because of the robocall. Ex. 5 ¶ 7. The robocall particularly angered her because she spends a lot of time encouraging other people to vote and promoting voting as a civic duty, and the robocall sought to undermine confidence in the voting process. Ex. 5 ¶¶ 9–10; Ex. 51 at 71:24-72:22, 93:06-94:10.**

**RESPONSE**: Disputed, Plaintiff Nancy Hart testified that the Robocall did not deter her from voting, that she did not know or speak to any member of the Black community who received

15

the call, and that she did not find the Robocall intimidating or threatening. *See* Ex. G 16:15-18; 43:6-11, 53:1-2.

**REPLY TO RESPONSE**: Defendants' response is unsupported and contradicted by Hart's testimony. *See* D.E. 241 ¶ 19.

**27.     On October 26, 2021, Burkman and Wohl admitted to the Court that they prepared the Project 1599 Robocall message and caused it to be sent.  Ex. 53 at 12–13, 15. In a brief submitted in support of a motion to quash in Michigan, Burkman and Wohl's attorneys stated, "A couple months before the November 2020 election, Burkman and Wohl, two conservative provocateurs, disseminated a robocall in the 313-area code." Ex. 54 at 1. At a hearing in Michigan state court, Defendants' attorney stated, "They outline in the e-mails why they did this robo call." Ex. 55 at 10:19-20.**

**RESPONSE**: Agree that all parties concede Defendants are political provocateur, but Demurrer as to the remainder.

**REPLY TO RESPONSE**: Paragraph 27 is undisputed. Defendants' additional response is immaterial and unsupported by evidence.

**28.     New York's election law prohibits using information in the statewide voter registration for non-election purposes. N.Y. Election Law § 3-103(5); Declaration of Douglas Kellner ("Kellner Decl.") ¶ 22. In New York, "there is no database that police departments, credit card companies, the Centers for Disease Control, or anyone else may access to show voters who used or applied for absentee ballots for any purpose other than the conduct of elections." *Id.* ¶ 22.**

**RESPONSE**: Disputed, as Defendants have illustrated innumerable examples of databases relied upon by investigators and others to locate fugitives and debtors that abstract from Boards of

16

Election records including New York State Board of Election records. *See* Docket No. 211 at Ex. J at 7; Docket No. 40 at Ex. No. 1 and 2.

**REPLY TO RESPONSE**: Defendants' response is unsupported by evidence. Defendants' expert report, which Plaintiffs have moved to strike, does not constitute evidence. Moreover, Defendants' expert conceded at his deposition that the Election Law does not permit use of election records for non-election purposes and does not include an exemption for law enforcement, credit card companies, or the CDC. D.E. 219-2 at 230:23-31:25, 232:05-12, 233:11-34:07. The exhibits listed at Docket No. 40 are hearsay not within any exception and also do not address the illegality of using New York's statewide voter registration for non-election purposes.

**29.    During the 2020 election, in the middle of the COVID-19 pandemic, the State of New York adopted several measures to ensure that all voters could access the ballot without contracting COVID-19. Chief among these was ensuring that all eligible voters could vote by absentee or so-called vote-by-mail ballots.** *Id.* **¶ 18. During the course of the election cycle, the State adopted numerous laws, regulations, and executive orders to expand absentee balloting, also known as vote-by-mail.** *Id.* **¶¶ 10–16. Absentee ballots are an efficient and effective voting method and often the only viable method for voters who have difficulty or cannot vote in person at the polls.** *Id.* **¶ 17.**

**RESPONSE**: Disputed, because in the months preceding the 2020 Election, officials in New York,[1] Michigan,[2] and Ohio[3] confirmed that voting in-person could be undertaken safely and all other relevant states put out information that it was in fact safe to vote in person provided voters followed CDC guidelines.

---

[1] *See* https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-voting.pdf.
[2] *See* https://www.michigan.gov//media/Project/Websites/coronavirus/Folder14/Recommendations_for_Poll_Workers_and_Election_Officials.pdf?rev=45b773d17ba8442c91c0a2979ec55329
[3] *See* https://www.ohiosos.gov/globalassets/elections/directives/2020/2020-09-25.pdf

**REPLY TO RESPONSE**: Defendants' response does not cite any "public notice" posted by the New York State Board of Elections (the first footnote cites a document generated by New York City's Department of Health—an unrelated entity), and each of those documents is hearsay not within any exception. The cited material is irrelevant to Kellner's statement of New York State's interest and expenditure of resources promoting and expanding the use of absentee ballots.

**30.** **Douglas Kellner, the commission of elections, stated that the Project 1599 Robocall "would have had the capacity to undermine, interfere, and conflict with the [New York] State Board's and the local BOEs' efforts to inform voters of their rights with respect to absentee ballots, as well as the State's common-sense measures to expand the use of absentee ballots in light of the COVID-19 pandemic."** *Id.* **¶ 24.**

**RESPONSE**: Disputed, as Commissioner Kellner's opinion rendered in 2022 conflicts with the public notice posted by his agency, as well as related agencies throughout the country, which stated that in-person voting was safe.[4]

**REPLY TO RESPONSE**: Defendants' response does not cite any "public notice" posted by the New York State Board of Elections (the first footnote cites a document generated by New York City's Department of Health—an unrelated entity), and each of those documents is hearsay not within any exception. The cited material is irrelevant to Kellner's statement of New York State's interest and expenditure of resources promoting and expanding the use of absentee ballots.

---

[4] *See* notes 1–3, *supra*.

Dated: New York, New York
       August 19, 2022

**LETITIA JAMES**
*Attorney General*
*State of New York*

By: /s/ *Rick Sawyer*
Jessica Clarke, Chief, Civil Rights Bureau
Rick Sawyer, Special Counsel
Colleen Faherty, Assistant Attorney General
28 Liberty St., 20th Floor
New York, NY 10005
(212) 416-8252
Jessica.Clarke@ag.ny.gov
Richard.Sawyer@ag.ny.gov
Colleen.Faherty@ag.ny.gov

Respectfully submitted,

By:  /s/ *Franklin Monsour Jr.*

Amy Walsh
Franklin Monsour Jr.
Rene Kathawala
Brittany Roehrs
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
(212) 506-5000
awalsh@orrick.com
fmonsour@orrick.com
rkathawala@orrick.com
broehrs@orrick.com


By: /s/ *David Brody*

David Brody (admitted *pro hac vice*)
Marc Epstein
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8600
dbrody@lawyerscommittee.org
mepstein@lawyerscommittee.org

*Attorneys for Plaintiffs*