# epic.org

**Electronic Privacy Information Center**
1519 New Hampshire Avenue NW
Washington, DC 20036, USA



📞 +1 202 483 1140
🖨 +1 202 483 1248
🐦 @EPICPrivacy
🌐 https://epic.org

<u>**BY ECF**</u>

August 23, 2022

Honorable Victor Marrero
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:     *National Coalition on Black Civic Participation, et al. v. Wohl et al.*, No. 1:20-cv-8668

Dear Judge Marrero:

The Electronic Privacy Information Center ("EPIC") respectfully moves through this letter for leave to submit an *amicus curiae* brief in support of Plaintiffs' and Plaintiff-Intervenor's Motion for Summary Judgment with respect to the federal law claims in this case.[1] Plaintiffs and Plaintiff-Intervenor consent to this motion. Defendants do not consent to this motion.

There is no applicable rule of civil procedure governing *amicus curiae* briefs, so "[d]istrict courts have broad discretion to permit or deny an appearance as amicus curiae in a case." *In re GLG Life Tech Corporation Securities Litigation*, 287 F.R.D. 262, 265 (S.D.N.Y. 2012) (internal quotation marks omitted). "An *amicus* brief should normally be allowed . . . when an *amicus* has unique information or perspective that can help the court." *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007). District courts "are not bound by Rule 29 [of the Federal Rules of Appellate Procedure], but sometimes look to it for guidance when reviewing a request to file an amicus brief." *Id.* at *1, n.1. When a party objects to the filing of an amicus brief by a private party and leave to file a brief is sought, "Rule 29(b) provides that the motion for leave to file must be accompanied by the proposed brief and must state: (1) the movant's interest; and (2) the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case." *Neonatology Assocs., P.A. v. Comm'r*, 293 F.3d 128, 130–31 (3d Cir. 2002).

EPIC is a nonpartisan, nonprofit organization dedicated to focusing public attention on emerging privacy and civil liberties issues. It regularly produces research, provides policy analysis, submits open records requests, submits amicus briefs, and engages in litigation to protect privacy

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than the *amicus curiae* or its counsel contributed money that was intended to fund preparing or submitting this brief. EPIC is a nonprofit organization with no parent corporation and in which no person or entity owns stock.

and digital rights. It has published research and submitted *amicus curiae* briefs to protect voter privacy.

EPIC's proposed *amicus curiae* brief would help the Court by providing historical context about the importance of privacy to voter protection in the United States, which is relevant to understanding how to properly characterize the Defendants' actions in this case. EPIC's proposed brief traces how employers, creditors, landlords, party bosses, and other powerful actors have used threats of economic and physical reprisal to control voters in the past. EPIC's brief describes how legislators in the 19th century turned to privacy to address these issues and adopted the secret ballot, which enables voters to exercise the franchise without fear of reprisal. Ballot secrecy and other voter privacy measures have since become immensely popular and are guaranteed in state constitutions and statutes nationwide. EPIC's proposed brief describes why, while this case does not directly implicate the secret ballot, the Defendants' conduct falls into a long line of intimidating behavior that strikes at the heart of privacy and election integrity. The proposed brief also explains why the chosen method of communication in this case—robocalls—is especially invasive.

Accordingly, EPIC respectfully requests that this Court grant leave to file an *amicus curiae* brief in this matter, which is attached.

Respectfully submitted,

*/s/ Thomas McBrien*
Thomas McBrien
Law Fellow

*Counsel for Amicus Curiae*
*Electronic Privacy Information Center*

cc:     All counsel (via ECF)

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES,

     Plaintiffs,

     -and-

People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK

     v.

JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10,

     Defendants.

