UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES,

        -against-

DOUGLASS MACKEY,

               Defendant.

**MEMORANDUM & ORDER**
**21-CR-80 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

The Government brings a single-count indictment (Dkt. 8) (the "Indictment") against Defendant Douglass Mackey under 18 U.S.C. § 241. The Indictment relates to Defendant Mackey's alleged participation in an online conspiracy to injure certain Twitter users' right to vote by spreading disinformation during the 2016 Presidential election. (*See* Compl. (Dkt. 1) (the "Complaint") ¶ 3; Indictment.) Pending before the court is Defendant Mackey's Motion to Dismiss the Indictment for lack of venue, violation of due process, and an "as applied" First Amendment violation. (Mot. (Dkt. 43); *see also* Gov't Resp. in Opp. (Dkt. 45) (the "Opp.").) The court held oral argument at the request of the parties on October 26, 2022. (*See* Oct. 27, 2022 Minute Entry.) The court DENIES Defendant Mackey's motion for the following reasons.

## I. BACKGROUND

### A. Factual Background

The Government alleges in its Complaint that Defendant Mackey, a New York City resident at the time of the events in question, was a prolific far-right Twitter user who established a substantial Twitter following using the pseudonym "Ricky Vaughn." (*See* Compl. ¶¶ 4-8.) At the peak of his Twitter fame, Mr. Mackey's account had approximately 58,000 followers. (*Id.*

at ¶ 11.) MIT Media Lab ranked "Ricky Vaughn" as #107 among top political influencers—ahead of, *e.g.*, NBC News (#114), Stephen Colbert (#119), and Newt Gingrich (#141). (*Id.*) Although Defendant Mackey was twice suspended from Twitter, he promptly returned to Twitter under a new Ricky Vaughn profile with a slightly different Twitter handle after each suspension.[1] (*Id.* at ¶¶ 12-14.)

The Government alleges that Mr. Mackey and his co-conspirators devised "memes[2]" and other social media posts intended to suppress Democratic voters through a coordinated disinformation campaign in the runup to the 2016 presidential election.[3] The scheme, as alleged, was simple enough. He and a group of other Twitter users allegedly workshopped hashtags[4] and images to

---

[1] The Government alleges that Defendant Mackey used the Twitter handle @Ricky_Vaughn99 from January 12, 2014 through October 5, 2016, the Twitter handle @TheRickyVaughn from October 8, 2016 through November 2, 2016, and the Twitter handle @ReturnofRV from November 3, 2016 through November 14, 2016. (Compl. ¶ 5.)

[2] Merriam Webster defines a "meme" as "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." *See* Merriam-Webster.com Dictionary, *"Meme"* (last visited Jan. 22, 2023), https://www.merriam-webster.com/dictionary/meme.

[3] Throughout the Complaint and motion briefing, the Government refers to Hillary Clinton as "The Candidate" and "Candidate 1," rather than by name. The Government also refers to Donald Trump as "Candidate 2," and chooses not to mention the Democratic and Republican political parties by name. Because the candidates and parties involved are readily apparent to any observer with a passing familiarity with the U.S. political landscape, this court has no reason to believe that using proper names will be prejudicial to either party. The court has thus opted to use the 2016 presidential candidates' and political parties' proper names throughout this opinion, rather than the Government's preferred pseudonyms.

[4] Merriam Webster defines a hashtag as a "a word or phrase preceded by the symbol # that classifies or categorizes the accompanying text (such as a tweet)." *See* Merriam-Webster.com Dictionary, *"Hashtag"* (last visited

dissuade "normies" and "shitlibs[5]" from voting for a candidate for president and, later, to trick that candidate's supporters into believing they could cast their ballots by sending a text message or posting on Facebook or Twitter. (*See generally id.*)

Specifically, Mr. Mackey and his co-conspirators are alleged to have participated in private direct message[6] groups on Twitter called "Fed Free Hatechat," the "War Room," and "Infowars Madman," (*Id.* at ¶¶ 13, 17,) to discuss "how best to influence the Election" and "to create, refine and share memes and hashtags that members of the group would subsequently post and distribute." (*Id.* at ¶ 15.) Members of the group messaged about "memes" and Tweets that would "suggest[] that certain voters were hiding their desire to vote for a Presidential candidate from one of the two main political parties," through "psyops[7]" intended to "make all these shitlibs think they're [sic] friends are

---

Jan. 22, 2023), https://www.merriam-webster.com/dictionary/hashtag. The court notes that on Twitter and other social media platforms hashtags also serve as a link between different posts that have used the same hashtag, and can thus be used as a tool to increase the reach of a Tweet to not only those viewing the social media creator's specific account, but also those searching the broader hashtag.

[5] The court was not previously familiar with the term "shitlib," but assumes given the context that it is a perjorative word for those who identify as liberal rather than conservative.

[6] Twitter users can send two different types of messages: direct messages, which can be viewed only by the sender and the user or users to whom those messages are sent, and Tweets, which are posted publicly and can be viewed by any user with access to the posting user's Twitter feed.

[7] Merriam Webster defines "psyops" as "military operations usually aimed at influencing the enemy's state of mind through noncombative means (such as distribution of leaflets)." *See* Merriam-Webster.com Dictionary, "*Psyops*" (last visited Jan. 22, 2023), https://www.merriam-webster.com/dictionary/psyops. The court is not aware of any evidence that Mackey or his co-conspirators were participating in actual military operations, and thus assumes that they were using this term colloquially to

secretly voting for" Donald Trump. (*Id.* at ¶ 16.) Other messages "relat[ed] plans to alter images of various celebrities in a manner that falsely suggested that the celebrities were supporting [Donald Trump's] candidacy" and suggested that if the Democrats were to win the presidency, women would be drafted into the military, with the stated intent of "mak[ing] the shitlib woman vote waver in this election." (*Id.* at ¶ 17-18.) In these conversations, one Twitter user also allegedly suggested the group work together on a guide to outline "by step by step, each major aspect of the ideological disruption toolkit." (*Id.* at ¶ 19 n.14.) The Complaint alleges that Defendant Mackey maintained "outsized influence" in the group due to his large Twitter following and general influence on the internet. (*Id.* at ¶ 19.)

With regard to the specific conduct underlying the indictment, the Government alleges that beginning in or around September 2016, Defendant Mackey and his co-conspirators conspired about, "formulated, created and disseminated information over social media that claimed, among other things, that supporters of [Hillary Clinton] . . . could and should vote for [her] by posting a specific hashtag on Twitter or Facebook, or by texting [her] first name to a specific telephone text code." (*Id.* at ¶ 3.)

The Government alleges that Mackey and his co-conspirators took inspiration for this particular Tweet from a similar image used in the United Kingdom to falsely inform voters that they could cast their votes in the June 2016 referendum by posting Vote Remain on their Facebook or Twitter account with the hashtag "EUReferendum." (*Id.* at ¶ 21.) One member of Mackey's group, acknowledging the size of Mackey's following, suggested mimicking this format and offered to "take something on [to assist Mackey] if it's helpful." Mackey responded with agreement that he had "like the most loyal army on Twitter." (*Id.* ¶ 19 n.15.)

---

analogize their efforts to "influence [Hillary Clinton voters'] minds" to similar efforts by military combatants.

The scheme, as alleged, aimed to cause Clinton supporters to believe they could cast their ballots by sending a text message or posting on social media and, as a result, fail to cast their vote for [Hillary Clinton] in the Election in a legally valid manner. (*Id.* at ¶¶ 3, 20, 32-33.)

The Government alleges that the conspirators exchanged several messages back and forth iterating on the best wording, formatting, content, and images to use throughout much of October 2016. (*Id.* at ¶ 22-27.) One conspirator chimed in with the advice to "make sure to use the [Clinton campaign's] latest color schemes." (*Id.* at ¶ 22.) Another expressed concern about Donald Trump voters "thinking this is legit and [staying] home," and suggested an adjustment to clarify the purported voting procedure pertained only to those voting for Hillary Clinton. (*Id.* at ¶ 26.)

The Government then alleges that on November 1, 2016, Defendant Mackey tweeted out a deceptive image featuring an "African American woman standing in front of an 'African Americans for [Hillary Clinton]' sign" and text that read "Avoid the Line. Vote from Home. Text '[Hillary]' to 59925[.] Vote for [Hillary Clinton] and be a part of history." (*Id.* at ¶ 32.) The deceptive image also included fine print stating "Must be 18 or older to vote. One vote per person. Must be a legal citizen of the United States. Voting by text not available in Guam, Puerto Rico, Alaska or Hawaii. Paid for by [Hillary Clinton] for President 2016." (*Id.*) Mr. Mackey then tweeted out a similar image, but with text in Spanish (along with the image described in paragraph 32 of the Complaint, the "Deceptive Tweets" or "Deceptive Images"). (*Id.* at ¶ 33.) That image included "a copy of the logo of Hillary Clinton's campaign, as well as a link to [Hillary Clinton's] campaign website" and made use of her campaign's "distinctive font" and hashtags. (*Id.*)

According to the Complaint, at least 4,900 people texted the number. (*Id.* at ¶ 36.) Many of the unique telephone numbers to

do so "belong[ed] to individuals located in the Eastern District of New York." (*Id.*)

The Complaint provides an explanation for Mackey's alleged intentions through his Tweets: on November 2, the day after he spread the Deceptive Images, he tweeted "Obviously, we can win Pennsylvania." (*Id.* at ¶ 31.) "The key is to drive up turnout with non-college whites, and limit black turnout." (*Id.*) Finally, on or about November 12, 2016, Defendant Mackey allegedly stated the following in a direct message exchange with another Twitter user: "...I posted a meme that told [Hillary Clinton] supporters they could text to vote. Lol". (*Id.* ¶ 30.)

## B.   Procedural Background

On January 22, 2021, an arrest warrant issued for Defendant Mackey pursuant to a 24-page criminal Complaint. (*See generally* Compl.; Arrest Warrant (Dkt. 2).) Three weeks later, a grand jury returned an indictment charging Mackey with a conspiracy to violate rights under 18 U.S.C. § 241. (*See* Indictment.) The Indictment reads in full:

> In or about and between September 2016 and November 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant DOUGLASS MACKEY, also known as "Ricky Vaughn," together with others, conspired to injure, oppress, threaten and intimidate one or more persons in the free exercise and enjoyment of a right and privilege secured to them by the Constitution and laws of the United States, to wit: the right to vote.

(Indictment at 1-2.) Defendant Mackey was arraigned before Magistrate Judge Sanket J. Bulsara on March, 10, 2021. (Mar. 10, 2021 Minute Entry.) The Government provided discovery to the Defendant throughout the summer and fall of 2021. (Dkt. 22.) On January 10, 2022, Defendant Mackey moved for a Bill of

6

Particulars. (BOP Mot. (Dkt. 25).) In a Memorandum and Order dated May 13, 2022, this court denied that motion in part but granted it specifically as to the issue of venue. (May 13, 2022 Mem. & Order ("BOP M&O") (Dkt. 36).) The Government filed a responsive Bill of Particulars on May 27, 2022. ((BOP) (Dkt. 39).) The instant Motion to Dismiss the Indictment was fully briefed as of September 6, 2022, and the court held oral argument at the request of the parties on October 26, 2022. (*See* Oct. 27, 2022 Minute Entry.)

