# DAVID M. SCHWARTZ, ESQ.

546 Fifth Avenue
New York, NY 10036
(212) 641-0499 (o)
(917) 566-5425 (c)
david@davidschwartzesq.com

March 28, 2023

VIA ECF

The Honorable Victor Marrero
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re: National Coalition on Black Civic Participation et al. v. Wohl et al., No. 20-cv-8668

Dear Judge Marrero:

On behalf of Defendants and in response to Plaintiff's "a joint letter on the prospective relief sought", and as directed by the Court's March 8, 2023 Decision and Order "[a]s the action remains pending with respect to the scope of relief sought against Defendants, including damages, attorney's fees, and costs, Plaintiffs shall file a joint letter on the prospective relief sought no later than twenty (20) days from the date of this Order. Defendants shall have ten (10) days to file a response. (Dkt. No. 256).

As a threshold issue, Plaintiffs in their March 28th 2023 letter, state "Plaintiffs are willing to waive a jury trial ..."

**Defendants, however, to be perfectly clear do not waive their constitutional right to a jury trial.**

> The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." ...[In] an early case in South Carolina, McCoy v. Lemon, 11 Rich. 165...The jury returned a verdict ... The trial court... conceding the inadequacy of the damages, held that no court possessed the power to bring about an

increase or decrease of the amount found by a jury in any other way than by granting a new trial. The Court of Appeals sustained the trial court...After pointing out the jealous regard of the American people, as evidenced by constitutions and legislation, for the right of jury trial, the court said that the judgment of the jury had been incorporated as an indispensable element in the judicial administration of the country; that in all cases sounding in damages, these damages must be assessed by the jury and not by the court independently thereof..." Dimick v. Schiedt, 293 US 474 - Supreme Court 1935

In addition, "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." Kampa v. White Consolidated Industries, Inc., 115 F. 3d 585 - Court of Appeals, 8th Circuit 1997 citing to Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 501, 79 S.Ct. 948, 952, 3 L.Ed.2d 988 (1959)(quoting Dimick v. Schiedt, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935)).

With the foregoing in mind, The Defendants rely on this venerable right and do insist on a jury trial. Plaintiffs have indicated that they intend to seek compensatory and punitive damages, statutory penalties, disgorgement of profits, injunctive relief, and attorney's fees and costs.

**Compensatory Damages.**

The Court knows our position. Compensatory Damages, if any, are negligible. Defendants incurred no cognizable injuries, no material out of pocket losses or monetary harms and we believe based on prior testimony that no claims for impairment of reputation or personal humiliation exist and that claims of mental anguish and suffering are not supported by the record adduced to date.

"In tort law, compensatory damages, also known as actual damages, are damages awarded by a court equivalent to the loss a party suffered. If a party's right was technically violated but they suffered no harm or losses, a court may instead grant nominal damages. The Supreme Court held in Birdsall v. Coolidge, 93 U.S. 64 (1876) that the phrases "compensatory damages" and "actual damages" are identical. The amount awarded is based on the proven harm, loss, or injury suffered by the plaintiff. This award does not include punitive damages, which may be awarded when the defendant's actions are especially reckless or malicious.[1]

It remains that in the context of finding that "that NCBCP has organizational standing" this court referenced the fact that "Defendants argue that NCBCP lacks standing because the pecuniary damages incurred by the organization – roughly $160 -- as a result of the Robocall is "de minimus" ... Plaintiffs counter, a pecuniary loss of $160 alone would be sufficient to confer standing upon NCBCP as "a loss of even a small amount of money is ordinarily an 'injury'" ...[and] ... Defendants ... argue ... any damages the organization suffered are "self-inflicted"...[amounting to]... "voluntary action" ... The Court disagree[d] ... endeavoring to distinguish Clapper stating

---

[1] Cornell Law School Wex Definition Team 'Compensatory Damages' June 2022 .

that ... the Supreme Court did not find standing where the respondents were incurring costs in anticipation of "non-imminent harm" that was not "certainly impending." ...[and] ...the Supreme Court rejected this argument because the threatened injury was "highly speculative" and not "certainly impending." Id.

Exactly. A jury may find that the damages complained of by NCBCP and the other Plaintiffs are indeed highly speculative. This is a fact specific inquiry. Moreover, for reasons of its own the court once again flags the 85,000-call number in its analysis of reasonableness in NCBCP's purported diverting of funds. But this serves to exaggerate the purported harm. In analyzing the voluntariness of this diversion of resources the Court stated that "the Robocall had already been disseminated to more than 85,000 phone numbers across the United States."

But NCBCP could not have known the number disseminated let alone that supposedly 85,000 had been rolled. Certainly, a Trier of fact might find that this retroactive assumption is indeed quite speculative and more importantly might look to the actual number of calls that appear to have connected as a better gauge of any perceived harm to be assessed.

