IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES,<br><br>Plaintiffs,<br><br>-and-<br><br>People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10,<br><br>Defendants. | Civil Action No. 20-cv-8668 |

**PLAINTIFFS' TRIAL MEMORANDUM**

Pursuant to Paragraph I.A.3 of Attachment I of the Court's Individual Practices, Plaintiffs National Coalition on Black Civic Participation ("NCBCP"), Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, Andrea Sferes, and the State of New York submit this memorandum outlining the issues to be tried and authorities relied upon.

**I.     Introduction**

Defendants Jacob Wohl, Jack Burkman, and J.M. Burkman & Associates ("JMBA") violated the Voting Rights Act of 1965, the Ku Klux Klan Act of 1871, the Civil Rights Act of 1957, and New York civil rights laws. This trial will adjudicate what quantity of damages—compensatory, punitive, and statutory—they owe as a result of their unlawful conduct.

In the runup to the 2020 election and at the height of the COVID-19 pandemic, Defendants conspired to engage in a voter suppression operation targeting Black voters. They created a robocall (the "Robocall") threatening that voting by mail would expose voters' personal information to police, creditors, and the Centers for Disease Control and Prevention ("CDC"), which would pursue "old warrants," "collect outstanding debts," and enforce "mandatory vaccinations," respectively, and sent it to 85,307 numbers around the country, including 5,494 in New York. Defendants paid only $1,000—about one cent per recipient—to send the Robocall. They targeted locations with large Black populations and filled the Robocall with racially coded language and harmful racial stereotypes that were carefully selected to deter Black voters. And they celebrated the success of their plan when they received "angry black call backs."

Accordingly, the issues to be tried in this case are the effects of Defendants' Robocall on Plaintiffs, the injuries it caused Plaintiffs, the punishment Defendants should receive for the egregiousness of their racially motivated voter suppression effort, and the need to deter future voter suppression by Defendants and others who may seek to emulate their tactics.

Plaintiffs in this case are eight individual recipients of the Robocall, NCBCP, and the State of New York. Each of the eight individual Plaintiffs received the Robocall and was frightened or enraged. Multiple Plaintiffs decided to risk their safety at the height of the COVID-19 pandemic and vote in person rather than by mail because of the Robocall. For one Plaintiff, the Robocall was traumatizing. Because of the Robocall, he was intimidated out of voting in subsequent elections and he requested to be removed from the Board of Elections' voter rolls. NCBCP, a non-partisan nonprofit organization dedicated to increasing civic engagement and voter participation in Black and underserved communities, diverted staff and resources from its Census operation to respond to the Robocall. And New York is home to nearly 5,500 numbers to which the calls were directed.

When granting a temporary restraining order against Defendants in 2020, this Court recognized the serious threat of "electoral terror" posed by abuse of modern communications technologies. *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 464 (S.D.N.Y. 2020) (*"NCBCP I"*). "Because of the vastly greater population they can reach instantly with false and dreadful information, contemporary means of voter intimidation may be more detrimental to free elections than the approaches taken for that purpose in past eras, and hence call for swift and effective judicial relief." *Id*. This heightened risk necessitates a powerful message of deterrence.

Testimony from Plaintiffs and from experts on voter intimidation, the harmful impact of racial stereotypes, and New York Election Law, as well as evidence of Defendants' "evil motive or intent," *Smith v. Wade*, 461 U.S. 30, 56 (1983), will establish to the jury Plaintiffs' entitlement to compensatory and punitive damages and statutory penalties.

## II. Facts

In granting summary judgment to Plaintiffs on liability, the Court made a host of findings that bind the jury at trial. Plaintiffs will file a motion in limine outlining the established facts that

the Court should read to the jury before charging them. In addition, expert testimony will show that Defendants' statements in the Robocall were false, their false statements constituted election disinformation which undermined voting rights and election integrity, and their Robocall spread harmful racial stereotypes about the Black community. The experts will describe the harm the Robocall had on New York's democratic institutions and New York's Black electorate.

**III.    Legal Issues**

    **a.  Damages & Other Trial Relief[1]**

        **i.  Compensatory Damages**

The Court has already ruled that Defendants violated the KKK Act, which provides for compensatory damages. *See* 42 U.S.C. § 1985(3). Plaintiffs thus seek compensatory damages in an amount to adequately compensate them for Defendants' violating their rights and will present evidence about damages caused by Defendants' conduct.

