IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES,<br><br>　　　　　　Plaintiffs,<br><br>-and-<br><br>People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK<br><br>　　　　　　Plaintiff-Intervenor,<br><br>　v.<br><br>JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10,<br><br>　　　　　　Defendants. | Civil Action No. 20-cv-8668 |

Answer to Document 288

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF NEW YORK ATTORNEY GENERAL'S MOTION *IN LIMINE* TO RULE AS A MATTER OF LAW ON THE NUMBER OF "VIOLATIONS" OF CIVIL RIGHTS LAW§ 40-C**

The Plaintiff New York State Attorney General has moved that this Court instruct the jury that, as a matter of law, each call Defendants sent to New York phone numbers constituted a violation of law compensable under New York Civil Rights Law § 40-d and that Defendants committed at least 5,494 statutory violations.

However, in effect, what NYS is asking this court to do is clearly the Jury's responsibility as it is the Jury that should examine the extent of the damages. In addition, what they ask is in no way,

shape or form supported by the evidence and neither was it the central focus of any evidentiary ruling necessary to this court's determination as to liability. However, it is critical to determining damages and is a fact specific inquiry.

Citing to your decision, your Honor noted that "[o]n August 26, 2020, through an account held by Burkman Associates, Message Communications transmitted the Robocall to 85,307 phone numbers across the country, including 5,494 calls with New York area codes."[1]

However, it is irrefutable and already a matter of record that although 85,307 may have been loaded into Message Communications dialer, a far smaller number were "successfully completed", to use industry nomenclature.

This Court in October 2020 ordered that a curative robocall be undertaken before the November election and recognized at the time that based on Message Communications records only 29,117 calls were successfully completed. Calls were deemed "successful" if there was a "Live Answer" or a "Voicemail." Calles logged as "No Answer" were logically deemed unsuccessfully completed.

---

[1] Your Honor in finding liability, actually said, "There is no dispute that Defendants' Robocall reached more than 85,000 numbers, including approximately 5,494 in the State of New York alone, no doubt comprised of eligible voters. Each Individual Plaintiff received the Robocall and were all registered voters planning to vote in the 2020 Election, a federal election." One presupposed your Honor selected his words with precision. Just because 85,000 numbers were loaded does not mean that there were 85,000 good numbers or that Message Communications actually dialed them all or anyone *received* them. Some may have been recorded as not having 'answered' because the numbers were disconnected, and the former owners may very well be deceased. Some did not have answering machines or answering services and so did not "receive" a call. In addition, at no time has any evidence been put forward establishing that all these numbers correspond with registered voters, let alone voters eligible to vote in the 2020 federal election. This is why your Honor could speak more definitely about the Individual Plaintiff's representation, and rightly so. However, what the court acknowledged, and indeed, we all learned when the court ordered a pre-election curative call, is that loading numbers into a Robocall website is not the same thing as reaching or making contact with an active functioning number. It took several rolls to reach 95% of the 29,107 subset that were deemed successfully transmitted. Again, 85,307 calls uploaded translated to 29,107 that were only arguably received. And of the 5,494 uploaded, even a cursory review of the call sheets establish that a far smaller number could be construed as having connected in any sense of the word. If fact, we know that most of these 5,494 were outside the 29,107.

This Court pursuant to a Decision and Order dated October 28, 2020 (Doc 38) stated in pertinent part that "the Court will authorize Plaintiffs to take appropriate steps to distribute the Curative Message *to the recipients of the original robocall*, with the Defendants to pay Plaintiffs reasonable costs and fees …Defendants shall produce records to demonstrate compliance …the court will hold a hearing to review compliance…" (See also Docs 43, 45, 48, 50, 52 and 53).

Ultimately this Court, and indeed, Plaintiffs accepted the logic that based on call logs, only 29,107 numbers received the original call and if Defendants were to attempt to transmit curative messages to numbers outside of this dataset, they would be doubly confused since they never received the original. Anyone who did not receive the original call was obviously not harmed and their rights could not be said to have been violated since they never received the message that this court found to be intimidating and therefore, a violation of various laws.

Here is the rub. New York State has 15 Area Codes; 212, 315, 347, 516, 518, 585, 607, 631, 646, 716, 718, 845, 914, 917 and 929. A simple sort using these area codes as a filter establishes that out of the 85,307 uploaded calls only 5,494 had one of these area codes.[2] As noted previously, only 29,117 were recorded to have been completed across many states and of the 5,494 New York numbers, only 1,517, as a starting point convention, could be preliminarily deemed successfully completed because these numbers were part of the 29,117-subset deemed for purposes of the curative message as successfully completed.

