UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #:_____  │
│ DATE FILED: October 28, 2020 │
└─────────────────────────────┘
```

---------------------------------X
NATIONAL COALITION ON BLACK CIVIC  :
PARTICIPATION, et al.              :
                                   :
                Plaintiffs,        :    20 Civ. 8668 (VM)
                                   :
     - against -                   :    **DECISION AND ORDER**
                                   :
JACOB WOHL, et al.                 :
                                   :
                Defendants.        :
---------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiffs National Coalition on Black Civic Participation ("NCBCP"), Mary Winter, Gene Steinberg, Nancy Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel, and Andrea Sferes (collectively, "Plaintiffs") filed this action against defendants Jacob Wohl ("Wohl"), Jack Burkman ("Burkman"), J.M. Burkman & Associates, LLC ("J.M. Burkman & Associates"), Project 1599, and John and Jane Does 1 through 10 (collectively, "Defendants"). Plaintiffs allege that Defendants sent robocalls containing false information intended to scare recipients from voting by mail in violation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and Section 2 of the Ku Klux Klan Act, 42 U.S.C. § 1985(3). Plaintiffs seek a temporary restraining order and preliminary injunction prohibiting Defendants, their agents, employees, and all persons acting in concert with them from sending such robocalls (the "Motion"). (See "Proposed Order,"

Dkt. No. 12; "Plaintiffs' Memorandum," Dkt. No. 13; "Ramsey Decl.," Dkt. No. 14; "Winter Decl.," Dkt. No. 15; "Steinberg Decl.," Dkt. No. 16; "Hart Decl.," Dkt. No. 17; "Wolff Decl.," Dkt. No. 18; "Slaven Decl.," Dkt. No. 19; "Kennedy Decl.," Dkt. No. 20; "Daniel Decl.," Dkt. No. 21; "Sferes Decl.," Dkt. No. 22.) Defendants oppose the Motion. (See "Opposition," Dkt. No. 36.) For the reasons that follow, the Court GRANTS Plaintiffs' Motion for a temporary restraining order.

## Introduction

The right to vote embodies the very essence of democracy. Absent free and fair elections uninfluenced by fear, the underpinnings of democratic rule would crumble. The United States Constitution, as enforced by Congress and the courts, enshrines these principles.

In 1871, Congress, in a measure designed to safeguard the right to vote constitutionally guaranteed to all eligible United States citizens, enacted the Ku Klux Klan Act. Historically, that statute derived from the harm experienced by newly emancipated and enfranchised former slaves. Seeking to cast their votes in federal and state elections, they encountered, at home and at the polls, blatant intimidation carried out by open threats, economic coercion, and even

physical violence inflicted to prevent their participation in the nation's electoral process.

Today, almost 150 years later, the forces and conflicts that animated Congress's adoption of the Ku Klux Klan Act as well as subsequent voting rights legislation, are playing out again before this Court, though with a difference. In the current version of events, the means Defendants use to intimidate voters, though born of fear and similarly powered by hate, are not guns, torches, burning crosses, and other dire methods perpetrated under the cover of white hoods. Rather, Defendants carry out electoral terror using telephones, computers, and modern technology adapted to serve the same deleterious ends. Because of the vastly greater population they can reach instantly with false and dreadful information, contemporary means of voter intimidation may be more detrimental to free elections than the approaches taken for that purpose in past eras, and hence call for swift and effective judicial relief.

Many Plaintiffs in this case assert that they were recipients of robocalls initiated by Defendants conveying messages that placed recipients in reasonable fear of casting their votes in the impending presidential election, in person or by mail. Upon initial factual review, this Court finds that the information Defendants' calls convey is manifestly

false and meant to intimidate citizens from exercising voting rights.

Defendants do not contest that they originated the robocalls. In fact, by their own admission in other public statements they reportedly made, they have worked overtly to influence potential voters through disinformation campaigns. Instead, as legal ground for their action, Defendants advance a sinister and pernicious theory. They contend that the expression their robocalls communicated constitutes speech protected by the First Amendment. Defendants' theory implicates a fundamental threat to democracy. This Court thus rejects it as justification for Defendants' baneful conduct. The First Amendment cannot confer on anyone a license to inflict purposeful harm on democratic society or offer refuge for wrongdoers seeking to undermine bedrock constitutional principles. Nor can it serve as a weapon they wield to bring about our democracy's self-destruction.

Accordingly, for the reasons stated below, Plaintiffs' motion for a temporary restraining order is GRANTED.

## I. <u>BACKGROUND</u>[1]

Plaintiff NCBCP is a nonprofit, nonpartisan civil rights and racial justice organization dedicated to increasing civic

---

[1] The factual background herein derives from the Complaint, as well as from the exhibits filed in connection with Plaintiffs' Memorandum and the

engagement in Black and underserved communities. The additional plaintiffs comprise individual voters registered in New York, Pennsylvania, and Ohio (collectively, the "Individual Plaintiffs").

Burkman is a lobbyist and the founder of lobbying firm J.M. Burkman & Associates. Wohl and Burkman co-founded the political organization Project 1599.

Wohl has boasted to journalists of his and Burkman's plans to influence politics through disinformation campaigns. For example, according to a February 26, 2019 article in USA Today, Wohl, then twenty-one-years old, told reporters that he and Burkman were planning "ways to discredit Democrats in the 2020 election with lies and other disinformation, using his large following on social media to cause disarray similar to what Russians did during the 2016 election."[2] In addition, the Daily Beast published a document that Wohl later said was a draft of his business plan for the "Arlington Center for Political Intelligence."[3] As reported by the Washington Post,

_____

Court's October 26, 2020 hearing. Except when specifically quoted or referenced, no further citation to these sources will be made.

[2] Crystal Hayes & Gus Garcia-Roberts, This Is How Jacob Wohl Created a Sexual Harassment Accusation Against Robert Mueller, USA Today (Feb. 26, 2019), https://www.usatoday.com/story/news/politics/2019/02/26/robert-mueller-hoax-how-jacob-wohl-created-sexual-harassment-plot/2993799002/.

[3] Manuel Roig-Franzia & Beth Reinhard, Meet the GOP Operatives Who Aim to Smear the 2020 Democrats - But Keep Bungling It, Wash. Post (June 4, 2019), https://www.washingtonpost.com/lifestyle/style/meet-the-gop-operatives-who-aim-to-smear-the-2020-democrats--but-keep-bungling-it/2019/06/04/5b70f000-7691-11e9-bd25-c989555e7766_story.html.

the plan involved "disseminat[ing] false information about Democratic presidential candidates to swing political betting markets."[4]

In late August 2020, thousands of voters in the United States, including voters in Illinois, Ohio, New York, and Pennsylvania, received robocalls that conveyed the following message:

> Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl. Mail-in voting sounds great, but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts? The CDC is even pushing to use records for mail-in voting to track people for mandatory vaccines. Don't be finessed into giving your private information to the man, stay safe and beware of vote by mail.[5]

See Complaint ¶ 29; Dkt. No. 33.[6]

On October 26, 2020, this Court held a hearing in this matter to discuss Plaintiffs' request for a temporary restraining order (the "October 26 Hearing"). Defendants

---

[4] Id.

[5] At the hearing before the Court on October 26, 2020, Wohl argued that the calls did not include the phrase "stay home," as indicated in Plaintiffs' submissions. (See Plaintiffs' Memorandum, at 2; Complaint ¶ 29.) Plaintiffs subsequently acknowledged the transcription error in their prior submissions, but argued it "has no bearing on the merits of the relief requested." (Dkt. No. 33.)

[6] Defendants argue that Plaintiffs' evidence is largely composed of hearsay, making it inadmissible and unreliable. But the Second Circuit has held that "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010). Rather, whether evidence is hearsay goes to its weight, not its admissibility. Id. Here, the Court sees no reason why Plaintiffs' hearsay evidence is unreliable, and Defendants have failed to offer one.

Burkman and Wohl appeared at the hearing pro se and acknowledged that they were responsible for initiating the robocalls, including by preparing the message conveyed and hiring a nonparty California company to electronically place the calls. The evidence submitted in connection with Plaintiffs' motion further supports this fact. The robocall message identifies Project 1599 as the source of the calls and names Burkman and Wohl as its founders. Recipients' phones reflected that the robocalls came from "Jack Burkman" and the number "703-795-5364." (Hart Decl. ¶ 5; see also Sferes Decl. ¶ 4; Steinberg Decl. ¶ 4; Wolff Decl. ¶ 4.)

Plaintiffs estimate that approximately 85,000 robocalls conveying this message have been placed to date. The calls targeted areas with large populations of Black voters, such as Detroit, Michigan, as well as urban areas with significant minority populations, such as New York City. Defendants denied that the calls targeted any racial demographic in particular, and they even claimed that they do not know how to target a robocall to particular demographic groups. The Court finds Defendants' statements on that point lacking in credibility in light of other admissions they made. Specifically, Burkman explained at the October 26 hearing that robocalls are issued by randomly selecting phone numbers within particular area or zip codes. Given the technical

feasibility of targeting calls to particular geographic areas, and generally known information about social and economic residential patterns in this country,[7] it is not difficult to discern how particular demographic groups can be targeted through robocalls.

The robocall message contains various false statements, including: (1) the claim that police will use vote-by-mail information to track persons with outstanding warrants; (2) the assertion that vote-by-mail information will be used by debt collectors; and (3) the claim that the Centers for Disease Control and Prevention ("CDC") is seeking access to vote-by-mail information to conduct mandatory vaccination efforts.

