# DAVID M. SCHWARTZ, ESQ. LLM

546 Fifth Avenue, 6th Floor, New York, NY 10036  T: 212.641.0049  E: david@davidschwartzesq.com

February 28, 2024

**VIA CM/ECF & EMAIL**

Honorable Jed S. Rakoff (RakoffNYSDChamber@nysd.uscourts.gov)
United Stated District Court Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Re:  National Coalition on Black Civic Participation et al. v Jacob Wohl, Jack Burkman et al. Civil Action No. 20-cv-8668, Motion to Reconsider Summary Judgement Ruling

On February 27, 2024, this court granted leave for defendants to file a motion to reconsider the summary judgment ruling issued by Judge Victor Marrero on March 8, 2024.

Not only was that decision improper on its face, the decision still leaves a myriad of issues of fact in this case, including, but not limited to the meaning of what a completed robocall means according to statute and caselaw. Many of these issues appear in our Motion in Limine for the damages trial which is to commence on April 15, 2024 (Exhibit A).[1] These same issues go to the crux of the liability portion of this trial, and summary judgment should never have been granted.

We respectfully assert that Judge Marrero's decision in favor of Plaintiffs on the issue of liability was at the least premature and misapprehended key facts and the law as relates to same. Judge Marrero ruled in pertinent part that "The Court does not find that the distinction that Defendants try to make is meaningful. Ribando's opinion that the Robocall is not intimidating must be stricken as it is a legal conclusion reserved for the fact finder to decide. (See infra Section III.A.2.)…Defendants argue that Ribando's opinion is offered to show that "he has encountered actionable intimidation in a criminal context." … Intimidation in the criminal context differs from intimidation in the context of the VRA and the KKK Act. Per New York Penal Law Section 215.17, which Ribando specifically relies on, intimidation involves "[i]ntentionally caus[ing] serious physical injury to another person for the purpose of obstructing, delaying, preventing or impeding the communication by such other person . . . relating to a criminal transaction . . . ." N.Y. Pen. Law § 215.17(1) (emphasis added). This definition includes a force element, which is notably absent from the statutes at issue in this case." … Any probative value of Ribando's opinion of intimidation in the criminal context, which the Court finds there to be little of, is substantially outweighed by the unfair prejudice that may result from admitting his opinion." National Coalition on Black Civic Participation, et al., v Jacob Wohl, et al.,Case 1:20-cv-08668-VM-OTW Document 256, Filed 03/08/23 (Exhibit B).[2]

We respectfully disagree. Putting aside for the moment that the Court ultimately decided that the robocall did constitute intimidation despite the fact there was no discernable direct threat

---

[1] Exhibit A - Motions to Dismiss (Docs. 302-306)
[2] Exhibit B - Decision and Order (Doc. 256)

emanating from the Defendants themselves, but rather amounted to the Defendants predicting or forecasting what others might do, the Court did not leave this question for the Jury. We urge this Court to recognize that this was erroneous.

In addition, this Court did not have the benefit of Justice Kagan's decision in a recent certiorari decision. *See Counterman v. Colorado*, 600 U.S. 2106, 2113 (2023).

In pertinent part Justice Kagan wrote:

"[t]rue threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection. And a statement can count as such a threat based solely on its objective content. The first dispute here is about whether the First Amendment nonetheless demands that the State in a true-threats case prove that the defendant was aware in some way of the threatening nature of his communications. Colorado argues that there is no such requirement. Counterman contends that there is one, based mainly on the likelihood that the absence of such a mens rea requirement will chill protected, non-threatening speech. Counterman's view, we decide today, is the more consistent with our precedent. To combat the kind of chill he references, our decisions have often insisted on protecting even some historically unprotected speech through the adoption of a subjective mental-state element. We follow the same path today, holding that the State must prove in true-threats cases that the defendant had some understanding of his statements' threatening character. The second issue here concerns what precise mens rea standard suffices for the First Amendment purpose at issue. Again guided by our precedent, we hold that a recklessness standard is enough. Given that a subjective standard here shields speech not independently entitled to protection—and indeed posing real dangers—we do not require that the State prove the defendant had any more specific intent to threaten the victim" …"True threats" of violence is another historically unprotected category of communications. *See Virginia v. Black*, 538 U.S. 343, 359 (2003); *see United States v. Alvarez*, 567 U.S. 709, 717–718 (2012) (plurality opinion). The "true" in that term distinguishes what is at issue from jests, "hyperbole," or other statements that when taken in context do not convey a real possibility that violence will follow (say, "I am going to kill you for showing up late"). *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). True threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence." *Black*, 538 U. S., at 359. Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat, as this Court recently explained. *See Elonis v. United States*, 575 U.S. 723, 733 (2015). The existence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the other end. Ibid. When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to "fear of violence" and to the many kinds of "disruption that fear engenders." *Black*, 538 U. S., at 360 (internal quotation marks omitted). The facts of this case well illustrate how…The same reasoning counsels in favor of requiring a subjective element in a true-threats case. This Court again must consider the prospect of chilling non-threatening expression, given the ordinary citizen's predictable tendency to steer "wide[ ] of the unlawful zone." *Speiser v. Randall*, 357 U.S. 513, 526 (1958). The speaker's fear of mistaking whether a statement is a threat; his fear of the legal system getting that judgment wrong; his fear, in any event, of incurring legal costs—all those may lead him to swallow words that are in fact not true threats. Some 50 years ago, Justice Marshall made the point when reviewing a true-threats prosecution arguably involving only political hyperbole.

