# EXHIBIT A
## MOTIONS TO DISMISS
## DOCS. 302-306

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES, | |
| Plaintiffs, | |
| -and- | Civil Action No. 20-cv-8668 |
| People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK | |
| Plaintiff-Intervenor, | |
| v. | |
| JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10, | |
| Defendants. | |

Answer to Document 288

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF NEW YORK ATTORNEY GENERAL'S MOTION *IN LIMINE* TO RULE AS A MATTER OF LAW ON THE NUMBER OF "VIOLATIONS" OF CIVIL RIGHTS LAW § 40-C

The Plaintiff New York State Attorney General has moved that this Court instruct the jury that, as a matter of law, each call Defendants sent to New York phone numbers constituted a violation of law compensable under New York Civil Rights Law § 40-d and that Defendants committed at least 5,494 statutory violations.

However, in effect, what NYS is asking this court to do is clearly the Jury's responsibility as it is the Jury that should examine the extent of the damages. In addition, what they ask is in no way,

shape or form supported by the evidence and neither was it the central focus of any evidentiary ruling necessary to this court's determination as to liability. However, it is critical to determining damages and is a fact specific inquiry.

Citing to your decision, your Honor noted that "[o]n August 26, 2020, through an account held by Burkman Associates, Message Communications transmitted the Robocall to 85,307 phone numbers across the country, including 5,494 calls with New York area codes."[1]

However, it is irrefutable and already a matter of record that although 85,307 may have been loaded into Message Communications dialer, a far smaller number were "successfully completed", to use industry nomenclature.

This Court in October 2020 ordered that a curative robocall be undertaken before the November election and recognized at the time that based on Message Communications records only 29,117 calls were successfully completed. Calls were deemed "successful" if there was a "Live Answer" or a "Voicemail." Calles logged as "No Answer" were logically deemed unsuccessfully completed.

---

[1] Your Honor in finding liability, actually said, "There is no dispute that Defendants' Robocall reached more than 85,000 numbers, including approximately 5,494 in the State of New York alone, no doubt comprised of eligible voters. Each Individual Plaintiff received the Robocall and were all registered voters planning to vote in the 2020 Election, a federal election." One presupposed your Honor selected his words with precision. Just because 85,000 numbers were loaded does not mean that there were 85,000 good numbers or that Message Communications actually dialed them all or anyone *received* them. Some may have been recorded as not having 'answered' because the numbers were disconnected, and the former owners may very well be deceased. Some did not have answering machines or answering services and so did not "receive" a call. In addition, at no time has any evidence been put forward establishing that all these numbers correspond with registered voters, let alone voters eligible to vote in the 2020 federal election. This is why your Honor could speak more definitely about the Individual Plaintiff's representation, and rightly so. However, what the court acknowledged, and indeed, we all learned when the court ordered a pre-election curative call, is that loading numbers into a Robocall website is not the same thing as reaching or making contact with an active functioning number. It took several rolls to reach 95% of the 29,107 subset that were deemed successfully transmitted. Again, 85,307 calls uploaded translated to 29,107 that were only arguably received. And of the 5,494 uploaded, even a cursory review of the call sheets establish that a far smaller number could be construed as having connected in any sense of the word. If fact, we know that most of these 5,494 were outside the 29,107.

This Court pursuant to a Decision and Order dated October 28, 2020 (Doc 38) stated in pertinent part that "the Court will authorize Plaintiffs to take appropriate steps to distribute the Curative Message *to the recipients of the original robocall*, with the Defendants to pay Plaintiffs reasonable costs and fees …Defendants shall produce records to demonstrate compliance …the court will hold a hearing to review compliance…" (See also Docs 43, 45, 48, 50, 52 and 53).

Ultimately this Court, and indeed, Plaintiffs accepted the logic that based on call logs, only 29,107 numbers received the original call and if Defendants were to attempt to transmit curative messages to numbers outside of this dataset, they would be doubly confused since they never received the original. Anyone who did not receive the original call was obviously not harmed and their rights could not be said to have been violated since they never received the message that this court found to be intimidating and therefore, a violation of various laws.

Here is the rub. New York State has 15 Area Codes; 212, 315, 347, 516, 518, 585, 607, 631, 646, 716, 718, 845, 914, 917 and 929. A simple sort using these area codes as a filter establishes that out of the 85,307 uploaded calls only 5,494 had one of these area codes.[2] As noted previously, only 29,117 were recorded to have been completed across many states and of the 5,494 New York numbers, only 1,517, as a starting point convention, could be preliminarily deemed successfully completed because these numbers were part of the 29,117-subset deemed for purposes of the curative message as successfully completed.

However, for purposes of the curative call, Defendants were overinclusive in order to establish compliance and avoid contempt. Using Robocall company records and their standards, which are aimed at and billing for the calls they roll, is no indication that anyone ever heard anything like a

---

[2] A review of Message's call sheets establishes that there was a total of 5,494 NY numbers. Of these, 965 were logged as having gone to Answering Machines and 552 were received Live. The rest were not received. They were logged as follows: 501 logged as busy. 389 logged as disconnected, 43 as a fax machine, 2,994 as No Answer, 49 as No Ring Back and obscurely, one as "Pressed 5"

complete prerecorded message. Again, calls were deemed "successful" if there was a "Live Answer" or an "Answering Machine" even if the duration of the call was five seconds and the prerecorded message was actually 37 seconds. "Hello, my name is Tamika ... click. Not quite "you had me at hello", but we are assessing damages here. Simply put, even out of the 1,517 calls a jury could reasonably conclude were actually hang-ups so early in the call, nothing substantive was heard.

Our laws almost invariably distinguish between attempts and successful commissions. Attempted Assault is distinguishable from Assault. Attempted Murder is distinguishable from Murder and so on for obvious reasons.

It is already a matter of record that the Federal Communications Commission (a/k/a the "FCC" or the "Commission") has imposed a massive life altering fine of $5,134,500 upon the Defendants because out of the 85,307 robocalls 1,141 were transmitted by Message Communications to *wireless phones* without the consent of the recipients and neither Message Communications nor Defendants properly filtered out wireless numbers (a/k/a cell numbers) in violation of a provision of the TCPA.

Instructive is the methodology employed by the Commission to establish the number of calls. In its Forfeiture Order dated June 6th, 2023, it notes that:

> "[t]he Commission used the same methodology in prior robocall cases which further supports the lawfulness of the Commission's process.[3] First, the Bureau was alerted to suspected unlawful robocalls. Then the Bureau issued subpoenas and worked with industry partners and fellow law enforcement agencies to identify the source of the calls. The Bureau reviewed subpoena responses and listened to sample recordings of the calls to verify that they were all

---

[3] In its Footnote 61, in said Forfeiture Order, the Commission, in furtherance of establishing its methodology in computing the number calls was lawful, states that "[t]he Bureau used the same techniques and investigative processes that it has used in all of its recent robocall enforcement cases. See e.g., Roesel Forfeiture Order, supra note 54, at 9218-19, para. 40; Moser Forfeiture Order, supra note 13, at 13430, para. 33; John C. Spiller; Jakob A. Mears; Rising Eagle Capital Group LLC; JSquared Telecom LLC; Only Web Leads LLC; Rising Phoenix Group; Rising Phoenix Holdings; RPG Leads; and Rising Eagle Capital Group - Cayman, Notice of Apparent Liability for Forfeiture, 35 FCC Rcd 5948, 5948 (2020).

prerecorded. ***Call detail records were then examined to identify <u>each call's</u> date, time, and duration.*** The Bureau analyzed the call detail records with industry-standard, commercially available software and database of known assigned wireless numbers to determine whether they were made to wireless numbers. This process identified 1,141 calls to wireless numbers. Finally, the Bureau spoke to consumers who later provided signed declarations attesting to facts that support the finding of these violations."

Clearly, given its mission, the FCC had to establish which numbers were associated with *wireless* numbers since the FCC cannot punish for content, only for wireless numbers called without consent. However, its methodology also included looking at the date, time and duration *of each call* and even followed up with those it suspected were recipients of the calls based on this data review.

This makes perfect sense since deeming attempted calls violations simply doesn't make any sense. If the purported harm is that such calls are a nuisance and an invasion of privacy in the FCC context, then a call that was not completed is obviously neither a nuisance nor an invasion of privacy.

Likewise, while this Court found for purposes of violations of acts or statutes, that the content of the prerecorded call was intimidating or threatening, if this prerecorded message was never received by any recipient, then an attempted call that was not completed could not be intimidating or threatening and could not be a violation.

And why does the FCC look at the call's date, time and duration? Well, it stands to reason that if a prerecorded call is approximately 37 seconds, then a call that the dialing company deemed successful that was only six or seven seconds long wasn't really heard at all. In fact, a five or six or seven second call connotes a hang up. As such, out of the 1,517 calls that our message company may

have deemed as having been successfully received, it simply meant that the dialing would charge for them against the $1,000 dollars they received.[4]

Our Jury, no doubt, as a Trier of Fact on the question of damages, may likely employ a similar methodology. Of the 1,517 calls that have New York area codes how many, according to available records, which were deemed successful were hung up on in the first five seconds? Six seconds, 15 seconds? What is a fair cut off for deeming a call actually received? Should we only count Live Answer calls over 25 seconds? Can we just assume that a robocall recorded on an Answering Machine was listened to? 25 seconds? 30? Jurors should be able to draw upon their common sense and life experience to make this determination. Whatever the determination, the number of recipients is less than 1,517[5].

This Court, within the context of analyzing compliance with its curative call instruction accepted the logic that not all calls transmitted were received. So did the Plaintiffs. This Court did not have to reach a conclusion as to how many calls were "received" and would therefore constitute a violation. Instead, this court recognized it was established to the Court's satisfaction that the named Individual Plaintiffs received the call and this was sufficient for establishing violations. The Jury, in assessing damages, should be allowed to make this factual determination based on all available records and evidence.

---

[4] "Hi, this is Tamika Taylor from Project 1599, the civil rights organization founded by Jack Burkman and Jacob Wohl...." Is approximately 8 seconds. This is not threatening or intimating and so should not be found to be a violation.

[5] A reasonable jury could conclude that a prerecorded message of only 37 seconds in duration that connects with an answering machine for less than eight seconds is an aborted call and harmless. Similar logic would attach to a Lice call of only eight seconds in duration. That's obviously a hang up and harmless (See again Footnote 3). Out of 1,517 NY telephone numbers logged as Live or Answering Machines, 19 were less than eight seconds in duration. Simple arithmetic tells us that only 1,498 calls associated with a NY number could have possibly connected long enough to have been heard. If a jury determined that a call would have to be at least 18 seconds in duration against 37 seconds to count (roughly the midway point), this would calculate out to excluding another 258 calls or 1,240 being deemed to be possibly received calls. Or perhaps the jury might determine that the first third of the call was harmless. That would translate to 12 seconds before hanging up as the cut off. There were 42 such hang ups or machine click offs of less than 12 seconds duration. What is abundantly clear is that 5,427 is just wrong and that even 1,517 is over inclusive.

In addition, in using the FCC's methodology as a guide, which the FCC insists is a lawful methodology insofar as the AG has no declarations from any of these possible recipients, is it even rationale or fair to simply deduce that the rest received the call? Sure, the Individual Plaintiffs can be cross examined and are declarants. But the rest?

Let us assume for the sake of argument that it is established that a call connecting for 20 seconds will be deemed received and that an Excel sorting establishes that this reduces the field of possible recipients to 857. How many of these recipients in August of 2020, had actually moved to Florida or North Carolina or Georgia? How can the AG be making these assertions on behalf of former New Yorkers? Has the AG checked for snowbird voting or even cross checked any of the numbers to see if the numbers and names correspond with a live, eligible NY voter?[6]

And then, how many were voters in good standing during the relevant period? The short of it is what the AG insists this court do is pre-determining for the Jury that because there were 5,494 numbers with New York areas out of the 85,307 numbers uploaded, there were 5,494 violations, but this is wholly illogical.

In the context of the curative call which this Court ordered on an emergency basis pre-election in order to correct any impressions or false information circulated the court agreed that the 29,117 run was the proper universe for the curative message because a curative robocall to the larger set of numbers would simply sow confusion since the larger set never received the August call. Clearly if these 56,190 individuals never received an offending call so none of their rights can be said to have been violated. In like manner, most of the 5,494 numbers were within this excluded untouched 56,190 and were never recipients, and so cannot have felt intimidated, threatened, or confused. Putting aside

---

[6] After filtering the call logs to establish who actually received a call, has the AG presented a "Buff Card" showing that the recipients were actually eligible registered voters in August of 2020? For purposes of assessing damages, shouldn't this be part of the jury's calculus?

that of this number countless numbers and/or their recipients are dead or disconnected or moved and so likely no longer eligible to vote, even a cursory review of the proper universe of 29,117 only includes 1,517 numbers with what appear to be New York area codes. This alone makes the AG's instant request of this Court internally illogical and patently unfair.

As a final thought experiment, if the Defendants had not commissioned Message Communications to make the call but instead hired live callers to read a script and gave them 5,494 numbers to call, but call logs showed they only reached 1,517 households with the offending scripted message never reaching the balance in what universe, would they be punished for the 3,970 persons clearly never reached? Obviously, we believe the factual inquiry does not stop there but it is a starting point in determining damages.

Plaintiffs assert that all parties agree that each call to a New York phone number <u>can</u> constitute a separate violation of § 40-c subject to a statutory penalty under New York Civil Rights Law § 40-d.

Can. Yes, perhaps. However, we differ in that we do not agree that such <u>must</u> be deemed separate violations or that the inquiry stops there. From our perspective, unfortunately the Individual Plaintiffs are reasonably positioned to establish damages by their further testimony at trial. The trier of fact will no doubt want to hear from each of them.

We do not agree that non-complainants who have provided no declarations or otherwise even confirmed receipt let alone grievance or harm should be thrown in the same basket as the Individual Plaintiffs who can and will be cross-examined and have, in some fashion, articulated at least some grievance. We do not believe that without solid objective evidence that it can be assumed a call was received. Likewise, if it appears that a call was aborted early on then it can be assumed a violation occurred or that a penalty should be attached.

Plaintiffs now ask the Court to rule as a matter of law that each phone call to a New York phone number constitutes a separate violation, and that Defendants committed at least 5,494 statutory violations compensable under § 40-d. As noted previously, this fact specific inquiry is best left to the Jury. The Jury might look at the call logs and the record and decide that the five New York Individual Plaintiffs are due $500 and that the rest get nothing, or perhaps that those who the call logs show listened to the message for a complete 37 seconds get $100, but everyone who hung up gets nothing. This court previously ordered that Defendants preserve curative call records so that this Court could determine whether said call was substantially compliant. What the AG is asking today does not correspond with or reconcile with this Court's previous conclusion that Defendants curative call supported by that record was in compliance. This, in fact, appears to be why the AG wants those records excluded now.

The short of it is the AG wants you to usurp this decision making and factual inquiry from the Jury despite there being no law in support of their contentions and references and despite a factual record that does not support this conclusion.

Plaintiffs state that "It is also beyond dispute that the Robocall affected more than one person- roughly 5,494 New York phone numbers." This is in fact disputed and it is an exceedingly strange formulation.

Phone numbers that are disconnected within this subset, can they be *affected*? Phone numbers that never received the prerecorded message based on any objective view of the evidence are *"affected"*? In what way? Likewise, if the record indicates someone hung up on the prerecorded message at or before "Hello …"

The FCC imposed its fines not for the content of the call but for it having been received by wireless phones. The FCC outlined their methodology to establish that the robocall was received even

looking at the duration of the calls and took steps to additionally ensure they'd been received. The AG seeks to avoid any similar inquiry even though liability was imposed in the liability phase of this trial for the offending content of this call, and yet, in the damages phase thinks it is unimportant to determine if anyone other than the Individual Plaintiffs actually received and listened to the offending content.

The AG asserts that "the Court has already reviewed that evidence--uncontroverted at summary judgment--and concluded that the call affected 5,494 New York phone numbers."

In fact, it was unnecessary for this court to make such a full throttled determination in the liability phase, but we would respectfully argue that the closest this court came to doing so came to the fore while ordering the curative call and then accepting the adequacy of rolling it to the 29,117 and not the 85,307. The same reasoning applied to the 5,494 though (never needed to be reached because of the rights).

The AG again formulates that "Defendants subjected each phone number they called to discrimination" as if NY Human Rights Law concerns itself with inanimate objects. Phone numbers cannot be discriminated against and phone numbers that were never called or picked up, obviously were subjected to nothing.

To avoid this obvious conclusion, the AG frames the issues in an odd, illogical way to avoid this reasoning. The AG then cites to the FCC case while taking pains to avoid referencing how the FCC arrived at their 1,141 number.

The AG's motion should be denied in its entirety. If anything, their motion makes it abundantly clear why they wish to entirely suppress information regarding the curative call even though clearly, anything that mitigated harm is entirely relevant in assessing damages. Likewise, the court's reasoning

surrounding that call and accepting the sufficiency of the completed pre-election roll out of that curative robocall, is entirely relevant.

Dated: New York, New York
         July 7, 2023

Respectfully submitted,


By:   /s/ David M. Schwartz

David M. Schwartz, Esq.
546 Fifth Avenue, 6th Fl.
New York, NY 10036
(212) 641-0049
david@davidschwartzesq.com

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES, <br><br> Plaintiffs, <br><br> -and- <br><br> People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10, <br><br> Defendants. | Civil Action No. 20-cv-8668 |

Answers to Documents 291 and 293

### NOTICE OF DEFENDANTS' MOTION *IN LIMINE* TO PROHIBIT PLAINTIFFS FROM INTRODUCING EVIDENCE ON ISSUES DECIDED AT SUMMARY JUDGMENT AND GENERALLY IN OPPOSITION TO PLAINTIFFS MOTION WHICH SEEKS TO EXCLUDE CROSS EXAMINING PLAINTIFFS ON ACTUAL DAMAGES

For the reasons set forth in Defendants' accompanying Memorandum of Law, and based on the

Declaration of David Schwartz in support of Defendants' Motions *In Limine*, together with attached

exhibits, and the record and pleadings on file in this case, Defendants respectfully ask the Court to

prohibit Plaintiffs from introducing evidence or argument that would effectively rehash and relitigate

the Court's decisions at summary judgment and deny Plaintiffs motion seeking to exclude inquiries into

the extent of actual damages actually suffered by Plaintiffs.

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES, Plaintiffs, -and- People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK Plaintiff-Intervenor, v. JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10, Defendants. | Civil Action No. 20-cv-8668 |

Answers to Documents 292 and 294

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* TO PROHIBIT PLAINTIFFS FROM INTRODUCING EVIDENCE ON ISSUES DECIDED AT SUMMARY JUDGMENT AND GENERALLY IN OPPOSITION TO PLAINTIFFS MOTION WHICH SEEKS TO EXCLUDE CROSS EXAMINING PLAINTIFFS ON ACTUAL DAMAGES**

Defendants seek an order prohibiting Plaintiffs from introducing evidence, eliciting testimony, or making arguments at trial concerning issues the Court decided at summary judgment.

The Court has already granted judgment on liability to Plaintiffs for every claim brought in this case. Yet Plaintiffs are set to use the same experts who offered opinions regarding liability and have no special expertise regarding the human psyche or trauma. Allowing evidence or testimony that is effectively cumulative even though liability has already been established and amounts to retreading the

fact that violation has been established, would waste time at trial on irrelevant issues, and risks confusing the jury concerning the narrow issues remaining to be decided.