Civil Action No. 20-cv-8668

**BRIEF OF THE ELECTRONIC PRIVACY INFORMATION CENTER
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' JOINT MOTION FOR
SUMMARY JUDGMENT AS TO LIABILITY ON ALL CLAIMS**

Thomas McBrien (*pro hac vice*)
Alan Butler
Caitriona Fitzgerald
John Davisson
ELECTRONIC PRIVACY
  INFORMATION CENTER
1519 New Hampshire Avenue NW
Washington, D.C. 20036
(202) 483-1140

Dated: August 23, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

INTEREST OF THE AMICUS ........................................................................... iii

ARGUMENT ..................................................................................................... 1

    I.   Voter privacy is widely recognized as critical to election integrity. ..................... 1

    a.   Voter privacy evolved as a response to intimidation and coercion. ...................... 1

    b.   Since the introduction of the secret ballot, state legislatures, courts, and Congress have widely recognized that voter privacy is fundamental to the franchise. .............. 4

    II.  The Defendants' robocalls in this case fell squarely into the statutes' definitions of "intimidation" by threatening voters' privacy. ....................................................... 5

## TABLE OF AUTHORITIES

**Cases**

*Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d. 964 (N.D. Cal. 2019) ......................... 7
*Burson v. Freeman*, 504 U.S. 191 (1992) ................................................................................. 2, 4
*Cellco P'ship v. Plaza Resorts Inc.*, No. 12-cv-81238, 2013 WL 5436553 (S.D. Fla. Sept.
    27, 2013) ................................................................................................................................ 7
*Cox v. Williams*, 216 Ga. 535 (1961) ........................................................................................ 5
*Desai v. ADT Security Sys. Inc.*, 78 F. Supp. 3d 896  (N.D. Ill. 2015) ...................................... 7
*King v. Cook*, 298 F. Supp. 584 (N.D. Miss. 1969) ................................................................... 6
*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest
    Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ............... 6
*Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018) .................................................. 4
*Moon v. Seymour*, 182 Ga. 702 (186 S.E. 744) (1936) ............................................................... 5
*United States ex rel. Katzenbach v. Original Knights of the KKK*, 250 F. Supp. 330 (E.D.
    La. 1965) ............................................................................................................................... 6
*United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012) ........................................................... 6

**Statutes**

22 U.S.C. § 8203(6)(B) ............................................................................................................... 5

**Other Authorities**

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter
    Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173 (2015) ............................................ 3, 4
Caitriona Fitzgerald, Susannah Goodman, and Pamela Smith, *The Secret Ballot at Risk:
    Recommendations for Protecting Democracy* (Aug. 2016). ............................................... 3, 4
Eldon Cobb Evans, A History of the Australian Ballot System in the United States (1917) . 2, 3, 4
Encyclopedia Britannica, *Australian Ballot* ............................................................................. 2
Faith Karimi, *Spam Calls Are Hindering Efforts to Contact Trace and Track Covid-19*,
    CNN (Oct. 6, 2020) ............................................................................................................... 7
Jill Lepore, *Rock, Paper, Scissors*, New Yorker (Oct. 8, 2009) ................................................ 3
Jonathan W. White, Opinion, *How Lincoln Won the Soldier Vote*, N.Y. Times (Nov. 7,
    2014) ..................................................................................................................................... 3
Nat'l Acad. of Sci., Eng'g, and Med., et al. *Securing the Vote: Protecting American
    Democracy* 42, 87 (Nat'l Acad. Press, 2018) ....................................................................... 2

## INTEREST OF THE AMICUS

The Electronic Privacy Information Center ("EPIC") is a public interest research center established to focus public attention on emerging privacy and civil liberties issues. EPIC frequently participates as *amicus curiae* in cases that implicate emerging privacy issues, including voter privacy. *See, e.g.*, Brief of *Amici Curiae* EPIC et. al, *Crawford v. Marion County Election Board*, 128 S. Ct. 1610 (2008) (opposing voter photo-ID requirements as infringing on citizens' right to cast a secret ballot); Brief of *Amici Curiae* EPIC et al., *Doe v. Reed*, 561 U.S. 186 (2010) (arguing that the First Amendment protects the right to anonymity in referenda signatures); *Brief of Amici Curiae* EPIC et al., *Watchtower Bible and Tract Society of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150 (2002) (supporting First Amendment Right to anonymous door-to-door speech).

EPIC also routinely participates as *amicus curiae* in cases concerning robocalls. *See, e.g.*, Br. for EPIC et al. as *Amici Curiae* Supporting Respondent, *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2020) (No. 19-511); Br. for EPIC et al. as *Amici Curiae* Supporting Petitioner, *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020) (No. 19-631); Br. for EPIC as *Amicus Curiae* Supporting Respondent, *PDR Network v. Carlton & Harris Chiropractic*, 139 S. Ct. 2051 (2019) (No. 17-1705); Br. for NCLC & EPIC as *Amici Curiae* Supporting Appellant, *Lindenbaum v. Realgy*, LLC, 13 F.4th 524 (6th Cir. 2021).