## II.   STANDARD OF REVIEW

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment satisfies Rule 7(c)(1)—and thus the requirements of the Fifth and Sixth Amendments—if it "'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also United States v. Lee*, 833 F.3d 56, 67-68 (2d Cir. 2016) (stating that an indictment's failure to allege an element of the charged offense is a constitutional violation).[8]

To meet this standard, indictments typically "need do little more than to track the language of the statute charged and state the approximate time and place of the alleged crime." *United States v. Thompson*, 141 F. Supp. 3d 188, 194 (E.D.N.Y. 2015) (quoting *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (alterations

---

[8] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

adopted)). Indictments generally do not "have to specify evidence or details of how the offense was committed." *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017) (citation omitted). Moreover, "[w]hen considering a motion to dismiss, the [c]ourt must treat the indictment's allegations as true." *Id.* at *5 (citing *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999)). Issues relating to factual sufficiency are generally not considered at this stage, with a limited exception for when a "full proffer of the evidence has been made." *United States v. Perez*, 575 F.3d 164, 166–67 (2d Cir. 2009). However, the interpretation of a federal statute and the facial sufficiency of an indictment are matters of law reviewable on a motion to dismiss an indictment. *United States v. Ahmed*, 94 F. Supp. 3d 394, 404-05 (E.D.N.Y. 2015). That said, "the dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation and quotation marks omitted).

## III. DISCUSSION

### A. Venue

Defendant Mackey argues that the Indictment should be dismissed because venue is not proper in the Eastern District of New York, as Defendant Mackey did not commit overt acts in, engage in essential conduct in, or have substantial contacts with the district. (Mot. at 6-11). Mackey further argues that the Government's selection of this district "leads to the appearance of abuses, if not abuses." (*Id.* at 11-12). The Government counters that venue is proper because (1) Deceptive Images passed through the Eastern District of New York as they were electronically sent from Manhattan to Twitter's servers and beyond, (Opp. at 25) (2) Deceptive Images were viewed by Twitter users in the Eastern District following their distribution, (*id.*), (3) Deceptive Images may have been viewed in the Eastern District because

they were "wittingly or unwittingly" retweeted into the district, (*id.* at 26), and (4) intended victims of the misinformation conspiracy were located in the Eastern District (*id.* at 28).

>    1. Standard of review for venue on a motion to dismiss

Courts in this Circuit have generally reserved judgment on criminal venue for trial. At the motion to dismiss stage, courts assess only the facial sufficiency of the indictment as to venue. *See United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998) (holding that typically, dismissal of the indictment is premature if it relies on "inferences as to the proof that would be introduced by the government at trial"). There is, however, an exception to this rule. The "sufficiency of the evidence" may, in addition to the legal sufficiency of the indictment itself, be "addressed on a pretrial motion to dismiss the indictment" if "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial." *United States v. Perez*, 575 F.3d 164, 166–67 (2d Cir. 2009) (quoting *Alfonso*, 143 F.3d at 776–77); *see also United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018) (noting the Second Circuit had previously affirmed a pretrial evidentiary analysis "where the government had voluntarily submitted an affidavit containing the entirety of its proof"); *United States v. Mennuti*, 639 F.2d 107, 108 n.1 (2d Cir. 1981) (applying the exception later discussed in *Alfonso*).

"A full proffer of the evidence" has been made when the government has provided "a detailed presentation of the entirety of the evidence." *Id.* On May 13, 2022, this court granted a Bill of Particulars on the issue of venue. (BOP M&O.) The Government filed its Bill of Particulars on May 27, 2022. (Letter in Resp. to BOP M&O ("BOP") (Dkt. 39).) Although some caselaw suggests that a bill of particulars can function as a full proffer of the evidence, *see, e.g., United States v. Laurent*, 861 F. Supp. 2d 71, 110

(E.D.N.Y. 2011) ("Compliance with this order [granting defendant's motion for a bill of particulars that required names of witnesses, summaries of testimony, and all relevant documents on the issue] will be sufficient to constitute a full proffer of the evidence [the government] intends to present at trial"), it did not do so here.

When granting Defendant Mackey's motion for a bill of particulars, the court specifically granted the Government's application to reserve its rights to change its venue theory or offer additional evidence up to or at trial. (BOP M&O at 5 n.1.) ("The court is mindful that a bill of particulars should not 'foreclose the government from using proof it may develop as the trial approaches.' *United States v. Jimenez*, 824 F. Supp. 351, 363 (S.D.N.Y. 1993). Accordingly, the government was granted leave to amend its theory of venue should that theory change during discovery, motion practice, or while preparing for trial. *See* 1 Wright & Miller, Fed. Prac. & Proc. Crim. § 130 (4th ed.).") And, in its responsive Bill of Particulars, the Government stated once more that it "reserves the right to amend this bill of particulars as the case progresses toward trial." (BOP at 2.)

Moreover, the Bill of Particulars offered only a single sentence pertaining to each of the four theories of venue for which it intends to put forward evidence at trial. (*Id.* at 1-2.) This constitutes a "limited proffer" rather than a "full proffer" because it merely "summarizes, typically in a single sentence, the testimony ... and the physical evidence that the government expects to present to the jury." *United States v. Urso*, 369 F. Supp. 2d 254, 259–60 (E.D.N.Y. 2005). In light of that fact, the Government's bill may not become "a method for the defendant to frame an argument that the government's trial evidence concerning venue will be insufficient." *United States v. Griffith*, 515 F. Supp. 3d 106, 123 (S.D.N.Y. 2021) (citing *United States v. Murgio*, 209 F. Supp. 3d 698, 720-21 (S.D.N.Y. 2016)). Thus the court shall, at this

stage, assess Defendant's motion to dismiss the indictment for improper venue only insofar as facial consideration of the indictment will allow. At trial, the Government will need to prove venue to the jury by the preponderance of the evidence, *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011), whether that evidence be circumstantial or direct. *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir. 1984).

### 2. Legal framework

#### a. *Venue in a criminal conspiracy*

Venue is proper for a crime in the district in which the crime was committed. *See* U.S. Const. amend. VI. B; Fed. R. Crim. P. 18; *see also* U.S. Const. art. iii, § 2, cl. 3. But "[t]he site of a crime's commission is not always readily determined. The commission of some crimes can span several districts." *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007). Indeed, the Supreme Court has frequently made clear that venue is proper in any district "through which force propelled by an offender operates." *United States v. Johnson*, 323 U.S. 273, 275 (1944). Venue for a subset of crimes, known as "continuing offense[s]," is proper in "any district in which such offense was begun, continued, or completed." 18 U.S.C § 3237(a). The Second Circuit has long held that crimes of conspiracy—like crimes involving kidnapping, *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999), or interstate commerce—qualify as continuing offenses. *See, e.g., Rommy*, 506 F.3d at 119-20; *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987).

#### b. *The essential conduct test in the Second Circuit*

When applying the Supreme Court's primary test for identifying criminal venue, the essential conduct test or *locus delicti* test, "a court must initially identify the conduct constituting the offense (the nature of the offense) and then discern the location of the commission of the criminal acts." *Rodriguez-Moreno*, 526 U.S. at

279. While some circuits had traditionally relied on a narrower "verb test," the Supreme Court in *Rodriguez-Moreno* cautioned against "appl[ying]" that test "rigidly" or "to the exclusion of other relevant statutory language" in discerning what criminal conduct has occurred and where. *Id.* at 280. In the Second Circuit, essential conduct, also known as conduct constituting the offense, has occurred any place where either "the conspiratorial agreement was formed," *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (1987), or any overt act was (1) committed "for the purpose of accomplishing the objectives of the conspiracy," *Tzolov*, 642 F.3d at 320, so long as it was (2) reasonably foreseeable that the overt act would occur in that location. *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003). Overt acts in furtherance of a conspiracy constitute essential conduct regardless of whether those acts were committed by a defendant, a co-conspirator, or an innocent non-conspirator caused to act by a conspirator. *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008) ("This includes not just acts by co-conspirators but also acts that the conspirators caused others to take[.]"); *see also United States v. Abdullaev*, 761 F. App'x 78, 84 (2d Cir. 2019) (Summary Order) ("We have repeatedly found venue proper where an out-of-district defendant causes an overt act to be committed by an innocent third party within the district of venue[.]"); *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (stating that the defendant "need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there").

The Second Circuit's foreseeability requirement necessitates "some sense of venue having been freely chosen by the defendant." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018) (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)). "Actual knowledge that an overt act was committed in the district of prosecution is not required, however: venue will lie if a reasonable jury could find that it was more probable than not

that the defendant reasonably could have foreseen that part of the offense would take place in the district of prosecution." *Id.* at 69-70. The foreseeability requirement does not operate to artificially limit the number of districts in which venue can be properly laid. *See United States v. Rowe*, 414 F.3d 271, 279 (2d Cir. 2005) ("[The defendant] must have known or contemplated that the advertisement would be transmitted by computer to anyone the whole world over who logged onto the site and entered the chat room. It is clear that the chat room could be entered in this district and in fact was entered in this district.").

And, importantly for the Section 241 context, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense." *Whitfield v. United States*, 543 U.S. 209, 218 (2005). For this reason, although several circuits have held that there is no overt act required for a Section 241 conspiracy, courts in the Second Circuit have treated conspiracy under this statute the same as other kinds of conspiracies for the purposes of venue. *See, e.g., United States v. Castellano*, 610 F. Supp. 1359, 1390 (S.D.N.Y. 1985).

    *c.   Telephonic and electronic communications as overt acts*

The Second Circuit has held that a reasonable jury can find the sending or receipt of telephonic or electronic communications into or out of a given district to be overt acts in furtherance of a conspiracy, and thus sufficient to give rise to venue in that district. *See Rommy*, 506 F.3d at 122. "That an instrument of commerce or technology permits the conspirator to communicate with his listener while physically removed from him does not alter the fact that the conspirator has committed an overt act at the recipient's location." *Id.*; *see also Lange*, 834 F.3d at 70 ("[V]enue is also proper in the district where an electronic communication was received.").

Phone calls between conspirators in furtherance of a conspiracy can give rise to venue in the district where either person involved with the phone call is located. *Id.* Phone calls between a conspirator and an innocent non-conspirator can also give rise to venue in the district where either person involved with the phone call is located, regardless of who placed the call. *See Rommy*, 506 F.3d at 122-123; *see also Naranjo*, 14 F.3d at 146 (holding that telephone call from conspirator in Eastern District of New York to undercover agent in Southern District of New York established venue in Southern District); *United States v. Kenner*, No. 13-CR-607 (JFB) (AYS), 2019 WL 6498699, at *5 (E.D.N.Y. Dec. 3, 2019) ("Indeed, phone calls into or out of a district can establish venue in that district so long as they further the ends of the conspiracy.").

The Circuit has also held venue to be proper in districts where emails, faxes, text messages, or messages to subscribers that furthered the ends of the conspiracy were sent or received, whether by conspirators or non-conspirators. *See United States v. Russell*, No. 09-CR-968 (DLI), 2014 WL 2558761, at *6-7 (E.D.N.Y. June 5, 2014) (finding venue proper where government agent located in the Eastern District of New York exchanged emails with conspirator and conspirator's wife), *aff'd in relevant part, rev'd in part sub nom. Lange*, 834 F.3d 58; *United States v. Kim*, 246 F.3d 186, 192 (2d Cir. 2001) (finding venue based on sending and receiving faxes); *Royer*, 549 F.3d at 896 (finding venue based on "defendants' transmission of confidential information to the AP site subscribers in the Eastern District of New York"); *Kirk Tang Yuk*, 885 F.3d at 74 (finding venue based on communications including text messages). And, this Circuit has construed receipt of an electronic communication to include acts as simple as a non-conspirator accessing a chatroom. *See Rowe*, 414 F.3d at 279 (finding venue proper when "it [was] clear that the chat room . . . in fact was entered in this district").