The Trier of fact may also look to the cost that Defendants incurred in complying with a Court Ordered Curative call, as either sufficient compensatory damages since the purpose of said Curative call was to undo or *Cure* any perceived harm. At the very least, looking at the total associated with the Curative call, which was designed to mirror the total calculated, would have possibly connected in the first instance makes more sense than looking at the theoretic 85,000.

It also warrants noting that this Court previously accepted evidence that only 29,117 out of the 85,309 phone numbers allegedly called were deemed completed.[2] Indeed, the "Curative Notice" ordered by the court was limited to these 29,117 numbers as it was deemed unnecessary to send the message to persons who never actually *received* an original call.[3] Moreover, further extrapolating the successful completion rate from the larger dataset of 85,309 calls, only 29,117 were apparently delivered, constituting, at best, a 34.13% "success rate."[4]

If 29,117 calls were deemed completed throughout the United States and it is alleged that some 5,494 were distributed in New York State, clearly a smaller universe would have connected within Metro Detroit. The Trier of Fact can then weigh whether it was an overreaction for BWR Metro Detroit to divert resources. Certainly, the relative efficacy of robocalls in general versus the impact of one singular roll out of calls would seem to be a fair question for a Jury.

This Court also stated that "NCBCP had to reallocate roughly "$10,000 to $20,000 worth of time, technological resources, and paid staff to respond to the robocall." (Pls. Add'l Rule 56.1 Stmt. ¶ 3.). Putting aside that nowhere in NCBCP's deposition (i.e. Tameka Ramsey Brown) is this figure substantiated, it was also testified to that they did not speak to anybody who stated they

---

[2] *National Coalition on Black Civic Participation et al v. Wohl et al*, (No. 1:20-cv-08668, Doc. No. Document 50) (S.D.N.Y. 2020).

[3] *National Coalition on Black Civic Participation et al v. Wohl et al*, (No. 1:20-cv-08668, Doc. No. Document 50) (S.D.N.Y. 2020).

[4] *National Coalition on Black Civic Participation et al v. Wohl et al*, (No. 1:20-cv-08668, Doc. No. Document 50) (S.D.N.Y. 2020).

were personally deterred from voting as a result of receiving the robocall, which again goes to the speculative nature of the harm.

Your Defendants cite to these facts, not in an attempt to re-litigate standing here, but rather to point out that a reasonable Jury might find that the NCBCP and/or the Individual Defendants perceptions of prospective harm, were far from imminent and far too speculative when assessing the level of damages or the appropriateness of imposition of same.

Regarding Statutory Penalties the Plaintiffs have indicated they will seek statutory damages under Civil Rights Law § 40-d of $500 for each of the 5,494 calls *made to New York phone numbers*. See, e.g., People by Abrams v. Hamilton, 125 A.D.2d 1000, 1001 (4th Dep't 1986) (holding that § 40-d must be "liberally construed" and authorizing OAG to seek penalties for every violation of § 40-c).

Plaintiffs do not represent where this 5,494 figure is derived from. Is it simply the subset of New York area codes out of the 85,309, that may have been transmitted to the Robocall company or does this number represents that number of calls that connected to a New York area code telephone? A conscientious jury would no doubt like to look to the forensic science behind how one determines a connection was made in assessing actual damages. Defendants will not, for purposes of this letter, reiterate or relitigate their belief no harm befell any recipient of a robocall, but rather emphasize that seeking a statutory penalty for calls that were never received, can't be what was contemplated by the statute. Otherwise, one would be imposing penalties for what are being deemed violations, but are at best, failed attempts at violations and that simply does not comport with any rationale statutory construction.

In addition, the OAG knowing cites to People by Abrams v. Hamilton, 125 A.D.2d 1000, 1001 (4th Dep't 1986) for the proposition that § 40-d must be "liberally construed" and ostensibly authorizing the OAG to seek penalties for every violation of § 40-c but this 4th Dept case does not seem to be cited for that particular proposition by subsequent courts. "In Sundaram v. Brookhaven Nat. Laboratories, 424 F. Supp. 2d 545 - Dist. Court, ED New York 2006 the Eastern District court referenced in pertinent part that "the plaintiffs claims for violations of section 40-c of the New York Civil Rights Law must be dismissed because he failed to give the necessary notice to the Attorney General of New York…Section 40-d of the New York Civil Rights Law provides a private right of action to any person who suffers a violation of section 40-c, but further provides, "[a]t or before the commencement of any action under this section, notice thereof shall be served upon the attorney general." N.Y. Civ. Rights Law § 40-d. New York courts have consistently held that notice to the attorney general is an essential prerequisite to actions for violations of section 40-c. See, e.g., Giaimo & Vreeburg v. Smith, 192 A.D.2d 41, 45-46, 599 N.Y.S.2d 841, 844 (2nd Dep't 1993); Silver v. Equitable Life Assur. Soc. of U.S., 168 A.D.2d 367, 368, 563 N.Y.S.2d 78, 80 (1st Dep't 1990); accord Shepard v. Frontier Communications Services, Inc., 92 F.Supp.2d 279, 287 (S.D.N.Y.2000); Harvey v. NYRAC, Inc., 813 F.Supp. 206, 212 (E.D.N.Y.1993). Accordingly, the plaintiffs claims for violations of section 40-c of the New York Civil Rights Law should be dismissed."