For the individual plaintiffs, "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . . , personal humiliation, and mental anguish and suffering." *Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299, 307 (1986) (internal citations omitted); *see also Rodriguez v. Vill. of Port Chester*, 535 F. Supp. 3d 202, 221 (S.D.N.Y. 2021). It also may include damages from the deprivation of the right to vote in a particular election. *See, e.g.*, *Stachura*, 477 U.S. at 311 n.14; *Nixon v. Herndon*, 273 U.S. 536, 540 (1927) (Holmes, J.) (damages for infringement of the right to vote "hardly has been doubted for over two hundred years, since Ashby v. White, 2 Ld. Raym. 938 [(1703)]"); *Wayne v.*

---

[1] Plaintiffs request the chance to submit post-trial briefing seeking permanent injunctive relief under the Voting Rights Act and the New York Civil Rights Law and attorney's fees and costs under 42 U.S.C. § 1988(b)–(c) and New York law. Plaintiffs reserve the right to request additional post-trial briefing should additional issues arise.

*Venable*, 260 F. 64, 65–66 (8th Cir. 1919) (upholding jury award of $2,000 for deprivation of the right to vote).[2]

For NCBCP, compensatory damages include any diversion of resources away from its activities and for any other opportunity costs it incurred as a result of Defendants' unlawful actions. *See, e.g.*, *Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 129 (2d Cir. 2020) ("[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." (citation omitted)); *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (relying on "opportunity cost" for organizational standing). Opportunity costs include "attention, time, and personnel" that could have been spent advancing the organization's mission, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017), such as the value of work contributed by volunteers, *see* Order Den. Mot. for Summ. J. at 5, *Delta Pilots Ass'n v. Melvin*, No. 14-CV-00225 (S.D.N.Y. July 10, 2018), ECF No. 104 (awarding compensatory damages for volunteer hours spent repairing a computer system after it was hacked, because the value of that time "cannot . . . be zero." (citing *United States v. Middleton*, 231 F.3d 1207, 1214 (9th Cir. 2000)). The amount of damages for volunteer hours may be "set at the amount plaintiff would have had to pay . . . had it hired an outside contractor . . . , or some other number entirely." *Id*.

###  ii. Punitive Damages

Next, Plaintiffs seek punitive damages as a result of Defendants' violations of 42 U.S.C. § 1985. Punitive damages serve the dual function of "deterrence" and "retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). They are appropriate when "the

---

[2] Adjusted for inflation, this amounts to approximately $35,000. *See* U.S. Inflation Calculator, www.usinflationcalculator.com.

4

defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith*, 461 U.S. at 56; *see Irizarry v. Quiros*, 722 F.2d 869, 872 (1st Cir. 1983) (holding that the same standard applies in Section 1985 case); *Perez v. Cucci*, 725 F. Supp. 209, 255 (D.N.J. 1989), *aff'd* 898 F.2d 142 (3d Cir. 1990) (applying same standard and ruling that plaintiffs who prove claims under Section 1985(3) may recover "nominal, compensatory and punitive damages" as well as compensation for emotional distress, and equitable relief).

Defendants' conduct meets this standard. Defendants carried out "electoral terror using telephones, computers, and modern technology," *NCBCP I*, 498 F. Supp. 3d. at 464, jeopardizing no less than Plaintiffs' right to vote—a fundamental right that is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Wohl and Burkman's actions threatened that right. *See* Dkt. 216-60 (Monsour Declaration in Support of Motion for Summary Judgment Ex. 60 ("Grimmer Report")) at 8 ("The corrosive effects of Wohl and Burkman's robocalls are both immediate and potentially long-lasting. Repairing the damage from these disinformation campaigns will require substantial effort, if repair is possible at all."). Absent adequate punishment, Defendants' low-cost and high-volume voter suppression tactics could inspire further unscrupulous disenfranchisers. Punitive damages are necessary to deter Defendants and others.

Moreover, the evidence will show—indeed has already shown—that Defendants acted with "evil motive or intent." They invested significant time and money into a plan to target ZIP codes with large Black populations with a message that, they hoped, would dissuade recipients

from voting. After they sent the Robocall, Wohl and Burkman celebrated the chaos they had unleashed: "[I] love these robo calls . . . getting angry black call backs . . . win or lose . . . the black robo was a great jw [sic] idea," Burkman told Wohl. Dkt. No. 256 at 9; *see also id.* at 69. Wohl's social media posts will show contempt and hostility for the civil rights of Black Americans, particularly the right to vote. Punishing this sort of callousness toward the protected rights of their fellow citizens is precisely the aim of punitive damages.

### iii. Statutory Penalties

The Office of the New York Attorney General seeks statutory penalties. Under New York Civil Rights Law § 40-d, statutory damages of between $100 and $500 must be awarded for every violation of New York Civil Rights Law § 40-c. Section 40-c is violated when a person is "subjected to any discrimination in his or her civil rights" based on "race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability." N.Y. Civ. Rights Law § 40-c. This Court has already concluded that Defendants violated New York Civil Rights Law § 40-c. *See* Dkt. 256 at 90. Thus, the only issue for the jury to decide is the total statutory damages due.