However, for purposes of the curative call, Defendants were overinclusive in order to establish compliance and avoid contempt. Using Robocall company records and their standards, which are aimed at and billing for the calls they roll, is no indication that anyone ever heard anything like a

---

[2] A review of Message's call sheets establishes that there was a total of 5,494 NY numbers. Of these, 965 were logged as having gone to Answering Machines and 552 were received Live. The rest were not received. They were logged as follows: 501 logged as busy. 389 logged as disconnected, 43 as a fax machine, 2,994 as No Answer, 49 as No Ring Back and obscurely, one as "Pressed 5"

complete prerecorded message. Again, calls were deemed "successful" if there was a "Live Answer" or an "Answering Machine" even if the duration of the call was five seconds and the prerecorded message was actually 37 seconds. "Hello, my name is Tamika … click. Not quite "you had me at hello", but we are assessing damages here. Simply put, even out of the 1,517 calls a jury could reasonably conclude were actually hang-ups so early in the call, nothing substantive was heard.

Our laws almost invariably distinguish between attempts and successful commissions. Attempted Assault is distinguishable from Assault. Attempted Murder is distinguishable from Murder and so on for obvious reasons.

It is already a matter of record that the Federal Communications Commission (a/k/a the "FCC" or the "Commission") has imposed a massive life altering fine of $5,134,500 upon the Defendants because out of the 85,307 robocalls 1,141 were transmitted by Message Communications to *wireless phones* without the consent of the recipients and neither Message Communications nor Defendants properly filtered out wireless numbers (a/k/a cell numbers) in violation of a provision of the TCPA.

Instructive is the methodology employed by the Commission to establish the number of calls. In its Forfeiture Order dated June 6th, 2023, it notes that:

> "[t]he Commission used the same methodology in prior robocall cases which further supports the lawfulness of the Commission's process.[3] First, the Bureau was alerted to suspected unlawful robocalls. Then the Bureau issued subpoenas and worked with industry partners and fellow law enforcement agencies to identify the source of the calls. The Bureau reviewed subpoena responses and listened to sample recordings of the calls to verify that they were all

---

[3] In its Footnote 61, in said Forfeiture Order, the Commission, in furtherance of establishing its methodology in computing the number calls was lawful, states that "[t]he Bureau used the same techniques and investigative processes that it has used in all of its recent robocall enforcement cases. See e.g., Roesel Forfeiture Order, supra note 54, at 9218-19, para. 40; Moser Forfeiture Order, supra note 13, at 13430, para. 33; John C. Spiller; Jakob A. Mears; Rising Eagle Capital Group LLC; JSquared Telecom LLC; Only Web Leads LLC; Rising Phoenix Group; Rising Phoenix Holdings; RPG Leads; and Rising Eagle Capital Group - Cayman, Notice of Apparent Liability for Forfeiture, 35 FCC Rcd 5948, 5948 (2020).

prerecorded. ***Call detail records were then examined to identify <u>each call's</u> date, time, and duration.*** The Bureau analyzed the call detail records with industry-standard, commercially available software and database of known assigned wireless numbers to determine whether they were made to wireless numbers. This process identified 1,141 calls to wireless numbers. Finally, the Bureau spoke to consumers who later provided signed declarations attesting to facts that support the finding of these violations."

Clearly, given its mission, the FCC had to establish which numbers were associated with *wireless* numbers since the FCC cannot punish for content, only for wireless numbers called without consent. However, its methodology also included looking at the date, time and duration <u>*of each call*</u> and even followed up with those it suspected were recipients of the calls based on this data review.

This makes perfect sense since deeming attempted calls violations simply doesn't make any sense. If the purported harm is that such calls are a nuisance and an invasion of privacy in the FCC context, then a call that was not completed is obviously neither a nuisance nor an invasion of privacy.

Likewise, while this Court found for purposes of violations of acts or statutes, that the content of the prerecorded call was intimidating or threatening, if this prerecorded message was never received by any recipient, then an attempted call that was not completed could not be intimidating or threatening and could not be a violation.