Defendants characterize these claims as "opinions." However, the use of the phrase "did you know" before each of these false and misleading assertions supports the conclusion that they were expressed not as opinion, but as fact. At the October 26 Hearing, Burkman and Wohl maintained the truth of these claims, but the Court is unpersuaded. Burkman and Wohl

---

[7] See, e.g., Aaron Williams & Armand Emamdjomeh, America is More Diverse than Ever But Still Segregated, Wash. Post (last updated May 10, 2018), https://www.washingtonpost.com/graphics/2018/national/segregation-us-cities; see also generally Richard Rothstein, The Color of Law: A Forgotten History of How Our Government Segregated America (2017) (exploring legal history of housing discrimination and state sponsored segregation); Tal Z. Zarsky, Understanding Discrimination in the Scored Society, 89 Wash. L. Rev. 1375, 1394 (2014) (discussing discriminatory proxies used in algorithms relied upon in numerous industries, including "zip codes as proxies for race").

defended the accuracy of their claims on the public availability of voter information -- but the information in those records is generated in connection with voter registration, not mail-in balloting. In other words, the publication of information about voters in public records is a function of voter registration, and unrelated to whether a voter chooses to vote by mail or in person. The Court finds that Defendants' contention that voting by mail increases the likelihood of dissemination of a voter's personal information is baseless.

Furthermore, Defendants provide no credible evidence, and the Court finds none in the record of this proceeding, to support a claim that publicly available voter-registration lists are used by law enforcement, debt collectors, and the CDC in the manner the robocall alleges.[8] At the October 26 Hearing, the Court gave Wohl and Burkman the opportunity to provide a factual basis validating these claims. Wohl and Burkman supplied no such support, apart from their own speculation that the CDC is always pushing to collect any available data, and that debt collectors scour all public

---

[8] The Court takes judicial notice of the varied procedural requirements for obtaining voter-registration information across different states, as well as the diverse types of voter information publicly available, which, for example, does not always include voters' addresses. See Nat'l Conference of State Legislatures, Access To and Use Of Voter Registration Lists (Aug. 5, 2019) https://www.ncsl.org/research/elections-and-campaigns/access-to-and-use-of-voter-registration-lists.aspx.

records as a matter of course. Nor have Defendants identified compelling evidence to corroborate the claim that law enforcement will use voter-registration lists to execute arrest warrants. Hence, the Court finds that these statements are false and misleading and that as a consequence, in the minds of reasonable voters, would produce a substantial intimidating effect.

As noted above, the speaker delivering the robocall message identified herself in the message as "Tamika Taylor." That name has been used incorrectly by media outlets to refer to the mother of Breonna Taylor, Tamika Palmer. Breonna Taylor was a Black woman shot and killed by police in Louisville, Kentucky, and her story has been an impetus for and key focus of racial justice reform movements focused on discriminatory policing and systemic racism. In the wake of Breonna Taylor's death, her mother has become a well-known advocate for civil rights.[9] Use of this name in the script of the call is suggestive of an effort to provide an aura of legitimacy to the robocall message.

---

[9] The Court is persuaded that Tamika Palmer's status as a well-known civil rights advocate is a matter of general knowledge and, thus, the proper subject of judicial notice. See generally Brakkton Booker, Breonna Taylor's Mother: "I Won't Go Away. I'll Still Fight," NPR (Sept. 18, 2020), https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/09/18/914164312/breonna-taylors-mother-i-won-t-go-away-i-ll-still-fight.

The Individual Plaintiffs report that the robocalls made them concerned about voting by mail. For example, plaintiff Gene Steinberg, who has an 18-year-old nonviolent criminal conviction, described receiving the call as "particularly traumatic." (Steinberg Decl. ¶ 13.) The claim that law enforcement would use mail-in voters' information to track persons with outstanding arrest warrants made Steinberg frightened and anxious given his criminal history. Plaintiff Andrea Sferes also found the robocall to be distressing and "emotionally upsetting." (Sferes Decl. ¶ 9.) Having outstanding medical debt, Sferes began to doubt whether her information would be shared if she voted by mail, and she "had to try and convince [herself] that [the robocall message] was not true." (Id. ¶ 8.) Plaintiff Nancy Hart, a journalist whose work focuses on the Black community in and around Pittsburgh, became "irate" when she received the call because she recognized it as a deceptive scheme designed to prey upon fears in the Black community about the police, predatory debt collectors, and government-mandated medical programs, and thereby scare Black voters from voting. (Hart Decl. ¶¶ 7-8.) As a result of the calls, at least two Plaintiffs -- Steinberg and Winter -- have decided against voting by mail, which they had originally planned to do because of their fears of

exposure to COVID-19. Steinberg and Winter no longer view voting by mail as reliable.

NCBCP invests significant resources in the Black Women's Roundtable ("BWR"), an empowerment program that promotes Black participation in the Census and elections and engages in on-the-ground organizing. When the robocalls began in late August, NCBCP's BWR program in the Detroit area ("BWR Metro Detroit") learned that Detroit community members were receiving the calls. BWR Metro Detroit became concerned that the calls would intimidate Black voters from participating in the upcoming elections and/or scare Black voters who would have voted by mail into voting in person, thereby increasing their risk of contracting COVID-19. Accordingly, BWR Metro Detroit diverted resources allocated toward increasing Census participation to addressing the disinformation communicated in the robocall. For example, BWR Metro Detroit's co-chair switched from assisting community members with the completion of their Census forms to responding to the robocalls' disinformation. NCBCP fears that the continued dissemination of robocalls will force NCBCP to divert additional resources to counteract the further spread of the robocalls' disinformation.

Burkman and Wohl are facing felony charges arising from the robocalls. Each is charged in Michigan with one count of

intimidating voters, one count of conspiracy to commit an election law violation, one count of using a computer to commit the crime of intimidating voters, and using a computer to commit the crime of conspiracy.[10] One condition of Burkman's and Wohl's bail is that they must not "initiate, or cause anyone else to initiate, any robocalls or other communications directed at multiple recipients until November 4."[11] They are also facing a felony indictment in Ohio, but have not been arraigned on those charges as of the date of this Order.[12]

At the October 26 Hearing, defendants Burkman and Wohl raised a number of arguments against issuance of a temporary restraining order. For example, Defendants asserted that Plaintiffs lacked standing. In addition, Defendants claimed that the issuance of a temporary restraining order in this case would be entirely without precedent, and that the case should be stayed pending the outcome of their criminal proceedings. Moreover, Defendants argued that the robocalls constitute constitutionally protected political speech.

---

[10] See <u>AG Nessel Files Felony Charges Against Jack Burkman, Jacob Wohl in Voter-Suppression Robocalls Investigation</u>, Dep't of Att'y Gen. (Oct. 1, 2020), https://www.michigan.gov/ag/0,4534,7-359--541052--,00.html.

[11] See CTRM 134 36th District Court, *36thDC134*, YouTube (Oct. 8, 2020), https://www.youtube.com/watch?v=X8KUAWLGbZA (arraignment).

[12] See <u>Virginia and California Duo Indicted as Part of Voter Intimidation Robocall Scam That Targeted Midwestern Minority Communities</u>, Cuyahoga County Office of the Prosecutor (Oct. 27, 2020) http://prosecutor.cuyahogacounty.us/en-US/duo-indicted-voter-intimidation-scam-targeted-minority-communities.aspx.

Finally, Defendants stated that they had not sent or authorized any further robocalls since the criminal proceedings against them in Michigan had begun.

During the hearing, Defendants represented to the Court that they had obtained counsel who would enter an appearance on October 27, 2020. In light of this statement, at the conclusion of the hearing, the Court granted Defendants until October 27, 2020 at 3:00 p.m. to enter any written submission on Defendants behalf. Defense counsel filed the Opposition to Plaintiffs' Motion on October 27, 2020 in accordance with that Order.

In the Opposition, Defendants argue that Plaintiffs have not demonstrated standing, a harm not compensable by monetary damages, or a likelihood of success on the merits. Defendants also emphasize their First Amendment rights, arguing that harm to their First Amendment interests counsels against granting the relief Plaintiffs seek.

## I. <u>LEGAL STANDARDS</u>

"The standards for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 . . . are identical." <u>Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr. 2006-FF6</u>, 368 F. Supp. 3d 723, 726 (S.D.N.Y. 2019) (quoting <u>Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.</u>, 190 F. Supp. 2d 577, 580

(S.D.N.Y. 2002)). To obtain such relief, the plaintiff must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that [the requested relief] is in the public interest." N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, 883 F.3d 32, 37 (2d Cir. 2018). The showing of irreparable harm "is the single most important prerequisite . . . ." LSSi Data Corp. v. Time Warner Cable, Inc., 892 F. Supp. 2d 489, 501 (S.D.N.Y. 2012) (internal quotation marks omitted). To demonstrate irreparable harm, the movant must show "an injury that is neither remote nor speculative, but actual and imminent." Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999) (internal quotation marks omitted). The movant must further show that the injury "cannot be remedied by an award of monetary damages." Id.

"When considering a motion for a preliminary injunction, unlike a motion to dismiss, the Court need not accept as true the well-pleaded allegations in Plaintiff['s] complaint." Victorio v. Sammy's Fishbox Realty Co., No. 14 Civ. 8678, 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12, 2014) (citing Incantalupo v. Lawrence Union Free Sch. Dist. No. 15, 652 F. Supp. 2d 314, 317 n.1 (E.D.N.Y. 2009)).

### III.   DISCUSSION

A. <u>STANDING</u>

The "Constitution requires that anyone seeking to invoke federal jurisdiction . . . have standing to do so." <u>Crist v. Comm'n on Presidential Debates</u>, 262 F.3d 193, 194 (2d Cir. 2001). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." <u>Clapper v. Amnesty Int'l</u>, 568 U.S. 398, 408 (2013).