*See Rogers v. United States*, 422 U.S. 35 (1975). The Court in Rogers reversed the conviction on other grounds, but Justice Marshall focused on the danger of deterring non-threatening speech. An objective standard, turning only on how reasonable observers would construe a statement in context, would make people give threats "a wide berth." *Id*., at 47 (concurring opinion). And so, use of that standard would discourage the "uninhibited, robust, and wide-open debate that the First Amendment is intended to protect." *Id*., at 48 (quoting *Sullivan*, 376 U. S., at 270). According to Sotomayor concurrence, to sustain a threat conviction without violating ones First Amendment right, the states bear the burden of proof to show that the mere utterance of threatening words bears some level of intent behind it; it merely is not enough that a reasonable person might have understood the words as a threat, the jury must find that the speaker intended to convey a threat. *See Perez v. Florida*, 580 U.S. 1187, 1189 (2017).

The reasoning—and indeed some of the words—came straight from this Court's decisions insisting on a subjective element in other unprotected-speech cases, whether involving defamation, incitement, or obscenity. No doubt, the approach in all those cases has a cost: Even as it lessens the chill of protected speech, it makes prosecution of otherwise prescribable, and often dangerous, communications harder. And the balance between those two effects may play out differently in different contexts, as the next part of this opinion discusses. But the ban on an objective standard remains the same, lest true-threats prosecutions chill too much protected, non-threatening expression." *Id*.

Indeed we would also note that Justice Sotomayor in her concurrence citing back to Perez for the proposition that, "to sustain a threat conviction without encroaching upon the First Amendment, States must prove more than the mere utterance of threatening words—some level of intent is required… it is not enough that a reasonable person might have understood the words as a threat—a jury must find that the speaker actually intended to convey a threat." *See Perez*, at 1189.

Both Justice Kagan and Sotomayor have therefore in recent vintage upheld the case law that we relied upon in our Motions to Dismiss and our Motions for Summary Judgment, urging that the First Amendment was being run over rough shod.

While we recognize this *Counterman* decision as well as *Perez* relate to a criminal conviction, it remains that there have been virtually no Civil verdicts finding against a Defendant. We laid this out distinctly in our initial Letter Motions and were encouraged by the Court to raise these issues again later in the case.

We did in indeed raise them again when all individual Plaintiffs had been deposed as well as NCBCP and pointed out that most of these White plaintiffs did not allow the call to deter their behavior in the least and most merely testified they had concerns for their neighbors believing that their Black neighbors might be more gullible them they were. NCBCP, in turn, knew of no minorities who had received a call or of anyone who had been intimated by it. With all the claims effectively gutted it was therefore counterintuitive that Judge Marrero would see fit not just to substitute his thinking for that of a jury but to actually find the Defendants liable without more.

3

      In addition, his Decision and Order leave open questions as to statutory liability. It is completely unclear how the Court ruled regarding this branch of the case. We put forward myriad arguments as to why alleged calls made or otherwise facially incomplete should not be counted in the damages phase and why only the individual Plaintiffs should be counted even though virtually all of these individuals complained of no true threat.

      In addition to open questions as to liability, with virtually every individual Plaintiff disowning feeling any true sense of intimidation and articulating no true-threat, Judge Marrero simply ignored the fact that the all-White Plaintiffs, while expressing concern, did not actually indicate any intimidation. Expressing concern that their non-White neighbors would not be able to see past the robocalls hyperbolic nature is not synonymous with same. Ultimately, we believe this should have been left to a jury.

      Your Defendants, therefore, respectfully request that based on the subsequent US Supreme Court case of *Counterman* v. *Colorado*, and the myriad of issues of fact that should have been left to the jury to decide as to liability, that this court reverse the prior ruling by Judge Marrero as to Summary Judgment and to grant the Defendants a full trial by a jury of their peers.

      We would note that if this Wohl/Burkman decision is allowed to stand, then the Plaintiffs will have succeeded in resurrecting Civil KKK and the VRA as a cudgel that will chill free speech and have many swallowing their words to avoid legal costs and sanctions. The Civil KKK and VRA serve a noble and important purpose but extending it to Wohl/Burkman related behaviors could prove a death knell to civil liberties.

      With Justice Kagan's and Sotomayor's sterling reasoning in mind, we believe it appropriate that we are asking this Court to revisit our Motions to Dismiss and/or our Motion for Summary Judgment against the backdrop of *Counterman* as a guide (Exhibits C and D).[3] [4] Also included, by way of background for Your Honor, are the various and sundry Stay Requests, all of which were summarilydenied (Exhibit E).[5]

      No juror had the opportunity to hear from the Decedents to make a 'mens rea' finding and without same, they have effectively been denied their day in court. It isn't as if jury instructions and the like cannot ensure an even playing field.

      Respectfully submitted,

      */s/ David M. Schwartz*
David M. Schwartz, Esq.
546 Fifth Avenue, 6th Fl.
New York, NY 10036
(212) 641-0499
david@davidschwartzesq.com

*Attorney for the Defendants*

cc:    All counsel of record (via ECF)

---

[3] Exhibit C - Motions to Dismiss (Docs. 58, 62 and 236, 238)
[4] Exhibit D - Motions for Summary (Docs. 208, 210)
[5] Exhibit E - Stay Requests (Docs. 68, 70, 77, 106)