## I. Legal Standard

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."[1]

Plaintiff correctly notes that courts routinely exclude evidence from trial that conflicts with a summary judgment order on multiple grounds. See, e.g., NIC Holding Corp. v. Lukoil Pan Ams., No. 05-CV-093772MEA, 2009 WL 996408, at *2 (S.D.N.Y. Apr. 14, 2009) (collecting cases). Issue preclusion forecloses such evidence. See, e.g., Chavez v. Metro. Dist. Comm'n, No. 3:02-cv-458, 2005 WL 8166060, at *2 (D. Conn. Apr. 28, 2005). Presenting evidence that would circumvent local rules concerning reconsideration motions also justifies exclusion. See, e.g., U.S. Underwriters Ins. Co. v. Falcon Constr. Corp., No. 02-cv-4182, 2006 WL 3146422, at *3 (S.D.N.Y. Oct. 30, 2006). So does the law of the case doctrine. See, e.g., Republic of Turkey v. Christie's Inc., 527 F. Supp. 3d 518, 521– 22 (S.D.N.Y. 2021) (precluding evidence trial at trial); MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP, 232 F. Supp. 3d 558, 571 (S.D.N.Y. 2017) (Marrero, J.) (same); Cary Oil Co. v. MG Ref. &amp; Mktg., Inc., 257 F. Supp. 2d 751, 765 (S.D.N.Y. 2003) (Marrero, J.) (same). Some courts exclude evidence about an "issue . . . decided on summary judgment" because it is no longer relevant. Shlikas v. Sallie Mae, Inc., No. 06-cv-2106, 2010 WL 3385477, at *3 (D. Md. Aug. 26, 2010), aff'd sub nom. Shlikas v. Arrow Fin. Servs., 487 F. App'x 68 (4th Cir. 2012); see also, e.g., Lima, 2020 WL 4731418, at *5 (excluding testimony that went to liability as it would "likely mislead the jury").

---

[1] The Supreme court cited to Delaware Rule of Evidence 403, which is virtually identical to Federal Rule of Evidence 403, provided in Delaware v. Van Arsdall, 475 US 673 - Supreme Court 1986

Under each of these rationales, the Court may preclude all parties from relitigating questions already resolved at summary judgment. However, Plaintiffs appear to want to have it both ways. Plaintiffs seem to want to raise issues on direct and then exclude and cross once the issue has been put at issue. Allowing this approach would be both erroneous and unjust.

## II. Argument

For the record, Plaintiff's speculate as to what tact Defendants may take to contextualize their actions or minimize any alleged harms that may have befallen Plaintiffs, but what Plaintiffs are actually seeking to do with this motion is to preemptively shift their burden of establishing damages away from themselves and onto Defendants, effectively short-circuiting the need for a damages phase.

Your Defendants do not intend to disclaim liability. However, if Plaintiffs articulate a basis for damages including their perceptions and feelings, Defendants must be allowed to test the reasonableness of those perceptions and feelings. Plaintiffs also argue that Defendants should be precluded from questioning or argument suggesting Plaintiffs suffered no injury.

Plaintiffs might as well argue that there is no need for a damage phase of the trial. Violation has been established, but damages for each Individual Plaintiff each who articulate different claims and purport different affects. This is more so for our Not-For-Profit Plaintiff, as well as the People. Just because your honor established there was a violation of law does not mean that the work of establishing specific monetary damages has been done. A reasonable Jury might award one Individual Plaintiff a dollar based on his claims and testimony and yet another Individual $10,000 because the Jury finds her claims more credible or more salient. In the same vein, the jury may determine after a forensics-oriented review that NCBCP is due X or Y or Z, weighing innumerable facets in their determination.

Defendants in turn wish to foreclose any defenses rooted in the Defendants actual beliefs, however erroneous, and as such, seek an order precluding any such contextualizing even though this could certainly be relevant in assessing punitive damages.

If a miscreant wrongly believes she has some kind of justification rooted in the constitution for improper behavior, that can be relevant to the imposition of the level of damages and the species of damages. Certainly, this Court may issue instructions to guide the jury on points of law and the law of the case, but precluding the Jury from getting the complete picture in order to assess damages undercuts the rights and prerogatives of a Jury Trial.

Finally, this court made certain findings for the purpose of determining liability based on the record before them. This included Defendants who were taking the fifth, who had ongoing criminal litigation to contend with. This is no longer the case.

Plaintiffs now would have every jot of dicta in your Honor's decision elevated to the point of immutability as if each and every jot was attached the same weight and in any case was alluded to for purposes of a determination regarding liability.

While violation of law has been established which resulted in a decision on liability, it is not inconsistent to revisit Plaintiffs perceptions to establish the reasonableness of those perceptions and the reasonableness of their action, as well as Defendants perceived excuses.

We do live in the real world where one can have mixed motives which may at the very least provide historical context which a jury may properly weigh when dispensing damages and a just verdict.

## III. Conclusion

For the foregoing reasons, the Court should not grant Plaintiffs' Motion *In Limine* and should not bar Defendants from introducing evidence or argument conflicting with issues the Court already resolved. A more nuanced approach is necessary. As issues are raised on direct, this court is best positioned to provide instructions. The blanket approach urged by Plaintiffs is neither necessary nor proper.

Dated: New York, New York
     July 7, 2023

Respectfully submitted,

By:   */s/ David M. Schwartz*

David M. Schwartz, Esq.
546 Fifth Avenue, 6th Fl.
New York, NY 10036
(212) 641-0049
david@davidschwartzesq.com

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL COALITION ON BLACK CIVIC
PARTICIPATION, MARY WINTER, GENE
STEINBERG, NANCY HART, SARAH
WOLFF, KAREN SLAVEN, KATE KENNEDY,
EDA DANIEL, and ANDREA SFERES,

            Plaintiffs,

-and-

People of the STATE OF NEW YORK, by its
attorney general, LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK

            Plaintiff-Intervenor,

        v.

JACOB WOHL, JACK BURKMAN, J.M.
BURKMAN & ASSOCIATES, LLC, PROJECT
1599, and JOHN and JANE DOES 1-10,

            Defendants.

Civil Action No. 20-cv-8668

Answer to Document 297

**NOTICE OF DEFENDANTS' RESPONSE TO PLAINTIFFS MOTION *IN LIMINE* TO
EXCLUDE EVIDENCE OF PLAINTIFFS' SETTLEMENT WITH THE MESSAGE
DEFENDANTS AND CROSS MOTION TO ENSURE MAHANIAN'S ATTENDANCE**

For the reasons set forth in Defendants' accompanying Response and Memorandum of

Law, and based on the Declaration of David Schwartz in support of Defendants' Cross Motion to

ensure Mahanian's attendance, together with attached exhibits, and the record and pleadings on

file in this case, Defendants respectfully ask the Court to deny Plaintiffs Motion *In Limine*

concerning settlement because of the relevance of the specter of bias, and grant Defendants'

request that Mahanian give witness testimony.

Dated: New York, New York
      July 7, 2023

Respectfully submitted,


By: _/s/ David M. Schwartz_____

David M. Schwartz, Esq.
546 Fifth Avenue, 6th Fl.
New York, NY 10036
(212) 641-0049
david@davidschwartzesq.
com

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL COALITION ON BLACK CIVIC PARTICIPATION, MARY WINTER, GENE STEINBERG, NANCY HART, SARAH WOLFF, KAREN SLAVEN, KATE KENNEDY, EDA DANIEL, and ANDREA SFERES,<br><br>Plaintiffs,<br><br>-and-<br><br>People of the STATE OF NEW YORK, by its attorney general, LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>JACOB WOHL, JACK BURKMAN, J.M. BURKMAN & ASSOCIATES, LLC, PROJECT 1599, and JOHN and JANE DOES 1-10,<br><br>Defendants. | Civil Action No. 20-cv-8668 |

Answer to Document 295

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF THE SUBJECT MATTER OF PLAINTIFF'S PRIOR CONVICTION

Defendants move to dismiss the Plaintiff's motion to preclude Defendants from not introducing evidence about the subject matter of Plaintiff Gene Steinberg's prior conviction during the damages phase trial scheduled to begin on December 11, 2023. D.E. 286.

### I.    Introduction

Plaintiff Gene Steinberg is alleging that his "trauma" from the robocall on August 26, 2020, can be attributed to his prior conviction. He spoke extensively about the "trauma and harm that it caused to [him] as a result of [his] prior past." Steinberg Dep. 27:7-8. Mr. Steinberg also

mentioned that hearing how "law enforcement may come after you" caused trauma. Steinberg Dep. 45:7-8. This is highly relevant towards damages. On the basis of rule 404(b) and 611(b), the Court should allow us to question Mr. Steinberg about his prior conviction on cross examination. The probative value far outweighs the prejudicial value.

## II.    Legal Standard

Prior bad act evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404b. Gene Steinberg's past conviction clearly focuses on knowledge and identity. Mr. Steinberg has a past with law enforcement and is stating that his "trauma" from the phone call was because of this past. Since much of his "trauma" can be attributed to his prior conviction, it is vital for the Court to hear about this to learn the full story. The prejudicial value is outweighed by the probative value. The purpose of entering his prior conviction is not to attack character or taint the jury's opinion of Mr. Steinberg - rather it is for them to understand where the "trauma" is coming from. Additionally, this prior conviction has led to many changes in his life, shaping his identity. He has "been seeing a therapist as a result." Steinberg Dep. 31:4-5. This prior act has shaped his life to the point where he has needed therapy for many years (he has been seeing his current therapist for six years). Additionally, matters brought up on direct examination are allowed to be questioned in cross examination. "Rule 611(b) provides that 'a witness may be cross-examined on any matter relevant to any issue in the case, including credibility.'" *Martinez v. State*, 17 S.W.3d 677, 688 (Tex. Crim. App. 2000).

## III.    Argument

Mr. Steinberg's prior conviction is entirely relevant, so the Court gets the whole truth and nothing but. Hearing vaguely about an act from the past will not allow the Court to achieve the full story. Mr. Steinberg's prior conviction is to show his knowledge and identity as a result of his prior conviction. The standard under rule 404(b) is "…whether that evidence is probative of a material issue other than character." *Huddleston v. United States*, 485 U.S. 681, 686 (1988). The exception of this rule– specifically identity and knowledge, coupled with its probative value– allows it to be admissible in Court. "In the absence of a significant showing of unfair prejudice, evidence with substantial probative value should not be excluded." *United States v. Benjamin Jamil*, 707 F.2d 638, 644 (2d Cir. 1983). There is no unfair prejudice.

## IV.    Conclusion

On the aforementioned grounds, the Court should deny the Plaintiffs' motion *in limine* and bar Defendants from introducing evidence at trial about the subject matter of Mr. Steinberg's prior conviction.

Dated: New York, New York
        July 7, 2023

Respectfully submitted,


By:   */s/ David M. Schwartz*

David M. Schwartz, Esq.
546 Fifth Avenue, 6th Fl.
New York, NY 10036
(212) 641-0049
david@davidschwartzesq.com

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

NATIONAL COALITION ON BLACK CIVIC
PARTICIPATION, MARY WINTER, GENE
STEINBERG, NANCY HART, SARAH
WOLFF, KAREN SLAVEN, KATE KENNEDY,
EDA DANIEL, and ANDREA SFERES,

          Plaintiffs,

-and-

People of the STATE OF NEW YORK, by its
attorney general, LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK

          Plaintiff-Intervenor,

        v.

JACOB WOHL, JACK BURKMAN, J.M.
BURKMAN & ASSOCIATES, LLC, PROJECT
1599, and JOHN and JANE DOES 1-10,

          Defendants.

Civil Action No. 20-cv-8668

Answer to Document 299

**DECLARATION OF DAVID M. SCHWARTZ IN SUPORT OF DEFENDANTS'
MOTIONS IN LIMINE, DEFENDANT'S CROSS MOTION REQUIRING MAHANIAN'S
PRESENCE AT TRIAL AND DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTIONS IN LIMINE**

David M. Schwartz, an attorney duly admitted to practice law in the State of New York and

the U.S. District Court for the Southern District of New York, hereby declares pursuant to 28

U.S.C. § 1746 and under the penalties of perjury:

1.     I am counsel representing Defendants Jacob Wohl, Jack Burkman, J.M. Burkman

& Associates, LLC, and Project 1599 in this action.

2.      I submit this declaration in support of all Defendant's Motions *In Limine*, Defendant's

Cross Motion requiring Mahanian's presence at trial and Defendant's opposition to Plaintiffs'

Motions *In Limine*. I have personal knowledge of the facts stated here, and each of them is true

and correct.

3.      Attached as **Exhibit A** is a copy of Decision and Order dated October 28, 2020

(Document 38) authorizing Plaintiffs to distribute Curative Message to recipients of original

robocall.

4.      Attached as **Exhibit B** is a copy of Letter (Document 43) dated October 29, 2020, to

Judge Marrero.

5.      Attached as **Exhibit C** is a copy of Minute Entry (Document 45) for proceedings held

before Judge Marrero dated October 30, 2020.

6.      Attached as **Exhibit D** is a copy of Order dated October 30, 2020 (Document 49)

regarding original robocall and curative message.

7.      Attached as **Exhibit E** is a copy of Letter (Document 52) dated November 1, 2020 to

Judge Marrero regarding curative robocall.

8.      Attached as **Exhibit F** is a copy of Transcript (Document 53) dated November 2, 2020 of

Conference held on October 26, 2020 before Judge Marrero.

9.      Attached as **Exhibit G** is a copy of an Excel Spreadsheet of the 2020 Call Log.

10.     Pursuant to Judge Marrero's Individual Practices Section II.E, I attest that I am familiar

with the full contents of the documents attached to this declaration, that I will maintain a copy of

the entire documents in my case files until after a final court disposition of the action, and the

copies of documents filed with these motion papers are authentic copies of the relevant portions

of the documents.

WHEREFORE, I respectfully request that the Court grant the relief sought in the

Notices of Motion and grant such other and further relief as the Court deems just and

proper.

Dated: New York, New York
      July 7, 2023                Respectfully submitted,


                By: _/s/ David M. Schwartz_____

                David M. Schwartz, Esq.
                546 Fifth Avenue, 6th Fl.
                New York, NY 10036
                (212) 641-0049
                david@davidschwartzesq.
                com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

NATIONAL COALITION ON BLACK CIVIC  :
PARTICIPATION, et al.              :
                                   :
                                   :
                    Plaintiffs,    :     20 Civ. 8668 (VM)
                                   :
    - against -                    :     **DECISION AND ORDER**
                                   :
JACOB WOHL, et al.                 :
                                   :
                                   :
                    Defendants.    :
------------------------------------X

```
┌──────────────────────────────────┐
│ USDC SDNY                         │
│ DOCUMENT                          │
│ ELECTRONICALLY FILED              │
│ DOC #:_____               │
│ DATE FILED: October 28, 2020      │
└──────────────────────────────────┘
```

**VICTOR MARRERO, United States District Judge.**

Plaintiffs National Coalition on Black Civic
Participation ("NCBCP"), Mary Winter, Gene Steinberg, Nancy
Hart, Sarah Wolff, Karen Slaven, Kate Kennedy, Eda Daniel,
and Andrea Sferes (collectively, "Plaintiffs") filed this
action against defendants Jacob Wohl ("Wohl"), Jack Burkman
("Burkman"), J.M. Burkman & Associates, LLC ("J.M. Burkman &
Associates"), Project 1599, and John and Jane Does 1 through
10 (collectively, "Defendants"). Plaintiffs allege that
Defendants sent robocalls containing false information
intended to scare recipients from voting by mail in violation
of Section 11(b) of the Voting Rights Act, 52 U.S.C.
§ 10307(b), and Section 2 of the Ku Klux Klan Act, 42 U.S.C.
§ 1985(3). Plaintiffs seek a temporary restraining order and
preliminary injunction prohibiting Defendants, their agents,
employees, and all persons acting in concert with them from
sending such robocalls (the "Motion"). (See "Proposed Order,"

Dkt. No. 12; "Plaintiffs' Memorandum," Dkt. No. 13; "Ramsey Decl.," Dkt. No. 14; "Winter Decl.," Dkt. No. 15; "Steinberg Decl.," Dkt. No. 16; "Hart Decl.," Dkt. No. 17; "Wolff Decl.," Dkt. No. 18; "Slaven Decl.," Dkt. No. 19; "Kennedy Decl.," Dkt. No. 20; "Daniel Decl.," Dkt. No. 21; "Sferes Decl.," Dkt. No. 22.) Defendants oppose the Motion. (See "Opposition," Dkt. No. 36.) For the reasons that follow, the Court GRANTS Plaintiffs' Motion for a temporary restraining order.

## Introduction

The right to vote embodies the very essence of democracy. Absent free and fair elections uninfluenced by fear, the underpinnings of democratic rule would crumble. The United States Constitution, as enforced by Congress and the courts, enshrines these principles.

In 1871, Congress, in a measure designed to safeguard the right to vote constitutionally guaranteed to all eligible United States citizens, enacted the Ku Klux Klan Act. Historically, that statute derived from the harm experienced by newly emancipated and enfranchised former slaves. Seeking to cast their votes in federal and state elections, they encountered, at home and at the polls, blatant intimidation carried out by open threats, economic coercion, and even

physical violence inflicted to prevent their participation in the nation's electoral process.

Today, almost 150 years later, the forces and conflicts that animated Congress's adoption of the Ku Klux Klan Act as well as subsequent voting rights legislation, are playing out again before this Court, though with a difference. In the current version of events, the means Defendants use to intimidate voters, though born of fear and similarly powered by hate, are not guns, torches, burning crosses, and other dire methods perpetrated under the cover of white hoods. Rather, Defendants carry out electoral terror using telephones, computers, and modern technology adapted to serve the same deleterious ends. Because of the vastly greater population they can reach instantly with false and dreadful information, contemporary means of voter intimidation may be more detrimental to free elections than the approaches taken for that purpose in past eras, and hence call for swift and effective judicial relief.

Many Plaintiffs in this case assert that they were recipients of robocalls initiated by Defendants conveying messages that placed recipients in reasonable fear of casting their votes in the impending presidential election, in person or by mail. Upon initial factual review, this Court finds that the information Defendants' calls convey is manifestly

3

false and meant to intimidate citizens from exercising voting rights.

Defendants do not contest that they originated the robocalls. In fact, by their own admission in other public statements they reportedly made, they have worked overtly to influence potential voters through disinformation campaigns. Instead, as legal ground for their action, Defendants advance a sinister and pernicious theory. They contend that the expression their robocalls communicated constitutes speech protected by the First Amendment. Defendants' theory implicates a fundamental threat to democracy. This Court thus rejects it as justification for Defendants' baneful conduct. The First Amendment cannot confer on anyone a license to inflict purposeful harm on democratic society or offer refuge for wrongdoers seeking to undermine bedrock constitutional principles. Nor can it serve as a weapon they wield to bring about our democracy's self-destruction.

Accordingly, for the reasons stated below, Plaintiffs' motion for a temporary restraining order is GRANTED.

## I. **BACKGROUND**[1]

Plaintiff NCBCP is a nonprofit, nonpartisan civil rights and racial justice organization dedicated to increasing civic

---

[1] The factual background herein derives from the Complaint, as well as from the exhibits filed in connection with Plaintiffs' Memorandum and the

engagement in Black and underserved communities. The
additional plaintiffs comprise individual voters registered
in New York, Pennsylvania, and Ohio (collectively, the
"Individual Plaintiffs").

Burkman is a lobbyist and the founder of lobbying firm
J.M. Burkman & Associates. Wohl and Burkman co-founded the
political organization Project 1599.