**ARGUMENT**

Voter intimidation has been a long-running threat to American self-government. Employers, creditors, landlords, party bosses, and other powerful actors have used threats of economic and physical reprisal to control voters. To address this evil, legislators in the 19th century turned to privacy. They adopted the secret ballot, which enables voters to exercise the franchise without fear of reprisal. Ballot secrecy and other voter privacy measures[1] have since become immensely popular. They are guaranteed in state constitutions and statutes nationwide, and the Supreme Court has recognized voter privacy as a compelling state interest that satisfies strict scrutiny.

This case directly implicates voter privacy. Although this case arises under the Ku Klux Klan Act and Voting Rights Act, understanding the secret ballot's development illustrates why the Defendants' actions constitute intimidation under those statutes. The Defendants are the latest in a long line of actors who have warned voters that voting the "wrong way" would be noticed and punished. The Defendants directly violated the Plaintiffs' privacy by placing robocalls to them without their consent, and they threatened the Plaintiffs with further privacy invasions by falsely claiming that voting by mail may subject them to debt collection, investigation, and forced vaccination. This intimidating behavior strikes at the heart of voter privacy and electoral integrity.

**I.  Voter privacy is widely recognized as critical to election integrity.**

    **a.  Voter privacy evolved as a response to intimidation and coercion.**

Ballot secrecy is a cornerstone of modern democracies. The secret ballot system is one in which individuals vote by marking their preference on a standard sheet provided to them by the

---

[1] Voter privacy includes the right to secrecy of voters' ballot selections as well as privacy when marking, verifying, and casting one's ballot.

government, usually in a private environment. *See* Encyclopedia Britannica, *Australian Ballot* (2022).[2] This system reduces the threats of coercion, intimidation, bribery, and tampering by obscuring each voter's decision. Voters must know that their voting decisions will not be used to subject them to economic, physical, or other types of harm in order to make a truly independent decision. As the National Academy of Sciences has found, "[i]f anonymity is compromised, voters may not express their true preferences." Nat'l Acad. of Sci., Eng'g, & Med., et al. *Securing the Vote: Protecting American Democracy* 42, 87 (Nat'l Acad. Press, 2018).

Prior to states' adoption of the secret ballot, a lack of privacy in voting procedures enabled widespread voter intimidation by powerful actors. The colonial period provided myriad ways to vote—from raising voices to stamping feet to counting beans—all of which were done in public, facilitating widespread bribery and intimidation. *See Burson v. Freeman*, 504 U.S. 191, 201 (1992). By the early 1800s, most states had adopted voting by paper ballots, which made voting more efficient and slightly more private. *See id.* In this system, the parties themselves created the ballots with their candidates' names pre-marked and passed them out to voters to hand to election judges. *See id.* But voter intimidation concerns persisted because the parties made the ballots large and conspicuously colored so that it was easy to determine who was voting for whom. *See id.* Voters were sometimes threatened with economic ruin, joblessness, or violence if they voted against the will of their employer, landlord, creditor, or party benefactor. *See* Eldon Cobb Evans, A History of the Australian Ballot System in the United States 12–13, 22 (1917). The military was another arena of voter coercion. Significant pressure was put on military rank-and-file to vote for specific candidates, with servicemen sometimes demoted or relieved of duty if they refused or expressed their preference for another politician. *See* Jonathan

---

[2] https://www.britannica.com/topic/Australian-ballot.

W. White, Opinion, *How Lincoln Won the Soldier Vote*, N.Y. Times (Nov. 7, 2014).[3] These issues grew after the Civil War, as Northern party bosses aimed to consolidate and maintain their political hegemony and Southern whites engaged in a widespread campaign of violence to discourage newly freed slaves from voting or attaining political power. *See* Eldon Cobb Evans, *A History of the Australian Ballot System in the United States* 7 (1917); Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173, 184–85 (2015).