Furthermore, "venue lies where a wire in furtherance of a scheme begins its course, continues or ends." *United States v. Rutigliano*, 790 F.3d 389, 397 (2015) (citing *United States v. Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982)); *see also Kim*, 246 F.3d at 192-93 (noting that "[t]he fact that he was not in Manhattan when he caused the wire transmissions does not eliminate the connection between Kim's acts and the Southern District for the purposes of venue" while holding that "wire communications to and from Manhattan were essential to the continuing offense of causing fraudulent wires to be transmitted.").

Venue is also proper in any district through which electronic communications in furtherance of the conspiracy pass. *See United States v. Brown*, 293 F. App'x 826, 829 (2d Cir. 2008) (Summary Order) (affirming a district court holding that a wire transfer automatically routed through Manhattan was sufficient to find venue in the Southern District); Sept. 3, 2021 Redacted Op. (Dkt. 84-1), *United States v. Ng Chong Hwa*, No. 18-CR-538 (E.D.N.Y. Sept. 10, 2021) ("*Ng* Order") at 46 (extending this principle to include use of "Goldman's telecommunication facilities, which transited through the Eastern District of New York"). This principle builds on the Second Circuit's longstanding willingness to find venue for a conspiracy properly laid in districts through which conspirators themselves had merely passed. *See Tzolov*, 642 F.3d at 314 (2d Cir. 2011) ("[V]enue for a conspiracy may be laid in a district through which conspirators passed in order to commit the underlying offense."); *United States v. Duque*, 123 F. App'x 447, 449 (2d Cir. 2005) (Summary Order) (where flying over Jamaica Bay was sufficient to find venue in the Southern District); *Kirk Tang Yuk*, 885 F.3d at 71-72 (where "passing over the channel known as 'the Narrows'" was sufficient to find venue in the Southern District).

### d. *The substantial contacts test in the Second Circuit*

In *United States v. Reed* in 1985, the Second Circuit set forth a "substantial contacts" test for determining criminal venue. 773 F.2d 477, 481 (2d Cir. 1985). This test weighed several factors including (1) "the site of the defendant's acts," (2) "the elements and nature of the crime," (3) "the locus of the effect of the criminal conduct," and (4) "the suitability of each district for accurate factfinding." *Id.* In a series of holdings throughout the 1990s, however, the Supreme Court—though not explicitly overturning the substantial contacts test—adopted a different test, the essential conduct test discussed at length above. *See generally Rodriguez-Moreno,* 526 U.S. 275; *United States v. Cabrales*, 524 U.S. 1 (1998).

Although the Second Circuit has since continued to at times supplement the Supreme Court's controlling essential conduct test with its own substantial contacts test, it now accords it less weight and has significantly narrowed the doctrine to better fit the Supreme Court's line of venue cases. The Circuit has, in particular, noted that the substantial contacts test from *Reed* is not a "formal constitutional test," and, rather, is intended to help courts in determining "whether a chosen venue is unfair or prejudicial to a defendant," "especially in those cases where the defendant's acts did not take place within the district selected as the venue for the trial." *United States v. Saavedra,* 223 F.3d 85, 93 (2d Cir. 2000). Lately, the Second Circuit has construed *Reed* as allowing the substantial contacts test to be automatically met if the defendant's acts in the district were themselves "a sufficient basis for establishing venue." *Tzolov,* 642 F.3d at 321. Where a case can be neatly decided on that prong, courts in the Second Circuit need not weigh other factors from *Reed's* substantial contacts test. *Id.* Further, a court need only make the substantial contacts inquiry "if the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of the trial." *Rutigliano,* 790 F.3d

at 399; *see also Lange*, 834 F.3d at 75. When, however, "an overt act in furtherance of a criminal conspiracy has been committed in the district . . . this supplemental inquiry has no relevance." *Kirk Tang Yuk*, 885 F.3d at 70.

### 3. Application

The Indictment is facially sufficient as to venue because a reasonable jury could find venue to be proper under any one of several theories put forward by the Government.

#### a. *Venue based on overt acts in furtherance of the conspiracy*

In the BOP and the Government's Opposition to the Motion, (*see* Opp. 22-31), the Government asserts that disinformation was spread, over Twitter, in furtherance of the conspiracy, "to and through the Eastern District of New York," through Tweets and retweets received in the district as well as when the "Deceptive Images passed through the Eastern District of New York as they were electronically sent from Manhattan to Twitter's servers and beyond." (BOP at 1; Opp. at 25.) The Government also asserts that as a result of acts committed by conspirators, the disinformation was viewed by Twitter users in the Eastern District of New York. (Opp. at 25.) Given that the instant charges under Section 241 allege a criminal conspiracy, *id.*, the *locus delicti* can be found anywhere that an act in furtherance of the charged Section 241 conspiracy has taken place. *See Kirk Tang Yuk*, 885 F.3d at 70.

A reasonable jury could find that the tweeting of deceptive images into the Eastern District was an "overt act" in furtherance of the alleged scheme to spread disinformation over Twitter in the hopes of injuring the right to vote, whether tweeted by Defendant Mackey or retweeted by a co-conspirator or innocent nonconspirator caused to act by members of the conspiracy. *See Abdullaev*, 761 F. App'x at 84 (Summary Order) ("We have

repeatedly found venue proper where an out-of-district defend-
ant causes an overt act to be committed by an innocent third
party within the district of venue."); *see also Royer,* 549 F.3d at
895 (finding that venue would be proper in the district where
innocent site subscribers acted). Defendant Mackey argues in his
reply brief that because the Government has not presented past
cases where criminal venue was established by Tweets, commu-
nications using Twitter cannot properly support a finding of
venue. (Reply at 2.) So narrow a reading of the relevant case law
would ignore the interpretative dynamism necessitated by the
rapid technological change of our era. As more and more Ameri-
cans choose to communicate via Twitter and other messaging
platforms rather than by phone or email, the judiciary's under-
standing of how continuing crimes can be committed through
electronic communications must keep pace and evolve. Although
the cases discussed above did not deal directly with communica-
tions via Twitter, the Second Circuit's cases on phone calls,
emails, text messages, faxes, chat room messages, and wire trans-
fers as overt acts illustrate that the government can establish
venue where such electronic communications were sent to or re-
ceived by individuals in the venue district. Tweets are themselves
electronic communications, so the Government may establish
venue based on where Tweets are foreseeably received.

Similarly, venue would be properly laid in the Eastern District if
the jury found by the preponderance of the evidence that decep-
tive images in furtherance of the charged conspiracy had
foreseeably "passed through the Eastern District of New York as
they were electronically sent from Manhattan to Twitter's servers
and beyond." (Opp. at 25.) Venue is proper in any district
through which electronic communications in furtherance of the
conspiracy passed. *See Brown,* 293 F. App'x at 829; *Ng* Order at
46. There is no meaningful difference between automatic rout-
ings of funds or wire communications and the movement of
electronic messaging over Twitter servers. If an electronic wire

18

gives rise to venue in a district by merely passing through, so too do electronic Tweets.[9]

If the Government proves at trial that the deceptive images were viewed in the Eastern District, and that such viewing (though innocent) was a foreseeable overt act furthering the ends of the conspiracy, it could also properly give rise to a finding of venue. A reasonable jury could find that logging onto Twitter and viewing the Deceptive Tweets was an overt act and that though the viewers were innocent third parties, their doing so unwittingly furthered the ends of the conspiracy against their right to vote. It is of no import that those viewing the tweets were unaware of the conspiracy, so long as the conspirators caused them to do so and their doing so furthered the objects of the conspiracy. *See Royer*, 549 F.3d at 896. Most significantly, innocent viewing of tweets was in no way "anterior and remote to" the criminal conduct. *United States v. Geibel*, 369 F.3d 682, 697 (2d Cir. 2004). Instead, these alleged acts were "crucial to the success of the scheme." *Royer*, 549 F.3d at 894.

Defendant Mackey argues that individuals accessing the tweets in the Eastern District would not be engaging in sufficiently essential conduct for venue to be proper, relying heavily on a recent Third Circuit case, *United States v. Auernheimer*. 748 F.3d 525 (3d Cir. 2014). That case does not control in this district, however, and runs contrary to controlling case law in the Second Circuit. Moreover, the facts in *Auernheimer* are easily distinguishable. While both cases deal with "mass interconnectivity" over the internet, the defendant in *Auernheimer* was merely alleged to

---

[9] Note, however, that it is not sufficient for the Government to merely prove that the communication was "likely to have passed through" the Eastern District. *See United States v. Brennan*, 183 F.3d 139, 144 (2d Cir. 1999) (finding lack of venue where it was alleged that mail was "likely to have passed through" a district). Instead, the Government must actually prove at trial, by a preponderance of the evidence, that the tweets physically passed through the district.

have unlawfully collected email addresses belonging to residents of the District of New Jersey. 748 F.3d at 533-534. There was no allegation that any communications were sent to or received in the District of New Jersey. *Id.* And there were no allegations that the holders of those email addresses themselves took any steps in furtherance of the conspiracy. *Id.*

Finally, a reasonable jury could hold, under any of these theories, that it was reasonably foreseeable that Tweets from a Manhattan-based Twitter personality with thousands of followers (Compl. 8-11) would reach or pass through a judicial district as large as the Eastern District of New York. Where, as here, "the use of modern communications facilities to execute a sophisticated criminal scheme inherently contemplates activities throughout" a large geographic area, conspirators should not then be able to escape the broad geographical scope stemming from the broad intentions of that scheme. *Royer,* 549 F.3d at 893.

### b. *Venue based on location of intended victims*

The last of the Government's proffered theories of venue—that venue is proper because intended victims of the misinformation conspiracy were located in the Eastern District, (Opp. at 28)— presents a different legal question. Finding venue under this theory would require a holding that venue can be proper due to the effects of a conspiracy, even when no act was committed in the district where venue is sought. In support of this proposition, the Government (1) argues that effects-based venue is appropriate where, as here, there is no overt act element of the crime, and (2) cites to *Reed*'s inclusion of the effects of a conspiracy in the substantial contacts test. This court is not persuaded, however, that because some circuits have held there need not be *overt* acts in furtherance of a conspiracy for a conspiracy against rights to have taken place, venue is proper wherever the effects of a civil rights conspiracy were *intended* to be felt. Even if Defendant Mackey had conspired to send but never actually sent his Tweets,

he and his co-conspirators would still have participated in conduct constituting the offense by forming the conspiracy to begin with, and there would therefore always be at least one judicial district in which venue is proper.