In the case at hand, the AG intervened and made reference to 5500 calls in its intervenor complaint, but the AG has not substantiated that these calls were actually effectuated. We know a handful of the Individual Plaintiffs were New Yorkers. Perhaps the AG can claim these 4 or 5 claimants in assessing statutory damages, but as to the 5494, in addition to showing forensically how the AG arrived at that number and confirmed that this universe actually received a completed a/k/a successful Robocall, they would also seem to have to show how many of those NY area code numbers are truly still in NY. Furthermore, since as has already been observed in these proceedings and also by the FCC proceedings, folks are now known to port landlines to cellphones and for the past several years, there has been a mass exodus of New Yorkers. Presumably, NY Civil Rights laws were not intended to protect Floridian residents from nuisance calls.

Plaintiff then seeks **Punitive Damages,** alleging that Defendants conduct was egregious and that Defendants invested significant time and money into a deliberate plan to target zip codes with large Black populations with a message that, they hoped, would dissuade recipients from voting. Putting aside all the ink and testimony to date expended demonstrating that the intent was to inform as to the lack of reliability on mail in voting as opposed to dissuading anyone from personally voting and that no one testified that it deterred them one jot, Punitive Damages are overkill.

This court has held that "despite Defendants' attempts to paint themselves as "goofballs and political hucksters with an irreverent sense of humor" (Defs. MSJ Brief at 2) to lessen the seriousness of the call, nothing in the record or in the context of Defendants' communications, suggests that the Robocall was "mere hyperbole." … The call markedly lacked any outlandish details or other cues that may indicate to an ordinary listener that it should not be taken seriously."

Respectfully in his concurring opinion in the 1964 Jacobellis v. Ohio case, Supreme Court Justice Potter Stewart delivered what has become the most well-known line related to the detection of "hard-core" pornography: the infamous "I know it when I see it." statement. "I have reached the conclusion . . . that under the First and Fourteenth Amendments criminal laws in this area are constitutionally limited to hard-core pornography. I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that."

Suffice it to say that notwithstanding the court's analysis for purposes of establishing liability i.e hyperbole and humor - a Jury of ones' peers may or may not see or attach the same weight of egregiousness to Defendants freestanding Robocall and they may just look at their overall antics since Plaintiffs have continually brought such into view. Likewise, they may conclude that spending a few thousand dollars on a Robocall, which could not reasonably be expected to have any discernable impact on a national election, was simply part of their schtick. In any case, it is appropriate to leave the levying of Punitive damages to the Jury.

In the same vein, Plaintiffs assert that Defendants "celebrated the chaos they unleashed after distributing the robocall and will present further evidence showing that Defendants' motivations were malicious. Actually, the only showing is that these self-promoting You Tubers have tremendously bad taste and a tin ear and that their hijinks have cost them greatly, while having absolutely no impact on the 2020 elections. There was absolutely no chaos and this is a figment of imagination by the Plaintiffs.

The OAG seeks disgorgement of any profits obtained by Defendants as a result of their unlawful conduct under New York Executive Law § 63(12). The expansive record created to date shows this to be a non sequitur. These Robocalls have cost the Defendants everything.

Defendants in an abundance of overkill also seek Injunctive Relief. This is simply improper. The law stands. If anything assuming this decision and order stands that law has been forever clarified and expanded and this request is beyond the pale.

In Fed. Election Com'n v. Wisc. Right to Life, 551 US 449 - Supreme Court 2007 a District court was asked to wade in and issue injunctive relief. There the Supreme Court mused "as is often the case in this Court's First Amendment opinions, we have gotten this far in the analysis without quoting the Amendment itself: "Congress shall make no law ... abridging the freedom of speech." The Framers' actual words put these cases in proper perspective. Our jurisprudence over the past 216 years has rejected an absolutist interpretation of those words, but when it comes to drawing difficult lines in the area of pure political speech — between what is protected and what the Government may ban — it is worth recalling the language we are applying.... when it comes to defining what speech [may be subject to a] ...a ban — the issue we *do* have to decide — we give the benefit of the doubt to speech, not censorship. The First Amendment's command that "Congress shall make no law ... abridging the freedom of speech" demands at least that."

Respectfully submitted,

David M Schwartz, Esq.

Counsel for Burkman and Wohl

CC: All counsel of record (via ECF)