Section 40-d imposes a mandatory civil penalty for "each and every violation" of § 40-c. N.Y. Civ. Rights Law § 40-d. New York courts have held that § 40-d must be "liberally construed" and have authorized the Attorney General to seek penalties for multiple violations of § 40-c. *People by Abrams v. Hamilton*, 125 A.D.2d 1000, 1002 (4th Dep't 1986). The parties agree that each number reached by the robocall can constitute a separate "violation" under the statute. The Attorney General plans to file a motion in limine requesting that the Court decide as a matter of law how many "violations" took place in this case.

The Attorney General seeks the full statutory damages of $500 for each of the violations. Defendants' egregious conduct justifies the maximum statutory penalty available. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 186 (2000) ("Civil penalties can….[t]o the extent that they encourage defendants to discontinue current violations and deter them from committing future ones…afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct."). As the Attorney General will show through expert testimony, Defendants specifically targeted the Black community to reduce Black turnout ahead of the 2020 election. Dkt. 256 at 97. Defendants included racially coded language in the robocalls that perpetuated harmful racial stereotypes about the Black community. *Id.* at 96–97. After issuing the robocalls, Defendants celebrated the "angry black call backs" they received, *id.* at 97, showing a disturbing lack of remorse and a strong likelihood to engage in future unlawful and discriminatory conduct. This evidence justifies an award of the full statutory damages permitted under the law.

Defendants argue that the Attorney General may not seek damages on behalf of New Yorkers who did not join this lawsuit, but the New York courts have definitively rejected that proposition, holding that the Attorney General may seek penalties on behalf of individual victims "so long as the penalties are to be paid to the victims." *Hamilton*, 125 A.D.2d at 1002. In accordance with *Hamilton*, the Attorney General will distribute the funds awarded to individuals who received the robocall. Nor must the Attorney General present evidence of damages from every single New Yorker who received the call, as Defendants wrongly asserted. As *Hamilton* found, the statute does not require such a "burden" on the victims and the Court in order for the Attorney General to recover on behalf of injured third parties. *Id.*

### b. Voir Dire

The parties present joint voir dire except in two main respects. First, Defendants request that the Introduction and Background include facts that have not been established on summary judgment, such as the number of supposed likely recipients, as well as facts that are irrelevant, prejudicial, or otherwise inadmissible, such as information about the corrective robocall.[3] Second, Defendants object to standard voir dire about jurors' backgrounds, such as what publications they read, social media outlets they subscribe to, and podcasts they listen to. The Court should overrule Defendants' objections as these questions will help the Court determine which jurors should be eliminated for cause.

### c. Evidentiary Issues

Plaintiffs will identify several key evidentiary issues in their forthcoming motions in limine, including those connected to the binding effect of the Court's Order granting summary judgment, authentication of documents, the consequences of Defendants' invocation of the Fifth Amendment during their depositions, and limitations on the scope of Defendants' cross-examinations of the individual Plaintiffs.

### d. Jury Instructions

The parties present joint proposed jury instructions. Where the parties have been unable to agree, the Court should adopt Plaintiffs' proposed instructions for the reasons set forth in their proposed charges.

---

[3] Plaintiffs will separately file a motion in limine with their objections to the admissibility of the corrective robocall.

### IV.    Conclusion

Plaintiffs ask the Court to grant their forthcoming evidentiary motions, issue their requested jury instructions, allow them the chance to present post-trial briefing, and grant any other relief appropriate based on the course and outcome of the trial.

Dated: New York, New York
       June 15, 2023

Respectfully submitted,

**LETITIA JAMES**
*Attorney General*
*State of New York*

By: /s/ Rick Sawyer
Rick Sawyer, Special Counsel
Colleen Faherty, Assistant Attorney General*
New York City Civil Rights Bureau
*Executive Division, Federal Initiatives
New York State Office of the Attorney General
28 Liberty St., 20th Floor
New York, NY 10005
(212) 416-8252
Richard.Sawyer@ag.ny.gov
Colleen.Faherty@ag.ny.gov

*Attorney for Plaintiff-Intervenor People,*
*State of New York*

By:   /s/ Marc Epstein

David Brody (admitted *pro hac vice*)
Marc Epstein
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
(202) 662-8600
dbrody@lawyerscommittee.org
mepstein@lawyerscommittee.org

Amy Walsh
Franklin Monsour Jr.
Rene Kathawala
ORRICK HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
(212) 506-5000
awalsh@orrick.com
fmonsour@orrick.com
rkathawala@orrick.com

*Attorneys for Plaintiffs*