And why does the FCC look at the call's date, time and duration? Well, it stands to reason that if a prerecorded call is approximately 37 seconds, then a call that the dialing company deemed successful that was only six or seven seconds long wasn't really heard at all. In fact, a five or six or seven second call connotes a hang up. As such, out of the 1,517 calls that our message company may

have deemed as having been successfully received, it simply meant that the dialing would charge for them against the $1,000 dollars they received.[4]

Our Jury, no doubt, as a Trier of Fact on the question of damages, may likely employ a similar methodology. Of the 1,517 calls that have New York area codes how many, according to available records, which were deemed successful were hung up on in the first five seconds? Six seconds, 15 seconds? What is a fair cut off for deeming a call actually received? Should we only count Live Answer calls over 25 seconds? Can we just assume that a robocall recorded on an Answering Machine was listened to?  25 seconds? 30? Jurors should be able to draw upon their common sense and life experience to make this determination.  Whatever the determination, the number of recipients is less than 1,517[5].

This Court, within the context of analyzing compliance with its curative call instruction accepted the logic that not all calls transmitted were received. So did the Plaintiffs. This Court did not have to reach a conclusion as to how many calls were "received" and would therefore constitute a violation. Instead, this court recognized it was established to the Court's satisfaction that the named Individual Plaintiffs received the call and this was sufficient for establishing violations. The Jury, in assessing damages, should be allowed to make this factual determination based on all available records and evidence.

---

[4] "Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl…." Is approximately 8 seconds. This is not threatening or intimating and so should not be found to be a violation.
[5] A reasonable jury could conclude that a prerecorded message of only 37 seconds in duration that connects with an answering machine for less than eight seconds is an aborted call and harmless.  Similar logic would attach to a Lice call of only eight seconds in duration.   That's obviously a hang up and harmless (See again Footnote 3). Out of 1,517 NY telephone numbers logged as Live or Answering Machines, 19 were less than eight seconds in duration.  Simple arithmetic tells us that only 1,498 calls associated with a NY number could have possibly connected long enough to have been heard.  If a jury determined that a call would have to be at least 18 seconds in duration against 37 seconds to count (roughly the midway point), this would calculate out to excluding another 258 calls or 1,240 being deemed to be possibly received calls.  Or perhaps the jury might determine that the first third of the call was harmless.  That would translate to 12 seconds before hanging up as the cut off. There were 42 such hang ups or machine click offs of less than 12 seconds duration.  What is abundantly clear is that 5,427 is just wrong and that even 1,517 is over inclusive.

In addition, in using the FCC's methodology as a guide, which the FCC insists is a lawful methodology insofar as the AG has no declarations from any of these possible recipients, is it even rationale or fair to simply deduce that the rest received the call? Sure, the Individual Plaintiffs can be cross examined and are declarants. But the rest?

Let us assume for the sake of argument that it is established that a call connecting for 20 seconds will be deemed received and that an Excel sorting establishes that this reduces the field of possible recipients to 857. How many of these recipients in August of 2020, had actually moved to Florida or North Carolina or Georgia? How can the AG be making these assertions on behalf of former New Yorkers? Has the AG checked for snowbird voting or even cross checked any of the numbers to see if the numbers and names correspond with a live, eligible NY voter?[6]

And then, how many were voters in good standing during the relevant period? The short of it is what the AG insists this court do is pre-determining for the Jury that because there were 5,494 numbers with New York areas out of the 85,307 numbers uploaded, there were 5,494 violations, but this is wholly illogical.

In the context of the curative call which this Court ordered on an emergency basis pre-election in order to correct any impressions or false information circulated the court agreed that the 29,117 run was the proper universe for the curative message because a curative robocall to the larger set of numbers would simply sow confusion since the larger set never received the August call. Clearly if these 56,190 individuals never received an offending call so none of their rights can be said to have been violated. In like manner, most of the 5,494 numbers were within this excluded untouched 56,190 and were never recipients, and so cannot have felt intimidated, threatened, or confused. Putting aside

---

[6] After filtering the call logs to establish who actually received a call, has the AG presented a "Buff Card" showing that the recipients were actually eligible registered voters in August of 2020? For purposes of assessing damages, shouldn't this be part of the jury's calculus?

that of this number countless numbers and/or their recipients are dead or disconnected or moved and so likely no longer eligible to vote, even a cursory review of the proper universe of 29,117 only includes 1,517 numbers with what appear to be New York area codes. This alone makes the AG's instant request of this Court internally illogical and patently unfair.