To demonstrate that Article III's standing requirements are met, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)</u>, 528 U.S. 167, 181–82 (2000). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, <u>i.e.</u>, with the manner and degree of evidence required at the successive stages of the litigation." <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992) (internal quotation marks and citations omitted); <u>see</u> <u>New York v. Trump</u>, No. 20 Civ. 5770, 2020 WL 5422959, at *9 (S.D.N.Y. Sept. 10, 2020). "[A] plaintiff must demonstrate standing for each

claim and form of relief sought." <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 404 (2d Cir. 2011).

When, as here, a case involves "multiple plaintiffs, only one plaintiff need possess the requisite standing for a suit to go forward." <u>New York v. U.S. Dep't of Agric.</u>, 454 F. Supp. 3d 297, 303 (S.D.N.Y. 2020) (citing <u>Town of Chester v. Laroe Estates, Inc.</u>, 137 S. Ct. 1645, 1651 (2017); <u>Massachusetts v. E.P.A.</u>, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.")).

The injury-in-fact requirement is meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy." <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 158 (2014) (internal quotation marks and citation omitted). A "future injury" can suffice, if it is "certainly impending, or there is a substantial risk that the harm will occur." <u>Id.</u> at 157; <u>see</u> <u>Clapper</u>, 568 U.S. at 414 n.5 (explaining that plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about"); <u>Dep't of Commerce v. U.S. House of Representatives</u>, 525 U.S. 316, 332-33 (1999) (finding standing when certain jurisdictions were "substantially likely . . . [to] suffer vote dilution" (internal quotation marks and citation omitted)).

Traceability requires showing "a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (internal quotation marks, alterations, and citation omitted). However, traceability does not require "[p]roximate causation." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014). "Article III 'requires no more than de facto causality.'" Dep't of Commerce v. New York, 139 S. Ct. 2551, 2566 (2019) (quoting Block v. Meese, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)).

Redressability requires a showing that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (internal quotation marks and citation omitted). The plaintiff need not "show that a favorable decision will relieve his *every* injury." Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n, 760 F.3d 427, 432 (5th Cir. 2014) (citing Larson v. Valente, 456 U.S. 228, 243 n.15 (1982)).

"Where, as here, Plaintiff is an entity, standing may be established either (i) directly, based on an injury to the entity itself, i.e. organizational standing, or (ii) in the

organization's representative capacity, based on the injuries to its members, i.e. associational standing." Pen Am. Ctr., Inc. v. Trump, 448 F. Supp. 3d 309, 319 (S.D.N.Y., 2020) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975); Fair Hous. Justice Ctr., Inc. v. Cuomo, No. 18 Civ. 3196, 2019 WL 4805550, at *6 (S.D.N.Y. Sept. 30, 2019)).

An organization seeking to establish direct standing must "meet[] the same test that applies to individuals." Pen Am. Ctr., 448 F. Supp. 3d at 323 (quoting N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012)). Specifically, the organization must show "an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the challenged action]; and (iii) that a favorable decision would redress its injuries." Centro de la Communidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017).

An organization may establish injury-in-fact by showing that the challenged conduct causes "a 'perceptible impairment' of an organization's activities . . . ." Nnebe v. Daus, 644 F.3d 147, 157 (2d Cir. 2011). A perceptible impairment occurs when, for example, the organization "divert[s] money from its other current activities to advance

19

its established organizational interests . . . ." Centro, 868 F.3d at 110; Pen Am., 448 F. Supp. 3d at 325.

The Second Circuit recently addressed how an organization may establish standing on the basis of a perceptible impairment in Moya v. United States Department of Homeland Security, 975 F.3d 120 (2d Cir. 2020). In that case, the plaintiff immigration organization alleged that the defendants' conduct had "frustrated" its organizational mission by forcing the organization to divert its resources. Specifically, the organization alleged that the defendants' conduct required it to spend twice as much time servicing clients who required N-648 disability waiver requests for naturalization, "leaving less time for [the organization's] other clients." Id. This "opportunity cost," the Second Circuit said, represented a "real drain on the organization's resources" and thus "a perceptible impairment of its ability to help immigrants." Id. (internal quotation marks and citation omitted).

Here, it appears NCBCP has satisfactorily established Article III standing based on an injury to NCBCP itself.[13] As to the injury-in-fact requirement, Plaintiffs filed an

---

[13] Notably, Defendants make no argument that NCBCP lacks organizational standing. Instead, Defendants only argue that NCBCP lacks associational standing. Because the Court concludes that NCBCP has sufficiently demonstrated organizational standing, however, the Court does not need to reach the issue of associational standing.

affidavit from Tameka Ramsey, a representative of BWR Metro Detroit. (See Ramsey Decl. ¶ 4.) One of BWR Metro Detroit's goals is "to promote and support civic participation," including by "helping and encouraging members of the Black community in Detroit to participate in the Census." (Id. ¶ 6.) Once the organization learned of the robocalls, the BWR Metro Detroit co-chair "had to stop her Census work in order to respond to robocalls." (Id. ¶ 10.) Thus, like the immigration organization in Moya, BWR Metro Detroit and NCBCP must spend more time on voting-related outreach to combat Defendants' disinformation, leaving less time to work on its Census-related outreach. As in Moya, this diversion of resources is an opportunity cost that constitutes a perceptible impairment of the organization's activities. As such, NCBCP has satisfied the injury-in-fact requirement.

As to the traceability requirement, NCBCP has established a causal connection between its injury and the challenged conduct. As Ramsey's affidavit makes clear, BWR Metro Detroit became concerned about the robocalls and the intimidation and fear the calls would cause in the Black community in the Detroit area. (Ramsey Decl. ¶ 7.) Because Ramsey "needed to inform [her] community that the robocalls were false and that voting by mail is safe[,] BWR Metro Detroit mobilized quickly to respond, which required

21

diverting resources and putting other important work on hold." (Id. ¶ 9.) Thus, Plaintiffs have demonstrated that the injury alleged -- the diversion of resources -- stems directly from Defendants' robocalls.

Finally, as to the redressability requirement, NCBCP has established that injunctive relief would likely redress its injury. BWR Metro Detroit has had to redirect its resources towards conducting outreach to ensure community members know the robocalls are false, and Ramsey expressed concern "that if the robocalls continue, BWR [Metro Detroit] will have to divert additional resources from other programs in order to protect our community's right to vote and help people safely vote by mail." (Id. ¶ 11.) If Defendants were prohibited from making additional robocalls or directed to issue a correction, however, BWR Metro Detroit would not have to divert more resources from other programming in order to correct the disinformation. Accordingly, a court order can prevent future harm to NCBCP and redress its injury.[14]

B.   ABSTENTION

At the October 26 hearing, Defendants suggested that the Court should stay this action pending the conclusion of state

---

[14] Having concluded that plaintiff NCBCP satisfies Article III, the Individual Plaintiffs need not have standing for the "suit to go forward," though the Court notes that at least some of the Individual Plaintiffs have standing. See New York, 454 F. Supp. 3d at 303.

criminal proceedings in Michigan.[15] "In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72 (2013). "[O]nly exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 368 (1989). Well established abstention doctrines delineate the limited sets of circumstances in which federal courts will abstain from hearing a case. For the reasons discussed below, the Court concludes that no abstention doctrine counsels in favor of a stay in this case.

Unlike in Younger v. Harris, 401 U.S. 37 (1971), and its progeny, here there is no plaintiff who is a defendant in a pending state criminal, administrative, or civil proceeding and who is asking a federal court to enjoin or otherwise interfere with the pending state matter. Cf. id. at 46 (holding that a federal court should not enjoin a pending state criminal proceeding unless necessary to prevent "great and immediate" irreparable injury); Ohio Civil Rights Comm'n

---

[15] Defendants did not reference the Ohio indictment, likely because they had not yet been charged there at the time of the hearing. Nonetheless, the Court notes that if Defendants had raised it, the abstention analysis that follows would remain unchanged. Whether comparing the present motion to the Michigan or Ohio proceeding, there is no basis for a stay on abstention grounds.

v. Dayton Christian Schs., Inc., 477 U.S. 619 (1986)
(extending Younger in the context of a state administrative
proceeding); Juidice v. Vail, 430 U.S. 327 (1977) (extending
Younger in the context of a state court contempt proceeding);
Huffman v. Pursue, Ltd., 420 U.S. 592 (1975) (extending
Younger in the context of a civil state nuisance proceeding).
Younger abstention is therefore inapplicable.

As the suit before this Court does not involve any state
law claims, abstention is not appropriate under the doctrines
set forth in Railroad Commission v. Pullman Co., 312 U.S. 496
(1941), Burford v. Sun Oil Co., 319 U.S. 315 (1943), or
Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25
(1959).

Finally, abstention is not warranted under Colorado
River Water Conservation District v. United States, 424 U.S.
800 (1976). "Colorado River abstention is reserved for
exceptional circumstances." U.S. Bank Nat'l Assoc. v. E.
Fordham De LLC, 385 F. Supp. 3d 256, 258 (S.D.N.Y. 2019),
aff'd 804 F. App'x 106 (2d Cir. 2020). As the Second Circuit
recently stated when affirming this Court's decision in
United States Bank National Association:

> In deciding whether to abstain under Colorado River, a
> district court must first determine whether the federal
> and state court cases are parallel. Nat'l Union Fire
> Ins. Co. v. Karp, 108 F.3d 17, 22 (2d Cir. 1997). Federal
> and state proceedings are parallel for purposes of

abstention when the two proceedings are "essentially the same" -- when there is an identity of parties, and the issues and relief sought are the same. Id. If the actions are deemed parallel, courts are then to consider six factors to determine whether abstention is appropriate. These factors are: (1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction. De Cisneros, 871 F.2d at 307.