Wohl has boasted to journalists of his and Burkman's
plans to influence politics through disinformation campaigns.
For example, according to a February 26, 2019 article in USA
Today, Wohl, then twenty-one-years old, told reporters that
he and Burkman were planning "ways to discredit Democrats in
the 2020 election with lies and other disinformation, using
his large following on social media to cause disarray similar
to what Russians did during the 2016 election."[2] In addition,
the Daily Beast published a document that Wohl later said was
a draft of his business plan for the "Arlington Center for
Political Intelligence."[3] As reported by the Washington Post,

---

Court's October 26, 2020 hearing. Except when specifically quoted or
referenced, no further citation to these sources will be made.
[2] Crystal Hayes & Gus Garcia-Roberts, This Is How Jacob Wohl Created a
Sexual Harassment Accusation Against Robert Mueller, USA Today (Feb. 26,
2019), https://www.usatoday.com/story/news/politics/2019/02/26/robert-
mueller-hoax-how-jacob-wohl-created-sexual-harassment-
plot/2993799002/.
[3] Manuel Roig-Franzia & Beth Reinhard, Meet the GOP Operatives Who Aim to
Smear the 2020 Democrats – But Keep Bungling It, Wash. Post (June 4,
2019), https://www.washingtonpost.com/lifestyle/style/meet-the-gop-
operatives-who-aim-to-smear-the-2020-democrats--but-keep-bungling-
it/2019/06/04/5b70f000-7691-11e9-bd25-c989555e7766_story.html.

the plan involved "disseminat[ing] false information about
Democratic presidential candidates to swing political betting
markets."[4]

In late August 2020, thousands of voters in the United
States, including voters in Illinois, Ohio, New York, and
Pennsylvania, received robocalls that conveyed the following
message:

> Hi, this is Tamika Taylor from Project 1599, the civil
> rights organization founded by Jack Burkman and Jacob
> Wohl. Mail-in voting sounds great, but did you know that
> if you vote by mail, your personal information will be
> part of a public database that will be used by police
> departments to track down old warrants and be used by
> credit card companies to collect outstanding debts? The
> CDC is even pushing to use records for mail-in voting to
> track people for mandatory vaccines. Don't be finessed
> into giving your private information to the man, stay
> safe and beware of vote by mail.[5]

See Complaint ¶ 29; Dkt. No. 33.[6]

On October 26, 2020, this Court held a hearing in this
matter to discuss Plaintiffs' request for a temporary
restraining order (the "October 26 Hearing"). Defendants

---

[4] Id.

[5] At the hearing before the Court on October 26, 2020, Wohl argued that
the calls did not include the phrase "stay home," as indicated in
Plaintiffs' submissions. (See Plaintiffs' Memorandum, at 2; Complaint ¶
29.) Plaintiffs subsequently acknowledged the transcription error in
their prior submissions, but argued it "has no bearing on the merits of
the relief requested." (Dkt. No. 33.)

[6] Defendants argue that Plaintiffs' evidence is largely composed of
hearsay, making it inadmissible and unreliable. But the Second Circuit
has held that "hearsay evidence may be considered by a district court in
determining whether to grant a preliminary injunction." Mullins v. City
of New York, 626 F.3d 47, 52 (2d Cir. 2010). Rather, whether evidence is
hearsay goes to its weight, not its admissibility. Id. Here, the Court
sees no reason why Plaintiffs' hearsay evidence is unreliable, and
Defendants have failed to offer one.

Burkman and Wohl appeared at the hearing pro se and acknowledged that they were responsible for initiating the robocalls, including by preparing the message conveyed and hiring a nonparty California company to electronically place the calls. The evidence submitted in connection with Plaintiffs' motion further supports this fact. The robocall message identifies Project 1599 as the source of the calls and names Burkman and Wohl as its founders. Recipients' phones reflected that the robocalls came from "Jack Burkman" and the number "703-795-5364." (Hart Decl. ¶ 5; see also Sferes Decl. ¶ 4; Steinberg Decl. ¶ 4; Wolff Decl. ¶ 4.)

Plaintiffs estimate that approximately 85,000 robocalls conveying this message have been placed to date. The calls targeted areas with large populations of Black voters, such as Detroit, Michigan, as well as urban areas with significant minority populations, such as New York City. Defendants denied that the calls targeted any racial demographic in particular, and they even claimed that they do not know how to target a robocall to particular demographic groups. The Court finds Defendants' statements on that point lacking in credibility in light of other admissions they made. Specifically, Burkman explained at the October 26 hearing that robocalls are issued by randomly selecting phone numbers within particular area or zip codes. Given the technical

7

feasibility of targeting calls to particular geographic
areas, and generally known information about social and
economic residential patterns in this country,[7] it is not
difficult to discern how particular demographic groups can be
targeted through robocalls.

The robocall message contains various false statements,
including: (1) the claim that police will use vote-by-mail
information to track persons with outstanding warrants; (2)
the assertion that vote-by-mail information will be used by
debt collectors; and (3) the claim that the Centers for
Disease Control and Prevention ("CDC") is seeking access to
vote-by-mail information to conduct mandatory vaccination
efforts.

Defendants characterize these claims as "opinions."
However, the use of the phrase "did you know" before each of
these false and misleading assertions supports the conclusion
that they were expressed not as opinion, but as fact. At the
October 26 Hearing, Burkman and Wohl maintained the truth of
these claims, but the Court is unpersuaded. Burkman and Wohl

---

[7] See, e.g., Aaron Williams & Armand Emamdjomeh, America is More Diverse
than Ever But Still Segregated, Wash. Post (last updated May 10, 2018),
https://www.washingtonpost.com/graphics/2018/national/segregation-us-
cities; see also generally Richard Rothstein, The Color of Law: A
Forgotten History of How Our Government Segregated America (2017)
(exploring legal history of housing discrimination and state sponsored
segregation); Tal Z. Zarsky, Understanding Discrimination in the Scored
Society, 89 Wash. L. Rev. 1375, 1394 (2014) (discussing discriminatory
proxies used in algorithms relied upon in numerous industries, including
"zip codes as proxies for race").

8

defended the accuracy of their claims on the public
availability of voter information -- but the information in
those records is generated in connection with voter
registration, not mail-in balloting. In other words, the
publication of information about voters in public records is
a function of voter registration, and unrelated to whether a
voter chooses to vote by mail or in person. The Court finds
that Defendants' contention that voting by mail increases the
likelihood of dissemination of a voter's personal information
is baseless.

Furthermore, Defendants provide no credible evidence,
and the Court finds none in the record of this proceeding, to
support a claim that publicly available voter-registration
lists are used by law enforcement, debt collectors, and the
CDC in the manner the robocall alleges.[8] At the October 26
Hearing, the Court gave Wohl and Burkman the opportunity to
provide a factual basis validating these claims. Wohl and
Burkman supplied no such support, apart from their own
speculation that the CDC is always pushing to collect any
available data, and that debt collectors scour all public

---

[8] The Court takes judicial notice of the varied procedural requirements
for obtaining voter-registration information across different states, as
well as the diverse types of voter information publicly available, which,
for example, does not always include voters' addresses. See Nat'l
Conference of State Legislatures, Access To and Use Of Voter Registration
Lists (Aug. 5, 2019) https://www.ncsl.org/research/elections-and-
campaigns/access-to-and-use-of-voter-registration-lists.aspx.

9

records as a matter of course. Nor have Defendants identified compelling evidence to corroborate the claim that law enforcement will use voter-registration lists to execute arrest warrants. Hence, the Court finds that these statements are false and misleading and that as a consequence, in the minds of reasonable voters, would produce a substantial intimidating effect.

As noted above, the speaker delivering the robocall message identified herself in the message as "Tamika Taylor." That name has been used incorrectly by media outlets to refer to the mother of Breonna Taylor, Tamika Palmer. Breonna Taylor was a Black woman shot and killed by police in Louisville, Kentucky, and her story has been an impetus for and key focus of racial justice reform movements focused on discriminatory policing and systemic racism. In the wake of Breonna Taylor's death, her mother has become a well-known advocate for civil rights.[9] Use of this name in the script of the call is suggestive of an effort to provide an aura of legitimacy to the robocall message.

---

[9] The Court is persuaded that Tamika Palmer's status as a well-known civil rights advocate is a matter of general knowledge and, thus, the proper subject of judicial notice. See generally Brakkton Booker, Breonna Taylor's Mother: "I Won't Go Away. I'll Still Fight," NPR (Sept. 18, 2020), https://www.npr.org/sections/live-updates-protests-for-racial-justice/2020/09/18/914164312/breonna-taylors-mother-i-won-t-go-away-i-ll-still-fight.

10

The Individual Plaintiffs report that the robocalls made them concerned about voting by mail. For example, plaintiff Gene Steinberg, who has an 18-year-old nonviolent criminal conviction, described receiving the call as "particularly traumatic." (Steinberg Decl. ¶ 13.) The claim that law enforcement would use mail-in voters' information to track persons with outstanding arrest warrants made Steinberg frightened and anxious given his criminal history. Plaintiff Andrea Sferes also found the robocall to be distressing and "emotionally upsetting." (Sferes Decl. ¶ 9.) Having outstanding medical debt, Sferes began to doubt whether her information would be shared if she voted by mail, and she "had to try and convince [herself] that [the robocall message] was not true." (Id. ¶ 8.) Plaintiff Nancy Hart, a journalist whose work focuses on the Black community in and around Pittsburgh, became "irate" when she received the call because she recognized it as a deceptive scheme designed to prey upon fears in the Black community about the police, predatory debt collectors, and government-mandated medical programs, and thereby scare Black voters from voting. (Hart Decl. ¶¶ 7-8.) As a result of the calls, at least two Plaintiffs -- Steinberg and Winter -- have decided against voting by mail, which they had originally planned to do because of their fears of

exposure to COVID-19. Steinberg and Winter no longer view voting by mail as reliable.

NCBCP invests significant resources in the Black Women's Roundtable ("BWR"), an empowerment program that promotes Black participation in the Census and elections and engages in on-the-ground organizing. When the robocalls began in late August, NCBCP's BWR program in the Detroit area ("BWR Metro Detroit") learned that Detroit community members were receiving the calls. BWR Metro Detroit became concerned that the calls would intimidate Black voters from participating in the upcoming elections and/or scare Black voters who would have voted by mail into voting in person, thereby increasing their risk of contracting COVID-19. Accordingly, BWR Metro Detroit diverted resources allocated toward increasing Census participation to addressing the disinformation communicated in the robocall. For example, BWR Metro Detroit's co-chair switched from assisting community members with the completion of their Census forms to responding to the robocalls' disinformation. NCBCP fears that the continued dissemination of robocalls will force NCBCP to divert additional resources to counteract the further spread of the robocalls' disinformation.

Burkman and Wohl are facing felony charges arising from the robocalls. Each is charged in Michigan with one count of

12

intimidating voters, one count of conspiracy to commit an election law violation, one count of using a computer to commit the crime of intimidating voters, and using a computer to commit the crime of conspiracy.[10] One condition of Burkman's and Wohl's bail is that they must not "initiate, or cause anyone else to initiate, any robocalls or other communications directed at multiple recipients until November 4."[11] They are also facing a felony indictment in Ohio, but have not been arraigned on those charges as of the date of this Order.[12]

At the October 26 Hearing, defendants Burkman and Wohl raised a number of arguments against issuance of a temporary restraining order. For example, Defendants asserted that Plaintiffs lacked standing. In addition, Defendants claimed that the issuance of a temporary restraining order in this case would be entirely without precedent, and that the case should be stayed pending the outcome of their criminal proceedings. Moreover, Defendants argued that the robocalls constitute constitutionally protected political speech.

---

[10] See AG Nessel Files Felony Charges Against Jack Burkman, Jacob Wohl in Voter-Suppression Robocalls Investigation, Dep't of Att'y Gen. (Oct. 1, 2020), https://www.michigan.gov/ag/0,4534,7-359--541052--,00.html.
[11] See CTRM 134 36th District Court, 36thDC134, YouTube (Oct. 8, 2020), https://www.youtube.com/watch?v=X8KUAWLGbZA (arraignment).
[12] See Virginia and California Duo Indicted as Part of Voter Intimidation Robocall Scam That Targeted Midwestern Minority Communities, Cuyahoga County Office of the Prosecutor (Oct. 27, 2020) http://prosecutor.cuyahogacounty.us/en-US/duo-indicted-voter-intimidation-scam-targeted-minority-communities.aspx.

Finally, Defendants stated that they had not sent or authorized any further robocalls since the criminal proceedings against them in Michigan had begun.

During the hearing, Defendants represented to the Court that they had obtained counsel who would enter an appearance on October 27, 2020. In light of this statement, at the conclusion of the hearing, the Court granted Defendants until October 27, 2020 at 3:00 p.m. to enter any written submission on Defendants behalf. Defense counsel filed the Opposition to Plaintiffs' Motion on October 27, 2020 in accordance with that Order.

In the Opposition, Defendants argue that Plaintiffs have not demonstrated standing, a harm not compensable by monetary damages, or a likelihood of success on the merits. Defendants also emphasize their First Amendment rights, arguing that harm to their First Amendment interests counsels against granting the relief Plaintiffs seek.

## I.   **LEGAL STANDARDS**

"The standards for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 . . . are identical." Sterling v. Deutsche Bank Nat'l Tr. Co. as Trs. for Femit Tr. 2006-FF6, 368 F. Supp. 3d 723, 726 (S.D.N.Y. 2019) (quoting Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd., 190 F. Supp. 2d 577, 580

14

(S.D.N.Y. 2002)). To obtain such relief, the plaintiff must
show "(1) irreparable harm; (2) either a likelihood of success
on the merits or both serious questions on the merits and a
balance of hardships decidedly favoring the moving party; and
(3) that [the requested relief] is in the public interest."
N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, 883 F.3d 32,
37 (2d Cir. 2018). The showing of irreparable harm "is the
single most important prerequisite . . . ." LSSi Data Corp.
v. Time Warner Cable, Inc., 892 F. Supp. 2d 489, 501 (S.D.N.Y.
2012) (internal quotation marks omitted). To demonstrate
irreparable harm, the movant must show "an injury that is
neither remote nor speculative, but actual and imminent."
Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir.
1999) (internal quotation marks omitted). The movant must
further show that the injury "cannot be remedied by an award
of monetary damages." Id.

"When considering a motion for a preliminary injunction,
unlike a motion to dismiss, the Court need not accept as true
the well-pleaded allegations in Plaintiff['s]
complaint." Victorio v. Sammy's Fishbox Realty Co., No. 14
Civ. 8678, 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12,
2014) (citing Incantalupo v. Lawrence Union Free Sch. Dist.
No. 15, 652 F. Supp. 2d 314, 317 n.1 (E.D.N.Y. 2009)).

### III. DISCUSSION

A.    STANDING

The "Constitution requires that anyone seeking to invoke
federal jurisdiction . . . have standing to do so." Crist v.
Comm'n on Presidential Debates, 262 F.3d 193, 194 (2d Cir.
2001). "The law of Article III standing, which is built on
separation-of-powers principles, serves to prevent the
judicial process from being used to usurp the powers of the
political branches." Clapper v. Amnesty Int'l, 568 U.S. 398,
408 (2013).

To demonstrate that Article III's standing requirements
are met, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a)
> concrete and particularized and (b) actual or imminent,
> not conjectural or hypothetical; (2) the injury is
> fairly traceable to the challenged action of the
> defendant; and (3) it is likely, as opposed to merely
> speculative, that the injury will be redressed by a
> favorable decision.

Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), 528 U.S.
167, 181-82 (2000). "[E]ach element must be supported in the
same way as any other matter on which the plaintiff bears the
burden of proof, i.e., with the manner and degree of evidence
required at the successive stages of the litigation." Lujan
v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) (internal
quotation marks and citations omitted); see New York v. Trump,
No. 20 Civ. 5770, 2020 WL 5422959, at *9 (S.D.N.Y. Sept. 10,
2020). "[A] plaintiff must demonstrate standing for each

16

claim and form of relief sought." Cacchillo v. Insmed, Inc., 638 F.3d 401, 404 (2d Cir. 2011).

When, as here, a case involves "multiple plaintiffs, only one plaintiff need possess the requisite standing for a suit to go forward." New York v. U.S. Dep't of Agric., 454 F. Supp. 3d 297, 303 (S.D.N.Y. 2020) (citing Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017); Massachusetts v. E.P.A., 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review.")).

The injury-in-fact requirement is meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (internal quotation marks and citation omitted). A "future injury" can suffice, if it is "certainly impending, or there is a substantial risk that the harm will occur." Id. at 157; see Clapper, 568 U.S. at 414 n.5 (explaining that plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about"); Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 332-33 (1999) (finding standing when certain jurisdictions were "substantially likely . . . [to] suffer vote dilution" (internal quotation marks and citation omitted)).

Traceability requires showing "a causal connection
between the injury and the conduct complained of — the injury
has to be fairly traceable to the challenged action of the
defendant, and not the result of the independent action of
some third party not before the court." Lujan, 504 U.S. at
560 (internal quotation marks, alterations, and citation
omitted). However, traceability does not require "[p]roximate
causation." Lexmark Int'l, Inc. v. Static Control Components,
Inc., 572 U.S. 118, 134 n.6 (2014). "Article III 'requires no
more than de facto causality.'" Dep't of Commerce v. New York,
139 S. Ct. 2551, 2566 (2019) (quoting Block v. Meese, 793
F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)).

Redressability requires a showing that it is "likely, as
opposed to merely speculative, that the injury will be
redressed by a favorable decision." Lujan, 504 U.S. at 561
(internal quotation marks and citation omitted). The
plaintiff need not "show that a favorable decision will
relieve his *every* injury." Dep't of Texas, Veterans of Foreign
Wars of U.S. v. Texas Lottery Comm'n, 760 F.3d 427, 432 (5th
Cir. 2014) (citing Larson v. Valente, 456 U.S. 228, 243 n.15
(1982)).

"Where, as here, Plaintiff is an entity, standing may be
established either (i) directly, based on an injury to the
entity itself, i.e. organizational standing, or (ii) in the

18

organization's representative capacity, based on the injuries to its members, i.e. associational standing." Pen Am. Ctr., Inc. v. Trump, 448 F. Supp. 3d 309, 319 (S.D.N.Y., 2020) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975); Fair Hous. Justice Ctr., Inc. v. Cuomo, No. 18 Civ. 3196, 2019 WL 4805550, at *6 (S.D.N.Y. Sept. 30, 2019)).

An organization seeking to establish direct standing must "meet[] the same test that applies to individuals." Pen Am. Ctr., 448 F. Supp. 3d at 323 (quoting N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012)). Specifically, the organization must show "an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the challenged action]; and (iii) that a favorable decision would redress its injuries." Centro de la Communidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017).

An organization may establish injury-in-fact by showing that the challenged conduct causes "a 'perceptible impairment' of an organization's activities . . . ." Nnebe v. Daus, 644 F.3d 147, 157 (2d Cir. 2011). A perceptible impairment occurs when, for example, the organization "divert[s] money from its other current activities to advance

its established organizational interests . . . ." Centro, 868 F.3d at 110; Pen Am., 448 F. Supp. 3d at 325.

The Second Circuit recently addressed how an organization may establish standing on the basis of a perceptible impairment in Moya v. United States Department of Homeland Security, 975 F.3d 120 (2d Cir. 2020). In that case, the plaintiff immigration organization alleged that the defendants' conduct had "frustrated" its organizational mission by forcing the organization to divert its resources. Specifically, the organization alleged that the defendants' conduct required it to spend twice as much time servicing clients who required N-648 disability waiver requests for naturalization, "leaving less time for [the organization's] other clients." Id. This "opportunity cost," the Second Circuit said, represented a "real drain on the organization's resources" and thus "a perceptible impairment of its ability to help immigrants." Id. (internal quotation marks and citation omitted).