American legislatures recognized that privacy was necessary to protect voters from the fear of economic and physical reprisal for voting their conscience and viewed ballot secrecy as the way to ensure this privacy. *See* Caitriona Fitzgerald, Susannah Goodman, & Pamela Smith, *The Secret Ballot at Risk: Recommendations for Protecting Democracy* (Aug. 2016).[4] Originally considered by some Americans as a cowardly way to vote, the secret ballot was eventually adopted as a necessary measure to ensure that the powerful did not prevail upon the relatively powerless through voter intimidation and coercion. *See* Jill Lepore, *Rock, Paper, Scissors*, New Yorker (Oct. 8, 2009).[5] Upon the passage of New York's version of ballot secrecy, a commenter noted "We have secured secrecy; and intimidation by employers, party bosses, police officers, saloonkeepers and others has come to an end." *See Burson*, 504 U.S. at 204 (quoting W. Ivins, *The Electoral System of the State of New York, Proceedings of the 29th Annual Meeting of the New York State Bar Association* 316 (1906)). Ballot secrecy did not cure every ill, which is why statutes such as the Ku Klux Klan Act and Voting Rights Act were necessary. *See generally* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39

---

[3] http://opinionator.blogs.nytimes.com/2014/11/07/how-lincoln-won-the-soldier-vote/.
[4] https://secretballotatrisk.org.
[5] https://www.newyorker.com/magazine/2008/10/13/rock-paper-scissors.

N.Y.U. Rev. L. & Soc. Change 173 (2015). But all three aimed to ensure that each American could vote free from fear and intimidation.

> **b. Since the introduction of the secret ballot, state legislatures, courts, and Congress have widely recognized that voter privacy is fundamental to the franchise.**

The secret ballot spread quickly throughout the United States and is now fundamental to elections across the country. Maine adopted the secret ballot first in 1831, 36 years before the second state would adopt it. Evans, *supra*, at 7–8. By the 1890s, every state save Kentucky had done the same. *Id.* at 16. A 2016 state survey conducted by EPIC, Common Cause, and Verified Voting found that the vast majority of states (44) had constitutional provisions guaranteeing secrecy in voting, while the remaining states had statutory provisions referencing secrecy in voting. Caitriona Fitzgerald, Susannah Goodman, and Pamela Smith, *The Secret Ballot at Risk: Recommendations for Protecting Democracy* (Aug. 2016).[6]

Federal courts have also reinforced the importance of voter privacy. In *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), the Supreme Court proclaimed that universal political speech restrictions at polling places emerge from a respect for ballot secrecy:

> Between 1888 and 1896, nearly every State adopted the secret ballot. Because voters now needed to mark their state-printed ballots on-site and in secret, voting moved into a sequestered space where the voters could "deliberate and make a decision in . . . privacy."

*Id.* at 1883. The Court has also recognized ballot secrecy as a "rare case" in which a legislative restriction on speech can survive strict scrutiny review under the First Amendment because of "the States' compelling interests in preventing voter intimidation and election fraud." *See Burson*, 504 U.S. at 198–99, 204.

---

[6] https://secretballotatrisk.org.

State courts have also recognized that voter privacy is fundamental to election integrity. In *Cox v. Williams*, 216 Ga. 535 (1961), the Supreme Court of Georgia found that the duty of election officers to adhere to the state's voter privacy statute and other polling place requirements was so critical that the violation thereof could lead to a declaration that an election is null and void. *Id.* at 537 (noting violations that included "no screen, curtain, or door on the front of such [voting] booths to exclude vision of the voter while marking his ballot"). In an earlier case in which an election was also declared null and void after violations of the requirements for voting booths, the Georgia Supreme Court wrote:

> It was intended that in counties holding elections under the Australian ballot system there should be privacy in the preparation of the ticket by a voter, so that he might exercise his own volition in the choice of candidates, and that he might feel, when he is preparing his ballot to express his volition or election as to the different candidates, that he is free from all observation by the prying eyes of those who might be interested in having him vote for certain other candidates. […] [W]here there is a total disregard of the statute, it cannot be treated as an irregularity, but it must be held and adjudicated to be cause for declaring the election void and illegal.

*Moon v. Seymour*, 182 Ga. 702, 702 (1936).

Ballot secrecy is so essential to the right to vote that the United States, by law, will not recognize foreign states as democracies unless they vote "by secret ballot." 22 U.S.C. § 8203(6)(B) (requiring the Secretary of State, in determining whether a country is democratic, to "conduct assessments of such conditions in countries and whether the country exhibits the following characteristics," including whether the "national legislative body of such country . . . [is] chosen by free, fair, open, and periodic elections, by universal and equal suffrage, and by secret ballot").