Furthermore, the substantial contacts test does not apply in this context, and its focus on effects-based venue is therefore irrelevant. *Kirk Tang Yuk*, 885 F.3d at 70 (stating that when "an overt act in furtherance of a criminal conspiracy has been committed in the district . . . this supplemental inquiry has no relevance."). Finally, the substantial contacts test is used today as an additional check on fairness, not as a method for expanding venue. *See Saavedra*, 223 F.3d at 93. The test is intended to guard against "the two chief ills that the constitutional venue provisions are meant to guard against—bias and inconvenience[.]" *Rowe*, 414 F.3d at 279-280. Given that the most obvious place for venue to be proper, the Southern District of New York, lies just across the river from this venue, and that the residents of that district hold much the same political leanings as the residents of the Eastern District, those factors "are not substantially present in this case." *Id.* Defendant Mackey argues on reply that the Government should be unable to establish that venue lies in a given district purely because it is "the location of the intended victims" of a conspiracy. (Reply at 3-5.) This court agrees. Were this the only mode of contact with the district, venue would not be properly laid.

However, given the several ways in which a jury *could* properly find venue, this court does not dismiss the Indictment for lack of venue.

### B.   Due Process

Defendant Mackey also argues for dismissal of the Indictment on the basis that it violates his due process rights. Mr. Mackey contends that he did not have sufficient warning that conspiring to tweet false voting instructions would constitute criminal conduct

pursuant to Section 241. In support of this argument, Defendant Mackey reasons (1) that Section 241 was not intended to "expand criminal liability" and this prosecution does not sufficiently resemble prior prosecutions, (2) that the way the statute was written implies "injury" would not include the instant conduct, (3) that an examination of Department of Justice and Congressional materials implies this behavior was not intended to be criminalized by the statute, and (4) that the general rule of lenity in criminal cases should apply.

All of these theories are premised on the well-settled proposition that criminal defendants are entitled to "fair warning . . . of what the law intends to do if a certain line is passed." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). At its core, the "principle is that no man shall be held criminally responsible for conduct that he could not reasonably understand to be proscribed." *Id.* (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). And the constitutional commitment to "[d]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.*

*Lanier* states plainly that "[w]hen broad constitutional requirements have been 'made specific' by the text or settled interpretations, willful violators 'certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment. They are not punished for violating an unknowable something." *Id.* at 267 (quoting *Screws v. United States*, 325 U.S. 91, 105 (1945) (alterations adopted)). Rather, the standard for fair warning in a criminal case is akin to the "clearly established" standard used to determine qualified immunity in civil cases. *Id.* at 271. Fair warning of possible prosecution under § 241 is provided to defendants "if, but only

if, in light of pre-existing law the unlawfulness under the Constitution is apparent." *Id.* Drawing on qualified immunity case law, the Court held that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.*

*Lanier* thus rejected the more stringent "fundamentally similar" standard put forth by the Sixth Circuit, pointing instead to past decisions in which the Court had "upheld convictions under § 241 or § 242 despite notable factual distinctions between the precedents relied on and the cases then before the Court" because "prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* at 269 (citing *United States v. Guest*, 383 U.S. 745, 759, n.17 (1966) (addressing imposition on the right to travel by private persons for the first time, where prior right to travel cases had focused on state action), *United States v. Saylor*, 322 U.S. 385 (holding that vote dilution violated § 241, where prior cases only addressed improper counts of the vote), and *United States v. Classic*, 313 U.S. 299, 321-324 (1941) (expanding vote counting cases into the primary election context)). In *United States v. Classic*, 313 U.S. 299 (1941), the Supreme Court offered guidance on when a § 241 prosecution violates due process by expanding criminal liability to a context not apparent from prior cases.

> [I]t is no extension of the criminal statute . . . to find a violation of it in a new method of interference with the right which its words protect. For it is the constitutional right, regardless of the method of interference, which is the subject of the statute and which in precise terms it protects from injury and oppression.

*Classic*, 313 U.S. at 324.

The scope of criminal liability must also be examined within the context of the specific statute in question, and Section 241 functions differently from most federal criminal statutes. "Section 241 of Title 18 is an anomaly in the federal code of crimes . . . and it is *sui generis* in the federal law of conspiracy. Ordinarily, a conspiracy is an agreement between two or more persons to do an unlawful thing by unlawful means. Yet it is not a substantive federal crime to do what Section 241 makes it a federal crime to conspire to do." *Crolich v. United States*, 196 F.2d 879, 880 (5th Cir. 1952).

Finally, it is irrelevant whether a defendant was actively thinking of their behavior in constitutional terms. "The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution. When they so act they at least act in reckless disregard of constitutional prohibitions or guarantees." *Screws v. United States*, 325 U.S. 91, 105 (1945); *see also United States v. Nathan*, 238 F.2d 401, 407 (7th Cir. 1956) ("[I]t is immaterial that the defendants were without knowledge of the constitutional rights of citizens. When they acted in concert to pollute the ballot box they acted in reckless disregard of such rights and must be held to the consequences.").

### 1. Prior Prosecutions

In order to properly assess whether fair warning was given to Defendant Mackey, this court must understand the scope of prior prosecutions under the statute. For a fair warning analysis, "the pre-existing law may be found in appellate as well as lower court decisions." *United States v. Melendez*, No. 03-80598 (AC), 2004 WL 162937 at *6 (E.D. Mich. Jan. 20, 2004). § 241's fair warning doctrine focuses most centrally on the *right* that has been violated — in this case, the right to vote. A fulsome review of the federal courts' § 241 voting rights cases to date thus constitutes

the court's best available tool for determining whether fair warning for the instant prosecution was given.

Section 241 was originally enacted as Section 6 of the Enforcement Act of 1870. Like other provisions of the Enforcement Act, Section 6's original focus was on enforcing reconstruction's promise of suffrage for southern Black men in the face of significant violence and pushback from the Ku Klux Klan, then in its heyday. ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 1863-1877 454 (2005 ed.). As Congress and the Supreme Court retreated on the issue of reconstruction, bowing to political forces in the South, much of the Enforcement Act was struck down or repealed. *Id.* By the end of the era, only Section 6 and its sister provision Section 7, now Sections 241 and 242, remained in force. *Id.* at 454-55. From their start, these statutory provisions were largely about voting rights "secured . . . by the constitution and laws of the United States of America." *Ex parte Yarbrough,* 110 U.S. 65 (1884) ("The Ku Klux Cases"); *see also United States v. Butler*, 25 F. Cas. 213, 220 (1877). Although "the source of this section in the doings of the Ku Klux and the like is obvious, and acts of violence obviously were in the minds of Congress" when legislating, the statute has since been used to prosecute a wide range of non-violent conspiracies entered into with the intent to injure, oppress, threaten, or intimidate free exercise of the right to vote as well as other constitutional and federal rights. *United States v. Mosley*, 238 U.S. 383, 387-88 (1915) ("§ 6 being devoted, as we have said, to the protection of all Federal rights from conspiracies against them, naturally did not confine itself to conspiracies contemplating violence[.]"). And, "in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government, they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men." *Classic*, 313 U.S. at 316.

a. *The evolution of election-related § 241 cases*

The first election-related § 241 case on record took place in 1877, when two election officials were prosecuted under the statute for conspiring to kill a Black man because he supported a Republican rather than a Democrat in a federal general election. *United States v. Butler*, 25 F. Cas. 213, 220 (D.S.C. 1877). But by the 1910s, the statute was also used to prosecute less violent conspiracies against voting rights. In 1911, local election officials were indicted for conspiring to make ballots intentionally confusing for one party's voters. *United States v. Stone*, 188 F. 836, 838-39 (D. Md. 1911). In 1915, officers of a county board of elections were indicted for conspiring to omit certain votes from the vote count. *United States v. Mosley*, 238 U.S. 383, 385 (1915).

In 1918, the Supreme Court cabined the growing doctrine slightly, holding in *United States v. Bathgate* that bribing voters was not an infringement on the right to vote under Section 241. 246 U.S. 220, 227 (1918). The Court reasoned first that it could not construe § 241 to cover conspiracies to bribe voters because Congress had made its wishes clear by expressly repealing a different section of the act which dealt specifically with bribery. *Bathgate*, 246 U.S. at 226. The Court further reasoned that the right to vote at issue under this statute was the *personal* right to vote rather than the general political right to vote; under the *Bathgate* scheme, although the vote count totals were manipulated, individuals maintained their personal right to vote. *Id.* at 226-27.[10]

---

[10] This part of the *Bathgate* decision was later called into question by *United States v. Saylor*, 322 U.S. 385 (1944). That case allowed a prosecution of election officials for ballot stuffing on the theory that it "prevent[ed] an honest count by the return board of the votes lawfully cast," indicating the statute does in fact apply to generalized vote dilution. *Id.* at 389. Later cases cite *Saylor* for the proposition that vote dilution is a cognizable theory of injury to rights under Section 241. *See, e.g., Crolich v. United States*, 196 F.2d 879, 881 (5th Cir. 1952).

But *Bathgate*'s limitation of the statute was an anomaly. In the 1930s, the Department of Justice (the "DOJ") prosecuted an ever-broader range of voting rights cases under this statute, with the understanding that injuring the right to vote included both hampering a qualified voter's ability to cast their vote and failing to count a vote properly cast. *See United States v. Pleva*, 66 F.2d 529, 530 (2d Cir. 1933) (addressing election inspectors that conspired to tally the ballots incorrectly); *United States v. Buck*, 18 F. Supp. 213, 215 (W.D. Mo. 1937) (prosecuting election commissioners that conspired to injure voters' rights by counting certain votes for a different candidate); *United States v. Clark*, 19 F. Supp. 981 (W.D. Mo. 1937) (holding that changing votes after polls had been closed could also be prosecuted under this statute); *Walker v. United States*, 93 F.2d 383, 388 (8th Cir. 1937) (county election officials "conspired to count, record, and certify the ballots of voters [in a presidential election] falsely with fraudulent intent"); *Ryan v. United States*, 99 F.2d 864, 867-68 (8th Cir. 1938) (holding that a jury was correct in finding that ballots were falsified and other ballots were changed from Democratic to Republican by a certain ward's Republican Committeewoman).[11]

---

[11] Defendant Mackey appears to argue that the Second Circuit's decision in *United States v. Kantor*, 78 F.2d 710 (1935), precludes his prosecution. *Kantor* held that "there was no injury to qualified voters" when the scheme effected votes at a general (both state and federal) election, and the government put forth no evidence that any injured voters intended to vote for candidates for federal office. *Id.* at 711. But *Kantor* addressed an evidentiary issue: the government had failed to show the injury was to the right to vote in *federal* elections, *id.*; although the November 2016 election in New York was a general election, Defendant Mackey's alleged scheme was directed at voters in the presidential election, many of whom, according to the government attempted to vote for president by text. Further, in 1944, the Supreme Court considered another Section 241 prosecution related to a conspiracy regarding a general election, and found no issue. 322 U.S. 385, 389-90 (1944).

In *United States v. Classic,* 313 U.S. 299 (1941), the Court made clear that it viewed the statute as flexible enough to be used in situations that were new but implicated the same rights, as both the nature of the right to vote *and* the most effective ways to oppress voters' rights naturally shifted over time. *United States v. Classic,* 313 U.S. 299 (1941). The Court considered an alleged conspiracy to miscount votes in a Louisiana primary election, where the power to elect a Louisiana representative to Congress had functionally shifted to the primary elections, as those primaries limited who citizens would be able to choose on the general election ballot. *Id.* at 308-09. The Court held that Section 241 could be used to prosecute interference with the right to vote in a Louisiana party primary election, although it was not technically a federal election, because that interference was actually interference with the broader right to vote, and was merely taking place "at the only stage of the election procedure when [voters'] choice is of significance . . . [or] could have any practical effect on the ultimate result, the choice of the Congressman to represent the district." *Id.* at 314. In other words, § 241 could be violated at any stage that represented an "integral part of the procedure for the popular choice" and in any way that injured their "right to participate in that choice," regardless of whether the method for doing so was "one with which the framers were not familiar." *Id.* at 314, 316.