As a final thought experiment, if the Defendants had not commissioned Message Communications to make the call but instead hired live callers to read a script and gave them 5,494 numbers to call, but call logs showed they only reached 1,517 households with the offending scripted message never reaching the balance in what universe, would they be punished for the 3,970 persons clearly never reached? Obviously, we believe the factual inquiry does not stop there but it is a starting point in determining damages.

Plaintiffs assert that all parties agree that each call to a New York phone number <u>can</u> constitute a separate violation of § 40-c subject to a statutory penalty under New York Civil Rights Law § 40-d.

Can. Yes, perhaps. However, we differ in that we do not agree that such <u>must</u> be deemed separate violations or that the inquiry stops there. From our perspective, unfortunately the Individual Plaintiffs are reasonably positioned to establish damages by their further testimony at trial. The trier of fact will no doubt want to hear from each of them.

We do not agree that non-complainants who have provided no declarations or otherwise even confirmed receipt let alone grievance or harm should be thrown in the same basket as the Individual Plaintiffs who can and will be cross-examined and have, in some fashion, articulated at least some grievance. We do not believe that without solid objective evidence that it can be assumed a call was received. Likewise, if it appears that a call was aborted early on then it can be assumed a violation occurred or that a penalty should be attached.

Plaintiffs now ask the Court to rule as a matter of law that each phone call to a New York phone number constitutes a separate violation, and that Defendants committed at least 5,494 statutory violations compensable under § 40-d. As noted previously, this fact specific inquiry is best left to the Jury. The Jury might look at the call logs and the record and decide that the five New York Individual Plaintiffs are due $500 and that the rest get nothing, or perhaps that those who the call logs show listened to the message for a complete 37 seconds get $100, but everyone who hung up gets nothing. This court previously ordered that Defendants preserve curative call records so that this Court could determine whether said call was substantially compliant. What the AG is asking today does not correspond with or reconcile with this Court's previous conclusion that Defendants curative call supported by that record was in compliance. This, in fact, appears to be why the AG wants those records excluded now.

The short of it is the AG wants you to usurp this decision making and factual inquiry from the Jury despite there being no law in support of their contentions and references and despite a factual record that does not support this conclusion.

Plaintiffs state that "It is also beyond dispute that the Robocall affected more than one person- roughly 5,494 New York phone numbers." This is in fact disputed and it is an exceedingly strange formulation.

Phone numbers that are disconnected within this subset, can they be *affected*? Phone numbers that never received the prerecorded message based on any objective view of the evidence are *"affected"*? In what way? Likewise, if the record indicates someone hung up on the prerecorded message at or before "Hello …"

The FCC imposed its fines not for the content of the call but for it having been received by wireless phones. The FCC outlined their methodology to establish that the robocall was received even

looking at the duration of the calls and took steps to additionally ensure they'd been received. The AG seeks to avoid any similar inquiry even though liability was imposed in the liability phase of this trial for the offending content of this call, and yet, in the damages phase thinks it is unimportant to determine if anyone other than the Individual Plaintiffs actually received and listened to the offending content.

The AG asserts that "the Court has already reviewed that evidence--uncontroverted at summary judgment--and concluded that the call affected 5,494 New York phone numbers."

In fact, it was unnecessary for this court to make such a full throttled determination in the liability phase, but we would respectfully argue that the closest this court came to doing so came to the fore while ordering the curative call and then accepting the adequacy of rolling it to the 29,117 and not the 85,307. The same reasoning applied to the 5,494 though (never needed to be reached because of the rights).

The AG again formulates that "Defendants subjected each phone number they called to discrimination" as if NY Human Rights Law concerns itself with inanimate objects. Phone numbers cannot be discriminated against and phone numbers that were never called or picked up, obviously were subjected to nothing.

To avoid this obvious conclusion, the AG frames the issues in an odd, illogical way to avoid this reasoning. The AG then cites to the FCC case while taking pains to avoid referencing how the FCC arrived at their 1,141 number.

The AG's motion should be denied in its entirety. If anything, their motion makes it abundantly clear why they wish to entirely suppress information regarding the curative call even though clearly, anything that mitigated harm is entirely relevant in assessing damages. Likewise, the court's reasoning

surrounding that call and accepting the sufficiency of the completed pre-election roll out of that curative robocall, is entirely relevant.

Dated: New York, New York
      July 7, 2023

Respectfully submitted,

By:  /s/ *David M. Schwartz*

David M. Schwartz, Esq.
546 Fifth Avenue, 6th Fl.
New York, NY 10036
(212) 641-0049
david@davidschwartzesq.com