804 F. App'x at 107.

In this case, the proceedings are not "essentially the same." Id. First, the parties in the proceedings are not the same. NCBCP and the Individual Plaintiffs are not involved in the Michigan action, and the Michigan prosecutor is not involved in this action. Although Wohl and Burkman have both been charged in Michigan, the entity defendants in this action -- Project 1599 and J.M. Burkman & Associates -- are not parties to the Michigan criminal proceedings. Second, the issues in the two cases are not the same. Although both cases arise from the same set of facts, Plaintiffs in this civil suit allege violations of federal law, while in Michigan, Defendants Wohl and Burkman face a prosecution for violations of Michigan state law. Finally, the relief sought in the two proceedings is not the same. In Michigan, the prosecutor will pursue criminal penalties -- that is, criminal fines and

imprisonment. Here, Plaintiffs seek temporary and permanent injunctive relief as well as compensatory and punitive damages for the harm they suffered. As the proceedings are not parallel, the Court need not even proceed to consider the six Colorado River factors. See id.

C.    IRREPARABLE HARM

Plaintiffs have demonstrated irreparable harm. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014); see also Conn. Dep't of Envtl. Prot. v. Occupational Safety & Health Admin., 356 F.2d 226, 231 (2d Cir. 2004) (noting that the Second Circuit has "held that the alleged violation of a constitutional right triggers a finding of irreparable injury"). Given the fundamental nature of the right to vote, "if potential members of the electorate suffer intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether extinguished, Plaintiff[s] would be irreparably harmed." Ariz. Democratic Party v. Ariz. Republican Party, No. 16 Civ. 03752, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016). "Further, if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast,

and no amount of traditional remedies such as money damages
would suffice after the fact." Id.[16] Additionally, the injury
NCBCP suffered when BWR Metro Detroit was forced to divert
resources away from its work related to the Census is clearly
irreparable because the Census has now concluded.

Defendants' arguments with respect to irreparable harm
are not persuasive. First, Defendants contend that NCBCP
alleged what amounts to monetary loss. But Defendants
fundamentally misunderstand the nature of the injuries
Plaintiffs claim. The harm NCBCP suffered when it had to
divert its resources away from Census-related programming to
address Defendants' robocalls cannot be remedied monetarily
because the Census has ended. Moreover, Defendants ignore the
injury inflicted upon Plaintiffs' and other members of the
electorate's right to vote free of intimidation. This is an
injury of constitutional significance, and for the reasons

---

[16] The Court is unpersuaded by Defendants' argument that they were merely
"[e]xpressing . . . wariness about the trustworthiness of one mode of
voting over another" and "attempt[ing] to get folks to vote in-person to
ensure voting integrity." (Opposition at 5.) As set forth in Section
III.D.1, the Court concludes that the statements were designed to
intimidate voters from voting by mail. In the context of a life-
threatening global pandemic, intimidating citizens from voting by mail
results in, at best, "harm in the form of exposure to COVID-19" and, at
worst, preventing eligible voters from casting a ballot altogether. See
Jones v. U.S. Postal Serv., No. 20 Civ. 6516, 2020 WL 5627002, at *12
(S.D.N.Y. Sept. 21, 2020) (concluding that plaintiffs had demonstrated
sufficient injury resulting from mail delays which would force citizens
to vote in person and risk infection).

discussed above, interference with or abridgment of the right to vote gives rise to a finding of irreparable injury.[17]

Second, Defendants claim that the delay between the time the robocalls were issued -- on August 26, 2020 -- and the time Plaintiffs brought their lawsuit -- on October 16, 2020 -- undermines a finding of irreparable harm. But the Second Circuit has expressly stated that a "two-month delay [does] not make [an] interim injunctive order inappropriate." Mattina ex rel. Nat'l Labor Relations Bd. v. Kingsbridge Heights Rehab. & Care Ctr., 329 F. App'x 319, 323 (2d Cir. 2009) (citing Kaynard v. MMIC, Inc., 734 F.2d 950, 952, 954 (2d Cir. 1984)). Thus, Defendants' arguments have failed to persuade the Court that a sufficient showing of irreparable harm has not been made in this case.

At the hearing on October 26, Defendants, appearing pro se, emphasized that they have not made robocalls since the institution of criminal proceedings against them in Michigan and have no plans for further robocalls in the future. The Court construes these representations as an argument that Plaintiffs have not shown a sufficiently imminent irreparable

---

[17] Relatedly, Defendants' argument that injury to members of the electorate who are not plaintiffs in this lawsuit is insufficient to find irreparable harm is flatly contradicted by Arizona Democratic Party, 2016 WL 8669978, at *11, which relied on the inability to find and redress the harms felt by potential voters who were dissuaded from exercising their voting rights.

harm. But the Court is not reassured by Defendants' unsworn, self-serving assurances that they have no plans to issue any more robocalls. "A defendant's expressed intention to cease the offending conduct is not sufficient to eliminate the possibility of irreparable harm" absent the existence "of a consent injunction or other enforceable assurance" that the offending conduct will not recur. Kuklachev v. Gelfman, 629 F. Supp. 2d 236, 252 (E.D.N.Y. 2008) (citing Twentieth Century Fox Film Corp. v. Marvel Enters., 155 F. Supp. 2d 1, 49 (S.D.N.Y. 2001)).

Nor does the Michigan bail condition prohibiting Defendants from issuing robocalls or other mass communications undermine the Court's finding of irreparable harm. There is some question of whether Wohl has abided by that condition to date.[18] Moreover, bail conditions are commonly modified, and Plaintiffs have raised legitimate concerns regarding the scope of the Michigan court's jurisdiction to enforce those conditions, including with regard to the entities named as defendants in this suit. As a result, the Court is not persuaded that the bail condition eliminates the possibility of irreparable harm here.[19]

---

[18] CTRM 438 36th District Court, *WC CR438*, YouTube (Oct. 15, 2020), https://www.youtube.com/watch?v=dyMHDzXEpZ8 (probable cause conference).
[19] The Court concludes that, just as Defendants' alleged cessation of robocalls does not undermine a finding of irreparable harm, Defendants' cessation does not render this case moot. For the reasons articulated

D.    LIKELIHOOD OF SUCCESS ON THE MERITS

For the reasons set forth below, the Court is persuaded that Plaintiffs have demonstrated a substantial likelihood of success on the merits with regard to their claims under the Voting Rights Act and Ku Klux Klan Act.

1.    The Voting Rights Act

a.    History

Congress passed the Voting Rights Act ("VRA") in 1965 in response to the Civil Rights Movement and mounting social pressures to realize the constitutional guarantee of the Fifteenth Amendment that the right to vote shall not be denied "on account of race or color." H.R. Rep. No. 89-439, at 30 (1965), as reprinted in 1965 U.S.C.C.A.N. 2437, 2439 ("House Report"). As the House Report explained, the efforts to defend the rights under the Fifteenth Amendment had, in prior generations, "fallen far short of [the country's] aspirations." Id.

The Civil Rights Act of 1957 was the first of this era that attempted to give teeth to the existing voting-rights laws. See Ben Cady & Tom Glazer, Voters Strike Back: Litigating Against Modern Voter Intimidation, 39 N.Y.U. Rev.

--------

above, Defendants have failed to carry their "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (quoting Laidlaw, 528 U.S. at 190).

L. & Soc. Change 173, 188 (2015). Over the years that
followed, Congress modified the voting laws through the Civil
Rights Acts of 1960 and 1964 to address defects litigants
encountered in trying to vindicate the rights these laws were
meant to protect. H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N.
2437, 2440. Despite these modifications, however, the
enforcement of the voting-rights laws remained challenging
and slow. Id. at 2440-41. Only seventy-one voting-rights
cases were filed by the Justice Department under all three
Civil Rights Acts, and despite these cases, widespread
discriminatory practices persisted. See id. at 2441. Against
this backdrop, the Voting Rights Act of 1965 was passed, "to
adopt more effective measures" than existed at the time. Id.
at 2442.

As relevant here, while the Civil Rights Act of 1957
prohibited intimidation "for the purpose of interfering with
the right to vote in Federal elections," Section 11(b)'s
prohibitions extended more broadly. See 1965 U.S.C.C.A.N.
2437, 2440. Section 11(b) provides, in relevant part, that:

> No person, whether acting under color of law or
> otherwise, shall intimidate, threaten, or coerce, or
> attempt to intimidate, threaten, or coerce any person
> for voting or attempting to vote.

52 U.S.C. § 10307(b). Likewise, while the Civil Rights Act of
1957 prohibited intimidation "for voting or attempting to

31

vote," the VRA extended the protections to not just voting, but to other voting-related conduct, including, for example, encouraging others to vote or helping register other voters. See id. Section 11(b)'s reach is extensive, in accordance with the VRA's ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of unencumbered access to the vote, regardless of race. See 1965 U.S.C.C.A.N. 2437.

    b.   Scope and Enforceability

As a threshold matter, and by its clear terms, Section 11(b) undoubtedly applies to private conduct, and private individuals are subject to its prohibitions. League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found. ("LULAC"), No. 18 Civ. 423, 2018 WL 3848404, at *3 (E.D. Va. Aug. 13, 2018) (concluding that Section 11(b) reaches private conduct upon a review of the case law and statutory text). Indeed, Section 11(b) provides that "no person" shall interfere, "whether acting under color of law or otherwise," with "any person's" right to vote. That the prohibited acts may be "under color of law or otherwise," and that the contemplated perpetrator and victim "persons" are not limited or qualified, both reflect Section 11(b)'s reach beyond government actors.

Defendants contend that Section 11(b) affords no private right of action. That is incorrect. Consistent with Section

11(b)'s broad reach, both the government and private parties may sue to enforce Section 11(b). See Arizona Democratic Party, 2016 WL 8669978, at *4 (concluding that Section 11(b) "does not exclude a private right of action for injunctive relief") (citing Allen v. State Bd. of Elections, 393 U.S. 544, 556 (1969) (holding that Section 5 of the VRA implied a private right of action because the "laudable goal" of the VRA to "make the guarantees of the Fifteenth Amendment finally a reality for all citizens" would be "severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General")); Cady & Glazer, supra, at 183 (explaining that the Ku Klux Klan Act and the VRA "create private rights of action in federal courts"); see also, e.g., LULAC, 2018 WL 3848404, at *1 (denying a motion to dismiss the Section 11(b) claim brought by an organization and four individual plaintiffs).