Here, it appears NCBCP has satisfactorily established Article III standing based on an injury to NCBCP itself.[13] As to the injury-in-fact requirement, Plaintiffs filed an

---

[13] Notably, Defendants make no argument that NCBCP lacks organizational standing. Instead, Defendants only argue that NCBCP lacks associational standing. Because the Court concludes that NCBCP has sufficiently demonstrated organizational standing, however, the Court does not need to reach the issue of associational standing.

20

affidavit from Tameka Ramsey, a representative of BWR Metro Detroit. (See Ramsey Decl. ¶ 4.) One of BWR Metro Detroit's goals is "to promote and support civic participation," including by "helping and encouraging members of the Black community in Detroit to participate in the Census." (Id. ¶ 6.) Once the organization learned of the robocalls, the BWR Metro Detroit co-chair "had to stop her Census work in order to respond to robocalls." (Id. ¶ 10.) Thus, like the immigration organization in Moya, BWR Metro Detroit and NCBCP must spend more time on voting-related outreach to combat Defendants' disinformation, leaving less time to work on its Census-related outreach. As in Moya, this diversion of resources is an opportunity cost that constitutes a perceptible impairment of the organization's activities. As such, NCBCP has satisfied the injury-in-fact requirement.

As to the traceability requirement, NCBCP has established a causal connection between its injury and the challenged conduct. As Ramsey's affidavit makes clear, BWR Metro Detroit became concerned about the robocalls and the intimidation and fear the calls would cause in the Black community in the Detroit area. (Ramsey Decl. ¶ 7.) Because Ramsey "needed to inform [her] community that the robocalls were false and that voting by mail is safe[,] BWR Metro Detroit mobilized quickly to respond, which required

21

diverting resources and putting other important work on hold." (Id. ¶ 9.) Thus, Plaintiffs have demonstrated that the injury alleged -- the diversion of resources -- stems directly from Defendants' robocalls.

Finally, as to the redressability requirement, NCBCP has established that injunctive relief would likely redress its injury. BWR Metro Detroit has had to redirect its resources towards conducting outreach to ensure community members know the robocalls are false, and Ramsey expressed concern "that if the robocalls continue, BWR [Metro Detroit] will have to divert additional resources from other programs in order to protect our community's right to vote and help people safely vote by mail." (Id. ¶ 11.) If Defendants were prohibited from making additional robocalls or directed to issue a correction, however, BWR Metro Detroit would not have to divert more resources from other programming in order to correct the disinformation. Accordingly, a court order can prevent future harm to NCBCP and redress its injury.[14]

B.    ABSTENTION

At the October 26 hearing, Defendants suggested that the Court should stay this action pending the conclusion of state

---

[14] Having concluded that plaintiff NCBCP satisfies Article III, the Individual Plaintiffs need not have standing for the "suit to go forward," though the Court notes that at least some of the Individual Plaintiffs have standing. See New York, 454 F. Supp. 3d at 303.

22

criminal proceedings in Michigan.[15] "In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72 (2013). "[O]nly exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 368 (1989). Well established abstention doctrines delineate the limited sets of circumstances in which federal courts will abstain from hearing a case. For the reasons discussed below, the Court concludes that no abstention doctrine counsels in favor of a stay in this case.

Unlike in Younger v. Harris, 401 U.S. 37 (1971), and its progeny, here there is no plaintiff who is a defendant in a pending state criminal, administrative, or civil proceeding and who is asking a federal court to enjoin or otherwise interfere with the pending state matter. Cf. id. at 46 (holding that a federal court should not enjoin a pending state criminal proceeding unless necessary to prevent "great and immediate" irreparable injury); Ohio Civil Rights Comm'n

---

[15] Defendants did not reference the Ohio indictment, likely because they had not yet been charged there at the time of the hearing. Nonetheless, the Court notes that if Defendants had raised it, the abstention analysis that follows would remain unchanged. Whether comparing the present motion to the Michigan or Ohio proceeding, there is no basis for a stay on abstention grounds.

v. Dayton Christian Schs., Inc., 477 U.S. 619 (1986) (extending Younger in the context of a state administrative proceeding); Juidice v. Vail, 430 U.S. 327 (1977) (extending Younger in the context of a state court contempt proceeding); Huffman v. Pursue, Ltd., 420 U.S. 592 (1975) (extending Younger in the context of a civil state nuisance proceeding). Younger abstention is therefore inapplicable.

As the suit before this Court does not involve any state law claims, abstention is not appropriate under the doctrines set forth in Railroad Commission v. Pullman Co., 312 U.S. 496 (1941), Burford v. Sun Oil Co., 319 U.S. 315 (1943), or Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25 (1959).

Finally, abstention is not warranted under Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976). "Colorado River abstention is reserved for exceptional circumstances." U.S. Bank Nat'l Assoc. v. E. Fordham De LLC, 385 F. Supp. 3d 256, 258 (S.D.N.Y. 2019), aff'd 804 F. App'x 106 (2d Cir. 2020). As the Second Circuit recently stated when affirming this Court's decision in United States Bank National Association:

> In deciding whether to abstain under Colorado River, a district court must first determine whether the federal and state court cases are parallel. Nat'l Union Fire Ins. Co. v. Karp, 108 F.3d 17, 22 (2d Cir. 1997). Federal and state proceedings are parallel for purposes of

24

abstention when the two proceedings are "essentially the same" -- when there is an identity of parties, and the issues and relief sought are the same. Id. If the actions are deemed parallel, courts are then to consider six factors to determine whether abstention is appropriate. These factors are: (1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction. De Cisneros, 871 F.2d at 307.

804 F. App'x at 107.

In this case, the proceedings are not "essentially the same." Id. First, the parties in the proceedings are not the same. NCBCP and the Individual Plaintiffs are not involved in the Michigan action, and the Michigan prosecutor is not involved in this action. Although Wohl and Burkman have both been charged in Michigan, the entity defendants in this action -- Project 1599 and J.M. Burkman & Associates -- are not parties to the Michigan criminal proceedings. Second, the issues in the two cases are not the same. Although both cases arise from the same set of facts, Plaintiffs in this civil suit allege violations of federal law, while in Michigan, Defendants Wohl and Burkman face a prosecution for violations of Michigan state law. Finally, the relief sought in the two proceedings is not the same. In Michigan, the prosecutor will pursue criminal penalties -- that is, criminal fines and

25

imprisonment. Here, Plaintiffs seek temporary and permanent injunctive relief as well as compensatory and punitive damages for the harm they suffered. As the proceedings are not parallel, the Court need not even proceed to consider the six Colorado River factors. See id.

C.   IRREPARABLE HARM

Plaintiffs have demonstrated irreparable harm. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014); see also Conn. Dep't of Envtl. Prot. v. Occupational Safety & Health Admin., 356 F.2d 226, 231 (2d Cir. 2004) (noting that the Second Circuit has "held that the alleged violation of a constitutional right triggers a finding of irreparable injury"). Given the fundamental nature of the right to vote, "if potential members of the electorate suffer intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether extinguished, Plaintiff[s] would be irreparably harmed." Ariz. Democratic Party v. Ariz. Republican Party, No. 16 Civ. 03752, 2016 WL 8669978, at *11 (D. Ariz. Nov. 4, 2016). "Further, if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast,

26

and no amount of traditional remedies such as money damages would suffice after the fact." Id.[16] Additionally, the injury NCBCP suffered when BWR Metro Detroit was forced to divert resources away from its work related to the Census is clearly irreparable because the Census has now concluded.

Defendants' arguments with respect to irreparable harm are not persuasive. First, Defendants contend that NCBCP alleged what amounts to monetary loss. But Defendants fundamentally misunderstand the nature of the injuries Plaintiffs claim. The harm NCBCP suffered when it had to divert its resources away from Census-related programming to address Defendants' robocalls cannot be remedied monetarily because the Census has ended. Moreover, Defendants ignore the injury inflicted upon Plaintiffs' and other members of the electorate's right to vote free of intimidation. This is an injury of constitutional significance, and for the reasons

---

[16] The Court is unpersuaded by Defendants' argument that they were merely "[e]xpressing . . . wariness about the trustworthiness of one mode of voting over another" and "attempt[ing] to get folks to vote in-person to ensure voting integrity." (Opposition at 5.) As set forth in Section III.D.1, the Court concludes that the statements were designed to intimidate voters from voting by mail. In the context of a life-threatening global pandemic, intimidating citizens from voting by mail results in, at best, "harm in the form of exposure to COVID-19" and, at worst, preventing eligible voters from casting a ballot altogether. See Jones v. U.S. Postal Serv., No. 20 Civ. 6516, 2020 WL 5627002, at *12 (S.D.N.Y. Sept. 21, 2020) (concluding that plaintiffs had demonstrated sufficient injury resulting from mail delays which would force citizens to vote in person and risk infection).

27

discussed above, interference with or abridgment of the right to vote gives rise to a finding of irreparable injury.[17]

Second, Defendants claim that the delay between the time the robocalls were issued -- on August 26, 2020 -- and the time Plaintiffs brought their lawsuit -- on October 16, 2020 -- undermines a finding of irreparable harm. But the Second Circuit has expressly stated that a "two-month delay [does] not make [an] interim injunctive order inappropriate." Mattina ex rel. Nat'l Labor Relations Bd. v. Kingsbridge Heights Rehab. & Care Ctr., 329 F. App'x 319, 323 (2d Cir. 2009) (citing Kaynard v. MMIC, Inc., 734 F.2d 950, 952, 954 (2d Cir. 1984)). Thus, Defendants' arguments have failed to persuade the Court that a sufficient showing of irreparable harm has not been made in this case.

At the hearing on October 26, Defendants, appearing pro se, emphasized that they have not made robocalls since the institution of criminal proceedings against them in Michigan and have no plans for further robocalls in the future. The Court construes these representations as an argument that Plaintiffs have not shown a sufficiently imminent irreparable

---

[17] Relatedly, Defendants' argument that injury to members of the electorate who are not plaintiffs in this lawsuit is insufficient to find irreparable harm is flatly contradicted by Arizona Democratic Party, 2016 WL 8669978, at *11, which relied on the inability to find and redress the harms felt by potential voters who were dissuaded from exercising their voting rights.

harm. But the Court is not reassured by Defendants' unsworn, self-serving assurances that they have no plans to issue any more robocalls. "A defendant's expressed intention to cease the offending conduct is not sufficient to eliminate the possibility of irreparable harm" absent the existence "of a consent injunction or other enforceable assurance" that the offending conduct will not recur. Kuklachev v. Gelfman, 629 F. Supp. 2d 236, 252 (E.D.N.Y. 2008) (citing Twentieth Century Fox Film Corp. v. Marvel Enters., 155 F. Supp. 2d 1, 49 (S.D.N.Y. 2001)).

Nor does the Michigan bail condition prohibiting Defendants from issuing robocalls or other mass communications undermine the Court's finding of irreparable harm. There is some question of whether Wohl has abided by that condition to date.[18] Moreover, bail conditions are commonly modified, and Plaintiffs have raised legitimate concerns regarding the scope of the Michigan court's jurisdiction to enforce those conditions, including with regard to the entities named as defendants in this suit. As a result, the Court is not persuaded that the bail condition eliminates the possibility of irreparable harm here.[19]

---

[18] CTRM 438 36th District Court, *WC CR438*, YouTube (Oct. 15, 2020), https://www.youtube.com/watch?v=dyMHDzXEpZ8 (probable cause conference).
[19] The Court concludes that, just as Defendants' alleged cessation of robocalls does not undermine a finding of irreparable harm, Defendants' cessation does not render this case moot. For the reasons articulated

D.     LIKELIHOOD OF SUCCESS ON THE MERITS

For the reasons set forth below, the Court is persuaded that Plaintiffs have demonstrated a substantial likelihood of success on the merits with regard to their claims under the Voting Rights Act and Ku Klux Klan Act.

1.     The Voting Rights Act

a.     History

Congress passed the Voting Rights Act ("VRA") in 1965 in response to the Civil Rights Movement and mounting social pressures to realize the constitutional guarantee of the Fifteenth Amendment that the right to vote shall not be denied "on account of race or color." H.R. Rep. No. 89-439, at 30 (1965), as reprinted in 1965 U.S.C.C.A.N. 2437, 2439 ("House Report"). As the House Report explained, the efforts to defend the rights under the Fifteenth Amendment had, in prior generations, "fallen far short of [the country's] aspirations." Id.

The Civil Rights Act of 1957 was the first of this era that attempted to give teeth to the existing voting-rights laws. See Ben Cady & Tom Glazer, Voters Strike Back: Litigating Against Modern Voter Intimidation, 39 N.Y.U. Rev.

---

above, Defendants have failed to carry their "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (quoting Laidlaw, 528 U.S. at 190).

L. & Soc. Change 173, 188 (2015). Over the years that
followed, Congress modified the voting laws through the Civil
Rights Acts of 1960 and 1964 to address defects litigants
encountered in trying to vindicate the rights these laws were
meant to protect. H.R. Rep. No. 89-439, 1965 U.S.C.C.A.N.
2437, 2440. Despite these modifications, however, the
enforcement of the voting-rights laws remained challenging
and slow. Id. at 2440-41. Only seventy-one voting-rights
cases were filed by the Justice Department under all three
Civil Rights Acts, and despite these cases, widespread
discriminatory practices persisted. See id. at 2441. Against
this backdrop, the Voting Rights Act of 1965 was passed, "to
adopt more effective measures" than existed at the time. Id.
at 2442.

As relevant here, while the Civil Rights Act of 1957
prohibited intimidation "for the purpose of interfering with
the right to vote in Federal elections," Section 11(b)'s
prohibitions extended more broadly. See 1965 U.S.C.C.A.N.
2437, 2440. Section 11(b) provides, in relevant part, that:

> No person, whether acting under color of law or
> otherwise, shall intimidate, threaten, or coerce, or
> attempt to intimidate, threaten, or coerce any person
> for voting or attempting to vote.

52 U.S.C. § 10307(b). Likewise, while the Civil Rights Act of
1957 prohibited intimidation "for voting or attempting to

31

vote," the VRA extended the protections to not just voting,
but to other voting-related conduct, including, for example,
encouraging others to vote or helping register other voters.
See id. Section 11(b)'s reach is extensive, in accordance
with the VRA's ambitious aims of encouraging true enforcement
of the Fifteenth Amendment's promise of unencumbered access
to the vote, regardless of race. See 1965 U.S.C.C.A.N. 2437.

    b.   Scope and Enforceability

As a threshold matter, and by its clear terms, Section
11(b) undoubtedly applies to private conduct, and private
individuals are subject to its prohibitions. League of United
Latin Am. Citizens - Richmond Region Council 4614 v. Pub.
Interest Legal Found. ("LULAC"), No. 18 Civ. 423, 2018 WL
3848404, at *3 (E.D. Va. Aug. 13, 2018) (concluding that
Section 11(b) reaches private conduct upon a review of the
case law and statutory text). Indeed, Section 11(b) provides
that "no person" shall interfere, "whether acting under color
of law or otherwise," with "any person's" right to vote. That
the prohibited acts may be "under color of law or otherwise,"
and that the contemplated perpetrator and victim "persons"
are not limited or qualified, both reflect Section 11(b)'s
reach beyond government actors.

Defendants contend that Section 11(b) affords no private
right of action. That is incorrect. Consistent with Section

11(b)'s broad reach, both the government and private parties may sue to enforce Section 11(b). See Arizona Democratic Party, 2016 WL 8669978, at *4 (concluding that Section 11(b) "does not exclude a private right of action for injunctive relief") (citing Allen v. State Bd. of Elections, 393 U.S. 544, 556 (1969) (holding that Section 5 of the VRA implied a private right of action because the "laudable goal" of the VRA to "make the guarantees of the Fifteenth Amendment finally a reality for all citizens" would be "severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General")); Cady & Glazer, supra, at 183 (explaining that the Ku Klux Klan Act and the VRA "create private rights of action in federal courts"); see also, e.g., LULAC, 2018 WL 3848404, at *1 (denying a motion to dismiss the Section 11(b) claim brought by an organization and four individual plaintiffs).

  c. No Racial Animus or Targeting Required

 A plaintiff need not show racial animus or discrimination to establish a violation of Section 11(b). First, the statutory text prohibits intimidation, threats, and coercive conduct, without any explicit or implicit reliance on the motivation of the actor. Indeed, the legislative history makes clear that "[t]he prohibited acts of intimidation need not be racially motivated." H.R. Rep.

33

No. 89-439, 1965 U.S.C.C.A.N. at 2462; see also Willingham v. County of Albany, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006) ("While the purpose of the VRA was to eliminate racial discrimination in voting, [Section] 11(b) of the act does not explicitly require proof that racial discrimination motivated the intimidation, threats, or coercion."); Cady & Glazer, supra, at 190 ("[S]ection 11(b) was a deliberate attempt to expand the existing laws against voter intimidation, including by eliminating any legal requirement of racial targeting.").

### d. "Intimidate, Threaten, or Coerce"

To establish a claim under Section 11(b), a plaintiff must show that the defendant has intimidated, threatened, or coerced someone for voting or attempting to vote, or has attempted such intimidation, threat, or coercion. In the sections that follow, the Court discusses conduct encompassed by the terms "intimidate," "threaten," and "coerce." After considering the text of the statute and First Amendment principles bearing on its interpretation, the Court describes cases applying Section 11(b), as well as other statutes containing similar prohibitions on threats and intimidation.

These authorities confirm that threats and intimidation include messages that a reasonable recipient familiar with the context of the message would interpret as a threat of

34

injury tending to deter individuals from exercising their voting rights. The threatened injury need not be one of violence or bodily harm. For example, threats of economic harm, legal action, dissemination of personal information, and surveillance can qualify depending on the circumstances.

    i.    The Statutory Language

In deciding what conduct is covered by the terms "intimidate," "threaten," and "coerce," the Court must begin with the plain meaning of the statutory language. E.g., United States v. Reynoso, 239 F.3d 143, 146 (2d Cir. 2000) (citing United States v. Piervinanzi, 23 F.3d 670, 677 (2d Cir. 1994) ("[T]he starting point for interpreting a statute is the language of the statute itself.")). As "usual," the Court must also "interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." L.S. v. Webloyalty.com, Inc., 954 F.3d 110, 115 (2d Cir. 2020) (internal quotation marks and citations omitted).

The words "intimidate," "threaten," and "coerce," have familiar and somewhat overlapping definitions. See Webster's Third New International Dictionary (1966). To "intimidate" means to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)." Id. at 1183. To "threaten" means to "utter

35

threats against" or "promise punishment, reprisal, or other distress." Id. at 2381. And to "coerce" means to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)." Id. at 438.

ii. First Amendment Considerations

Defendants argue in their Opposition that their robocalls communicated a message entitled to First Amendment protection. Statutes such as the VRA that restrict threatening speech "must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." Watts v. United States, 394 U.S. 705, 708 (1969) (per curiam).

To determine whether a restriction on speech is content-based and hence subject to strict scrutiny, a court must "consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015) (citation omitted). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." Id. at 163-64.