## II. The Defendants' robocalls in this case fell squarely into the statutes' definitions of "intimidation" by threatening voters' privacy.

The Defendants' strategy in this case was to depress voter turnout by threatening voters' privacy, funneling them into a false choice between risking their freedom and autonomy by

voting in person or foregoing voting altogether. The Defendants violated the voters' privacy in two ways. First, the Defendants threatened privacy harms if the Plaintiffs voted by mail—i.e., increased scrutiny and the potentially harmful consequences such as forced vaccination, legal action, and the sharing of information with debt collectors. Second, the Defendants' chosen method of placing robocalls without the Plaintiffs' consent violated the Plaintiffs' privacy and contributed to the spam call epidemic. These actions are intimidating and strike at the heart of election integrity.

The Defendants are the most recent in a long line of actors who have tried to achieve political goals by intimidating voters. These actors can no longer monitor who is voting for whom through a show of hands or party-provided ballots, but they can achieve similar ends by striking fear in voters they suspect have differing political beliefs.  Much like other voters throughout American history, the Plaintiffs in this case were made to fear for their economic and physical wellbeing if they freely exercised their right to vote. Many courts have recognized that attacking voters' privacy constitutes intimidation. *See, e.g.*, *United States v. Nguyen*, 673 F.3d 1259, 1261 (9th Cir. 2012) (warning individuals if they voted in upcoming election that their personal information would be collected by government computer system); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *5 (E.D. Va. Aug. 13, 2018) (publishing names and personal information); *United States ex rel. Katzenbach v. Original Knights of the KKK*, 250 F. Supp. 330, 342 (E.D. La. 1965) (distributing handbills identifying advocates of moderate desegregation); *King v. Cook*, 298 F. Supp. 584, 587 (N.D. Miss. 1969) (publishing in local newspaper names and addresses of individuals applying for voter registration).

Robocalling is an especially pernicious tactic that is currently wreaking havoc on the privacy and seclusion of Americans. In recent years, lawsuits have exposed campaigns consisting of tens of thousands or even millions of illegal robocalls. *See, e.g.*, *Cellco P'ship v. Plaza Resorts Inc.*, No. 12-cv-81238, 2013 WL 5436553, at *2 (S.D. Fla. Sept. 27, 2013) (finding 5,785,245 robocalls promoting seller's travel services); *Desai v. ADT Security Sys. Inc.*, 78 F. Supp. 3d 896, 901 (N.D. Ill. 2015) (finding nearly 3.8 million illegal robocalls made); *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 977 (N.D. Cal. 2019) (finding "millions" of robocalls made, including 989,295 robocalls to the 149,838 putative class 15 members). This flood of unwanted spam has harmful and far-reaching impacts. For example, it contributed to individuals failing to answer important contact-tracing calls early in the COVID-19 pandemic because they had become used to screening calls from unknown numbers. *See* Faith Karimi, *Spam Calls Are Hindering Efforts to Contact Trace and Track Covid-19*, CNN (Oct. 6, 2020).[7] Robocalls like the ones at issue in this case are likely to make this problem worse.

## CONCLUSION

For the foregoing reasons, the Court should grant the Plaintiffs' Joint Motion for Summary Judgment.

Dated: August 23, 2022                          Respectfully submitted,

/s/ Thomas McBrien
**Thomas McBrien** (*pro hac vice*)
   Law Fellow

**Alan Butler**
   Executive Director

**Caitriona Fitzgerald**
   Deputy Director

**John Davisson**

---

[7] https://www.cnn.com/2020/10/06/us/coronavirus-contact-tracing-trnd/index.html.

Director of Litigation

ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Avenue NW
Washington, D.C. 20036
(202) 483-1140

*Counsel for Amici Curiae*
*Electronic Privacy Information Center*

**CERTIFICATE OF SERVICE**

I certify that on August 23, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States District Court for the Southern District of New York by CM/ECF. All participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Thomas McBrien
**Thomas McBrien (pro hac vice)**
  Law Fellow

ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Avenue NW
Washington, D.C. 20036
(202) 483-1140

*Counsel for Amicus Curiae Electronic Privacy
Information Center*

9