Throughout the 1940s, 50s and 60s, the Department of Justice continued to prosecute cases against those who used a variety of methods to injure or oppress the "personal right of the elector to cast his own vote and have it honestly counted." *Saylor,* 322 U.S. at 387; *see Klein v. United States,* 176 F.2d 184, 185 (8th Cir. 1949) (addressing conspiracy to hinder properly registered voters and cause unqualified voters to vote in the name of qualified voters); *United States v. Prichard,* 181 F.2d 326, 327 (6th Cir. 1950) (stuffing ballot boxes)*; Crolich v. United States,* 196 F.2d 879, 880 (5th Cir. 1952) (stuffing ballot boxes); *United States v.*

*Nathan*, 238 F.2d 401, 403 (7th Cir. 1956) ("pollution of the ballot box" by submitting ballots from fake voters); *Fields v. United States*, 228 F.2d 544, 547 (4th Cir. 1955) (discussing conspiracy to incorrectly fill out ballots on behalf of illiterate voters who thought they were receiving assistance in voting); *United States v. Skurla*, 126 F. Supp. 713, 715 (W.D.P.A. 1954) (considering situation where conspirators forged false ballots, "caused an incorrect tally of the votes cast to be returned" and paid people "to impersonate lawful voters and to cast illegal votes"); *United States v. Ellis*, 43 F. Supp. 321, 324 (W.D.S.C. 1942) ("[T]he right to vote in a Federal election comprehends and includes the right to register for a General Election."); *United States v. Chandler*, 157 F. Supp. 753, 754 (S.D. W. Va. 1957) (falsified absentee ballot voting).

Over the last fifty years, indictments under § 241 have continued to evolve in order to adequately address injuries to the right to vote, as modes of voting and would-be wrongdoers' corresponding methods for injuring those votes have shifted. Notably, a 1988 federal indictment under § 241 dealt with a relatively complex scheme to intentionally misdirect votes by absentee voters opposing the conspirators' preferred candidate. *United States v. Townsley*, 843 F.2d 1070, 1073-75 (8th Cir. 1988). In that case, the "Democratic Committeeman" for a ward organization in St. Louis had workers in that organization qualified as notaries. *Id.* at 1074. He then required those notaries to go to absentee voters' houses to notarize and retrieve their ballots, but to leave those ballots partially unsealed and bring them directly to his office. *Id.* The committeeman would then check each ballot and submit only those ballots in favor of his organization's candidate. *Id.* Although the circuit reversed the district court on an unrelated issue, it noted that the § 241 count of the indictment was sufficient to sustain a verdict. *Id.* at 1086. Similarly, in *United States v. Olinger*, a precinct captain was indicted under § 241 after he

instructed election judges purporting to assist elderly and mentally ill voters to instead "punch 10" on each resident's computerized ballot, resulting in a vote for all Democrats on the ballot. *United States v. Olinger,* 759 F.2d 1293, 1297 (7th Cir. 1985).

More recently, in *United States v. Tobin,* the Department of Justice prosecuted a defendant under § 241 for allegedly conspiring to "disrupt the telephone lines" through which voters could seek assistance from the state Democratic party or firefighters "to impede or prevent voters who needed transportation from getting to the polls," in order "to prevent voters from casting votes for Democratic candidates in the federal election." No. 04-CR-216-01 (SM), 2005 WL 3199672, at *1 (D.N.H. Nov. 30, 2005). Although the jury did not ultimately convict on the evidence presented, the district court found that defendant had fair warning and the indictment survived the corresponding motion to dismiss. *Id.* at *4 ("That a conspiracy or agreement to interfere with the free exercise of the right to vote would violate § 241 is established in the prior decisions of the Supreme Court. Fair warning is given by the statute and decisional law that such conduct is prohibited.").

In sum, the statute's historical usage shows that the indictment before the court today is the latest in a long line of electoral and voting rights prosecutions under 18 U.S.C. § 241. For more than a century, courts have held that this statute flexibly proscribes conspiracies to injure the right to vote in a variety of contexts and undertaken using a variety of mechanisms.

>    b.  *Physical Acts, Threatening or Intimidating Speech, and Independent Wrongful Conduct*

Defendant Mackey is correct that many—but not all—of the cases above pertain to physical acts such as stuffing a ballot box or counting fraudulent votes. (*See* Mot. at 14.) These cases did not, however, *rely* on the physicality of the acts to reach their

holdings. Indeed, many of those cases raised a similar question to the one before the court: whether the statute was "sufficiently broad in its scope to include the offense" charged. *Foss v. United States.*, 266 F. 881, 882 (9th Cir. 1920). Not once has a federal court's response to that question been defined by the offense's corporeal tangibility. *See e.g., Saylor*, 322 U.S. at 388 (deciding that the statute included the charged offense based solely because there was a conspiracy "directed at the personal right of the elector to cast his own vote and to have it honestly counted"). Nor does the statute or the case law offer any reason why a court *would* rely on that fact.

It is also true, as Defendant Mackey claims, (*see* Mot. at 14), that some past cases involving potential violations of Section 241 have pertained to threatening or intimidating speech. *See, e.g., United States v. Robinson,* 813 F.3d 251, 254 (6th Cir. 2016) ("[Defendant] . . . coerced and threatened voters to get them to vote for her by absentee ballot."); *Butler*, 25 F. Cas. at 220. Once again, there is nothing in these cases indicating that threats or intimidation are the only kinds of speech through which the statute could be violated. "[T]he specific means chosen by the alleged conspirators to achieve their goal of suppressing the number of votes cast for Democrats . . . is not significant in the fair warning context." *Tobin*, 2005 WL 3199672, at *3.

Finally, although many § 241 prosecutions involve some "independent wrongful conduct" that would itself constitute a substantive crime, that is certainly not required under the statute. For instance, in *Guinn v. United States,* 238 U.S. 347 (1915), the Supreme Court upheld a prosecution of Oklahoma state election officers who enforced the provisions of an amendment to the Oklahoma constitution that disenfranchised citizens whose lineal ancestors were illiterate as of January 1, 1866, as a conspiracy to violate the Fifteenth Amendment. *Id.* at 354. State officials enforcing their state's own constitution can hardly be said to have

been engaging in "independent wrongful conduct," though a conspiracy to do so did, in fact, violate Section 241.

Given the above, it is clear that the lack of physical action, threat or intimidation, or "independent wrongful conduct" found in Mr. Mackey's alleged conspiracy has no bearing on the question of fair warning.

### 2. Definition of Injury within Section 241

Next, Defendant Mackey invokes principles of statutory construction to argue that (1) the definition of "injury" in Section 241 does not include acts that "merely hinder or prevent" the free exercise of a constitutional right, (Mot. at 16-18) and (2) when read in connection to related statutes, the concept of "injury" in Section 241 necessitates some kind of forcible act, (Mot. at 14-16).

Specifically, Defendant Mackey posits that a comparison of the first and second clauses of Section 241 gives support to a limited definition of injury under the first clause of § 241 in accordance with the principle of *expressio unius est exclusio alterius*. The word "hinder" is expressly included in the list of verbs in the second clause of § 241 (relating to Klansmen in disguise on a highway), but not in the list of verbs in the first clause of § 241 (at issue here). 18 U.S.C § 241. This omission of "hinder" from the verb list, Defendant Mackey argues, expressly limits the reach of Section 241's first clause. But existing case law belies this conclusion. *See Lanier*, 520 U.S. at 266 (relying on the "general constitutional rule already identified in the decisional law" to find fair warning).

Federal courts have for decades defined "injury" to or "oppression" of rights as including behavior that "obstruct[s]," "hinder[s]," or "prevent[s]," *Klein*, 176 F.2d at 185; "frustrate[s]," *United States v. Weston*, 417 F.2d 181, 183 (1969); makes "difficult," *United States v. Stone*, 188 F. 836, 838 (D. Md.

1911); or "indirect[ly] rather than" "direct[ly] assault[s]," *Tobin*, 2005 WL 3199672 at *4, the free exercise of rights. In *Stone*, it was sufficient that officials conspired to "prepare[] and . . . print[] and fold[] the official ballots in such form that any voter could easily vote for the Democratic candidate" but so that it would be "difficult" or "impossible" for many voters, particularly illiterate Black voters, to vote for the Republican candidate. *Stone*, 188 F. at 838. The court in *Stone* also explicitly defined a Section 241 injury as "some act which is intended to *prevent* some citizen or citizens from exercising their constitutional rights." *Stone*, 188 F. at 840 (emphasis added). As far back as 1884, the Supreme Court has held that "[w]henever the acts complained of are of a character to *prevent* [the free exercise of the relevant right], or *throw obstruction in the way of* exercising this right, and for the purpose and with intent to prevent it . . . those acts come within the purview of the statute." *United States v. Waddell*, 112 U.S. 76, 80 (1884) (emphasis added). Thus, a reasonable jury could find that conduct that makes exercising the right to vote more difficult, or in some way prevents voters from exercising their right to vote, could in fact constitute a Section 241 injury to that right.

Further, the Supreme Court in *Mosley* interpreted the relationship between § 241's first and second clauses differently from how Defendant Mackey urges. *See Mosley*, 238 U.S. at 387-88. When Congress amended the relevant statute just a few years prior, it reorganized the clauses—moving the more general language regarding injury to conspiracies first, while putting the other clause, about the Klan in disguise on the highway, second—to reflect the changing times. *Id.* The statutory provision now codified as Section 241

> had a general scope and used general words that have become the most important now that the Ku Klux have passed

away. The change of emphasis is shown by the wording already transposed. . . . The clause as to going in disguise upon the highway has dropped into a subordinate place, and even there has a somewhat anomalous sound. The section now begins with sweeping general words.

*Id.* at 388. In other words, the Supreme Court construed the "sweeping general words" of § 241's first clause as the broader part of the statute, and the second clause to be comparatively narrow in its scope; Defendant Mackey's interpretation would allow the narrower second clause to restrict the first.

Nor does the exclusion of the word "hinder" from the first clause, in itself, limit the scope of the fair warning given to potential violators like Mr. Mackey. As discussed above, federal courts have held that "hindering" is a method of "injuring" a right under the first clause of Section 241. *Klein,* 176 F.2d at 185. Moreover, Merriam Webster defines "to hinder" as "to make slow or *difficult* the progress of: hamper," or "to hold back: *prevent,* check." *See* Merriam-Webster.com Dictionary, *"Hinder"* (last visited Jan. 23, 2023), https://www.merriam-webster.com/dictionary/hinder.

The cases cited by Defendant Mackey for the proposition that Section 241 does not prohibit "merely inhibiting exercise of rights," (Mot. at 16), deal with—and cabin their holdings to—different verbs in the statute than the one under which the Government primarily seeks to prosecute Defendant Mackey—"threaten" and "intimidate" rather than "injure." [12] *See United States v. Lee,* 6 F.3d 1297, 1298-99 (8th Cir. 1993) (en banc)

---

[12] Although the Indictment, tracking the statutory language of 18 U.S.C. § 241, includes the full list of verbs—to injure, oppress, threaten and intimidate—the Government has stated their belief that the word "injury" most fully captures the effects of the conduct at issue. (May 6, 2022 Tr. (Dkt. 47) at 16-17 ("THE COURT: Which of the four words in the statute most closely -- most closely addresses the conduct that you say is illegal? MR. PAULSEN: I believe the first, Your Honor the first, injury.").)