    c.   No Racial Animus or Targeting Required

A plaintiff need not show racial animus or discrimination to establish a violation of Section 11(b). First, the statutory text prohibits intimidation, threats, and coercive conduct, without any explicit or implicit reliance on the motivation of the actor. Indeed, the legislative history makes clear that "[t]he prohibited acts of intimidation need not be racially motivated." H.R. Rep.

No. 89-439, 1965 U.S.C.C.A.N. at 2462; see also Willingham v. County of Albany, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006) ("While the purpose of the VRA was to eliminate racial discrimination in voting, [Section] 11(b) of the act does not explicitly require proof that racial discrimination motivated the intimidation, threats, or coercion."); Cady & Glazer, supra, at 190 ("[S]ection 11(b) was a deliberate attempt to expand the existing laws against voter intimidation, including by eliminating any legal requirement of racial targeting.").

    d.    "Intimidate, Threaten, or Coerce"

To establish a claim under Section 11(b), a plaintiff must show that the defendant has intimidated, threatened, or coerced someone for voting or attempting to vote, or has attempted such intimidation, threat, or coercion. In the sections that follow, the Court discusses conduct encompassed by the terms "intimidate," "threaten," and "coerce." After considering the text of the statute and First Amendment principles bearing on its interpretation, the Court describes cases applying Section 11(b), as well as other statutes containing similar prohibitions on threats and intimidation.

These authorities confirm that threats and intimidation include messages that a reasonable recipient familiar with the context of the message would interpret as a threat of

34

injury tending to deter individuals from exercising their voting rights. The threatened injury need not be one of violence or bodily harm. For example, threats of economic harm, legal action, dissemination of personal information, and surveillance can qualify depending on the circumstances.

### i. The Statutory Language

In deciding what conduct is covered by the terms "intimidate," "threaten," and "coerce," the Court must begin with the plain meaning of the statutory language. E.g., United States v. Reynoso, 239 F.3d 143, 146 (2d Cir. 2000) (citing United States v. Piervinanzi, 23 F.3d 670, 677 (2d Cir. 1994) ("[T]he starting point for interpreting a statute is the language of the statute itself.")). As "usual," the Court must also "interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." L.S. v. Webloyalty.com, Inc., 954 F.3d 110, 115 (2d Cir. 2020) (internal quotation marks and citations omitted).

The words "intimidate," "threaten," and "coerce," have familiar and somewhat overlapping definitions. See Webster's Third New International Dictionary (1966). To "intimidate" means to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)." Id. at 1183. To "threaten" means to "utter

threats against" or "promise punishment, reprisal, or other distress." Id. at 2381. And to "coerce" means to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)." Id. at 438.

ii.  First Amendment Considerations

Defendants argue in their Opposition that their robocalls communicated a message entitled to First Amendment protection. Statutes such as the VRA that restrict threatening speech "must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam).

To determine whether a restriction on speech is content-based and hence subject to strict scrutiny, a court must "consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015) (citation omitted). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." Id. at 163-64.

36

Section 11(b) proscribes speech based on the message the speaker conveys -- specifically whether the content of the speaker's message is threatening or intimidating to voters. See Reed, 576 U.S. at 163. Section 11(b) does not regulate other types of messages, such as communications encouraging voter registration. To determine whether a violation of the statute has occurred, the content of the speaker's message must be examined. See McCullen v. Coakley, 573 U.S. 464, 479 (2014) ("The Act would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred.") (internal quotation marks and citations omitted). Thus, Section 11(b) is a content-based speech restriction.

Over time, the Supreme Court has defined narrow categories of speech that can be prohibited based on content. Such categories include, for example, true threats, see Watts, 394 U.S. at 708; speech directed at and likely to incite imminent lawless action, see Brandenburg v. Ohio, 395 U.S. 444, 447 (1969) (per curiam); child pornography, see New York v. Ferber, 458 U.S. 747 (1982); obscenity, see Miller v. California, 413 U.S. 15 (1973); and fighting words, see Chaplinsky v. New Hampshire, 315 U.S. 568 (1942).

False statements are not categorically excluded from First Amendment protection. See United States v. Alvarez, 567

U.S. 709, 718-22 (2012) (plurality); id. at 732-37 (Breyer, J., concurring). Although false statements that discourage people from exercising the right to vote could conceivably be exempted from First Amendment protection altogether, the Supreme Court has not crafted such an exemption.[20]

As noted above, true threats are not entitled to First Amendment protection. See Watts, 394 U.S. at 708. The Second Circuit applies an objective test to determine whether a defendant's statement is a true threat. See United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013). Specifically, the "test for whether conduct amounts to a true threat is . . . whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." Id. (internal quotation marks and citations omitted); see also United States v. Santos, 801 F. App'x 814, 816 (2d Cir. 2020) (applying the Turner test).

Prohibitions on true threats are constitutional "even where the speaker has no intention of carrying them out." Turner, 740 F.3d 420. At the same time, however, "political hyperbole" is not a true threat, even when "crude," "abusive, and inexact." Watts, 394 U.S. at 708 (holding that the

---

[20] The Supreme Court upheld a statute that banned electioneering within 100 feet of a polling place in Burson v. Freeman, 504 U.S. 191, 206, 211 (1992) (plurality), finding that the regulation advanced the state's interests in protecting the right to vote and electoral integrity.

statement "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." did not amount to a true threat). Courts examine the language used and the context of the message to distinguish true threats from hyperbole. See Turner, 740 F.3d at 421 ("The full context of Turner's remarks reveals a gravity readily distinguishable from mere hyperbole or common public discourse."). In Watts, for example, the Supreme Court considered the context and expressly conditional nature of the statement at issue, as well as listeners' laughter in response to the statement, as supporting the conclusion that the statement was mere hyperbole. See Watts, 394 U.S. at 708.

The threat need not be expressed in first person, unconditional, future tense. "[R]igid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience" would render prohibitions on true threats "powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Turner, 740 F.3d at 422 (quoting United States v. Malik, 16 F.3d 45, 50 (2d Cir. 2013), and citing United States v. Shoulberg, 895 F.2d 882, 886 (2d Cir. 1990)). In fact, in Virginia v. Black, 538 U.S. 343, 354, 357, 363 (2003), the Supreme Court recognized that,

interpreted in a broader historical and social context, cross burnings can constitute true threats even though they communicate no explicit message.

The Supreme Court has not squarely addressed whether threats of nonviolent or nonphysical harm can constitute true threats. In Black, the Court explained that "[t]rue threats *encompass* those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359 (emphasis added). That is, the Court explained that true threats include threats of unlawful violence; the Court did not specify whether only threats of unlawful violence are true threats. With regard to intimidation, the Court explained that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat" that exists "where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Id. at 360. Prohibition of true threats is appropriate, the Court reasoned, because it "protects individuals from the fear of violence and the disruption that fear engenders, as well as from the possibility that the threatened violence will occur." Id. (citations omitted).

This Court does not interpret the Supreme Court's analysis in <u>Black</u> to suggest that the government can ban only threats of physical harm. The threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence. Indeed, the Second Circuit has indicated that threats of serious nonphysical harm are true threats unprotected by the First Amendment. In <u>Turner</u>, the Second Circuit approvingly cited constitutional law scholar and legal philosopher Kent Greenawalt for the proposition that:

> Despite the relevance of freedom of speech, a legislature could reasonably decide to make it criminal for a person with apparent firmness of purpose to threaten a specific legal wrong grave enough to be likely either to cause substantial emotional disturbance in the person threatened or to require the employment of substantial resources for investigation or prevention.

<u>Turner</u>, 720 F.3d at 420 (quoting Kent Greenawalt, Speech, Crime and the Uses of Language 91 (1989)). Moreover, the Second Circuit's test for identifying a true threat, as set forth in <u>Turner</u>, requires only a showing that a reasonable recipient "would interpret [the message] as a *threat of injury*." <u>Id.</u> at 420 (emphasis added). The Court accordingly does not interpret the First Amendment as prohibiting the government from restricting speech that communicates threats of nonviolent or nonbodily harm.

Whether true threats are only statements that the speaker intended as threats likewise remains unresolved by the Supreme Court. The Second Circuit has explained:

> [In] Virginia v. Black, . . . the Supreme Court stated that "'[t]rue threats' encompass those statements where the speaker *means to communicate* a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Since Black, some disagreement has arisen among our sister circuits regarding whether Black altered or overruled the traditional objective test for true threats by requiring that the speaker subjectively intend to intimidate the recipient of the threat.

Id. at 420 n.4 (citations omitted) (emphasis added). The Second Circuit declined to resolve that question in Turner, because, on the facts of that case, "a true threat was established pursuant to both the objective and subjective tests." Id. Moreover, even if the Constitution requires a showing of subjective intent in criminal cases, that requirement may not apply in civil cases. See United States v. Elonis, 135 S. Ct. 2001, 2009 (2015) (interpreting a statute criminalizing threats as containing a scienter requirement in light of "the general rule . . . that a guilty mind is a necessary element in the indictment and proof of every crime" (internal quotation marks and citations omitted)).

This question of intent is of particular relevance to Section 11(b) of the VRA because it contains no explicit

requirement of intent. Ultimately, however, the Court need not resolve this question. For reasons discussed below, whether or not Section 11(b) must be construed as including an intent requirement does not alter the outcome here.