Section 11(b) proscribes speech based on the message the
speaker conveys -- specifically whether the content of the
speaker's message is threatening or intimidating to voters.
See Reed, 576 U.S. at 163. Section 11(b) does not regulate
other types of messages, such as communications encouraging
voter registration. To determine whether a violation of the
statute has occurred, the content of the speaker's message
must be examined. See McCullen v. Coakley, 573 U.S. 464, 479
(2014) ("The Act would be content based if it required
enforcement authorities to examine the content of the message
that is conveyed to determine whether a violation has
occurred.") (internal quotation marks and citations omitted).
Thus, Section 11(b) is a content-based speech restriction.

Over time, the Supreme Court has defined narrow
categories of speech that can be prohibited based on content.
Such categories include, for example, true threats, see
Watts, 394 U.S. at 708; speech directed at and likely to
incite imminent lawless action, see Brandenburg v. Ohio, 395
U.S. 444, 447 (1969) (per curiam); child pornography, see New
York v. Ferber, 458 U.S. 747 (1982); obscenity, see Miller v.
California, 413 U.S. 15 (1973); and fighting words, see
Chaplinsky v. New Hampshire, 315 U.S. 568 (1942).

False statements are not categorically excluded from
First Amendment protection. See United States v. Alvarez, 567

37

U.S. 709, 718-22 (2012) (plurality); id. at 732-37 (Breyer, J., concurring). Although false statements that discourage people from exercising the right to vote could conceivably be exempted from First Amendment protection altogether, the Supreme Court has not crafted such an exemption.[20]

As noted above, true threats are not entitled to First Amendment protection. See Watts, 394 U.S. at 708. The Second Circuit applies an objective test to determine whether a defendant's statement is a true threat. See United States v. Turner, 720 F.3d 411, 420 (2d Cir. 2013). Specifically, the "test for whether conduct amounts to a true threat is . . . whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." Id. (internal quotation marks and citations omitted); see also United States v. Santos, 801 F. App'x 814, 816 (2d Cir. 2020) (applying the Turner test).

Prohibitions on true threats are constitutional "even where the speaker has no intention of carrying them out." Turner, 740 F.3d 420. At the same time, however, "political hyperbole" is not a true threat, even when "crude," "abusive, and inexact." Watts, 394 U.S. at 708 (holding that the

---

[20] The Supreme Court upheld a statute that banned electioneering within 100 feet of a polling place in Burson v. Freeman, 504 U.S. 191, 206, 211 (1992) (plurality), finding that the regulation advanced the state's interests in protecting the right to vote and electoral integrity.

statement "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." did not amount to a true threat). Courts examine the language used and the context of the message to distinguish true threats from hyperbole. See Turner, 740 F.3d at 421 ("The full context of Turner's remarks reveals a gravity readily distinguishable from mere hyperbole or common public discourse."). In Watts, for example, the Supreme Court considered the context and expressly conditional nature of the statement at issue, as well as listeners' laughter in response to the statement, as supporting the conclusion that the statement was mere hyperbole. See Watts, 394 U.S. at 708.

The threat need not be expressed in first person, unconditional, future tense. "[R]igid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience" would render prohibitions on true threats "powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Turner, 740 F.3d at 422 (quoting United States v. Malik, 16 F.3d 45, 50 (2d Cir. 2013), and citing United States v. Shoulberg, 895 F.2d 882, 886 (2d Cir. 1990)). In fact, in Virginia v. Black, 538 U.S. 343, 354, 357, 363 (2003), the Supreme Court recognized that,

interpreted in a broader historical and social context, cross burnings can constitute true threats even though they communicate no explicit message.

The Supreme Court has not squarely addressed whether threats of nonviolent or nonphysical harm can constitute true threats. In Black, the Court explained that "[t]rue threats *encompass* those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. at 359 (emphasis added). That is, the Court explained that true threats include threats of unlawful violence; the Court did not specify whether only threats of unlawful violence are true threats. With regard to intimidation, the Court explained that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat" that exists "where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Id. at 360. Prohibition of true threats is appropriate, the Court reasoned, because it "protects individuals from the fear of violence and the disruption that fear engenders, as well as from the possibility that the threatened violence will occur." Id. (citations omitted).

This Court does not interpret the Supreme Court's analysis in Black to suggest that the government can ban only threats of physical harm. The threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence. Indeed, the Second Circuit has indicated that threats of serious nonphysical harm are true threats unprotected by the First Amendment. In Turner, the Second Circuit approvingly cited constitutional law scholar and legal philosopher Kent Greenawalt for the proposition that:

> Despite the relevance of freedom of speech, a legislature could reasonably decide to make it criminal for a person with apparent firmness of purpose to threaten a specific legal wrong grave enough to be likely either to cause substantial emotional disturbance in the person threatened or to require the employment of substantial resources for investigation or prevention.

Turner, 720 F.3d at 420 (quoting Kent Greenawalt, Speech, Crime and the Uses of Language 91 (1989)). Moreover, the Second Circuit's test for identifying a true threat, as set forth in Turner, requires only a showing that a reasonable recipient "would interpret [the message] as a *threat of injury*." Id. at 420 (emphasis added). The Court accordingly does not interpret the First Amendment as prohibiting the government from restricting speech that communicates threats of nonviolent or nonbodily harm.

Whether true threats are only statements that the speaker intended as threats likewise remains unresolved by the Supreme Court. The Second Circuit has explained:

> [In] Virginia v. Black, . . . the Supreme Court stated that "'[t]rue threats' encompass those statements where the speaker *means to communicate* a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Since Black, some disagreement has arisen among our sister circuits regarding whether Black altered or overruled the traditional objective test for true threats by requiring that the speaker subjectively intend to intimidate the recipient of the threat.

Id. at 420 n.4 (citations omitted) (emphasis added). The Second Circuit declined to resolve that question in Turner, because, on the facts of that case, "a true threat was established pursuant to both the objective and subjective tests." Id. Moreover, even if the Constitution requires a showing of subjective intent in criminal cases, that requirement may not apply in civil cases. See United States v. Elonis, 135 S. Ct. 2001, 2009 (2015) (interpreting a statute criminalizing threats as containing a scienter requirement in light of "the general rule . . . that a guilty mind is a necessary element in the indictment and proof of every crime" (internal quotation marks and citations omitted)).

This question of intent is of particular relevance to Section 11(b) of the VRA because it contains no explicit

42

requirement of intent. Ultimately, however, the Court need not resolve this question. For reasons discussed below, whether or not Section 11(b) must be construed as including an intent requirement does not alter the outcome here.

iii. Cases Applying Section 11(b)

Consistent with the text of Section 11(b) and the First Amendment considerations described above, courts have concluded that conduct putting others "in fear of harassment and interference with their right to vote" constitutes intimidation "sufficient" to support a Section 11(b) claim. E.g., LULAC, 2018 WL 3848404, at *4 (quoting Damon v. Hukowitz, 964 F. Supp. 2d 120, 149 (D. Mass. 2013) ("Intimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct.")).

Conduct that puts others "in fear of harassment and interference with their right to vote" naturally includes egregious conduct, such as acts of violence. See, e.g., Katzenbach v. Original Knights of Ku Klux Klan, 250 F. Supp. 330, 337 (E.D. La. 1965) (finding that assault and economic retaliation constituted unconstitutional voter intimidation).

But unlawful voter intimidation also includes subtler forms of intimidation that do not threaten bodily harm. For example, in Daschle v. Thune, the court issued a temporary

43

restraining order against defendants who had been following
Native American voters within polling places, "ostentatiously
making noises" behind them, discussing Native Americans who
were prosecuted for illegally voting, following them out of
the polling places, and recording their license plate
numbers. See Decision and Order at 2, No. 4:04 Civ. 04177
(D.S.D. Nov. 1, 2004); see also Complaint at 5-6, id. In
imposing the restraining order, the court found that this
conduct resulted in "the intimidation of prospective Native
American voters." Decision and Order at 2, id.

### iv. Other Statutes

Decisions interpreting the terms "intimidate" and
"threaten" in other statutes are also instructive. Indeed,
the "whole code canon" instructs that identical terms should
typically be construed consistently across different acts or
titles of the United States Code. See, e.g., Buckeye Check
Cashing, Inc. v. Cardegna, 546 U.S. 440, 448 n.3 (2006) ("Our
more natural reading is confirmed by the use of the word . . .
elsewhere in the United States Code."); see also United States
v. Harmon, No. CR 19-395, 2020 WL 4251347, at *9 (D.D.C. July
24, 2020) (citing K.L. v. R.I. Bd. of Educ., 907 F.3d 639,
646 (1st Cir. 2018) (referencing the "'whole code' canon,"
"under which courts construe terms across different" acts or
titles of a legal code "consistently")).

44

Communicating the prospect of adverse legal consequences, including arrest or prosecution, may rise to the level of an unlawful threat or intimidation. In United States v. McLeod, the Fifth Circuit held that certain arrests and prosecution constituted unlawful voter intimidation. 385 F.2d 734 (5th Cir. 1967) (interpreting a provision of the 1957 Civil Rights Act that prohibits intimidation, threats, or coercion for the purpose of interfering with the right to vote). In McLeod, a sheriff stationed officers in and around voter-registration meetings, and the officers "made notes during the meetings, took down the license numbers of cars in the area, and spoke with each other and with the sheriff's office by portable two-way radio." Id. at 737. Two individuals involved with the meetings were later arrested and prosecuted. Id. at 737-38. Subsequently, state officials arrested twenty-nine Black individuals attending a voter-registration meeting based on traffic violations. Id. at 738. Addressing both sets of conduct, the Fifth Circuit held that it was intimidating and coercive, explaining that "[i]t is difficult to imagine anything short of physical violence which would have a more chilling effect on a voter registration drive than the pattern of baseless arrests and prosecutions revealed in this record." Id. at 740-41. Similarly, in Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263

45

F.3d 208, 222-23 (2d Cir. 2001), the Second Circuit concluded that an employer's statement to his employee that if the employee continued requesting accommodations for her disability, he would address her behavior "through legal channels" could constitute an unlawful threat or intimidation in violation of the Americans with Disabilities Act.

Economic pressure may also be considered a form of intimidation. See, e.g., United States v. Beaty, 288 F.2d 653, 654-57 (6th Cir. 1961) (applying the Civil Rights Act of 1957 and holding that the eviction of sharecroppers as punishment for registering to vote constitutes unlawful intimidation); United States v. Bruce, 353 F.2d 474, 476-77 (5th Cir. 1965) (finding unlawful intimidation when a landowner restricted an insurance collector's access to the landowner's property due to the insurance collector's efforts to register voters).

Courts have defined "intimidation" for purposes of the Fair Housing Act ("FHA"),[21] as including nonviolent and nonbodily harm such as surveillance and derogatory remarks. The Ninth Circuit has said that "[i]ntimidation [under the FHA] would require" simply "a showing that the [defendant's] activities had generated fear in the [plaintiff]." Walker v.

---

[21] As the Second Circuit has recognized, the language of the FHA and Section 11(b) of the VRA is "very similar." New York v. Davis, 411 F.2d 750, 753 (2d Cir. 1969).

City of Lakewood, 272 F.3d 1114, 1129 n.4 (9th Cir. 2001). In
People Helpers Foundation, Inc. v. City of Richmond, 781 F.
Supp. 1132, 1135 (E.D. Va. 1992), the district court concluded
that plaintiffs adequately alleged unlawful threats and
intimidation under the FHA when they alleged that defendants
had photographed plaintiffs and People Helpers volunteers and
made derogatory remarks about the Black residents. Id. at
1135-36.

Under certain circumstances, warnings of the
dissemination of personal information can also constitute a
threat or intimidation. In United States v. Nguyen, 673 F.3d
1259, 1265 (9th Cir. 2012), the Ninth Circuit considered a
letter that was widely distributed among Latino immigrants
and "warned . . . that if they voted in the upcoming election
their personal information would be collected . . . and . . .
could be provided to organizations who are 'against
immigration.'" Id. On the facts of that case, the Ninth
Circuit concluded that the there was "sufficient" basis for
a jury to conclude that the mailing constituted unlawful
"intimidation" under California law. Id.[22]

---

[22] Defendants quote at length from United States v. McNeal, 818 F.3d 141,
153 (4th Cir. 2016), in which the Fourth Circuit explained that courts
interpret the word "intimidation" as referencing a threat to use physical
force in the context of criminal statutes defining bank robbery. Because
the provisions of the VRA and the Ku Klux Klan Act at issue here are not
defining "crimes involving takings 'by force and violence, or by
intimidation,'" McNeal and the cases cited within it are inapposite. See

47

e. Likelihood of Success on Plaintiffs' VRA Claim

The Court is persuaded that Plaintiffs are substantially likely to prevail in proving that the robocalls violated Section 11(b). The calls state that personal information will be disclosed to creditors, the CDC, and law enforcement -- and with significant consequences. The calls explicitly state that creditors will use the information to collect debts, that the CDC will use it to identify people for mandatory vaccination, and that law enforcement will use it to enforce old, outstanding warrants.

The context in which Defendants' message was communicated supports a conclusion that the message constituted a threat or intimidation. See McLeod, 385 F.2d at 740 (explaining defendants' "acts cannot be viewed in isolation" and "must be considered against the background of contemporaneous events in Selma and the general climate prevailing there at the time"); Turner, 720 F.3d at 420 (the "test for whether conduct amounts to a true threat is . . . whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury"). And in context, it is not difficult to

_____

id. The statutory schemes discussed in this section -- including the Fair Housing Act, the 1957 Civil Rights Act, and the Americans with Disabilities Act -- are more closely analogous to those at hand and therefore offer more useful guidance with regard to the proper construction of the term intimidation within the VRA and KKK Act.

48

see how the references to arrest warrants, outstanding debt, and mandatory vaccines may cause reasonable Black voters to resist voting out of fear. The history of discriminatory policing, discriminatory lending and debt collection practices, and unethical medical procedures within the Black community, as highlighted by Plaintiffs, continue to generate reasonable mistrust of law enforcement, financial institutions, and the medical community.[23] Additionally, the COVID-19 pandemic has had a disproportionate impact on Black communities. See Nguyen, 673 F.3d at 1265 (concluding there was a fair probability that a letter stating that personal information of Latino voters would be provided to organizations "against immigration" was unlawfully threatening and intimidating).

---

[23] The Court considers the historical existence of discriminatory policing, lending, debt collection, and medical practices to be a generally known fact and hence properly subject to judicial notice. See, e.g., Sarah A. Seo, Policing the Open Road (2019) (discussing historically discriminatory policing practices); Austin Frakt, Bad Medicine: The Harm That Comes From Racism, N.Y. Times (Jan. 13, 2020) https://www.nytimes.com/2020/01/13/upshot/bad-medicine-the-harm-that-comes-from-racism.html (providing historical examples of "unjust treatment of nonwhite groups in health care"); Paul Kiel & Annie Waldman, The Color of Debt: How Collection Suits Squeeze Black Neighborhoods, ProPublica (Oct. 8, 2015), https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-neighborhoods (tying the racial wealth gap to historic discrimination and finding that in recent years even accounting for income, the rate of court judgments from debt collection lawsuits was twice as high in mostly black communities); Tuskegee Study, 1932-1972, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/tuskegee/index.html (last visited Oct. 25, 2020) (referencing United States Public Health Service experiment in which adequate treatment for syphilis was withheld "from a group of poor black men who had the disease, causing needless pain and suffering for the men and their loved ones").

49

Context indicates that a reasonable recipient would likely interpret the prospect of a forced vaccination, in particular, as a threat of bodily injury to voters who vote by mail. Interpreting this portion of the message in context requires recognition of the widespread uncertainty within the United States concerning the efficacy and safety of the COVID-19 vaccines under development.[24] In this environment, the robocalls' statement concerning mandatory vaccinations is reasonably perceived as a threat of bodily harm.

Moreover, by stating that voters' personal information "will be used by police departments to track down old warrants," the calls may fairly be perceived as threatening arrest or legal action against those with criminal records. Such conduct has previously been held to be intimidating. See, e.g., McLeod, 385 F.2d 734 (holding that baseless or pretextual arrests and prosecutions were unlawful intimidation); Damon, 964 F. Supp. 2d at 150 (stating that "a threat of arrest would presumably qualify under the right

---

[24] U.S. Public Now Divided Over Whether to Get COVID-19 Vaccine, Pew Research Ctr.: U.S. Policy & Politics (Sept. 17, 2020), https://www.pewresearch.org/science/2020/09/17/u-s-public-now-divided-over-whether-to-get-covid-19-vaccine/ (finding that 77 % of Americans "think it's very or somewhat likely a COVID-19 vaccine will be approved in the United States before its safety and effectiveness are fully understood" and that "[j]ust 32% of Black adults say they would definitely or probably get a COVID-19 vaccine, compared with 52% of White adults . . . .").

circumstances as threats, intimidation, or coercion");
Lovejoy-Wilson, 263 F.3d 208 (holding that the threat of legal
action could violate the prohibition on intimidation in the
Americans with Disabilities Act).

Likewise, the reference to credit card companies and
debt collection could instill fears that voters would face
adverse economic consequences if they exercised their right
to vote by mail. Courts have recognized that such economic
pressure may also be intimidating. See Beaty, 288 F.2d 657
(holding that the threat of eviction was unlawful
intimidation); Bruce, 353 F.2d 474, 476-77 (holding that
restricting an individual's access to his clients was
intimidating or coercive).

Here, that Plaintiffs did not immediately dismiss the
robocalls indicates that the broadcasted message was more
than mere hyperbole. In their affidavits, the Individual
Plaintiffs repeatedly attest that they were frightened and
enraged by the calls. In fact, both Winter and Steinberg
testified that they were so shaken by the threats these calls
posed that they no longer plan to vote by mail. (Winter Decl.
¶ 16; Steinberg Decl. ¶¶ 14-15.) Similarly, Sferes and
Steinberg, having outstanding medical debt and an old arrest

51

warrant, respectively, were both especially distressed by what appeared to be the prospect of future penalties.[25]

It is true that the robocalls were not themselves violent and are not as egregious as the physical acts of intimidation seen in some of the case law. But, as discussed above, "threats, intimidation or coercion may take on many forms." Beaty, 288 F.2d at 654. There is no requirement -- in the statutory text or the case law -- that intimidation be violent or physical. Cf. People Helpers Found., Inc., 781 F. Supp. at 1135 (explaining that "even if the acts of the [defendants] were not violent or illegal per se, they may still have constituted interference, intimidation, or coercion under [the FHA]").

Rather, as discussed above, subtle forms of voter intimidation are equally prohibited, and the robocalls share striking similarities with some of the nonviolent intimidation in the cases. For instance, in Daschle, the court concluded that conduct such as photographing license plates and speaking loudly about other Native American defendants

---

[25] The claims in the robocall were likewise not mere statements of opinion. Whether a statement is one of opinion or fact depends on the "content of the communication as a whole, its tone and apparent purpose." Davis v. Boeheim, 22 N.E.3d 999, 1005 (N.Y. 2014) (applying New York law). The use of the phrase "did you know" before the claims regarding how the recipients' personal information would be used was not "loosely definable" or "variously interpretable." See Ollman v. Evans, 750 F.2d 970, 980 (D.C. Cir. 1984). Viewing the content of the call as a whole, then, it is clear the statements were expressed as statements of fact rather than, as Defendants argue, statements of opinion.

who had been arrested for voter fraud constituted intimidation. Decision and Order at 2, Daschle, No. 4:04 Civ. 04177. Just as the defendants in Daschle instilled reasonable fears in Native American voters about facing legal trouble for voting, the robocalls here likely did and would inspire fear in reasonable voters, like Steinberg and Sferes, about being targeted by law enforcement or debt collectors if they vote by mail.