(Gibson, J., concurring); *United States v. Magleby*, 241 F.3d 1306, 1314 (10th Cir. 2001).

Defendant Mackey next argues that the definition of "injury" in Section 241 necessitates some kind of forcible act when read in connection with Section 245. (Mot. at 14.) But this betrays a fundamental misunderstanding of both the relationship between Section 241 and Section 245 and *United States v. Pacelli*, 491 F.2d 1108 (2d Cir. 1974), the case upon which he draws. Section 245 "made it unlawful to interfere with a number of specifically listed 'federally protected activities.'" *Id.* at 1113. But contrary to Defendant Mackey's argument (and unlike Section 241), that section explicitly prohibited injuring the exercise of the enumerated rights "*by force or threat of force.*" 18 U.S.C. § 245(b). Section 241 does nothing of the sort. And *Pacelli* explicitly rejected any contention that Section 245's limitations should be understood to amend or otherwise limit the scope of Section 241: the Second Circuit specifically found "no basis in the new statute or in its history warranting a departure from the rule against amendments by implication," *Id.* at 1115, and thus held that the federal courts' past construction of Section 241 would remain untouched. Congress's purpose in enacting Section 245 was to "draft a law effectively dealing with racial violence only," with no "intention to strip the national government of its existing ability under § 241 to protect" rights. *Id.* at 1114-15. Thus, Section 245's requirement of some "forcible act" has no bearing on what is protected under Section 241.

In fact, as discussed above, courts have very explicitly held § 241 to apply to a whole host of acts that do not include the use of force or violence, *see, e.g., Saylor*, 322 U.S. at 385 (holding that vote dilution violated the right to vote under § 241 though prior cases had not dealt only with the violations through improper counts of the vote), *Classic*, 313 U.S. at 299 (expanding vote counting cases into the primary election context), and the Second

35

Circuit explicitly left those holdings intact after the passage of the related but distinct Section 245.[13]

Taken together, the decisional and statutory law does not provide support for a finding that Mr. Mackey lacked fair warning that a conspiracy to prevent, hinder, or inhibit the free exercise of the right to vote, without the use of force, could violate Section 241.

### 3. DOJ and Congressional Materials

There is no requirement that, in order to give Mr. Mackey fair warning that his conduct violated Section 241, the Department of Justice needed to publish materials detailing his exact method of allegedly violating the statute as an example of misconduct under § 241. Moreover, the publications cited in Defendant's Motion do not narrow the scope of what might constitute criminal activity under Section 241. (*See* Mot. at 21-22.) Indeed, the language these publications offer explaining the contours of what could violate the statute going forward can easily be construed to include the conduct at issue here. The 2017 Guide to Federal

---

[13] The court notes that in a since-overturned 2006 opinion, the Second Circuit held, using the categorical approach, that Section 241 was a crime of violence for the purposes of 18 U.S.C. 924(c). *United States v. Acosta*, 470 F.3d 132, 137 (2d Cir. 2006). *See also United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009). This holding did rest on a finding that "physical force is perhaps the most obvious way to injure, threaten, or intimidate," and that the statute therefore met the "substantial risk of force" standard set forth by the residual clause. *Acosta*, 470 F.3d at 136. The Circuit did not, however, find that a Section 241 necessarily entailed a use of force. The statute's lack of a minimum conduct requirement actually led the Supreme Court to overturn the "residual clause" of 924(c) in *U.S. v. Davis*. 139 S. Ct. 2319, 2326 ("[T]he imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined 'ordinary case.'"). In short, despite its now defunct holding that § 241 constituted a crime of violence, the Circuit never actually held that all instances of conspiracy under § 241 would involve schemes that required the use of force.

Prosecution of Election Offenses lays out examples of "private schemes"[14] that align with this case and the cases discussed above: "(1) voting fraudulent ballots in mixed elections, and (2) thwarting get-out-the-vote or ride-to-the-polls activities of political factions or parties through such methods as jamming telephone lines or vandalizing motor vehicles." Dep't of Just., Federal Prosecution of Election Offenses 36-37 (2017).

Defendant Mackey also invokes Congress's repeated decision not to pass the Deceptive Practices and Voter Intimidation Prevention Act, a bill seeking to criminalize election interference by misinformation which has been regularly introduced in Congress since 2005, as evidence that Defendant Mackey's conduct was (at least arguably) not already covered by Section 241. *See, e.g.,* S. 1975, 109th Congress, First Session; S. 4069, 109th Congress, Second Session; S. 453, 110th Congress, First Session; S. 1840, 117th Congress. Without explicitly saying so, Defendant Mackey is arguing that this statute should be interpreted according to the extrinsic canon known as the "Rejected Proposal Rule." William N. Eskridge, Jr., *Interpreting Legislative Inaction*, 87 Mich. L. Rev. 67, 69 (1988) ("[T]he 'rejected proposal rule' . . . posits that proposals rejected by Congress are an indication that the [existing] statute cannot be interpreted to resemble the rejected proposals.").

Here, however, there is sufficient case law as to the scope of Section 241 that this court need not resort to extrinsic canons relating to subsequent legislative history in order to determine fair warning. Even if the court did choose to consider this related

---

[14] The document defines a private scheme as "a pattern of conduct that does not involve the necessary participation of a public official acting under color of law, but that can be shown to have adversely affected the ability of qualified voters to vote in elections in which federal candidates were on the ballot." Dep't of Just., Federal Prosecution of Election Offenses 37 (2017).

legislative history, however, it would not reach Defendant Mackey's conclusion: the reality is that members of Congress often have political reasons for introducing legislation or suggesting further clarification of an existing rule, such as posturing for cameras or satisfying important constituencies.[15]

### 4.   Rule of Lenity

Mr. Mackey also brings forth a more general argument that the rule of lenity counsels in favor of dismissing the Indictment because the question of fair warning is, in his view, a close one. But the rule of lenity counsels courts "to favor a more lenient interpretation of a criminal statute when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011). Section 241 is unambiguous, and thus the court does believe the rule of lenity applies.

### 5.   Conclusion

In sum, this court finds that the record of historical prosecutions of conspiracies to injure the right to vote, combined with a reasonable reading of the statute itself, constituted ample fair warning for Defendant Mackey that his alleged conduct would violate Section 241.

## C.   First Amendment

Finally, Mr. Mackey argues that the Indictment should be dismissed because Section 241 is, as applied in the instant prosecution, unconstitutional under the First Amendment.[16] The

---

[15] Although this is also a general weakness of the rejected proposal rule, it is particularly persuasive in the context of election interference, which has been a hot-button issue over the period in question.

[16] The defense styles this argument as one that, "[i]f Section 241 can fairly be interpreted to cover the Tweeted Memes in this case, it is unconstitutionally *overbroad* as applied." (Mot. at 22.) (Emphasis added.) The court

court disagrees. Defendant Mackey argues that, although Section 241 is facially constitutional, he cannot be prosecuted thereunder for his Deceptive Tweets because they are examples of election deception, a type of pure speech protected by the First Amendment at its fullest. Controlling case law and the values undergirding the Supreme Court's First Amendment jurisprudence do not support this outcome.

This case is about conspiracy and injury, not speech. (*See* Opp. at 15-16 (collecting cases and arguing that "the language [Defendant Mackey] used is akin to verbal acts," which fall outside the scope of the First Amendment, "rather than protected ... speech.").) As previously stated, § 241 does not require an overt act, *see Crolich*, 196 F.2d at 880, nor is it restricted to specific methods used to effectuate the alleged conspiracy against rights. As applied within the Indictment, this law is used to prosecute a conspiracy to trick people into staying home from the polls—conduct effectuated through speech—not a crime particular to the utterances made to effect that aim.

To the extent that the conduct allegedly used to affect a conspired-about injury *does* implicate the First Amendment, the appropriate analysis is one of how the First Amendment interacts with verifiably factually false utterances made to "gain a material advantage" in the context of election procedures. *United States v.*

---

is puzzled by this framing. "A party alleging overbreadth claims that although a statute did not violate his or her First Amendment Rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir 2006) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Defendant Mackey's legal arguments all rest on the statute's unconstitutionality as it pertains to the specific facts of his case, not to the facts of a hypothetical third party's case. For this reason, the court addresses the statute's constitutionality as applied, rather than through a First Amendment overbreadth analysis.

*Alvarez*, 567 U.S. 709, 723 (2012).[17,18] False speech raises unique First Amendment concerns, and depending on the context of the false speech, may fall into categories historically exempted from First Amendment protection or warrant intermediate, not strict, scrutiny. *Id.* at 717 (Kennedy, J, plurality); *id.* at 730-31 (Breyer, J., concurring in the judgment). Under either approach, this prosecution passes constitutional muster, and Defendant Mackey's remaining contention—that his speech is protected as satire—is a question of fact reserved for the jury.

---

[17] *Alvarez* did not contain a majority opinion: four Justices joined the plurality opinion, while two concurred only in the judgment and another three dissented. *Alvarez*, 567 U.S. at 712. This opinion relies on the analysis about which the plurality and concurrence agree. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

[18] *Alvarez* addressed a *facial* challenge to the Stolen Valor Act, while the instant challenge is to a statute *as-applied*. However, the precedent still controls. "An as-applied challenge . . . 'requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right.'" *Picard*, 42 F.4th at 101 (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006)); *see also C.R. Corps v. Pestana*, No. 21-CV-9128 (VM), 2022 WL 2118191, at *4 (S.D.N.Y. June 13, 2022). Indeed, "with an as-applied challenge, Plaintiffs need not challenge the legitimacy of the [statute] in the abstract; they need only address the [statute] with respect to their own activities." *Upsolve, Inc. v. James*, No. 22-CV-627 (PAC), 2022 WL 1639554, at *6 (S.D.N.Y. May 24, 2022). And, in as-applied First Amendment challenges, the question of content regulation becomes a question of whether the case at bar "show[s] a content-based application" of the law in question. *Butler v. City of New York*, 559 F. Supp. 3d 253, 270 (S.D.N.Y. 2021).

1. False Speech—Legal Framework[19]

   a. *The* Alvarez *plurality—categorical approach and strict scrutiny*

In some instances, including in the plurality in *Alvarez*, the Supreme Court has employed a historical-categorical approach to determining when utterances are unprotected by the First Amendment, even where the statute in question is content-based. *See Alvarez*, 567 U.S. at 717. Under that approach, "content-based restrictions have been permitted, as a general matter, only when confined to the few historic and traditional categories of expression long familiar to the bar." *Id.* (collecting cases and defining the relevant categories as obscenity, fraud, defamation, fighting words, child pornography, speech integral to criminal conduct, true threats, advocacy intended to incite imminent lawless action, and "speech presenting some grave and imminent threat the government has the power to prevent"). Under this approach, utterances can primarily be deemed unprotected or "proscribable" when they fall into one of these historically excepted categories; in any other context, the government action is analyzed pursuant to a strict scrutiny framework. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383-84 (1992).