    iii. Cases Applying Section 11(b)

    Consistent with the text of Section 11(b) and the First Amendment considerations described above, courts have concluded that conduct putting others "in fear of harassment and interference with their right to vote" constitutes intimidation "sufficient" to support a Section 11(b) claim. E.g., LULAC, 2018 WL 3848404, at *4 (quoting Damon v. Hukowitz, 964 F. Supp. 2d 120, 149 (D. Mass. 2013) ("Intimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct.")).

    Conduct that puts others "in fear of harassment and interference with their right to vote" naturally includes egregious conduct, such as acts of violence. See, e.g., Katzenbach v. Original Knights of Ku Klux Klan, 250 F. Supp. 330, 337 (E.D. La. 1965) (finding that assault and economic retaliation constituted unconstitutional voter intimidation).

    But unlawful voter intimidation also includes subtler forms of intimidation that do not threaten bodily harm. For example, in Daschle v. Thune, the court issued a temporary

restraining order against defendants who had been following Native American voters within polling places, "ostentatiously making noises" behind them, discussing Native Americans who were prosecuted for illegally voting, following them out of the polling places, and recording their license plate numbers. <u>See</u> Decision and Order at 2, No. 4:04 Civ. 04177 (D.S.D. Nov. 1, 2004); <u>see also</u> Complaint at 5-6, <u>id.</u> In imposing the restraining order, the court found that this conduct resulted in "the intimidation of prospective Native American voters." Decision and Order at 2, <u>id.</u>

 iv. <u>Other Statutes</u>

 Decisions interpreting the terms "intimidate" and "threaten" in other statutes are also instructive. Indeed, the "whole code canon" instructs that identical terms should typically be construed consistently across different acts or titles of the United States Code. <u>See</u>, <u>e.g.</u>, <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 546 U.S. 440, 448 n.3 (2006) ("Our more natural reading is confirmed by the use of the word . . . elsewhere in the United States Code."); <u>see also</u> <u>United States v. Harmon</u>, No. CR 19-395, 2020 WL 4251347, at *9 (D.D.C. July 24, 2020) (citing <u>K.L. v. R.I. Bd. of Educ.</u>, 907 F.3d 639, 646 (1st Cir. 2018) (referencing the "'whole code' canon," "under which courts construe terms across different" acts or titles of a legal code "consistently")).

Communicating the prospect of adverse legal consequences, including arrest or prosecution, may rise to the level of an unlawful threat or intimidation. In United States v. McLeod, the Fifth Circuit held that certain arrests and prosecution constituted unlawful voter intimidation. 385 F.2d 734 (5th Cir. 1967) (interpreting a provision of the 1957 Civil Rights Act that prohibits intimidation, threats, or coercion for the purpose of interfering with the right to vote). In McLeod, a sheriff stationed officers in and around voter-registration meetings, and the officers "made notes during the meetings, took down the license numbers of cars in the area, and spoke with each other and with the sheriff's office by portable two-way radio." Id. at 737. Two individuals involved with the meetings were later arrested and prosecuted. Id. at 737-38. Subsequently, state officials arrested twenty-nine Black individuals attending a voter-registration meeting based on traffic violations. Id. at 738. Addressing both sets of conduct, the Fifth Circuit held that it was intimidating and coercive, explaining that "[i]t is difficult to imagine anything short of physical violence which would have a more chilling effect on a voter registration drive than the pattern of baseless arrests and prosecutions revealed in this record." Id. at 740-41. Similarly, in Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263

F.3d 208, 222-23 (2d Cir. 2001), the Second Circuit concluded that an employer's statement to his employee that if the employee continued requesting accommodations for her disability, he would address her behavior "through legal channels" could constitute an unlawful threat or intimidation in violation of the Americans with Disabilities Act.

Economic pressure may also be considered a form of intimidation. See, e.g., United States v. Beaty, 288 F.2d 653, 654-57 (6th Cir. 1961) (applying the Civil Rights Act of 1957 and holding that the eviction of sharecroppers as punishment for registering to vote constitutes unlawful intimidation); United States v. Bruce, 353 F.2d 474, 476-77 (5th Cir. 1965) (finding unlawful intimidation when a landowner restricted an insurance collector's access to the landowner's property due to the insurance collector's efforts to register voters).

Courts have defined "intimidation" for purposes of the Fair Housing Act ("FHA"),[21] as including nonviolent and nonbodily harm such as surveillance and derogatory remarks. The Ninth Circuit has said that "[i]ntimidation [under the FHA] would require" simply "a showing that the [defendant's] activities had generated fear in the [plaintiff]." Walker v.

---

[21] As the Second Circuit has recognized, the language of the FHA and Section 11(b) of the VRA is "very similar." New York v. Davis, 411 F.2d 750, 753 (2d Cir. 1969).

City of Lakewood, 272 F.3d 1114, 1129 n.4 (9th Cir. 2001). In
People Helpers Foundation, Inc. v. City of Richmond, 781 F.
Supp. 1132, 1135 (E.D. Va. 1992), the district court concluded
that plaintiffs adequately alleged unlawful threats and
intimidation under the FHA when they alleged that defendants
had photographed plaintiffs and People Helpers volunteers and
made derogatory remarks about the Black residents. Id. at
1135-36.

Under certain circumstances, warnings of the
dissemination of personal information can also constitute a
threat or intimidation. In United States v. Nguyen, 673 F.3d
1259, 1265 (9th Cir. 2012), the Ninth Circuit considered a
letter that was widely distributed among Latino immigrants
and "warned . . . that if they voted in the upcoming election
their personal information would be collected . . . and . . .
could be provided to organizations who are 'against
immigration.'" Id. On the facts of that case, the Ninth
Circuit concluded that the there was "sufficient" basis for
a jury to conclude that the mailing constituted unlawful
"intimidation" under California law. Id.[22]

---

[22] Defendants quote at length from United States v. McNeal, 818 F.3d 141,
153 (4th Cir. 2016), in which the Fourth Circuit explained that courts
interpret the word "intimidation" as referencing a threat to use physical
force in the context of criminal statutes defining bank robbery. Because
the provisions of the VRA and the Ku Klux Klan Act at issue here are not
defining "crimes involving takings 'by force and violence, or by
intimidation,'" McNeal and the cases cited within it are inapposite. See

e.   Likelihood of Success on Plaintiffs' VRA Claim

The Court is persuaded that Plaintiffs are substantially likely to prevail in proving that the robocalls violated Section 11(b). The calls state that personal information will be disclosed to creditors, the CDC, and law enforcement -- and with significant consequences. The calls explicitly state that creditors will use the information to collect debts, that the CDC will use it to identify people for mandatory vaccination, and that law enforcement will use it to enforce old, outstanding warrants.

The context in which Defendants' message was communicated supports a conclusion that the message constituted a threat or intimidation. See McLeod, 385 F.2d at 740 (explaining defendants' "acts cannot be viewed in isolation" and "must be considered against the background of contemporaneous events in Selma and the general climate prevailing there at the time"); Turner, 720 F.3d at 420 (the "test for whether conduct amounts to a true threat is . . . whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury"). And in context, it is not difficult to

---

id. The statutory schemes discussed in this section -- including the Fair Housing Act, the 1957 Civil Rights Act, and the Americans with Disabilities Act -- are more closely analogous to those at hand and therefore offer more useful guidance with regard to the proper construction of the term intimidation within the VRA and KKK Act.

see how the references to arrest warrants, outstanding debt, and mandatory vaccines may cause reasonable Black voters to resist voting out of fear. The history of discriminatory policing, discriminatory lending and debt collection practices, and unethical medical procedures within the Black community, as highlighted by Plaintiffs, continue to generate reasonable mistrust of law enforcement, financial institutions, and the medical community.[23] Additionally, the COVID-19 pandemic has had a disproportionate impact on Black communities. See Nguyen, 673 F.3d at 1265 (concluding there was a fair probability that a letter stating that personal information of Latino voters would be provided to organizations "against immigration" was unlawfully threatening and intimidating).

---

[23] The Court considers the historical existence of discriminatory policing, lending, debt collection, and medical practices to be a generally known fact and hence properly subject to judicial notice. See, e.g., Sarah A. Seo, Policing the Open Road (2019) (discussing historically discriminatory policing practices); Austin Frakt, Bad Medicine: The Harm That Comes From Racism, N.Y. Times (Jan. 13, 2020) https://www.nytimes.com/2020/01/13/upshot/bad-medicine-the-harm-that-comes-from-racism.html (providing historical examples of "unjust treatment of nonwhite groups in health care"); Paul Kiel & Annie Waldman, The Color of Debt: How Collection Suits Squeeze Black Neighborhoods, ProPublica (Oct. 8, 2015), https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-neighborhoods (tying the racial wealth gap to historic discrimination and finding that in recent years even accounting for income, the rate of court judgments from debt collection lawsuits was twice as high in mostly black communities); Tuskegee Study, 1932-1972, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/tuskegee/index.html (last visited Oct. 25, 2020) (referencing United States Public Health Service experiment in which adequate treatment for syphilis was withheld "from a group of poor black men who had the disease, causing needless pain and suffering for the men and their loved ones").

Context indicates that a reasonable recipient would likely interpret the prospect of a forced vaccination, in particular, as a threat of bodily injury to voters who vote by mail. Interpreting this portion of the message in context requires recognition of the widespread uncertainty within the United States concerning the efficacy and safety of the COVID-19 vaccines under development.[24] In this environment, the robocalls' statement concerning mandatory vaccinations is reasonably perceived as a threat of bodily harm.