The robocalls are also akin to the letters the Ninth Circuit deemed likely intimidating in Nguyen. The letters in Nguyen targeted Latinos and warned about voters' information being transmitted to anti-immigration groups. 673 F.3d at 1265. The robocalls here target Black voters and warn about private information being shared with groups -- law enforcement, debt collectors, and the CDC -- that might realistically take adverse action against them. In short, like the letters in Nguyen, and the comments made by the Daschle defendants, the robocalls reasonably arouse fear in recipients about the consequences of voting by mail and thus are subtler, but no less potent, forms of intimidation.

The Court deems it highly relevant that this message was conveyed directly to individual voters by phone, that the speaker of the message was cast as a seemingly familiar figure, and that the language was designed to communicate

harms that "you" -- the individual who answered the phone -- will suffer. Although the content of the message was not individualized, it nonetheless bore many of the hallmarks of a personal communication. These features of the robocalls contribute to the Court's understanding of the communication as intimidating and distinguish it from statements made by pundits on television, candidates at political rallies, and commentators and public officials on social media. Additionally, that the message was falsely framed as originating from a "civil rights organization" lent gravity and a fake appearance of credibility to the warnings it conveyed.

The evidence and the precedent support the conclusion that the robocalls put the Individual Plaintiffs "in [reasonable] fear of harassment and interference with their right to vote." LULAC, 2018 WL 3848404, at *4. Furthermore, whether they were ultimately intimidated, threatened, or coerced does not undermine this analysis. Indeed, Section 11(b) also prohibits conduct that serves to intimidate, threaten, or coerce, and *attempts* to intimidate, threaten, and coerce in equal measure. See 52 U.S.C. § 10307(b).

Likewise, even if Section 11(b) contained an intent requirement -- which by its plain language it does not -- Plaintiffs would likely succeed in showing that Defendants'

conduct here was intentional. In early 2019, Wohl told USA
Today that he and Burkman were planning "ways to discredit
Democrats in the 2020 election" and "cause disarray."[26] A
draft of his "business plan" revealed that Wohl planned to
"disseminate false information about Democratic presidential
candidates to swing political betting markets."[27] No wonder,
then, that the robocalls reached recipients in urban areas
with significant minority populations who largely skew
Democratic.[28] Defendants' prior conduct and expressed goals,
together with the language of the robocall and its context,
provide strong support for a conclusion that Defendants
intended the robocall to harm Democrats by suppressing
turnout among Black voters. Furthermore, the natural outcome
of broadcasting the robocall message was voter intimidation,
and "normally" a person "is presumed to have intended the
natural consequences of his deeds." Washington v. Davis, 426
U.S. 229, 253 (1976) (Stevens, J., concurring).

For the reasons stated above, the Court concludes that
Plaintiffs have demonstrated a substantial likelihood of
success on their Section 11(b) claim. The Court further

---

[26] See supra note 2.

[27] See supra note 3.

[28] Trends in Party Affiliation Among Demographic Groups, Pew Research Ctr:
U.S.        Policy        &        Politics        (Mar.        20,        2018),
https://www.pewresearch.org/politics/2018/03/20/1-trends-in-party-
affiliation-among-demographic-groups/.

55

concludes that application of Section 11(b) to the conduct at issue in this case is fully consistent with the First Amendment because the robocall message was a true threat.[29]

## 2. The Ku Klux Klan Act

42 U.S.C. § 1985(3), a provision of the Ku Klux Klan Act of 1871 ("KKK Act"), reads in its entirety:

> *If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;* or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; *in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.*

---

[29] Even if the robocall were not a true threat, the Court would conclude that content-based speech restrictions imposed by the VRA and KKK, as interpreted above, are narrowly tailored to advance compelling government interests. See Burson v. Freeman, 504 U.S. at 198-99 (plurality) ("[A] State has a compelling interest in protecting voters from confusion and undue influence.").

41 U.S.C. § 1985(3) (emphases added). Section 1985(3) is comprised of multiple clauses. See Kush v. Rutledge, 460 U.S. 719, 726 (1983) (emphasizing that past precedent interpreted only "the first clause of [Section] 1985(3)"); see also Cady & Glazer, supra, at 203. The italicized portion, or the first clause of Section 1985(3), is commonly referred to as the "Equal Protection Clause," while the underlined portion is referred to as the "Support or Advocacy Clause." See Note, The Support or Advocacy Clause of 1985(3), 133 Harv. L. Rev. 1382, 1390-91 (2020). Though the vast majority of cases interpreting § 1985(3) pertain to the Equal Protection Clause, the Support or Advocacy Clause is the focus of the present case.[30]

Based on the statutory text, the elements of a Section 1985(3) claim brought for violations of the Support or Advocacy Clause include: (1) a conspiracy; (2) the purpose of

---

[30] One key distinction between the Support or Advocacy Clause and the Equal Protection Clause merits mention. The Support or Advocacy Clause created "a Federal right . . . to recover damages for interfering with Federal voting rights." Paynes v. Lee, 377 F.2d 61, 64 (5th Cir. 1967). The Equal Protection Clause, on the other hand, allows only for recovery for "deprivations of equal protection or equal privileges and immunities under the Fourteenth Amendment." See id. While the Equal Protection Clause thus requires a violation of a separate constitutional right, Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372 (1979), the Support or Advocacy Clause gives rise to an independent substantive right -- the right to vote and participate in voting-related activities. Accordingly, plaintiffs bringing claims under the Support or Advocacy Clause need not identify a violation of a separate constitutional right. See LULAC, 2018 WL 3848404, at *6.

which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections.[31]

### a. Conspiracy

As to the first requirement, the elements of a conspiracy under federal law are: "(1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an 'overt act' by one or more members of the conspiracy in furtherance of the conspiracy." United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002). A conspiracy "need not be shown by proof of an explicit agreement." Cine Sk8, Inc. v. Town of Henrietta, 507 F.3d 778, 792 (2d Cir. 2007) (internal quotation marks and citation omitted). However, "a plaintiff must demonstrate at least that parties have a tacit understanding to carry out the prohibited conduct." Id. (internal quotation marks and citation omitted).

### b. Intimidation and Threats

The Court has identified no authority indicating that the terms "intimidation" and "threat" bear a different

---

[31] This formulation differs slightly from the elements set forth in § 1985(3) cases in the Second Circuit. However, this is because those cases dealt with the Equal Protection Clause and not the Support or Advocacy Clause. See, e.g., Cine Sk8, Inc. v. Town of Henrietta, 507 F.3d 778, 792 (2d Cir. 2007) (internal quotation marks and citation omitted).

meaning in the KKK Act than they do in the VRA. The Court will therefore interpret these terms consistent with the discussion above in Section III.D.1.

    c.   No Animus Requirement

Unlike plaintiffs suing under the Equal Protection Clause of the KKK Act, plaintiffs suing under the Support or Advocacy Clause need not demonstrate that defendants acted with discriminatory, class-based animus. See Kush, 460 U.S. at 726 (rejecting the argument that the discriminatory animus requirement, which "arose under the *first clause* of [Section] 1985(3)," should be extended to the remaining portions of Section 1985 (emphasis added)).

    d.   Likelihood of Success on Plaintiffs' KKK Act Claim

Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim under the KKK Act, § 1985(3). For the reasons discussed below, all of the elements are likely satisfied here.

    i.   Conspiracy

There seems little doubt that Plaintiffs can prove a conspiracy. Both Wohl and Burkman have admitted to participating in the creation and distribution of the robocall message, indicating that the first element of conspiracy -- an agreement between two or more persons -- is met. The second element -- knowledge -- can be reasonably

inferred from the fact that the robocalls were placed from a number associated with Burkman and are sponsored by an organization founded by Wohl and Burkman, as well as from the fact that Wohl and Burkman have openly acknowledged engaging in efforts "to hurt Democrats." (Plaintiffs' Memorandum, at 17.) And finally, the placing of these calls demonstrates that the third element -- an overt act in furtherance of the conspiracy -- is met here.

### ii. Threat or Intimidation

Plaintiffs have demonstrated that they are likely to establish a threat or intimidation under the KKK Act for the same reasons discussed above with regard to threats and intimidation under the VRA. See supra Section III.D.1.

### iii. Target of the Conspiracy

Finally, the last element of a Support or Advocacy Clause claim is easily met here as well. There is little doubt that the robocalls targeted lawful voters who were planning to vote, either by mail or in person. As the affidavits of the Individual Plaintiffs establish, the robocall recipients are legally entitled to vote. (Winter Decl. ¶ 3; Steinberg Decl. ¶ 3; Hart Decl. ¶ 2; Wolff Decl. ¶ 3; Slaven Decl. ¶ 3; Kennedy Decl. ¶ 3; Daniel Decl. ¶ 3; Sferes Decl. ¶ 3; see also Ramsey Decl. ¶¶ 7, 9.) And mail-in voting is clearly a lawful, voting-related activity. See Paynes v. Lee, 377 F.2d

61, 64 (5th Cir. 1967) ("The right to be free from threatened harm and the right to be protected from violence for an attempted exercise of a voting right are no less protected than the right to cast a ballot on the day of election."). Thus, Plaintiffs have established a substantial likelihood that they will prevail on the merits of their Support or Advocacy Clause claim under § 1985(3).

E.   PUBLIC INTEREST

The Court has little trouble concluding that the public interest favors granting Plaintiffs' request for a temporary restraining order. Contrary to Defendants' contentions, their conduct is far from innocuous, and Plaintiffs' claims are far from "histrionic." (Opposition at 22.) No right is more sacred in a democracy than the right to vote freely. But if left unchecked, Defendants' conduct imperils this right, and with it, the very heart and constitutional foundation of this nation.

By disseminating a robocall message laden with falsity and ill purpose and dire effects, Defendants have not, as they claim, acted within the bounds of the First Amendment and engaged in mere political speech. Defendants intentionally reached into the homes of voters and raised the specter of arrest, financial distress, infirmity, and compulsory medical procedures. Not only did Defendants incite

61

fears of these grim consequences, but they baselessly tied the prospects to mail-in voting. The result cannot be described as anything but deliberate interference with voters' rights to cast their ballots in any legal manner they choose. And the intimidation of individual voters inflicts harm upon the broader public's interest in selecting elected officials through a free and fair process.

Finally, the Court rejects Defendants' argument that the public interest is not served by injunctive relief because "[t]he underlying statutes cited . . . by the Plaintiffs . . . were intended to curtail violence, menacing and intimidation of the kind employed by a violent secret society . . . in the [R]econstruction era South." (Opposition at 22.) The public's interests require that this Court take firm and swift action against all who intimidate voters -- hooded or not.

E.    FORM OF RELIEF

The VRA allows "for preventive relief, including an application for a temporary or permanent injunction, restraining order, or other order." 52 U.S.C. § 10308(d). The Court's authority to issue any "other order" includes the authority to order "whatever additional action is necessary to return individuals to their status quo ante" -- that is, the status quo before Defendants acted unlawfully --

including affirmative remedial action. See McLeod, 385 F.2d at 748-50.[32]

Here, Plaintiffs have made a strong showing that Defendants' conduct has induced fear about mail-in voting and deterred robocall recipients from exercising their right to do so. To that extent, Defendants have already inflicted significant harm not only on Plaintiffs, but on the nation's democratic institutions. "Of course, no court order can completely eradicate the effect of [Defendants'] actions." Id. at 749. But the Court "can and must . . . do all within its power to eradicate the effect of the unlawful [conduct] in this case." Id. at 750. Accordingly, restraining Defendants from engaging in further unlawful conduct would not suffice to undo the harm they have brought about in this case. In order to mitigate the damage Defendants have caused and thus endeavor to return the robocall recipients to the position they were in before Defendants placed those calls, the Court considers it necessary for Defendants to issue a message to all recipients of the robocalls informing them

---

[32] Even absent this statutory authorization, the Court has the power to order an affirmative act or mandate a specified course of conduct so long as Plaintiffs have demonstrated a clear or substantial likelihood of success on the merits. See Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (internal quotation marks and citation omitted); Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc., 454 F. Supp. 2d 64, 68 (E.D.N.Y. 2006) (internal quotation marks and citation omitted). As discussed previously, Plaintiffs have demonstrated a substantial likelihood of succeeding on their VRA and KKK Act claims.

about this Court's finding that Defendants' original message contained false statements that have had the effect of intimidating voters, and thus interfering with the upcoming presidential election, in violation of federal voting-rights laws.[33]

## IV. ORDER

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that Plaintiffs' motion for a temporary restraining order (Dkt. No. 12) is **GRANTED**; and it is further

**ORDERED** that, sufficient reason having been shown therefore, pursuant to Rule 65 of the Federal Rules of Civil Procedure, Defendants are temporarily restrained, pending a hearing on Plaintiffs' motion for a preliminary injunction, from engaging in, or causing anyone else to engage in, robocalls or similar forms of communications sent directly to multiple recipients (such as text messaging), without prior

---

[33] The Court is aware that defendants Wohl and Burkman face the following bail condition in their pending Michigan case: "Neither defendant is to initiate, or cause anyone else to initiate, any robocalls or other communications directed at multiple recipients until November 4, 2020." See CTRM 134 36th District Court, *36thDC134,* YouTube (Oct. 8, 2020), https://www.youtube.com/watch?v=X8KUAWLGbZA. The Court is not persuaded that this condition was intended to prohibit the type of remedial messaging envisioned by the present Order. To the extent there is a conflict between the bail condition and this Court's Order, however, it is the Court's understanding that when "[f]aced with conflicting orders -- one issued by a federal court to implement the Constitution, and the other issued by a state court as a matter of state practice," the federal court order takes precedence under "the priority prescribed by the Constitution" through the Supremacy Clause. See Madej v. Briley, 370 F.3d 665, 667 (7th Cir. 2004).

written express consent of each recipient or approval of this Court, through at least November 3, 2020; and it is further

**ORDERED** that Defendants shall send, or authorize an appropriate third party to send, a robocall message (the "Curative Message") informing the recipients of the original robocall message discussed in this Decision and Order (the "Prior Robocall") of this Court's findings regarding that call. The Curative Message shall be issued to all recipients of the Prior Robocall and shall state only the following: "At the direction of a United States  district court, this call is intended to inform you that a federal court has found that the message you previously received regarding mail-in voting from Project 1599, a political organization founded by Jack Burkman and Jacob Wohl,  contained false information that has had the effect of intimidating voters, and thus interfering with the upcoming presidential election, in violation of federal voting-rights laws."; and it is further

**ORDERED** that by Thursday, October 29, 2020 at 5:00 p.m., Defendants shall produce records sufficient to demonstrate compliance with the preceding paragraph of this Order. In the event Defendants fail to do so, the Court will hold a hearing on Friday, October 30, 2020 at 10:00 a.m. to review the status of Defendants' compliance with this Order and give Defendants an opportunity to show cause why they should not be held in

contempt of court for any noncompliance the Court finds. At that time the Court will also authorize Plaintiffs to take appropriate steps to distribute the Curative Message to the recipients of the original robocall, with Defendants to pay Plaintiffs' reasonable costs and fees as assessed by the Court; and it is further

**ORDERED** that Defendants shall keep records of each such communication discussed in the previous paragraphs of this Order (including a copy of the communication, the name and contact information of each person contacted, the content of the message, any consents obtained, and the date and time of the communication) until the conclusion of this litigation or the expiration of this Order, whichever is earlier.

**SO ORDERED.**

Dated:     New York, New York
           28 October 2020

                                        Victor Marrero
                                        U.S.D.J.

66



# GERSTMAN SCHWARTZ LLP

### ATTORNEYS AT LAW

October 29, 2020

**VIA CM/ECF & EMAIL**
The Honorable Victor Marrero (chambersnysdmarrero@nysd.uscourts.gov)
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

  Re: *National Coalition on Black Civil Participation et al. v. Wohl et al.*, United States
    District Court, Southern District of New York, Case No. 1:20-cv-08668

Dear Judge Marrero:

  We write on behalf of the Defendants Jacob Wohl, Jack Burkman, J.M. Burkman &
Associates, LLC, and Project 1599 (collectively, "Defendants") in the above-referenced matter to
address Your Honor's Orders dated October 28, 2020 and October 29, 2020 (collectively, the
"Orders"), respectively.

  Respectfully, and without relitigating the merits of Your Honor's Orders, there are several
logistical constraints preventing Defendants' from being able to fully comply with these Orders
by the Court's 5:00 p.m. deadline.

  After conferring with Scott Grabel, Defendant Mr. Burkman's Michigan criminal counsel,
he has taken the position that although the Michigan court has modified its Order to allow for
compliance with this Court's Orders, we have no such forbearance from the Ohio court at this
time. Therefore, Mr. Grabel's position remains that any robocall, including a retraction, could
potentially violate the Ohio criminal court's directives and he will therefore not advise his client
to do so. In addition, Mr. Grabel believes that such would be wholly violative of his clients' Fifth
and Sixth Amendment rights, effectively amounting to his clients being forced engage in an
allocution in advance of Michigan and Ohio criminal trials, thereby undermining a host of criminal
defenses available to our clients. On information and belief, based on a conversation had with Mr.
Grabel, Mr. Wohl's counsel concurs with this assessment.

  With candor, we have been hampered in interacting with our clients all day because they
are in a hearing in Michigan's 36th District Court, which remained ongoing until approximately
4:30 p.m.

  Even if Defendants were able to adhere to this Court's Orders, all of the data necessary to
effectuate a remedial robocall is currently in the possession of Robert Mahanian of Messaging
Communications. Due to the ongoing criminal matter, upon information and belief, Mr. Mahanian

---

**GERSTMANSCHWARTZ.COM**



has been advised by his own attorney to refrain from speaking with Defendants. Additionally, upon information and belief, Mr. Mahanian advised our clients in August 2020 that, as a member of the USTelecom, he and Messaging Communications are no longer willing or able to speak to them. Moreover, insofar as Mr. Mahanian is a potential witness in the criminal matter, any attempt by Defendants to contact him would be tantamount to witness tampering and could jeopardize their criminal defense for various and sundry reasons. Thus, Mr. Grabel has advised his clients to refrain from any such communications (note that the Michigan 36th District Court did not amend its Order to permit Defendants to speak to Mr. Mahanian or Messaging Communications). Nor should Defendants be placed in this catch-22 position.[1]

Respectfully, without admitting culpability, and notwithstanding the constitutional and logistical arguments raised herein and in our prior submissions, insofar as your Honor has determined that the statement at issue is false and has fashioned a remedial measure, based on information provided in discovery to the Michigan's 36th District prosecutors' office, while evidently showing that approximately 85,309 phone numbers were fed into the robocall company's dialer, and that only approximately *5,812* of these calls actually made a connection to either an answering machine or a live person. The remaining approximately 79,497 numbers made absolutely no connection to any human being or answering machine whatsoever.

Even assuming, *arguendo*, Defendants were able to comply with Your Honor's Order without the legal, constitutional and/or logistical constraints and implications addressed herein and prior hereto, and even were Defendants allowed to interact with Mr. Mahanian and/or Messaging Communications directly, requiring that these calls be placed again would not as a matter of course reach the same 5,812 answering machines or live persons reached originally. This is not logistically how robocall dialers work. This has the potential to cause mass confusion because many of these new recipients had never received the initial call. Instead, an entirely different universe of people would receive a remedial corrective call to which they are a stranger, or which is beyond recollection (recall that the original calls were effectuated months ago, in August 2020). A call about a federal court decision so close to an election might have unintended consequences.