---

[19] The court has opted to conduct the below *Alvarez* analysis under the assumption that the speech in question is content-based. Whether government action regarding speech is content-based implicates a dynamic area of the law. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) ("Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose"); *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464 (2022) (noting that "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral"); *see also Picard v. Magliano*, 42 F.4th 89, 102 (2d Cir. 2022). The court is far from certain that this prosecution is actually content-based under the law, but as the result is the same, the analysis that follows assumes the *Alvarez* analysis is necessary.

New categories may—albeit extremely rarely—be added to this list. "[B]efore exempting a category of speech from the normal prohibition on content-based restrictions, however, the Court must be presented with persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription." *Alvarez*, 567 U.S. at 722.

If the speech does not fall into one of these categories (or meet the criteria for identifying a previously-unrecognized category), the court will typically apply strict scrutiny. In order to pass muster under a strict scrutiny analysis, the regulation must be "narrowly tailored to serve a compelling state interest." *Picard v. Magliano*, 42 F.4th 89, 103 (2d Cir. 2022). To determine whether a regulation is narrowly tailored, a "court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004).

Note, however, that the *Alvarez* plurality does not go so far as to say that the application of strict scrutiny would necessarily be the correct course for all instances of content-based falsity. *Alvarez*, 567 U.S. at 721-22 ("[T]here are instances in which the falsity of speech bears upon whether it is protected. Some false speech may be prohibited even if analogous true speech could not be. This opinion does not imply that any of these targeted prohibitions are somehow vulnerable. But it also rejects the notion that false speech should be in a general category that is presumptively unprotected."). Instead, the plurality takes great pains to highlight the aspects of that case which rendered strict scrutiny appropriate. *Alvarez*, 567 U.S. at 722-23 (expressing concern about the statute "control[ling] and suppress[ing] all false statements on this one subject in almost limitless times and settings. . . . without regard to whether the lie was made for the purpose of material gain").

b. *The* Alvarez *concurrence—intermediate scrutiny for factually verifiable falsity*

Justice Breyer's concurrence agreed with the plurality that strict scrutiny should be applied to *some* types of regulation of false speech, particularly to "[l]aws restricting false statements about philosophy, religion, history, the social sciences, [and] the arts." *Alvarez*, 567 U.S. at 732-33 (Breyer, J., concurring in the judgment). But the concurrence opted to apply intermediate scrutiny in *Alvarez*, stating that "[t]he dangers of suppressing valuable ideas are lower where . . . the regulations concern false statements about easily verifiable facts that do not concern such subject matter." *Id.* at 732. When it comes to "false statements about easily verifiable facts," the *Alvarez* concurrence argued that intermediate scrutiny should be applied. *Id.* The concurrence notes too that false speech can be prohibited in instances where the lie is likely to make "a specific harm [] more likely to occur." *Id.* at 736. To conduct this intermediate scrutiny analysis, a court must "ask whether it is possible substantially to achieve the Government's objective in less burdensome ways" that for instance, "insist upon a showing that the false statement caused specific harm or at least was material," apply only in "contexts where such lies are most likely to cause harm," or involve "information dissemination" rather than restriction of speech. *Id.* at 738.

c. *Controlling law from* Alvarez

Where, as in *Alvarez*, "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). First, the *Alvarez* concurrence controls with regard to its rejection of the strict historical categorical approach, where exceptions to First Amendment protection are limited solely to the enumerated historical exceptions, as the plurality only secured

43

four votes for that point. *Alvarez*, 567 U.S. at 730. Although the historical categories test can inform this court's analysis, it does not exclusively control.

Second, there are several areas of agreement between the two opinions. False speech relating to history, philosophy, and so forth can be debatable and difficult to verify and should therefore be afforded full First Amendment protection. *Alvarez*, 567 U.S. at 732-33 (Breyer, J., concurring in the judgment). As one court described it, both *Alvarez* opinions contrasted a "bar stool braggadocio" with one making a false statement for a "material purpose," thus creating a materiality requirement of sorts for the types of false statements that are susceptible to government regulation. *United States v. Chappell*, 691 F.3d 388, 398 (4th Cir. 2012) (explaining that this distinction was discussed approvingly by the *Alvarez* plurality *and* central to the concurrence's holding). Additionally, there is genuine agreement that statutes that prohibit falsities in order to "protect the integrity of government processes" (*e.g.*, perjury statutes, laws barring lying to government officials, and those "prohibit[ing] falsely representing that one is speaking on behalf of the Government,") are properly within the government's regulatory authority. *Alvarez*, 567 U.S. at 720-21; *see also id.* at 734-35 (Breyer, J., concurring) (stating that it is permissible to regulate false speech that creates a "particular and specific harm by interfering with the functioning of a government department"). Both opinions support the idea that "restrictions on false factual statements that cause legally cognizable harm tend not to offend the Constitution." *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1232 (10th Cir. 2021) (citing *Alvarez*, 567 U.S. at 719 and *id.* at 734-36 (Breyer, J., concurring in the judgment). And finally, a regulation would improperly proscribe a false statement if it did not contain at least an implicit requirement that the statement be *knowingly* or *intentionally* false. *Alvarez*, 567 U.S. at 719; *id.* at 732 (Breyer, J., concurring

in the judgment) ("I would read the statute favorably to the Government as criminalizing only false factual statements made with knowledge of their falsity and with the intent that they be taken as true").

### d. *Political speech*

Defendant Mackey argues that his deceptive Tweets constitute protected political speech. A vibrant political discourse is a prerequisite to this nation's successful maintenance of a thriving democracy.

> Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.

*McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346 (1995). For this reason, courts have long hesitated to uphold restrictions on political speech. *See e.g., Citizens United v. FEC,* 558 U.S. 310, 349 (2010) ("If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech."); *Eu v. S.F. Cnty. Democratic Cent. Comm.,* 489 U.S. 214, 223 (1989) (overturning a ban on party primary endorsements on the basis that "debate on the qualifications of candidates is integral to the operation of the system of government established by our Constitution"); *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 (1971) (holding that the First Amendment protects statements about candidates). Content-based restrictions of *political* speech have thus been consistently subject to strict scrutiny, *see e.g., Arizona Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721, 734 (2011) (holding that a matching funds provision substantially burdened political speech in a public forum and thus must be subjected to

strict scrutiny), and *Alvarez*—which did not address political speech—did not impact that approach. *See 281 Care Comm. v. Arneson*, 766 F.3d 774, 782-83 (8th Cir. 2014) (concluding that *Alvarez* did not alter the level of scrutiny applied to political speech regulation); *see also Massachusetts v. Lucas*, 472 Mass. 387, 396 (2015) ("[W]e find it doubtful that the concurring opinion of two justices in *Alvarez* abrogated the well-established line of First Amendment precedent holding that content-based restrictions of political speech must withstand strict scrutiny.")

Courts have, on the other hand, been deferential to government regulation of speech that is not *political* in nature and is instead related to politics only in so far as it proscribes the procedures governing elections. *See, e.g., Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (holding that a ban on write-in ballots did not violate the First Amendment because "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system"). Although in dicta in an unrelated case, the Supreme Court recently made this differentiation explicit: "[w]e do not doubt that the State may prohibit messages intended to mislead voters about voting requirements and procedures." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1899 n.4 (2018).

### 2.   False Speech—Application

The Government correctly argues that Defendant Mackey's Deceptive Tweets are most accurately characterized as a vehicle or means for illegal conduct, and that the statute—even as applied—is targeting that aspect of Mr. Mackey's behavior, rather than a free-floating crime of speech. Treason is still treason if it is spoken aloud. Conspiracy is still criminal if it is communicated verbally. A supervisor who publicly orders a subordinate to discriminate has violated anti-discrimination laws, despite acting through their utterances. The instant prosecution is a continuation of that commonsense understanding of the relationship

between crime and speech, present throughout so much of the doctrinal history.

To the extent that Mr. Mackey's Deceptive Tweets should be doctrinally examined as speech, they are proscribable false utterances subject to an intermediate scrutiny analysis. Indeed, for the reasons set forth below, this prosecution regarding Mr. Mackey's Deceptive Tweets survives under the analysis for false speech set forth in *Alvarez*.

Although the *Alvarez* plurality and concurrence fail to reach agreement on the precise line between the types of false speech regulations that are examined under strict scrutiny and those which are less protected, *Alvarez*'s logic illustrates that strict scrutiny is not required in the instant case. Like Mr. Alvarez's claims that he held the Congressional Medal of Honor, *Alvarez*, 567 U.S. at 713, Mr. Mackey's claims that Democrats could vote for President by text were indubitably false, with "no room to argue about interpretation or shades of meaning." *Id.* at 716. But unlike Mr. Alvarez's claims, Mr. Mackey's tweets do not even arguably constitute "pure speech." *Id.* at 715. This prosecution targets only false speech intentionally used to injure other individuals' attempt to exercise their constitutionally guaranteed right to vote, and to secure an outcome of value to Mr. Mackey—an advantage in a Presidential election for his preferred candidate—despite Mr. Mackey's knowledge that the statements in his tweets were false.

Defendant Mackey is alleged to have designed the Deceptive Images so that they would be mistaken for messages from the Hillary Clinton campaign. (*See* Compl. at ¶¶ 22-33.) In that sense, this case is analogous to impersonation and false pretenses cases considered since *Alvarez* by the Fourth, Eighth, and Tenth Circuits, all three of which differentiated between instances in which false utterances constituted protected speech (requiring a strict scrutiny analysis) versus unprotected speech (requiring

only intermediate scrutiny). *See Animal Legal Def. Fund v. Reynolds,* 8 F.4th 781, 787 (8th Cir. 2021); *Kelly,* 9 F.4th at 1232; *Chappell,* 691 F.3d at 396-97. In *Reynolds,* the court held that under *Alvarez,* an Iowa statute prohibiting "access to an agricultural production facility by false pretenses" was "consistent with the First Amendment because it prohibits exclusively lies associated with a legally cognizable harm—namely, trespass to private property." *Reynolds,* 8 F.4th at 785-86. The instant statute as applied meets that standard, in that the Government seeks to prosecute only lies associated with the "legally cognizable harm" resulting from criminal conspiracy to injure voting rights. This same case makes great hay of the need for a "materiality" element. *Id.* at 788. As stated above, the nature of this application of Section 241—which implicates a conspiracy to "injure"—renders a materiality requirement inherently present for any successful prosecution. 18 U.S.C. § 241.

Defendant Mackey correctly asserts that even under *Alvarez,* a finding that the Deceptive Tweets constituted political speech would require the application of strict scrutiny to the regulation. But Defendant Mackey's argument that the instant utterances should be categorized as political speech is unavailing. Political speech is, to be sure, "at the heart of American constitutional democracy" and the area where the First Amendment's "constitutional guarantee has its fullest and most urgent application." *Brown v. Hartlage,* 456 U.S. 45, 53 (1982) (prohibiting an application of a law that would prohibit candidates from participating in "the unfettered interchange of ideas for the bringing about of political and social changes desired by people."). But the definition of political speech cannot be one of unlimited scope. The Court's political speech cases have uniformly involved speech and expressive conduct relating to the *substance* of what is (or may be) on the ballot—policy issues, party preference, candidate credentials, candidate positions, putative facts about issues covered by ballot questions, and the like. *See e.g., John Doe*

*No. 1 v. Reed*, 561 U.S. 186, 194-95 (2010) ("[T]he expression of a political view implicates a First Amendment right."); *Citizens United*, 558 U.S. at 349–50; *McIntyre*, 514 U.S. at 346 ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution."). The instant application of Section 241 does not attempt to regulate speech about the substance of what is on the ballot. Instead, it attempts to protect access to the ballot.[20]

While it is possible that regulation of election misinformation or disinformation could, under other circumstances, be unconstitutional as impermissible proscriptions of political speech, this prosecution targets "speech that harms the election process," rather than speech about a candidate or a candidate's views.[21] *See generally* David S. Ardia & Evan Ringel, *First Amendment Limits on State Laws Targeting Election Misinformation*, 20 First Amend.