Moreover, by stating that voters' personal information "will be used by police departments to track down old warrants," the calls may fairly be perceived as threatening arrest or legal action against those with criminal records. Such conduct has previously been held to be intimidating. See, e.g., McLeod, 385 F.2d 734 (holding that baseless or pretextual arrests and prosecutions were unlawful intimidation); Damon, 964 F. Supp. 2d at 150 (stating that "a threat of arrest would presumably qualify under the right

---

[24] U.S. Public Now Divided Over Whether to Get COVID-19 Vaccine, Pew Research Ctr.: U.S. Policy & Politics (Sept. 17, 2020), https://www.pewresearch.org/science/2020/09/17/u-s-public-now-divided-over-whether-to-get-covid-19-vaccine/ (finding that 77 % of Americans "think it's very or somewhat likely a COVID-19 vaccine will be approved in the United States before its safety and effectiveness are fully understood" and that "[j]ust 32% of Black adults say they would definitely or probably get a COVID-19 vaccine, compared with 52% of White adults . . . .").

circumstances as threats, intimidation, or coercion"); Lovejoy-Wilson, 263 F.3d 208 (holding that the threat of legal action could violate the prohibition on intimidation in the Americans with Disabilities Act).

Likewise, the reference to credit card companies and debt collection could instill fears that voters would face adverse economic consequences if they exercised their right to vote by mail. Courts have recognized that such economic pressure may also be intimidating. See Beaty, 288 F.2d 657 (holding that the threat of eviction was unlawful intimidation); Bruce, 353 F.2d 474, 476-77 (holding that restricting an individual's access to his clients was intimidating or coercive).

Here, that Plaintiffs did not immediately dismiss the robocalls indicates that the broadcasted message was more than mere hyperbole. In their affidavits, the Individual Plaintiffs repeatedly attest that they were frightened and enraged by the calls. In fact, both Winter and Steinberg testified that they were so shaken by the threats these calls posed that they no longer plan to vote by mail. (Winter Decl. ¶ 16; Steinberg Decl. ¶¶ 14-15.) Similarly, Sferes and Steinberg, having outstanding medical debt and an old arrest

warrant, respectively, were both especially distressed by what appeared to be the prospect of future penalties.[25]

It is true that the robocalls were not themselves violent and are not as egregious as the physical acts of intimidation seen in some of the case law. But, as discussed above, "threats, intimidation or coercion may take on many forms." Beaty, 288 F.2d at 654. There is no requirement -- in the statutory text or the case law -- that intimidation be violent or physical. Cf. People Helpers Found., Inc., 781 F. Supp. at 1135 (explaining that "even if the acts of the [defendants] were not violent or illegal per se, they may still have constituted interference, intimidation, or coercion under [the FHA]").

Rather, as discussed above, subtle forms of voter intimidation are equally prohibited, and the robocalls share striking similarities with some of the nonviolent intimidation in the cases. For instance, in Daschle, the court concluded that conduct such as photographing license plates and speaking loudly about other Native American defendants

---

[25] The claims in the robocall were likewise not mere statements of opinion. Whether a statement is one of opinion or fact depends on the "content of the communication as a whole, its tone and apparent purpose." Davis v. Boeheim, 22 N.E.3d 999, 1005 (N.Y. 2014) (applying New York law). The use of the phrase "did you know" before the claims regarding how the recipients' personal information would be used was not "loosely definable" or "variously interpretable." See Ollman v. Evans, 750 F.2d 970, 980 (D.C. Cir. 1984). Viewing the content of the call as a whole, then, it is clear the statements were expressed as statements of fact rather than, as Defendants argue, statements of opinion.

who had been arrested for voter fraud constituted
intimidation. Decision and Order at 2, Daschle, No. 4:04 Civ.
04177. Just as the defendants in Daschle instilled reasonable
fears in Native American voters about facing legal trouble
for voting, the robocalls here likely did and would inspire
fear in reasonable voters, like Steinberg and Sferes, about
being targeted by law enforcement or debt collectors if they
vote by mail.

The robocalls are also akin to the letters the Ninth
Circuit deemed likely intimidating in Nguyen. The letters in
Nguyen targeted Latinos and warned about voters' information
being transmitted to anti-immigration groups. 673 F.3d at
1265. The robocalls here target Black voters and warn about
private information being shared with groups -- law
enforcement, debt collectors, and the CDC -- that might
realistically take adverse action against them. In short,
like the letters in Nguyen, and the comments made by the
Daschle defendants, the robocalls reasonably arouse fear in
recipients about the consequences of voting by mail and thus
are subtler, but no less potent, forms of intimidation.

The Court deems it highly relevant that this message was
conveyed directly to individual voters by phone, that the
speaker of the message was cast as a seemingly familiar
figure, and that the language was designed to communicate

53

harms that "you" -- the individual who answered the phone -- will suffer. Although the content of the message was not individualized, it nonetheless bore many of the hallmarks of a personal communication. These features of the robocalls contribute to the Court's understanding of the communication as intimidating and distinguish it from statements made by pundits on television, candidates at political rallies, and commentators and public officials on social media. Additionally, that the message was falsely framed as originating from a "civil rights organization" lent gravity and a fake appearance of credibility to the warnings it conveyed.

The evidence and the precedent support the conclusion that the robocalls put the Individual Plaintiffs "in [reasonable] fear of harassment and interference with their right to vote." LULAC, 2018 WL 3848404, at *4. Furthermore, whether they were ultimately intimidated, threatened, or coerced does not undermine this analysis. Indeed, Section 11(b) also prohibits conduct that serves to intimidate, threaten, or coerce, and *attempts* to intimidate, threaten, and coerce in equal measure. See 52 U.S.C. § 10307(b).

Likewise, even if Section 11(b) contained an intent requirement -- which by its plain language it does not -- Plaintiffs would likely succeed in showing that Defendants'

conduct here was intentional. In early 2019, Wohl told USA Today that he and Burkman were planning "ways to discredit Democrats in the 2020 election" and "cause disarray."[26] A draft of his "business plan" revealed that Wohl planned to "disseminate false information about Democratic presidential candidates to swing political betting markets."[27] No wonder, then, that the robocalls reached recipients in urban areas with significant minority populations who largely skew Democratic.[28] Defendants' prior conduct and expressed goals, together with the language of the robocall and its context, provide strong support for a conclusion that Defendants intended the robocall to harm Democrats by suppressing turnout among Black voters. Furthermore, the natural outcome of broadcasting the robocall message was voter intimidation, and "normally" a person "is presumed to have intended the natural consequences of his deeds." Washington v. Davis, 426 U.S. 229, 253 (1976) (Stevens, J., concurring).

For the reasons stated above, the Court concludes that Plaintiffs have demonstrated a substantial likelihood of success on their Section 11(b) claim. The Court further

---

[26] See supra note 2.

[27] See supra note 3.

[28] Trends in Party Affiliation Among Demographic Groups, Pew Research Ctr: U.S. Policy & Politics (Mar. 20, 2018), https://www.pewresearch.org/politics/2018/03/20/1-trends-in-party-affiliation-among-demographic-groups/.

concludes that application of Section 11(b) to the conduct at issue in this case is fully consistent with the First Amendment because the robocall message was a true threat.[29]

2.   The Ku Klux Klan Act

42 U.S.C. § 1985(3), a provision of the Ku Klux Klan Act of 1871 ("KKK Act"), reads in its entirety:

> *If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;* or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; *in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.*

---

[29] Even if the robocall were not a true threat, the Court would conclude that content-based speech restrictions imposed by the VRA and KKK, as interpreted above, are narrowly tailored to advance compelling government interests. See Burson v. Freeman, 504 U.S. at 198-99 (plurality) ("[A] State has a compelling interest in protecting voters from confusion and undue influence.").

41 U.S.C. § 1985(3) (emphases added). Section 1985(3) is comprised of multiple clauses. See Kush v. Rutledge, 460 U.S. 719, 726 (1983) (emphasizing that past precedent interpreted only "the first clause of [Section] 1985(3)"); see also Cady & Glazer, supra, at 203. The italicized portion, or the first clause of Section 1985(3), is commonly referred to as the "Equal Protection Clause," while the underlined portion is referred to as the "Support or Advocacy Clause." See Note, The Support or Advocacy Clause of 1985(3), 133 Harv. L. Rev. 1382, 1390-91 (2020). Though the vast majority of cases interpreting § 1985(3) pertain to the Equal Protection Clause, the Support or Advocacy Clause is the focus of the present case.[30]

Based on the statutory text, the elements of a Section 1985(3) claim brought for violations of the Support or Advocacy Clause include: (1) a conspiracy; (2) the purpose of

---

[30] One key distinction between the Support or Advocacy Clause and the Equal Protection Clause merits mention. The Support or Advocacy Clause created "a Federal right . . . to recover damages for interfering with Federal voting rights." Paynes v. Lee, 377 F.2d 61, 64 (5th Cir. 1967). The Equal Protection Clause, on the other hand, allows only for recovery for "deprivations of equal protection or equal privileges and immunities under the Fourteenth Amendment." See id. While the Equal Protection Clause thus requires a violation of a separate constitutional right, Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372 (1979), the Support or Advocacy Clause gives rise to an independent substantive right -- the right to vote and participate in voting-related activities. Accordingly, plaintiffs bringing claims under the Support or Advocacy Clause need not identify a violation of a separate constitutional right. See LULAC, 2018 WL 3848404, at *6.

which is to force, intimidate, or threaten; (3) an individual
legally entitled to vote who is engaging in lawful activity
related to voting in federal elections.[31]

    a.   Conspiracy

As to the first requirement, the elements of a conspiracy
under federal law are: "(1) an agreement between two or more
persons to commit an unlawful act; (2) knowingly engaging in
the conspiracy intending to commit those offenses that were
the objects of the conspiracy; and (3) commission of an 'overt
act' by one or more members of the conspiracy in furtherance
of the conspiracy." United States v. Reyes, 302 F.3d 48, 52
(2d Cir. 2002). A conspiracy "need not be shown by proof of
an explicit agreement." Cine Sk8, Inc. v. Town of Henrietta,
507 F.3d 778, 792 (2d Cir. 2007) (internal quotation marks
and citation omitted). However, "a plaintiff must demonstrate
at least that parties have a tacit understanding to carry out
the prohibited conduct." Id. (internal quotation marks and
citation omitted).