Accordingly, and respectfully, Your Honor's Orders would effectively influence prospective witnesses insofar as Defendants' respective criminal attorneys might attempt to contact the approximately 5,812 potential witnesses who were the recipients of these robocalls to determine, among other things, how they received the call and whether they were actually affected

---

[1] Notably, *Madej v. Briley*, 370 F.3d 665, 667 (7th Cir. 2004), the Seventh Circuit case respectfully cited to by Your Honor referencing a conflict between a federal court order and a state court order is distinguishable from the case at hand insofar as that involved criminal cases. The instant conflict warranting a stay involves a federal civil case and two state criminal indictments arising out of the same nucleus of operative facts. Here, civil injunctive relief and monetary damages cannot compare to imperiled liberty interests.



by it in any way. This could adversely affect witnesses or even impact potential jury pools making it impossible for our clients to receive a fair trial in Michigan or Ohio.

Your Honor's directive would have the net effect of informing these prospective witnesses how to testify if called upon to do so; that is, because a federal judge already made a determination that they might not have otherwise agreed with, particularly considering the context of the robocall, which is prefaced in part by a question: *i.e.*, "but did you know that if you vote by mail, your personal information will be part of a public database that will be used by police departments to track down old warrants and be used by credit card companies to collect outstanding debts?" *See, e.g.*, *Bulger v. Woods*, 917 F.3d 471 (6th Cir. 2019) (finding that a question mark leaves open the possibility that reasonable readers would interpret statement as a mere inquiry signaling the speaker's lack of certainty and inviting others to reach their own conclusions).

Without rehashing our contentions in their entirety, our clients are not in any way contemptuous of your Orders; however, given the significant liberty interests at stake and the advice of their criminal defense counsel, our clients find themselves between a rock and a hard place.

We would note that Your Honor has indicated a willingness to consider further requests from Defendants for alternative forms of relief. We are more than willing to discuss same at tomorrow's hearing.

Respectfully Submitted,

/s/ *David M. Schwartz*

/s/ *Randy E. Kleinman*

cc:     All counsel of record (via ECF)

**Full docket text:**

Minute Entry for proceedings held before Judge Victor Marrero: Telephone Conference held on 10/30/2020. The Court held a second hearing to review the status of Defendants' compliance with its October 28, 2020 Decision and Order (Dkt. No. 38) and to give Defendants an opportunity to show cause why they should not be held in contempt of court for any noncompliance. Aaron Gold and Rachelle Navarro present for Plaintiffs, David Schwartz, Randy Kleinman, and Scott Grabel present for Defendants. Court reporter present. The Court determined that Defendants would be in substantial compliance with its October 28, 2020 Decision and Order upon issuance of calls to all recipients of the prior robocalls stating: "At the direction of a United States district court, this call is intended to inform you that a federal court has found that the message you previously received regarding mail-in voting from Project 1599 contained false information that has had the effect of intimidating voters, and thus interfering with the upcoming presidential election, in violation of federal voting-rights laws." Defendants are instructed to provide an update, by no later than 3:00 p.m. today, on the steps they have taken by then to distribute that message to the recipients of the prior robocalls. (ksp)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/07/2023 16:35:53 | | | |
| **PACER Login:** | DSMSecondCir | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 1:20-cv-08668-VM-OTW |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |



# GERSTMAN SCHWARTZ LLP
A T T O R N E Y S   A T   L A W

October 30, 2020

**<u>VIA CM/ECF & EMAIL</u>**
The Honorable Victor Marrero (chambersnysdmarrero@nysd.uscourts.gov)
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

   Re: *National Coalition on Black Civil Participation et al. v. Wohl et al.*, United States
   District Court, Southern District of New York, Case No. 1:20-cv-08668

Dear Judge Marrero:

   We write on behalf of the Defendants Jacob Wohl, Jack Burkman, J.M. Burkman &
Associates, LLC, and Project 1599 (collectively, "Defendants") in the above-referenced matter to
update the Court regarding the status of Defendants' compliance with Your Honor's Order issued
today at approximately 1:30 p.m. (the "Order").

   Defendants retained the services of DialMyCalls, which has now completed the process of
calling "all recipients of the prior robocalls stating: 'At the direction of a United States district
court, this call is intended to inform you that a federal court has found that the message you
previously received regarding mail-in voting from Project 1599 contained false information that
has had the effect of intimidating voters, and thus interfering with the upcoming presidential
election, in violation of federal voting-rights laws.'" Please see the enclosed Robocall Vendor
Confirmation.

   Accordingly, Defendants are in full compliance with the Court's Order.

        Respectfully Submitted,

        /s/ *David M. Schwartz*

        /s/ *Randy E. Kleinman*

encl: Robocall Vendor Confirmation

cc:  All counsel of record (via ECF)

**GERSTMANSCHWARTZ.COM**

1399 Franklin Avenue, Suite 200, Garden City, N.Y. 11530 OFFICE: 516.880.8170 FAX: 516.880.8171

Case 1:22-cv-00859-JSR   Document 106-46   Filed 07/26/23   Page 99 of 128

 **DialMyCalls**.com

**Need Help? Call Us!**
**(800)928-2086**

## Call Broadcast Confirmation

This is your confirmation of the broadcast sent from your DialMyCalls account. To view the report of the call blast please login to your account and click the reports tab. Broadcast reports are generated within 5 minutes after all of the calls are sent.

| | |
|---|---|
| **Confirmation #:** | DC23441751 |
| **Recording To Send:** | RoboCall [0:23] |
| **Contacts To Send To:** | 29,117 Unique Phone Numbers |
| **Caller ID:** | (202) 795-3213 |
| **Total Credits:** | 29,117 |
| **Time & Date:** | Immediately |

## New Features You Might Not Know About...

We're constantly adding new features to DialMyCalls. If you have an idea for a way for us to improve our service we'd love to hear from you, please contact us and we'll see what we can do about adding it in.

 **IPhone & Android Apps**
Now you can access your DialMyCalls account using our app available on the iPhone and Android platform.

 **View & Print Invoices**
We store all your old invoices and receipts in the control panel. Simply login any time and print or save them out.

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
NATIONAL COALITION ON BLACK CIVIC  :
PARTICIPATION, et al.              :
                                   :
                  Plaintiffs,      :
                                   :
     - against -                   :
                                   :
JACOB WOHL, et al.                 :
                                   :
                  Defendants.      :
-----------------------------------X
```

┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:_____       │
│ DATE FILED: 10/30/2020      │
└─────────────────────────────┘

20 Civ. 8668 (VM)

**ORDER**

**VICTOR MARRERO, United States District Judge.**

On October 30, 2020, the Court held two hearings on the status of Defendants' compliance with its October 28, 2020 Decision and Order ("October 28 Order," Dkt. No. 38). During the second hearing on this issue, the Court directed Defendants to provide it with a status update of Defendants' compliance by 3:00 p.m. In response, Defendants submitted a letter stating that Defendants had retained the services of DialMyCalls, which had completed the process of calling all recipients of the prior robocalls and issuing the message authorized by the Court during the second hearing (the "Curative Message"). (See Dkt. No. 48.) Defendants represent that they are in full compliance with the Court's October 28 Order. (See id.)

The Court finds that Defendants' submission is insufficient to determine their compliance with its October 28 Order. For instance, Defendants' supporting documentation

does not indicate the content of the message transmitted. In addition, although the documentation reflects that calls were placed to 29,117 recipients, it is unclear what group the 29,117 recipients reflects. Previously, Defendants asserted that the robocall message discussed in the October 28 Order (the "Prior Robocall") reached approximately 85,309 numbers, and of that number, 5,812 calls made contact with an individual or voicemail system. (Dkt. No. 43.)

Furthermore, it is not apparent from Defendants' supporting documentation whether Defendants are in compliance with the record-keeping provision of the October 28 Order, which requires Defendants to maintain records "including a copy of the communication, the name and contact information of each person contacted, the content of the message, any consents obtained, and the date and time of the communication." (Dkt. No. 38.)

Accordingly, Defendants are directed to, by no later than Saturday, October 31, 2020 at 3:00 p.m., explain the discrepancy between the 29,117 recipients of today's call and the 85,309 numbers previously called; comply with the record-keeping provision of the October 28 Order; provide documentary evidence sufficient to show the contents of the message transmitted; and provide documentary evidence sufficient to demonstrate that the recipients of today's call

2

-- that is, the Curative Message -- were the recipients of the Prior Robocall.

**SO ORDERED:**

Dated:    New York, New York
          30 October 2020

Victor Marrero
U.S.D.J.

3



November 1, 2020

<u>By ECF and Email</u>

Honorable Victor Marrero
United States District Court for the Southern District of New York
500 Pearl St.
New York, New York 10007-1312

**Rachelle Navarro**

**E** rnavarro@orrick.com
**D** +1 212 506 5348
**F** +1 212 506 5151

Re: National Coalition on Black Civic Participation, et al. v. Wohl, et al. (20-cv-8668)

Dear Judge Marrero:

We write in response to Defendants' October 31, 2020 letter explaining their compliance with this Court's order to disseminate the curative robocall. *See* ECF No. 50. Assuming Defendants followed the process and procedures laid out in their letter, Plaintiffs have no objection to the manner in which Defendants have sought to comply with the Court's order.

Respectfully submitted,

/s/

Rachelle Navarro

cc: David Schwartz, Esq. (by ECF and email)
Randy Kleinman, Esq. (by ECF and email)

KAQKNATM

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
3  NATIONAL COALITION ON BLACK
   CIVIC PARTICIPATION, et al.,
4
              Plaintiffs,
5
                  v.                    20 CV 8668 (VM)
6                                        Telephone Conference
   JACOB WOHL, et al.,
7
              Defendants.
8
   ------------------------------x
9                                        New York, N.Y.
                                         October 26, 2020
10                                       9:00 a.m.
11 Before:
12                  HON. VICTOR MARRERO,
13                                       District Judge
14                       APPEARANCES
15 ORRICK HERRINGTON & SUTCLIFFE LLP
        Attorneys for Plaintiffs
16 BY:  RACHELLE MARIE NAVARRO
17 LAWYERS' COMMITTEE FOR CIVIL RIGHTS
        Attorneys for Plaintiffs
18 BY:  JOHN LIBBY
19 JACOB WOHL, Pro Se Defendant
20 JACK BURKMAN, Pro Se Defendant
21
22
23
24
25