---

[20] Defendant Mackey emphasizes that "caustic" and "offensive" political speech, as well as the associational right to gather for such speech, is protected by the First Amendment. Thus, Mr. Mackey argues, the objectively offensive message exchanges between Mr. Mackey and his alleged co-conspirators were protected. (Mot. at 25-26 (citing *Hill v. Colorado*, 530 U.S. 703, 716 (2000); *Thornhill v. Alabama*, 310 U.S. 88 (1940), *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)).) But the court understands the Complaint to be providing the exchanges in question (those referring to Democrats as "shitlibs," (Compl. ¶ 18) or emphasizing the importance of limiting the number of Black voters (*id.* at ¶ 31), and so forth) as background and context for the conversational environment in which the Deceptive Tweets were ultimately conspired about and formulated, rather than as acts to be regulated or criminalized in of themselves. As the court does not view the Indictment as pertaining to those exchanges, this line of Defendant Mackey's argument is irrelevant.

[21] As noted in Section I.A of this Order, the alleged Deceptive Tweets made false statements as to how Hillary Clinton voters could cast their votes. (*See* Compl. at ¶ 32) ("Avoid the Line. Vote from Home. Text '[Hillary]' to 59925[.] Vote for [Hillary Clinton] and be a part of history").

49

L. Rev. 291, 298 (2022) (differentiating between the two in arguing that "[s]tatutes that target defamatory speech or speech that harms the election process, is fraudulent, or that intimidates voters are likely to be permissible, while statutes that target other types of speech that have not traditionally been subject to government restriction will face an uphill battle in demonstrating that they are constitutional."). If Defendant Mackey had tweeted false statements about Hillary Clinton's policy positions, for instance, a different analysis would be necessary. But the issue at bar is whether Tweets telling one candidate's supporters that they can vote by text or Tweet, therefore making "false statements about election procedures, such as the day the election will be held, the proper place to cast one's vote, or voting requirements" are proscribable utterances. James Weinstein, *Free Speech and Domain Allocation: A Suggested Framework for Analyzing the Constitutionality of Prohibitions of Lies in Political Campaigns,* 71 Okla. L. Rev. 167, 222 (2018); *see also* Richard L. Hasen, *A Constitutional Right to Lie in Campaigns and Elections?*, 74 Mont. L. Rev. 53, 70 (2013) (quoting Professor Eugene Volokh's statement that "narrower bans on, say, knowingly false statements about when or where people should vote . . . might be constitutional" under *Alvarez*). Indeed, regulation of such speech regarding election procedures properly falls into the very different category of false speech regarding the efficient administration of government processes, which even Kennedy's plurality in *Alvarez* acknowledges has often been upheld by courts. *Alvarez,* 567 U.S. at 727-28.

Thus, this court will follow Justice Breyer's lead on the appropriate mode of analysis for false speech that is entitled to less than complete First Amendment protection and apply intermediate scrutiny. *Alvarez,* 567 U.S. at 731-32 (Breyer, J., concurring in the judgment). Intermediate scrutiny requires that there be a "fit" between § 241 as applied and the government's interest in regulating the utterances in question. *Id.* The Court has made clear

time and time again that the United States has a compelling interest in maintaining the integrity of election procedures. *See, e.g., Hartlage,* 456 U.S. at 53; *Anderson v. Celebrezze,* 460 U.S. 780, 804 (1983); *Mansky,* 138 S. Ct. at 1890 n.4; *Burson v. Freeman,* 504 U.S. 191, 199 (1992) (stating that the state interest in "protect[ing] the right to vote in an election conducted with integrity and reliability" is a "compelling one[]"). This compelling interest undoubtedly includes making sure voters have accurate information about how, when, and where to vote. Prosecutions such as the one before this court are one of the few tools at the Government's disposal for doing so. Counter speech, a typical mode of countering false speech, is unlikely to be of much use in the context of tweets spread across the far reaches of the internet in the days and hours immediately preceding an election.

And the prosecution is narrowly tailored to serve this interest. Section 241's intent requirement ensures that accidental misinformation will not be criminalized. Further, permitting § 241 to be used for a narrow set of prosecutions regarding conspiracies to make verifiably false utterances about the time, place, or manner of elections that would injure the right to vote is unlikely to encourage selective prosecutions or chill broad categories of constitutional speech. For these reasons, the instant regulation as applied constitutes a sufficiently tailored approach to further a compelling government interest, and thus survives intermediate scrutiny.

Even if the plurality's holding in *Alvarez* wholly bound this court, this court would still find the instant application of the statute constitutional. The utterances in question—Mr. Mackey's Deceptive Tweets—fit into two of the categories of speech historically excepted from full First Amendment protection, and may even fall under a historical but heretofore unrecognized category.

First, the Deceptive Tweets are merely a single element within a course of criminal conduct. As discussed above, the core unlawful

act in this case is the formation of a conspiracy to injure a right. The Deceptive Tweets are simply the *means* through which the injury was conspired to take place. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) (stating that "[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as integral part of conduct in violation of a valid criminal statute" and upholding a statute primarily aimed at criminalizing a type of industry collusion, but which also had the collateral impact of prohibiting otherwise lawful protest). Since then, the Supreme Court has employed this exception in a broad range of circumstances where the speech in question was secondary to the core conduct being criminalized. In 1968, the Court held that a statute prohibiting draft card burning fell within this category and was thus proscribable despite the obvious expressive conduct involved. *See generally United States v. O'Brien*, 391 U.S. 367 (1968). The Court also made this category the basis for its holding that child pornography was proscribable content despite the First Amendment. *New York v. Ferber*, 458 U.S. 747, 761 (1982) ("The advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials, an activity illegal throughout the Nation.") Similarly, Defendant Mackey's alleged *conspiracy* to prevent individuals from exercising their right to vote was criminal. That properly criminalizing that conspiracy has, in this circumstance, the collateral effect of prohibiting certain false utterances does not change the fact that those false utterances are merely an element within a broader course of criminal conduct.

Second, the Deceptive Tweets implicate the fraud exception. The Court's historical decisions indicate that statutes regulating (and criminalizing) fraud do not violate the First Amendment. This exception can be attributed to the particulars of history, but it can also be understood as acknowledging the irrelevance of fraudulent acts to the values protected by the First Amendment, such as

52

the free exchange of ideas, the furtherance of deliberative democracy, the ability to hold institutions accountable, and the import of personal expressive fulfillment. Regardless of its justification, fraud is not covered speech under the First Amendment. Although the Supreme Court has not clearly defined fraud for First Amendment purposes, under New York law the "elements of a common law fraud claim are a material false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 255 (S.D.N.Y. 2012). The Government plans to prove that Mr. Mackey's Deceptive Images contained material false representations intended to defraud Hillary Clinton voters, upon which the Government alleges there was reasonable reliance injuring the right to vote. Thus, Mr. Mackey's Deceptive Tweets, though far from the typically commercial instance of fraud, implicate the Court's fraud exception.

Third, the *Alvarez* plurality left room for the rare occasion in which another historical category could appropriately be recognized. For this to be warranted, a court must be presented with "persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription." *Alvarez*, 567 U.S. at 722. Indeed, the *Alvarez* plurality appears to essentially describe one such category without naming it—that of false speech injuring the "integrity of Government processes." *Id.* at 720-21. *Alvarez*'s designation of this historical category of proscribable speech, along with the dearth of First Amendment values underlying these types of false statements, provides persuasive evidence that related restrictions on content have a long and valid history. Under this additional category, the instant prosecution survives First Amendment analysis.

### 3. Satire

Defendant Mackey also argues that his Deceptive Tweets constitute protected satire. It is well settled that "parody and satire are

deserving of substantial freedom—both as entertainment and as a form of social and literary criticism," and are thus protected by the First Amendment. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) (emphasis in original omitted); *see also Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 57 (1988) ("[T]his claim cannot, consistently with the First Amendment, form a basis for the award of damages when the conduct in question is the publication of a caricature such as the ad parody involved here."). The question of whether a reasonable listener or reader would understand the false statements as satire or as factual assertions is one best left, at least initially, to the jury. *See, e.g., Falwell v. Flynt*, 797 F.2d 1270, 1273-74 (4th Cir. 1986), *rev'd sub nom. on other grounds Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) (noting that the jury determined "the parody was not reasonably believable"); *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) ("Whether the M & M Cowboy characters were parodies of The Naked Cowboy, however, raises factual questions that are not for the Court to decide at this stage of the litigation."); *see also FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 141 (2d Cir. 2019) (stating that issues which present "a nettlesome and fact intensive . . . question of fact" are "for the jury rather than a question of law for the court"). Importantly, "the test . . . is not whether some actual readers were misled, but whether the hypothetical reasonable reader could be (after time for reflection)." *Farah v. Esquire Mag.*, 736 F.3d 528, 537 (D.C. Cir. 2013). Contextual factors to consider could include whether the "prominent indicia of satire" were present, including "humorous or outlandish details," "stylistic elements" indicating it was "not serious," and the "substance" itself. *Id.* at 538-39.

Defendant Mackey's argument that the Indictment should be dismissed because the underlying speech is satire is unavailing. The question of whether the Deceptive Tweets were satire is an issue

of fact best left to the jury.[22] If the jury finds that the Deceptive Tweets were satire, Defendant Mackey must be acquitted. At this time, however, it is inappropriate to conclude that Defendant Mackey engaged in protected satire as a matter of law.[23] This court shall not substitute for the judgment of a jury its own judgment as to whether the reasonable listener or reader would have interpreted Mr. Mackey's tweets as earnest directions for voting or an online farce.

### 4. Conclusion

For these reasons, the court finds the instant application of Section 241 cannot, at this stage, be held unconstitutional pursuant to the First Amendment.

---

[22] Mr. Mackey's more general arguments about the nature of communications on Twitter also go to the question of satire and will similarly be left to the jury. (*See* Mot. at 23 (arguing that "Twitter is a no-holds-barred free-for-all" and all Tweets should be understood as "hyperbole," "satire" or "ridicule").

[23] The court notes that the Complaint lays out alleged facts which seriously undermine the claim that Defendant Mackey was engaging in satire. Defendant Mackey's private conversations with co-conspirators reference the need to suppress Democratic turnout in the upcoming election and brainstorm ways they can contribute to that goal (Compl. ¶¶ 17-18, 31); discuss using the official color scheme and logo of the Clinton campaign to ensure the images were believable (*id.* at ¶¶ 22-23); and expound on how they plan to react in a manner that "make[s] it more believable" to the target audience (*id.* at ¶ 25).

## IV. CONCLUSION

For the foregoing reasons, the court DENIES Defendant Mackey's (Dkt. 43) Motion to Dismiss the Indictment.

SO ORDERED.

Dated:     Brooklyn, New York
           January 23, 2023

                                          s/Nicholas G. Garaufis
                                          ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                          NICHOLAS G. GARAUFIS
                                          United States District Judge