    b.   Intimidation and Threats

The Court has identified no authority indicating that
the terms "intimidation" and "threat" bear a different

---

[31] This formulation differs slightly from the elements set forth in
§ 1985(3) cases in the Second Circuit. However, this is because those
cases dealt with the Equal Protection Clause and not the Support or
Advocacy Clause. See, e.g., Cine Sk8, Inc. v. Town of Henrietta, 507 F.3d
778, 792 (2d Cir. 2007) (internal quotation marks and citation omitted).

meaning in the KKK Act than they do in the VRA. The Court will therefore interpret these terms consistent with the discussion above in Section III.D.1.

### c.   No Animus Requirement

Unlike plaintiffs suing under the Equal Protection Clause of the KKK Act, plaintiffs suing under the Support or Advocacy Clause need not demonstrate that defendants acted with discriminatory, class-based animus. See Kush, 460 U.S. at 726 (rejecting the argument that the discriminatory animus requirement, which "arose under the *first clause* of [Section] 1985(3)," should be extended to the remaining portions of Section 1985 (emphasis added)).

### d.   Likelihood of Success on Plaintiffs' KKK Act Claim

Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim under the KKK Act, § 1985(3). For the reasons discussed below, all of the elements are likely satisfied here.

### i.   Conspiracy

There seems little doubt that Plaintiffs can prove a conspiracy. Both Wohl and Burkman have admitted to participating in the creation and distribution of the robocall message, indicating that the first element of conspiracy -- an agreement between two or more persons -- is met. The second element -- knowledge -- can be reasonably

inferred from the fact that the robocalls were placed from a number associated with Burkman and are sponsored by an organization founded by Wohl and Burkman, as well as from the fact that Wohl and Burkman have openly acknowledged engaging in efforts "to hurt Democrats." (Plaintiffs' Memorandum, at 17.) And finally, the placing of these calls demonstrates that the third element -- an overt act in furtherance of the conspiracy -- is met here.

### ii.   Threat or Intimidation

Plaintiffs have demonstrated that they are likely to establish a threat or intimidation under the KKK Act for the same reasons discussed above with regard to threats and intimidation under the VRA. See supra Section III.D.1.

### iii. Target of the Conspiracy

Finally, the last element of a Support or Advocacy Clause claim is easily met here as well. There is little doubt that the robocalls targeted lawful voters who were planning to vote, either by mail or in person. As the affidavits of the Individual Plaintiffs establish, the robocall recipients are legally entitled to vote. (Winter Decl. ¶ 3; Steinberg Decl. ¶ 3; Hart Decl. ¶ 2; Wolff Decl. ¶ 3; Slaven Decl. ¶ 3; Kennedy Decl. ¶ 3; Daniel Decl. ¶ 3; Sferes Decl. ¶ 3; see also Ramsey Decl. ¶¶ 7, 9.) And mail-in voting is clearly a lawful, voting-related activity. See Paynes v. Lee, 377 F.2d

61, 64 (5th Cir. 1967) ("The right to be free from threatened harm and the right to be protected from violence for an attempted exercise of a voting right are no less protected than the right to cast a ballot on the day of election."). Thus, Plaintiffs have established a substantial likelihood that they will prevail on the merits of their Support or Advocacy Clause claim under § 1985(3).

E.   PUBLIC INTEREST

The Court has little trouble concluding that the public interest favors granting Plaintiffs' request for a temporary restraining order. Contrary to Defendants' contentions, their conduct is far from innocuous, and Plaintiffs' claims are far from "histrionic." (Opposition at 22.) No right is more sacred in a democracy than the right to vote freely. But if left unchecked, Defendants' conduct imperils this right, and with it, the very heart and constitutional foundation of this nation.

By disseminating a robocall message laden with falsity and ill purpose and dire effects, Defendants have not, as they claim, acted within the bounds of the First Amendment and engaged in mere political speech. Defendants intentionally reached into the homes of voters and raised the specter of arrest, financial distress, infirmity, and compulsory medical procedures. Not only did Defendants incite

fears of these grim consequences, but they baselessly tied the prospects to mail-in voting. The result cannot be described as anything but deliberate interference with voters' rights to cast their ballots in any legal manner they choose. And the intimidation of individual voters inflicts harm upon the broader public's interest in selecting elected officials through a free and fair process.

Finally, the Court rejects Defendants' argument that the public interest is not served by injunctive relief because "[t]he underlying statutes cited . . . by the Plaintiffs . . . were intended to curtail violence, menacing and intimidation of the kind employed by a violent secret society . . . in the [R]econstruction era South." (Opposition at 22.) The public's interests require that this Court take firm and swift action against all who intimidate voters -- hooded or not.

E.  FORM OF RELIEF

The VRA allows "for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order." 52 U.S.C. § 10308(d). The Court's authority to issue any "other order" includes the authority to order "whatever additional action is necessary to return individuals to their status quo ante" -- that is, the status quo before Defendants acted unlawfully --

including affirmative remedial action. See McLeod, 385 F.2d at 748-50.[32]

Here, Plaintiffs have made a strong showing that Defendants' conduct has induced fear about mail-in voting and deterred robocall recipients from exercising their right to do so. To that extent, Defendants have already inflicted significant harm not only on Plaintiffs, but on the nation's democratic institutions. "Of course, no court order can completely eradicate the effect of [Defendants'] actions." Id. at 749. But the Court "can and must . . . do all within its power to eradicate the effect of the unlawful [conduct] in this case." Id. at 750. Accordingly, restraining Defendants from engaging in further unlawful conduct would not suffice to undo the harm they have brought about in this case. In order to mitigate the damage Defendants have caused and thus endeavor to return the robocall recipients to the position they were in before Defendants placed those calls, the Court considers it necessary for Defendants to issue a message to all recipients of the robocalls informing them

---

[32] Even absent this statutory authorization, the Court has the power to order an affirmative act or mandate a specified course of conduct so long as Plaintiffs have demonstrated a clear or substantial likelihood of success on the merits. See Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (internal quotation marks and citation omitted); Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 64, 68 (E.D.N.Y. 2006) (internal quotation marks and citation omitted). As discussed previously, Plaintiffs have demonstrated a substantial likelihood of succeeding on their VRA and KKK Act claims.

about this Court's finding that Defendants' original message contained false statements that have had the effect of intimidating voters, and thus interfering with the upcoming presidential election, in violation of federal voting-rights laws.[33]

### IV.  ORDER

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that Plaintiffs' motion for a temporary restraining order (Dkt. No. 12) is **GRANTED**; and it is further

**ORDERED** that, sufficient reason having been shown therefore, pursuant to Rule 65 of the Federal Rules of Civil Procedure, Defendants are temporarily restrained, pending a hearing on Plaintiffs' motion for a preliminary injunction, from engaging in, or causing anyone else to engage in, robocalls or similar forms of communications sent directly to multiple recipients (such as text messaging), without prior

---

[33] The Court is aware that defendants Wohl and Burkman face the following bail condition in their pending Michigan case: "Neither defendant is to initiate, or cause anyone else to initiate, any robocalls or other communications directed at multiple recipients until November 4, 2020." See CTRM 134 36th District Court, *36thDC134,* YouTube (Oct. 8, 2020), https://www.youtube.com/watch?v=X8KUAWLGbZA. The Court is not persuaded that this condition was intended to prohibit the type of remedial messaging envisioned by the present Order. To the extent there is a conflict between the bail condition and this Court's Order, however, it is the Court's understanding that when "[f]aced with conflicting orders -- one issued by a federal court to implement the Constitution, and the other issued by a state court as a matter of state practice," the federal court order takes precedence under "the priority prescribed by the Constitution" through the Supremacy Clause. See Madej v. Briley, 370 F.3d 665, 667 (7th Cir. 2004).

written express consent of each recipient or approval of this Court, through at least November 3, 2020; and it is further

**ORDERED** that Defendants shall send, or authorize an appropriate third party to send, a robocall message (the "Curative Message") informing the recipients of the original robocall message discussed in this Decision and Order (the "Prior Robocall") of this Court's findings regarding that call. The Curative Message shall be issued to all recipients of the Prior Robocall and shall state only the following: "At the direction of a United States district court, this call is intended to inform you that a federal court has found that the message you previously received regarding mail-in voting from Project 1599, a political organization founded by Jack Burkman and Jacob Wohl, contained false information that has had the effect of intimidating voters, and thus interfering with the upcoming presidential election, in violation of federal voting-rights laws."; and it is further

**ORDERED** that by Thursday, October 29, 2020 at 5:00 p.m., Defendants shall produce records sufficient to demonstrate compliance with the preceding paragraph of this Order. In the event Defendants fail to do so, the Court will hold a hearing on Friday, October 30, 2020 at 10:00 a.m. to review the status of Defendants' compliance with this Order and give Defendants an opportunity to show cause why they should not be held in

contempt of court for any noncompliance the Court finds. At that time the Court will also authorize Plaintiffs to take appropriate steps to distribute the Curative Message to the recipients of the original robocall, with Defendants to pay Plaintiffs' reasonable costs and fees as assessed by the Court; and it is further

**ORDERED** that Defendants shall keep records of each such communication discussed in the previous paragraphs of this Order (including a copy of the communication, the name and contact information of each person contacted, the content of the message, any consents obtained, and the date and time of the communication) until the conclusion of this litigation or the expiration of this Order, whichever is earlier.

**SO ORDERED.**

Dated:   New York, New York
         28 October 2020

                                 _____
                                       Victor Marrero
                                         U.S.D.J.