```
 1                    (The Court and all parties appearing telephonically)
 2               THE COURT:   Good morning.  This is Judge Victor
 3     Marrero.
 4               This is a proceeding in the matter of National
 5     Coalition on Black Civic Participation and others against Wohl
 6     and others.  It's Docket No. 20 CV 8668.
 7               Do we have a reporter on the line?
 8               (Pause)
 9               THE COURT:   The Court scheduled this proceeding on the
10     filing by plaintiffs of this action seeking a temporary
11     restraining order and permanent injunction prohibiting the
12     defendants from engaging in telephone communications designed
13     to intimidate voters from participating in the presidential
14     election scheduled next week.
15               Would counsel please enter your appearances for the
16     record.
17               MS. NAVARRO:   Good morning, your Honor.  This is
18     Rachelle Navarro, of Orrick Herrington & Sutcliffe.  And also
19     on the phone for the plaintiff, you have Mr. John Libby, of the
20     Lawyers' Committee for Civil Rights.
21               MR. LIBBY:   Good morning, your Honor.  John Libby
22     here.
23               THE COURT:   Good morning.  Thank you.
24               MR. BURKMAN:   Your Honor, this is Jack Burkman.
25     Unfortunately, we have not yet been able to secure counsel.  We
```

1   did yesterday, and counsel will be available tomorrow.  We only

2   had two days, so I am just here speaking for myself pro se this

3   morning.  We were served with this lawsuit last week, and we

4   tried to get counsel as fast as we could.  Thank you.

5       MR. WOHL:  This is Jacob Wohl here.  I would basically

6   second everything that Jack just brought up.

7       THE COURT:  Mr. Burkman and Mr. Wohl, can you indicate

8   what efforts you made to seek counsel and any particular

9   prospect that counsel would be available?

10      MR. BURKMAN:  Yes, your Honor.  We have secured

11  counsel by the name of David Schwartz.  I believe we were

12  served with this lawsuit Thursday.  I can't remember exactly.

13  We rushed as fast as we could to get a lawyer, and we have

14  secured him as of yesterday, and he will be available on the

15  case literally within 24 hours or so.  We moved as fast as we

16  could.

17      THE COURT:  All right.  I thank you.

18      Can you give me some particulars about who Mr. David

19  Schwartz is?

20      MR. BURKMAN:  He is a litigator, he is a civil

21  litigator in New York City, I think a fairly well-known civil

22  litigator in New York City, and we have retained him.

23      THE COURT:  All right.  Thank you.

24      In light of that, we're going to proceed since we have

25  a record in the hearing.  The transcript will be available to

1   the defendants and Mr. Schwartz, so let us proceed in the

2   meantime.

3           I will give the plaintiffs a minute initially to make

4   their case, and I will give the defendants each an equal amount

5   of time to present their case pro se, and I will give them an

6   opportunity to supplement whatever they indicate now by

7   submission by Mr. Schwartz not later than close of business

8   tomorrow.

9           All right, Ms. Navarro.

10          MS. NAVARRO:  Thank you, your Honor.  And just as a

11  matter to clarify the record, defendants, Mr. Burkman and

12  Mr. Wohl, were served on Wednesday of last week, not Thursday.

13          Your Honor, first, we want to thank you on behalf of

14  the plaintiffs, many of which are on the phone.  We want to

15  thank you for holding a prompt hearing on this issue.  We are

16  here today asking this court for your help.  We're here asking

17  you to protect what the Supreme Court has called the most

18  precious right, the right to vote, free of intimidation and

19  free of interference.

20          In this case, the defendants disseminated a robocall

21  to over 85,000 people.  This robocall contained three blatant

22  lies designed to dissuade people from using mail-in voting.

23  These three lies are that the police will use the voters'

24  identifying information to execute outstanding police warrants,

25  that credit cards will use the information to collect on

1   outstanding debts, and that the CDC will use the information to
2   pursue forced vaccinations.

3        Defendants have targeted these robocalls to areas with
4   high populations of black residents. And it's important, your
5   Honor, that the lies that are included in the robocalls feed on
6   very real fears that exist in the black community. The
7   robocall is intended to intimidate voters, and, indeed, it has
8   intimidated voters, and it's also caused organizations, like
9   Plaintiff National Coalition, to divert resources in order to
10  respond.

11       Your Honor, we did our best to lay out our arguments
12  in the papers, and I don't want to rehash them for you, but we
13  do think there are three very important points that must be
14  emphasized.

15       The first, your Honor, is that the defendants'
16  behavior here is the most offensive kind. Not only does the
17  robocall contain blatant lies about mail-in voting that stir up
18  racist tropes, but the defendants are sending this robocall at
19  a moment when the country is navigating the worst and most
20  deadly pandemic it has seen in over a hundred years.

21       So what does that mean tactically? It means that if
22  voters are intimidated out of voting by mail because of this
23  robocall, they either have to vote in person, potentially
24  exposing themselves to COVID-19, or not vote at all.

25       Second, the intimidating effect of these robocalls is

SOUTHERN DISTRICT REPORTERS, P.C.

1    not just conjecture. The effect is very real. And in

2    considering this motion, I ask the Court to remember our

3    plaintiffs. Let's take plaintiffs, Mary Winter and James

4    Steinberg, for example. As Ms. Winter and Mr. Steinberg laid

5    out in their declaration, they live in a county where COVID-19

6    cases have been on the rise. And, as such, in an effort to

7    protect themselves and their loved ones, they have always said

8    that they were going to vote by mail. But then they received

9    this call, this hateful call. And even though both Ms. Winter

10    and Mr. Steinberg, they know this robocall is a hateful lie,

11    they still found this robocall to be so intimidating, that it

12    has completely undermined their confidence in mail-in voting,

13    and now they will be voting in person.

14        This is the effect that the robocalls have had on

15    people who know it's a lie, so we can just imagine the effect

16    the robocall will have on all these other recipients of the

17    robocalls who don't realize that.

18        Real harm has also been caused to organizations like

19    Plaintiff National Coalition on Black Civic Participation.

20    This organization, an organization whose resources are already

21    stretched and who are serving underrepresented communities,

22    they were forced to divert these resources from the regular

23    mission to respond and counter these deceptive robocalls. This

24    injury is not conjecture, it is real.

25        Third, and lastly, your Honor, it is almost certain

1   that if defendants are not enjoined, they will continue to

2   engage in voter intimidation.  Defendants have a long history

3   of perpetrating fraudulent schemes, and these fraudulent

4   schemes are designed to disrupt elections.  We laid out in our

5   papers the long history the defendants have.

6        You've read the examples, your Honor.  Over the last

7   couple of years, they have encouraged or paid multiple

8   individuals to falsely allege sexual assault against various

9   different public figures.  Just a few months ago, they went on

10  Craigslist and hired actors to play FBI agents to stage a raid

11  on Mr. Burkman's house, and then alleged that the government

12  was retaliating against them.

13       The defendants are fraudsters, your Honor.  Frankly,

14  they have made being a fraudster their full-time job these last

15  couple of years.  And this behavior, this behavior of

16  perpetrating fraudulent schemes, is consistent with their

17  stated goal.  Defendants have publicly admitted that they are

18  engaged in an all-out assault to disrupt the election.  Last

19  year, when they sought funding for organization, they said they

20  planned to make stuff up in order to suppress the votes.  And

21  as we get closer to the election, your Honor, the more relevant

22  and potentially more effective this strategy of disrupting the

23  election becomes.  It must be stopped.

24       So, for these reasons and the reasons laid out in our

25  brief, we would ask the Court to enjoin the defendants from

1　further violations of the law and also enjoin them from sending

2　out any other robocalls or other mass communications until

3　after the election.

4　　　　　Thank you, your Honor.

5　　　　　THE COURT:  All right.  Thank you, Ms. Navarro.  A

6　couple of questions.

7　　　　　Do plaintiffs have a complete list and contact numbers

8　of the individuals who were targeted to receive the defendants'

9　robocalls?

10　　　　　MS. NAVARRO:  Just for clarity, do we have a complete

11　list of the 85,000 recipients?

12　　　　　THE COURT:  Yes.

13　　　　　MS. NAVARRO:  We do not, your Honor.  We do

14　understand, and as laid out in our papers, the Michigan A.G.'s,

15　Attorney General's, Office does have an active criminal

16　investigation.  The robocalls were sent through a company

17　called Message Communications.  Discovery is ongoing in that

18　case, and I imagine that the Michigan Attorney General's Office

19　probably does have that list from Message Communications.

20　　　　　THE COURT:  Thank you.

21　　　　　With reference to the proceeding in Michigan, do

22　plaintiffs have any indication whether the defendants engaged

23　in any form of robocalls or other communication to plaintiffs

24　or other individuals like plaintiffs following the order by the

25　Michigan court in that case?

1       MS. NAVARRO:  This is Rachelle Navarro again.

2       Your Honor, I understand for you to be asking whether

3   we have reason to believe that defendants have perhaps violated

4   their bail conditions.  One of the bail conditions of the

5   Michigan court was that defendants not engage in sending out

6   any other mass communications.

7       We have no direct evidence, your Honor.  I will note

8   that I believe at the last proceeding, on October 15th, the

9   Court did raise concerns that they had received indications

10  that Defendant Wohl, Mr. Wohl, has potentially violated the

11  order, but they're still running down that evidence.

12      If I may, your Honor, also, we recognize that there is

13  this Michigan bail condition in place, but we do not believe

14  that the conditions imposed by the court as part of the bail

15  package in Michigan are sufficient to protect the voters, and

16  we believe this for a couple of reasons.

17      First, your Honor, there's no guarantee that the bail

18  condition ordering Mr. Burkman or Mr. Wohl not to engage in

19  further mass communications will stay in place.  Bail

20  conditions do change, and plaintiffs and other voters have no

21  control over this.  And the Michigan court also has

22  jurisdictional limits on enforcement, right?  The Court has no

23  way to address substantive voter intimidation that occurred

24  outside of Michigan other than the relief available to it for

25  violations of bail.  And the Michigan order does not reach the

1   entity defendants -- does not reach the entity defendants

2   either.   This TRO seeks to bind entity defendants and others

3   who may be working with Mr. Burkman and Mr. Wohl.

4        Also, your Honor, we only know of robocalls.  We only

5   know of actions by Mr. Wohl and Mr. Burkman if they are

6   reported to us.  All we know -- we do know - and Mr. Wohl and

7   Mr. Burkman have stated - that it is their goal to suppress the

8   vote, that it is their goal to disrupt the election.  We know

9   that.  We just don't know what other schemes they have embarked

10  on to do so because we only know what is reported to us.

11        The last thing I'll say, your Honor, on this point --

12  and I think this is important -- there are only nine days left

13  to the election.  There is no reason to believe that defendants

14  won't continue to engage in their efforts to intimidate voters,

15  and for the reasons I just said, I think there's every reason

16  to believe that defendants will continue.  They have a long

17  history of perpetrating fraud and have publicly repeatedly

18  stated their intentions to interfere with the election.

19        And I think plaintiffs here and, frankly, voters

20  everywhere, have a right to vote free of intimidation that is

21  caused by the defendants' fraudulent schemes.

22        THE COURT:  All right.  Thank you very much.

23        Let me then turn to the defendants and allow you an

24  opportunity to say anything you may wish to say on your behalf

25  in response to the plaintiffs' allegations.

1          Mr. Burkman?

2          MR. BURKMAN:   Thank you, your Honor.

3          Well, I would just say, first of all, we have no plans

4   to do any -- will not be doing any robocalls and, frankly, no

5   electioneering between now and Election Day.   That much, I can

6   say for sure.

7          Secondly, we strongly believe that the bail order of

8   the Michigan judge is unconstitutional and that it violates the

9   First Amendment.

10         Thirdly, I would say, just even a cursory look at the

11  case law, I don't believe any federal judge has ever given an

12  order like the one that Ms. Navarro is requesting today in the

13  Southern District or anywhere in the United States.   I think it

14  would be completely entirely without precedent.

15         Fourth, I would say, of course, we deny the

16  plaintiffs' claims.   We believe they're baseless and without

17  any foundation.   The plaintiff really hangs her claims on a

18  statute called the Ku Klux Klan Act, which is a statute from

19  150 years ago, which has never been used for this purpose or

20  any purpose even close to it.

21         Fifth, we would suggest that none of the plaintiffs

22  have any standing in this case.

23         So just to go down this long list, I mean, I don't

24  want to use the word absurd, and I don't want to succumb to

25  hyperbole, but I really think this is about as far-fetched as

1    anything could possibly be.  And I would ask -- if you would, I

2    would ask if Mr. Wohl has anything to add.

3              THE COURT:  Let me --

4              MR. WOHL:  Yes.

5              THE COURT:  Before Mr. Wohl speaks, Mr. Burkman, I

6    will ask just a couple of questions, and I will ask the same

7    questions to Mr. Wohl.

8              MR. BURKMAN:  Sure.

9              THE COURT:  You deny and claim that the plaintiffs'

10   allegations have no basis.  Did you or anyone that you are

11   affiliated with prepare the robocalls and cause them to be

12   sent?

13             MR. BURKMAN:  Well, I would suggest -- the call in

14   question, your Honor, what I would suggest to you, first of

15   all, we believe it's true on its face.

16             Secondly, we believe --

17             THE COURT:  Mr. Burkman, my question was not whether

18   they're true or false right now.  My question was whether you,

19   acting alone or with anyone else, prepared that message and

20   caused it to be sent?

21             MR. BURKMAN:  Oh, yes, your Honor, yes.  That is our

22   call, yes, yes.

23             THE COURT:  You don't deny that you caused this call

24   to be made and that you --

25             MR. BURKMAN:  No.

1          THE COURT:  -- don't deny the content of it?

2          MR. BURKMAN:  No, your Honor, we do not.

3          THE COURT:  Thank you.

4          Second question:  Do you have in your possession or

5    through an agent, like the entity that Ms. Navarro referred to

6    before, that has the contacts, the individuals to whom your

7    call was directed?

8          MR. BURKMAN:  In my -- I do not have in my possession.

9    I do not know what that entity in California has in its

10   possession.  Obviously, there are sensitivities.  One of the

11   things we'll probably be asking for in this case is a stay

12   pending the resolution of the criminal case in Michigan.  So I

13   don't know what they would have in California.

14         THE COURT:  Well, when you prepared the robocall and

15   presumably had it transmitted to the entity in California, did

16   you have instructions to them as to what they should do with

17   the content of the robocall?

18         MR. BURKMAN:  Yes, as to the content, yes, we did,

19   yes.

20         THE COURT:  You told them what to do with it?

21         MR. BURKMAN:  Well, in terms of what to do with it,

22   you mean what the content of the call would be?

23         THE COURT:  No.  What they should do with the content

24   of the call that you directed them to do something with.  Did

25   you ask them to forward that robocall to anyone, to plaintiffs

                    SOUTHERN DISTRICT REPORTERS, P.C.

KAQKNATM

1  in particular?

2          MR. BURKMAN:  To the plaintiffs?  Well, a robocall

3  call is sent out, it's sent out to various zip codes in various

4  places.  So it's a random -- any robocall is kind of a random

5  distribution to various people in various places.

6          THE COURT:  That is my question.  Did you give

7  instructions to that entity to send the --

8          MR. BURKMAN:  Well, yes, of a kind, yes, in the way

9  that any robocall would have instructions, yes, correct.  Yes.

10         THE COURT:  All right.

11         And did you indicate to them any guidelines as to

12  where the call should be directed in particular, any

13  particular --

14         MR. BURKMAN:  Your Honor, honestly, I would have to

15  consult -- it's been a while.  I would have to consult notes

16  and such.  To answer that fully, I'd have to consult.

17         THE COURT:  All right.

18         MR. BURKMAN:  I don't have all of that at the ready.

19         THE COURT:  Thank you.

20         Let me, then, ask Mr. Wohl if he wishes to make any

21  statement?

22         MR. WOHL:  Yes, your Honor.

23         I would second everything that Mr. Burkman just

24  pointed out.  I would also say, and I would stress the point,

25  that there are no robocalls underway.  There have not been any

SOUTHERN DISTRICT REPORTERS, P.C.

1  robocalls underway since the beginning of any sort of legal

2  proceedings in Michigan, and that what we believe that this is,

3  is not an effort to stop robocalls -- no one, least of all the

4  plaintiffs, and no one else has alleged that any robocalls have

5  taken place since the proceedings began in Michigan. So what

6  this represents is an effort not to stop robocalls, but to

7  stifle our constitutionally protected political speech.

8       And as to Ms. Navarro's mention of the bail conditions

9  in Michigan and the like, that was examined by the court.

10  There was another hearing since the one that she referenced,

11  and everything is all in good standing as it relates to bail

12  conditions in Michigan.

13       So that's what I would conclude with, your Honor.

14       THE COURT: All right. Thank you.

15       Mr. Wohl, you indicated that you echo all of what

16  Mr. Burkman said. Does that include acknowledgment that you

17  participated in the preparation of the content of the message

18  and its communication to plaintiffs through the entity in

19  California?

20       MR. WOHL: Yes, your Honor, as to Mr. Burkman's

21  specific representation, yes, yes.

22       THE COURT: All right. Thank you.

23       Now, let me ask both Mr. Burkman and Mr. Wohl whether

24  they have specific facts or evidence that the voter information

25  that voters submit if they mail in ballots is, in fact, being

SOUTHERN DISTRICT REPORTERS, P.C.

1   made available either to law enforcement agents, to credit card

2   companies, or to the CDC for the purpose of forced vaccination.

3   On what specific evidence or facts do you base your statement

4   that those representations are not false?

5             MR. WOHL:  This is Mr. Wohl here, if I could begin.

6             No one has ever made the claim, until now, presumably,

7   that voter records, particularly in the State of Michigan, are

8   not part of the public record.  Of course, they're part of the

9   public record.  And, in fact, in the State of Michigan, not

10  just law enforcement, not just credit card companies, but, in

11  fact, any person can walk into the clerk's office, and without

12  even filling out a Freedom of Information Act request and, in

13  fact, a much simpler, much more abbreviated request, they can

14  obtain the information belonging to voters.

15            In the Michigan case in particular, law enforcement

16  proved this was true, as we've recently learned in discovery,

17  because Michigan law enforcement requested the voter records of

18  individuals.  It did not require a subpoena, it did not require

19  a warrant because, of course, that is public information.  So

20  there is no question as to whether or not voter records are

21  public information that can be accessed by law enforcement.

22            Further, I would say that there is an entire industry

23  of database providers, of service providers to law enforcement

24  agencies and debt collectors that specifically specialize in

25  scraping public databases, whether it be for library cards, for

1     voter records, or any other form of public data. So that has

2     never been anything that has been held in contention. All that

3     Ms. Navarro would have to do is consult the Michigan statute or

4     consult statutes in other states to see that that is, in fact,

5     the case.

6           Now, as to law enforcement, I address that point by

7     pointing to the specific example in Michigan where the voter

8     records were pulled, and, clearly, that is something that could

9     happen more broadly should law enforcement decide they want to

10    do it.

11          But the most important thing to understand is that

12    those records will be scraped by database providers, and so if

13    your latest address was not in one of those databases, and you

14    register to vote, it will be at some point.

15          And as to the difference between voting by mail versus

16    voting in person, if you were to vote in person, many folks

17    that are in at-risk situations -- whether they have debt,

18    whether they have criminal warrants that are not felony

19    warrants and they're able to vote -- they will use oftentimes,

20    we learned, less specific addresses. Perhaps they'll use their

21    apartment building and not the unit number when they fill out

22    to register to vote. And, of course, there's no problem with

23    this because if you vote in person, you vote in person, but if

24    you're voting by mail, you have to use your specific address

25    right down to the unit number, otherwise you won't receive your

1 | ballot in the mail, and you won't vote.

2 | So that addresses that point. Again, credit card

3 | collectors use every piece of data at their disposal, including

4 | data scraped from voter records.

5 | And then as to the last point, the CDC, what I would

6 | say is that there are now dozens of hours of congressional

7 | testimony by public health officials at the federal level, at

8 | the statehouse level before state legislatures, talking about

9 | what they feel is the importance of mandatory vaccines,

10 | particularly for COVID-19 as they become available, in order to

11 | beat back the pandemic.

12 | Mandatory vaccines were cited by Ms. Navarro as

13´ | something that is, for whatever reason she believes, especially

14 | unpopular in the black community, but our research indicates

15 | that mandatory vaccines are not just unpopular in the black

16 | community, they're unpopular across all different kinds of

17 | communities, all different races, all different religions,

18 | creeds, colors, nationalities. The anti-vaccine movement is a

19 | diverse movement, and, clearly, this call was not targeted to

20 | black individuals -- there's no way to do that, to my

21 | knowledge -- it is a call that is a public service

22 | announcement, and every claim made in the call is dispositively

23 | true.

24 | THE COURT: All right. Thank you.

25 | Mr. Burkman, anything else you may wish to add to what

1   Mr. Wohl just said?

2          MR. BURKMAN:  I would just add, your Honor, I have

3   been in Washington a long time, and I would say that entities

4   like FBI, and DOJ, and DHS, they all have an enormous

5   history -- and not just these entities, but the contractor

6   community by which they're supported -- the Lockheeds, the

7   General Dynamics, and Northrup, and all of that -- they all

8   have an enormous history of gathering data from anything they

9   possibly can, not just voting data, but immigration data, you

10  name it.  And in terms of I believe that message said the CDC

11  is pushing for certain kinds of data -- I don't have it in

12  front of me -- the CDC is always pushing for any kind of data

13  it can get its hands on.  So I've seen all of that for decades.

14          THE COURT:  All right.  Thank you.

15          Ms. Navarro, let me turn back to you.  Do you have

16  anything to add by way of reply?

17          MS. NAVARRO:  Yes, your Honor.  Thank you.

18          First, I'd like to take on Mr. Burkman's and

19  Mr. Wohl's last, if you can call them, statements regarding the

20  veracity of the robocall, and then my colleague, Mr. Libby,

21  will address First Amendment concerns.

22          Your Honor, I started this conversation by talking

23  about why the robocalls were so effective.  What's shocking to

24  me is defendants are now using this legal proceeding, this

25  phone call, to continue to perpetrate hateful lies.  Your

SOUTHERN DISTRICT REPORTERS, P.C.

1   Honor, let's be clear.  The robocalls were directed at mail-in
2   voting.  Mail-in voting is part of voter registration.  That
3   information, the information of your name and your address,
4   that exists in the voter registry database.  It doesn't exist
5   also as part of mail-in voting.  The information already
6   exists.

7           So the distinction that defendants are trying to draw
8   between a voter registration and information that's part of
9   your mail-in ballot is completely disingenuous and, again, is
10  intended to play on the fears that exist in a time when this
11  country is dealing with the worst pandemic it has dealt with in
12  a hundred years.  This behavior is unacceptable, and I find it
13  unacceptable that defendants are using your Honor's courtroom
14  to continue to perpetrate these lies.

15          Second, there is a difference between whether
16  information is publicly available and how it will be used.  All
17  I heard defendants say was that information regarding voter
18  registration is publicly available.  That has nothing to do
19  with how it will be used by the CDC, by law enforcement, by
20  credit card companies.  There is zero evidence to support that.
21  And let's be clear, let's go back to what the robocall said.
22  This is an effort by defendants to discourage mail-in voting,
23  and thereby discourage voting.  The robocall says, stay home,
24  stay safe, and beware of vote by mail.  Stay home, they want
25  you to stay home.  This is an all-out assault on voting.

1        I'll now give the floor to my colleague, Mr. Libby.

2        MR. LIBBY:  Yes.  Good morning, your Honor.  John

3    Libby.

4        With regard so defendants' statements concerning the

5    First Amendment and the scope of the TRO that we're seeking,

6    this is actually a very narrowly tailored proposed TRO that

7    we're asking the Court to enter.

8        The first paragraph simply admonishes the defendants

9    not to violate the law.  Criminal speech is not protected by

10   the First Amendment.

11       The second paragraph is a very narrowly tailored time,

12   place, and manner restriction, which, by the way, they've

13   already admitted that they're not going to do, they've said

14   that they're not going to engage in robocalls between now and

15   the election.  But we're asking the Court to enter the order

16   that we're seeking ordering the defendants not to make any

17   robocalls between now and Election Day or to cause others to

18   make robocalls between now and Election Day.  And we're eight

19   days away, very limited time, place, and manner restrictions

20   protecting the integrity of the election, and such a

21   restriction and such an order, which they've admitted they

22   would abide by anyway, does not run afoul of the First

23   Amendment.

24       The other point I'd make, your Honor, is with regard

25   to Mr. Burkman's statement regarding the KKK Act.  The KKK Act

1   has been used repeatedly in voter intimidation cases — and we

2   cited the cases in our briefs — to prevent conspiracies

3   designed to intimidate voters, again to protect the integrity

4   of the vote and the integrity of the election. So it's not

5   simply an old 150-year-old law, it's active, it's used

6   repeatedly in cases of this type, and it's certainly

7   appropriate to be used here.

8           I'll submit, your Honor.

9           THE COURT: All right. Thank you.

10          Let me ask a follow-up question to that, Mr. Libby.

11          By plaintiffs' estimate, the robocall message was sent

12  to 85,000 or more voters. The plaintiffs, the individual

13  plaintiffs in this litigation, presumably, are a very small

14  fraction of the people who received the call. Is that correct?

15          MR. LIBBY: That's correct, your Honor. That's our

16  current information.

17          THE COURT: So, out of the 85,000, is it conceivable

18  that a substantial number of those still may have been

19  influenced or might be influenced by the robocall into not

20  voting or not voting by mail?

21          MR. LIBBY: Well, your Honor, that would be

22  speculation on my part, but we certainly have what we believe

23  is a representative set of plaintiffs who have clearly

24  indicated in their declarations that they felt intimidated by

25  this call. As Ms. Navarro indicated in her opening remarks, at

1    least two of those plaintiffs have had their voting plans

2    changed, and they're going to take their health and their lives

3    into risk, and they're going to go vote in person because of

4    this hateful robocall by these defendants.

5         THE COURT:  So, again, at least in theory, a fair

6    number of people who received this call, absent any other

7    contrary message, could be influenced into not voting or not

8    voting by mail, again in theory?

9         MR. LIBBY:  I think that would be a reasonable

10   inference, your Honor.  But we don't have any concrete

11   information at this point absent further discovery in this case

12   or in the Michigan case.

13        THE COURT:  All right.  I thank you.

14        If there is nothing else, I'm going to close the

15   hearing and --

16        MR. WOHL:  Just one last thing, your Honor.  Mr. Wohl

17   here, just for the record, if you would allow?

18        THE COURT:  Yes.

19        MR. WOHL:  Just a quick note:  I would be remiss not

20   to point out that when Ms. Navarro last spoke, she said the

21   call said to stay home.  She is mistaken.  The call did not say

22   the words "stay home" in it; it did not say "stay home" in any

23   way, shape, or form.  So I just wanted to get that on the

24   record.

25        THE COURT:  Well, isn't that a matter that could be

SOUTHERN DISTRICT REPORTERS, P.C.

1    factually verified?  Is there a --

2           MR. WOHL:  There's a transcript of the call, your

3    Honor.  There is a tape, and the tape -- and nobody has ever

4    alleged the tape says stay home.  That's not in the transcript

5    published by anyone.  I think it's probably an innocent

6    mistake, but I wanted to get that on the record.

7           THE COURT:  All right.

8           MR. WOHL:  It does say "stay safe"; it does not say

9    stay home.

10           THE COURT:  Let's come back to Ms. Navarro.

11           Where did the plaintiffs' version of the call come

12    from?  And does it contain the language that you indicate that

13    says stay home?

14           MS. NAVARRO:  Your Honor, the transcript of the call,

15    we have laid it out for your Honor on page 2 of the memorandum

16    of law, there's a transcript there, and it's also page 29 of

17    the complaint.  And the very last line is:  "Don't be finessed

18    into giving your private information to the man.  Stay home,

19    safe, and beware of vote by mail."

20           THE COURT:  All right.  Thank you.

21           Again, this is a question of fact dispute that should

22    be easily verifiable by looking into the transcript.

23           Coming back, I'm going to close the hearing at this

24    point.  Mr. Burkman and Mr. Wohl, I will give you, through

25    Mr. Schwartz, an opportunity to supplement what you've said,

1    present any other legal defense.  I will ask that Mr. Schwartz

2    submit a notice of appearance today, and that he have until

3    tomorrow, not later than 3:00 p.m., to submit any further

4    material that he may wish to submit on your behalf.

5                MR. WOHL:  Thank you, your Honor.

6                THE COURT:  All right.  Thank you very much.  Have a

7    good day.

8                MR. BURKMAN:  Thank you, your Honor.

9                MS. NAVARRO:  Thank you, your Honor.

10                                  * * *

11

12

13

14         I hereby certify that the foregoing is a true and

15    accurate transcript, to the best of my skill and ability, from

16    my stenographic notes.

17

18

19

20    _____

21              Official Court Reporter
                U.S. District Court

22

23

24

25